Nos. 23-1400
23-1464

UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

ADRIANNA WADSWORTH,
*Plaintiff- Appellee / Cross-Appellant,*

*v.*

CHUCK NGUYEN.,
*Defendant-Appellant / Cross-Appellee,*

MSAD 40/RSU 40; Andrew Cavanaugh
*Defendants / Cross-Appellees,*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MAINE
Case No. 2:19-cv-00577-JAW

**BRIEF OF PLAINTIFF-APPELEE/CROSS-APPELLANT
ADRIANNA WADSWORTH**

Eric R. LeBlanc (1st Cir. Bar
#1145577)
Zachary H. Hammond (1st Cir. Bar
#1199716)
Bennett & Belfort, P.C.
24 Thorndike Street, Suite 300
Cambridge, MA 02141
T: (617) 577-8800 x211
F: (617) 577-8811
E: eleblanc@bennettandbelfort.com
    zhammond@bennettandbelfort.com

Rachel D. Okun (1st Cir. Bar
#1207948)
Okun Law PLLC
251 US-1, Suite W18
Falmouth, ME 04105
T: (207) 204-8042
E: rachel@oknlawoffice.com

## FED. R. CIV. P. 26.1 DISCLOSURE STATEMENT

Not applicable, as Plaintiff/Cross-Appellant Adrianna Wadsworth is an individual person.

# TABLE OF CONTENTS

Table of Contents……………………………………………………..…iv

Table of Authorities…………………………………………………..…vi

Statement in Support of Oral Argument…………………………..…xii

Jurisdictional Statement…………………………………………....1

Statement of Issues Presented……………………………………..…2

Statement of the Case………………………………………………3

Facts Relevant to this Appeal………………………………………………3

Relevant Procedural History…………………………………………27

Summary of the Argument……………………………………………29

Argument………………………………………………………..…32

    A.    Standard of Review……………………………………………32

    B.    Ms. Wadsworth's Amended Complaint Sufficiently Alleges Liability Against Mr. Nguyen for Principal Cavanaugh's Actions…………..32

    C.    Genuine Issues of Material Fact Preclude Summary Judgment on Ms. Wadsworth's Title IX Claim………………………………….......38

        1.    Mr. Nguyen Is an Appropriate Person………………...……..39

        2.    Asst. Principal's Philbrook and Pease as well as Mr. Nguyen Had Actual Notice of Principal Cavanaugh's Harassment of Ms. Wadsworth………………………………………...………44

    D.    There Are Genuine Issues of Material Fact on Ms. Wadsworth's 42 U.S.C. § 1983 Claims…………………………………….....51

1.      MSAD 40 Violated Ms. Wadsworth's Right to Equal
        Protection……………………………………..……....52

        a.      Ambiguity in MSAD 40's Sexual Harassment Policy
                Caused this Constitutional Violation……………..……..52

        b.      MSAD 40's Failure to Provide Training on Sexual
                Harassment Reporting Also Caused the Violation of Ms.
                Wadsworth's Rights………………………………..…..54

2.      Principal Cavanaugh Violated Ms. Wadsworth's Rights Under
        the Fourteenth Amendment…………………………..…..56

        a.      Reasonable Jury Can Conclude that Principal
                Cavanaugh's Conduct Shocks the Conscience………...56

        b.      Qualified Immunity…………………………………63

                i.      State Created Danger…………………………64

                ii.     Equal Protection………………………………...66

3.      Disputed Material Facts About Mr. Nguyen's Knowledge
        Makes Summary Judgment on 42 U.S.C. § 1983 Claim
        Inappropriate………………………………………..…66

        a.      Qualified Immunity…………………………………67

E.      The District Court Correctly Determined that Genuine Issues of
        Material Fact Preclude Summary Judgment on Mr. Nguyen's MTCA
        Notice Affirmative Defense…………………………….…...67

F.      Mr. Nguyen Has Failed to Establish His Entitlement to Discretionary
        Function Immunity…………………………………………..…74

Conclusion/Statement of Relief Sought…………………….…….…81

Certificate of Compliance with Typeface and Length Limitations…………..…83

Certificate of Service……………………………………..……....….…83

**TABLE OF AUTHORITIES**

**Cases**

*Abeyta By & Through Martinez v. Chama Valley Indep. Sch. Dist. No. 19*,
    77 F.3d 1253 (10th Cir. 1996)……...............................................61, 65

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)..................................................33

*Amsden v. Moran*, 904 F.2d 748 (1st Cir. 1990)…………………………………… 59

*B.W. v. Career Tech. Ctr. of Lackawanna Cnty.*,
    422 F. Supp. 3d 858 (M.D. Pa. 2019)…………………………………………...40

*Ballou v. McElvain*, 29 F.4th 413 (9th Cir. 2022)………………………………… 37

*Bordanaro v. McLeod*, 871 F.2d 1151 (1st Cir. 1989)…………………………… 52

*Bostic v. Smyrna Sch. Dist.*, 418 F.3d 355 (3d Cir. 2005)………………………... 39

*Bridges v. Scranton Sch. Dist.*, 655 Fed. App'x 172 (3d Cir. 2015)……………... 62

*Brodeur v. Claremont Sch. Dist.*, 526 F. Supp. 2d 195 (D.N.H. 2009)…………... 47

*Brown v. Arizona*, 82 F.4th 863 (9th Cir. 2023)…………………………………...45

*Brown v. Hot, Sexy, & Safer Prods. Inc.*, 68 F.3d 525 (1st Cir. 1995)………....59, 61

*C.B. v. Me. Sch. Admin. Dist. No. 40*,
    Civil No. 08-57-P-H, 2008 U.S. Dist. LEXIS 68236 (D. Me. Jul. 29, 2008)
    …………………………………………………………………………………...75

*C.S. v. Madison Metro. Sch. Dist.*, 34 F.4th 536 (7th Cir. 2022)…………….....46, 51

*Camilo-Robles v. Hoyos*, 151 F.3d 1 (1st Cir.1998)………………………33, 34, 40

*City of Canton v. Harris*, 489 U.S. 378 (1989)………………………………..53, 54

*Connick v. Thompson*, 563 U.S. 51 (2011)…………………………………52, 55

vi

*Coyne v. Cronin*, 386 F.3d 280 (1st Cir. 2004)…………………………………….58

*Cruz-Arce v. Mgmt. Admin. Servs. Corp.*, 19 F.4th 538 (1st Cir. 2021)…………..51

*Cruz-Erazo v. Rivera-Montanez*, 212 F.3d, 617 (1st Cir. 2000)…………………..60

*Danvers v. Loudon Cnty. Sch. Bd.*,
    Civil Action No. 1:21-cv-1028 (RDA/JFA), 2022 U.S. Dist. LEXIS 178213
    (E.D. Va. Sept. 29, 2022)…………………………………………………...43

*Darling v. Augusta Mental Health Inst.*, 535 A. 2d 421 (Me. 1987)……...68, 74, 79

*Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629 (1999)………………………..44

*Deschenes v. City of Sanford*, 137 A.3d 198 (Me. 2016)………………………….73

*Doe v. Bradshaw*, 203 F. Supp. 3d 168 (D. Mass. 2016)………………………….46

*Doe v. D'Agostino*, 367 F. Supp. 2d 157 (D. Mass. 2005)……………………..57, 65

*Doe v. Fairfax Cnty. Sch. Bd.*, 1 F.4th 257 (4th Cir. 2021)……………………44, 45

*Doe v. Fournier*, 851 F. Supp. 2d 207 (D. Mass. 2012)………………………..56, 65

*Doe v. Georgetown Cnty. Sch. Dist.*,
    No. 2:14-cv-01873-DCN, 2015 U.S. Dist. LEXIS 137934
    (D.S.C. Oct. 9, 2015)……………………………………………………………62

*Doe v. Loyalsock Twp. Sch. Dist.*,
    No. 4:21-CV-01343, 2022 U.S. Dist. LEXIS 68665 (M.D. Pa. Apr. 13, 2022)
    …………………………………………………………………………...40

*Doe v. Pawtucket Sch. Dep't*, 969 F.3d 1 (1st Cir. 2020)………………………….38

*Doe v. Rockingham Cnty. Sch. Bd.*,
    Case No. 5:21-cv-00051, 2022 U.S. Dist. LEXIS 11386
    (W.D. Va. Jan. 21, 2022)…………………………………………………...40

*Doe v. Sch. Bd. of Broward Cnty.*, 604 F.3d 1248 (11th Cir. 2010) .......................47

*Doe v. Taylor Indep. Sch. Dist.*, 975 F.2d 137(5th Cir. 1992) ................................66

*Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443 (5th Cir. 1994) ............................57,61

*Doucette v. City of Lewiston*, 697 A.2d 1292 (Me. 1997) ......................................78

*Douglas v. Hirshon*, 63 F.4th 49 (1st Cir. 2023) ......................................................32

*E.N. v. Susquehanna Twp. Sch. Dist.*,
    Civil Action No. 1:09-CV-1727, 2010 U.S. Dist. LEXIS 124193
    (M.D. Pa. Nov. 23, 2010) ........................................................................39-40

*Faucher v. City of Auburn*, 465 A. 2d 1120 (Me. 1983) ...................................67, 73

*Feminist Majority Found. v. Hurley*, 911 F.3d 674, 703 (4th Cir. 2018) ...............38

*Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246 (2009) ...................................39

*Forth v. Laramie Cnty. Sch. Dist. No. 1*,
    85 F.4th 1044, 2023 U.S. App. LEXIS 29609 (10th Cir. 2023) ..45,46, 49, 51

*Foss v. Marvic Inc.*, 994 F.3d 57 (1st Cir. 2021) ....................................................32

*Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274 (1998) ...................38-39, 44

*Grace v. Bd. of Trs.*, 85 F.4th 1 (1st Cir. 2023) ......................................................46

*Gutierrez-Rodriguez v. Cartagena*, 882 F.2d 553 (1st Cir. 1989) ..........................51

*Harrington v. Almy*, 977 F.2d 37 (1st Cir. 1992) ....................................................62

*Hildebrand v. Washington Cnty. Comm'rs*, 33 A.3d 425 (Me. 2011) ..............75, 79

*Ira Green, Inc., v. Mil. Sales & Serv. Co.*, 775 F.3d 12 (1st Cir. 2014) .................49

*Irish v. Fowler*, 436 F. Supp. 3d 362 (D. Me. 2020) ..............................................60

*Irish v. Fowler*, 979 F.3d 65 (1st Cir. 2020) ....................................................*passim*

*Irish v. Maine*, 849 F.3d 521 (1st Cir. 2017) .........................................................58

*J.K.J. v. Polk Cnty.*, 960 F.3d 367 (7th Cir. 2020) ..................................................56

*J.R. v. Gloria*, 593 F.3d 73 (1st Cir. 2010) ...............................................................63

*J.S. v. Houston Cnty. Bd. of Educ.*, 877 F.3d 979 (11th Cir. 2017) ........................40

*Jones v. City of Boston*, 752 F.3d 38 (1st Cir. 2014) ..............................................54

*Kakitis v. Perry*, 659 A.2d 852 (Me. 1995) ..............................................................69

*Learnard v. Inhabitants of Van Buren*, 164 F. Supp. 2d 35 (D. Me. 2001) ............72

*Lipsett v. Univ. of Puerto Rico*, 864 F.2d 881 (1st Cir. 1988) ................................51

*López-Santos v. Metro. Sec. Servs.*, 967 F.3d 7 (1st Cir. 2020) .............................32

*Mary M. v. N. Lawrence Cmty. Sch. Corp.*, 131 F.3d 1220 (7th Cir. 1997) ...........45

*McCarthy v. Inhabitants of the Town of Kennebunkport*,
    366 F. Supp. 2d 165 (D. Me. 2005) ...........................................................73

*Melo v. City of Somerville*, 953 F.3d 165 (1st Cir. 2020) .......................................39

*Morgan v. Kooistra*, 941 A.2d 447 (Me. 2008) .......................................................79

*Norton v. Hall*, 834 A.2d 928 (Me. 2003) ...............................................................78

*Ocasio-Hernandez v. Fortuño-Burset*, 640 F.3d 1 (1st Cir. 2011) ........................35

*Palm v. Sisters of Charity Health Sys.*, 537 F. Supp. 2d 228 (D. Me. 2008) ..........73

*Parker v. Dall-Leighton*,
    Dkt. No. 2:17-CV-216-GZS, 2018 U.S. Dist. LEXIS 108867
    (D. Me. Jun. 29, 2018) ................................................................................70

*Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986) ..............................................52

*Penate v. Sullivan*, 73 F.4th 10 (1st Cir. 2023) ..................................................63, 64

*Pepperman v. Barrett*, 661 A.2d 1124 (Me. 1995) .................................................67

*Perry v. Dean*,
  Dkt. Nos. BCD-CV-13-48 & BCD-CV-14-14,
  2015 Me. Bus. & Consumer LEXIS 52 (Me. Super. Dec. 3, 2015) .............71

*Peters v. City of Westbrook*, 787 A.2d 141 (Me. 2001) ..........................68

*Pittsley v. Warish*, 927 F.2d 3 (1st Cir. 1991) ...................................59, 61

*Plamp v. Mitchell Sch. Dist. 17-2*, 565 F.3d 450 (8th Cir. 2001) ..........................41

*Quintal v. City of Hallowell*, 956 A.2d 88 (Me. 2008) .............................74

*Robinson v. City of Pittsburgh*, 120 F.3d 1286 (3d Cir. 1997) ..............................36

*Rodriguez v. Town of Moose River*, 922 A.2d 484 (Me. 2007) .............................79

*Saldivar v. Racine*, 818 F.3d 14 (1st Cir. 2016) ......................................51

*Santiago v. Puerto Rico*, 655 F.3d 61 (1st Cir. 2011) ......................................40, 41

*Selby v. Cumberland County*, 796 A.2d 678 (Me. 2002) .......................................78

*Shevrin v. Partners Healthcare Sys.*, 804 F.3d 23 (1st Cir. 2015) .........................49

*Souza v. Pina*, 53 F.3d 423 (1st Cir. 1995) ......................................59, 61

*Suboh v. Dist. Att'y Off.*, 298 F.3d 81 (1st Cir. 2002) .............................64

*Tesoriero v. Syosset Cent. Sch. Dist.*, 382 F. Supp. 2d 387 (E.D. N.Y. 2005) ........ 48

*Warren v. Reading Sch. Dist.*, 278 F.3d 163 (3d Cir. 2002) ...................................41

*Welch v. Ciampa*, 542 F.3d 927 (1st Cir. 2008) ......................................51

*Young v. City of Providence*, 404 F.3d 4 (1st Cir. 2005) .........................................56

**Federal Statutes**

20 U.S.C. § 1681.................................................................38

42 U.S.C. § 1983.............................................................*passim*

**State Statutes**

14 M.R.S.A. § 8107.......................................................67, 68

22 M.R.S.A § 4000 et. seq.......................................................76

**Other Authorities**

Fed. R. App. P. 30, Adv. Comm. Notes to subdivision (a) (1967) .........................12

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Plaintiff/Cross-Appellant Adrianna Wadsworth ("Ms. Wadsworth" or the "Plaintiff") respectfully requests oral argument on this appeal. Resolution of the claims and defenses in this matter, including those on appeal, involves a close review of a factually dense record. The District Court held oral argument, and Ms. Wadsworth believes that oral argument would aid in clarifying the record for the Court.

# JURISDICTIONAL STATEMENT

Ms. Wadsworth commenced this action in the United States District Court for the District of Maine (the "District Court") on December 27, 2019. Appendix at 21 ("App., __") In her operative pleading, the Amended Complaint, Ms. Wadsworth asserts both federal law and Maine state law claims against Defendants-Appellees MSAD 40/RSU 40 ("MSAD 40"), Andrew Cavanaugh ("Principal Cavanaugh"), and Defendant-Appellant/Cross-Appellee Chuck Nguyen ("Mr. Nguyen") (collectively, the "Defendants"). App. at 58-64. The District Court exercised subject matter jurisdiction over the federal class due to the existence of a federal question under 28 U.S.C. § 1331 and supplemental jurisdiction over the Maine state law claims as per 28 U.S.C. § 1367(a).

On October 2, 2020, the District Court granted in part and denied in part Mr. Nguyen's motion to dismiss. Addendum at A050 ("Add. at A__"). Following discovery, Defendants moved for summary judgment. The District Court ruled on these motions on March 20, 2023. It granted MSAD 40's motion for summary judgment as to Ms. Wadsworth's claims under Title IX and 42 U.S.C. §1983 Amended Complaint. A051. It granted summary judgment to Principal Cavanaugh and Mr. Nguyen on her § 1983 claims against them but denied summary judgment as to her state tort claims. A139, A230. To seek further review of the adverse rulings, Ms. Wadsworth moved for entry of partial final judgment on April 20,

2023, which the District Court granted on May 16, 2023 and entered judgment in Defendants' favor the federal claims on May 17, 2023. A320-321, A328-329. Ms. Wadsworth filed her notice of appeal on May 23, 2023. App., 70-72. For these reasons, this Court has jurisdiction over Ms. Wadsworth's appeal.

## STATEMENT OF ISSUES PRESENTED

1.	Should the Court reverse the District Court's dismissal of Ms. Wadsworth's 42 U.S.C. § 1983 claim against Mr. Nguyen based on a violation of her right to equal protection under the Fourteenth Amendment?

2.	Should the Court determine that Mr. Nguyen was an appropriate person under Title IX?

3.	Should the Court reverse the District Court's determination in its grant of summary judgment to MSAD 40 that no appropriate person had actual notice of Principal Cavanaugh's conduct as required under Title IX?

4.	Should the Court reverse the District Court's grant of summary judgment to MSAD 40 on Ms. Wadsworth's claim under 42 U.S.C. § 1983?

5.	Should the Court reverse the District Court's grant of summary judgment to Principal Cavanaugh on Ms. Wadsworth's 42 U.S.C. § 1983 claim?

6.	Should the Court affirm the District Court's denial of summary judgment on Mr. Nguyen's Maine Tort Claims Act Notice affirmative defense.

7.     Should the Court affirm the District Court's denial of summary judgment on Mr. Nguyen's claim for discretionary immunity.

## STATEMENT OF THE CASE

## I.     FACTS RELEVANT TO THIS APPEAL

Over the course of two school years, Principal Cavanaugh subjected Ms. Wadsworth, a minor at the time, to a blatant and repeated pattern of sexual harassment and grooming. This harassment included gender-based pet names used on a near daily basis while on school property, requests for nude pictures, requests to move into his home, demands that Ms. Wadsworth get birth control against her parents' wishes, pulling Ms. Wadsworth from her classes despite teacher complaints, and thousands of text messages, many of a sexual and inappropriate nature. School officials, including the school social worker, school resource officer, and assistant principals knew about many of these abuses, and turned a blind eye. In fact, Mr. Nguyen actively aided and abetted, normalized, and justified Principal Cavanaugh's continued grooming of Ms. Wadsworth. Such injustice cannot stand.

Ms. Wadsworth attended Medomak Valley High School ("MVHS"), which is a school located within MSAD 40, between 2014 and 2018. App., 231 at ¶¶1-2, 890 at 11:23-12:3.

Mr. Nguyen and Ms. Wadsworth first met in 2016 during Principal Cavanaugh's tenure. App., 285 at ¶¶4-5. Principal Cavanaugh referred her to Mr.

Nguyen, because she risked leaving home due to ongoing family stress and had no place to go. *Id.*, at ¶6. Principal Cavanaugh had no supervisory or disciplinary authority over Mr. Nguyen, who reported to the special education student service coordinator and to the assistant IEP coordinator. *Id.*, 44 at ¶14; 826 at 21:19-22:9.

Principal Cavanaugh began paying special attention to Ms. Wadsworth when she was just sixteen years old. App., 45 at ¶23. From 2016 through 2017, Principal Cavanaugh told Ms. Wadsworth she was pretty, looked nice, and made comments about she was wearing nearly every day while Ms. Wadsworth was in school. App., 45 at ¶¶23-24; 330 at ¶28; 461 at 219:5-8.  Principal Cavanaugh repeatedly referred to Ms. Wadsworth with pet names, both in person and via text message, such as "cupcake", "princess", and "ladytime." *Id.* 338 at ¶¶29-30. On a nearly daily basis, Principal Cavanaugh exchanged text messages with Ms. Wadsworth, including many highly inappropriate ones.  App., 46 at ¶34; 139 at ¶90. In the text messages from the limited time period of April 20, 2017 through November 3, 2017, Principal Cavanaugh called Ms. Wadsworth "cupcake" at least 60 times, "ladytime" at least 28 times, and "princess" at least 18 times. App., 133 at ¶42. In other text messages, Principal Cavanaugh asked her to send him pictures of her in her swim suit, asked her about her sexual activity, and whether or not she was having orgasms. App., 139 at ¶90. The sexual harassment began when Ms. Wadsworth worked for Principal Cavanaugh in the summer of 2016 after her

sophomore year and only ending with his suspension in November 2017, during her senior year. App., 131-133 at ¶¶28-32 & 42, 189-192 at ¶¶20-25, 28-33, 586-587.

Prior to the school's investigation, Mr. Nguyen and Assistant Principal Tamra Philbrook were present when Principal Cavanaugh called Ms. Wadsworth "cupcake." App., 132 at ¶33-34. Additionally, in a meeting, Ms. Wadsworth informed both Mr. Nguyen and Assistant Principal Philbrook about her text messages with Principal Cavanaugh and his nicknames for her. App., 481, 76:11-22. In this meeting, Ms. Wadsworth reported that Principal Cavanaugh called her "cupcake" and other nick names in text messages, that the "cupcake" nickname embarrassed her because one of her friends had found out about it and made fun of her while others jokingly called her "cupcake." *Id.*

Assistant Principal Philbrook came in after the meeting had started, said nothing initially, then left saying "I'll just leave you guys to it," after Ms. Wadsworth described the "cupcake" part. App., 471 at 33:21-34:1 & 35:6-10, 481-482 at 76:5-77:3. In fact, Ms. Wadsworth and Mr. Nguyen discussed her text messages quite often. *Id.*, 471 at 34:8-36:1. Principal Cavanaugh never tried to hide his text messages with Ms. Wadsworth, and he admitted that he may have told Assistant Principal Philbrook, Mr. Nguyen, MVHS' athletic director, and others about his exchanges with Ms. Wadsworth. *Id.*, 1040 at 150:19-152:3.

At a school basketball game, Mr. Nguyen sat next to Principal Cavanaugh and witnessed him comment on Ms. Wadsworth's looks as she cheered in the middle of the gym in the presence of everyone attending the game. App., 45 at ¶ 24; 460-461 at 217:9-218:13. On more than one occasion, Mr. Nguyen was present and heard Principal Cavanaugh call Ms. Wadsworth "cupcake," and at least once, he was present and heard Principal Cavanaugh call Ms. Wadsworth "ladytime." *Id.*, 479 at 68:10-69:14.

In the spring of 2017, during her junior year at MVHS around the time of junior prom, Principal Cavanaugh handed Ms. Wadsworth an envelope of money and called her "cupcake" in the school's front office as Assistant Principal Philbrook stood beside them. App., 482 at 77:4-23. During that same time period, in a meeting in his office in Assistant Principal Philbrook's presence, on at least one occasion, Principal Cavanaugh asked Ms. Wadsworth who she intended to take to prom, who had asked her, what she planned to wear, called her "cupcake," and commented that she "could take several people to or anyone [she] wanted to prom." *Id.*, at 78:2-23. Assistant Principal Philbrook added that she already knew the people who had talked about taking Ms. Wadsworth to prom. *Id.*, at 78:18-20. Mr. Nguyen was also present in this meeting, and he agreed with Principal Cavanaugh's comment that she could take anyone she wanted to prom, that she "was a good looking girl," pretty, and smart. *Id.*, 47 at ¶41; 455 at 194:6-19,

195:18-196:14. At the end of this conversation in Mr. Nguyen's presence, Principal Cavanaugh gave Ms. Wadsworth $20, and told her to let him know if she needed money for a prom dress or to paint her nails. *Id.*, 454 at 193:10-19, 455 at 196:18-197:13.

On another occasion both Principal Cavanaugh and Assistant Principal Philbrook described Ms. Wadsworth as a "pretty girl," and "top shelf." App., 47 at ¶41; 455 at 195:7-17.

Principal Cavanaugh gave Ms. Wadsworth gifts including hygiene products such as tampons and pads, a Carhartt jacket, and money. App., 454 at 190:9-191:9. Principal Cavanaugh also purchased Ms. Wadsworth's school pictures and gave her money to buy a prom dress. App., 1030 at 109:5-8. Principal Cavanaugh gave the hygiene products to Ms. Wadsworth in the school gym with several other students and adults present. App., 454 at 192:2-16; 676. Principal Cavanaugh gave Ms. Wadsworth cash in front of Mr. Nguyen, Assistant Principal Philbrook, and the school attendance secretary. App. 454 at 193:10-19.

Embarrassed because of what others might think of Principal Cavanaugh giving her these gifts in the middle of school, Ms. Wadsworth told Mr. Nguyen about the hygiene products and box of gifts from her school principal. App., 45 at ¶¶25-26; 335 at ¶53; 458 at 209:21-210:3; 676-677. Mr. Nguyen assured her that Principal Cavanaugh was ensuring that she had everything that she needed. *Id.*, 45

at ¶ 27; 459 at 210:3-5. In fact, it seemed to Ms. Wadsworth that Mr. Nguyen already knew about these gifts and that they had talked, because before she even specified the contents of the gifts, Mr. Nguyen asked if hygiene products were something she needed. *Id.*, at 210:17-22 & 211:22-212:4. Ms. Wadsworth specifically mentioned that the gift of hygiene products included tampons or pads. *Id.*, at 212:19-213:5.

In Ms. Wadsworth's junior year, before cheerleading started in November, Principal Cavanaugh took her for a medical examination, so that she could participate. App., 456 at 198:4-17 & 199:8-23. Ms. Wadsworth initially declined his offer to take her to the appointment, advising him that Ms. Kenniston could bring her, but Principal Cavanaugh insisted on taking her. *Id.*, 672-673. Immediately prior to and during the appointment, Principal Cavanaugh suggested that she get on birth control. *Id*, 673. He also prepared a letter for the doctor and may have given it to the receptionist. *Id*, 673, 1028 at 104:15-16, 1067 at 257:23-258:6. This letter describes conflicts in Ms. Wadsworth's family, her mental health concerns and menstrual cycle, and requests that any medical records be kept from her parents. *Id.*, at 1327-1328. Ms. Wadsworth asked Mr. Nguyen if it was appropriate for Principal Cavanaugh to bring her to a doctor's appointment, to which Mr. Nguyen responded by assuring Ms. Wadsworth that Principal Cavanaugh was trying to be a father figure to her. App., 45 at ¶¶ 28-30; 675. After

the physical examination, Principal Cavanaugh continually suggested that Ms. Wadsworth obtain birth control. *Id.*, 333-334 at ¶46, 457 at 203:4-20. He ultimately scheduled a second appointment at which she received a birth control prescription. *Id.*, 699 at 38:11-39:6 & 40:14-16, 700 at 42:6-43:12, 701 at 46:3-6. Ms. Wadsworth felt unable to cancel the appointment. *Id.*, 700-701 at 44:20-45:6. He also continued urging that she use birth control long after the appointment, texting her on May 18, 2017, "Hey kid. Are you taking the bc [sic] pills?" *Id.*, 603.

Mr. Nguyen knew of the scheduled birth control appointment and advised Principal Cavanaugh that taking her would not be a good idea. App., 702 at 49:1-50:11, 1029 at 107:22-108:20. Darren Kenniston ultimately brought Ms. Wadsworth to the appointment. *Id.*, 1299. When Ms. Kenniston returned from work that day, she saw the appointment paperwork in the kitchen and asked Ms. Wadsworth about the appointment. *Id.* Ms. Wadsworth told her that Principal Cavanaugh had made the appointment and that he would take her, but that the school social worker stepped in and advised him not to. *Id.* Ms. Kenniston was so disturbed by Principal Cavanaugh's behavior that she called Mr. Nguyen to complain. *Id.*, 702 at 49:1-9, 1299. Mr. Nguyen asked her how she had become aware of the appointment and said that the issue had been addressed, but he took no other corrective action. *Id.*, 702 at 49:14-50:11, 1299. He did not inform

Superintendent Stephen Nolan ("Superintendent Nolan") or his supervisor of the call or begin an investigation. *Id.*, 924 at 145:15-146:1.

Instead, the following school day, Mr. Nguyen called Ms. Wadsworth into his office and asked if she knew that Ms. Kenniston had complained. App., 675-676. Mr. Nguyen asked if she was okay with Principal Cavanaugh suggesting birth control, to which she responded she didn't know and asked Mr. Nguyen if he thought it was weird or inappropriate. *Id.*, 458 at 208:17-24. Mr. Nguyen responded that he understood why Ms. Kenniston was concerned, but that Ms. Kenniston did not understand that Principal Cavanaugh was just trying to look out for her and be a father figure to her. *Id.*, 676, 208:21-209:11. Mr. Nguyen added that Principal Cavanaugh wanted to make sure she had everything she needed and thought of her as a daughter. *Id.*, 46 at ¶31.

Over the course of several months in Spring of 2017, Principal Cavanaugh incessantly asked Ms. Wadsworth to move into his home. On April 28, 2017, after repeatedly asking her to move in, he texted, "I don't like this at all. You need to come here tomorrow. I will get a room ready for you and you can rest and get better. We will take care of you. I think you are just too stressed." App., 592. The next day, he asked, "Do you think staying with me isnt [sic] a good idea?" and "How about if you stay with us a couple of nights per week?" *Id.*, 593. On May 10, 2017, Principal Cavanaugh messaged Ms. Wadsworth: "Would your parents

freak if you lived with me?" "What about staying here for a couple days just to try it? You might like it. At least no one would yell at you. What about staying here tomorrow night?" "If you decide you want to stay with me, just give a brutha a heads up," and "One of these days I will get you to live with me." *Id.*, 598.

Principal Cavanaugh persistently pressed Ms. Wadsworth on this topic, texting on May 18, 2017: "Move in here and we will teach you;" "You are up early! You should live here for your senior year. It would be a stable place and i dont [sic] care about child support;" "You could start today! You are all talk. Of course if you really wanted to be here for your senior year, that would be the best thing for you;" and "I know. I have always said you were a class act. I think if you talked with Debbie and i [sic] about it we could take care of a lot. I would write a letter to the superintendent and all that." App., 602-603. Principal Cavanaugh later wrote, "If the driving from Augusta is a problem I have told you to live with me, but you don't want to do that. So you tell me," on June 8, 2017, and "Ok, and i [sic] know I sound like a broken record but you can always stay with me, even for just a night, a weekend, a week, month, whatever," on June 9, 2017. *Id.*, 615. Though she had previously expressed reservations about moving in, Principal Cavanaugh continued until June 22, 2017, when he texted her, "I have a bit of bad news. I spoke with work about you staying with me and i cant [sic]. I feel terrible but thats [sic] what it is." *Id.*, 624.

Though Principal Cavanaugh did not specify with whom he spoke at work, he informed colleagues about his desire to live with Ms. Wadsworth. At some point in the Summer of 2017, he asked Mr. Nguyen for his "professional advice if she should move in with him and his wife." App., 837 at 67:20-68:23; Doc. 91-2 at 68.[1] Mr. Nguyen advised against it, opining "that doing so would not be a good idea." *Id.* Nonetheless it caused him to have concerns about the principal's relationship with Ms. Wadsworth. *Id.*, 837 at 67:20-68:23. Mr. Nguyen advised Principal Cavanaugh not to meet with Ms. Wadsworth alone. *Id.*, 924 at 147:22-148:9.

Not long after, on September 19, 2017, School Resource Officer Christopher Spear ("Officer Spear") stopped Ms. Wadsworth and discovered that she was driving a car registered to Principal Cavanaugh. App., 54 at ¶¶120-121; 1313. That same day, Officer Spear told Assistant Principal Philbrook about the stop and the car's registration, and she responded that it was not a secret, remarking "Chris, if you only knew the half the story…". App., 55 at ¶¶122-124; 758 at 34:18-35:18; 764 at 58:12-59:3; 766 at 67:3-68:17. Assistant Principal Philbrook told Officer Spear that Principal Cavanaugh had asked Ms. Wadsworth if she was interested in

[1] Defendant Chuong Nguyen's Responses to Plaintiff's First Set of Interrogatories, Document 91-2. This document is part of the summary judgment record, but it was inadvertently omitted from the Appendix. *See* Fed. R. App. P. 30, Adv. Comm. Notes to subdivision (a) (1967) (noting that "the record itself is always available to supply inadvertent omissions from the appendix.").

moving in with him. *Id.*, 758 at 33:20-35:18, 764 at 58:18-59:3. Assistant Principal Philbrook also said that when Principal Cavanaugh had asked his wife about Ms. Wadsworth moving in, she replied "if Adrianna moves in, let me go get a 21-year-old boy to help me out if Adrianna's going to be living in our house." *Id.*, 758 at 33:25-34:4.

Assistant Principal Philbrook also said that staff had complained to her and Assistant Principal Linda Pease about Principal Cavanaugh spending too much time with Ms. Wadsworth. App., 1313. Asst. Principal Philbrook said that she and Assistant Principal Pease had tried to have professional conversations with Principal Cavanaugh about his behavior, and asked Officer Spear to speak with him. *Id.*, 55 at ¶¶122-124; 758 at 34:5-35:4. Assistant Principal Philbrook also said that she thought Ms. Wadsworth's good looks had blinded Principal Cavanaugh, causing him to cross boundaries. *Id.*, 765 at 62:14-18.When Officer Spear spoke to Principal Cavanaugh on either September 19 or September 20, 2017, he admitted to buying the car for Ms. Wadsworth but that she could work it off by continuing to clean for him at his house. *Id.*, 766 at 67:3-20; 1313. After the traffic stop, Assistant Principal Philbrook never considered reporting what had happened to Superintendent Nolan. *Id.*, 766 at 68:11-25, 1233 at 46:14-16.

Officer Spear reported the situation to Chief Labombarde and followed up with an email on September 20, 2017 titled "Pervert Principal." App., ¶¶124-128;

1313; 768 at 74:13-15. Officer Spear later testified that what he learned on September 19, 2017 caused him to suspect that that Ms. Wadsworth and Principal Cavanaugh were having an inappropriate relationship. *Id.*, 758 at 35:18-24. Moreover, he arrived at this conclusion without even knowing that they exchanged text messages or their content. *Id.*, 782-783 at 132:16-133:2.

Principal Cavanaugh also regularly excused Ms. Wadsworth from her classes for meetings with him. App., 452-453 at 185:24-187:18, 1031 at 114:13-115:13. He also regularly excused her absences, even though he lacked the authority to do so. *Id.*, 913-914 at 103:2-105:11, 1315-1316. This prompted at least four teachers to complain and question Ms. Wadsworth about the situation, leading her to believe that they thought that her relationship with Principal Cavanaugh was inappropriate. *Id.*, 452-453 at 185:11-187:18, 1031 at 115:14-116:6.

On October 4, 2016, Ms. Wadsworth's English teacher emailed Principal Cavanaugh, Assistant Principal Pease, Assistant Principal Philbrook, and Mr. Nguyen, stating that she and another teacher "wanted to voice [their] concern about [Ms.] Wadsworth being pulled from [their classes] at the request of [Principal Cavanaugh's] office." App., 1319. Assistant Principal Philbrook and Assistant Principal Pease asked Principal Cavanaugh not to "haul [Ms. Wadsworth] out of a class or keep her from her class," and to respond to these complaints. *Id.*, 1254 at 130:20-131:6. Principal Cavanaugh responded that, "Anna has some issues outside

of class that we are working to resolve. I know she is extremely conscientious regarding her coursework and you are correct regarding her stress level. I apologize for her being removed during these important classes and I will make sure it does not happen again." *Id.*, 1319.

Principal Cavanaugh failed to follow through on this promise as he continued withdrawing Ms. Wadsworth from class to meet with him, texting her on May 31, 2017, "Any chance we could meet today? I want to catch up on what's going on, but I also want to talk about an important academic issue ... First period. At the start [of class]. I will call you down ... Penny will send you to me when you get here." App., 611. He also continued excusing her absences and he subsequently instructed the attendance secretary to stop recording them. *Id.*, 46 at ¶37; 611; 1315-1316.

On October 30, 2017, Ms. Wadsworth told Ms. Kenniston that Principal Cavanaugh had sent her a text message asking if she had ever sent nude photos. App., 1300. Ms. Wadsworth stated that Principal Cavanaugh had nude photos on his phone of female students from the neck down, and that he was trying to figure out the students' identity from the photos. *Id.* Ms. Kenniston tried calling the Superintendent's office twice to report what she learned, but when the Superintendent did not respond, she contacted the Department of Homeland

Security. *Id.* This led the local police department to investigate Principal Cavanaugh. *Id.*

Detective Don Murray of the Knox County Sheriff's Office met with Ms. Wadsworth on November 2, 2017, at which time he took her phone. App., 1301. During their interview, Ms. Wadsworth did not mention Mr. Nguyen or indicate that he had any knowledge of the events she recounted. App., 310 at ¶ 87, 1301. The presence of a police officer, who wanted to talk to her, inspect her phone, and ask her personal questions caught her off guard and upset her. *Id.*, 479 at 66:2-10. Once Superintendent Nolan became aware of Principal Cavanaugh's conduct, he suspended the principal, ending his sexual harassment of Ms. Wadsworth. *Id.*, 169-170 at ¶¶38-41.

After the discovery of the text messages and as MSAD 40's investigation proceeded, Chris MacLean, an attorney representing Principal Cavanaugh, approached Ms. Wadsworth in the school parking lot and asked to speak with her. App., 451 at 181:9-16. She got into his car, where he encouraged her to sign an affidavit supporting Principal Cavanaugh and repeatedly stated "Mr. Cavanaugh is a standup guy, wouldn't you agree." App., 451-452 at 181:17-182:3. Their conversation occurred after Superintendent Nolan instructed Principal Cavanaugh not to go onto school property. *Id.*, 935 at 191:6-23. This affidavit denied any inappropriate relationship between Ms. Wadsworth and Principal Cavanaugh and

described their communications as silly and playful bantering and claimed that his requests for scandalous photos were intended to ensure that she did not share nude photos of herself. *Id.*, 665-668, at ¶¶4-5 & 10-12. Ms. Wadsworth never signed the affidavit. *Id.*, 450 at 177:7-18, 452 at 182:3-15, 183:13-17, 184:16-22.

Mr. Nguyen spoke with Principal Cavanaugh a few times after the investigation began but before his resignation, to be supportive and friendly. App., 850 at 118:15-20, 1039 at 146:17-147:2. Principal Cavanaugh shared that he had been drinking excessively. *Id.*, 850 at 119:3-5. Mr. Nguyen told Principal Cavanaugh that it was "unfortunate [that] this is happening…," that he "shouldn't have texted this kid as much; but I know you, and ... you're a good guy ... things will work themselves out ...." *Id.*, 1039-1040 at 147:20-149:6.

After hearing that Mr. Nguyen was defending Principal Cavanaugh, Chief Labombarde met with him. App. at 979, 30:9-13, 31:1-6. In the meeting, Mr. Nguyen said that they needed to be more supportive of Principal Cavanaugh, argued that Principal Cavanaugh had merely acted as father figure, that his conduct was not "really inappropriate," that he had done nothing wrong, and that anyone who worked with kids could face similar accusations. App., 924 at 146:9-15, 979-980 at 31:11-32:15, 32:21-33:20. Mr. Nguyen also claimed that Ms. Wadsworth was "bringing it on herself," that he was "trying to get her to talk about it," and that he was talking to her about withdrawing from MVHS and enrolling elsewhere.

App., 146 at ¶136, 938 at 203:16-204:11; Doc. 91-5 at 12 & 48.[2] Chief

Labombarde had already reviewed the text messages, and he described their

content, "I said, Chuck ... I got nine kids, I would never have a conversation with

any one of them … about the things that were being ... asked in here ... there's no

way I would ask my daughter about her sex life, about ... all that stuff, you know,

and that not what fathers do ...." *Id.*, 979 at 32:4-20.

The meeting prompted Chief Labombarde to inform Superintendent Nolan

on November 17, 2017 about these comments. App., 924 at 146:9-14, 938 at

203:16-204:17; Doc. 91-5 at 48. Superintendent Nolan instructed Mr. Nguyen in

mid-November 2017 to stop any further contact with Ms. Wadsworth. *Id.*, 761 at

48:12-22, 774 at 98:15-25, 850-851 at 120:16-121:3, 123:11-124:6, 859-860 at

156:24-157:3, 924-925 at 146:21-147:3, 148:10-16, 149:6-15, 938-939 at 204:18-

207:22, 1294; Doc. 91-2 at 75; Doc. 91-5 at 11 & 48-49.

Mr. Nguyen disregarded these instructions and met with Ms. Wadsworth on

November 21 and on December 11, 2017, and on at least five more occasions.

App., 851 at 122:17-20, 123:11-124:1; 471 at 36:16-23; 860:157:4-11; 1294. In

one of the first meetings, Mr. Nguyen told Ms. Wadsworth that Principal

Cavanaugh had done nothing inappropriate. *Id.*, 472 at 37:13-15. When Ms.

Wadsworth expressed uncertainty about her relationship with Principal Cavanaugh,

---

[2] Exhibit 11 to the Deposition of Defendant MSAD 40, Document 91-5 at 48.

Mr. Nguyen described him as being "nothing but helpful to . . ." to her. *Id.*, 450 at 176:4-177:4. He asked if she knew that Principal Cavanaugh considered her a daughter. *Id.*, 450 at 177:5-14. He also said that Principal Cavanaugh was "a stand-up guy," that his behavior was "not what they're making it out to be," and that if she wanted to help, she should sign the affidavit and "tell the truth." *Id.*, 472 at 37:15-21.

During a subsequent meeting, Ms. Wadsworth described receiving such upsetting messages from Principal Cavanaugh's family that she wanted to withdraw from MVHS; Mr. Nguyen said that they had a reason to be angry and that she should apologize to Principal Cavanaugh's family. App., 472 at 37:22-38:17, 39:1-8. He also told her what to include in her apology. *Id.*, at 38:15-17. In a different meeting, after she expressed confusion and questioned herself and the nature of her relationship with Principal Cavanaugh, Mr. Nguyen stood up, closed his office door, and said that Principal Cavanaugh "was off-colored with" her, had lost sight of his boundaries, and had a drinking problem. *Id.*, 57 at ¶145; 39:19-40:3; Doc. 91-2 at 70. Mr. Nguyen encouraged her to imagine a day in the future, where would have coffee with Principal Cavanaugh, when "all of this would be gone and over with." *Id.*, 472-473 at 40:20-41:1. In another meeting, Mr. Nguyen tried to convince her to withdraw from MVHS and finish high school elsewhere. *Id.*, 774 at 99:1-14

In December 2017, Ms. Wadsworth received Facebook messages from Deborah Ecker McFarland, who was Principal Cavanaugh's domestic partner, telling her that unless she wrote to the school board to defend him, he would lose his job and the school would "say horrible things about him in the paper," that their son would read. App., 451 at 179:8-180:1-19; 657; 1021 at 74:2-7. Ms. McFarland accused her of coyly asking Principal Cavanaugh about sex and baiting and manipulating him. *Id.*, 659. In response, Ms. Wadsworth apologized. *Id.*, 660-661.

Mr. Nguyen also communicated with Ms. Wadsworth via Facebook messenger despite being directed not to. On January 12, 2018 after she had contacted him to describe Ms. McFarland's messages, Mr. Nguyen suggested that she "tell her truth to press," and offered to contact Principal Cavanaugh on her behalf. App., 152. Mr. Nguyen told Ms. Wadsworth that "Someday [she] should speak to Mr. [Cavanaugh]. Otherwise [it] looks like you turned on him," and reported that Ms. McFarland was angry because she had not signed the affidavit. *Id.*, 154-155. Mr. Nguyen said that Ms. McFarland had "a right to be mad," and that Principal Cavanaugh "should have fought it but his lawyer said his chance was slim without the affidavit." *Id.*, at 156. Mr. Nguyen asked if she wanted to "Move on or speak out," when things became stable. *Id.* Mr. Nguyen also contacted Ms. Wadsworth via Facebook messenger after she began college. *Id.*, 886.

After Officer Spear learned of the no-contact directive, he saw Ms. Wadsworth in school teary-eyed walking away from her friends as Mr. Nguyen chased after her. App., 761 at 48:12-22; 1294. Officer Spear was so disturbed by this behavior that he reported Mr. Nguyen to the Maine Board of Social Work Licensure on January 11, 2018 for unethical decision making and putting his loyalties to Principal Cavanaugh above protecting Ms. Wadsworth's well-being. App., 1294-1295. Had Superintendent Nolan known that Mr. Nguyen had acted contrary to his instruction, it would have prompted another investigation and possible discipline. App., 925 at 150:10-14.

Before the investigation, Ms. Wadsworth felt anxious and confused about her relationship with Principal Cavanaugh. App., 430 at 97:4-7. Rumors started by Principal Cavanaugh's niece, claiming that she only placed second in her class because she had had sex with the principal and did favors for him, also upset her. *Id.*, 436 at 120:17-122:1. Because of these rumors, she questioned herself, her judgment, and whether she could trust Principal Cavanaugh or whether she had let other people affect her. *Id.*, 438 at 126:8-19. She also felt guilty for questioning the relationship, because she believed that Mr. Nguyen, teachers, staff, and classmates knew about it and had no concerns. *Id.*, 444 at 152:1-22.

After the investigation began, Ms. Wadsworth cried frequently before school and on her way home. App., 468 at 21:2-9. She asked her father to excuse her from

school and told her mother that she did not want to attend school anymore. *Id.* Once, she had a panic attack while driving as a result of the investigation. *Id.*, 469 at 25:24-26:6.

At present, Ms. Wadsworth attends law school, but she continues to suffer from anxiety and has issues speaking with male professors. App., 465 at 12:2-3. Praise from one male professor while they were alone in a classroom made her feel uncomfortable. *Id.*, at 12:4-12. Continued depression and anxiety have left Ms. Wadsworth without a desire to complete school, attend class, or communicate with anyone. *Id.*, 468 at 23:13-24:5. Her law school grades have suffered due to her anxiety. *Id.*, 466 at 15:1-23. She tries to avoid social situations due to anxiety; once she fainted due to anxiety at a sorority event. *Id.*, 467 at 19:18-20:2. Compliments from male professors, seeing vehicles like the one driven by Principal Cavanaugh or phrases like the ones he used in his text messages will trigger traumatic flashbacks, rashes, and nausea. *Id.*, 475-476 at 51:5-53:13. These reactions occur as frequently as twice per month. *Id.*, at 52:16-25. With one exception, she has not dated since MVHS. *Id.*, 467 at 17:25-18:18.

The School District's sexual harassment policy defines sexual harassment as unwelcome sexual advances, requests for sexual favors, pressures to engage in sexual activity, gestures, comments, or other written, graphic, electronic or verbal conduct that is gender-based that interferes with a student's education. App., 1320

& 1323-1324. That policy is applicable to school employees in their conduct with students. *Id.* Sexual harassment of students by staff constitutes grounds for discipline, including termination. *Id.* The policy charges the Superintendent, his designee, or the Title IX Coordinator with investigating harassment complaints. *Id.* The policy defines a complaint to include alleging that a student is being harassed on the basis of their sex and harassment to include written, graphic, or electronic conduct relating to a person's membership in a protected class that is sufficiently severe, pervasive or persistent to interfere with the subject's ability to participate in school. *Id.*, 1322. It requires any person who believes that a student has been harassed to report their concern to the "building principal," and states that persons unsure if harassment has occurred to contact the superintendent or his designee. *Id.*, 1322-1323. It also requires staff to report any possible harassment of students to the building principal. *Id.*, 1323. Building principals are required to respect a complainant's confidentiality and promptly inform the superintendent on receipt of a complaint. *Id.* The superintendent or his designee is responsible for investigating complaints. *Id.* Complaints about supervisory staff shall be investigated by a person not subject to that supervisor's authority. *Id.*, 1323-1324.

MSAD 40 instructed the affirmative action coordinator to provide trainings to staff on its sexual harassment policies. App., 902 at 59:4-9. During the relevant period, Principal Cavanaugh was affirmative action coordinator for MVHS and for

the district. *Id.*, 902 at 59:4-9, 905 at 69:5-21. He never provided training to staff on sexual harassment or on sexual harassment reporting and said that he lacked the qualifications to provide such a training. *Id.*, 1046 at 173:3-22. He recalled that "I gave a presentation like during new teacher orientation ... I don't think that's a training. I mean, it was just a presentation," and that he gave it to new teachers, but not to anyone else. *Id.*, at 173:17-174:3. His affirmative action officer role was assigned to him and he never had to deal with it much. *Id.*, at 175:4-12. Principal Cavanaugh expressed criticism of MSAD 40 because he had given the presentation for a few years without any training at all. *Id.*, 1046 at 175:17-22. Principal Cavanaugh did not consider a daylong seminar he had attended to be training on how to train school staff on spotting and reporting sexual harassment. *Id.*, at 175:23-176:20.

Assistant Principal Philbrook, Assistant Principal Pease, and Mr. Nguyen all provided different answers as to who they should report sexual harassment to if the principal was the harasser. App., 828-829 at 32:3-33:12, 1184 at 86:2-18, 1262 at 161:15-24. Assistant Principal Pease reported that no one would have known how to report sexual harassment to the Superintendent. *Id.*, 1184 at 86:19-87:5.

Mr. Nguyen had some familiarity with MSAD 40's sexual harassment policy and believed that it required him to notify the affirmative action officer in the Superintendent's office about staff sexually harassing students. App., 828-829 at

31:2-32:20, 33:2-14, 34:16-35:9. Mr. Nguyen also knew of his mandatory reporter duties, received training on them as an MSAD 40 employee, and even reported to MVHS' athletic director, to Maine's Office of Child and Family Services ("OCFS"), and to the police that a volunteer tumbling coach had sexually assaulted Ms. Wadsworth. *Id.*, 827 at 26:3-21, 852 at 125:20-128:11, 853 at 131:14-132:3. Assistant Principal Philbrook believed that Principal Cavanaugh was the appropriate person to report harassment to. *Id.*, 1226 at 17:1-9.

MSAD 40 itself has no knowledge of whether Principal Cavanaugh had sufficient qualifications to train on sexual harassment reporting, but it did not believe that his presentations contained any training on reporting sexual harassment when the affirmative action officer is the harasser. App., 902 at 60:2-24, 906 at 75:14-19. MSAD 40 has no evidence of what this presentation contained as Principal Cavanaugh purportedly maintained it on his work computer and never provided the district with a copy. *Id.*, 903 at 62:4-11, 904 at 66:2-11. MSAD 40 also lacks staff acknowledgments of training attendance. *Id.*, 905 at 70:16-20. Following Principal Cavanaugh's departure, MSAD 40 began to provide sexual harassment training through an online platform and it assembled brochure for staff to describe the boundaries between appropriate and inappropriate interactions with students. *Id.*, 902 at 59:11-60:1.

Superintendent Nolan agreed that Principal Cavanaugh's behavior towards Ms. Wadsworth, including the car, the gifts, the money, and the birth control appointment raised concerns for him and were red flags. *Id.*, 912 at 97:13-21, 913 at 103:8-21, 915 at 111:8-23, 916-917 at 116:21-118:1, 929-930 at 167:13-169:1. Neither the Assistant Principals nor Mr. Nguyen reported Principal Cavanaugh's conduct to the Superintendent or his designee. App., 1184 at 86:19-87:5.

On June 18, 2018, Ms. Wadsworth sent notices of claim as per the Maine Tort Claims Act ("MTCA") to MSAD 40, MVHS, and Principal Cavanaugh. Doc. 92-1 at 2, 7 & 12.[3] Her notices state:

> From April 20, 2017 through November 3, 2017, [Principal] Cavanaugh ... pursued and engaged in an inappropriate relationship with [Ms. Wadsworth], a minor student. [He] sent thousands of text messages to [her], provided her gifts, and made sexually explicit and inappropriate remarks to her. As a result of the relationship, [she] suffered emotional damages and damage to her reputation.

*Id.*, at 14. The notice identifies Principal Cavanaugh as the involved municipal employee and states that she has undergone counseling. *Id.* At the time, she did not know the extent of Mr. Nguyen's involvement and therefore did not send him a notice. App., 319-321, ¶¶115-118. Her notice to MSAD 40, which employed Mr. Nguyen at the time, expressly referenced her emotional distress. *Id.*, 319-321, ¶¶115-118; 823 at 10:8-20; Doc. 92-1 at 14.

---

[3] MTCA Notice, Document 92-1.

## II.     RELEVANT PROCEDURAL HISTORY

Ms. Wadsworth filed a Complaint against MSAD 40, Mr. Nguyen, and Mr. Cavanaugh on December 27, 2019. App., 25-41. In the District Court's order on Mr. Nguyen's motion to dismiss granting and denying in part, it allowed Ms. Wadsworth to proceed on all Counts except for her equal protection claim under 42 U.S.C. § 1983. A050. The District Court found that Ms. Wadsworth's Amended Complaint did not allege that Mr. Nguyen treated her differently than other students and because she did not allege that Mr. Nguyen had control over Principal Cavanaugh. A040-041.

In denying MSAD 40's partial motion to dismiss, the District Court determined that Assistant Principals Pease and Philbrook were "appropriate persons" with the authority to institute corrective measures under Title IX but that Mr. Nguyen was not. Document 39, at 26 & 36-37.

All Defendants moved for summary judgment on July 27, 2022. A054. In her opposition, Ms. Wadsworth agreed to dismiss her tort claims against MSAD 40. A137-138. The District Court granted MSAD 40's Motion for Summary Judgment. A138. The District Court held that an Assistant Principal was an official of the school district with sufficient authority to fit within the definition of "appropriate person" under Title IX. A120-121. However, the District Court determined that Ms. Wadsworth failed to demonstrate that either Assistant

Principal Pease or Assistant Principal Philbrook had actual notice of Principal Cavanaugh's conduct. A124-125. As to her claims under 42 U.S.C. § 1983, the District Court held that the facts did not show that MSAD 40 violated the Fourteenth Amendment's Equal Protection Clause through an unconstitutional policy or a failure to train. A128; A135-137.

The District Court granted Mr. Nguyen's Motion for Summary Judgment as to Count 2 but denied summary judgment of the state law claims. A229. The District Court found that there was insufficient evidence to prove that Mr. Nguyen deprived Ms. Wadsworth of the federally protected right to be free from intrusions into her bodily integrity and that his behavior did not "shock the conscience." A198-202. Further, the District Court found that even if Mr. Nguyen's behavior did meet that standard, he was entitled to qualified immunity. A215.

The District Court granted Principal Cavanaugh's Motion for Summary Judgment as to Count 2 but denied summary judgment on the state law claims against him. A318. The District Court reasoned that there was no binding or persuasive authority suggesting that non-physical harassment violates the right to bodily integrity or that such abuse "shocks the conscience," and even it found otherwise, Principal Cavanaugh would be entitled to qualified immunity. A295. As to her Equal Protection Claim, the District Court determined that there were sufficient facts in the record to support that Ms. Wadsworth was selectively treated

compared with others similarly situated and that such treatment was based on impermissible considerations, but that Principal Cavanaugh was entitled to qualified immunity. A304-309.

## SUMMARY OF THE ARGUMENT

This Court should reverse the District Court's determinations in its order on Mr. Nguyen's motion to dismiss as to Ms. Wadsworth's 42 U.S.C. § 1983 claim. The facts asserted in the Amended Complaint along with all reasonable inferences drawn in Ms. Wadsworth's favor allege that Mr. Nguyen had knowledge of the risk posed by Principal Cavanaugh, that he exercised control over Principal Cavanaugh, and could have easily taken measures to address the risk but failed to do so; instead, Mr. Nguyen abetted the harassment. The Amended Complaint contains sufficient facts in addition to the reasonable inferences drawn therefrom to allege that Mr. Nguyen violated Ms. Wadsworth's Fourteenth Amendment right to equal protection by assuring her that Principal Cavanaugh's conduct was appropriate in contrast to how Mr. Nguyen would have treated a male student.

Summary judgment on Ms. Wadsworth's Title IX should also be vacated. A reasonable jury could find that Mr. Nguyen was an appropriate person under Title IX with authority to take corrective measures to end the harassment based on the evidence that he stopped Principal Cavanaugh from taking Ms. Wadsworth to the birth control appointment the principal scheduled for her and that he stopped

Principal Cavanaugh from continuing to coerce Ms. Wadsworth into living with him. A reasonable fact finder should also conclude that Assistant Principals Philbrook and Pease, and Mr. Nguyen had actual notice of the harassment from evidence showing that they knew that Principal Cavanaugh told Ms. Wadsworth that she was attractive, a pretty girl, top shelf, and that she could take anyone she wanted to prom, that Principal Cavanaugh referred to Ms. Wadsworth with gendered nicknames in person in their presence and in text messages to her, that teachers had complained about Ms. Wadsworth's frequent absences to meet with Principal Cavanaugh, that Principal Cavanaugh wanted Ms. Wadsworth to live with him, and that he let her drive a car that he owned. When Assistant Principal Philbrook relayed just some of these facts to Officer Spear, he quickly sent an email to Police Chief Labombarde titled "pervert principal."

Genuine issues of material fact also warrant reversal of summary judgment on Ms. Wadsworth's remaining § 1983 claims. The lack of clarity in MSAD 40's sexual harassment policy regarding the appropriate person to report harassment to if the school principal was the harasser and the School District's total failure to provide sexual harassment training to its employees permitted Principal Cavanaugh's harassment to go unchecked for at least 16 months. A reasonable jury should also conclude that Principal Cavanaugh's conscience-shocking sexual harassment violated Ms. Wadsworth's right to bodily integrity as well as her right

to equal protection. Mr. Nguyen's efforts to protect Principal Cavanaugh while he harassed Ms. Wadsworth, and after the principal resigned, also shock the conscience, violating her right to bodily integrity. Neither individual is entitled to qualified immunity, because it was clearly established at the time that rampant sexual harassment would violate a student's right to bodily integrity and right to equal protection.

Finally, this Court should affirm denial of summary judgment on Mr. Nguyen's MTCA notice defense and claim for discretionary immunity. A reasonable jury can conclude that Ms. Wadsworth lacked knowledge of the extent of Mr. Nguyen's tortious conduct when she submitted her notice, but that it contained more than enough information to enable MSAD 40 to sufficiently investigate her claims. A reasonable jury can also conclude that Mr. Nguyen's efforts to protect Principal Cavanaugh—first by assuring Ms. Wadsworth that Principal Cavanaugh was acting appropriately and then by encouraging her to apologize to her harasser's family and sign an affidavit so that he could get his job back—bore no relation to a basic governmental policy or objective, was in no way essential to realization of that objective, and most resembled activities carried out by people generally, not an immune government activity.

**ARGUMENT**

A. **Standard of Review**

The standard of review on dismissal for failure to state a claim is *de novo* and requires accepting all well-pleaded facts as true and drawing all reasonable inferences in the plaintiff's favor. *Foss v. Marvic Inc.*, 994 F.3d 57, 62 (1st Cir. 2021); *Douglas v. Hirshon*, 63 F.4th 49, 52 (1st Cir. 2023).

An appellate court also conducts *de novo* review of summary judgment rulings, with the facts construed in the light most favorable to and with all reasonable inferences in the non-movant's favor. *López-Santos v. Metro. Sec. Servs.*, 967 F.3d 7, 11 (1st Cir. 2020); *Irish v. Fowler*, 979 F.3d 65, 73 (1st Cir. 2020).

B. **Ms. Wadsworth's Amended Complaint Sufficiently Alleges Liability Against Mr. Nguyen for Principal Cavanaugh's Actions.**

In her Amended Complaint, Ms. Wadsworth alleged that Mr. Nguyen knew of the risk posed to her by Principal Cavanaugh, could have stopped Principal Cavanaugh but failed to do so, and instead caused further harm. In its order on Mr. Nguyen's Motion to Dismiss, the District Court dismissed Ms. Wadsworth's equal protection claim, but in so doing, it adopted an inappropriate standard for supervisory liability for 42 U.S.C. § 1983 for violations of the Fourteenth Amendment. To be sure, the District Court failed to recognize factual allegations showing that Mr. Nguyen is liable for Principal Cavanaugh's violations of Ms.

Wadsworth's constitutional rights. A040-041. In reaching its decision, the District Court opined that supervisory liability requires the plaintiff to establish that the defendant had some degree of control over the bad actor. As the Supreme Court explained in *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009), "supervisory liability" is an inapt term in this context. After all, "each Government official ... is liable for his or her own misconduct ... *purpose rather than knowledge is required to impose ... liability on the subordinate for unconstitutional discrimination.*" 556 U.S. at 677 (emphasis added). Likewise, "the same holds true for an official charged with violations arising from his or her superintendent responsibilities." *Id*.

Consistent with this principle, this Court has held that a defendant may be liable when his deliberate indifference enables another official's constitutional violation, even if he is not the wrongdoer's formal supervisor. *See Camilo-Robles v. Hoyos*, 151 F.3d 1, 11-12 (1st Cir. 1998). There, although the First Circuit used the shorthand term "supervisor," it defined that term "*loosely to encompass a wide range of officials who are themselves removed from the perpetration of the rights-violating behavior.*" *Id.*, at 6-7. The court held that such an official "may be liable under section 1983 if he ... *engages in a practice that leads to a civil rights violation committed by another.*" *Id.*, at 6-7 (citations omitted) (emphasis added). Specifically, a defendant "may be liable for the foreseeable consequences of [another official's] conduct if he would have known of it but for his deliberate

33

indifference or willful blindness." *Id.*, at 7 (internal quotations omitted). The elements of deliberate indifference are "(1) a grave risk of harm, (2) the defendant's actual or constructive knowledge of that risk, and (3) his failure to take easily available measures to address the risk." *Id.* To show causation, the plaintiff must connect "the supervisor's" conduct to "the subordinate's" actions. *Id.*

In *Hoyos*, this Court held that two psychiatrists could be held liable because they twice certified a dangerous police officer as fit for duty, even though they lacked any "official authority to rearm [the officer] and restore him to active duty," a supervisory relationship or even an employment relationship with the governmental entity. 151 F.3d at 10-12. Yet the evidence showed that the psychiatrists knew before recertifying the officer that he posed a grave risk of harm as they knew he had shot two innocent persons, denied reality, had issues with anxiety and impulse control. *Id.*, at 11. Despite this, they recertified the officer even though they knew that re-certification would likely result in his return to active duty. *Id.*, at 11-12. Refusing recertification was an easily available measure to address the risk that these physicians refused to take that caused the ensuing violation of the plaintiff's civil rights. *Id.* The lack of supervisory authority proved no barrier to liability here, because the physicians knew of the risk, could have easily stopped it, but they failed to do so.

As in *Hoyos*, Ms. Wadsworth specifically alleges Mr. Nguyen's knowledge by asserting that she informed him of Principal Cavanaugh's public gifts and plans to bring her to a medical examination and get her on birth control, asked him about the normality and appropriateness of these gifts and plans, and that the Principal made sexually based comments on her appearance and clothing in front of the Mr. Nguyen, who became aware of inappropriate behavior towards her in 2016.

Ms. Wadsworth alleges the that Mr. Nguyen could have easily stopped the harassment. She asserts that he was the school social worker, the Director of Student Services—not the principal—supervised him, that he had a professional obligation to report her complaints to his supervisor, the School Department, or the police or OCFS, and that MSAD 40's policies also required him to report the harassment to his supervisor to inform the Superintendent. She also alleges that Mr. Nguyen knew about Principal Cavanaugh's conduct in 2016, but that the harassment finally stopped at least eleven months later when a third party reported it to the Waldoboro Police Department, prompting Principal Cavanaugh's suspension and resignation in December 2017. From this, a court may reasonably infer that a report by Mr. Nguyen would have quickly stopped Principal Cavanaugh. *See Ocasio-Hernandez v. Fortuño-Burset*, 640 F.3d 1, 15 (1st Cir. 2011) (reasonable to infer in § 1983 First Amendment retaliation case knowledge of plaintiffs' political affiliations by alleging that defendants asked about how

plaintiffs became employed and about their political affiliations, that co-workers knew their political affiliations, and that defendants promoted coworkers with shared political affiliations).

Indeed, the Amended Complaint alleges that Mr. Nguyen not only failed to take any action to stop the harassment, but also affirmatively abetted Principal Cavanaugh in grooming Ms. Wadsworth. When she asked whether the gifts were normal, Mr. Nguyen assured her that Principal Cavanaugh was being nice to her and that there was nothing inappropriate about the gifts. Mr. Nguyen told her that Principal Cavanaugh was just trying to be a "father figure," when she questioned whether it was appropriate for him to bring her medical evaluation for cheerleading. He also told her that it was normal for the principal to advise her to be on birth control. And after the allegations came to light, Mr. Nguyen tried to cover up Principal Cavanaugh's misconduct. Indeed, he informed Ms. Wadsworth that Principal Cavanaugh had a drinking problem, which somehow justified his conduct in Mr. Nguyen's misguided opinion.[4]

Thus, the Amended Complaint contains allegations and reasonable inferences asserting Mr. Nguyen's control over Principal Cavanaugh towards Ms. Wadsworth. It also alleges far greater involvement in the harassment by Mr.

---

[4] As discussed *infra* at 41-43, Mr. Nguyen in fact exercised control over Principal Cavanaugh in the rare instances that he chose to do so.

Nguyen than the conduct that the Third Circuit described as "mere inaction" in the opinion that formed the basis for the District's Court's dismissal. *See Robinson v. City of Pittsburgh*, 120 F.3d 1286 (3d Cir. 1997).

It is also reasonable to infer that the Amended Complaint alleges that Mr. Nguyen subjected Ms. Wadsworth to disparate treatment in violation of the Fourteenth Amendment. Specifically, it alleges Ms. Wadsworth is a female student who attended MVHS, which is a public school, where Mr. Nguyen worked as the school's social worker. From the allegations concerning Mr. Nguyen's replies to Ms. Wadsworth's questions about the appropriateness of Principal Cavanaugh's conduct, it is reasonable to infer that she received some therapeutic support from the him. Because MVHS is a public school, it is reasonable to infer that non-female students attended and received therapeutic support from Mr. Nguyen.

While it is reasonable to infer that Mr. Nguyen would not have treated a male student the same way considering the gender-based allegations at issue, the District Court erred in determining that an allegation of comparator evidence is necessary to maintain an equal protection claim. *See Ballou v. McElvain*, 29 F.4th 413, 426 (9th Cir. 2022) ("the existence of a comparator is not a prerequisite to stating a disparate treatment claim under the Fourteenth Amendment."). The District Court relied on precedent from this Court relating to "class of one" claims which are inapposite in the instant litigation. Indeed, even when a plaintiff has

failed to identify a comparator, where a school employee "ratified," "sought to downplay," and "made no effort to stop" harassment at school, a violation of the Equal Protection Clause is viable. *See Feminist Majority Found. v. Hurley*, 911 F.3d 674, 703 (4th Cir. 2018).

Based on these plausible conclusions, it is reasonable to infer that Mr. Nguyen's assurances to Ms. Wadsworth violated her Fourteenth Amendment right to equal protection, because the social worker would not have acted in that way to male students. *See e.g., Doe v. Pawtucket Sch. Dep't*, 969 F.3d 1, 9 (1st Cir. 2020) (reasonable to infer deliberate indifference by alleging that principal knew of sexual contact and four-year age gap between plaintiff and assailant, that school did nothing after learning of assault, and that prior in-school sexual assault prompted police to visit).

### C. Genuine Issues of Material Fact Preclude Summary Judgment on Ms. Wadsworth's Title IX Claim.

Title IX provides that "No person ... shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Title IX is enforced through an implied right of action for monetary damages in cases of intentional discrimination. *See Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 281 (1998). In that decision, the Supreme Court held that:

An "appropriate person" under [Title IX] is, *at a minimum*, an official of the recipient entity *with authority to take corrective action to end the discrimination*. Consequently ... we hold that a damages remedy will not lie under Title IX *unless an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures* ... has actual knowledge ....

*Id.*, at 290 (emphasis added). A plaintiff may establish a Title IX claim against a school district "by showing that *a single school administrator with authority to take corrective action* responded to harassment with deliberate indifference." *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 257 (2009) (emphasis added).

## 1. Mr. Nguyen Is an Appropriate Person.[5]

There is no bright line rule precluding this Court from considering Mr. Nguyen an appropriate person following a fact intensive analysis. *See Bostic v. Smyrna Sch. Dist.*, 418 F.3d 355, 361-362 (3d Cir. 2005) (employee's status as an appropriate person is a fact-based determination); *Melo v. City of Somerville*, 953 F.3d 165, 170 (1st Cir. 2020) (determining job functions is a factually intensive inquiry that may not be appropriate for summary judgment). The record here contains sufficient evidence to create a genuine dispute of material fact.

While possessing supervisory authority demonstrates that a school official is an appropriate person under Title IX, the absence of such authority is not

---

[5] Due to the District Court's ruling that Ms. Wadsworth had not alleged Mr. Nguyen's control, Ms. Wadsworth could not oppose summary judgment by arguing that he was an appropriate person under Title IX.

dispositive, and in some instances a guidance counselor serves as an appropriate person. *See E.N. v. Susquehanna Twp. Sch. Dist.*, Civil Action No. 1:09-CV-1727, 2010 U.S. Dist. LEXIS 124193, at *6 & *48 (M.D. Pa. Nov. 23, 2010) (holding that guidance counselor was an appropriate person with respect to teacher's sexual misconduct); *Doe v. Rockingham Cnty. Sch. Bd.*, Case No. 5:21-cv-00051, 2022 U.S. Dist. LEXIS 11386, at *20-22 (W.D. Va. Jan. 21, 2022) (guidance counselor was appropriate person to report teacher's harassment). A teacher may also constitute an appropriate person. *See J.S. v. Houston Cnty. Bd. of Educ.*, 877 F.3d 979, 989-990 (11th Cir. 2017) (special education teacher was an appropriate person); *B.W. v. Career Tech. Ctr. of Lackawanna Cnty.*, 422 F. Supp. 3d 858, 881 (M.D. Pa. 2019) (mandatory reporter was an appropriate person); *Doe v. Loyalsock Twp. Sch. Dist.*, No. 4:21-CV-01343, 2022 U.S. Dist. LEXIS 68665, at *12-15 (M.D. Pa. Apr. 13, 2022) (alleging that staff and administration knew of harassment by coach and that plaintiff disclosed specifics to teacher sufficiently alleged that appropriate person had knowledge).[6]

This Court and the two sister circuits who have opined about whether a school social worker can be an appropriate person under Title IX have not foreclosed that possibility. In *Santiago v. Puerto Rico*, this Court determined that

---

[6] These rulings comport with *Hoyos*, even though the plaintiff in *Hoyos* did not and could not bring a Title IX claim. *See* 151 F.3d at 12.

the plaintiff had not sufficiently alleged that a social worker with actual knowledge of the conduct by an outside vendor's employee was an appropriate person. *See* 655 F.3d 61, 75 (1st Cir. 2011) ("Although it mentions ... the school social worker, the complaint contains nothing that suggests that [she] comes within Title IX's 'appropriate person' taxonomy.").[7] The Eighth Circuit Court of Appeals held that *"we do not hold that guidance counsellors ... are never 'appropriate persons'* for the purposes of finding [liability] ... however, the record does not establish that [the counsellor was] vested with sufficient 'authority to address the alleged discrimination and to institute corrective measures.'") *See Plamp v. Mitchell Sch. Dist. 17-2*, 565 F.3d 450, 459 (8th Cir. 2009) (emphasis added); *accord Warren v. Reading Sch. Dist.*, 278 F.3d 163, 173 (3d Cir. 2002) ("Although a principal can be 'an appropriate person,' there is clearly insufficient evidence on this record to allow a jury to conclude that [the social worker] was cloaked with sufficient authority to be a 'responsible person' during any time relevant here.") These cases are clearly distinguishable from the instant matter.

The record discloses that Mr. Nguyen exercised considerable control over Principal Cavanaugh, checking his worst impulses. Specifically, a reasonable jury

---

[7] Interestingly, it was not clear if the principal was an appropriate person because an outside vendor employed the alleged harasser, potentially leaving the principal without the authority to institute corrective measures. *See Santiago*, 655 F.3d at 74.

could easily conclude that Mr. Nguyen stopped Principal Cavanaugh from taking

Ms. Wadsworth to the birth control appointment. Mr. Nguyen's statement to Ms.

Kenniston suggests that he believed that when he put his foot down, he could stop

Principal Cavanaugh.

A reasonable fact finder could similarly conclude that Mr. Nguyen

influenced Principal Cavanaugh's attempt to coerce Ms. Wadsworth into residing

with him. During the summer of 2017, Principal Cavanaugh broached the prospect

living with Ms. Wadsworth, which Mr. Nguyen advised him against. That same

summer, Principal Cavanaugh told Ms. Wadsworth that he had spoken with

someone at work and could no longer invite her to live with him. Because the

record discloses no one else who attempted to dissuade Principal Cavanaugh

during the relevant time, a reasonable jury could determine that Mr. Nguyen was

the person who put an end to these patently inappropriate efforts.

Moreover, Mr. Nguyen knew that had he tried to act in conformity with

MSAD 40 policy—as he understood it—or with his mandatory reporting

obligations, he would have halted Principal Cavanaugh's harassment of Ms.

Wadsworth.[8] Mr. Nguyen had some familiarity with MSAD 40's sexual harassment

policy and believed that it required him to notify the affirmative action officer in

---

[8] Indeed, Mr. Nguyen admitted that Principal Cavanaugh "was off-colored with"
Ms. Wadsworth and had lost sight of his boundaries, tacit admissions that he knew
that this conduct was potential sexual harassment.

the Superintendent's office about a staff member sexually harassing a student. The policy actually states an investigation should result from a report to the Superintendent. Mr. Nguyen also knew of his mandatory reporter duties as proven by his report to MVHS' athletic director, to OCFS, and to the police that a tumbling coach had sexually assaulted Ms. Wadsworth. Once Superintendent Nolan became aware of the allegations, he quickly suspended the principal, ending the sexual harassment.

This is not an instance in which the Court would be required to determine that a subordinate had the requisite authority over a supervisor, because Principal Cavanaugh had no supervisory or disciplinary authority over Mr. Nguyen.

Consequently, a reasonable jury could conclude that Mr. Nguyen was an appropriate person to institute corrective measures because he had the ability to control Principal Cavanaugh, and he could have reported the principal's conduct to the Superintendent, to law enforcement or to child protective services and had the obligation to do so. *See Doe v. Russell Cnty. Sch. Bd.*, Case No. 1:16CV00045, 2017 US. Dist. LEXIS 56479, at *18 (W.D. Va. Apr. 13, 2017) (finding appropriate person where school employee could have conducted independent investigation, reported conduct to school board or to law enforcement, or limited harasser's access to student); *Danvers v. Loudon Cnty. Sch. Bd.*, Civil Action No. 1:21-cv-1028 (RDA/JFA), 2022 U.S. Dist. LEXIS 178213, at *20 (E.D. Va. Sept. 29, 2022)

(plausibly alleging that teacher was appropriate person where teacher had affirmative reporting duty and ability to report allegations to law enforcement or his superiors).

>   **2.    Assistant Principals Philbrook and Pease as well as Mr. Nguyen Had Actual Notice of Principal Cavanaugh's Harassment of Ms. Wadsworth.**

In assessing whether the Assistant Principals had actual notice of Principal Cavanaugh's conduct, the District Court required "highly reliable and similar reports of inappropriate teacher behavior," to demonstrate that the school actually knew of the sexual harassment, suggesting that only subjective awareness would be sufficient, but that requirement is not the law. While the Supreme Court uses the terms "actual notice" and "actual knowledge" interchangeably, either suffices. In fact, Title IX liability attaches when a school official is "advised of" misconduct. *Gebser*, 524 U.S. at 290; *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 649, 653-654 (1999) (reversing dismissal of Title IX claim where plaintiff alleged actual knowledge and deliberate indifference by asserting school's failure to adequately respond to repeated "complaints" and "allegations" of misconduct). Subjective awareness is not the standard used by three of this Court's sister circuits.

The Fourth Circuit, the Nineth Circuit, and the Tenth Circuit have all used an objective standard in assessing notice. *See Doe v. Fairfax Cnty. Sch. Bd.*, 1 F.4th 257, 265-268 (4th Cir. 2021) (when an appropriate person "receives a report *that*

*can objectively be construed as alleging sexual harassment*, that receipt establishes actual notice of such harassment for Title IX purposes.") (emphasis added); *Brown v. Arizona*, 82 F.4th 863, 880 (9th Cir. 2023) (*en banc*) ("We agree with the Fourth Circuit that 'actual knowledge' ... means either actual knowledge or actual notice."); *Forth v. Laramie Cnty. Sch. Dist. No. 1*, 85 F.4th 1044, 2023 U.S. App. LEXIS 29609, at *1, n. 1 (10th Cir. 2023); *accord Mary M. v. N. Lawrence Cmty. Sch. Corp.*, 131 F.3d 1220, 1225 (7th Cir. 1997) (report that student and employee had been on date and planned to skip school/work gave principal actual notice, even though he did not credit it).

Requiring more than receipt of a report or a complaint that can be objectively construed as alleging sexual harassment would lead to absurd results. Instead of providing the "opportunity to take action," requiring subjective knowledge would lead to school districts trying to avoid liability by promoting ignorance, arguing—as MSAD 40 did—that the appropriate persons lacked a subjective understanding that the reports described sexual harassment. *See* Doc. 100 at 13; *Fairfax Cnty. Sch. Bd.*, 1 F.4th at 267. Demanding that minors provide highly reliable reports of similar inappropriate conduct to demonstrate actual notice is unrealistic as they "cannot be expected to articulate the sexual abuse and harassment they suffer in the same words as adults," and are prone to manipulation by adults, including their harassers *Id.* Such was the case for Ms. Wadsworth. Her

relationship with Principal Cavanaugh confused her and she questioned its appropriateness, but she feared that complaining would cause her harm and her doubts conflicted with Mr. Nguyen's frequent assurances.

Subjective knowledge is not the standard used by this Court either. *See Grace v. Bd. of Trs.*, 85 F.4th 1, 23-24 (1st Cir. 2023) (reversing summary judgment on actual knowledge). There the school argued that a report claiming that other students disliked the plaintiff because of his perceived sexual orientation, which the plaintiff had relayed to a dean, who decided not to discipline anyone, failed to make the dean subjectively aware of harassment based on the plaintiff's perceived sexual orientation. *Id.*, at 8-9, 23. But this Court disregarded the dean's subjective belief, instead determining that a reasonable jury could find that this complaint gave the school. *Id.*, at 23-24.[9]

Consequently, highly reliable and similar reports are unnecessary to provide objective notice. Moreover, in determining notice, the court should examine the complaints and reports in their totality, not in isolation. *See Forth*, 2023 U.S. App. LEXIS 29609, at *19 ("To determine whether a school district had 'knowledge of a substantial risk of abuse,' we examine the reports provided to relevant officials in

---

[9] The *Grace* plaintiff's complaint likely constitutes a "student statement" insufficient to give notice in *Doe v. Bradshaw*, which the District Court extensively referenced in its summary judgment decision. *See* A121-122 (*quoting* 203 F. Supp. 3d 168, 185 (D. Mass. 2016)).

46

totality, not in isolation."); *C.S. v. Madison Metro. Sch. Dist.*, 34 F.4th 536, 544 (7th Cir. 2022) ("What all of this means ... is that a school district's duty to act is not triggered until it has actual knowledge of facts *which in the totality of the circumstances indicate that sex-based discrimination has occurred or is occurring under its watch*.") (emphasis added). As such, Principal Cavanaugh's constant and repeated sexual harassment, known to the Assistant Principals and Mr. Nguyen provided them with notice. *See Doe v. Sch. Bd. of Broward Cnty.*, 604 F.3d 1248, 1258 (11th Cir. 2010) (reversing summary judgment on Title IX claim for teacher's harassment of student).

Based on the totality of the circumstances, a reasonable jury should have no difficulty concluding that the Assistant Principals and Mr. Nguyen had actual notice of Ms. Wadsworth's ongoing sexual harassment by Principal Cavanaugh. Assistant Principal Philbrook knew that Principal Cavanaugh found Ms. Wadsworth attractive as she had agreed when he said that Ms. Wadsworth was a "pretty girl," and "top shelf," which are obvious reference to her physical attractiveness. App., 455 at 195:7-17. In the discussion with Assistant Principal Philbrook about who would be Ms. Wadsworth's prom date, Principal Cavanaugh again clearly communicated that he found her attractive. Knowledge of a teacher's comments concerning a student's appearance give rise to a genuine issue of material fact regarding actual notice. *See Brodeur v. Claremont Sch. Dist.*, 526 F.

Supp. 2d 195, 208-209 (D.N.H. 2009) ("A jury could readily find that these accounts of [the teacher's] comments, which [the guidance counselor] passed on to [the principal], amount to 'actual knowledge of discrimination' necessary to subject the district to liability….").

Assistant Principal Philbrook and Mr. Nguyen also knew that Principal Cavanaugh sent text messages to Ms. Wadsworth with gendered nicknames like "cupcake." Mr. Nguyen and the Assistant Principals also knew of Principal Cavanaugh's gifts to Ms. Wadsworth, including tampons. Principal Cavanaugh gave Ms. Wadsworth cash in front of Assistant Principal Philbrook. Shortly after he stopped Ms. Wadsworth in September 2017, Assistant Principal Philbrook's remark that "if [Officer Spear] only knew the half the story...." creates an irrefutable inference that she knew that there was something inappropriate happening. *See Tesoriero v. Syosset Cent. Sch. Dist.*, 382 F. Supp. 2d 387, 398 (E.D. N.Y. 2005) (denying summary judgment in part because principal knew that teacher gave body lotion to students).

The Assistant Principals knew of teachers' complaints about the amount of time Principal Cavanaugh spent with Ms. Wadsworth and her frequent excused absences. Mr. Nguyen even suspected enough to suggest that Principal Cavanaugh should stop meeting alone with Ms. Wadsworth. A reasonable jury could infer notice from the October 2016 teacher complaints about Ms. Wadsworth's frequent

excused absences and the Assistant Principals' ensuing conversation with Principal Cavanaugh. *See Forth*, 2023 U.S. App. LEXIS 29609, at *37-38 (reasonable to infer notice from teacher's request that student have permission to visit his classroom whenever she liked due to their special relationship).

Most telling is the comment attributed to Principal Cavanaugh's wife by Assistant Principal Philbrook when she spoke with Officer Spear on September 19, 2017 in which she reported that when Principal Cavanaugh's wife had said "*let me go get a 21-year-old boy to help me out if Adrianna's going to be living in our house*." From this, a reasonable jury could infer that Assistant Principal Philbrook believed that Principal Cavanaugh wanted to have sex with Ms. Wadsworth. *See Forth*, 2023 U.S. App. LEXIS 29609, at *42-45 (reasonable jury could infer notice of sexual harassment from assistant principal's immediate response on seeing reaction of harasser's father-in-law on being asked about plaintiff).[10]

A reasonable jury can also infer notice from the "pervert principal" subject line in Officer Spear's email. Regardless of the actual content, it shows that what Officer Spear learned from Assistant Principal Philbrook (an appropriate person)

---

[10] This statement is not hearsay. It is statement by Assistant Principal Philbrook, who is an MSAD 40 employee, regarding a potential danger to a student, which is certainly a matter within the scope of her employment, offered against MSAD 40 to prove what she knew, not to establish what Ms. McFarland actually said. *See Shevrin v. Partners Healthcare Sys.*, 804 F.3d 23, 45 (1st Cir. 2015); *Ira Green, Inc., v. Mil. Sales & Serv. Co.*, 775 F.3d 12, 19 (1st Cir. 2014).

the day after he stopped Ms. Wadsworth and spoke with Assistant Principal caused him to believe that Principal Cavanaugh desired an inappropriate sexual relationship with a student. His subsequent testimony confirms this. *See J.M. v. Hilldale Indep., Sch. Dist. No. 1-29*, 397 F. App'x 445, 452-453 (10th Cir. 2010) (reasonable jury could infer actual knowledge from student's accusation that teacher was pedophile and that he had seen teacher and plaintiff lying on teacher's hotel-room bed).

Most of the conduct that Assistant Principal Philbrook knew of violated MSAD 40's sexual harassment policy. Principal Cavanaugh's nicknames for Ms. Wadsworth and references to her physical attractiveness are undeniably gender-based comments that no 16-year-old student should hear from her principal. His persistent invitations to reside with him, and his gifts created the appearance of pressure to engage in sexual activity. Ms. Wadsworth's frequent departures from class to meet with Principal Cavanaugh also interfered with her education, as confirmed by Ms. Wadsworth's teachers, in violation of the policy. Superintendent Nolan agreed that the car, the gifts, the money, and the birth control appointment raised concerns for him.

From this reported conduct in total with reasonable inferences drawn in Ms. Wadsworth's favor, a reasonable jury could conclude that Assistant Principal Philbrook, Mr. Nguyen, or Assistant Principal Pease had actual notice that

Principal Cavanaugh was sexually harassing Ms. Wadsworth in violation of Title

IX. *See Forth*, 2023 U.S. App. LEXIS 29609 at *47. At minimum, a reasonable

jury could conclude they had notice of "a substantial risk" of sexual harassment,

*Forth*, 2023 U.S. App. LEXIS 29609, at *19, or that they were willfully blind to it.

*C.S.*, 34 F.4th at 545 ("jury may infer actual knowledge based on the official's

willful blindness").

> **D.    There Are Genuine Issues of Material Fact on Ms. Wadsworth's 42 U.S.C. § 1983 Claims.**

42 U.S.C. § 1983 creates a private right of action for any person deprived

under the color of law of any right, privilege, or immunity secured by the

Constitution or the laws. *See Cruz-Arce v. Mgmt. Admin. Servs. Corp.*, 19 F.4th

538, 543 (1st Cir. 2021). The Fourteenth Amendment is one such right, and it

forbids state actors from denying "[t]o any person within [there] jurisdiction the

equal protection of the laws." § 1983 claims are shown by demonstrating (1) the

violation of a Constitutional or legal right; (2) by a perpetrator acting under the

color of law. *See Saldivar v. Racine*, 818 F.3d 14, 18 (1st Cir. 2016). There must

also a causal connection between the deprivation and the conduct in question. *See*

*Gutierrez-Rodriguez v. Cartagena*, 882 F.2d 553, 559 (1st Cir. 1989). School

districts may only be liable under § 1983, if the constitutional violation occurred

pursuant to an official policy or custom. *Welch v. Ciampa*, 542 F.3d 927, 941 (1st

Cir. 2008). Sexual harassment like what Ms. Wadsworth experienced, "violates the

equal protection clause if such [harassment] does not 'serve important governmental objectives' and is not 'substantially related to achievement of those objectives.'" *See Lipsett v. Univ. of Puerto Rico*, 864 F.2d 881, 896 (1st Cir. 1988).

      **1.**      **MSAD 40 Violated Ms. Wadsworth's Right to Equal Protection.**

      **a.**      **Ambiguity in MSAD 40's Sexual Harassment Policy Caused this Constitutional Violation.**

Because MSAD 40 is a municipal department, it is liable only for constitutional violations arising from its municipal policies. *See Connick v. Thompson*, 563 U.S. 51, 60 (2011) ("A municipality or other local government may be liable under [§ 1983] if the governmental body itself subjects a person to a deprivation of rights or causes a person to be subjected to such deprivation.") (internal quotations omitted). But "official municipal policy includes the decision of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Id.*, at 61; *see also Bordanaro v. McLeod*, 871 F.2d 1151, 1156 (1st Cir. 1989). To put it simply, municipal liability can only arise from a municipal act. *See Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986) ("*Monell* reasoned that recovery from a municipality is limited to acts that are, properly speaking, acts 'of the municipality' -- that is, acts which the municipality has officially sanctioned or ordered."). Due to the lack of vicarious liability under § 1983 for non-policy making employees'

actions—like Principal Cavanaugh—"the "first inquiry in any case alleging municipal liability under § 1983 is ... whether there is a direct causal link between a municipal policy … and the alleged constitutional deprivation." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989).

A glaring hole in MSAD 40's complaint reporting policy caused—in part—Ms. Wadsworth's inability to escape Principal Cavanaugh. The policy states that "Any individual who believes that a student has been discriminated against or harassed should report their concern promptly to the building principal …," that "School staff shall report possible ... harassment of students to [sic] building principal," and that the "building principal" must "respect the [complainant's] confidentiality…" and "promptly inform the Superintendent . . ." of the complaint. But this policy fails to define the term "building principal," creating a lacunae as it is not apparent to whom a report may be made to, beyond the school principal.

Ordinarily, the policy's unclarity is not an issue, because a school principal is obviously a "building principal," but when the principal is the harasser then the policy appears to make him the only appropriate recipient of complaints about his conduct. This is what occurred at MVHS, where the policy's silence on whether assistant principals are "building principal," strict adherence, and the Superintendent's unavailability short of a report from law enforcement meant that

sexual harassment complaints could only be made to harasser, who would unsurprisingly fail to promptly inform the Superintendent.

Here, the Assistant Principals and Mr. Nguyen all spoke with Principal Cavanaugh, but none of them reported his conduct to the Superintendent or his designee. Rather than inform the Superintendent following Officer Spear's traffic stop, Assistant Principal Philbrook decided to contact Chief Labombarde. Ms. Kenniston tried to contact the Superintendent, leaving two messages, but she never heard back. Had MSAD 40 closed the lacunae with a reporting policy that clearly indicated that assistant principals were also "building principals", then Principal Cavanaugh's misconduct could have been stopped.[11]

> **b.** **MSAD 40's Failure to Provide Training on Sexual Harassment Reporting Also Caused the Violation of Ms. Wadsworth's Rights.**

Alternatively, MSAD 40 may be liable for failure to train its employees by identify a constitutional violation closely related to the poor training of its employees stemming from deliberate indifference to the rights those with whom the employees had contact. *See Jones v. City of Boston*, 752 F.3d 38, 59 (1st Cir.

---

[11] While the District Court attributed their failure to contact the superintendent to ignorance of the sexual harassment, as discussed *supra* at 47-51, a reasonable jury could conclude that the Assistant Principals and Mr. Nguyen had notice, making their confusion about the policy a possible cause. Alternatively, a reasonable jury could conclude their indifference to Ms. Wadsworth's plight caused this inaction.

2014). To determine liability and deliberate indifference, "the focus must be on adequacy of the training program in relation to the tasks [the employees] must perform." *Harris*, 489 U.S. at 390. For liability to attach for a training deficiency, the identified deficiency "must be closely related to the ultimate injury." *Id.*, at 391. And while this standard requires that policymakers had "actual or constructive notice that a particular omission in [training] causes [employees] to violate citizens' constitutional rights…" liability may be shown based on a single incident. *Connick*, 563 U.S. at 61-64 ("The Court sought not to foreclose the possibility, however rare, that the unconstitutional consequences of failing to train could be so patently obvious that a city could be liable … without proof of a pre-existing pattern of violations.").

Here, the record contains evidence that MSAD 40 offered no training on reporting sexual harassment. During the relevant period, Principal Cavanaugh served as affirmative action coordinator for MVHS and for MSAD 40, but he never provided staff training on sexual harassment or on sexual harassment reporting. Moreover, per his testimony he *lacked the qualifications* to give this training. Instead, he recalled that "I gave a presentation ... I don't think that's a training. I mean, it was just a presentation," but it was only for new teachers. The Assistant Principals and Mr. Nguyen identifying different persons to report sexual harassment to if the principal was the harasser, and Assistant Principal Pease's

testimony that no one at MVHS would have known how to report sexual harassment to the Superintendent makes MSAD 40's utter failure to provide training pellucid. MSAD's ignorance of Principal Cavanaugh's qualifications or his presentations' content coupled with the absence of information on sexual harassment reporting if the affirmative action officer was the harasser, substantiate the training's complete inadequacy.

Given these glaring deficiencies, in addition to the non-existent documentation showing that training occurred, a reasonable jury can infer that MSAD 40 had notice that problems would arise from a lack of training. *See Young v. City of Providence*, 404 F.3d 4, 27-28 (1st Cir. 2005) (reversing summary judgment where failure to document training created genuine issue of material fact); *J.K.J. v. Polk Cnty.*, 960 F.3d 367, 381-382 (7th Cir. 2020) (affirming jury verdict finding municipal failure to give sexual harassment training where risk of sexual assault was apparent).

### 2. Principal Cavanaugh Violated Ms. Wadsworth's Rights Under the Fourteenth Amendment.

#### a. Reasonable Jury Can Conclude that Principal Cavanaugh's Conduct Shocks the Conscience.

Principal Cavanaugh's rampant and unmitigated sexual harassment of Ms. Wadsworth violated her right to be free from intrusions to her bodily integrity. *See Doe v. Fournier*, 851 F. Supp. 2d 207, 219 (D. Mass. 2012) ("It is beyond question

that the Fourteenth Amendment protects the right to bodily integrity and that right 'is necessarily violated when a state actor sexually abuses a schoolchild ....'") (*quoting Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 451-452 (5th Cir. 1994)); *Doe v. D'Agostino*, 367 F. Supp. 2d 157, 172 (D. Mass. 2005) (denying summary judgment on minor student's claim based on teacher's violation of his right to bodily integrity).

The elements of a state-created danger claim are: 1) a state actor affirmatively acted to create or enhance a danger to Ms. Wadsworth; 2) the act or acts created or enhanced a danger specific to Ms. Wadsworth and distinct from the danger to the public; 3) the act or acts caused Ms. Wadsworth's harm; and 4) the state actor's conduct, when viewed in total, shocks the conscience. *See Fowler*, 979 F.3d at 75. Where officials have the opportunity to make unhurried judgments, deliberate indifference may shock the conscience, particularly where the state official performs multiple acts indifferent to a rising risk of acute and severe danger. *Id.* To show deliberate indifference, Ms. Wadsworth must show, at a bare minimum, that Principal Cavanaugh actually knew of a substantial risk of serious harm and disregarded that risk. *Id.* Alternatively, where state actors must act in a matter of seconds or minutes a higher level of culpability is required. *Id.* (affirming denial of summary judgment on plaintiff's state-created danger claim and reversing grant of summary judgment on qualified immunity).

The record contains a variety of evidence that creates genuine disputes of material fact. Principal Cavanaugh's sexual harassment Ms. Wadsworth, who was a minor in his care due to his position as MVHS' principal, including his constant, salacious, and distracting text messages, public gifts, gender-based nicknames, public appraisals of her physical attractiveness, and withdrawals from class created a distinct danger distinct that caused her palpable emotional harm that persists. *See e.g.*, App., 455 at 195:7-17, 465-466 at 10:24-15:23, 467-468 at 17:25-24:22, 475-476 at 51:14-54:22, 482 at 77:2-78:23, 574, 579, 603.

This conduct occurred over the course of two school years, giving Principal Cavanaugh plenty of time for unhurried judgments, during which he performed innumerable acts indifferent to the risking risk of acute and severe danger to Ms. Wadsworth. Moreover, because MSAD 40 tasked him with briefing new employees on the sexual harassment policy and made him the affirmative action officer, a reasonable jury can infer that Principal Cavanaugh knew of the substantial risk of serious harm from his harassment of Ms. Wadsworth, and he ignored that risk. *See Coyne v. Cronin*, 386 F.3d 280, 288 (1st Cir. 2004) ("To make ... a showing [of deliberate indifference], [the plaintiff] must, at a bare minimum, demonstrate that [the defendant] actually knew of a substantial risk … to [her] and disregarded that risk."). His conduct clearly violated MSAD 40's policies and basic common sense, strengthening the inference that he acted with conscience-shocking

deliberate indifference. *See Irish v. Maine*, 849 F.3d 521, 528 (1st Cir. 2017) ("If

… the [defendant's] actions violated accepted [procedural] norms ... It may also

directly speak to whether [he] acted in deliberate indifference to [the plaintiff's]

safety, so much so that [his] conduct shocks the conscience.").

While the District Court would not find that Principal Cavanaugh's conduct

shocked the conscience due to the dearth of precedent, a reasonable jury may—and

likely will—infer that the text messages, gifts, excused absences, invitations to

reside with him, flirtations from a high school principal to a minor student in his

charge are among those actions "which, in context, appear 'shocking or violative of

universal standards of decency.'" *Amsden v. Moran*, 904 F.2d 748, 754 (1st Cir.

1990) (*quoting Furtado v. Bishop*, 604 F.2d 80, 95 (1st Cir. 1979)).

The District Court correctly noted that this Court has repeatedly refused to

foreclose the possibility that verbal harassment could shock-the-conscience. *See*

*Brown v. Hot, Sexy, & Safer Prods. Inc.*, 68 F.3d 525, 532 (1st Cir. 1995)

("Although we have not foreclosed the possibility that … verbal harassment may

constitute 'conscious shocking' behavior in violation of substantive due process

rights ... our review of the caselaw indicates that the threshold for alleging such

claims is high and that the facts here do not rise to that level,"); *Souza v. Pina*, 53

F.3d 423, 427 (1st Cir. 1995) ("While we do not foreclose the possibility that [an

official's] statements ... or other forms of psychological harm, may [violate] a

citizen's substantive due process rights, we find that the facts alleged here do not rise to that level,") (internal citations omitted); *Pittsley v. Warish*, 927 F.2d 3, 7 & n. 3 (1st Cir. 1991) ("As despicable and wrongful as it may have been, the single threat … is not sufficient to 'shock the conscience'... This does not mean that under no circumstances will [verbal harassment] rise to the level of a constitutional violation.")

But because it could not identify any other decisions in which courts found non-physical conduct conscience-shocking, the District Court declined to deem the unrelenting sexual harassment Ms. Wadsworth experienced sufficiently shocking, but it opined that "this area of the law may be ripe for reexamination ... [as] the current state of the law artificially diminishes the impact of psychological sexual harassment." A291-292, n.110. This area of the law is indeed ripe for reexamination because the facts differ from prior First Circuit cases on the shock-the-conscience standard and Ms. Wadsworth suffered far more egregious sexual harassment. *See Irish v. Fowler*, 436 F. Supp. 3d 362, 419 (D. Me. 2020) ("The facts of this case, however, are different from … prior cases ... discussing the state-created danger theory, and the Court regards [them] as more egregious.").

Principal Cavanaugh's pervasive, relentless sexual harassment of a minor is far more extreme in manner, degree, and duration than the conduct that this Court found non-conscience-shocking. For example, the disgraceful conduct alleged in

*Cruz-Erazo v. Rivera-Montanez* occurred in infrequent interactions over approximately eight months. *See* 212 F.3d, 617, 618-620 (1st Cir. 2000). By contrast, Principal Cavanaugh's almost daily sexual harassment began in the summer of 2016 after Ms. Wadsworth's sophomore year and only ended with his suspension in November 2017, during her senior year. Thus, Ms. Wadsworth suffered through sexual harassment that occurred far more frequently and over a much longer span of time—at least 16 months—than the heinous conduct in *Pittsley. See* 927 F.2d at 4-5 & 7 (four encounters in two months in which police officers told children that they would murder their parents).[12] The conscience-shocking nature of this harassment is confirmed by Chief Labombarde—a long-time police officer—telling Mr. Nguyen that Principal Cavanaugh's behavior was reprehensible.

Principal Cavanaugh's harassment was more egregious, frequent, and occurred over a much longer period than the conduct described in other decisions in this circuit. *See e.g.*, *Hot, Sexy, & Safer Prods. Inc.*, 68 F.3d at 529 & 532

---

[12] In *Souza*, press appearances, which allegedly caused the plaintiff's suicide, also likely occurred less frequently. *See* 53 F.3d at 424 & 427 (media claims that decedent was serial killer did not shock the conscience). But more importantly, our understanding of conscience-shocking behavior has evolved in the 28 years since *Souza*. *See e.g.*, *Taylor Indep. Sch. Dist.*, 15 F.3d at 476 (5th Cir. 1994) (Jones, J., dissenting) (not recognizing that teacher sexually assaulting student violated her right to bodily integrity).

(dismissing claim for mandatory attendance at sexually explicit assembly). That is also the case for analogous out-of-circuit decisions. *See e.g., Abeyta By & Through Martinez v. Chama Valley Indep. Sch. Dist. No. 19*, 77 F.3d 1253, 1255-1257 (10th Cir. 1996) (two months); *Bridges v. Scranton Sch. Dist.*, 655 Fed. App'x 172, 178 (3d Cir. 2015) (teacher insulted student twice); *Doe v. Georgetown Cnty. Sch. Dist.*, No. 2:14-cv-01873-DCN, 2015 U.S. Dist. LEXIS 137934, at *2-5 & 14 (D.S.C. Oct. 9, 2015) (single remark about student). The 16 months—at a minimum—of almost daily sexual harassment at school and at home and in public and in private that Ms. Wadsworth experience is abhorrent and exceeds by all measures the conduct described in prior decisions.

*Harrington v. Almy*, in which the plaintiff satisfied the shock-the-conscience standard, describes evidence that is eerily reminiscent to what Ms. Wadsworth endured, even without a physical intrusion. *See* 977 F.2d 37, 38-39 & 44 (1st Cir. 1992). The defendant suspended the plaintiff for over two years for claimed child abuse. *Id.*, at 39. Even though the district attorney had halted his investigation within ten months of the suspension, the defendant conditioned reinstatement on a bodily intrusive examination, terminated the plaintiff when he refused, and only reinstated him following arbitration. *Id.* Ms. Wadsworth's 16 months of sexual harassment is of comparable duration. Principal Cavanaugh also demanded that she undergo an intrusive medical treatment (without her parents' consent). The

harassment exclusively occurred when Ms. Wadsworth was a minor. The frequency of Principal Cavanaugh's harassment far exceeds the conduct described in *Almy*.

Moreover, determining that sexual harassment would only shock the conscience when accompanied by physical contact would lead to an untenable result, because it would make the injury paramount, even though intent is the most important hallmark. *See J.R. v. Gloria*, 593 F.3d 73, 79 (1st Cir. 2010) ("the official conduct most likely to rise to the conscience-shocking level is the *conduct intended to injury in some way unjustifiable by any government interest*.") (internal quotations omitted) (emphasis added). Principal Cavanaugh clearly intended to violate Ms. Wadsworth's right to bodily integrity through sexual contact. No physical contact occurred due to Ms. Kenniston's timely intervention, not because Principal Cavanaugh stopped on his own. Thus, he manifested the requisite intent to injure Ms. Wadsworth for his own personal pleasure, which is no way justified by any government interest. But even so, his intent to violate Ms. Wadsworth's bodily integrity severely affected her.

### b. Qualified Immunity

Defeating qualified immunity requires satisfying a two-prong test: 1) whether the facts shown make out a constitutional violation, 2) of a clearly established right when the violation occurred. *See Penate v. Sullivan*, 73 F.4th 10, 17 (1st Cir. 2023). The second prong has two sub-parts: a) the right's relative

clarity to a reasonable official when the conduct occurred; and b) whether the facts of the case would have made a reasonable official aware that his conduct violated the constitutional right. *Id.* Cases with materially similar facts are not necessary to determine the clarity. *Fowler*, 979 F.3d at 77-78 ("a general proposition of law may clearly establish the violative nature of a defendant's actions, especially when the violation is egregious."). On summary judgment, the facts for qualified immunity are framed according to traditional leeway accorded to the non-movant. *Penate*, 73 F.4th at 15.

### i.      State Created Danger

The section above makes it apparent that Principal Cavanaugh violated Ms. Wadsworth's right to bodily integrity through sexual harassment in which he manifested an unjustifiable intent to injure her. When an educator sexually harasses a student, the student's constitutional right to bodily integrity is clearly at stake. *See Suboh v. Dist. Att'y Off.*, 298 F.3d 81, 94 (1st Cir. 2002) ("We have no doubt that there is a clearly established constitutional right at stake, although we have found no case exactly on all fours with the facts of this case.") There are innumerable cases stating that proposition. *U.S. v. Giordano*, 442 F.3d 30, 47 (2d Cir. 2006); *Stoneking v. Bradford Area Sch. Dist.*, 882 F.2d 720, 727 (3d Cir. 1989); *Doe v. Rosa*, 795 F.3d 429, 436-437 (4th Cir. 2015); *Doe v. Rains Cnty. Indep. Sch. Dist.*, 66 F.3d 1402, 1406 (5th Cir. 1995); *Doe v. Claiborne Cnty.*, 103 F.3d 495,

506 (6th Cir. 1996); *Hess v. Garcia*, 72 F.4th 753, 767 (7th Cir. 2023); *Shrum ex. Rel. Kelly v. Kluck*, 249 F.3d 773, 778 (8th Cir. 2001); *Doe By & Through Doe v. Petaluma City Sch. Dist.*, 54 F.3d 1447, 1451 (9th Cir. 1995); *Chama Valley Indep. Sch. Dist. No.* 19, 77 F.3d at 1255; *Hinkley v. Baker*, 122 F. Supp. 2d 48, 53 (D. Me. 2000); *Fournier*, 851 F. Supp. 2d at 219; *D'Agostino*, 367 F. Supp. 2d at 172; *Roe v. Wilson*, 365 F. Supp. 3d 71, 80 (D.D.C. 2019). Even if there were not, no reasonable high school principal would conclude that Principal Cavanaugh's constant sexual harassment of a student was constitutionally permissible. *See Taylor v. Riojas*, 141 S.Ct. 52, 54 (2020) ("Confronted with the particularly egregious facts of this case, any reasonable [official] should have realized that [the conduct] violated the Constitution."). These cases represent a robust consensus of persuasive authority that hold a teacher's sexual harassment of a student may result in a violation of the constitutional right to bodily integrity.

Nine of the cited sister-circuit decisions date from before Principal Cavanaugh began sexually harassing Ms. Wadsworth in 2016, thus the state of the law should have given him fair warning that sexually harassing Ms. Wadsworth was unconstitutional. *See Fowler*, 979 F.3d at 79. Moreover, MSAD 40's policy clearly barred this sort of behavior, strengthening the inference of clarity. *Id.*, at 77. Thus, the record contains evidence satisfying both prongs of the qualified immunity test, rendering summary judgment inappropriate.

### ii.     Equal Protection

The District Court agreed that Principal Cavanaugh's sexual harassment violated Ms. Wadsworth's right to equal protection under the Fourteenth Amendment, but granted summary judgment based on qualified immunity due to a purported dearth of case law holding that a teacher sexually harassing a student could result in an equal protection violation. However, there are number of out-of-circuit cases that express this proposition. *See Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 749 (2d Cir. 2003); *Jennings v. Univ. of N.C.*, 482 F.3d 686, 701 (4th Cir. 2007); *Doe v. Taylor Indep. Sch. Dist.*, 975 F.2d 137, 149 (5th Cir. 1992); *Delgado v. Stegall*, 367 F.3d 668, 674 (7th Cir. 2004); *SH. A v. Tucumcari Mun. Schs.*, 321 F.3d 1285, 1288 (10th Cir. 2003). As such, it was clearly established that Principal Cavanaugh's conduct violated Ms. Wadsworth's right to equal protection.

### 3.     Disputed Material Facts about Mr. Nguyen's Knowledge Makes Summary Judgment on 42 U.S.C § 1983 Claim Inappropriate.

The District Court granted Mr. Nguyen summary judgment on the state-created danger claim because it mistakenly applied the summary judgment standard. As described *supra* at 47-51, the record contains a variety of evidence from which a reasonable juror could conclude that he had actual notice of the harassment and thus had sufficient knowledge for deliberate indifference. Indeed, he knew of conduct that would raise red flags for MSAD 40's superintendent. The

District Court's conclusion to the contrary is belied by his behavior following Principal Cavanaugh's suspension. Had he not been so deliberately indifferent to shock the conscience, it is difficult to fathom why he would have asserted that Ms. Wadsworth was bringing it on herself, why he would have encouraged her to apologize to her harasser's family, or why he would have been concerned with Ms. Wadsworth's perceived betrayal of Principal Cavanaugh. Based on these facts, a reasonable juror may conclude that Mr. Nguyen's actions shock the conscience.

### a.    Qualified Immunity

The analysis on qualified immunity applicable to the state-created danger claim against Principal Cavanaugh is equally applicable to Mr. Nguyen.

### E.    The District Court Correctly Determined that Genuine Issues of Material Fact Preclude Summary Judgment on Mr. Nguyen's MTCA Notice Affirmative Defense.

While Mr. Nguyen contends otherwise, the District Court correctly determined that genuine issues of material fact existed on the sufficiency of her notice.

In June 2018, MTCA required that submission of a notice against a governmental entity within 180 days after the claim's accrual or within 180 days of a minor claimant's 18th birthday. 14 M.R.S.A. § 8107(1)-(2). This statute enables "*the governmental entity to investigate and evaluate claims* for the purposes of defense or settlement." *Pepperman v. Barrett*, 661 A.2d 1124, 1126 (Me. 1995)

(*citing Faucher v. City of Auburn*, 465 A. 2d 1120, 1123 (Me. 1983)) (reversing denial of summary judgment on claim against individual municipal employees where plaintiff did not provide requisite notice to municipality) (emphasis added). To that end, a claimant "against any political subdivision of the State of Maine or an employee thereof . . ." must address her notice to "one of the persons upon whom a summons and complaint could be served under the [Me. R. Civ. P. 4]." 14 M.R.S.A § 8107(3)(B). The notice must contain *inter alia* "The name and address of any governmental employed involved, *if known*." 14 M.R.S.A. § 8107(1) (emphasis added). The statute permits a substantially complaint notice to proceed, and a claim "shall not be held invalid or insufficient by [inaccurately] stating the time, place, nature or cause of the claim, or otherwise, unless it is shown that *the governmental entity was in fact prejudiced thereby*." *Id.*, at (4) (emphasis added). Mr. Nguyen's exegesis only identifies two claimed deficiencies in Ms. Wadsworth's notice, though neither render it deficient.

Mr. Nguyen first claims that that the purported failure to directly serve him with the notice, but Ms. Wadsworth was not required to do so as he is likely aware. *See e.g.* Nguyen Br., at 25. The cases he cites expressly state this. *See e.g. Darling v. Augusta Mental Health Inst.*, 535 A. 2d 421, 430 (Me. 1987) ("section 8107 ... requires a claimant to notify the governmental entity of a claim against its employee for conduct within the scope of his employment even though no claim is

asserted against the entity itself."); *Peters v. City of Westbrook*, 787 A.2d 141, 143

(Me. 2001) ("Plaintiffs who seek to hold a governmental unit and employee liable

must first meet a procedural requirement of notifying the unit of the intention to

bring a claim."). In fact, Mr. Nguyen's counsel concurred at oral argument. App.,

1379 at 25:7-14. It is undisputed that Ms. Wadsworth notified MSAD 40 through

its Superintendent, which is the relevant governmental unit. Thus, Mr. Nguyen's

assertion is meritless.

The other purported deficiency—that the notice did not list Mr. Nguyen as

an involved employee—has no more heft. MTCA only requires the name and

address of the involved governmental employees, if known. *See Kakitis v. Perry*,

659 A.2d 852, 854 n. 1 (Me. 1995) (reversing summary judgment grant where

governmental entity received timely notice with claim's basis enabling it to

investigate or seek settlement). In June 2018, Ms. Wadsworth did not know the

extent of Mr. Nguyen's involvement.

Ms. Wadsworth then knew that Principal Cavanaugh had pursued an

inappropriate relationship with her and Mr. Nguyen's behavior in her presence—

i.e., his knowledge of the nicknames, the text messages, the gifts, and his

assurances—and what others told her about him, like his intervention in the birth

control appointment. She did not mention Mr. Nguyen to Detective Murray in his

interview. Subsequently but before issuing the notice, she knew that Mr. Nguyen

was encouraging her to apologize to Ms. McFarland and to issue a statement supporting Principal Cavanaugh. Thus a jury could infer that at the time of her notice, Ms. Wadsworth knew that Mr. Nguyen's responses were strange, but that she did not regard him as an involved employee.

But, as the District Court described in detail, Ms. Wadsworth lacked any knowledge of Mr. Nguyen's conversation with Chief Labombarde in which he expressed his belief that she was "bringing it on herself." She was similarly unaware of Superintendent Nolan's no-contact directive that Mr. Nguyen had defied. This behavior reveals Mr. Nguyen's improper intent and the extent to which he deviated from what a reasonable person would have done, belying his perceived lack of involvement. Aside from alleging that Mr. Nguyen had told her that Principal Cavanaugh was drinking heavily, the absence of any allegations concerning Mr. Nguyen's post-November 2017 conduct makes it pellucid that she only learned of his defiance in discovery.

Ms. Wadsworth's ignorance renders the two trial court decisions he cites inapposite. *See* Nguyen Br. at 23-25. In *Parker v. Dall-Leighton*, the plaintiff knew the defendant's name and the precise facts giving rise to liability but *chose* not to name this defendant in her notice. Docket No. 2:17-CV-216-GZS, 2018 U.S. Dist. LEXIS 108867, at *2-4 (D. Me. Jun. 29, 2018) (Singal, J.) (granting summary judgment due to plaintiff's intentional failure to name defendant). The plaintiff

omitted this information as she lacked the confidence to fully communicate with her counsel while incarcerated, and because the defendant was, "a really well-liked [correctional officer] at the re-entry center, [the plaintiff] was just fearful of what the other guards and/or inmates might do if [she] caused more of ... an uproar ... [The plaintiff] wanted to let them know, but [she] was just scared to do it." *Id.*, at *3-4.

*Perry v. Dean* is similarly distinguishable. *See* Docket Nos. BCD-CV-13-48 & BCD-CV-14-14, 2015 Me. Bus. & Consumer LEXIS 52, at *65-66 (Me. Super. Dec. 3, 2015) (granting summary judgment where plaintiff's filings did not sufficiently comply with statute). In this matter, an affidavit filed along with the complaint failed to constitute appropriate notice, because it was untimely and did not identify the involved governmental employees involved even though she knew their identity and their alleged tortious conduct when notice would have been timely. *Id.*

Mr. Nguyen's attempt to distinguish *Kakitis* is unpersuasive because Ms. Wadsworth's notice enabled MSAD 40 to learn of his involvement. Nguyen Br. at 27-28. Like in *Kakitis*, where the notice communicating the involvement of unknown custodians in the destruction of personal property through unspecified negligent conduct afforded the recipient the opportunity to investigate or settle, Ms. Wadsworth's timely notice to MSAD 40, in which she reported suffering

71

emotional damages, effectively communicated Mr. Nguyen's involvement, because it likely would have prompted investigation of his conduct to evaluate her damages. 659 A. 2d at 853-854. Such an investigation when MSAD 40 already knew of their frequent meetings and his support for Principal Cavanaugh and skepticism for her would have uncovered his defiance, permitting evaluation of potential claims against him. *See Learnard v. Inhabitants of Van Buren*, 164 F. Supp. 2d 35, 39 (D. Me. 2001) (Singal, J.) (plaintiff's failure to identify all defendants sued or fully specify their wrongful conduct in notice was non-fatal as description of wrongful conduct permitted investigation and evaluation).

Conclusory jeremiads aside, Mr. Nguyen fails to identify any portion of the record that hints that the notice deprived MSAD 40 of an opportunity to investigate her claims. He identifies no document, answer to interrogatory, or deposition testimony that shows—explicitly or implicitly—that the notice prevented or otherwise impaired an investigation. Nguyen Br. at 29. The facts show that before receiving notice, MSAD 40 conducted an investigation that culminated in Principal Cavanaugh's resignation. Through this investigation, Superintendent Nolan directed Mr. Nguyen to cease meeting with Ms. Wadsworth, because of his comments to Chief Labombarde. Her notice effectively served as "icing on the cake." App., 1380 at 26:11-17.

Mr. Nguyen incorrectly contends that failing to expressly reference him excused him from showing prejudice, because the decisions he cites describe notices with grave substantive and procedural deficiencies, not the single omission in Ms. Wadsworth's otherwise compliant notice. *See Faucher v. City of Auburn*, 465 A. 2d 1120, 1123 (Me. 1983) (oral notice not made to person authorized to accept service and which described damages but not demand for monetary damages lacked more than mere inaccuracies); *Deschenes v. City of Sanford*, 137 A.3d 198, 202 & n. 7 (Me. 2016) (conversations with employee not authorized to accept service in which plaintiff provided hospital note but disclaimed intention to sue and then with town clerk in which plaintiff talked about accident, but not about potential claim failed to constitute substantial compliance); *McCarthy v. Inhabitants of the Town of Kennebunkport*, 366 F. Supp. 2d 165, 168 (D. Me. 2005) (letter did not substantially comply because it was to person not authorized to accept service and failed to concisely describe injuries claimed or monetary damages); *Palm v. Sisters of Charity Health Sys.*, 537 F. Supp. 2d 228, 232-233 (D. Me. 2008) (letter to defendant hospital without individual addressee, return address, or monetary damages claimed and only communicated refusal to pay bills and planned lawsuit failed to substantially comply).

Mr. Nguyen's argument regarding Ms. Wadsworth's knowledge is an exercise in circular logic that improperly seeks to draw inferences against the non-

movant. *See Fowler*, 979 F.3d at 73. His inference from her decision to sue him violates this standard. Moreover, there is no reason to infer from her choice to sue him in December 2019 that she knew of his involvement more than a year and a half prior.

Because Ms. Wadsworth's notice only lacks an express identification of Mr. Nguyen as an involved employee—at the worst—he must also show prejudice. He singularly fails both in this endeavor and in demonstrating that there are no genuine issues of material fact as to Ms. Wadsworth's compliance and as such he fails to meet his burden.

### F. Mr. Nguyen Has Failed to Establish His Entitlement to Discretionary Function Immunity.

Mr. Nguyen's claim for discretionary function immunity rests on clay feet. The four-factor analysis shows that the discretionary immunity affords him no protection, because his conduct cannot not possibly fall within his discretion as a social worker. *See Darling*, 535 A.2d at 426. Assuring Ms. Wadsworth that Principal Cavanaugh's conduct was appropriate, encouraging her to cast doubt on the allegations, apologize to her harasser's family, continue her relationship with her harasser, and telling her that the family had a right to be angry with her after being instructed to cease all contact with her is not a basic governmental policy, program, or objective. In fact, Mr. Nguyen's effort to help Principal Cavanaugh resume his position impairs the proper and efficient performance of his duties,

which is a basic governmental objective. *See Quintal v. City of Hallowell*, 956 A.2d 88, 97 (Me. 2008) ("it is the municipal government's objective to have employees that properly and efficiently perform the tasks assigned to them.").

By the same logic, this conduct is in no way essential to realization or accomplishment of education, which is the basic governmental program identified by Mr. Ngyen. *See C.B. v. Me. Sch. Admin. Dist. No. 40*, Civil No. 08-57-P-H, 2008 U.S. Dist. LEXIS 68236, at *23-24 (D. Me. Jul. 29, 2008) (telling other students that plaintiff had falsely alleged sexual relationship with teacher and telling plaintiff that he would not be protected from abuse by that teacher were not essential to accomplish educating children). Moreover, there is no strong link between that governmental objective and assuring Ms. Wadsworth's that Principal Cavanaugh's actions were appropriate. *See Hildebrand v. Washington Cnty. Comm'rs*, 33 A.3d 425, 430 (Me. 2011) ("Our cases require a strong link between the basis governmental objective and the means used to realize it."). If anything, Mr. Nguyen's effort to persuade Ms. Wadsworth to withdraw from MVHS is detrimental to that mission. Telling Ms. Wadsworth that Principal Cavanaugh was a standup guy did not involve any exercise of policy evaluation, judgment, or expertise nor did he have the requisite authority to make such statements. In fact, as a mandatory reporter, Mr. Nguyen should have reported the sexual harassment,

depriving him of legal authority to assure her that Principal Cavanaugh was behaving appropriately. *See* 22 M.R.S.A § 4000 et. seq.[13]

As he is wont to do, Mr. Nguyen attempts to minimize his post-November 2017 behavior by describing this conduct as allegations that constitute a novel theory of liability, but it is neither. Based on the deposition testimony of MSAD 40, Chief Labombard and Officer Spears, a reasonable jury could easily find that Superintendent Nolan issued the no-contact directive in November 2017. Even Mr. Nguyen acknowledged in his answers to interrogatories that "a couple of weeks [after the allegations came out] I met with Mr. Nolan and Mr. Ocean during which *they advised me against further meetings with Ms. Wadsworth*,"; he also testified that the Superintendent had asked him not to have contact with her. Doc. 91-2 at 75 (emphasis added); App., 859-860 at 156:24-157:3. While he also characterized this as a voluntary choice, it is clear that shortly after the allegations came out in early November 2017, Mr. Nguyen was no longer allowed to contact Ms. Wadsworth.

---

[13] The Maine Child and Family Services and Child Protection Act requires social workers and school officials to report instances of "a threat to a child's health or welfare by physical, mental or emotional injury or impairment, sexual abuse or exploitation" to the Department of Health and Human Services and in some cases the District Attorney. "Child" is defined as any person under the age of 18. *See* 22 M.R.S.A. § 4002, 4011A.

There is more than enough evidence for a fact finder to determine that Mr. Nguyen defied that instruction.[14] Mr. Nguyen admitted to meeting with her in December 2017 and exchanging messages with her on March 9, 2018 and on September 12, 2018. The record also contains the messages he exchanged with Ms. Wadsworth in January 2018, in which he stated that Ms. McFarland had a right to be mad at her for not signing the affidavit and that Principal Cavanaugh should have fought termination. A reasonable jury would have no difficulty concluding that these interactions occurred after the Superintendent's instruction. Consequently, neither the instruction nor Mr. Nguyen's defiance of it are "supposed" or allegations as he so inartfully puts it.

The post-investigative conduct is part and parcel of Ms. Wadsworth's allegations against Mr. Nguyen. His statements in these meetings and in their messages are instances in which he intended to cause or should have known that he would cause emotional distress by falsely assuring her are encompassed in her claim for intentional infliction of emotional distress. This conduct also highlights Mr. Nguyen's failure to comport with his duty to protect her from sexual harassment and discrimination as she alleges in her claim for negligent infliction of emotional distress. Finally, Mr. Nguyen's January 2018 messages in which he

---

[14] Alternatively, Mr. Nguyen failed to live up to his "agreement" with Superintendent Nolan as he evasively testified.

encourages Ms. Wadsworth to speak to Principal Cavanaugh someday in the future over coffee encouraged her to continue the relationship as alleged in her claim for negligence. This is more than sufficient to place Mr. Nguyen on notice that Ms. Wadsworth's tort claims are based on the entirety of his interactions with her.

Mr. Nguyen's defiance of Superintendent Nolan to protect Principal Cavanaugh again distinguishes his conduct from the opinions he cites. Both *Doucette v. City of Lewiston* and *Norton v. Hall* involved failures to abide by policies promulgated by the governmental entity to public officials who allegedly negligently performed their official duties. 697 A.2d 1292, 1294 (Me. 1997) (policy requiring dispatcher to elicit information about missing person's mental health did not transform her role's basic discretionary and did not expose her to liability for not eliciting that information); 834 A.2d 928, 933 (Me. 2003) (officer not deprived of discretionary immunity for injuries arising for her failure to abide by rules of the road in responding to an emergency). *Selby v. Cumberland County* also involved a policy violation by a public employee in the context of his duties. 796 A.2d 678, 680-681 (Me. 2002) (decision to initiate chase of driver travelling at excessive speed was within deputy's discretion despite policy forbidding chases for minor traffic offenses).

Based on the objective standard used to distinguish immune governmental activity from non-immune activity resembling the decisions carried out by people

generally, it is apparent that Mr. Nguyen's defense of a colleague whom he protected at every opportunity was an activity carried out by people generally. *See Rodriguez v. Town of Moose River*, 922 A.2d 484, 490 (Me. 2007). These actions were not work-related nor were they undertaken to serve MSAD 40, and many occurred outside of school hours and outside his place of employment. *See Morgan v. Kooistra*, 941 A.2d 447, 454 (Me. 2008) (firefighter not entitled to immunity for complaints he made to third parties about a colleague's sexual activities because they were not taken to serve the fire department, did not involve the actions he had been hired to perform, and were motivated by personal animus).

Mr. Nguyen's conduct bears no resemblance to actions that the Maine Supreme Judicial Court has held occurred within the scope of discretion. *See Hildebrand*, 33 A.3d at 431 (each *Darling* factor weighed in favor of concluding that 14 M.R.S.A § 8111(1)(C) immunized sheriff's conduct). In that decision, the sheriff's choice to end his office's relationship with the state DEA due to an officer's off-duty conduct necessarily involved the governmental policy of law enforcement, the decision to disassociate and to publicly explain the reasoning was essential to realization of that objective, required basic policy evaluation, and the sheriff had the requisite authority. *Id.*, at 430-431.

Mr. Nguyen's insistence that conclusions reached by the District Court lack support in the record is incorrect as a reasonable jury would have little difficulty

reaching same conclusions that the lower court did. His comments to Ms. Wadsworth about Principal Cavanaugh being a stand-up guy, who was "nothing but helpful to ..." to her, and who thought of her as a daughter, provide ample support for the conclusion that Mr. Nguyen acted to protect Principal Cavanaugh. Similarly, his statement that Principal Cavanaugh's behavior was "not what they're making it out to be," and that if Ms. Wadsworth wanted to help Principal Cavanaugh, she should sign the affidavit and "tell the truth," are obviously intended to downplay the harassment allegations. Mr. Nguyen's message on January 12, 2018 to Ms. Wadsworth that Ms. Wadsworth should someday "speak to [Principal Cavanaugh]. Otherwise [it] looks you turned on him…" and Principal Cavanaugh "should have fought it but his lawyer said his chance was slim without the affidavit," are him encouraging her to support her harasser. Because these interactions occurred after his meeting with Chief Labombarde in November 2017 in which the Police Chief described the content of some of the text messages, it is ridiculous for Mr. Nguyen to argue that he had no knowledge of the text messages when he encouraged Ms. Wadsworth to sign the affidavit.

Because a reasonable jury could conclude that Mr. Nguyen's conduct towards Ms. Wadsworth bore no relation to basic governmental objective, was in no way essential to realization or accomplishment of that program, and that he

lacked the requisite authority, the District Court properly denied summary judgment on his claim for discretionary function immunity.

## CONCLUSION/RELIEF SOUGHT

Principal Cavanaugh's constant and long-standing sexual harassment of Ms. Wadsworth, while she was a high school student in his care, irreparably altered her life. She depended on her school social worker and assistant principals to protect her, but they utterly failed her, either by ignoring the obvious or by abetting the harasser. Ms. Wadsworth deserves her day in court to fully redress these wrongs.

Because she plausibly alleged her equal protection and supervisory liability claims against Mr. Nguyen, and because genuine issues of material fact exist as to whether appropriate MSAD 40 employees had notice of the harassment, ambiguity in its sexual harassment reporting policy, whether any training on that policy occurred, and whether the conduct of Principal Cavanaugh and Mr. Nguyen shocked the conscience and violated her right to equal protection, Ms. Wadsworth is entitled to a jury trial on her Title IX, 42 U.S.C. § 1983 and tort claims.

As such, Ms. Wadsworth respectfully requests that this Court reverse the District Court's partial dismissal of her § 1983 claims against Mr. Nguyen, reverse and vacate summary judgment on her Title IX and remaining § 1983 claims, affirm denial of summary judgment on her state tort claims, and remand this matter for

trial. Ms. Wadsworth also requests an award of attorneys' fees and costs in prosecuting her appeal.

# CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limit of Fed R. App. P. 28.1(e)(2)(B)(i) because this brief contains 19,291 words, for which Plaintiff-Appellee/Cross-Appellant Adrianna Wadsworth has filed an assented-to Motion for Leave to File an Oversized Principal and Response Brief, which is currently pending. In the event that this motion is denied, Ms. Wadsworth will submit and an amended brief conforming to the type-volume limitation.

This brief complies with the typeface requirements of Fed. R. App P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because I have prepared this brief in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in 14-point Times New Roman font.

Date: November 30, 2023       */s/ Zachary H. Hammond*
                              Zachary H. Hammond

                Attorney for Adrianna Wadsworth

# CERTIFICATE OF SERVICE

I hereby certify that this Plaintiff/Cross-Appellant's Brief and Addendum, filed through the PACER/ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

Date: November 30, 2023       */s/ Zachary H. Hammond*
                              Zachary H. Hammond

**PLAINTIFF-APPELLEE/CROSS-APPELLANT ADRIANNA
WADSWORTH'S ADDENDUM**

**TABLE OF CONTENTS**

Page Number

Order on Chuck Nguyen's Motion to Dismiss
(Document 36)....................................................................................A001

Amended Order on MSAD 40/RSU 40's Motion for Summary Judgment
(Document 139) ...............................................................................A051

Order on Chuck Nguyen's Motion for Summary Judgment
(Document 140) ...............................................................................A139

Order on Andrew Cavanaugh's Motion for Summary Judgment
(Document 141) ...............................................................................A230

Order on Motion for Judgment and Stay
(Document 151) ...............................................................................A320

Partial Final Judgment
(Document 152) ...............................................................................A329

UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| ADRIANNA WADSWORTH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 2:19-cv-00577-JAW |
| | ) | |
| MAINE SCHOOL ADMINISTRATIVE | ) | |
| DISTRICT 40/REGIONAL SCHOOL | ) | |
| UNIT 40 et al., | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER ON DEFENDANT CHUCK NGUYEN'S MOTION TO DISMISS**

A former high school student brought a lawsuit against a school district, a school principal, and a school social worker stemming from sexual harassment she alleged the school principal committed against her while she was a high school student. The plaintiff's claims against the social worker are grounded on violations of 42 U.S.C. § 1983 and state tort claims of intentional infliction of emotional distress, negligent infliction of emotional distress, and negligence. The social worker seeks to dismiss the § 1983 claim on the grounds that the plaintiff fails to state an actionable claim because her state-created danger theory does not apply, she did not allege the necessary facts for a direct equal protection claim, and the § 1983 claims cannot be premised upon vicarious liability. He also claims that qualified immunity protects him and he seeks to dismiss the tort claims on the ground that discretionary function immunity prohibits liability as a matter of law.

The Court concludes that the plaintiff alleged a viable substantive due process claim under § 1983 but not a viable equal protection claim and that qualified

**A001**

immunity does not require a dismissal on the substantive due process claim at this point in the litigation. The Court further concludes that discretionary function immunity does not require dismissal of the state tort claims at this stage. The Court anticipates revisiting these issues upon the completion of discovery in the context of a motion for summary judgment.

## I.    PROCEDURAL HISTORY

On December 27, 2019, Adrianna Wadsworth[1] filed suit against Maine School Administrative District 40/Regional School Unit 40 (MSAD 40/RSU 40), Medomak Valley High School, Andrew Cavanaugh, and Chuck Nguyen. *Compl.* (ECF No. 1). She alleged a violation of 20 U.S.C. § 1681(a) (Title IX)[2] and negligent hiring, training, and supervision against MSAD 40/RSU 40 and Medomak Valley High School, brought claims under 42 U.S.C. § 1983 and common law tort and statutory claims of intentional infliction of emotional distress (IIED) and negligent infliction of emotional distress (NIED) against all the Defendants, and brought a negligence claim against Mr. Cavanaugh and Mr. Nguyen. *Id.* ¶¶ 134-179. On February 7, 2020, Mr. Cavanaugh answered the Complaint. *Def., Andrew Cavanaugh's Answer to Pl.'s Compl. and Demand for Jury Trial* (ECF No. 11). On March 11, 2020,

---

[1]    Ms. Wadsworth brought this lawsuit in her own name rather than under a pseudonym such as Jane Doe. Though a balancing of factors is required, a victim of sexual harassment or sexual assault—especially a minor at the time of the offense—often has a privacy interest sufficient to proceed under a pseudonym. *See, e.g., Doe v. Reg'l Sch. Unit No. 21*, Docket No. 2:19-00341-NT, 2020 WL 2833248, at 1-4 (D. Me. May 29, 2020) (*Doe*); *Doe v. Megless*, 654 F.3d 404, 408 (3d Cir. 2011). However, as an adult, Ms. Wadsworth has an equal right to bring the action under her own name.
[2]    Ms. Wadsworth's Title IX claim runs only against MSAD 40/RSU 40. *Am. Compl.* ¶¶ 156-72. Ms. Wadsworth "is not pursuing any Title IX claims against any of the individuals, nor could she." *Doe v. Pawtucket Sch. Dep't*, No. 19-1458, 2020 U.S. App. LEXIS 24859, at *17 (1st Cir. Aug. 6, 2020) (citing *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 641 (1999)).

MSAD 40/RSU 40 and Medomak Valley High School filed a motion to dismiss counts one and two of the Complaint. *Def. MSAD 40/RSU 40's Mot. to Dismiss Counts I and II of Compl.* (ECF No. 12). On the same day, Mr. Nguyen filed an answer to the Complaint. *Answer and Affirmative Defenses to Compl. and Jury Trial Demand (Def. Chuck Nguyen)* (ECF No. 13) (*Nguyen's Answer*).

On March 27, 2020, Ms. Wadsworth filed an amended complaint, dropping Medomak Valley High School as a defendant. *Pl.'s Am. Compl. and Demand for Jury Trial* (ECF No. 15) (*Am. Compl.*). On April 14, 2020, Mr. Cavanaugh filed an answer to the Amended Complaint. *Def., Andrew Cavanaugh's Answer to Pl.'s Am. Compl. and Demand for Jury Trial* (ECF No. 17). On May 8, 2020, MSAD 40/RSU 40 filed a motion to dismiss counts one and two of the Amended Complaint, and on May 11, 2020, MSAD 40/RSU 40 withdrew its first motion to dismiss. *Def. MSAD 40/RSU 40's Mot. to Dismiss Counts I and II of First Am. Compl.* (ECF No. 21);[3] *Def. MSAD 40/RSU 40's Withdrawal of Mot. to Dismiss as Moot* (ECF No. 22).

On April 10, 2020, Mr. Nguyen filed a motion to dismiss the Amended Complaint. *Def. Chuck Nguyen's Mot. to Dismiss Am. Compl.* (ECF No. 16) (*Nguyen's Mot.*). Ms. Wadsworth filed a response on May 15, 2020. *Opp'n of Pl., Adrianna Wadsworth, to Def. Chuck Nguyen's Mot. to Dismiss for Failure to State Claim* (ECF No. 24) (*Pl.'s Opp'n*). On June 5, 2020, Mr. Nguyen filed his reply. *Reply Mem. of*

---

[3]   While the docket entry for this filing includes Medomak Valley High School in the description, MSAD 40/RSU 40 filed this motion alone because the Amended Complaint terminated Medomak Valley High School as a defendant. *See Am. Compl.* ¶¶ 1-5.

*Law in Supp. of Def. Chuck Nguyen's Mot. to Dismiss Am. Compl.* (ECF No. 30) (*Nguyen's Reply*).

## II.   FACTS[4]

### A.   The Parties

Adrianna Wadsworth is a twenty-year old female who resides in Sydney, Maine. *Am. Compl.* ¶¶ 1, 8.  She was a student at Medomak Valley High School, part of MSAD 40/RSU 40, from 2014 through her graduation in June 2018.  *Id.* ¶ 9.

MSAD 40/RSU 40 is a school district which encompasses five towns in Maine: Friendship, Union, Waldoboro, Warren, and Washington.  *Id.* ¶ 2.  It operates and controls Medomak Valley High School in Waldoboro, Maine.  *Id.* ¶ 3.  MSAD 40/RSU 40 is a public entity within the meaning of Title IX and § 504 because it is a recipient of federal funding under applicable programs.  *Id.*

Andrew Cavanaugh is a resident of Maine who worked for MSAD 40/RSU 40 from 2003 through his resignation in December 2017.  *Id.* ¶¶ 4, 12.  He became principal of Medomak Valley High School in 2015.  *Id.* ¶ 10.

---

[4]    Considering a motion to dismiss, a court "accept[s] all well-pleaded facts in the complaint as true . . . ."  *Glik v. Cunniffe*, 655 F.3d 78, 79 (1st Cir. 2011) (quoting *Sanchez v. Pereira-Castillo*, 590 F.3d 31, 36 (1st Cir. 2009)).  A court also "construe[s] all reasonable inferences in favor of the plaintiff . . . ."  *Sanchez*, 590 F.3d at 41 (quoting *Trans-Spec Truck Serv., Inc. v. Caterpillar Inc.*, 524 F.3d 315, 320 (1st Cir. 2008); *Alt. Energy, Inc. v. St. Paul Fire & Marine Ins. Co.*, 267 F.3d 30, 33 (1st Cir. 2001)).

Ms. Wadsworth includes some facts in her response to the motion to dismiss not in the Amended Complaint.  *See, e.g.*, *Pl.'s Opp'n* at 10 ("[Mr.] Nguyen received reports from other teachers of [Mr.] Cavanaugh's harassment of [Ms. Wadsworth]").  Mr. Nguyen objects to these statements as facts for the purposes of this motion to dismiss.  *Nguyen's Reply* at 3-4.  The Court did not include these added facts in its recitation of the facts in this Order.

4

**A004**

Chuck Nguyen is a resident of Maine and was a social worker at Medomak Valley High School for all times relevant to this matter. *Id.* ¶¶ 5, 13.

**B.    The Events**

Beginning in 2016, Ms. Wadsworth's junior year of high school, when she was sixteen years old, the principal, Andrew Cavanaugh, began paying special attention to her; he made sexually-based comments about her looks and clothing choices in front of students and staff members and purchased personal hygiene products and gave them to her in front of other teachers and students. *Id.* ¶¶ 23-25. Ms. Wadsworth reported the gifts to the school social worker, Chuck Nguyen, and asked whether it was "normal" for the principal to be giving her gifts. *Id.* ¶¶ 26, 207. Mr. Nguyen assured Ms. Wadsworth that Mr. Cavanaugh was being nice to her and that there was nothing inappropriate about the gifts. *Id.* ¶ 27.

Subsequently, Mr. Cavanaugh advised Ms. Wadsworth that he was going to bring her to a medical examination. *Id.* ¶¶ 28-29. Ms. Wadsworth again approached Mr. Nguyen and asked whether it was appropriate for the high school principal to bring her to this appointment. *Id.* ¶ 30. Mr. Nguyen assured her that Mr. Cavanaugh was just trying to be a "father figure" to her. *Id.*

On another occasion, Mr. Cavanaugh advised Ms. Wadsworth that she should be on birth control. *Id.* ¶ 31. When this was brought up to Mr. Nguyen, he told Ms. Wadsworth that this was normal. *Id.*

Mr. Nguyen's advice that Mr. Cavanaugh's behavior was normal encouraged her to continue the relationship with Mr. Cavanaugh. *Id.* ¶ 207. Throughout this

time period, Mr. Cavanaugh commented on Ms. Wadsworth's looks and clothing choices in front of Mr. Nguyen. *Id.* ¶ 41. Mr. Nguyen became aware of Mr. Cavanaugh's inappropriate behavior toward Ms. Wadsworth in 2016. *Id.* ¶ 32; *see also id.* ¶¶ 169, 206.

The Amended Complaint goes on to allege that Mr. Cavanaugh also sent Ms. Wadsworth text messages—including sexually explicit and inappropriate messages—on a regular basis, gave her a car and other gifts, and called her into his office on a regular basis, often causing her to miss class. *Id.* ¶¶ 33-36, 42-121, 129-42. He continued this behavior through November 3, 2017. *Id.* ¶ 142. In November 2017, a third party contacted the Waldoboro Police Department regarding the inappropriate relationship between Mr. Cavanaugh and Ms. Wadsworth and the school district put Mr. Cavanaugh on leave pending the results of the police investigation. *Id.* ¶¶ 143-44. In December 2017, Mr. Cavanaugh resigned his position as principal of Medomak Valley High School. *Id.* ¶ 147. Other than what Ms. Wadsworth specifically alleged she said to Mr. Nguyen about Mr. Cavanaugh, she does not allege that Mr. Nguyen was aware of Mr. Cavanaugh's text messaging to Ms. Wadsworth.

After the District placed Mr. Cavanaugh on leave, Mr. Nguyen called Ms. Wadsworth into his office and advised her that Mr. Cavanaugh had a drinking problem. *Id.* ¶ 145.

### C.   The Policies

MSAD 40/RSU 40 has a policy prohibiting "sexual harassment," a term defined in the policy as including but not limited to "unwelcome sexual advances, requests

for sexual favors, or pressure to engage in sexual activity, physical contact of a sexual nature, gestures, comments, or other physical, written, graphic, electronic or verbal conduct that is gender-based that interferes with a student's education." *Id.* ¶¶ 15-16.   MSAD 40/RSU 40's Student Discrimination and Harassment Complaint Procedure provides that "[a]ny individual who believes that a student has been discriminated against or harassed should report their concern promptly to the building principal" and that "[s]chool staff will report possible incidents of discrimination or harassment of students to the building principal." *Id.* ¶ 17.   The policy requires building principals to "promptly inform the Superintendent and the person(s) who is the subject of the complaint that a complaint has been received." *Id.* ¶ 18.   It further states that a student may report instances of sexual harassment to the "police, the Maine Human Rights Commission and/or the federal office of Civil Rights." *Id.* ¶ 19.   The policy outlining employee complaints of harassment and discrimination, which includes employees acting as third-party complainants, instructs complainants to report to "that person's immediate supervisor or the building principal, and that such person receiving the complaint must immediately report it to the Superintendent." *Id.* ¶¶ 20-22.   The policy also allows an employee "to report complaints to the Maine Human Rights Commission and/or the federal office of Civil Rights." *Id.* ¶ 22.

### III.    THE PARTIES' POSITIONS

#### A.    Chuck Nguyen's Motion to Dismiss

Mr. Nguyen moves for "dismissal with prejudice of all claims asserted against him in [Ms. Wadsworth's] Amended Complaint" pursuant to Federal Rule of Civil Procedure 12(b)(6). *Nguyen's Mot.* at 1. He outlines the allegations Ms. Wadsworth makes in her Amended Complaint that refer to him and the standard of review for Rule 12(b)(6) motions. *Id.* at 1-4. He then addresses the § 1983 claim and the tort claims. *Id.* at 5-16.

#### 1.    Failure to Plead Viable Equal Protection Claim

Mr. Nguyen first discusses caselaw addressing sexual harassment claims under § 1983. He states that "Ms. Wadsworth has not specified which rights, privileges or immunities secured by the Constitution or laws of the United States she claims were violated" but that "the First Circuit has indicated that sexual harassment claims can be maintained under Section 1983 as an equal protection violation." *Id.* at 5 (citing *Lipsett v. Univ. of P.R.*, 864 F.2d 881, 896 (1st Cir. 1988)). He lists the requirements for proving an equal protection claim, including selective treatment based on impermissible considerations, identification of "putative comparators," *id.* at 5-6 (quoting *Harron v. Town of Franklin*, 660 F.3d 531, 537 (1st Cir. 2011)), and "proof that the defendant acted with discriminatory purpose." *Id.* at 6 (citing *Lipsett*, 864 F.2d at 896).

Moreover, according to Mr. Nguyen, "personal liability for an alleged equal protection violation cannot be based upon *respondeat superior.*" *Id.* at 6 (emphasis in

8

**A008**

original) (citing cases).  He discusses "supervisory liability," which he says attaches "if a person 'has created or overlooked a clear risk of future unlawful action *by a lower-echelon actor over whom he had some degree of control*,'" *id.* at 6-7 (emphasis in *Nguyen's Mot.*) (quoting *Camilo-Robles v. Zapata*, 175 F.3d 41, 44 (1st Cir. 1999)), and asserts that "[t]he United States District Court for the District of Maine has rejected efforts to hold governmental officials liable absent allegations to establish that the official had some degree of control over the alleged primary violator or direct participant."  *Id.* at 7 (citing *Edson v. Riverview Psychiatric Ctr.*, No. 1:16-cv-00079-JAW, 2017 WL 780787, at *45 (D. Me. Feb. 28, 2017)).  Mr. Nguyen then discusses *Robinson v. City of Pittsburgh*, 120 F.3d 1286 (3rd Cir. 1997), *abrogated on other grounds by Burlington Northern & Santa Fe Railway Company. v. White*, 548 U.S. 53 (2006), which he uses to argue that "a governmental employee who does not directly participate in alleged sexual harassment cannot be held liable for actions taken by a co-worker whom the employee does not supervise."  *Nguyen's Mot.* at 7-8.

Mr. Nguyen asserts that "[b]ased on these legal tenets, Ms. Wadsworth fails to state a viable equal protection claim against" him because she "does not allege that Mr. Nguyen himself engaged in any of the alleged discriminatory actions or that he directed anyone to do so."  *Id.* at 8-9.  He states that the Amended Complaint contains no factual allegation showing that Mr. Nguyen selectively treated Ms. Wadsworth based on her sex, that Ms. Wadsworth had putative comparators, that Mr. Nguyen acted "with the purpose of discriminating on the basis of sex," or that Mr. Nguyen "had any actual control or supervisory authority over Mr. Cavanaugh."  *Id.* at 9.

9

## 2.   Qualified Immunity for the § 1983 Claim

Mr. Nguyen argues that, even if Ms. Wadsworth made sufficient allegations in her Amended Complaint to support her § 1983 claim, he is entitled to dismissal of the claim based on qualified immunity.  *Id.*  He lays out the "two-pronged inquiry" courts use when analyzing qualified immunity, focusing on the "clearly established" prong, *id.* at 9-11 (quoting *Tolan v. Cotton*, 572 U.S. 650, 655-56 (2014)), and asserts that "Ms. Wadsworth's allegations do not implicate clearly established law." *Id.* at 11.  He states that he has not located "any Supreme Court or First Circuit authority to support an equal protection claim based on sexual harassment against a governmental employee who does not himself or herself engage in any harassing conduct and when the alleged harassment is perpetrated by a co-worker who is not the governmental employee's subordinate." *Id.*  Instead, he contends, the Third Circuit's opinion in *Robinson* holds the opposite.  *Id.* at 12.  Further, according to Mr. Nguyen, a reasonable social worker would not understand what he did to be unlawful, in part because "reasonable minds could differ on the significance of the alleged events (which, as pleaded, lack details that would necessarily suggest that Ms. Wadsworth was the victim of sexual harassment) and whether they required a report or a warning." *Id.*  Mr. Nguyen concludes that "[i]n sum, a reasonable social worker could have understood that he or she would not violate Ms. Wadsworth's constitutional rights by refraining from making a report or issuing a warning." *Id.*

10

### 3.   Discretionary Function Immunity for State Tort Claims

Mr. Nguyen cites the Maine Tort Claims Act, 14 M.R.S. §§ 8101-8118, as providing "absolute tort immunity to governmental employees engaged in discretionary functions." *Id.* He quotes a Maine Supreme Judicial Court opinion laying out a four-party inquiry to distinguish discretionary from ministerial functions. *Id.* at 12-13 (quoting *Darling v. Augusta Mental Health Inst.*, 535 A.2d 421, 426 (Me. 1987)). He says that "[o]n several occasions, the Law Court has applied *Darling* and the factors discussed in that case and has held that governmental officials engage in a discretionary function when they supervise other persons" and in support he cites several Maine Supreme Judicial Court cases. *Id.* at 13-14. He then discusses three Maine superior court cases about personal injuries to students that he says apply this reasoning to a governmental employee's supervision of students. *Id.* at 14-15.

Mr. Nguyen asserts that he "unquestionably had the lawful authority to provide services to students at a public high school" and that "providing services to students at a public high school necessarily involves the exercise of judgment by guidance counselors and social workers, including the discretionary assessment of whether a student may need assistance." *Id.* at 15 (citing 20-A M.R.S. § 4008-A). He argues that the situations Ms. Wadsworth alleged happened, including Ms. Wadsworth asking him if Mr. Cavanaugh's offer to drive her to a medical appointment, were appropriate and Mr. Cavanaugh's comment that she should be on birth control, "call[ed] for the exercise of evaluation and discretion . . .." *Id.* He states,

11

**A011**

"Whether a school social worker should interpret the alleged events referenced above—separately or in the aggregate—as abuse or harassment by a school principal is a judgment call that a school social worker must be allowed to make without the threat of liability."  *Id.* at 15-16.  He adds that this conclusion aligns with the legislative intent of discretionary function immunity.  *Id.* at 16.

### B.    Adrianna Wadsworth's Opposition

Ms. Wadsworth describes Mr. Nguyen's involvement in the alleged sexual harassment by Mr. Cavanaugh as "actively convinc[ing her], a child, that her school principal's misconduct was appropriate," "urg[ing her] to continue interacting with her harasser," and "actively interfer[ing] with [her] decision about whether to report [Mr.] Cavanaugh's hideous behavior" rather than "reporting the harassment to the Department of Health and Human Services (and perhaps the District Attorney) as he was statutorily required to." *Pl.'s Opp'n* at 1-2.  She asserts that she has set forth a prima facie case for all counts of the Amended Complaint, Mr. Nguyen does not have "any sort of immunity from those claims," and Mr. Nguyen's decision to file his motion to dismiss after filing an answer to the original complaint is grounds to deny the motion from a procedural standpoint. *Id.* at 2.  She then lays out the procedural and factual background of the case and her allegations. *Id.* at 2-4.

### 1.    Untimely Motion to Dismiss

Ms. Wadsworth contends that since nothing related to Mr. Nguyen changed from the Complaint to the Amended Complaint, Mr. Nguyen's decision to file a motion to dismiss rather than a restatement of his previous answer "is procedurally improper

and fatal to a motion to dismiss made pursuant to Fed.R.Civ.P. 12(b)(6)." *Id.* at 4. According to Ms. Wadsworth, "[i]f a defense is asserted in a motion to dismiss under Rule 12(b)(6), the motion must be lodged before an answer," and the right to assert the defense is revived after an amendment to a complaint only if the amended complaint contains new matter and the defendant objects to that new matter. *Id.* at 5. She says that Mr. Nguyen's "right to assert the defense of failure to state a claim existed at the time of [her] original Complaint" and that Mr. Nguyen "did not assert the available defense against the original Complaint in a motion," instead answering the Complaint and "wait[ing] until after [she] filed her Amended Complaint to launch the defense." *Id.* at 5-6.

### 2.   Valid § 1983 Claim

Ms. Wadsworth asserts that a court may dismiss a claim under Rule 12(b)(6) only if, on the facts alleged in the complaint, "the plaintiff cannot recover on any viable theory." *Id.* at 6 (citing *Gonzáles-Morales v. Hernández-Arencibia*, 221 F.3d 45, 48 (1st Cir. 2000)). She discusses the pleading requirements, which she views as liberal, and moves on to the requirements for valid § 1983 claim. *Id.* at 6-7. She claims that she "has clearly stated a potentially viable 'state-created danger' claim" and that her "equal protection claims also contain enough heft to get beyond the liberal standards of a motion to dismiss." *Id.* at 7.

### a.   State-Created Danger Claim

According to Ms. Wadsworth, "[Mr.] Nguyen is liable under a 'state-created danger' theory (i.e. substantive due process) for depriving [Ms. Wadsworth] of her

right to be free from intrusions into her bodily integrity and her right to receive a public education." *Id.* She outlines her view of the state-created danger theory in the First Circuit and other circuit courts, stating that at least eight federal circuit courts have recognized the theory and the First Circuit "has discussed [its] possible existence." *Id.* at 7-8 *(*quoting *Irish v. Maine*, 849 F.3d 521, 526 (1st Cir. 2017)). She alleges that Mr. Nguyen caused additional danger beyond Mr. Cavanaugh's actions by "repeatedly over the course of two years fail[ing] to make a mandatory report to Maine's Department of Health and Human Services or the District Attorney pursuant to the Maine Child and Family Services and Child Protection Act, 22 M.R.S.A. § 4000 et seq." and instead "encouraging [her] to continue her interactions with [Mr.] Cavanaugh on countless occasions over the course of two years." *Id.* at 8-9. She cites *Irish v. Fowler*, 436 F. Supp. 3d 362 (D. Me. 2020), for the rule that "'a degree and pattern of inaction' can 'rise to the level of an affirmative act'" and says that Mr. Nguyen's inaction and encouragement not to act qualify as an affirmative act under this logic. *Id.* at 9 (citing *Fowler*, 436 F. Supp. 3d at 417).

In Ms. Wadsworth's opinion, given the high burden on the plaintiff of showing that the state action shocks the conscience, discovery is necessary to develop the facts surrounding her state-created danger theory. *Id.* at 9-10. Nonetheless, she compares this case to a First Circuit case and argues that Mr. Nguyen's "decision not to report known sexual harassment in accordance with Maine law, despite knowing that a child (who was particularly vulnerable due to her age) had been repeatedly sexually

14

**A014**

harassed by her principal, is sufficiently conscience-shocking to survive a motion to dismiss." *Id.* at 10-11 (discussing *J.R. v. Gloria*, 593 F.3d 73 (1st Cir. 2010)).

Ms. Wadsworth also mentions a second exception to the general rule that a state has no due process obligation to protect individuals: the creation of a "special relationship." *Id.* at 8 n.2 (quoting *J.R.*, 593 F.3d at 79). She says "[t]he First Circuit has recognized the possibility that 'perhaps in narrow circumstances' a school or school employees might have a 'specific duty' to render aid to a student in peril," *id.* (quoting *Hasenfus v. LaJeunesse*, 175 F.3d 68, 72 (1st Cir. 1999)), and submits that Mr. Nguyen's special relationship to Ms. Wadsworth as her social worker is one of those "narrow circumstances." *Id.*

### b.   Equal Protection Claim

Ms. Wadsworth lays out her view of the basic requirements of an equal protection claim brought under § 1983, which mostly matches Mr. Nguyen's. *Id.* at 11-12. She distinguishes this case from *Robinson*, stating that she was a minor student and a client of Mr. Nguyen's rather than his coworker. *Id.* at 13. She asserts that Mr. Nguyen "failed to comply with school policies and procedures when faced with [her] complaints about [Mr.] Cavanaugh" and that he "participated in the discrimination" rather than merely advising her not to act. *Id.* Addressing the equal protection claim requirements, Ms. Wadsworth argues that "[Mr.] Nguyen treated [her] differently than similarly situated female students in the school as he actively participated in the discrimination." *Id.* at 14. She adds that "[i]t is inconceivable that [Mr.] Nguyen could have heard [her] complaints against [Mr.] Cavanaugh and

15

**A015**

concluded that [Mr.] Cavanaugh's actions were appropriate" and that "[i]n sum, [Mr.] Nguyen's actions served to reaffirm [Mr.] Cavanaugh's harassment, and that is a black letter violation of the law." *Id.* Finally, she asserts, "[t]here is no scenario in which [Mr.] Nguyen could have possibly been furthering an important governmental objective by protecting [Mr.] Cavanaugh and advising [Ms. Wadsworth] that [Mr.] Cavanaugh was 'being nice' and acting like a 'father figure' to her." *Id.*

### 3.    Qualified Immunity for § 1983 Claim

Ms. Wadsworth first contends that Mr. Nguyen's argument that he should be entitled to qualified immunity for his actions failed because he "was not performing a discretionary function" when he advised her. *Id.* She then lays out the two-part test for qualified immunity and argues that "[a] reasonable person in [Mr.] Nguyen's position would have known that [Mr.] Cavanaugh's actions were violating [her] constitutional rights, and that attempting to normalize and encourage the behavior was a furtherance of that violation," especially considering "the school's sexual harassment policies and Maine's mandatory reporting statutes." *Id.* at 15. According to Ms. Wadsworth, these facts are "enough to defeat a claim of qualified immunity, especially at the motion to dismiss stage of the litigation." *Id.* at 15-16.

### 4.    Discretionary Function Immunity for State Tort Claims

Ms. Wadsworth argues that Mr. Nguyen's statements to her "were outside the scope of his employment, and therefore do not qualify for discretionary function immunity." *Id.* at 17. She asserts that his job duties required him to "spend at least 80% of his 'time providing direct and indirect services on behalf of students'" but "did

not require or allow him to protect his colleagues from accusations of sexual harassment and discrimination at the expense of the students" or "to interfere with [Ms. Wadsworth's] decision to report what was without doubt inappropriate sexual harassment by a principal." *Id.* According to Ms. Wadsworth, since Mr. Nguyen chose not to offer her assistance and support, "any claim of immunity is defeated." *Id.* at 18. She adds that "[t]here were many ways that [Mr.] Nguyen could have responded or reacted which would have been in the scope of his discretionary duties as a social worker, including but not limited to investigating the complaint, reporting the complaint, or making the determination that a formal complaint was not appropriate," but "[h]e did none of these things, instead brushing off disturbing behavior and reassuring a child that a principal should be advising a student about the need for birth control." *Id.* She suggests that Mr. Nguyen may have felt that doing so was one his duties as Mr. Cavanaugh's friend and that doing so even after Mr. Cavanagh was suspended was "just the proverbial icing on the cake." *Id.* at 19.

Ms. Wadsworth then places her position within the *Darling* framework:

(1) [Mr.] Nguyen's statements to [Ms. Wadsworth] that [Mr.] Cavanaugh was "being nice," and acting as a "father figure," and that his behavior was "normal," did not involve a basic governmental policy, program or objective; (2) [Mr.] Nguyen's statements were not essential to realization of any policy, program, or objective; (3) [Mr.] Nguyen's statements did not require the exercise of basic policy evaluation, judgment, and expertise; and (4) [Mr.] Nguyen did not possess the requisite constitutional, statutory, or lawful authority and duty to do or make the statements to [Ms. Wadsworth]. In fact, [Mr.] Nguyen's response to [Ms. Wadsworth's] complaints was squarely contradictory to the school's sexual harassment policy and black letter Maine law, and therefore does not qualify for discretionary function immunity.

17

**A017**

*Id.* She concludes that "[a] reasonable person in [Mr.] Nguyen's position would have realized that [his actions] w[ere] outside the scope of his job duties" and that the Court should deny his claim of discretionary function immunity. *Id.* at 20.

### C.   Chuck Nguyen's Reply

Mr. Nguyen asserts that "[s]tripped of the[] new and unfounded contentions, [Ms. Wadsworth's] Opposition fails to rebut the arguments in the Motion" and that his motion is "both procedurally appropriate and substantively correct . . .." *Nguyen's Reply* at 1.

### 1.   Timely Motion to Dismiss

Mr. Nguyen says that Ms. Wadsworth's procedural objection to his motion to dismiss is "unfounded" because he raised the same affirmative defenses in his answer to the Complaint and filed the motion to dismiss within fifteen days after Ms. Wadsworth filed the Amended Complaint. *Id.* He adds that "none of the cases [Ms. Wadsworth] has cited are germane to the procedural posture" of his motion. *Id.* at 2. Regardless, Mr. Nguyen asserts, he "is free to move for judgment on the pleading on the grounds that [Ms. Wadsworth] has failed to present cognizable causes of action" under Federal Rule of Civil Procedure 12(c), so "even if [Ms. Wadsworth's] timeliness argument was supported by the rules or case law, the Court can treat Mr. Nguyen's motion as one made pursuant to Rule 12(c)." *Id.* at 2-3.

### 2.   Added Allegations

Mr. Nguyen lists facts Ms. Wadsworth includes in her opposition that he views as "the most prominent untethered assertions" not mentioned in the Amended

Complaint, including that he encouraged Ms. Wadsworth to continue the relationship and that he received reports from other teachers about Mr. Cavanaugh's harassment. *Id.* at 3-4. He says that "[t]he non-conclusory factual assertions that do appear in the Amended Complaint consist of four alleged conversations between [Ms. Wadsworth] and Mr. Cavanaugh and an indefinite number of unspecified comments by Mr. Cavanaugh 'on [Ms. Wadsworth's] looks and clothing choices in front of teachers, students, assistant principals, and [Mr.] Nguyen.'" *Id.* at 4 (quoting *Am. Compl.* ¶ 41) (citing *Am. Compl.* ¶¶ 26-27, 30, 31, 145).

### 3.   State-Created Danger Theory

Mr. Nguyen argues that Ms. Wadsworth "fails to even clear the low bar of notice pleading" regarding her state-created danger argument because she does not mention it or related terms in the Amended Complaint. *Id.* "In any event," he states, "the theory is inapplicable to the non-conclusory factual assertions in the Amended Complaint" because the claim demonstrates nothing more than alleged inaction by Mr. Nguyen and the United States Supreme Court rejected this theory of state-created danger in *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189 (1989). *Id.* at 4-5. He notes that, although Ms. Wadsworth suggests that a pattern of inaction can give rise to a constitutional duty under the Due Process Clause, "the First Circuit has not adopted such a rule, nor did [Ms. Wadsworth] cite any cases that would suggest that Mr. Nguyen's alleged conduct would be sufficient to satisfy such a rule." *Id.* at 5 n.6. He adds that his alleged responses "can hardly be characterized as 'shocking to the conscience,' regardless of whether the deliberate

indifference standard applies or not." *Id.* at 5-6 (citing *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 847 (1998); *Burrell v. Hampshire Cnty.*, 307 F.3d 1, 8 (1st Cir. 2002)). Mr. Nguyen also addresses Ms. Wadsworth's discussion of the "special relationship" duty and rejects its application to the context of this case because Ms. Wadsworth was not in the school's custody. *Id.* at 6.

### 4. Discretionary Function Immunity

According to Mr. Nguyen, Ms. Wadsworth's argument pertaining to Mr. Nguyen's Maine Tort Claims Act immunity is "unpersuasive" because "[m]ost of [Ms. Wadsworth's] argument . . . is premised upon allegations that do not appear in the Amended Complaint or assertions that are both conclusory and speculative." *Id.* at 7. He further argues that "to the extent the alleged discussions between [Ms. Wadsworth] and Mr. Nguyen actually occurred, that conduct unquestionably occurred within the scope of his employment" because he was the social worker at Medomak Valley High School at the time. *Id.* Finally, he asserts that his "alleged responses to [Ms. Wadsworth's] alleged queries were necessarily the product of a discretionary assessment" because they were reactions that required evaluation before response. *Id.* He says that "[e]ven if Mr. Nguyen's alleged assessments and his subsequent reactions were flawed (as [Ms. Wadsworth] suggests), they are nonetheless part of Mr. Nguyen's discretionary duties" and that "[t]he Maine Law Court has repeatedly held that persons making analogous types of evaluations are protected by discretionary function immunity." *Id.* (citing cases).

20

**A020**

## IV.   LEGAL STANDARD

Rule 12(b)(6) requires dismissal of a complaint that "fail[s] to state a claim upon which relief can be granted . . .." FED. R. CIV. P. 12(b)(6).  To state a claim, a complaint must contain, among other things, "a short and plain statement of the claim showing that the pleader is entitled to relief . . .." FED. R. CIV. P. 8(a)(2).  In other words, a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).  Plausible means "'something more than merely possible' or 'merely consistent with a defendant's liability.'" *Germanowski v. Harris*, 854 F.3d 68, 71-72 (1st Cir. 2017) (internal citation omitted) (quoting *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 55 (1st Cir. 2012); *Ocasio-Hernández v. Fortuño-Burset*, 640 F.3d 1, 11 (1st Cir. 2011)).  This is a "'context-specific' job that compels [judges] 'to draw on' [their] 'judicial experience and common sense.'" *Schatz*, 669 F.3d at 55 (quoting *Iqbal*, 556 U.S. at 679).

Analyzing plausibility is a "two-step analysis . . .." *Cardigan Mountain Sch. v. N.H. Ins. Co.*, 787 F.3d 82, 84 (1st Cir. 2015).  "First, the court must distinguish 'the complaint's factual allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited).'" *García-Catalán v. United States*, 734 F.3d 100, 103 (1st Cir. 2013) (quoting *Morales-Cruz v. Univ. of P.R.*, 676, F.3d 220,

224 (1st Cir. 2012)). "Second, the court must determine whether the factual allegations are sufficient to support 'the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id.* (quoting *Haley v. City of Boston*, 657 F.3d 39, 46 (1st Cir. 2011)).

## V.   DISCUSSION

Mr. Nguyen's motion to dismiss turns on whether (1) it is timely, (2) Ms. Wadsworth alleged an actionable substantive due process or equal protection claim under § 1983 in her Amended Complaint, (3) qualified immunity protects Mr. Nguyen from Ms. Wadsworth's § 1983 claim, and (4) discretionary function immunity protects Mr. Nguyen against Ms. Wadsworth's state tort claims.

### A.   Timeliness of Mr. Nguyen's Motion to Dismiss

Ms. Wadsworth and Mr. Nguyen disagree about whether Mr. Nguyen's motion to dismiss should be denied as untimely pursuant to Federal Rule of Civil Procedure 12(b)(6) because he filed an answer to the original Complaint—which preserved the defenses in the motion to dismiss—before filing the motion to dismiss and nothing related to Mr. Nguyen changed from the Complaint to the Amended Complaint. *Pl.'s Opp'n* at 4-6; *Nguyen's Reply* at 1-2. Mr. Nguyen adds that Rule 12(c) allows him to argue the same defenses in a motion for judgment on the pleadings, so "even if [Ms. Wadsworth's] timeliness argument was supported by the rules or case law, the Court can treat Mr. Nguyen's motion as one made pursuant to Rule 12(c)." *Id.* at 2-3 (citing *Pérez-Acevedo v. Rivero-Cubano*, 520 F.3d 26, 29 (1st Cir. 2008)).

"A motion asserting [failure to state a claim upon which relief can be granted] must be made before pleading if a responsive pleading is allowed." FED. R. CIV. P. 12(b)(6)). However, the District of Maine "has permitted late-filed motions to dismiss raising Rule 12(b) grounds, so long as those grounds have been preserved in the defendant's answer." *Daigle v. Stulc*, Civ. No. 09-353-B-W, 2009 WL 4348393, at *2 (D. Me. Nov. 24, 2009) (citing *Ecotecture, Inc. v. Wenz*, No. 99-387-P-C, 2000 WL 760961, at *1 (D. Me. May 16, 2000)). Since Mr. Nguyen raised the affirmative defense of failure to state a claim in his answer, *Nguyen's Answer* ¶¶ 7, 9, he preserved the defense and may proceed with his motion on Rule 12(b)(6) grounds. The Amended Complaint filed between Mr. Nguyen's answer and his motion to dismiss does not affect this principle.

In addition, the Amended Complaint did not contain any new allegations against Mr. Nguyen. *Pl.'s Opp'n* at 1 ("On March 27, 2020, [Ms. Wadsworth] filed her Amended Complaint, in which she did not add or otherwise change her claims against [Mr.] Nguyen in consideration of his prior Answer"). Also, Mr. Nguyen filed the motion to dismiss within the time required to file an answer to an amended pleading under Federal Rule of Civil Procedure 15(a)(1)(B). Finally, Ms. Wadsworth does not suggest any prejudice from the Court's consideration of Mr. Nguyen's motion, and from the Court's perspective, it is preferable to address the sufficiency of the complaint early in the litigation rather than dismiss the motion on technical grounds and revisit the same issues later under a different provision.

Finally, even if Mr. Nguyen could not proceed under Rule 12(b)(6), he would be allowed to proceed with his motion as a motion for judgment on the pleadings under Rule 12(c) and pursuant to Rule 12(h)(2). *See Emrit v. Nat'l Grid, Inc.*, CIVIL ACTION No. 14-14769-GAO, 2017 WL 2836998, at *1 & n.2 (D. Mass. June 29, 2017) (construing a Rule 12(b)(6) motion as a Rule 12(c) motion because the defendant filed an answer before filing the motion to dismiss and asserted the affirmative defense of failure to state a claim in its answer). "Converting the grounds for a motion from Rule 12(b)(6) to Rule 12(c) 'does not affect [a court's] analysis inasmuch as the two motions are ordinarily accorded much the same treatment.'" *Patrick v. Rivera-Lopez*, 708 F.3d 15, 18 (1st Cir. 2013) (quoting *Apontes-Torres v. Univ. of P.R.*, 445 F.3d 50, 54 (1st Cir. 2006)); *see also Pérez-Acevedo*, 520 F.3d at 29 ("A motion for judgment on the pleadings is treated much like a Rule 12(b)(6) motion to dismiss" (citing *Curran v. Cousins*, 509 F.3d 36, 43-44 (1st Cir. 2007))). "There is, of course, a modest different between Rule 12(c) and Rule 12(b)(6) motions. A Rule 12(c) motion, unlike a Rule 12(b)(6) motion, implicates the pleadings as a whole." *Apontes-Torres*, 445 F.3d at 54-55 (citing 5C CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1368 (3d ed. 2004))." When the parties agree that the "source of the pertinent facts" is the amended complaint, however, this difference is irrelevant. *Id.* at 55. Thus, since the parties agree the Amended Complaint is the source of the pertinent facts, there would be no harm to either party to construe Mr. Nguyen's motion as a motion for judgment on the pleadings. Thus, the Court could consider Mr. Nguyen's motion under either provision and the result would be the same. In

light of the tonal differences between the rules, the Court accepts Mr. Nguyen's motion as a motion to dismiss.

### B.     Section 1983 Claim

Section 1983 provides that

> [e]very person who, under color of [law], subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . ..

42 U.S.C. § 1983.  The deprivation prong requires there to be a deprivation of a federally protected right, privilege, or immunity and a causal connection between the conduct complained of and the deprivation.  *See Gutierrez-Rodriguez v. Cartagena*, 882 F.2d 553, 559 (1st Cir. 1989).  As Mr. Nguyen points out, § 1983 "is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred."  *Nguyen's Mot*. at 5 (internal quotation marks omitted) (citation omitted) (quoting *Graham v. Connor*, 490 U.S. 386, 389-94 (1989)). Moreover, the plaintiff must allege that "the perpetrator of the violation was acting under color of law."  *Cruz-Erazo v. Rivera-Montañez*, 212 F.3d 617, 621 (1st Cir. 2000). Mr. Nguyen does not contest that he acted under color of law.  Thus, Ms. Wadsworth must point to a specific federal right, allege a deprivation of that right, and allege a causal connection to Mr. Nguyen's conduct.

### 1.     Substantive Due Process

Ms. Wadsworth identifies a federal right: the right to be free from intrusions into her bodily integrity.  *Pl.'s Opp'n* at 7; *see Doe v. Sch. Admin. Dist. No. 19*, 66 F.

Supp. 2d 57, 65 (D. Me. 1999) ("It is well recognized that students have a fundamental right to bodily integrity that includes the right to be free from sexual abuse").  She also establishes a deprivation of that right: Mr. Cavanaugh's "repeated, demanding sexual harassment . . .."  *Pl.'s Opp'n* at 8.  Thus, the remaining question is whether she has alleged a causal connection between Mr. Nguyen's conduct and the deprivation of her right.

Ms. Wadsworth argues that "while [Mr.] Nguyen may not have perpetrated the harassment, the due process clause is nevertheless implicated" under a state-created danger theory because of his repeated failure to report the sexual harassment and his "perpetual and frequent normalization" of the behavior, which interfered with her decision to report Mr. Cavanaugh's conduct.  *Id.* at 8-9.  She asserts that more discovery is needed to develop the facts surrounding this theory of the case.  *Id.* at 9-10.  Mr. Nguyen responds that Ms. Wadsworth's claims "describe[] nothing more than alleged inaction" by him and the United States Supreme Court has rejected such a theory of state-created danger.  *Nguyen's Reply* at 5.[5]

---

[5]    Mr. Nguyen also argues that Ms. Wadsworth's state-created danger argument "fails to even clear the low bar of notice pleading" because she does not mention "the Fourteenth Amendment; the Due Process Clause; substantive due process; or 'state-created danger'" in the Amended Complaint. *Id.* at 4.  The Court disagrees.

In *Doe*, the federal district court in Maine found that "Doe adequately pleaded the state-created danger theory by alleging that the Defendants 'created an unreasonable risk of harm' that Doe would be deprived of his constitutional rights." *Doe*, 2020 WL 2820197, at *3 (quoting *Am. Compl.* ¶ 69, *Doe v. Reg'l Sch. Unit No. 21*, 2:19-cv-00341-NT (Nov. 15, 2019), ECF No. 27 (*Doe Am. Compl.*)).  The plaintiff in that case also alleged that the defendants "failed to take any action or implement any measures that would protect Plaintiff against further unlawful sexual misconduct by [the teacher]" and "failed to enforce [the school's] policies regarding staff conduct with students, harassment and sexual harassment of students, and investigations, and allowed [the teacher] continued unsupervised access to Plaintiff after being put on notice of her sexual misconduct." *Doe Am. Compl.* ¶ 22.  The *Doe* plaintiff mentioned substantive due process, *id.* ¶ 70, but did not mention the Fourteenth Amendment or use the term "state-created danger."  In *Fowler*, the plaintiffs alleged that the defendants' "failure to protect" "creat[ed] the danger to" the plaintiff but did not use the words "substantive due process,"

26

**A026**

### a.   State-Created Danger Doctrine in the First Circuit

The Fourteenth Amendment's Due Process Clause provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law . . .." U.S. CONST. amend. XIV, § 1. "As a general matter, 'a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause.'" *Irish*, 849 F.3d at 525 (quoting *DeShaney*, 489 U.S. at 197). This principle is not absolute: "[I]n situations in which there is a 'special relationship,' an affirmative, constitutional duty to protect may arise when the state 'so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs.'" *Rivera v. Rhode Island*,

---

"Fourteenth Amendment," or "state-created danger." *Fowler*, 1:15-cv-00503-JAW, *Second Am. Compl.* ¶ 43, (ECF No. 38). In *Raymond v. Maine School Administrative District 6*, the plaintiffs alleged in the complaint that the school district "failed to train staff" adequately and that "in doing so, [the school district] created a danger, increased the danger, and/or made [the alleged victim] more vulnerable to the danger of being assaulted . . .." *Raymond*, 2:18-cv-00379-JAW, *Compl.* ¶¶ 52-53 (ECF No. 1). The plaintiffs mentioned substantive due process but not the Fourteenth Amendment. *Id.* ¶ 49.

Here, Ms. Wadsworth alleged that Mr. Nguyen "deprived [her] of her rights by, among other acts and omissions, his failure to protect [her] when she complained about sexual harassment and discrimination by [Mr.] Cavanaugh." *Am. Compl.* ¶ 176. While she did not mention state-created danger, substantive due process, the Fourteenth Amendment, or the Due Process Clause, she stated within the § 1983 violation count that her claim against Mr. Nguyen stemmed from his failure to protect her, which deprived her of her rights. Her allegations were less specific than those in the three cited complaints, but none of the complaints contains all the terms Mr. Nguyen lists. Like Ms. Wadsworth's Amended Complaint, however, they all contain an allegation of failure to protect that causes the deprivation of constitutional rights. Moreover, Ms. Wadsworth did not mention the Equal Protection Clause in the Amended Complaint either, but Mr. Nguyen has no issue interpreting her § 1983 claim as an equal protection violation claim. *See Nguyen's Mot.* at 5 ("Ms. Wadsworth has not specified which rights, privileges or immunities secured by the Constitution or laws of the United States she claims were violated. However, the First Circuit has indicated that sexual harassment claims can be maintained under Section 1983 as an equal protection violation"). The "failure to protect" language is more directly linked to a state-created danger theory under substantive due process than an equal protection violation. Finally, since Ms. Wadsworth bases her state-created danger claim on the theory that a "degree and pattern of inaction" can "rise to the level of an affirmative act," *Pl.'s Opp'n* at 9 (quoting *Fowler*, 436 F. Supp. 3d at 417), the failure to protect is the crux of her argument. Thus, the Court concludes that Ms. Wadsworth adequately pleaded the state-created danger theory for her substantive due process claim under § 1983 in the Amended Complaint.

402 F.3d 27, 34 (1st Cir. 2005) (quoting *DeShaney*, 489 U.S. at 200).[6] "The Supreme Court also suggested, but never expressly recognized, the possibility that when the state creates the danger to an individual, an affirmative duty to protect might arise . . .." *Id.* at 34-35.

The Courts of Appeals in at least eight circuits have recognized the "state-created danger theory" as an exception to the general rule in *DeShaney*. *Irish*, 849 F.3d at 526 (citing *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1061 n.1 (9th Cir. 2006)); *see also Doe*, 2020 WL 2820197, at *3. Yet, two federal circuits have explicitly refused to recognize such an exception. *See Johnson v. City of Biddeford*, 2:17-cv-00264-JDL, 2020 WL 1877964, at *9 (D. Me. Apr. 15, 2020) (citing *Beltran v. City of El Paso*, 367 F.3d 299, 307 (5th Cir. 2004); *Vaughn v. City of Athens*, 176 F. App'x

---

[6]     Ms. Wadsworth's suggestion that her case fits within the "narrow circumstances" that might justify a school employee's constitutional duty to protect a student under the special relationship exception is unconvincing. *See* Pl.'s Opp'n at 8 n.2 (quoting *Hasenfus*, 175 F.3d at 72). The First Circuit has not explicitly recognized a special relationship in a school context. *See Rivera*, 402 F.3d at 34-35 (discussing the existence of the special relationship exception in certain situations, such as incarceration or custody, and not mentioning schools).
        In *Veronica Sch. Dist. 47J v. Acton*, 515 U.S. 646 (1995), the United States Supreme Court wrote that

> [t]raditionally at common law, and still today, unemancipated minors lack some of the most fundamental rights of self-determination . . .. They are subject . . . to the control of their parents or guardians. When parents place minor children in private schools for their education, the teachers and administrators of those schools stand *in loco parentis* over the children entrusted to them.

*Id.* at 655 (emphasis in original) (internal citation omitted). At the same time, quoting *Veronica*, the First Circuit recognized in *Hasenfus* that the authority public schools exercise over students does not "give rise to a constitutional 'duty to protect.'" *Hasenfus*, 175 F.3d at 71-72 (quoting *Veronica*, 515 U.S. at 655). In *Hasenfus*, the First Circuit discussed the possibility of "narrow circumstances" where a school official would have a due process obligation to act to protect a student, but it did not find such circumstances in that case. *Id.* at 72. Furthermore, the examples it listed where a constitutional duty to act might be found described school employees ignoring physical harm to students, such as a student suffering a heart attack or falling down an elevator shaft. *Id.* However Mr. Nguyen's actions or inactions are viewed, it is questionable whether they would fit within the definition of "pungent facts" that the First Circuit saw as necessary to hold a school official responsible for a constitutional violation, especially one based on a failure to act or whether Mr. Nguyen's counseling relationship to Ms. Wadsworth would be deemed a special relationship under First Circuit law. *See id.*

974, 976 n.1 (11th Cir. 2006)).  The First Circuit "has discussed the possible existence of the state-created danger theory" but has "never found it applicable to any specific set of facts," *Irish*, 849 F.3d at 526, and accordingly, the First Circuit has not yet adopted or set out a detailed test for the theory.  *See Abdisamad v. City of Lewiston*, 960 F.3d 56, 60 (1st Cir. 2020); *Fowler*, 436 F. Supp. 3d at 414 n.148.  Even so, courts in this district have applied First Circuit language discussing the theory in similar cases:

> "Under a [state-created] danger theory, a plaintiff must show that a 'government employee, in the rare and exceptional case, affirmatively act[ed] to increase the threat of harm to the claimant or affirmatively prevent[ed] the individual from receiving assistance.'" [*Raymond v. Me. Sch. Admin. Dist. 6*, No. 2:18-cv-00379-JAW, 2019 WL 2110498, at *7 (D. Me. May 14, 2019)] (quoting *Lockhart-Bembery v. Sauro*, 498 F.3d 69, 77 (1st Cir. 2007)).  Additionally, "the state actions must shock the conscience of the court." *Irish*, 849 F.3d at 526 (citing [*Rivera*, 402 F.3d at 35]).

*Doe*, 2020 WL 2820197, at *3 (some alterations in original).  In short, assuming the First Circuit would adopt the state-created danger theory, the plaintiff must show an affirmative act on the part of a government employee that creates or increases the danger to the plaintiff and that shocks the conscience of the Court.

The first prong, an affirmative act, is not further developed in the First Circuit. The circuits that have adopted the state-created danger theory require either an affirmative act or "a degree and pattern of inaction that rises to the level of an affirmative act." *Fowler*, 436 F. Supp. 3d at 417; *see also Johnson*, 2020 WL 1877964, at *9 & n.12 (discussing this sentence from *Fowler* and noting that First Circuit cases cited by plaintiffs' counsel "only reinforce the necessity of an affirmative act").  The

29

**A029**

Court is unaware of a First Circuit case that adopts the rule that a pattern of inaction can rise to the level of an affirmative act in this context or examines the type of conduct that would qualify as a "pattern." The Second Circuit has held that "repeated, sustained inaction by government officials, in the face of potential acts of violence," might "ris[e] to the level of an affirmative condoning of private violence, even if there is no explicit approval or encouragement." *Okin v. Village of Cornwall-on-Hudson Police Dep't*, 577 F.3d 415, 428 (2d Cir. 2009) (quoting *Pena v. DePrisco*, 432 F.3d 98, 111 (2d Cir. 2005)); *see also Johnson*, 2020 WL 1877964, at *9 (citing *Okin* while analyzing the defendants' omissions in a state-created danger claim).

The second prong requires the plaintiff to "allege facts 'so extreme and egregious as to shock the contemporary conscience.'" *Abdisamad*, 960 F.3d at 59-60 (quoting *DePoutot v. Raffaelly*, 424 F.3d 112, 118 (1st Cir. 2005)). "Mere negligence would be insufficient to maintain a claim of substantive due process violation," *id.* (quoting *Irish*, 849 F.3d at 528); however, "[i]n situations where actors have an opportunity to reflect and make reasoned and rational decisions, deliberately indifferent behavior may suffice to 'shock the conscience.'" *Rivera*, 402 F.3d at 36 (citing *Lewis*, 523 U.S. at 851-52).

In *Irish*, the First Circuit vacated this Court's grant of a motion to dismiss a § 1983 claim based on a state-created danger theory and remanded the case with instructions for further discovery. 849 F.3d at 525, 529. The First Circuit highlighted the lack of facts in the record about police procedure and training, what exactly the officers knew, and what actions they took before and after their affirmative act as

30

**A030**

"pertinent to the substantive due process and qualified immunity issues." *Id.* at 527-28.

Since *Irish*, the federal district court in Maine has handled a number of motions to dismiss § 1983 claims premised on the state-created danger theory.[7]  In *Raymond*, this Court concluded that it was premature to dismiss the plaintiffs' § 1983 claim against a school district and school administrators on a motion to dismiss when the plaintiffs alleged that another student sexually assaulted their child, that the defendants were aware the other student had engaged in instances of sexual assault in the past and posed an imminent threat to the child, and that the defendants willfully disregarded the known risks and failed to prevent the assault.  2019 WL 2110498, at *8.  This Court discussed *Irish* and held that "a fuller development of the

---

[7]        Within the First Circuit but outside the District of Maine, district courts issued rulings on state-created risk cases.  In *Hootstein v. Amherst-Pelham Regional School Committee*, 361 F. Supp. 3d 94 (D. Mass. 2019), a federal judge in the District of Massachusetts declined to allow a state-created danger claim to go forward because the state-created danger theory does not extend to harm caused by third persons.  *Id.* at 110-11.  In *Barresi v. City of Boston*, 345 F. Supp. 3d 98 (D. Mass. 2018), a district judge granted a motion to dismiss a claim that was based on a state-created danger theory when the police failed to arrest a domestic abuser yet committed no affirmative act that caused the abuser to murder the victim.  *Id.* at *1-3.  In *Doe1 v. Bos. Pub. Schs.*, No. 17-cv-11653-ADB, 2018 WL 3336535 (D. Mass. Jul. 6, 2018) (*Doe1*), a federal trial judge granted motions to dismiss all claims but allowed the plaintiffs to amend their complaint that alleged school officials acted and failed to act to protect students from sexual assaults by other students.  *Id.* at *1-3.  The *Doe1* Court found the complaint devoid of any "detail at all from which to determine if there is any actionable conduct."  *Id.* at *3.  After the plaintiffs amended the complaint and the defendants filed new motions to dismiss, the *Doe1* Court found that the § 1983 claim of state-created danger narrowly survived the motions to dismiss because "[t]he affirmative acts of concealment and retaliation alleged in the Amended Complaint amount to more than just knowledge of [the alleged victim's] assaults or a failure to intervene" and "school officials' decision not to report known sexual assaults to DCF in accordance with Massachusetts law despite knowing that elementary school-aged children (who are particularly vulnerable due to their age) had been repeatedly assaulted is sufficiently conscience-shocking to survive a motion to dismiss."  *Doe1 v. Bos. Pub. Schs.*, No. 17-cv-11653-ADB, 2019 WL 1005498, at *3-5 (D. Mass. Mar. 1, 2019).  However, the *Doe1* Court dismissed the state-created danger claim against the individual school official because of qualified immunity.  *Id.* at *6-7.

31

**A031**

facts [was] necessary" to determine what exactly the defendants knew and what policies or procedures, if any, they violated.  *Id.* (citing *Irish*, 849 F.3d at 529).

Similarly, the Court in *Doe* denied a motion to dismiss in a case about sexual abuse of a student by a teacher, holding that allegations that the defendants were on notice of inappropriate conduct by a teacher, failed to reasonably investigate or initiate remedial action, failed to enforce policies designed to prevent sexual conduct, and permitted the teacher to have unsupervised access to the plaintiff after being put on notice supported a claim under a state-created danger theory.  2020 WL 2820197, at *3.  The Court held that "more factual development [wa]s necessary to determine whether the actions of the Defendants increased the risk of harm to Doe and whether those actions constitute conscious-shocking behavior" but that "for the purposes of a motion to dismiss, the Plaintiff has stated a claim."  *Id.* (citing *Irish*, 849 F.3d at 527-28).

In *McCann on behalf of J.M. v. York School Department*, 365 F. Supp. 3d 132 (D. Me. 2019), on the other hand, a District of Maine court granted a motion to dismiss a § 1983 claim based on a state-created danger theory, holding that the school department did not shock the conscience in its response to bullying which resulted in an assault.  *Id.* at 137-39, 147.  The Court stated that generally an act that shocks the conscience is both "'intended to injure in some way' and 'unjustifiable by any government interest,'" and the complaint "d[id] not allege that the School Department acted purposefully with an intent to injure" the plaintiff but rather alleged that the

school department "failed to take [the plaintiff's] reports of harassment seriously and to respond to threats by other students." *Id.* at 147.

In *Johnson*, a District of Maine court granted a motion for summary judgment and dismissed a § 1983 claim premised on a state-created danger theory. 2020 WL 1877964, at *10, 13. Given the First Circuit's discussion of the theory in *Irish*, the *Johnson* Court "assume[d] that the First Circuit will eventually adopt the 'state-created danger' exception" for the purposes of its analysis. *Id.* at *5. It held that the defendants' alleged failures to act did not qualify as affirmative acts for the purposes of the state-created danger exception. *Id.* at 9. In doing so, it quoted a District of Massachusetts case, *id.*, in which the court, in finding sufficient facts for a state-created danger claim, cautioned that "[f]ailing to defuse a preexisting danger is not an affirmative act under the [state-created danger] doctrine" and noted that if the further discovery did not reveal evidence of an affirmative act that enhanced the danger to the plaintiffs, the Court would revisit the finding on summary judgment. *Doe1*, 2019 WL 1005498, at *5. The Court also stated that "courts must be careful to distinguish between . . . state inaction and action." *Id.* (quoting *Rivera*, 402 F.3d at 36).

The First Circuit weighed in on the state-created danger theory most recently in *Abdisamad*. The Court affirmed a district court's grant of a motion to dismiss a claim based on this theory and distinguished *Irish* on the grounds that *Abdisamad* dealt with municipal, not individual, liability and that the plaintiff did not allege that the defendants' policies caused the death but that the death resulted from a failure

to follow those policies. 960 F.3d at 60. The *Abdisamad* Court reiterated that the First Circuit still has not found the state-created danger theory applicable to any specific state of facts. *Id.*

In summary, since *Irish*, courts in the District of Maine have hesitated to dismiss a § 1983 claim premised on a state-created danger theory at the Rule 12(b)(6) motion stage when discovery could provide more clarity on what actions the defendants took, if any, and how policies and procedures impact the "shock the conscience" determination.

### b.      Analysis

Ms. Wadsworth presents two bases for a state-created danger claim: Mr. Nguyen's "failure to report" Mr. Cavanaugh's sexual harassment and his "perpetual and frequent normalization" of such behavior. *Pl.'s Opp'n* at 8. When viewed together, the Court finds that Ms. Wadsworth has alleged sufficient facts to survive the motion to dismiss.

The first basis, failure to report, is similar to the plaintiffs' claim in *Raymond*, in which this Court denied a motion to dismiss a state-created danger claim. In *Raymond*, the plaintiffs alleged that the defendants knew about the risk of one student to another student and failed to prevent the sexual assault. 2019 WL 2110498, at *8. Here, viewing the facts in the light most favorable to Ms. Wadsworth and drawing reasonable inferences in her favor, Mr. Nguyen was aware of Mr. Cavanaugh's inappropriate behavior towards Ms. Wadsworth—both through her reports and through his own observations—and the imminent threat it posed to her.

Yet he failed to report the harassment or advise her to stop interacting with Mr. Cavanaugh, disregarding the risk and failing to prevent continued abuse by Mr. Cavanaugh. Mr. Nguyen's inaction went further. He failed to report for over a year, including at least three specific times after Ms. Wadsworth reported disturbing actions by Mr. Cavanaugh towards her, such as telling her to use birth control. This length of time may be enough to show a pattern of inaction that rises to the level of an affirmative act. *See Fowler*, 436 F. Supp. 3d at 417. If this case were only about a failure to act, however, the Court would be constrained by *Hasenfus* and *Abdisamad*, which counsel against holding a school official liable for a failure to act except in the most immediate and egregious circumstances.

The second basis, normalization of Mr. Cavanaugh's sexual harassment, provides a clearer argument for an affirmative act by Mr. Nguyen. As in *Doe*, where the Court found that the allegations supported a claim under a state-created danger theory "particularly where the Defendants' actions—permitting [the teacher] unsupervised access to the Plaintiff after the March investigation—may have exposed Doe to additional abuse," 2020 WL 2820197, at *3, Ms. Wadsworth has sufficiently alleged that Mr. Nguyen's active choice to make comments that diminished the seriousness of Mr. Cavanaugh's inappropriate behavior encouraged her not to report Mr. Cavanaugh to someone else and to continue her relationship with him, *see Am. Compl.* ¶ 207, and thus exposed her to additional improper conduct over the course of a year. Ms. Wadsworth was sixteen years old when she sought Mr. Nguyen's advice. She was being sexually harassed by the principal of her high school, and the

very person she was supposed to be able to trust—the school social worker—told her at least three times that her concerns were unfounded and that her abuser was being nice and acting like a "father figure." This action, coupled with Mr. Nguyen's failure to report Mr. Cavanaugh himself, plausibly increased Mr. Cavanaugh's access to Ms. Wadsworth to continue sexually harassing her for over a year by preventing an investigation and encouraging her to keep making herself available to him.

At this stage, the Court only has Ms. Wadsworth's allegations and no explanation from Mr. Nguyen as to why he failed to report Mr. Cavanaugh's actions or why he normalized them. Like *Irish*, the Court would benefit from the further development of underlying facts. To paraphrase *Irish*, the "record here is devoid of any facts on whether [Mr. Nguyen's] decision [not to report Mr. Cavanaugh and to actively minimize his conduct] . . . was in line with [school] protocol and [social worker] training." *Irish*, 849 F.3d at 527. "More specifically, based on this record, [the Court] do[es] not know the steps, if any, that [school social workers] should take when they have reason to believe that [a school employee is sexually harassing a student and placing the student at risk]." *Id.* at 527-28. The MSAD 40/RSU 40 policies alleged in the Amended Complaint contain general information about employees' duties to report sexual harassment, but they do not make clear the school social worker's position in the reporting chain of command, presenting an incomplete and at times conflicting picture. *Am. Compl.* ¶¶ 15-22 (stating that "[s]chool staff will report possible incidents of . . . harassment of students to the building principal" who will report to the superintendent and stating later that an employee must report

36

**A036**

possible harassment "to that person's immediate supervisor or the building principal, and that such person receiving the complaint must immediately report it to the Superintendent"). They also do not specify the amount of discretion the school social worker has in evaluating whether a situation is a possible incident of harassment.

At this stage, Ms. Wadsworth's allegations also provide enough support for her claim to establish conscience-shocking behavior to prevent dismissal. Based on the allegations alone, there is a basis for applying the deliberate indifference standard in *Rivera* rather than the intent to injure standard in *McCann* and concluding that Mr. Nguyen's deliberately indifferent behavior shocks the Court's conscience. *See Rivera*, 402 F.3d at 36 (citing *Lewis*, 523 U.S. at 851-52); *McCann*, 365 F. Supp. 3d at 147. In addition, the record does not disclose any justifiable government interest served by Mr. Nguyen's comments. *See McCann*, 365 F. Supp. 3d at 147.

The record lacks the facts necessary to determine whether Mr. Nguyen's repeated failure to report and his normalization of Mr. Cavanaugh's disturbing behavior qualify as affirmative acts that increased Ms. Wadsworth's risk of danger and shock the conscience. As in *Irish* and *Raymond*, the Court does not know what exactly Mr. Nguyen knew of Mr. Cavanaugh's harassment, the circumstances of Ms. Wadsworth's reports to Mr. Nguyen, why her reports did not trigger a more serious response from Mr. Nguyen, what relationship Mr. Nguyen had with Mr. Cavanaugh—that is whether he was protecting and enabling a friend and colleague, whether he was worried that confronting Mr. Cavanaugh would adversely affect his own position, whether he violated any school policies, whether his inaction and

actions comport with professional standards, and what actions he took before and after the three conversations with Ms. Wadsworth.[8] The First Circuit in *Abdisamad* reinforced the distinction it made in *Irish* between harm arising from a government employee following a policy and harm arising from the employee's failure to follow the policy, 906 F.3d at 60, further establishing this factual issue as a reason to deny the motion to dismiss and proceed to discovery.

Ms. Wadsworth has alleged facts sufficient to convince the Court that further discovery is needed to determine whether she has a viable substantive due process claim premised on a state-created danger theory. At the same time, discovery may reveal there is less than meets the eye in this situation and that Mr. Nguyen simply misjudged it. Accordingly, the Court denies Mr. Nguyen's motion to dismiss her substantive due process claim under § 1983.

### 2.    Equal Protection Claim

Mr. Nguyen argues that Ms. Wadsworth fails to state a viable equal protection claim against him because the Amended Complaint contains no factual allegation showing that Mr. Nguyen selectively treated Ms. Wadsworth based on her sex, that Ms. Wadsworth had putative comparators, that Mr. Nguyen acted "with the purpose

---

[8]      Ms. Wadsworth alleges several additional facts in her response to the motion to dismiss not included in the Amended Complaint, including that Mr. Nguyen dissuaded Ms. Wadsworth from reporting Mr. Cavanaugh and received reports from other teachers about Mr. Cavanaugh's harassment. *Pl.'s Opp'n* at 3, 9-10. The Amended Complaint contains brief statements about the school district's policies, *see id.* ¶¶ 15-22, but again Ms. Wadsworth's response goes into more detail, alleging that Mr. Nguyen failed to comply with the school policies as well as his legal responsibilities to report. *Pl.'s Opp'n* at 13. For purposes of ruling on this motion to dismiss, the Court has not considered these additional facts contained only in a lawyer's filing; however, if the facts were critical, the Court would allow Ms. Wadsworth to amend her complaint to formally assert them. *See Doe1*, 2018 WL 3336535, at *1-3.

38

**A038**

of discriminating on the basis of sex," or that Mr. Nguyen "had any actual control or supervisory authority over Mr. Cavanaugh." *Nguyen's Mot.* at 8-9. Ms. Wadsworth responds that she has raised a viable equal protection claim under § 1983 because Mr. Nguyen's active participation—"by denying that [Mr.] Cavanaugh's behavior was inappropriate, thus encouraging [Ms. Wadsworth] to continue interacting with [Mr.] Cavanaugh as well as interfering with her potential decision to report the harassment"—shows he treated Ms. Wadsworth differently than similarly situated female students in the school and that his advice to her cannot be viewed as furthering an important governmental objective. *Pl.'s Opp'n* at 13-14.

"[Section] 1983 equal protection claims may be brought against individuals as well as municipalities . . .." *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 257 (2009) (citing *West v. Atkins*, 487 U.S. 42, 48-51 (1988)). "To state an equal protection claim, the plaintiff must 'show that the parties with whom he seeks to be compared have engaged in the same activity vis-à-vis the government entity without such distinguishing or mitigating circumstances as would render the comparison inutile.'" *Raymond*, 2019 WL 2110498, at *8 (quoting *Cordi-Allen v. Conlon,* 494 F.3d 245, 251 (1st Cir. 2007)). "[A] plaintiff needs to allege facts showing that '(1) the person, compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Davis v. Coakley*, 802 F.3d 128, 132-33 (1st Cir. 2015) (quoting *Rubinovitz v. Rogato*, 60 F.3d 906, 910 (1st Cir. 1995)).

The plaintiff must "identify and relate *specific instances*" of the defendant treating similarly situated persons differently, "instances which have the capacity to demonstrate that [plaintiffs] were singled . . . out for unlawful oppression." *Buchanan v. Maine*, 469 F.3d 158, 178 (1st Cir. 2006) (alterations and emphasis in original) (quoting *Rubinovitz*, 60 F.3d at 910). The plaintiff must also show that the defendant acted with a discriminatory intent. *Lipsett*, 864 F.2d at 896.

To the extent that Ms. Wadsworth brings an equal protection claim against Mr. Nguyen for his alleged actions, this claim fails. A District of Maine court recently dismissed an equal protection claim against a school department in a Title IX case because "[t]he complaint d[id] not allege either that [the student] was treated differently than other similarly situated students with disabilities, or that the School Department's actions were based on the types of impermissible considerations described" in *Davis*. *McCann*, 365 F. Supp. 3d at 147. As in *McCann*, Ms. Wadsworth's Amended Complaint does not allege that Mr. Nguyen treated Ms. Wadsworth differently than any other students. In fact, the Amended Complaint does not mention any other students Mr. Nguyen interacted with, so it falls far below the requirement that the plaintiff show specific instances of disparate treatment.

Ms. Wadsworth's equal protection claim also fails to the extent she attempts to hold Mr. Nguyen liable for the alleged actions of Mr. Cavanaugh because no facts establish that Mr. Nguyen had any control over Mr. Cavanaugh, the principal. Both parties discuss caselaw on supervisory liability under § 1983, *Nguyen's Mot.* at 6-7; *Pl.'s Opp'n* at 12-13, but, as Mr. Nguyen argues, this type of liability in inapplicable

here.  In the context of § 1983 claims, supervisory liability attaches "if a responsible official supervises, trains, or hires a subordinate with deliberate indifference toward the possibility that deficient performance of the task eventually may contribute to a civil rights deprivation."  *Sanchez*, 590 F.3d at 49 (quoting *Zapata*, 175 F.3d at 44).  A plaintiff "must establish that [the defendant] had some degree of control over" the actor who allegedly violated the plaintiff's constitutional rights.  *Edson*, 2017 WL 780787, at *15 (citing *Zapata*, 175 F.3d at 44; *Maldonado-Denis v. Castillo-Rodriguez*, 23 F.3d 576, 582 (1st Cir. 1994)).  Here, Ms. Wadsworth made no allegation that Mr. Nguyen had control over Mr. Cavanaugh's actions.  The guidance in *Robinson* only solidifies this conclusion.  120 F.3d at 1294 ("As a general matter, a person who fails to act to correct the conduct of someone over whom he or she has no supervisory authority cannot fairly be said to have 'acquiesced' in the latter's conduct").[9]

### C.    Qualified Immunity for § 1983 Claim

Mr. Nguyen and Ms. Wadsworth disagree about whether qualified immunity protects Mr. Nguyen from the equal protection claim under § 1983.  *Nguyen's Mot.* at 11-12; *Pl.'s Opp'n* at 15-16.  Neither party discusses qualified immunity in the context of the substantive due process claim based on the state-created danger theory.

"[T]he qualified immunity inquiry is a two-part test.  A court must decide: (1) whether the facts alleged or shown by the plaintiff make out a violation of a

---

[9]    Ms. Wadsworth attempts to distinguish *Robinson* by pointing out the difference in the relationship between plaintiff and defendant in each case—minor student and advisor instead of coworkers.  *Pl.'s Opp'n* at 13.  However, the relationship that matters for supervisory liability is the relationship between the defendant and the person who committed the constitutional violation, so this distinction is irrelevant.

constitutional right; and (2) if so, whether the right was 'clearly established' at the time of the defendant's alleged violation." *Maldonado v. Fontanes*, 568 F.3d 263, 268-69 (1st Cir. 2009) (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)).  "[T]he second, 'clearly established' step of the qualified immunity analysis . . ., in turn, has two aspects." *Id.* at 269.  First, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right," *id.* (alteration in original) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)); second, the Court must ask "whether a reasonable defendant would have understood that his conduct violated the plaintiff['s] constitutional rights." *Id.*  The Supreme Court has instructed that "this inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled on other grounds by Pearson*, 555 U.S. 223).

In *Irish*, the First Circuit looked to "the absence or the degree of deviations from the pertinent governmental trainings and protocols to inform its substantive due process and qualified immunity analyses."  *Raymond*, 2019 WL 2110498, at *9 (citing *Irish*, 849 F.3d at 528).  The First Circuit refused to find that the defendants were entitled to qualified immunity "without a fuller development of the facts," particularly highlighting the facts surrounding whether the officers violated protocols.  *Irish*, 849 F.3d at 528.  In *Raymond*, this Court applied the analysis from *Irish* to school policies and procedures and denied a motion to dismiss on qualified immunity grounds.  2019 WL 2110498, at *9.

The Court has already found that Ms. Wadsworth does not adequately state a claim for violation of her equal protection rights. Thus, this analysis is limited to the substantive due process claim. First, Mr. Nguyen does not argue that the right to bodily integrity, including the right to be free from sexual abuse, is not a clearly established right. In 1999, a district court in the District of Maine wrote that "[i]t is well recognized that students have a fundamental right to bodily integrity that includes the right to be free from sexual abuse." *Doe v. Sch. Admin. Dist. No. 19*, 66 F. Supp. 2d at 65. In May 2020, the district court in another *Doe* case found that a clearly established right together with a state-created danger claim was enough to survive a qualified immunity challenge at this stage of litigation. *See* 2020 WL 2820197, at *6. Second, as in *Irish* and *Raymond*, further discovery is necessary on whether Mr. Nguyen violated school policies and procedures and professional standards, issues that will inform the qualified immunity analysis. Third, to the extent that Mr. Nguyen's argument—that a reasonable social worker would not understand that what he or she was doing violated a constitutional right because the pleaded facts do not necessarily suggest that Ms. Wadsworth was the victim of sexual harassment—applies to the substantive due process claim, the Court disagrees. On the pleaded facts, even only those known to Mr. Nguyen, accepting the allegations in the Amended Complaint as true, Mr. Cavanaugh's sexual harassment of Ms. Wadsworth is clear.

For these reasons, the Court denies the motion to dismiss the § 1983 claim on qualified immunity grounds.

**A043**

### D.    Discretionary Function Immunity for State Tort Claims

### 1.    Legal Background

Ms. Wadsworth asserts three state tort claims against Mr. Nguyen: IIED, NIED, and negligence. *Am. Compl.* ¶¶ 189-208.  Mr. Nguyen argues that he is entitled to discretionary function immunity from the state tort claims pursuant to the Maine Tort Claims Act. *Nguyen's Mot.* at 15-16.  Ms. Wadsworth responds that the Court should deny Mr. Nguyen's claim of immunity because a reasonable person in his position would have realized that his actions were outside the scope of his job duties. *Pl.'s Opp'n* at 20.  Mr. Nguyen asserts that his conduct "unquestionably occurred within the scope of his employment" because he was the social worker at the high school the whole time. *Nguyen's Reply* at 7.

The Maine Tort Claims Act "applies a policy of broad liability to governmental employees, subject to the" enumerated exceptions. *Carroll v. City of Portland*, 1999 ME 131, ¶ 6, 736 A.2d 279.  One exception provides absolute immunity to employees of governmental entities "[p]erforming or failing to perform any discretionary function or duty, whether or not the discretion is abused . . .." 14 M.R.S. § 8111(1)(C). The immunity applies to discretionary acts that are "reasonably encompassed by the duties of the governmental employee in action . . .." *Carroll*, 1999 ME 131, ¶ 6 (quoting 14 M.R.S. § 8111(1)).  In other words, the immunity applies only to conduct "within the scope of [the government employee's] employment . . .." *Darling*, 535 A.2d at 425.  "[T]ort liability should not be imposed for conduct of a type for which the imposition of liability would substantially impair the effective performance of a

44

**A044**

discretionary function." *Carroll*, 1999 ME 131, ¶ 6 n.4 (alteration in original) (quoting *Grossman v. Richards*, 1999 ME 9, ¶ 6, 722 A.2d 371, 373).  Moreover, there is no exception to immunity under § 8111(1)(C) for "acts or omissions characterized by animus." *Buchanan ex rel. Estate of Buchanan v. Maine*, 417 F. Supp. 2d 24, 44 (D. Me. 2006), *aff'd*, 469 F.3d 158 (1st Cir. 2006) (*Buchanan*).

> To determine whether an act is discretionary, courts consider four questions:
>
> (1) Does the challenged act, omission, or decision necessarily involve a basic governmental policy, program or objective?  (2) Is the questioned act, omission, or decision essential to the realization or accomplishment of that policy, program, or objective as opposed to one which would not change the course or direction of the policy, program, or objective?  (3) Does the act, omission, or decision require the exercise of basic policy evaluation, judgment, and expertise on the part of the governmental agency involved?  (4) Does the governmental agency involved possess the requisite constitutional, statutory, or lawful authority and duty to do or make the challenged act, omission, or decision?

*Darling*, 535 A.2d at 426 (quoting *Trianon Park Condo. Ass'n v. City of Hialeah*, 468 So. 2d 912, 918 (Fla. 1985)).  "[I]n cases where the questioned conduct has little or no purely governmental content but instead resembles decisions or activities carried on by people generally, there is an objective standard for judgment by the courts and the doctrine of discretionary immunity does not bar the action." *Rodriguez v. Town of Moose River*, 2007 ME 68, ¶ 22, 922 A.2d 484 (quoting *Adriance v. Town of Standish*, 687 A.2d 238, 241 (Me. 1996)).

In *Polley v. Atwell*, 581 A.2d 410 (Me. 1990), the Maine Supreme Judicial Court held that a social worker's decision not to disclose certain information when placing a foster child in a new foster home was a discretionary act and the Maine Department of Human Services (DHS) employee was protected from all tort claims by

45

**A045**

discretionary function immunity. *Id.* at 413. The Law Court identified the governmental policy of confidentiality afforded to DHS records and emphasized that the statute containing the policy explicitly entrusted to DHS employees what information, if any, should be disclosed when placing children in foster homes. *Id.*

The Maine Supreme Judicial Court has reached similar conclusions in other cases involving government employees supervising other people. *See Roberts v. State*, 1999 ME 89, ¶ 10, 731 A.2d 855 (applying the *Darling* factors to an incarcerated individual's claims arising from a personal injury and holding that the corrections officer was immune from liability because "corrections is a basic governmental program," "supervision of inmates is essential to a corrections program," "[t]he supervision necessarily involves the exercise of judgment by corrections officers" including when to order an individual to a cell and when to shut the cell door, and the officer had lawful authority to supervise the incarcerated individual); *Brooks v. Augusta Mental Health Inst.*, 606 A.2d 789, 791 (Me. 1992) ("Because it involves the exercise of the individual employee's professional judgment, the supervision of patients by State mental health employees also falls within the discretionary function immunity provisions of section 8111(1)(C)"). Various Maine superior courts have applied discretionary function immunity to government employees supervising students in particular. *See, e.g.*, *Varney v. Richards*, No. CV-14-164, 2016 Me. Super. LEXIS 154, at *15-16 (Me. Super. Ct. July 21, 2016) ("The Superior Court has held that teachers' actions while supervising students at school [are] protected under discretionary function immunity, but the Law Court has not yet addressed the issue"

46

**A046**

(citing *Fraser v. Superintending Sch. Comm. Of Old Town*, No. CV-14-200, 2015 Me. Super. LEXIS 207, at *11-12 (Me. Super. Ct. July 19, 2015))).

The Law Court distinguished *Polley* from *MacKerron v. Madura*, 474 A.2d 166 (Me. 1984), where the Law Court found a police officer's actions outside the scope of his employment when he intentionally interfered with the economic relationship between an attorney and client because his conduct was so egregious it exceeded the scope of any discretion he could have possessed. *Polley*, 581 A.2d at 413-14 (citing *MacKerron*, 474 A.2d at 167). The police officer told the client that he would put in a good word for him before the judge and ask the district attorney about dropping the charge if he was not represented by an attorney but would do nothing if he was represented by the attorney. *MacKerron*, 474 A.2d at 166-67.

Significantly, however, in 1990, the *Polley* Court clarified that "*MacKerron* does not stand for the proposition that discretionary immunity is unavailable in any case in which the plaintiff alleges an intentional tort, rather than a negligent act or omission." 581 A.2d at 413. It added,

> Our focus on the "intentional" nature of the conduct was illustrative, not definitive. The rationale of the decision was not grounded on the plaintiff's allegation of an intentional tort, but rather, on the fact that the defendant's egregious conduct clearly exceeded, as a matter of law, the scope of any discretion he could have possessed in his official capacity as a police officer and therefore was not encompassed within the immunity provision of 14 M.R.S.A § 8111(1)(C).

*Id.* at 413-14. Instead, the Law Court reiterated the importance of the four *Darling* factors.

The District of Maine discussed this distinction in *Maguire v. Municipality of Old Orchard Beach*, 783 F. Supp. 1475, 1487 (D. Me. 1992). The *Maguire* Court concluded that two officers were entitled to discretionary function immunity even if their actions were deliberately indifferent or reckless but that one officer was not entitled to this immunity because his threat to the plaintiff—removing his night stick from his belt, holding it near the plaintiff's head, and threatening the plaintiff physical harm if he mentioned the towing incident to anyone—clearly exceeded the scope of any discretion he could have possessed in his role as a police officer. *Id.* at 1478, 1487.

## 2.    Analysis

One way of looking at Mr. Nguyen's actions shows a social worker hearing a complaint, evaluating it, and giving advice. Another way is to view Mr. Nguyen as someone enabling an administrator in his pursuit of a student.[10]  Whether discretionary function immunity protects Mr. Nguyen's actions depends on which view the Court takes, and that decision in turn depends on what facts not developed reveal.

For example, the first *Darling* factor asks whether "the challenged act, omission, or decision necessarily involve[s] a basic governmental policy, program or

---

[10]    Ms. Wadsworth's characterization of the alleged facts in her response to the motion to dismiss provides more detail about Mr. Nguyen's normalization of the sexual harassment and active interference with Ms. Wadsworth's decisions about the relationship. *See Pl.'s Opp'n* at 17-20.  As with the substantive due process claim, *see supra* note 8, these additional facts are not necessary to the Court's ruling in this Order, but they strengthen the argument that Ms. Wadsworth's state tort claims survive discretionary function immunity.  Again, if these additional facts were crucial to the Court's ruling on the motion to dismiss, the Court would allow Ms. Wadsworth an opportunity to amend her Amended Complaint.

48

**A048**

objective[.]"  *Darling*, 535 A.2d at 426 (quoting *Trianon Park Condo. Ass'n v. City of Hialeah*, 468 So. 2d 912, 918 (Fla. 1985)).  If Mr. Nguyen's actions were consistent with the practice of his profession and in accordance with school policy, then, although they were professional misjudgments, they necessarily involve a basic governmental policy, program, or objective—the counseling of students in accordance with Maine law.  On the other hand, if Mr. Nguyen's actions were attempts to normalize Mr. Cavanaugh's abnormal behavior because Mr. Nguyen and Mr. Cavanaugh were friends, Mr. Nguyen instinctively supports authority figures over students, or some other facts not yet known, then his actions fall outside of what he was hired to do as the school social worker.

From the Court's perspective, this issue is closest presented by the motion to dismiss.  Mr. Nguyen's minimization and normalization of Mr. Cavanaugh's inappropriate attention to Ms. Wadsworth seem peculiar, so much so that the Court is at a loss to explain his conduct without some additional facts.  Again, taking the lead from *Irish,* the Court concludes that discovery may reveal whether the facts justify the generalized allegations.  *Irish*, 849 F.3d at 528-29.  Discovery may illuminate the setting of Mr. Nguyen and Ms. Wadsworth's discussions, how Ms. Wadsworth approached Mr. Nguyen, the relationship between Mr. Nguyen and Mr. Cavanaugh, and what Mr. Nguyen actually knew from his personal observations of the interactions between Mr. Cavanaugh and Ms. Wadsworth, among other facts.

The Court does not know, for example, whether Ms. Wadsworth made a formal appointment with Mr. Nguyen to discuss Mr. Cavanaugh's actions as opposed to an

49

**A049**

informal conversation in passing, whether Mr. Nguyen made notes of his sessions, whether Mr. Nguyen spoke to Mr. Cavanaugh about Ms. Wadsworth's complaints, whether Ms. Wadsworth's complaints were in the context of other issues she discussed with Mr. Nguyen, or whether, as in *Irish*, Mr. Nguyen's advice comported with professional standards and school policies.  Although the issue is close, the Court concludes that it is wiser to allow the parties to proceed with discovery to open the door on why Mr. Nguyen did what he did and what he knew when he did it and to resolve this issue in the context of a motion for summary judgment, where underlying critical facts have been unearthed.

In conclusion, Ms. Wadsworth has sufficiently alleged tort claims against Mr. Nguyen that, when viewed in the light most favorable to her, survive discretionary function immunity under § 8111(1)(C) at the motion to dismiss stage.

## VI.   CONCLUSION

The Court GRANTS in part and DENIES in part Chuck Nguyen's Motion to Dismiss (ECF No. 16).  The Court DISMISSES so much of Count II of Adrianna Wadsworth's Amended Complaint as alleges an equal protection claim under 42 U.S.C. § 1983.  Otherwise, the Court DENIES Chuck Nguyen's Motion to Dismiss (ECF No. 16).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 2nd day of October, 2020

UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| ADRIANNA WADSWORTH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 2:19-cv-00577-JAW |
| | ) | |
| MAINE SCHOOL ADMINISTRATIVE | ) | |
| DISTRICT 40/REGIONAL SCHOOL | ) | |
| UNIT 40 et al., | ) | |
| | ) | |
| Defendants. | ) | |

**AMENDED[1] ORDER ON MSAD 40/RSU 40'S MOTION FOR SUMMARY JUDGMENT**

A former high school student brought a lawsuit against a school district, a school principal, and a school social worker asserting claims under 20 U.S.C. § 1681(a) (Title IX) and 42 U.S.C. § 1983, as well as state tort claims, stemming from sexual harassment she alleges the school principal committed against her. The school district moves for summary judgment on all claims against it. The Court grants summary judgment on the Title IX claim because there are no genuine issues of material fact that could sustain the plaintiff's contention that an official with the authority to implement corrective measures had actual knowledge of the alleged harassment and acted with deliberate indifference toward her. The Court grants summary judgment on the § 1983 claim because the record similarly does not support her claim that any school district policy or failure to train caused her injuries.

---

[1] This Amended Order issues to clarify that the Clerk's Office is ordered to enter judgment for MSAD 40/RSU 40 and against Adrianna Wadsworth at the final conclusion of the case, not immediately.

**A051**

Finally, upon consent of the plaintiff, the Court dismisses the state tort claims because the school district is immune from liability under the Maine Tort Claims Act.

## I.    PROCEDURAL HISTORY

On December 27, 2019, Adrianna Wadsworth[2] filed suit against Maine School Administrative District 40/Regional School Unit 40 (RSU 40 or the District),[3] Medomak Valley High School (MVHS), Andrew Cavanaugh, and Chuck Nguyen. *Compl.* (ECF No. 1).  She alleged a violation of Title IX and negligent hiring, training, and supervision against the District and MVHS, brought claims under 42 U.S.C. § 1983, brought common law tort and statutory claims of intentional infliction of emotional distress (IIED) and negligent infliction of emotional distress (NIED) against all the Defendants, and brought a negligence claim against Mr. Cavanaugh and Mr. Nguyen.  *Id.* ¶¶ 134-179.  On February 7, 2020, Mr. Cavanaugh answered the Complaint.  *Def., Andrew Cavanaugh's Answer to Pl.'s Compl. and Demand for Jury Trial* (ECF No. 11).  On March 11, 2020, the District and MVHS filed a motion to dismiss counts one and two of the Complaint.  *Def. MSAD 40/RSU 40's Mot. to Dismiss Counts I and II of Compl.* (ECF No. 12).  On the same day, Mr. Nguyen filed

---

[2]      Ms. Wadsworth brought this lawsuit in her own name rather than under a pseudonym such as Jane Doe.  Though a balancing of factors is required, a victim of sexual harassment or sexual assault—especially a minor at the time of the offense—often has a privacy interest sufficient to allow the victim to proceed under a pseudonym.  *See, e.g., Doe v. Reg'l Sch. Unit No. 21*, Docket No. 2:19-00341-NT, 2020 WL 2833248, at 1-4 (D. Me. May 29, 2020); *Doe v. Megless*, 654 F.3d 404, 408 (3d Cir. 2011).  However, as an adult, Ms. Wadsworth has an equal right to bring the action under her own name.

[3]      The filings in this case have variously referred to the District as MSAD 40/RSU 40, MSAD 40, or RSU 40.  According to the District, it was formerly known as MSAD 40 but is now known as RSU 40.  *Def. MSAD 40/RSU 40's Statement of Material Facts* ¶ 1 (ECF No. 101) (DSMF) ("Defendant Regional School Unit 40 ("RSU 40") . . . [was] formerly Maine School Administrative District 40").  The Court will refer to this party as RSU 40 or the District.

2

**A052**

an answer to the Complaint. *Answer and Affirmative Defenses to Compl. and Jury Trial Demand (Def. Chuck Nugyen)* (ECF No. 13).

On March 27, 2020, Ms. Wadsworth filed an amended complaint, dropping MVHS as a defendant. *Pl.'s Am. Compl. and Demand for Jury Trial* (ECF No. 15) (*Am. Compl.*). On April 10, 2020, Mr. Nguyen filed a motion to dismiss the Amended Complaint. *Def. Chuck Nguyen's Mot. to Dismiss Am. Compl.* (ECF No. 16). On April 14, 2020, Mr. Cavanaugh filed an answer to the Amended Complaint. *Def., Andrew Cavanaugh's Answer to Pl.'s Am. Compl. and Demand for Jury Trial* (ECF No. 17).

On May 8, 2020, the District filed a motion to dismiss counts one and two of the Amended Complaint, and on May 11, 2020, it withdrew its first motion to dismiss. *Def. MSAD 40/RSU 40's Mot. to Dismiss Counts I and II of First Am. Compl.* (ECF No. 21);[4] *Def. MSAD 40/RSU 40's Withdrawal of Mot. to Dismiss as Moot* (ECF No. 22). Ms. Wadsworth filed a response on June 8, 2020. *Opp'n of Pl., Adrianna Wadsworth, to Def. MSAD 40/RSU 40's Mot. to Dismiss for Failure to State a Claim* (ECF No. 31). On June 22, 2020, the District replied. *Def. MSAD 40/RSU 40's Reply in Supp. of Mot. to Dismiss* (ECF No. 32).

On October 2, 2020, the Court denied Mr. Nguyen's motion to dismiss, and on October 29, 2020, the Court denied the District's motion to dismiss. *Order on Def. Chuck Nguyen's Mot. to Dismiss* (ECF No. 36); *Order on MSAD 40/RSU 40's Mot. to Dismiss* (ECF No. 39) (*Order on Mot. to Dismiss*). The District filed its Answer to the

---

[4]       While the docket entry for this filing includes MVHS in the description, RSU 40 alone filed this motion because the Amended Complaint terminated MVHS as a defendant. *See Am. Compl.* ¶¶ 1-5.

3

**A053**

Amended Complaint on November 13, 2020 and Mr. Nguyen filed his Answer and affirmative defenses on February 4, 2021. *Def. MSAD 40/RSU 40's Answer to Pl.'s Am. Compl.* (ECF No. 45); *Answer and Affirmative Defense to Am. Compl. and Jury Trial Demand (Def. Chuck Nguyen)* (ECF No. 49).

On July 27, 2022, the District, Mr. Cavanaugh, and Mr. Nguyen each filed a motion for summary judgment accompanied by a statement of material facts. *Def. MSAD 40/RSU 40's Mot. for Summ. J.* (ECF No. 100) (*Def.'s Mot.*); *Def. MSAD 40/RSU 40's Statement of Material Facts* (ECF No. 101) (DSMF); *Def. Andrew Cavanaugh's Mot. for Summ. J.* (ECF No. 103); *Def. Andrew Cavanaugh's Rule 56 Statement of Material Facts in Supp. of His Mot. for Summ. J.* (ECF No. 104); *Def. Chuck Nguyen's Mot. for Summ. J.* (ECF No. 105); *Def. Chuck Nguyen's Statement of Material Facts in Supp. of Mot. for Summ. J.* (ECF No. 106). On October 19, 2022, Ms. Wadsworth filed an omnibus response to the motions for summary judgment, her own statement of additional material facts, and separate responses to each defendant's statement of material facts. *Pl. Adrianna Wadsworth's Omnibus Opp'n to Defs.' Mots. for Summ. J.* (ECF No. 114) (*Pl.'s Resp.*); *Pl.'s Rule 56 Statement of Material Facts in Supp. of Her Omnibus Opp'n to Defs.' Mots. for Summ. J.* (ECF No. 115) (PSAMF); *Pl.'s Resps. to Def. MSAD 40's Statement of Material Facts in Supp. of its Mot. for Summ. J.* (ECF No. 116) (PRDSMF); *Pl.'s Resps. to Def. Andrew Cavanaugh's Statement of Material Facts in Supp. of His Mot. for Summ. J.* (ECF No. 117); *Pl.'s Resps. to Def. Chuck Nguyen's Statement of Material Facts in Supp. of His Mot. for Summ. J.* (ECF No. 118).

4

**A054**

On November 17, 2022, the District filed a reply in support of its motion for summary judgment and a reply to Ms. Wadsworth's statement of additional material facts. *MSAD 40/RSU 40's Reply in Supp. of Mot. for Summ. J.* (ECF No. 121) (*Def.'s Reply*); *Def. MSAD 40/RSU 40's Reply Statement of Material Facts* (ECF No. 122) (DRPSAMF). The following day, Mr. Nguyen and Mr. Cavanaugh each filed their own replies and responses to Ms. Wadsworth's statement of additional material facts. *Def. Chuck Nguyen's Reply Mem. of Law in Supp. of Mot. for Summ. J.* (ECF No. 123); *Def. Chuck Nguyen's Resp. to Pl.'s Rule 56 Statement of Material Facts in Supp. of Her Omnibus Opp'n to Defs.' Mots. for Summ. J.* (ECF No. 124); *Def. Andrew Cavanaugh's Reply in Supp. of Mot. for Summ. J.* (ECF No. 125); *Def. Andrew Cavanaugh's Resps. to Pl.'s Rule 56 Statement of Material Facts in Supp. of Her Omnibus Opp'n to Defs.' Mots. for Summ. J.* (ECF No. 126).

Finally, on December 19, 2022, Ms. Wadsworth moved to request oral argument on the defendants' motions. *Pl.'s Request for Hearing/Oral Argument on Defs.' Mot. for Summ. J.* (ECF No. 127). The Court granted that motion, *Order* (ECF No. 128), and heard oral arguments on March 14, 2023. *Min. Entry* (ECF No. 137).

## II.   FACTS[5]

### A.   The Parties

Adrianna Wadsworth is a woman in her early twenties who attended MVHS, a school located within the District, between 2014 and 2018. PSAMF ¶¶ 1-2;

---

[5]    The Court states the facts "in the light most hospitable to [non-movants] consistent with record support . . .." *Mancini v. City of Providence ex rel. Lombardi*, 909 F.3d 32, 37 (1st Cir. 2018) (citing *Ahern v. Shinseki*, 629 F.3d 49, 51 (1st Cir. 2010); *Gillen v. Fallon Ambulance Serv., Inc.*, 283 F.3d 11, 17 (1st Cir. 2002)).

DRPSAMF ¶¶ 1-2; DSMF ¶¶ 3-4; PRDSMF ¶¶ 3-4.  At all pertinent times, Ms. Wadsworth was under the age of 18.  PSAMF ¶ 5; DRPSAMF ¶ 5.

RSU 40, formerly MSAD 40, is a Maine school district that encompasses the towns of Friendship, Union, Waldoboro, Warren, and Washington. DSMF ¶ 1; PRDSMF ¶ 1.  Stephen Nolan is the Superintendent of RSU 40 and has held that position since 2014.  DSMF ¶ 2; PRDSMF ¶ 2.  The Superintendent of RSU 40 is the direct supervisor of the principal of MVHS and the principal of MVHS is the direct supervisor of the assistant principals, but assistant principals do not have disciplinary authority over the principal.  DSMF ¶¶ 10, 12-13; PRDSMF ¶¶ 10, 12-13.  The Superintendent of RSU 40 has the power to nominate candidates to the School Board for approval for a building principal position, as well as the power to initiate an investigation into a principal's conduct, impose discipline short of dismissal, and recommend that the School Board dismiss a principal.  DSMF ¶ 11; PRDSMF ¶ 11.  Linda Pease was an Assistant Principal at MVHS from 2015 until she became the Interim Principal in late 2017 and then the Principal in the fall of 2018. DSMF ¶ 7; PRDSMF ¶ 7.  Tamra Philbrook is currently an Assistant Principal at MVHS and has held that position for approximately eleven years.  DSMF ¶ 8; PRDSMF ¶ 8.

Defendant Andrew Cavanaugh was the Principal of MVHS from 2015 until he resigned in December of 2017, and during this time he was also designated as MVHS' Affirmative Action Coordinator.  PSAMF ¶ 3; DRPSAMF ¶ 3; DSMF ¶ 5; PRDSMF ¶

6

**A056**

5.    Prior to 2015, Mr. Cavanaugh was an Assistant Principal at MVHS for approximately nine years.  DSMF ¶ 6; PRDSMF ¶ 6.

Defendant Chuck Nguyen was employed as a social worker at MVHS during the four years that Ms. Wadsworth was a student there.  DSMF ¶ 9; PRDSMF ¶ 9.

## B.    Andrew Cavanaugh's Alleged Harassment of Adrianna Wadsworth

During Ms. Wadsworth's junior and senior years of high school (starting in the fall of 2016), Mr. Cavanaugh repeatedly subjected her to unwanted conduct of a sexual nature, involving sexually charged and inappropriate comments, text messages, and gifts.[6]  PSAMF ¶ 3; DRPSAMF ¶ 3.  While some RSU 40 employees witnessed instances of Mr. Cavanaugh's inappropriate conduct towards Ms. Wadsworth, Mr. Cavanaugh was not investigated or disciplined until November 2017.[7]  PSAMF ¶ 6; DRPSAMF ¶ 6.

### 1.    Adrianna Wadsworth's Initial Encounters with Andrew Cavanaugh

In the spring of 2016, when Ms. Wadsworth was a sophomore at MVHS, she was caught drinking alcohol at a party and, as a result, she was sent to Mr. Cavanaugh's office for a meeting with Mr. Cavanaugh and the MVHS Athletic Director.  DSMF ¶ 14; PRDSMF ¶ 14. Before this meeting with the Athletic Director,

---

[6]    The District objects to PSAMF ¶ 3, contending that its allegation that Mr. Cavanaugh "sexually harassed" Ms. Wadsworth "should be stricken . . . [as] an argumentative and conclusory assertion." DRPSAMF ¶ 3.  The Court has modified PSAMF ¶ 3 to reflect factual assertions supported by the record.  *See Def.'s Mot.* at 1 (acknowledging that Mr. Cavanaugh "subjected Plaintiff to unwanted conduct of a sexual nature").  The Court has done so, despite its view that the distinction between sexual harassment and subjecting someone to unwanted conduct of a sexual nature is elusive.
[7]    The District offers the same objection to PSAMF ¶ 6, adding details about individual employees' lack of knowledge regarding the scope of Mr. Cavanaugh's inappropriate conduct.  The Court has modified PSAMF ¶ 6 to reflect factual assertions supported by the record.

Mr. Cavanaugh had met Ms. Wadsworth in passing—for example, when he presented her with awards for her academic achievements at school ceremonies—but had never had a conversation with Ms. Wadsworth. DSMF ¶ 15; PRDSMF ¶ 15. During the meeting in Mr. Cavanaugh's office with the Athletic Director and Ms. Wadsworth, Ms. Wadsworth discussed some difficulties that she was experiencing at home. DSMF ¶ 16; PRDSMF ¶ 16.

Shortly after Mr. Cavanaugh's first meeting with Ms. Wadsworth, Mr. Cavanaugh gave Ms. Wadsworth his cell phone number and told her to text him and to call him if she was "in a jam" or needed help.[8] DSMF ¶ 17; PRDSMF ¶ 17. Between Mr. Cavanaugh's first meeting with Ms. Wadsworth in the spring of 2016 and the end of the 2015-2016 school year, Mr. Cavanaugh met with Ms. Wadsworth a couple of times a week to continue to discuss the challenges Ms. Wadsworth was facing at home, as well as her academic performance, aspirations, and other topics. DSMF ¶ 18; PRDSMF ¶ 18. There were other students with whom Mr. Cavanaugh was meeting a couple of times a week during the same timeframe. DSMF ¶ 19; PRDSMF ¶ 19. At the end of the school year, Mr. Cavanaugh offered to hire Ms. Wadsworth to do work for him and his sister for the summer of 2016. DSMF ¶ 20; PRDSMF ¶ 20. Ms. Wadsworth's parents agreed that Ms. Wadsworth could work for Mr. Cavanaugh for the summer. DSMF ¶ 21; PRDSMF ¶ 21. Ms. Wadsworth worked for Mr.

---

[8]     Ms. Wadsworth qualifies DSMF ¶ 17 by adding that Mr. Cavanaugh also "told her to text him." PRDSMF ¶ 17. Finding this assertion supported by the record, the Court adds it to DSMF ¶ 17. *See* PSAMF, Attach. 2, *Decl. of Adrianna Wadsworth* at 1 ("when [Mr. Cavanaugh] gave me the number, he told me to text him").

Cavanaugh during the summers of 2016 and 2017 and was paid at a rate of $10 per hour.[9]  DSMF ¶ 22; PRDSMF ¶ 22.

### 2.    Andrew Cavanaugh's Inappropriate Comments and Gifts

Between 2016 and 2017, Mr. Cavanaugh told Ms. Wadsworth she was pretty, looked nice, and made comments about what she was wearing nearly every day while Ms. Wadsworth was in school.  PSAMF ¶ 28; DRPSAMF ¶ 28.  Mr. Cavanaugh repeatedly used pet names to refer to Ms. Wadsworth such as "cupcake," "princess," and "ladytime."  PSAMF ¶ 29; DRPSAMF ¶ 29.  This was done repeatedly in person and via text message on an almost daily basis between 2016 and 2017.[10]  PSAMF ¶ 30; DRPSAMF ¶ 30.  Mr. Cavanaugh, in a meeting in his office, told Ms. Wadsworth that she was good looking and could take anyone she wanted to prom.[11]  PSAMF ¶ 31; DRPSAMF ¶ 31.

At a school basketball game, Mr. Nguyen witnessed Mr. Cavanaugh comment on Ms. Wadsworth's looks.  PSAMF ¶ 32; DRPSAMF ¶ 32.  Mr. Nguyen was present

---

[9]    Ms. Wadsworth qualifies DSMF ¶ 22 to add that she also worked for Mr. Cavanaugh during the summer of 2017.  PRDSMF ¶ 22.  The Court finds this addition supported by the record and modifies DSMF ¶ 22 to include both summers.  *See Joint R. Materials for Defs.' Mots. for Summ. J.* (ECF No. 91) *(Joint R. Materials),* Attach. 18, *Text Messages Between Mr. Cavanaugh and Ms. Wadsworth (Text Messages)* at 2.

[10]    RSU 40 qualifies PSAMF ¶ 30, stating that "[Mr.] Cavanaugh testified that he would only use the pet names via text message and never in person at school . . . [and, f]or example, [Ms.] Pease never heard [Mr.] Cavanaugh refer to Plaintiff as 'cupcake.'"  DRPSAMF ¶ 30.  However, RSU 40 later acknowledges in DRPSAMF ¶ 33 that "Mr. Nguyen was present and heard . . . on multiple occasions, when Mr. Cavanaugh called Ms. Wadsworth 'cupcake'" and in DRPSAMF ¶ 34 that "Plaintiff testified to only two specific instances when [Ms.] Philbrook was present when [Mr.] Cavanaugh allegedly [referred to Ms. Wadsworth as 'cupcake']."  The Court rejects the District's contention that Mr. Cavanaugh "never in person at school" used the pet names, *id.* ¶ 30, and admits PSAMF ¶ 30.

[11]    RSU 40 qualifies PSAMF ¶ 31, contending that "[t]he excerpt cited does not support that [Mr.] Cavanaugh told Plaintiff she was good looking."  DRPSAMF ¶ 31.  The Court agrees that the cited page does not allege that Mr. Cavanaugh called Ms. Wadsworth good looking.  However, in the same deposition, she states that "Mr. Cavanaugh said that I could take anybody in the school that I wanted [to prom] and said that I was a good looking girl."  *Joint R. Materials*, Attach. 16, *Deposition of Arianna Wadsworth Vol. I* at 194:15-17 *(Wadsworth Dep. Vol. I)*.  The Court admits PSAMF ¶ 31.

9

**A059**

and heard, at least once, when Mr. Cavanaugh called Ms. Wadsworth "ladytime," and, on multiple occasions, when Mr. Cavanaugh called Ms. Wadsworth "cupcake." PSAMF ¶ 33; DRPSAMF ¶ 33. Ms. Philbrook was present when Defendant Cavanaugh called Ms. Wadsworth "cupcake" on at least two occasions.[12] PSAMF ¶ 34; DRPSAMF ¶ 34. In the spring of 2017, around the time of Ms. Wadsworth's junior prom, Ms. Philbrook was present when Mr. Cavanaugh handed Ms. Wadsworth an envelope of money in the office and called her "cupcake" during the exchange. PSAMF ¶ 35; DRPSAMF ¶ 35.

During this same period, Ms. Wadsworth met with Mr. Cavanaugh in his office, and on at least one occasion while Ms. Philbrook was present, Mr. Cavanaugh asked Plaintiff whom she was taking to prom, who had asked her to prom, called her "cupcake," asked about her prom dress, and advised her that she could take anyone she wanted to prom.[13] PSAMF ¶ 36; DRPSAMF ¶ 36. Mr. Nguyen was also present during this meeting and agreed with Mr. Cavanaugh's suggestions.[14] PSAMF ¶ 37;

---

[12] RSU 40 denies PSAMF ¶ 34, contending first that "[Ms.] Pease never heard Cavanaugh refer to Plaintiff as 'cupcake'" and, second, that "Plaintiff testified to only two specific instances when [Ms.] Philbrook was present when [Mr.] Cavanaugh allegedly said this." DRPSAMF ¶ 34. The Court does not view the former objection relevant to PSAMF ¶ 34 because it focuses on what Ms. Pease heard, not what Ms. Philbrook heard. The Court accepts the latter objection as a qualification and has modified PSAMF ¶ 34 to reflect that Ms. Wadsworth identified two specific instances.

[13] RSU 40 qualifies PSAMF ¶ 36, objecting that "[i]n Plaintiff's first deposition she testified to a slightly different version of events in which she was not clear about exactly who was present at what point when various statements were allegedly made." DRPSAMF ¶ 36. The Court agrees that Ms. Wadsworth may have expressed some uncertainty about who was present at this meeting in her first deposition, but the District does not dispute that Ms. Wadsworth testified to PSAMF ¶ 36's factual assertions in her second deposition. Finding record support for the assertion, the Court admits PSAMF ¶ 36.

[14] RSU 40 qualifies PSAMF ¶ 37, objecting that "[Mr.] Nguyen did not recall [Mr.] Cavanaugh making any comments to Plaintiff during the meeting regarding prom, nor did [Mr.] Nguyen recall making any comments himself to Plaintiff regarding prom." DRPSAMF ¶ 37. As the Court is required to view disputed facts in the light most favorable to the nonmovant, the Court finds that Ms. Wadsworth's testimony, as the nonmoving party, in support of the asserted fact is sufficient to justify its inclusion and admits PSAMF ¶ 37. *See Wadsworth Dep. Vol. I* at 195:18-196:3 ("Mr. Nguyen said,

DRPSAMF ¶ 37.  Ms. Philbrook was also present for a conversation during which Mr. Cavanaugh told Ms. Wadsworth that she could bring anyone she wanted to prom.[15] PSAMF ¶ 38; DRPSAMF ¶ 38.  Ms. Philbrook responded that she already knew who was talking about taking Ms. Wadsworth to prom.[16]  PSAMF ¶ 39; DRPSAMF ¶ 39.

Ms. Wadsworth was embarrassed that Mr. Cavanaugh called her "cupcake," and after one of her friends found out about the nickname, Ms. Wadsworth went to Mr. Nguyen's office and advised him that Mr. Cavanaugh called her "cupcake" when they texted each other.[17]  PSAMF ¶ 40; DRPSAMF ¶ 40.  Ms. Philbrook came into the office during that meeting with Mr. Nguyen while Ms. Wadsworth was reporting her feelings, sat down, did not say anything, and then—after an undetermined amount of time—said "I'll leave you guys to it" and left Mr. Nguyen's office.[18]  PSAMF

---

yes and that they've already heard several boys who want to take me to prom and made jokes about me turning them down or saying, yes, and so Mr. Nguyen just agreed with Mr. Cavanaugh").

[15]    RSU 40 raises the same qualification as in DRPSAMF ¶ 36.  The Court overrules it for the same reason, finding that Ms. Wadsworth's slight equivocation in one instance does not justify rejecting PSAMF ¶ 38 when her other testimony supports its assertion.  *See Wadsworth Dep. Vol. II* at 78:12-20 (Mr. Cavanaugh and Ms. Philbrook "were both chuckling, laughing because Mr. Cavanaugh had asked me, Miss Philbrook was present, about if I knew who I was taking to prom or who has asked me to prom and what I -- if I had my dress situation worked out, and he made another comment about how I could take several people or anyone I wanted to prom, and Miss Philbrook was definitely part of that because she had said that she knows already the people who were talking about taking me to the prom").  The Court admits PSAMF ¶ 38.

[16]    RSU 40 denies PSAMF ¶ 39, arguing that "[t]he cited excerpt does not support the assertion at all."  DRPSAMF ¶ 39.  The Court agrees that Ms. Wadsworth cited the incorrect page but finds the relevant assertion in the except cited by the Court in the previous footnote, and thus admits PSAMF ¶ 39.  *See Wadsworth Dep. Vol. II* at 78:19-20 (Ms. Philbrook "had said that she knows already the people who were talking about taking me to the prom").

[17]    RSU 40 qualifies PSAMF ¶ 40, stating that "[Mr.] Nguyen did not know that Plaintiff and [Mr.] Cavanaugh were exchanging text messages."  DRPSAMF ¶ 40.  However, Ms. Wadsworth testified that she "spoke to Mr. Nguyen about [students mockingly calling her cupcake] and told him that when [she and Mr. Cavanaugh] text he calls me cupcake and all the other nicknames."  *Wadsworth Dep. Vol. II* at 76:15-17.  Finding record support for the assertion, the Court overrules the District's objection and admits PSAMF ¶ 40.

[18]    RSU 40 qualifies PSAMF ¶ 41, stating that "Plaintiff testified that [Ms.] Philbrook was not present during the entire meeting but that 'she popped in during that meeting and sat with us, didn't say anything, and then she said I'll just leave you guys to it, and then she left'" and therefore "[i]t is

¶ 41; DRPSAMF ¶ 41.   In the text messages between Mr. Cavanaugh and Ms. Wadsworth, from the very limited period of April 20, 2017 through November 3, 2017, Mr. Cavanaugh called Ms. Wadsworth "cupcake" at least 60 times, "ladytime" at least 28 times, and "princess" at least 18 times.   PSAMF ¶ 42; DRPSAMF ¶ 42.   Mr. Cavanaugh did not try to hide the fact that he was sending text messages to Ms. Wadsworth, and according to him, while he could not remember proactively bringing up the exchanges, he may have told Ms. Philbrook, Mr. Nguyen, and Athletic Director Matt Lash, that he was exchanging text messages with Ms. Wadsworth.[19]   PSAMF ¶ 43; DRPSAMF ¶ 43.

Megan Wright, a classmate and friend of Ms. Wadsworth's, later testified that she thought Mr. Cavanaugh was creepy and that Mr. Cavanaugh commented on the length of Ms. Wadsworth's skirt when she walked into school in the morning.   PSAMF ¶ 155; DRPSAMF ¶ 155.   Ms. Wadsworth was borrowing Ms. Wright's skirt that day, and this comment made Ms. Wright so uncomfortable that she never wore it again.   PSAMF ¶ 155; DRPSAMF ¶ 155.   Ms. Wright testified that the relationship between Mr. Cavanaugh and Ms. Wadsworth was common knowledge throughout the school.[20]

---

not clear what aspects of the discussion [Ms.] Philbrook did and did not hear."   DRPSAMF ¶ 41.   The Court modified PSAMF ¶ 41 to address the District's qualification.

[19]      RSU 40 qualifies PSAMF ¶ 43 to emphasize that "[Mr.] Cavanaugh only stated he 'may' have told others but that he 'didn't bring it up either'" and to highlight Ms. Philbrook and Mr. Nguyen's testimony that they were not aware of the text messages.   DRPSAMF ¶ 43.   Although this qualification does not conflict with Ms. Wadsworth's phrasing that Mr. Cavanaugh may have told others the Court modified PSAMF ¶ 43 to add that Mr. Cavanaugh did not "bring up" the exchanges.

[20]      RSU 40 objects to PSAMF ¶ 157 on the grounds that "there is no foundation to support that Wright is competent to testify to 'common knowledge' throughout school, nor is there any foundation to support what this 'relationship' was understood to be."   DRPSAMF ¶ 157.   Given that the record is replete with evidence that Mr. Cavanaugh regularly pulled Ms. Wadsworth out of class, texted her constantly, and multiple teachers and administrators noticed and complained of their interactions, the Court does not strain to envision that their relationship—however it may be characterized—provided grist for the school's rumor mill.   Ms. Wright testified that her "group of friends" would "all find [the

PSAMF ¶ 157; DRPSAMF ¶ 157.  Mr. Cavanaugh commented on one of Ms. Wright's mother's Facebook posts—a picture of Ms. Wright and Ms. Wadsworth dressed up in Harry Potter costumes—stating that he felt slighted because he was not in the photo.[21]  PSAMF ¶ 156; DRPSAMF ¶ 156.  Mr. Cavanaugh also told Ms. Wadsworth

---

relationship] weird" and that she first heard about it through a mutual friend while living in Wisconsin.  *Joint R. Materials*, Attach. 23, *Dep. of Megan Wright* at 31:9-32:1.  As Ms. Wright was a student at MVHS and a friend of Ms. Wadsworth at the time, the Court finds support for Ms. Wright's assertion that the relationship was "common knowledge throughout the school," overrules the District's objection, and admits PSAMF ¶ 157.

[21]      PSAMF ¶ 156 states:

> Defendant Cavanaugh made comments to Plaintiff in the main office, saying she looked sexy in her glasses.  Defendant Cavanaugh also commented on one of Ms. Wright's mom's Facebook posts, a picture of Ms. Wright and Plaintiff dressed up in Harry Potter costumes, stating that he felt slighted because he wasn't in the photo.  This was the same costume that Plaintiff was wearing when Defendant Cavanaugh told her she looked like a playboy bunny.

PSAMF ¶ 156.  In support of these statements, Ms. Wadsworth cites the deposition testimony of Megan Wright.  *Id.* (*Dep. of Megan Wright* at 26:1-5, 28:5-21, 27:12-16).  In the first statement about the glasses, Ms. Wright says that she was not present when Mr. Cavanaugh made the comment, but that Ms. Wadsworth told Ms. Wright about the comment which took place in the main office at the beginning of their senior year.  *Id.* at 25:18-26:17.

In the second comment about the Facebook posting, Ms. Wright explained that there was a school dress-up day and Ms. Wadsworth, another female, and she dressed up as Harry Potter.  *Id.* at 27:12-28:23.  As it turned out, Mr. Cavanaugh dressed up as Harry Potter too.  *Id.* at 28:15-17.  There were two photographs: one with the three females and the other with the three females and Mr. Cavanaugh.  *Id.* at 28:11-21.  Ms. Wright's mother posted only the one of the three females on Facebook and did not post the one with the three females and Mr. Cavanaugh.  *Id.* at 27:23-28:21.  Mr. Cavanaugh commented that he felt slighted because Ms. Wright's mother had not posted the photograph in which he appeared.  *Id.* at 28:9-21.  Ms. Wright testified that Mr. Cavanaugh's comment made her feel "super uncomfortable."  *Id.* at 28:22-23.  The deposition does not clarify whether Mr. Cavanaugh made this comment directly to Ms. Wright or to Ms. Wadsworth who conveyed it to Ms. Wright.  Based on Ms. Wright's comment that Mr. Cavanaugh's comment made her feel "super uncomfortable," the Court infers that the comment was made to Ms. Wright.

The third comment involved same photograph of the three females wearing Harry Potter costumes on dress-up day.  *Id.* at 27:8-21.  Ms. Wadsworth told Ms. Wright that Mr. Cavanaugh commented on the way she held up her tie made her look like a Playboy bunny.  *Id.*  Ms. Wright did not hear Mr. Cavanaugh make this comment.  *Id.*

RSU 40 qualifies PSAMF ¶ 156 to argue that all three factual assertions—the glasses comment, the Facebook comment, and the Playboy bunny comment—are inadmissible hearsay.  DRPSAMF ¶ 156.  The District contends that "[Ms.] Wright testified that she was not present for the alleged comments about the glasses and the playboy bunny but was instead told about them by Plaintiff after they happened."  DRPSAMF ¶ 156.

The Court overrules RSU 40's evidentiary objections.  First, none of the testimony is offered for their truth and they are not hearsay—for example, the Playboy bunny comment is obviously not offered to prove that Ms. Wadsworth actually looked like a Playboy bunny.  FED. R. EVID. 801(c)(2)

---

13

that she looked sexy in glasses, a comment that Ms. Wadsworth repeated to Ms. Wright. *Id.* Finally, Ms. Wadsworth told Ms. Wright that Mr. Cavanaugh had told her that she looked like a Playboy bunny when wearing the Harry Potter costume. *Id.*

Mr. Cavanaugh also made Ms. Wadsworth uncomfortable when he gave her gifts at school, including a box of feminine hygiene products and a winter coat. PSAMF ¶ 53; DRPSAMF ¶ 53. He often gave her gifts of money. PSAMF ¶ 54; DRPSAMF ¶ 54. Ms. Wadsworth informed Mr. Nguyen that the gifts Mr. Cavanaugh was giving her made her feel embarrassed.[22] PSAMF ¶ 55; DRPSAMF ¶ 55. Mr.

---

("'Hearsay' means a statement that . . . a party offers in evidence to prove the truth of the matter asserted in the statement"). Second, the relevance of these statements is to demonstrate how widespread knowledge of Mr. Cavanaugh's inappropriate comments was throughout the high school. In its motion, RSU 40 contends that it was not aware of Mr. Cavanaugh's inappropriate comments about Ms. Wadsworth. If credited by a jury, against RSU 40's denial rests evidence that Mr. Cavanaugh's conduct toward Ms. Wadsworth was common knowledge among her classmates and it would be a short step for a jury to infer that members of RSU 40 must have been aware that there was something amiss.

Moreover, if Mr. Cavanaugh made the statement about the Facebook posting directly to Ms. Wright, the statement is admissible as statement of a party opponent. FED. R. EVID. 801(d)(2). The Court assumes for purposes of this ruling that as principal, Mr. Cavanaugh's statements would be admissible against RSU 40 as a statement by RSU 40's employee. FED. R. EVID. 801(d)(2)(D).

Although the Court has considered PSAMF ¶ 156 for this limited purpose, the static and sequential process of a motion for summary judgment seems particularly artificial here. Presumably due to the way discovery was conducted, there is no evidence from Ms. Wadsworth that Mr. Cavanaugh made these comments to her. Even so, it seems unlikely that Ms. Wright created these comments out of whole cloth. If Ms. Wadsworth were to testify consistently with Ms. Wright, Ms. Wadsworth's testimony about what Mr. Cavanaugh said to her would be admissible as an admission of a party opponent. FED. R. EVID. 801(d)(2). Furthermore, Ms. Wright's testimony would be admissible to rebut an express or implied charge of recent fabrication. FED. R. EVID. 801(d)(1)(B)(i).

[22] RSU 40 denies PSAMF ¶ 55, stating that "[Mr.] Nguyen testified that Plaintiff never approached him about [Mr.] Cavanaugh giving her gifts . . . [and Mr.] Nguyen did not know that [Mr.] Cavanaugh gave Plaintiff numerous gifts." DRPSAMF ¶ 55. Ms. Wadsworth has testified that "I do remember that I did discuss the hygiene products and the box of gifts that he gave me with Mr. Nguyen. I believe mentioning to [Mr. Nguyen] that I was kind of embarrassed because I don't know what people thought of that when they saw that, and once again [Mr. Nguyen] assured me that [Mr. Cavanaugh] was making sure that I had everything that I needed." *Wadsworth Dep. Vol. I* at 209:23-210:5; *see also id.* at 210:6-213:5 (describing that conversation in detail). Finding record support for the assertion and obligated to view disputed facts in the light most favorable to Ms. Wadsworth, the Court overrules the District's denial and admits PSAMF ¶ 55.

Nguyen responded by stating that Mr. Cavanaugh was just making sure she had everything she needed.[23]  PSAMF ¶ 56; DRPSAMF ¶ 56.

### 3.   The Birth Control Appointment

Mr. Cavanaugh took Ms. Wadsworth to a physical examination with her doctor so she could participate in cheerleading.[24]  PSAMF ¶ 44; DRPSAMF ¶ 44.  While at the appointment, Mr. Cavanaugh suggested Ms. Wadsworth get on birth control.  PSAMF ¶ 45; DRPSAMF ¶ 45.  Thereafter, Mr. Cavanaugh continually suggested Ms. Wadsworth get on birth control, and ultimately scheduled a medical appointment for her so that she could obtain birth control.  PSAMF ¶ 46; DRPSAMF ¶ 46.  Mr. Nguyen knew that Mr. Cavanaugh was attempting to schedule the birth control appointment.[25]  PSAMF ¶ 47; DRPSAMF ¶ 47.  Mr. Nguyen also knew that Mr. Cavanaugh intended to take Ms. Wadsworth to this birth control appointment, and

---

[23]     RSU 40 makes the same objection as in DRPSAMF ¶ 55 and the Court overrules it for the same reasons.

[24]     RSU 40 qualifies PSAMF ¶ 44, stating that "[t]he cited excerpt only supports that [Mr.] Cavanaugh took Plaintiff to a doctor's appointment."  DRPSAMF ¶ 44.  This objection is frivolous.  While the paragraph Ms. Wadsworth cited may not explicitly mention cheerleading as, it is clear from the surrounding context that the physical was for cheerleading.  *Wadsworth Dep. Vol. I* at 198:4-199:23 (stating that the appointment "occurred some time in my junior year before cheerleading started because I needed a physical in order to participate in cheerleading" and reiterating at least three times that the physical was for cheerleading).  The Court overrules RSU 40's qualification and admits PSAMF ¶ 44.

[25]     RSU 40 denies PSAMF ¶ 47, contending that "[Mr.] Nguyen testified that he did not know that [Mr.] Cavanaugh was trying to arrange for Plaintiff to get on birth control, and he denied ever having told [Mr.] Cavanaugh not to take Plaintiff to an appointment for birth control."  DRPSAMF ¶ 47.

     The record supports Ms. Wadsworth's assertion.  *See Joint R. Materials,* Attach. 8, *Dep. of Andrew Cavanaugh* at 107:22-108:-22 (*Cavanaugh Dep.*); *id.*, Attach. 14, *Dep. of Theresa Kenniston* at 46:20-50:4 (*Kenniston Dep.*).  At the very least, this constitutes a disputed fact where a reasonable factfinder could conclude that Mr. Nguyen was aware of the appointment, and at this stage the Court draws the inference in favor of Ms. Wadsworth.  *See Ahern*, 629 F.3d at 51 (1st Cir. 2010) (citation omitted) (at the summary judgment stage, "the nonmovants are entitled to the benefit of all reasonable inferences that the facts will bear").  The Court overrules the District's objection and admits PSAMF ¶ 47.

he advised Mr. Cavanaugh that taking Ms. Wadsworth would be a bad idea.[26] PSAMF ¶ 47; DRPSAMF ¶ 47.

In late 2016 or early 2017, Theresa Kenniston, a family friend with whom Ms. Wadsworth was living at the time, called Mr. Nguyen and complained about Mr. Cavanaugh setting up and intending to take Ms. Wadsworth to a doctor's appointment to obtain birth control, believing such action was inappropriate; the only thing Mr. Nguyen did with this information was to tell Ms. Kenniston the issue had been addressed.[27]  PSAMF ¶¶ 49-50; DRPSAMF ¶¶ 49-50.  Mr. Nguyen denies all knowledge of the birth control appointment and testified that the conversation was only about Ms. Kenniston taking Ms. Wadsworth to the doctor, with no mention of Mr. Cavanaugh.  PSAMF ¶¶ 47-50; DRPSAMF ¶¶ 47-50.  Mr. Nguyen did not inform Superintendent Nolan of the call with Ms. Kenniston or otherwise initiate any investigation relating to the call.[28]  PSAMF ¶ 51; DRPSAMF ¶ 51.  Mr. Nguyen spoke with Ms. Wadsworth about the birth control appointment, and despite the fact that Ms. Wadsworth told Mr. Nguyen that her parents did not approve of her receiving birth control, Mr. Nguyen informed her that Mr. Cavanaugh was like a father figure

---

[26]    RSU 40 denies PSAMF ¶ 48 for the same reasons as PSAMF ¶ 47.  DRPSAMF ¶ 48.  The Court overrules the objection for the reasons discussed in footnote 24 and admits PSAMF ¶ 48.

[27]    RSU 40 denies PSAMF ¶¶ 49-50 for largely the same reasons as PSAMF ¶¶ 47-48: while Ms. Kenniston testified to the assertions, Mr. Nguyen denied them in his own deposition.  DRPSAMF ¶¶ 49-50.  The Court again admits the assertions for the reasons discussed in footnote 24, although it includes Mr. Nguyen's denials in the following sentence.

[28]    RSU 40 qualifies PSAMF ¶ 51 for several reasons, including that Mr. Nguyen did not have the authority to take "corrective action" and that, consistent with his previous denials, Ms. Kenniston did not mention Mr. Cavanaugh on the call and thus there was nothing improper to investigate.  DRPSAMF ¶ 51.  The Court modified PSAMF ¶ 51 to reflect these qualifications.

to her, and that Mr. Cavanaugh thought of her "as a daughter."  PSAMF ¶ 52; DRPSAMF ¶ 52.

Mr. Cavanaugh also wrote an undated and unaddressed letter for Ms. Wadsworth to give to her doctor's office and advised that he had concerns including depression, attention deficit, irregular menstrual cycle, and lack of vaccinations due to religious concerns.  PSAMF ¶ 114; DRPSAMF ¶ 114.  Mr. Cavanaugh noted that Ms. Wadsworth's medical records should be kept confidential and not shared with her parents.  PSAMF ¶ 115; DRPSAMF ¶ 115.  Mr. Cavanaugh admits he did not have the authority to prevent Ms. Wadsworth's parents from seeing her medical records, as they remained her legal guardians.  PSAMF ¶ 116; DRPSAMF ¶ 116.

### 4.  Andrew Cavanaugh Asks Adrianna Wadsworth to Move in with Him

During the fall of 2016, Ms. Wadsworth left her parents' home and moved in with her friend and classmate at the home of her parents, Theresa and Darren Kenniston.  DSMF ¶ 32; PRDSMF ¶ 32.  Ms. Wadsworth lived with the Kennistons from the fall of 2016 until late in her senior year at MVHS in the spring of 2018, with the exception of a couple of weeks during that time period when Ms. Wadsworth lived with her older half-sister.  DSMF ¶ 33; PRDSMF ¶ 33.

Over the course of several months, between April 28, 2017 and June 22, 2017, Mr. Cavanaugh asked Ms. Wadsworth to move into his home on a number of

occasions.[29]   PSAMF ¶¶ 57-58; DRPSAMF ¶¶ 57-58.   During that period, Mr. Cavanaugh sent Ms. Wadsworth the following text messages:

> **April 28:** "You need to come here tomorrow.  I will get a room ready for you and you can rest and get better.  We will take care of you.  I think you are just too stressed."

> **April 29:** "Do you think staying with me isnt a good idea?"

> **May 10:** "Would your parents freak if you lived with me?"

> "What about staying here for a couple days just to try it?  You might like it.  At least no one would yell at you.  What about staying here tomorrow night?"

> "If you decide you want to stay with me, just give a brutha a heads up."

> "One of these days I will get you to live with me!"

> **May 18:** "Move in here and we will teach you."

> "You should live here for your senior year.  It would be a stable place and I dont care about child support."

> "I have always said you were a class act.  I think if you talked with Debbie and I about it we could take care of a lot.  I would write a letter to the superintendent and all that."

> **June 8:** "I have told you to live with me but you don't want to do that."

> **June 22:** "I have a bit of bad news.  I spoke with work about you staying with me and i cant.  I feel terrible but thats what it is."

PSAMF ¶¶ 59-69; DRPSAMF ¶¶ 59-69.   While Mr. Cavanaugh was not more specific

about whom at "work" he spoke with—he may have been referring to Mr. Nguyen,

---

[29]     RSU 40 admits the substance of PSAMF ¶¶ 57-58 but argues that they should be stricken because the deposed school officials have testified that they had no knowledge of Mr. Cavanaugh's texts to Ms. Wadsworth, and thus the texts are irrelevant.  DRPSAMF ¶¶ 57-58.  However, Mr. Cavanaugh later texted Ms. Wadsworth that he spoke "with work"—presumably, a District employee—about her moving in with him and was told that she could not.  PSAMF ¶ 69; DRPSAMF ¶ 69.  On this basis, the texts are relevant, and the Court admits PSAMF ¶¶ 57-58.

whom Mr. Cavanaugh asked if Ms. Wadsworth could move in with him (Mr. Nguyen responded that he did not think it was a good idea)—he informed someone at the school about his desire to have Ms. Wadsworth live with him, and no action was taken related to this request beyond seemingly denying it.[30]  PSAMF ¶¶ 70-71; DRPSAMF ¶¶ 70-71.

### 5.    Andrew Cavanaugh's Inappropriate Text Messages

Mr. Cavanaugh began texting with Ms. Wadsworth in or around May of 2016, which is approximately when she began working for him.  DSMF ¶ 23; PRDSMF ¶ 23.  On a near daily basis, Mr. Cavanaugh would exchange text messages with Ms. Wadsworth; many inappropriate.  PSAMF ¶ 90; DRPSAMF ¶ 90.  In his text messages, Mr. Cavanaugh would ask Ms. Wadsworth to send him pictures of her in her swimsuit, ask her about her sexual relationships with boys, and even about whether she was having orgasms.  PSAMF ¶ 90; DRPSAMF ¶ 90.

---

[30]     RSU 40 has several objections to PSAMF ¶ 70.  It first argues that the assertion that Mr. Cavanaugh told someone at RSU 40 should be stricken as hearsay because Ms. Wadsworth is using his text message for the truth of the matter asserted.  DRPSAMF ¶ 70.  The Court does not find it necessary to resolve this issue because the ultimate assertion—that Mr. Cavanaugh told at least one District employee about Ms. Wadsworth potentially moving in—is corroborated by Mr. Nguyen's unambiguous testimony that Mr. Cavanaugh told him exactly that.  PSAMF ¶ 71; DRPSAMF ¶ 71.  The Court modified PSAMF ¶ 70 to include the assertion.

RSU 40 also denies the assertion in PSAMF ¶ 70, submitting that Mr. Cavanaugh testified that he did not speak with work.  DRPSAMF ¶ 70.  Between Mr. Cavanaugh's own texts stating he "spoke with work" and Mr. Nguyen's testimony that Mr. Cavanaugh spoke with him about the issue, the record reveals sufficient factual support for the assertion.

Finally, RSU 40 submits that PSAMF ¶ 70 is irrelevant.  DRPSAMF ¶ 70.  The Court rejects this argument for the reasons stated in footnote 28 and admits PSAMF ¶ 70.

19

**A069**

On July 21, 2017, Mr. Cavanaugh texted her "You are like a daughter to me . . . Maybe a scandalous step daughter"[31] and "If you buy car insurance how would you afford those lacey shorts?"[32]   PSAMF ¶¶ 77-78; DRPSAMF ¶¶ 77-78.

On July 27, 2017, he texted her "How casual is sex with your friends?  Like is it no big deal or what?"   PSAMF ¶ 79; DRPSAMF ¶ 79.  Three days later, Mr. Cavanaugh texted Ms. Wadsworth "Good you should be at the beach.  I would ask for pictures, but that might be a bit much . . . Can I see the photos or would that bother you? Only send the scandalous ones! Ha hah."  PSAMF ¶ 80; DRPSAMF ¶ 80.  Later that day, he texted her "Do you have any more [pictures] you could send?"  PSAMF ¶ 81; DRPSAMF ¶ 81.  On August 2, 2017, he texted her "Can you help me Friday or will you be taking more nude pictures of yourself?"[33]  PSAMF ¶ 82; DRPSAMF ¶ 82.

On August 2, 2017, Ms. Wadsworth told Mr. Cavanaugh that she had been sexually assaulted by her cheerleading coach while swimming during an off-season cheerleading team trip earlier that summer.[34]  PSAMF ¶¶ 72-73; DRPSAMF ¶¶ 72-73.  Mr. Cavanaugh responded, in part:

---

[31]   RSU 40 makes three objections to PSAMF ¶ 77: that the portion that Mr. Cavanaugh abused Ms. Wadsworth's trust is conclusory, the assertion is irrelevant for the reasons discussed in footnote 28, and denying the assertion on the grounds that it is not found on the page cited by Ms. Wadsworth. DRPSAMF ¶ 77.  The Court sustains the first objection and has removed the conclusory portion of the assertion.  It overrules the relevance argument for the reasons stated in footnote 28.  Finally, the Court overrules the denial, finding that while Ms. Wadsworth's citation was off by several pages, the text message is found in the record. *Text Messages* at 12.  The Court admits PSAMF ¶ 77 as amended.

[32]   RSU 40 makes the same relevance objection and again denies the assertion as improperly cited.  DRPSAMF ¶ 78.  The Court overrules the objections for the reasons discussed in footnote 28 and admits PSAMF ¶ 78. *See Text Messages* at 12 ("If you buy car insurance how would you afford those lacey shorts?").

[33]   RSU 40 objects that the assertion is not found on the cited page.  DRPSAMF ¶ 82.  The Court finds the text message on the following page, overrules the objection, and admits PSAMF ¶ 82. *See Text Messages* at 17.

[34]   PSAMF ¶¶ 72-76 and 83-88 concern allegations that Ms. Wadsworth was sexually assaulted by a cheerleading coach, told Mr. Cavanaugh about the assault, and Mr. Cavanaugh failed to report it

Even if he [took you swimming], it should have only been swimming, a few laughs and that's it. I mean when I go to the beach (ve[r]y rare) and i see a student in a bikini, it can be awkward. I mean the pictures you sent me, they are great shots and well taken, but there is no mistaking that you a pretty snappy number. So to be at the beach with you alone was not t[h]e best because he is seeing you with pret[t]y much not[h]ing on. [35]

PSAMF ¶ 88; DRPSAMF ¶ 88. This conversation continued until August 4, 2017, at which time Mr. Cavanaugh told Ms. Wadsworth to put on "her Mickey Mouse negligee" and go to bed, and then stated, "Im deleting our conversations, and the swimsuit pictures, as much as i hate to! Hah hah."[36,37] PSAMF ¶ 89; DRPSAMF ¶ 89.

---

or take any corrective action. RSU 40 objects to each assertion that "Plaintiff is attempting to raise a new theory of liability against RSU 40 in her opposition to RSU 40's motion for summary judgment." DRPSAMF ¶¶ 72-76 and 83-88. In the District's view, her theory throughout the case has been that school officials failed to report or stop Mr. Cavanaugh's sexual harassment of her, but now, without amending her Complaint to include the allegations against the coach, "she is making a last-ditch effort to avoid summary judgment based on [Mr.] Cavanaugh's failure to report a coach's assault of her." DRPSAMF ¶¶ 72-76 and 83-88. During oral argument, Ms. Wadsworth's counsel acknowledged that the Amended Complaint does not refer to this sexual assault and stated that he learned of it only through discovery. Regardless of when Ms. Wadsworth's attorneys learned about the assault, Ms. Wadsworth certainly knew.

The Court largely sustains RSU 40's objections. The Amended Complaint makes no reference to a sexual assault by the cheerleading coach and, as the District noted, plaintiffs may not "raise new and unadvertised theories of liability for the first time in opposition to a motion for summary judgment." *Miranda-Rivera v. Toledo-Davila*, 813 F.3d 64, 76 (1st Cir. 2016) (citation and internal quotations omitted). Because Ms. Wadsworth has not alleged facts or advanced a theory of liability relating to sexual harassment or assault by the cheerleading coach, these assertions are only relevant where they relate to Mr. Cavanaugh's sexual harassment of her. The Court admits portions of these assertions that provide context for Mr. Cavanaugh's later inappropriate text messages. *See, e.g.,* PSAMF ¶ 88 (Mr. Cavanaugh contrasting his experiences seeing students in bikinis and calling Ms. Wadsworth "a pretty snappy number"). The Court sustains RSU 40's objections as to PSAMF ¶¶ 74-76 and 83-87 and omits those assertions. The Court partially sustains RSU 40's objections as to PSAMF ¶¶ 72-73 and 88, admitting altered or partial versions of those assertions relevant to Mr. Cavanaugh's misconduct.

[35]    The Court admits an abridged PSAMF ¶¶ 88, as explained in footnote 33.
[36]    RSU 40 admits the substance of PSAMF ¶ 89 but makes the same relevance objection discussed in footnote 33. DRPSAMF ¶ 89. The Court overrules the objection, finding that—while the coach's misconduct is still not relevant—these text messages are relevant evidence of Mr. Cavanaugh's inappropriate behavior.
[37]    The Court omits PSAMF ¶ 91 as virtually identical to PSAMF ¶ 43. *Compare* PSAMF ¶ 43 ("Shockingly, Mr. Cavanaugh did not try to hide the fact that he was sending text messages to Ms. Wadsworth, and according to him, he may have told Ms. Philbrook, Mr. Nguyen, and Athletic Director,

### 6.     Andrew Cavanaugh Pulling Adrianna Wadsworth from Class

Mr. Cavanaugh would meet regularly with Ms. Wadsworth during the 2016-2017 school year and the first few months of the 2017-2018 school year.[38]  DSMF ¶¶ 24-25; PRDSMF ¶¶ 24-25.  Mr. Cavanaugh would regularly pull Ms. Wadsworth out of class to have meetings with her in his office.[39]  PSAMF ¶ 106; DRPSAMF ¶ 106.  Mr. Cavanaugh told Ms. Pease and Ms. Philbrook that the reason for these meetings was that Ms. Wadsworth was dealing with a difficult family situation and needed support.  DSMF ¶ 26; PRDSMF ¶ 26.  Mr. Cavanaugh would excuse Ms. Wadsworth's absences from class and school, despite not having the authority to do so.[40]  PSAMF ¶ 107; DRPSAMF ¶ 107.

On October 4, 2016, Ms. Wadsworth's English teacher sent an email to Mr. Cavanaugh, Ms. Pease, Ms. Philbrook, and Mr. Nguyen stating that she and another English teacher wanted to "voice [their] concern about Anna Wadsworth being pulled from [Writing Center and AP Language classes] at the request of [Mr. Cavanaugh's]

Matt Lash, that he was exchanging text messages with Ms. Wadsworth") *with* PSAMF ¶ 91 ("Mr. Cavanaugh did not try to hide the fact that he was sending text messages to Ms. Wadsworth, and according to him, he may have told Ms. Philbrook, Mr. Nguyen, and Athletic Director, Matt Lash, that he was exchanging text messages with Ms. Wadsworth").

[38]     Ms. Wadsworth qualifies DSMF ¶¶ 24-25 and submits instead that "Defendant Cavanaugh met with and spoke to Plaintiff daily from the beginning of the 2016 school year until his resignation in November 2017."  PRDSMF ¶¶ 24-25.  The Court finds that formulation functionally equivalent to the combination of DSMF ¶¶ 24-25 and overrules Ms. Wadsworth's objections.

[39]     RSU 40 qualifies PSAMF ¶ 106 to object that it is not uncommon for teachers and principals to pull students out of class.  DRPSAMF ¶ 106.  The Court overrules the District's objection as beyond the scope of the fact asserted and admits PSAMF ¶ 106.

[40]     RSU 40 qualifies PSAMF ¶ 107 to object "[t]he cited excerpt does not support the assertion that [Mr.] 'Cavanaugh continued his inappropriate and sexual conversations with' Plaintiff during these meetings."  DRPSAMF ¶ 107.  The Court agrees, omits that portion of PSAMF ¶ 107, and admits the remainder of the assertion.

office."[41]  DSMF ¶ 27; PRDSMF ¶ 27; PSAMF ¶ 108; DRPSAMF ¶ 108.  In the email the teachers said that Ms. Wadsworth "seem[ed] stressed to be in the position of catching up" as a result of missing class and requested that administrators meet with her during study hall or another non-academic period rather than calling her out of class.  DSMF ¶ 28; PRDSMF ¶ 28.  Both School Assistant Principals, Ms. Pease and Ms. Philbrook, approached Mr. Cavanaugh and advised him not to "haul Anna [Wadsworth] out of a class or keep her from class."  PSAMF ¶ 109; DRPSAMF ¶ 109.

> Mr. Cavanaugh replied to the teachers' email, stating:
>
> Anna has some issues outside of class that we are working to resolve.  I know she is extremely conscientious regarding her coursework and you are correct regarding her stress level.  I apologize for her being removed during these important classes and I will make sure it does not happen again.[42]

DSMF ¶ 29; PRDSMF ¶ 29; PSAMF ¶ 110; DRPSAMF ¶ 110.  Mr. Cavanaugh continued to pull Ms. Wadsworth from classes, although the record is unclear whether he pulled her from the same classes referenced in the email exchange, Writing Center and AP Language.[43]  PSAMF ¶ 111; DRPSAMF ¶ 111.

As the behavior continued, Ms. Philbrook spoke with Mr. Cavanaugh a number of times about Ms. Wadsworth, including at least once to discuss Ms. Philbrook's

---

[41]    RSU 40 qualifies PSAMF ¶ 108 to request that the Court supplement additional details about the classes.  DRPSAMF ¶ 108.  The Court added that language and phrased the assertion using the District's wording from DSMF ¶ 27.

[42]    RSU 40 qualifies PSAMF ¶ 110 to object to Ms. Wadsworth's paraphrasing of the email.  DRPSAMF ¶ 110.  The Court supplies the language of the email as quoted in DSMF ¶ 29 and overrules the District's objection as moot.

[43]    RSU 40 denies PSAMF ¶ 111, contending that Mr. Cavanaugh promised not to excuse Ms. Wadsworth from Writing Center and AP Language again, and that the record does not show that he continued to pull her from those classes specifically.  DRPSAMF ¶ 111.  The Court omits the assertion that Mr. Cavanaugh "lied" and admits the remainder of PSAMF ¶ 111, supplemented to reflect the ambiguity about the classes.

concerns about him removing Ms. Wadsworth from her classes too much.[44]  PSAMF ¶ 112; DRPSAMF ¶ 112.  In October 2017, Mr. Cavanaugh instructed the school attendance secretary, Penny Morrill, to stop entering his name in the comments when he excused Ms. Wadsworth from class because "teachers didn't like it and he was getting grief for it."[45]  PSAMF ¶ 113; DRPSAMF ¶ 113.  It is not uncommon for principals, assistant principals, and guidance counselors to call students out of class to address issues the student is facing, nor is it uncommon for teachers to complain when a student is called out of class by someone else in the building, like a principal, assistant principal, or guidance counselor.[46]  DSMF ¶¶ 30-31; PRDSMF ¶¶ 30-31.

In early January 2017, Ms. Wadsworth was placed on the Student Assistance Team (SAT) for students about whom the school has some concern relating to a particular issue, which may include attendance or behavior.[47]  PSAMF ¶ 117;

---

[44]    RSU 40 qualifies PSAMF ¶ 112 to object that Mr. Cavanaugh only testified concretely to one conversation with Ms. Philbrook on the attendance topic and included his impressions about what she thought but only "might have" communicated to him.  DRPSAMF ¶ 112.  The Court altered PSAMF ¶ 112 to reflect Mr. Cavanaugh's deposition testimony, omitting the concerns that Ms. Philbrook "might have" communicated to him.  *Cavanaugh Dep.* at 121:1-122:16.

[45]    RSU 40 qualifies PSAMF ¶ 113 to contend that "[t]he cited exhibit does not support that [Mr.] 'Cavanaugh continued to receive so many complaints regarding removing Ms. Wadsworth from class,' only that 'teachers didn't like it and he was getting grief for it.'"  DRPSAMF ¶ 113.  The Court agrees, omits the reference to continued complaints, and admits the remainder of PSAMF ¶ 113 as supported by the record.

[46]    Ms. Wadsworth qualifies DSMF ¶ 31 to submit that "[w]hile not uncommon for teachers to complain, the relationship between Defendant Cavanaugh and Plaintiff Wadsworth was not a secret . . . It was very obvious that something was going on."  PRDSMF ¶ 31.  The Courts overrules the objection as beyond the scope of the fact asserted and admits DSMF ¶ 31.  Furthermore, Ms. Wadsworth has separately asserted and the Court has accepted the proposition that Mr. Cavanaugh's relationship with Ms. Wadsworth was common knowledge at MVHS.  *See* PSAMF ¶¶ 156-57.

[47]    RSU 40 qualifies PSAMF ¶ 117 to argue that "[t]he citations only support that Plaintiff was placed on the SAT due to some level of concern relating to the student," and not that attendance or Mr. Cavanaugh removing her from class were causal factors.  DRPSAMF ¶ 117.  The Court agrees and alters PSAMF ¶ 117 to explain the SAT without asserting that she was placed on it because of attendance or Mr. Cavanaugh.  *See Philbrook Dep.* at 171:19-24 (students put on the SAT are students "who the school has some concern about relating to a particular issue, be it attendance, behavior, etc. . . .").

DRPSAMF ¶ 117.  Mr. Cavanaugh instructed the SAT coordinator, Tammy Anderson, not to inform Ms. Wadsworth's parents of her placement in the group and noted specifically it "is imperative that her parents DO NOT receive any correspondence from us about her placement on the SAT."[48]  PSAMF ¶ 118; DRPSAMF ¶ 118.  Ms. Philbrook testified that this request was inappropriate.[49]  PSAMF ¶ 119; DRPSAMF ¶ 119.

### 7.    The Car and September 19, 2017 Traffic Stop

Mr. Cavanaugh purchased a car, insured that car, and gave it to Ms. Wadsworth for her personal use.  PSAMF ¶ 92; DRPSAMF ¶ 92.  On September 19, 2017, School Resource Officer, Chris Spear, a member of the Waldoboro Police Department and school staff, observed Ms. Wadsworth driving a black Hyundai vehicle, ran the plate with dispatch, and the vehicle came back as owned by Mr. Cavanaugh.  PSAMF ¶ 93; DRPSAMF ¶ 93.  Later that day, Officer Spear conducted a traffic stop on Ms. Wadsworth when he observed her speeding after school.  PSAMF ¶ 94; DRPSAMF ¶ 94.   Upon reviewing the registration information, Officer Spear asked Ms. Wadsworth why the registration showed that the vehicle was owned by Mr. Cavanaugh.  PSAMF ¶ 95; DRPSAMF ¶ 95.  Ms. Wadsworth responded that Mr. Cavanaugh was helping her out while she waited to potentially move in with her father.  PSAMF ¶ 96; DRPSAMF ¶ 96.

---

[48]     RSU 40 qualifies PSAMF ¶ 118 to state that "[Ms.] Anderson responded by noting that there would not be a letter because she was only sending letters for truancy."  DRPSAMF ¶ 118.  The Court overrules the objection as beyond the scope of the fact asserted and admits PSAMF ¶ 118.

[49]     RSU 40 qualifies PSAMF ¶ 119 to object that "[t]he cited excerpt only supports that [Ms.] Philbrook did not believe it was appropriate . . . [and] does not support that it was against school policy."  DRPSAMF ¶ 119.  The Court agrees that Ms. Philbrook did not state that the request was against school policy and omits that portion of PSAMF ¶ 119.

Following the traffic stop, Officer Spear returned to the school, where he spoke with Ms. Philbrook about the traffic stop and expressed his concern that Ms. Wadsworth was driving a vehicle owned and insured by Mr. Cavanaugh.[50]  PSAMF ¶ 97; DRPSAMF ¶ 97; DSMF ¶ 35; PRDSMF ¶ 35.  Ms. Philbrook responded that both she and Ms. Pease had received complaints that Mr. Cavanaugh was spending too much time with Ms. Wadsworth and complaints surrounding his excusing her from class too often.  PSAMF ¶ 98; DRPSAMF ¶ 98.  Ms. Philbrook also advised Officer Spear that Mr. Cavanaugh had asked Ms. Wadsworth if she was interested in moving in with him.[51]  PSAMF ¶ 99; DRPSAMF ¶ 99.  Ms. Philbrook informed Officer Spear that she and Ms. Pease had tried to have professional conversations with Mr. Cavanaugh with regard to his behavior towards Ms. Wadsworth.  PSAMF ¶ 100; DRPSAMF ¶ 100.

As a result of the traffic stop, Ms. Philbrook asked Officer Spear to have a conversation with Mr. Cavanaugh.  PSAMF ¶ 101; DRPSAMF ¶ 101.  On September 19, 2017, at 3:30 p.m., Officer Spear approached Mr. Cavanaugh, told him of the traffic stop, and advised him that staff and students had spoken about his relationship with Ms. Wadsworth, and that the perception was that she was receiving

---

[50]     Ms. Wadsworth qualifies DSMF ¶ 35 to propose adding that Ms. Philbrook also told Officer Spear that she and Ms. Pease had received complaints about Mr. Cavanaugh spending too much time with Ms. Wadsworth.  PRDSMF ¶ 35.  The Court admits those exact proposed additions as part of PSAMF ¶ 98 in the following sentence, and thus overrules Ms. Wadsworth's qualification as moot.

[51]     RSU 40 qualifies PSAMF ¶ 99 to clarify that Officer Spear did not include this information in an email he sent the police chief following his conversation with Ms. Philbrook.  DRPSAMF ¶ 99.  Officer Spear testified that he had learned during "the conversation with Tamra Philbrook . . . that Principal Cavanaugh had asked [Ms. Wadsworth] if she was interested in moving in."  *Joint R. Materials,* Attach. 12, *Dep. of Christopher P. Spear* at 33:20-24 (*Spear Dep.*).  The Court finds the District's qualification beyond the scope of the asserted fact and admits PSAMF ¶ 99.

special treatment in the form of favoritism from Mr. Cavanaugh.  PSAMF ¶ 102; DRPSAMF ¶ 102.  Mr. Cavanaugh admitted to Officer Spear that he had heard the speculation but advised that he was not really concerned.  PSAMF ¶ 103; DRPSAMF ¶ 103.  Officer Spear wrote up a summary of the stop and his conversations with Ms. Philbrook and Mr. Cavanaugh and sent an email to the Waldoboro Police Chief titled "Pervert Principal" which described many of Mr. Cavanaugh's behaviors relating to Ms. Wadsworth.[52]  PSAMF ¶ 104; DRPSAMF ¶ 104.  After the September 19, 2017 traffic stop, conversations about Mr. Cavanaugh's behavior, and "pervert principal" email, no official action was taken relating to Mr. Cavanaugh's behavior with Ms. Wadsworth for over a month.[53]  PSAMF ¶ 105; DRPSAMF ¶ 105.

### C.   The Investigation Into Andrew Cavanaugh

Eventually, Ms. Kenniston reported her concerns to law enforcement through a contact of her brother's at Homeland Security.  DSMF ¶ 37; PRDSMF ¶ 37.  On Thursday, November 2, 2017, Superintendent Nolan received a phone call from the Waldoboro Police Chief Bill Labombarde informing him about concerns reported to law enforcement regarding messages exchanged between Mr. Cavanaugh and a student at MVHS.  DSMF ¶ 38; PRDSMF ¶ 38.  During that initial phone call, Chief Labombarde asked Superintendent Nolan to give him twenty-four hours before taking any action so as to not compromise the law enforcement investigation.  DSMF

---

[52]   RSU 40 objects to what it views as conclusory allegations in PSAMF ¶ 104.  DRPSAMF ¶ 104.
The Court sustains the objection in part, omitting the descriptions of Mr. Cavanaugh "perpetrating" behaviors that were "concerning" on Ms. Wadsworth and admitting the factual assertions.

[53]   RSU 40 denies PSAMF ¶ 105 as conclusory and unsupported by the facts, particularly the assertion that Ms. Philbrook and the police chief had "clear knowledge" of Mr. Cavanaugh's "harassment."  DRPSAMF ¶ 105.  The Court sustains the objection and has pared back PSAMF ¶ 105 to include only factual assertions supported by the record.

**A077**

¶ 39; PRDSMF ¶ 39.  On Friday, November 3, 2017, Superintendent Nolan had a conversation with Detective Donald Murray of the Knox County Sheriff's Department during which Detective Murray asked Superintendent Nolan not to interview Mr. Cavanaugh until Detective Murray had interviewed him.  DSMF ¶ 40; PRDSMF ¶ 40.  On Sunday, November 5, 2017, Superintendent Nolan called Mr. Cavanaugh and put him on leave, instructing him not to report to MVHS the following day, Monday, November 6, 2017.  DSMF ¶ 41; PRDSMF ¶ 41.

Superintendent Nolan began an investigation into Mr. Cavanaugh.  PSAMF ¶ 120; DRPSAMF ¶ 120; DSMF ¶ 42; PRDSMF ¶ 42.  In investigating the allegations, Mr. Nolan reviewed the school's harassment policy titled, "Harassment and Sexual Harassment of Students" and made the following notes: "Interfering, pulling out of class, late nights, unwelcome, asks, shouldn't have asked."  PSAMF ¶ 120; DRPSAMF ¶ 120.  The policy notes "sexual harassment includes but is not limited to . . . gestures, comments, or other physical, written, graphic, electronic or verbal conduct that is gender-based that interferes with a student's education."  PSAMF ¶ 121; DRPSAMF ¶ 121.  In investigating the complaints against Mr. Cavanaugh, Superintendent Nolan made these notes in an effort to figure out how the situation aligned with the school's policies.[54]  PSAMF ¶ 122; DRPSAMF ¶ 122.  Additionally, Mr. Nolan,

---

[54]     RSU 40 qualifies PSAMF ¶ 122, objecting that "[t]he cited testimony does not support that Superintendent Nolan concluded the information was inconsistent with the practice, policy, and procedure" and instead "only supports that Superintendent Nolan was trying to figure out how a specific situation might align with one or more of the policies . . . ."  DRPSAMF ¶ 122.  The Court agrees with the District's interpretation of Superintendent Nolan's testimony, sustains the objection, and omits the contested portion of PSAMF ¶ 122.  *See Nolan Dep.* at 168:2-169:8 (explaining that he was "trying to figure out how a specific situation may align with one or more of our policies" but declining to state that Mr. Cavanaugh's behavior violated the policies).

testifying on behalf of the school, stated under oath that knowledge of the following would raise red flags regarding Mr. Cavanaugh's behavior: administrator excusing a student from class; school principal providing money to the attendance secretary to pay for Plaintiff's prom ticket; and principal providing money to the attendance secretary money in an envelope to give to Plaintiff.  PSAMF ¶ 123; DRPSAMF ¶ 123. Mr. Nolan added that the school principal lending or giving a car to a student would be a "gray[] area" and that a school administrator making appointment for student to take birth control would be "highly unusual."[55]  PSAMF ¶ 123; DRPSAMF ¶ 123.

Mr. Nolan went on to testify that individually, several of the facts asserted during the investigation would have potentially given him a reason to investigate Mr. Cavanaugh, including: the appointment about birth control, Mr. Cavanaugh providing a car to a student, Mr. Cavanaugh calling a student "cupcake," and Mr. Cavanaugh having seen nude photos of a student.[56]  PSAMF ¶ 124; DRPSAMF ¶ 124. Around mid-November, after Superintendent Nolan concluded his investigation and obtained copies of the text messages between Mr. Cavanaugh and Ms. Wadsworth, Superintendent Nolan prepared a memorandum to present to the School Board summarizing the results of the investigation and recommending that the School Board dismiss Mr. Cavanaugh.  DSMF ¶ 43; PRDSMF ¶ 43.

---

[55]    RSU 40 qualifies PSAMF ¶ 123 to contend that Superintendent Nolan did not specifically describe these two examples as "raising red flags."  DRPSAMF ¶ 123.  The Court altered these assertions to reflect the language from Mr. Nolan's testimony. *See Nolan Dep.* at 98:16-22, 117:15-17.
[56]    RSU 40 qualifies PSAMF ¶ 124 to note that Mr. Nolan was answering a question about whether these reasons would potentially give rise to the need to investigate Mr. Cavanaugh. DRPSAMF ¶ 124.  The Court slightly altered PSAMF ¶ 124 to include that addition.

Mr. Cavanaugh resigned from his position as MVHS Principal before the School Board held a dismissal hearing. DSMF ¶ 44; PRDSMF ¶ 44. After resigning from his position as a result of the investigation into his behavior (and in lieu of being fired), Mr. Cavanaugh returned his school-issued MacBook but it was missing the hard drive. PSAMF ¶ 125; DRPSAMF ¶ 125. To remove the hard drive, a special tool is required. PSAMF ¶ 126; DRPSAMF ¶ 126. As a result, Mr. Cavanaugh was charged with theft by unauthorized taking and transfer for removing the hard drive. PSAMF ¶ 127; DRPSAMF ¶ 127. In addition, Mr. Cavanaugh destroyed or turned in his cellular phone so it could not be used against him. PSAMF ¶ 128; DRPSAMF ¶ 128.

Around this time, Chris McLean, an attorney representing Mr. Cavanaugh with regard to the school board investigation, went "to the school and [waited] in the parking lot" to speak with Ms. Wadsworth.[57] PSAMF ¶ 129; DRPSAMF ¶ 129. This encounter with the attorney occurred after Mr. Cavanaugh was instructed not to go to the school.[58] PSAMF ¶ 130; DRPSAMF ¶ 130. Ms. Wadsworth got into the

---

[57]    RSU 40 qualifies PSAMF ¶ 129 to contend that the attorney went "to the school in the parking lot" (apparently in contrast to Ms. Wadsworth's formulation of "on school property") and that the citation does not support the assertion that this was "while the investigation was pending." DRPSAMF ¶ 129. Although the Court is skeptical that "on school property" does not include the school parking lot, the Court has slightly altered PSAMF ¶ 129 to address these concerns and accurately reflect Ms. Wadsworth's testimony. *See Wadsworth Dep. Vol. I* at 181:14-18.

[58]    RSU 40 objects that "[t]he testimony does not support the temporal aspect of the asserted fact." DRPSAMF ¶ 130. The Court finds that Ms. Wadsworth's deposition references "around the time of September through November of 2017," *Wadsworth Dep. Vol. I* at 181:14-15, as a time frame. Superintendent Nolan first called Mr. Cavanaugh about the allegations relating to Ms. Wadsworth on November 5, DSMF ¶ 41, and informed him during that call "do not report to school," as a standing directive. *Nolan Dep.* at 190:14-191:10. Given that Mr. Cavanaugh was immediately banned from school upon learning of the investigation, there is no evidence in this record that he would have retained an attorney about this issue and had that attorney seek out Ms. Wadsworth before Superintendent Nolan issued this "standing directive." The Court admits PSAMF ¶ 130 as supported by the record.

**A080**

attorney's car in the school parking lot and the attorney encouraged Ms. Wadsworth to sign an affidavit supporting Mr. Cavanaugh, repeatedly stating "Mr. Cavanaugh is a stand-up guy, wouldn't you agree?"[59]  PSAMF ¶¶ 131-32; DRPSAMF ¶¶ 131-32. Ms. Wadsworth never signed the proposed affidavit.[60]  PSAMF ¶ 133; DRPSAMF ¶ 133.

### D.    Chuck Nguyen's Conduct During and After the Investigation

After the investigation began, Mr. Nguyen reached out to Mr. Cavanaugh a few times trying to be supportive and helpful, telling Mr. Cavanaugh that that he should not have texted Ms. Wadsworth so much, but that Mr. Nguyen knew he was a good guy and assured him that things would work out.  PSAMF ¶¶ 134-35; DRPSAMF ¶¶ 134-35.  In November 2017, in reference to the investigation, the Waldoboro Police Chief advised Mr. Nolan that Mr. Nguyen thought the school should be more supportive of Mr. Cavanaugh, that Ms. Wadsworth was "bringing it on herself," and that Mr. Nguyen was trying to get her to talk about the situation with him.  PSAMF ¶ 136; DRPSAMF ¶ 136.  Mr. Nolan expressed concern that Mr. Nguyen "maybe . . . was, knowingly or unknowingly" interfering with the investigation into

---

[59]     RSU 40 qualifies PSAMF ¶ 131 to submit that "[t]he testimony only supports that Plaintiff had a conversation with an attorney for Cavanaugh at some point around September through November 2017, that the attorney went to the school in the parking lot, and that Plaintiff got in the attorney's car and talked about the potential of Plaintiff signing an affidavit."  DRPSAMF ¶ 131.  The Court slightly altered PSAMF ¶ 131 to reflect Ms. Wadsworth's testimony.  *See Wadsworth Dep. Vol. I* at 181:13-182:15.

[60]     RSU 40 qualifies PSAMF ¶ 133 to contend that "[t]he cited testimony only supports that there was a second meeting and that, at some point, Plaintiff and her parents all went to the attorney's office to talk with the attorney about the potential of signing an affidavit but that Plaintiff did not really remember the specifics of the conversation other than her parents getting upset."  DRPSAMF ¶ 133. The Court rejects the qualification as beyond the scope of the fact asserted and admits PSAMF ¶ 133.

Mr. Cavanaugh.[61]  PSAMF ¶ 137; DRPSAMF ¶ 137.  As a result, Mr. Nolan instructed Mr. Nguyen not to have any contact with Mr. Cavanaugh regarding Ms. Wadsworth and not to have contact with Ms. Wadsworth.  PSAMF ¶ 138; DRPSAMF ¶ 138.

Mr. Nguyen met with Ms. Wadsworth approximately five times after the allegations about Mr. Cavanaugh came out, although it is unclear from the record whether any or all of those meetings occurred after Mr. Nolan warned Mr. Nguyen not to have contact with her.[62]  PSAMF ¶ 139; DRPSAMF ¶ 139.  During one of the first meetings after the allegations came out, Mr. Nguyen told Ms. Wadsworth that Mr. Cavanaugh did not do anything inappropriate or have any inappropriate conversations with her, going on to say Mr. Cavanaugh was a "stand-up guy," and that "it's not what they are making it out to be."  PSAMF ¶ 140; DRPSAMF ¶ 140.  Mr. Nguyen advised Ms. Wadsworth that if she wanted to help, she could sign an affidavit and "tell the truth."  PSAMF ¶ 141; DRPSAMF ¶ 141.

In a later meeting, Ms. Wadsworth told Mr. Nguyen that Mr. Cavanaugh's family members had been sending her messages relating to Mr. Cavanaugh's harassment of her which were upsetting, and as a result she no longer wanted to go to school.  PSAMF ¶ 142; DRPSAMF ¶ 142.  Instead of reporting this further behavior to anyone at the school, Mr. Nguyen told Ms. Wadsworth that Mr. Cavanaugh's family had a right to be angry and advised Ms. Wadsworth to apologize to Mr.

---

[61]    RSU 40 qualifies PSAMF ¶ 137 to submit that Mr. Nolan only "maybe" thought Mr. Nguyen was interfering.  DRPSAMF ¶ 137.  The Court accepts the District's qualification and has modified PSAMF ¶ 137 to reflect Mr. Nolan's deposition testimony.  *See Nolan Dep.* at 207:1-5.

[62]    RSU 40 qualifies PSAMF ¶ 139 to object to the assertion that the meetings occurred "despite Mr. Nolan's warnings."  DRPSAMF ¶ 139.  The record is unclear when the meetings occurred in relation to Mr. Nolan's warnings, *see Wadsworth Dep. Vol. II* at 36:12-23, and the Court altered PSAMF ¶ 139 to address the District's concern and reflect the temporal uncertainty.

Cavanaugh's wife and niece, who was another student at the school.[63]  PSAMF ¶ 143;
DRPSAMF ¶ 143.

In another meeting with Ms. Wadsworth in his office, Mr. Nguyen stood up,
closed the door to his office, and informed Ms. Wadsworth that Mr. Cavanaugh had a
drinking problem and that he lost sight of his boundaries; he went on to tell Ms.
Wadsworth to picture a day in the future, in college, having coffee with Mr.
Cavanaugh, when "all of this would be gone and over with."[64]  PSAMF ¶ 144;
DRPSAMF ¶ 144.  On January 12, 2018, at 7:26 p.m., Ms. Wadsworth reached out to
Mr. Nguyen via Facebook messenger and complained that Mr. Cavanaugh's wife had
messaged her.  PSAMF ¶ 145; DRPSAMF ¶ 145.  Mr. Nguyen responded that Mr.
Cavanaugh's wife was mad that Ms. Wadsworth had not signed the affidavit, advised
her that Mr. Cavanaugh's wife had a right to be mad, and offered to reach out to Mr.
Cavanaugh on Ms. Wadsworth's behalf.  PSAMF ¶ 145; DRPSAMF ¶ 145.

According to Mr. Nolan, had he been aware that Mr. Nguyen continued to meet
with Ms. Wadsworth after he was instructed not to, he would have called for an
investigation and disciplined Mr. Nguyen.  PSAMF ¶ 146; DRPSAMF ¶ 146.  After
Mr. Nguyen was instructed not to have contact with Ms. Wadsworth, Mr. Spear
observed Ms. Wadsworth crying in the hallway, and Mr. Nguyen chasing her down

---

[63]     RSU 40 qualifies PSAMF ¶ 143 to object that the cited testimony does not support the assertion
that Mr. Cavanaugh's niece was another student at the school.  DRPSAMF ¶ 143.  The Court agrees
that this assertion is not referenced in the cited testimony but finds support for the assertion elsewhere
in Ms. Wadsworth's deposition and admits PSAMF ¶ 143 in its entirety.  *See Wadsworth Dep. Vol. II*
at 121:1-5 (Ms. Wadsworth had a dispute "with a girl in class . . . who's Mr. Cavanaugh's niece").
[64]     RSU 40 qualifies PSAMF ¶ 144 to object to the characterization of the meeting as "yet another
inappropriate meeting."    DRPSAMF   ¶   144.    The Courts sustains the objection, omits that
characterization, and admits the remainder of PSAMF ¶ 144.

the hallway. PSAMF ¶ 147; DRPSAMF ¶ 147. In or around November 2017, Police Chief Labombarde heard that Mr. Nguyen was defending Mr. Cavanaugh's behavior and he met with Mr. Nguyen in his office. PSAMF ¶ 148; DRPSAMF ¶ 148. During this conversation, Mr. Nguyen defended Mr. Cavanaugh's actions and again stated that Mr. Cavanaugh was just trying to be a father figure to Ms. Wadsworth. PSAMF ¶ 149; DRPSAMF ¶ 149. Mr. Nguyen stated to Mr. Labombarde: "You know, this could happen to you or I or anybody dealing with kids on a regular basis; somebody can make an allegation." PSAMF ¶ 150; DRPSAMF ¶ 150. Mr. Labombarde was shocked by this statement. PSAMF ¶ 150; DRPSAMF ¶ 150.

### E.   Adrianna Wadsworth's Mental Health

Ms. Wadsworth has experienced anxiety and depression, which she relates in part to the actions of Mr. Cavanaugh and Mr. Nguyen.[65] PSAMF ¶ 151; DRPSAMF ¶ 151. In high school, Ms. Wadsworth's depression and anxiety affected her at school because she did not want to go to class anymore, and she would cry in the morning on the way to and from school. PSAMF ¶ 152; DRPSAMF ¶ 152. Ms. Wadsworth began going to counseling in April 2018. PSAMF ¶ 153; DRPSAMF ¶ 153. Ms. Wadsworth continues to suffer from anxiety and has trouble in school dealing with male professors.[66] PSAMF ¶ 154; DRPSAMF ¶ 154.

---

[65]   RSU 40 qualifies PSAMF ¶ 151 to object that the cited testimony does not support the assertion that her depression and anxiety are "a result of Mr. Cavanaugh and Mr. Nguyen's actions." DRPSAMF ¶ 151. The Court disagrees, even though the cited testimony refers to depression and anxiety she experienced at college three years later, Ms. Wadsworth immediately clarified that she spoke to the college counselor in part due to "Mr. Cavanaugh and Mr. Nguyen and this situation." *See Wadsworth Dep. Vol. II* at 23:20-24-13.

[66]   RSU 40 qualifies PSAMF ¶ 154 to object that the cited testimony does not support the assertion that Ms. Wadsworth "continues to suffer from anxiety." DRPSAMF ¶ 154. However, when asked whether her anxiety has "improved as [she has] gone on in [her] college career in terms of having a

F.    **District Personnel's Awareness of Andrew Cavanaugh's Behavior**

Prior to the phone call that Superintendent Nolan received from Chief Labombarde on November 2, 2017, Superintendent Nolan was not aware of any concerns about the relationship between Mr. Cavanaugh and Ms. Wadsworth or any inappropriate behavior on the part of Mr. Cavanaugh.[67]  DSMF ¶ 45; PRDSMF ¶ 45. Superintendent Nolan was not aware of Mr. Cavanaugh engaging in sexual harassment in the past.[68, 69]  DSMF ¶ 46; PRDSMF ¶ 46.  Ms. Philbrook was aware that Mr. Cavanaugh and Ms. Wadsworth had communicated but did not learn of the content of some of the text messages between Mr. Cavanaugh and Ms. Wadsworth until Ms. Philbrook read them in the newspaper, and she did not know Mr.

---

comfort level dealing with all of [her] professors," Ms. Wadsworth responded "[d]efinitely not." *Wadsworth Dep. Vol. II* at 12:13-16.  The record reveals support for the assertion, and the Court overrules the District's objection and admits PSAMF ¶ 154.

[67]   Ms. Wadsworth qualifies DSMF ¶ 45 to submit that "in the course of his investigation, after learning that Defendant Cavanaugh had purchased a vehicle for the Plaintiff and that she had been working for him, Superintendent Nolan began to be concerned that there was something more going on between Plaintiff and Defendant Cavanaugh."  PRDSMF ¶ 45 (citing *Nolan Dep.* at 92:5-93:11). Because the proposed fact asserts what Mr. Nolan knew prior to the investigation and Ms. Wadsworth's objection concerns what he learned during the investigation, the Court overrules her objection as beyond the scope of the fact asserted and admits DSMF ¶ 45.

[68]   RSU 40's proposed DSMF ¶ 47 asserts that "[n]either Ms. Pease nor Ms. Philbrook had any concerns relating to the relationship between Ms. Wadsworth and Mr. Cavanaugh prior to November 2017."  Ms. Wadsworth denies this assertion, countering that, among other examples, "[Ms.] Philbrook advised Officer Spear that she and [Ms.] Pease had tried to have professional conversations with [Mr.] Cavanaugh in regard to his behavior."  PRDSMF ¶ 47.  The Court finds multiple examples of Mr. Pease and Ms. Philbrook demonstrating concern, *see, e.g., Spear Dep.* at 34:5-13 (Ms. Pease and Ms. Philbrook told Mr. Spear "we've tried to have professional conversations with [Mr. Cavanaugh] in regards to this behavior"), sustains Ms. Wadsworth's objection, and omits DSMF ¶ 47.

[69]   RSU 40's proposed DSMF ¶ 48 asserts that "The first time Ms. Philbrook learned that there was potentially an inappropriate relationship between Mr. Cavanaugh and Ms. Wadsworth was sometime in November 2017 when the school resource officer barged into her office, shut her door and closed her blinds, said Mr. Cavanaugh was under investigation (possibly about the text messages with Ms. Wadsworth), and told Ms. Philbrook not to say one word about it or she would be arrested."  Ms. Wadsworth objects, citing the same examples referenced in PRDSMF ¶ 47.  PRDSMF ¶ 48.  The Court agrees and omits DSMF ¶ 48 for the reasons described in footnote 67.

**A085**

Cavanaugh messaged with Ms. Wadsworth outside of school.[70] DSMF ¶ 49; PRDSMF ¶ 49. Until she received legal documentation over a year and a half after Mr. Cavanaugh left MVHS, Ms. Pease did not know anything concrete about Mr. Cavanaugh's extensive text messaging with Ms. Wadsworth; she had only heard intimations over the course of 2018, after Mr. Cavanaugh left MVHS.[71, 72] DSMF ¶ 50; PRDSMF ¶ 50.

The school resource officer did not know about Mr. Cavanaugh's texting with Ms. Wadsworth until after the law enforcement investigation began in November 2017. DSMF ¶ 53; PRDSMF ¶ 53. Ms. Pease was not aware at any point that Ms. Wadsworth was working for Mr. Cavanaugh for compensation. DSMF ¶ 54; PRDSMF ¶ 54. Ms. Philbrook knew Ms. Wadsworth worked for Mr. Cavanaugh but, in Ms. Philbrook's experience, it was normal for a student to do work for payment from a principal.[73] DSMF ¶ 55; PRDSMF ¶ 55. Ms. Pease was not aware that Mr.

[70] Ms. Wadsworth denies DSMF ¶ 49, objecting that "[Ms.] Philbrook was present in a meeting when Plaintiff advised Defendant Nguyen that Defendant Cavanaugh called her cupcake and other nicknames in text messages." PRDSMF ¶ 49. The Court altered DSMF ¶ 49 to reflect that Ms. Philbrook knew that Mr. Cavanaugh was texting Ms. Wadsworth but overrules the remainder of the objection as beyond the scope of the facts asserted.

[71] RSU 40's proposed DSMF ¶ 51 asserts that "Mr. Nguyen did not know, prior to November 2017, that Mr. Cavanaugh was texting Ms. Wadsworth." Ms. Wadsworth counters that Mr. Nguyen was aware of the messages. PRDSMF ¶ 51. The Court sustains the objection for the reasons stated in footnote 16 and omits DSMF ¶ 51.

[72] RSU 40's proposed DSMF ¶ 52 asserts that "[n]o person, including Ms. Wadsworth, ever raised concerns with Mr. Nguyen regarding Mr. Cavanaugh's relationship with Ms. Wadsworth." Ms. Wadsworth rejects this assertion, citing numerous examples. PRDSMF ¶ 52. The Court finds the assertion implausible on its face and clearly contradicted by—at least—the testimony of Ms. Wadsworth and Ms. Kenniston. *See Wadsworth Dep. Vol. I* at 209:19-210:5 (testifying that she told Mr. Nguyen she was "embarrassed" by Mr. Cavanaugh giving her feminine hygiene products); *Kenniston Dep.* at 46:15-25 (calling Mr. Nguyen because learning that "a male principal made an appointment for birth control for a 16-year-old girl . . . disturbed [her] greatly"). The Court sustains the objection and omits DSMF ¶ 52.

[73] Ms. Wadsworth admits DSMF ¶ 55 but qualifies it "to the extent that Ms. Philbrook expressed concerns about Defendant Cavanaugh's relationship with Plaintiff Wadsworth to him directly and to

Cavanaugh had given Ms. Wadsworth a car that was under his insurance and registration.  DSMF ¶ 56; PRDSMF ¶ 56.  Ms. Philbrook learned from the school resource office that Ms. Wadsworth was pulled over by the school resource officer driving a car registered to and insured by Mr. Cavanaugh.  DSMF ¶ 57; PRDSMF ¶ 57.  Mr. Cavanaugh told Ms. Philbrook that Ms. Wadsworth would be buying the car from him, and Ms. Philbrook knew Ms. Wadsworth had worked for Mr. Cavanaugh in the past.[74]  DSMF ¶ 57; PRDSMF ¶ 57.  Ms. Pease did not learn of the frequency with which Mr. Cavanaugh was meeting with Ms. Wadsworth until December 2017 when she saw a log created by the attendance secretary outlining the frequency of the meetings.  DSMF ¶ 58; PRDSMF ¶ 58.

### G.    The District's Policies and Trainings

#### 1.    The Sexual Harassment Policy and Complaint Procedure

Throughout the time Ms. Wadsworth was a student at MVHS, RSU 40 had policies in place prohibiting sexual harassment (the Policy) and setting forth a complaint procedure for reporting instances of sexual harassment (the Complaint Procedure).  DSMF ¶ 59; PRDSMF ¶ 59.  The Policy defines sexual harassment as: "Sexual harassment includes but is not limited to unwelcome sexual advances, requests for sexual favors or pressure to engage in sexual activity, physical contact of a sexual nature, gestures, comments, or other physical, written, graphic, electronic

---

Officer Spear."  PRDSMF ¶ 55.  The Court rejects this qualification as beyond the scope of the facts asserted and admits DSMF ¶ 55.

[74]    Ms. Wadsworth denies DSMF ¶ 57, objecting to the assertion that Ms. Philbrook "was not concerned about it."  PRDSMF ¶ 57.  The Court agrees and rejects that assertion for the reasons described in footnote 67, sustains the objection as relating to Ms. Philbrook's concern, and admits the remainder of DSMF ¶ 57.

or verbal conduct that is gender-based that interferes with a student's education."
PSAMF ¶ 7; DRPSAMF ¶ 7; DSMF ¶ 60; PRDSMF ¶ 60.  It requires "[s]chool
employees, fellow students, volunteers and visitors to the school, and other persons
with whom students may interact in order to pursue school activities . . . to refrain
from such conduct."   DSMF ¶ 61; PRDSMF ¶ 61.   The Policy provides:
"[h]arassment/sexual harassment of students by school employees is considered
grounds for disciplinary action, up to and including discharge." DSMF ¶ 62; PRDSMF
¶ 62.

The Complaint Procedure defines a "Complaint" as "an allegation that a
student has been discriminated against or harassed on the basis of race, color, sex,
sexual orientation, religion, ancestry, national origin, or disability."  DSMF ¶ 64;
PRDSMF ¶ 64.  The Complaint Procedure defines "Harassment" as including "oral,
written, graphic, electronic or physical conduct relating to an individual's actual or
perceived membership in a protected class that is sufficiently severe, pervasive or
persistent so as to interfere with or limit the individual's ability to participate in the
school unit's programs or activities by creating a hostile, intimidating or offensive
educational environment."  DSMF ¶ 65; PRDSMF ¶ 65.

The Complaint Procedure directs "[a]ny individual who believes that a student
has been discriminated against or harassed [to] report their concern promptly to the
building principal and utilize this complaint procedure. . ..  Individuals who are
unsure whether discrimination or harassment has occurred, or who need assistance
in preparing a written [complaint,] are encouraged to discuss the situation with the

Superintendent/designee."[75]  DSMF ¶ 66; PRDSMF ¶ 66.  Additionally, the policy states that sexual harassment complaints could be brought to the police or the Maine Human Rights Commission.  PSAMF ¶ 14; DRPSAMF ¶ 14.

The Policy mandates that "[t]he Superintendent/designee or the employee designated as the Title IX Coordinator will investigate complaints of harassment in accordance with the . . . Complaint Procedure."  PSAMF ¶ 8; DRPSAMF ¶ 8; DSMF ¶ 63; PRDSMF ¶ 63.  While the Policy does not define "designee," Superintendent Nolan testified that "it seems like it would be appropriate that it would be the principal or assistant principal."[76]  PSAMF ¶ 9; DRPSAMF ¶ 9.  The Policy goes on to state that "any individual who believes that a student has been discriminated against or harassed should report their concern to the building principal . . .."  PSAMF ¶ 10; DRPSAMF ¶ 10.  It adds further that "[s]chool staff shall report possible incidents of discrimination or harassment of students to [the] building principal. Parents and other adults are also encouraged to report any concerns about possible discrimination and harassment of students."  PSAMF ¶ 11; DRPSAMF ¶ 11; DSMF ¶ 67; PRDSMF ¶ 67.

When a complaint is received, the Policy provides that "the building principal shall promptly inform the Superintendent and the person(s) who is the subject of the

---

[75]     Ms. Wadsworth qualifies DSMF ¶ 66 to supply definitions for building principal and designee, and to add that the policy also allows reports to be made to the police.  PRDSMF ¶ 66.  The Court includes each of these requested additions elsewhere in this section by admitting PSAMF ¶¶ 9 and 13-14, and thus rejects Ms. Wadsworth's qualification as moot.

[76]     RSU 40 qualifies PSAMF ¶ 9 to submit that the policy is not specific and that Mr. Nolan was not certain who would qualify as his designee.  DRPSAMF ¶ 9.  The Court admits PSAMF ¶ 9 as altered to address the District's concerns and reflect Mr. Nolan's exact testimony. *Nolan Dep.* at 178:1-10 ("it seems like it would be appropriate that [the designee] would be the principal or assistant principal").

Complaint." PSAMF ¶ 12; DRPSAMF ¶ 12; DSMF ¶ 68; PRDSMF ¶ 68. While the term "building principal" is undefined in the policy, Superintendent Nolan testified that "building principal" means either the School Principal (Mr. Cavanaugh) or the School Assistant Principals (Ms. Philbrook and Ms. Pease). PSAMF ¶ 13; DRPSAMF ¶ 13.

The Complaint Procedure states that "[t]he Complaint will be investigated by the Superintendent unless the Superintendent designates another person to investigate it on the Superintendent's behalf. Any Complaint about an employee who holds a supervisory position shall be investigated by a person who is not subject to that supervisor's authority." DSMF ¶ 68; PRDSMF ¶ 68. Under the Policy, a staff person who had knowledge of a student being sexually harassed would ordinarily make a complaint to the principal, but if the principal was the perpetrator of the harassment, the staff person would be expected to make a report to the Superintendent.[77] DSMF ¶ 70; PRDSMF ¶ 70. In that scenario, a student being harassed by a principal who is also the affirmative action officer could report the harassment to the principal, any staff person, assistant principal, or counselor, and that person could then report the harassment.[78] PSAMF ¶ 21; DRPSAMF ¶ 21.

## 2. Sexual Harassment Training

---

[77]     Ms. Wadsworth denies DSMF ¶ 70, objecting that Mr. Nolan "testified that if the affirmative action officer and the principal were the same person, then a student could report sexual harassment to any staff person, assistant principal, or counselor." PRDSMF ¶ 70. The Court notes that DSMF ¶ 70 focuses entirely on how a staff person could report harassment, while Ms. Wadsworth denies this assertion on the grounds there are additional options for students to report *to* staff persons. The Court overrules Ms. Wadsworth's objection as beyond the scope of the fact asserted and admits DSMF ¶ 70.
[78]     RSU 40 qualifies PSAMF ¶ 21 to note that Mr. Nolan was speaking of a scenario where the harassing principal is also the affirmative action officer. DRPSAMF ¶ 21. The Court slightly altered PSAMF ¶ 21 to reflect Mr. Nolan's testimony.

As RSU 40's Affirmative Action Coordinator, Mr. Cavanaugh was responsible for training staff on the District's sexual harassment policies. PSAMF ¶ 15; DRPSAMF ¶ 15. Each year during the relevant period, Mr. Cavanaugh provided a PowerPoint presentation to staff on the topic, although he felt he "wasn't qualified" to give trainings on the sexual harassment policies.[79],[80] PSAMF ¶ 16; DRPSAMF ¶ 16; DSMF ¶ 74; PRDSMF ¶ 74. The District does not have a copy of the presentations because they were on the hard drive Mr. Cavanaugh removed from his computer, nor does it have other written evidence relating to the content of Mr. Cavanaugh's trainings. PSAMF ¶ 16; DRPSAMF ¶ 16; DSMF ¶ 74; PRDSMF ¶ 74. The District

---

[79]    The parties disagree about a number of factual issues relating to the sexual harassment trainings. The District submits that "[f]rom 2015 through the period relevant to this litigation, RSU 40 provided sexual harassment training to administrators and staff on a yearly basis and also provided new employees with copies of the sexual harassment policy." DSMF ¶ 74. Ms. Wadsworth makes numerous objections and rejoins that the District "has no evidence of the content of the sexual harassment training that Mr. Cavanaugh allegedly provided to staff, claiming that he created a PowerPoint presentation and maintained it on his work computer, but that Mr. Cavanaugh never gave the School a copy of such presentation." PSAMF ¶ 16; PRDSMF ¶ 74.

First, the parties agree that Mr. Cavanaugh testified that he presented a PowerPoint presentation to staff relating to the District's sexual harassment policies and also that the District does not have a copy of that PowerPoint because he removed the hard drive from his school-issued computer before returning it. DPSAMF ¶ 16; PRDSMF ¶ 74. The parties also do not appear to dispute that the District has no written evidence relating to Mr. Cavanaugh's trainings. *Compare* PSAMF ¶ 16; *with* DRPSAMF ¶ 16.

Second, while Ms. Wadsworth expresses skepticism that these presentations took place, *see* PSAMF ¶ 16 ("no evidence" of the training Mr. Cavanaugh "allegedly provided"), the record supports the assertion that Mr. Cavanaugh provided the presentations and that—even if he may have considered each session "just a presentation"—the rest of the staff viewed them as trainings. *See Pease Dep.* at 19:23-20:19 (recounting Mr. Cavanaugh providing sexual harassment training "every year"); *Philbrook Dep.* at 18:17-19:18 (same); *Cavanaugh Dep.* at 173:12-22 (describing giving the presentation).

For these reasons, the Court sustains in part and overrules in part Ms. Wadsworth's objections to DSMF ¶ 74, and sustains in part and overrules in part Mr. Cavanaugh's objections to PSAMF ¶ 16. It admits the portions of PSAMF ¶ 16 and DSMF ¶ 74 that it has found to be supported by the record.

[80]    Ms. Wadsworth's proposed PSAMF ¶ 19 states that "Mr. Cavanaugh testified that he did not provide sexual harassment training to staff and he was not qualified to give any such training." The District denies this assertion, citing staff members' recollections of the trainings. DRPSAMF ¶ 19. The Court admits Mr. Cavanaugh's assertion that he was unqualified but omits the remainder of PSAMF ¶ 19 for the reasons discussed in footnote 78.

does not have written records of staff members acknowledging that they received Mr. Cavanaugh's training, but multiple staff members remember attending.[81]  PSAMF ¶ 17; DRPSAMF ¶ 17.   Superintendent Nolan was not aware of whether Mr. Cavanaugh had received training to prepare him for training District staff on sexual harassment and reporting.[82]  PSAMF ¶ 20; DRPSAMF ¶ 20.

Superintendent Nolan testified that he did not believe that Mr. Cavanaugh's training contained any information regarding reporting sexual harassment when the affirmative action officer was the harasser and expected assistant principals would report sexual harassment to the principal, testifying: "I think if there was a conflict of that . . . they would report it to me."  PSAMF ¶ 20; DRPSAMF ¶ 20.

According to Ms. Pease, if the Principal was the harasser, she was to report it to the Superintendent; however, she noted that nobody in the school did that or knew to do that.[83]  PSAMF ¶ 23; DRPSAMF ¶ 23; DSMF ¶ 71; PRDSMF ¶ 71.  It was Ms. Pease's understanding of the policy that if a student was being sexually harassed, any adult in the school would move a report up the chain of command, to the assistant

---

[81]   RSU 40 qualifies PSAMF ¶ 17, noting that multiple staff members testified to attending the annual training.  DRPSAMF ¶ 17.  The Court agrees for the reasons stated in footnote 78 and altered PSAMF ¶ 17 to include the staff members' recollections.

[82]   RSU 40 qualifies PSAMF ¶ 20 to object that Mr. Cavanaugh was already the affirmative action officer when Mr. Nolan arrived and that Mr. Cavanaugh received some training as an affirmative action officer.  DRPSAMF ¶ 20.  The Court largely overrules the District's objection as beyond the scope of the facts asserted but alters PSAMF ¶ 20 slightly to more accurately reflect Mr. Nolan's testimony.

[83]   Ms. Wadsworth qualifies DSMF ¶ 71 to propose adding details about Ms. Pease's understanding.  PRDSMF ¶ 71.  The proposed additions are identical to Ms. Wadsworth's proposed PSAMF ¶ 23, which the District did not object to.  Because the Court admits PSAMF ¶ 23, it rejects Ms. Wadsworth's qualification as moot.

principals, the principal, or to the superintendent, if needed, for complaints to be made and an investigation to occur.  PSAMF ¶ 23; DRPSAMF ¶ 23.

According to Ms. Philbrook, if the Principal was the harasser, she was to report it to the Superintendent or the police.[84]  PSAMF ¶ 24; DRPSAMF ¶ 24; DSMF ¶ 72; PRDSMF ¶ 72.  Ms. Philbrook testified that her understanding of the sexual harassment policy was that students could make initial reports to any staff member they felt comfortable talking to, and then the staff member would report it to the school counselor, the school resource officer, the assistant principal, or the principal. PSAMF ¶ 25; DRPSAMF ¶ 25.

Mr. Nguyen testified that his understanding of the sexual harassment policy was that the reports of sexual harassment were to go to a district-level affirmative action officer in the Superintendent's office.[85]  PSAMF ¶ 26; DRPSAMF ¶ 26; DSMF ¶ 73; PRDSMF ¶ 73.  At the time, Mr. Cavanaugh was RSU 40's district-level affirmative action officer.  PSAMF ¶ 27; DRPSAMF ¶ 27.

### 3.    The District's Insurance Policy

RSU 40 maintains, and did maintain during the period relevant to this litigation, a general liability insurance policy through Trident Insurance.  DSMF ¶ 75; PRDSMF ¶ 75.  The insurance policy provides:

> [c]overage is limited to those areas for which governmental immunity
> has been expressly waived by 14 M.R.S.A. 8104-A, as limited by 14

---

[84]    Ms. Wadsworth qualifies DSMF ¶ 72 to propose adding details about Ms. Philbrook's understanding.  PRDSMF ¶ 72.  Because the Court admits PSAMF ¶ 23, it rejects Ms. Wadsworth's qualification as moot for the reasons explained in footnote 82.

[85]    Ms. Wadsworth qualifies DSMF ¶ 73 to raise the same issues discussed in footnotes 82 and 83.  PRDSMF ¶ 73.  The Court again adopts Ms. Wadsworth's proposed language and overrules her objection as moot.

M.R.S.A. 8104-B and 14 M.R.S.A. 8111. Coverage amount for causes of action seeking tort damages pursuant to the provisions of the Maine Tort Claims Act are limited to those specified in 14 M.R.S.A. 8105 and 8104-D. Liability coverage shall not be deemed a waiver of any immunities or limitation of damages available under the Maine Tort Claims Act, other Maine statutory law, judicial precedent or common law.

DSMF ¶ 76; PRDSMF ¶ 76.

## III.   THE PARTIES' POSITIONS

### A.   MSAD 40/RSU 40's Motion for Summary Judgment

Pursuant to Federal Rule of Civil Procedure 56, RSU 40 asks this Court to grant summary judgment in its favor and against Adrianna Wadsworth on all counts pleaded against it in the Amended Complaint: the Title IX, § 1983, and state law tort claims. *Def.'s Mot.* at 1. The District argues that it is entitled to summary judgment because: (1) no "appropriate person" within the District ever had actual knowledge of Mr. Cavanaugh's conduct before the Superintendent was notified of it by law enforcement, at which point Mr. Cavanaugh was removed from his position; (2) Ms. Wadsworth's alleged constitutional injuries were not the result of any RSU 40 policy or custom; and (3) RSU 40 is immune from her state law tort claims under the Maine Tort Claims Act. *Id.* at 2.

#### 1.   The Title IX Claim

The District contends that it is entitled to summary judgment on Ms. Wadsworth's Title IX claim because she has failed to show that "an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf ha[d] actual knowledge of

44

**A094**

discrimination in the recipient's programs and fail[ed] adequately to respond." *Id.* at 8 (quoting *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998)).

RSU 40 notes that Title IX prohibits discrimination "on the basis of sex" in federally funded educational programs and activities, *id.* at 7 (quoting 20 U.S.C. § 1681(a)), and that an administrator sexually harassing a student "can constitute gender-based discrimination actionable under Title IX" where the acts of sexual harassment are "sufficiently severe and pervasive to compromise or interfere with educational opportunities normally available to students." *Id.* (quoting *Frazier v. Fairhaven Sch. Comm.*, 276 F.3d 52, 65 (1st Cir. 2002)).  It adds, however, that "remedial scheme under Title IX is predicated upon notice to an appropriate person and an opportunity to rectify any violation."  *Id.* (citation and internal quotations omitted).

The first prong of the District's argument is that no "appropriate person" had notice of any harassment.  *Id.* at 8.  "A school official is an 'appropriate person' to receive notice of harassment for the purpose of determining liability under Title IX when that person, 'at a minimum, has the authority to institute corrective measures' and has 'customary disciplinary authority' over the alleged harasser."  *Id.* (quoting *McCann on behalf of J.M. v. York Sch. Dep't*, 365 F. Supp. 3d 132, 142 (D. Me. 2019)). It submits that, because different school districts have different structures, whether a particular school official qualifies as an "appropriate person" to receive notice of harassment under Title IX is a fact-based and case-specific inquiry.  *Id.*

45

**A095**

RSU 40 acknowledges that Superintendent Nolan would qualify as an "appropriate person" for Title IX purposes, as he has "the power to initiate an investigation into the principal's conduct, impose discipline short of dismissal, and recommend that the School Board dismiss the principal." *Id.* at 9. It contends, however, that "Superintendent Nolan was completely unaware of any concerns regarding Cavanaugh until November 2, 2017, when he received the call from the Chief of the Waldoboro Police," and he then "immediately took steps to ensure that Cavanaugh was removed from MVHS." *Id.*

The District then submits that, because Ms. Wadsworth will not be able to—in its view—show that Superintendent Nolan had notice of the harassment, she instead "will fall back on alleged knowledge of the two assistant principals, Pease and Philbrook." *Id.* It argues that these claims are similarly unavailing because "neither Pease nor Philbrook had any supervisory responsibilities over Cavanaugh and thus neither are 'appropriate persons' for the purposes of the Title IX analysis." *Id.* (citing *Gebser*, 524 U.S. at 290). RSU 40 added further that, while the Court noted in denying its motion to dismiss that assistant principals have qualified as appropriate persons, those cases have involved student-on-student harassment and assistant principals customarily have disciplinary authority over students. *Id.* at 10.

In contrast, the District suggests that the "appropriate persons" are different for cases involving harassment by a staff member. *Id.* The test is "whether a person with disciplinary authority over the harasser had actual knowledge of the harassment," and submits that "[a]lthough Pease and Philbrook may very well be

46

**A096**

appropriate persons for the purpose of a Title IX claim involving student-to-student harassment because they have disciplinary authority over students . . . it is undisputed that they have no authority over the principal and are not 'appropriate persons.'" *Id.* at 10-11. The District adds further that "the fact that Pease and Philbrook could have reported harassment to the Superintendent or law enforcement" does not "make them appropriate persons." *Id.* at 11. It concludes that Superintendent Nolan was "the only 'appropriate person' for Title IX purposes" and, because he did not have knowledge of the harassment until November 2, 2017, the District cannot be liable for a Title IX violation. *Id.* at 11-12.

The second prong of the District's Title IX argument is that, even if Ms. Pease and/or Ms. Philbrook were "appropriate persons" under Title IX, they did not have "actual knowledge" of sexual harassment because "there is no record evidence to support that either of them acted with deliberate indifference to known acts of harassment as is required for liability under Title IX." *Id.* at 12. The District lays out that "[t]o establish deliberate indifference on the part of the funding recipient, a plaintiff must show *actual knowledge* of the harassment." *Id.* (citing *Santiago v. Puerto Rico*, 655 F.3d 61, 73 (1st Cir. 2011)) (emphasis in *Def.'s Mot.*). Actual knowledge "means just that: actual knowledge of the sexual harassment itself, not merely reason to suspect harassment may be occurring." *Id.*

The District cites a recent Eighth Circuit Title IX case where the school prevailed on summary judgment after a student was sexually harassed by a teacher. *Id.* at 12-13 (citing *KD v. Douglas Cnty. Sch. Dist. No. 001*, 1 F.4th 591, 598 (8th Cir.

2021)).   The *KD* Court noted that, regarding actual knowledge, "favoritism towards the student; inordinate time spent with the student; unprofessional conduct towards the student; and vague complaints about the teacher's behavior toward the student . . . fall short of creating actual notice." *Id.* at 12 (quoting *KD*, 1 F.4th at 598).   The District submits that "[t]he facts regarding notice to school personnel in KD are far worse than the facts of this case where at most the only evidence Plaintiff has here is that both Pease and Philbrook knew that Cavanaugh was pulling Plaintiff out of class . . . and that Philbrook knew that Plaintiff had been spotted in Cavanaugh's car by the School Resource Officer." *Id.* at 13.   It concludes that "[c]ompared to the facts of *KD* there can be no question that no one in the RSU 40 administration had actual knowledge of sexual harassment" and "RSU 40 is thus entitled to summary judgment on Count I of the Complaint." *Id.*

### 2.   The § 1983 Claim

RSU 40 contends that it "is entitled to summary judgment on Plaintiff's § 1983 claim (Count II) because Plaintiff's injuries were not caused by RSU 40 policy or custom."[86]  *Id.*   At the outset, it notes that it cannot be held vicariously liable under § 1983 for Mr. Cavanaugh's actions and that "liability can be imposed on a local government only where that government's policy or custom is responsible for causing the constitutional violation or injury." *Id.* (quoting *Kelley v. LaForce*, 288 F.3d 1, 9 (1st Cir. 2002)).   The District explains that the Supreme Court has identified two paths under which a "policy or custom" can be subject to a § 1983 claim: "first, where

---

[86]      The District clarifies that it takes no position on Ms. Wadsworth's § 1983 claims against Mr. Nguyen and Mr. Cavanaugh.  *Id.* at 13 n.3.

an established policy or action by a municipal decision-maker directly causes the constitutional injury, and, second, where a facially lawful municipal action nonetheless led an employee to violate a person's constitutional rights." *Id.* at 14 (citing *Bd. of Cnty. Com'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 404-07 (1997)).

The first prong of the District's § 1983 argument is that its harassment policy and procedure were not the "moving force" behind Ms. Wadsworth's alleged constitutional injuries. *Id.* It states that "there can be no serious contention that the District's Sexual Harassment Policy and/or Complaint Procedure, were themselves illegal." *Id.* at 15. The District further submits that these policies, if followed, "would not violate Plaintiff's equal protection rights" and thus "it is undisputed that it was not any policy or practice of RSU 40 that violated Plaintiff's federally protected rights but rather the actions of a single individual: Cavanaugh." *Id.* at 16. Nor is there, the District argues, a "'hole' in the policy (the failure to directly address to whom one should report to if the principal is the harasser) [that] caused the Plaintiff's alleged injuries." *Id.* Instead, "school employees were expected to and believed they were required to report concerns of sexual harassment committed by the 'building principal' directly to the Superintendent." *Id.* The District concludes that "there is no causal link between the harassment policy and procedure and Plaintiff's alleged constitutional injuries" and thus its policy cannot support Ms. Wadsworth's § 1983 claim. *Id.* at 16-17.

The second prong of the District's § 1983 argument contends that "[t]here is no evidence that RSU 40 was deliberately indifferent to Plaintiff's rights due to an

ostensible failure to train employees to report sexual harassment." *Id.* at 17.   It explains that "although courts have recognized that a governmental entity's failure to train its employees may constitute the requisite policy or custom" for a § 1983 violation, "[a] failure to train will only rise to the level of an official custom or policy where the conduct amounts to deliberate indifference to the rights of the person and is 'closely related' to or 'the moving force' behind the constitutional injury." *Id.* (citing *Hayden v. Grayson*, 134 F.3d 449, 456 (1st Cir. 1998)).   The District adds that to prevail on a failure to train claim, "the plaintiff must show that the constitutional violation had a 'direct causal link' to the deficiency in training." *Id.* at 17-18 (quoting *Jones v. City of Bos.*, 752 F.3d 38, 59 (1st Cir. 2014)).

The District submits that there was no such training deficiency, and instead "employees knew and were expected to report directly to the Superintendent complaints of the 'building principal' engaging in sexual harassment of a student." *Id.* at 18.   In the District's view, "[t]here is no evidence whatsoever of any employee being confused about who to report to in this instance, and more importantly no evidence that anyone failed to report sexual harassment of Plaintiff because of the District's policy." *Id.*   Contending that Ms. Wadsworth has identified neither a flaw in its harassment policy nor a failure to train, the District asks the Court to grant summary judgment on her § 1983 claim.

### 3.   The State Law Tort Claims

Finally, the District argues that it is "entitled to summary judgment on Plaintiff's state law tort claims because RSU 40 is immune from liability under the

Maine Tort Claims Act [MTCA]." *Id.* at 19. Ms. Wadsworth has asserted three state law tort claims against the District: negligent hiring, training, and supervision (Count III); intentional infliction of emotional distress (Count IV); and negligent infliction of emotional distress (Count V).

Under the MTCA, the general rule is that "all governmental entities shall be immune from suit on any and all tort claims seeking recovery of damages." *Id.* (quoting 14 M.R.S.A. § 8103). The District notes that, while immunity can be waived in certain circumstances, "a governmental entity is liable for property damage, bodily injury or death" only in four specifically delineated areas (primarily relating to vehicle use, construction, and pollutants). *Id.* (quoting 14 M.R.S.A. § 8104-A). It submits that "[n]one of Plaintiff's state law tort claims fall within the four narrow exceptions to MTCA immunity." *Id.* at 19-20.

The District adds that "[a] governmental entity can waive MTCA immunity by procuring insurance coverage for matters that the MTCA otherwise provides that the governmental entity is immune," but states that "[w]hile RSU 40 maintains a policy of liability insurance, that insurance only provides coverage in areas for which RSU 40 is *not* immune under the MTCA." *Id.* at 20 (emphasis in *Def.'s Mot.*). The District asserts that RSU 40 has not waived its immunity to Ms. Wadsworth's state law tort claims here and thus "[t]he Court must grant RSU 40 summary judgment on Counts III, IV, and V of Plaintiff's Complaint due to RSU 40's immunity pursuant to the MTCA." *Id.*

## B.    Adrianna Wadsworth's Opposition

51

**A101**

Ms. Wadsworth submitted an omnibus opposition memorandum responding to all three defendants' motions to dismiss. The Court recounts here only the arguments relating to the District's motion. Ms. Wadsworth agrees to dismiss her state law tort claims against RSU 40 but rejoins that "[disputed] issues of fact, taken with all inferences in Ms. Wadsworth's favor, compel this Court to deny [RSU] 40's summary judgment motion" as to the Title IX and § 1983 claims. *Pl.'s Opp'n* at 32, 58.

### 1.   The Title IX Claim

Ms. Wadsworth submits that "[a] myriad of material facts remain in dispute regarding Ms. Wadsworth's Title IX Claims which require this Court to deny MSAD 40/RSU 40's Motion for Summary Judgment." *Id.* at 21. She contends that questions of material fact exist as to whether an appropriate person at RSU 40 had actual knowledge and as to whether the school acted with deliberate indifference. *Id.* at 22-29.

Ms. Wadsworth first counters that the District's interpretation of "appropriate person" is too narrow and that "there is no requirement in Title IX that the official have authority to take corrective action against the accused harasser; instead, the requirement is that the official have authority to take corrective action to stop the harassment." *Id.* at 22. She interprets the statute to indicate that "the individual who receives notice only needs to be someone who has the ability to take corrective action in some manner, which can take many forms[,] including passing the report up the chain of responsibility," and also that "[c]orrective action could also include conducting an independent investigation or reporting the alleged conduct to the

School Board or to law enforcement." *Id.* (citations and internal quotation marks omitted).

In Ms. Wadsworth's view, RSU 40's "argument that Assistant Principals Pease and Philbrook are not 'appropriate persons' ignores this Court's decision on the School's Motion to Dismiss, and contradicts [the District's] own statements in the record." *Id.* at 23. She points out that Superintendent Nolan, testifying for RSU 40 under a Rule 30(b)(6) notice, stated that school policy was for harassment to be reported to "the building principal." *Id.* Ms. Wadsworth observes that RSU 40 defined "the building principal" as either Mr. Cavanaugh as principal or Ms. Pease and/or Ms. Philbrook as assistant principals. *Id.* Ms. Wadsworth also reiterates that the Court stated in its Order denying the District's motion to dismiss that "it cannot be true that the only 'appropriate person' under Title IX is the person committing the harassment" and thus, because "common sense requires another 'appropriate person,'" Ms. Pease and Ms. Philbrook qualified for the purposes of resolving the motion to dismiss. *Id.* (quoting *Order on Mot. to Dismiss* at 25-26).

Ms. Wadsworth contends that now the District "has doubled down on its original position, already rejected by this Court, that no other staff within the School would be appropriate persons under the law because none had disciplinary authority over Mr. Cavanaugh—but that is not what the law requires." *Id.* at 24. She adds that "the law only requires that the staff could take some sort of corrective measures, not disciplinary action against Mr. Cavanaugh," and here Ms. Pease and Ms. Philbrook could have taken corrective steps such as demanding an investigation or

reporting their concerns to the Superintendent. *Id.* Ms. Wadsworth concludes that "at the very least there exists a triable issue of material fact as to whether Ms. Pease and Ms. Philbrook were appropriate persons," sufficient to defeat summary judgment. *Id.*

Next, Ms. Wadsworth turns to Title IX's actual notice requirement. She emphasizes that "[p]recedent is imprecise about exactly how *much* an appropriate person must know in order to satisfy the actual knowledge prong of the test." *Id.* (quoting *Does v. Southeast Delco Sch. Dist.*, 272 F. Supp. 3d 656, 688 (E.D. Pa. 2017)) (emphasis in *Does*). Ms. Wadsworth acknowledges that "numerous courts have held that [t]o have actual knowledge of an incident, school officials must have witnessed it or received a report of it," but submits that "[t]he actual notice standard does not set the bar so high that a school district is not put on notice until it receives a clearly credible report of sexual abuse from the plaintiff-student." *Id.* at 25 (citations and internal quotations omitted).

Given this standard, Ms. Wadsworth submits that "it belies credulity that [RSU] 40 is now arguing that witnessing Mr. Cavanaugh refer to Ms. Wadsworth as 'cupcake' on numerous occasions does not give rise to actual knowledge of harassment." *Id.* at 26. She cites a number of interactions in the record and contends that "when looked at together, [they] strongly suggest that Ms. Philbrook and Ms. Pease had actual knowledge of Mr. Cavanaugh's policy violations with respect to Ms. Wadsworth, or at least create an issue of material fact that a jury must decide." *Id.* at 27.

Ms. Wadsworth also offers an alternative theory of Title IX liability based not on harassment by Mr. Cavanaugh, but rather on the alleged sexual assault of Ms. Wadsworth by her cheerleading coach. *Id.* She contends that, because Mr. Cavanaugh was an "appropriate person" and had actual knowledge of the assault, "this Court should find that Mr. Cavanaugh himself had knowledge of a sexual assault by a school staff member, thereby satisfying the Title IX requirements and requiring [RSU] 40's Motion for Summary Judgment be dismissed." *Id.*

Finally, Ms. Wadsworth turns to the deliberate indifference prong, arguing that "[t]he standard is plainly met here." *Id.* at 28. She contends that, "[a]ccording to [RSU] 40, any number of issues relating to Mr. Cavanaugh's treatment of Ms. Wadsworth . . . should have prompted an investigation," but instead "the only actions prompted by any of these issues were ineffectual conversations with Mr. Cavanaugh in which he was instructed to stop his behavior." *Id.* at 28-29. Thus, in her view, "[a]t a minimum, there exist issues of material fact in this regard that preclude the entry of summary judgment." *Id.* at 29.

## 2.   The Section 1983 Claim

Ms. Wadsworth argues that the District's sexual harassment policy was unconstitutional and, alternatively, that it is liable for failure to train its employees. *Id.* at 29-34.

First, she submits that "[c]learly, the sexual harassment policy at issue has a glaring hole," specifically that it fails to define the term "building principal." *Id.* at 31. While Mr. Nolan has testified that the term refers to the principal and assistant

55

**A105**

principals, "the written policy is silent on the issue." *Id.* In her view, this silence "created a situation where all complaints of sexual harassment were required to go to the school principal—in this case Mr. Cavanaugh, who also happened to be the harasser." *Id.*

Ms. Wadsworth offers that "Ms. Pease, Ms. Philbrook, and Mr. Nguyen all spoke with Mr. Cavanaugh directly about his inappropriate behavior, but none of them ever reported the harassment to anyone else higher in the chain of command," and argues that "[t]echnically, they all followed the written policy of the School, and Ms. Wadsworth continued to suffer harassment, as a result of their adherence to that policy." *Id.*

Ms. Wadsworth concludes that "[h]ad the School crafted a clear written policy, there would be no question of the chain of reporting, and it can be inferred that the great harm Ms. Wadsworth suffered would have stopped far sooner," and thus the District should be denied summary judgment. *Id.* at 32.

Next, Ms. Wadsworth turns to her failure to train claim. She submits that "[w]hether the School provided training on its sexual harassment policies at all, as opposed to whether that training was faulty in any way, is a question of fact foreclosing the entry of summary judgment." *Id.* at 33. Noting that Mr. Cavanaugh testified that he did not provide trainings, she contends that "the School never provided training to any of its staff, which led to the multiple reporting failures regarding Mr. Cavanaugh's treatment of Ms. Wadsworth." *Id.* She concludes that this failure to train should defeat summary judgment on her § 1983 claim. *Id.* at 34.

56

**A106**

### 3.   The State Law Tort Claims

Ms. Wadsworth concedes to the District's motion as to the tort claims, stating that she affirmatively "agrees to dismiss her tort claims against MSAD 40 considering the Maine Tort Claims Act immunity conferred to the School." *Id.* at 45.

### C.   MSAD 40/RSU 40's Reply

The District reiterates that Ms. Wadsworth's Title IX claim must fail because no appropriate person had knowledge of the harassment and that her § 1983 claim must fail because its sexual harassment policy is constitutional and because there is no evidence that additional training would have prevented the harassment. *Def.'s Reply* at 1-8.

First, it submits that "when an appropriate person within RSU 40 had knowledge of the harassment, prompt and effective remedial action was taken and the harasser was removed from the school." *Id.* at 1. It rejoins that: as Mr. Cavanaugh's subordinates, Ms. Pease and Ms. Philbrook were not "appropriate persons"; Ms. Wadsworth's cited authority is inapt because the cases involved persons with the authority to discipline the harasser; and that, under her definition of the term, *any* person would qualify as an appropriate person and the term would be meaningless. *Id.* at 3-4 (emphasis in *Def,'s Reply*). Regarding actual knowledge, the District counters that Ms. Wadsworth offers "nothing more than alleged knowledge by one or both of [the assistant principals] of information that could be questionable, such as calling Plaintiff 'cupcake.'" *Id.* at 4.

The District also argues that Ms. Wadsworth's "eleventh-hour claim based on a cheerleading coach should be rejected" because it was not pleaded in the complaint and raised for the first time in her opposition. *Id.* at 5. It cites caselaw stating that a "[p]laintiff[] may not raise new and unadvertised theories of liability for the first time in opposition to a motion for summary judgment" and "[a]llowing a plaintiff to proceed on new, unpled theories after the close of discovery would prejudice defendants, who would have focused their discovery efforts on the theories actually pled." *Id.* (quoting *Miranda-Rivera v. Toledo-Davila*, 813 F.3d 64, 76 (1st Cir. 2016)).

The District also addresses Ms. Wadsworth's § 1983 claim. First, it responds that "although Plaintiff purports to advance an unconstitutional policy claim, she does so without citation to any authority for the proposition that RSU 40's sexual harassment policy is unconstitutional." *Id.* at 6. Instead, in its view, "all she does is argue that the policy has a 'glaring hole' and thus does not go far enough in protecting students from harassment," which is "insufficient to establish that the policy is unconstitutional." *Id.* Second, regarding her failure to train claim, it contends that "[t]he record is absolutely devoid of evidence that had there been additional training, Plaintiff would not have been sexually harassed by [Mr.] Cavanaugh, much less that any deficiency in training *caused* the harassment." *Id.* at 7 (emphasis in *Def.'s Reply*).

## IV.   LEGAL STANDARD

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "Genuine issues of fact are those that a factfinder could

58

**A108**

resolve in favor of the nonmovant, while material facts are those whose 'existence or nonexistence has the potential to change the outcome of the suit.'" *Green Mountain Realty Corp. v. Leonard*, 750 F.3d 30, 38 (1st Cir. 2014) (quoting *Tropigas de P.R., Inc. v. Certain Underwriters at Lloyd's of London*, 637 F.3d 53, 56 (1st Cir. 2011)).

When the movant "has made a preliminary showing that there is no genuine issue of material fact, the nonmovant must 'produce specific facts, in suitable evidentiary form, to . . . establish the presence of a trialworthy issue.'" *McCarthy v. City of Newburyport*, 252 F. App'x 328, 332 (1st Cir. 2007) (alteration in original) (quoting *Triangle Trading Co. v. Robroy Indus., Inc.*, 200 F.3d 1, 2 (1st Cir. 1999)). The nonmoving party must provide "'enough competent evidence' to enable a factfinder to decide in its favor on the disputed claims." *Carroll v. Xerox Corp.*, 294 F.3d 231, 237 (1st Cir. 2002) (quoting *Goldman v. First Nat'l Bank of Bos.*, 985 F.2d 1113, 1116 (1st Cir. 1993)). Then, a "court views the facts and draws all reasonable inferences in favor of the nonmoving party," *Ophthalmic Surgeons, Ltd. v. Paychex, Inc.*, 632 F.3d 31, 35 (1st Cir. 2011), but disregards "[c]onclusory allegations, improbable inferences, acrimonious invective, or rank speculation." *Mancini v. City of Providence ex rel. Lombardi*, 909 F.3d 32, 38 (1st Cir. 2018) (quoting *Ahern v. Shinseki*, 629 F.3d 49, 54 (1st Cir. 2010)). "[T]he plain language of Rule 56(c) mandates entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

**A109**

V.    DISCUSSION

A.    Title IX Claim

Title IX of the Education Amendments of 1972 provides in pertinent part:

No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance

20 U.S.C. § 1681.  The statute "creates an implied private right of action against federal funding recipients for money damages caused by a recipient's violation of its obligations under the Title." *Doe v. Pawtucket Sch. Dep't*, 969 F.3d 1, 7 (1st Cir. 2020). "Sexual harassment . . . 'can constitute discrimination on the basis of sex under Title IX.'" *Sonoiki v. Harvard Univ.*, 37 F.4th 691, 697 n.3 (1st Cir. 2022) (quoting *Doe v. Brown Univ.*, 896 F.3d 127, 132 (1st Cir. 2018) (quoting *Gebser*, 524 U.S. at 283)). "Such a violation can occur when a Title IX funding recipient is deliberately indifferent to known acts of sexual harassment of a student by a teacher." *Pawtucket*, 969 F.3d at 7  (citing *Gebser*, 524 U.S. at 287-88).  This standard requires "actual notice to an 'appropriate person,' 20 U.S.C. § 1682, who is 'an official of the recipient entity with authority to take corrective action to end the discrimination.'" *Id.* (quoting *Gebser*, 524 U.S. at 290).  In the educational context, courts should consider whether the school district "had notice of the sexual harassment, and either did nothing or failed to take additional reasonable measures after it learned that its initial remedies were ineffective." *Porto v. Town of Tewksbury*, 488 F.3d 67, 73-74 (1st Cir. 2007) (citing *Wills v. Brown Univ.*, 184 F.3d 20, 26 (1st Cir. 1999)).

The deliberate indifference standard also requires that "the funding recipient's actions—or failure to act—caused the student's subsequent harassment in some way or made the student 'liable or vulnerable' to harassment." *Pawtucket*, 969 F.3d at 9 (citing *Davis ex rel. Lashonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 645 (1999)). The causal requirement is broader than simple but-for causation, and allegations of "post-notice interactions between the victim and the harasser" can theoretically form a basis for a Title IX claim. *Id.* (quoting *Fitzgerald v. Barnstable Sch. Comm.*, 504 F.3d 165, 172-73 (1st Cir. 2007), *rev'd on other grounds*, 555 U.S. 246 (2009)). There is no causal relationship between an act of sexual harassment and the school officials' subsequent alleged indifference to that act; however, the plaintiff "may be able to make out a claim under Title IX based on the school's indifference from that point forward . . .." *Id.*

"[S]ome degree of severity or pervasiveness must be present in order for harassment to result in 'exclu[sion]' or 'discrimination' under Title IX." *Id.* at 10 (quoting 20 U.S.C. § 1681(a)). Student-on-student harassment "need only be severe enough to 'undermine[] and detract[] from the victim's educational experience' such that the victim is 'effectively denied equal access to an institution's resources and opportunities." *Id.* (alterations in original) (quoting *Davis*, 526 U.S. at 651). Moreover, "[c]onduct that might not be actionable under Title IX if perpetrated by a student might be deemed more likely to exclude, or discriminate against, the potential targets of the conduct if perpetrated by a person in authority." *Id.* at 11.

The inquiry into whether an appropriate person had actual knowledge and acted with deliberate indifference focuses on the roles and actions of Ms. Pease and Ms. Philbrook.  *See Pl.'s Opp'n* at 24 (identifying only Ms. Pease and Ms. Philbrook as appropriate persons).  The District acknowledges that Superintendent Nolan also qualifies as an appropriate person, *Def.'s Mot.* at 9, but Ms. Wadsworth does not dispute that he only learned about the harassment on November 2, 2017 and then took prompt action to investigate and remove Mr. Cavanaugh.[87]  *Id.*  The Court also found in its Order on the District's motion to dismiss that neither Mr. Nguyen nor Officer Spear qualified because they did not have the authority to take corrective action, and Ms. Wadsworth has not claimed otherwise in her response.  *Order on Mot. to Dismiss* at 36.

Additionally, while Ms. Wadsworth does not contend that Mr. Cavanaugh's knowledge of his own harassment could sustain a Title IX claim, she instead attempts to make out a Title IX claim based on his alleged failure to report Ms. Wadsworth's accusation that she was sexually assaulted by a cheerleading coach.  *Pl.'s Opp'n* at 27.  As the District noted, First Circuit precedent provides that "[p]laintiffs may not raise new and unadvertised theories of liability for the first time in opposition to a motion for summary judgment," because "[a]llowing a plaintiff to proceed on new, unpled theories after the close of discovery would prejudice defendants, who would have focused their discovery efforts on the theories actually pled."  *Miranda-Rivera*, 813 F.3d at 76 (citations and internal quotations omitted).  Here, the Amended

---

[87]     Ms. Wadsworth's counsel confirmed this concession during oral argument.

Complaint contains one hundred and forty-seven separate paragraphs of factual allegations. *Am. Compl.* ¶¶ 8-155. Ms. Wadsworth's participation in the sport of cheerleading is obliquely mentioned. *Id.* ¶¶ 28, 133. But there is no allegation or intimation that Ms. Wadsworth was subjected to a sexual assault by the cheerleading coach, that Mr. Cavanaugh was aware of any such allegation, or that he failed to act when he learned of it.

The line between pled and unpled theories can sometimes be imprecise. *See Conn. Gen. Life Ins. Co. v. Universal Ins. Co.*, 838 F.2d 612, 622 (1st Cir. 1988) (finding that plaintiff's failure to "plead [a] particular legal theory, when it did plead two related theories" would not bar relief, especially because the defendant raised specific defenses regarding the unpled theory). In addition, if Ms. Wadsworth had wished to proceed with this new theory of liability, she could have moved to amend her complaint even after the filing of the motions for summary judgment. *Adorno v. Crowley Towing & Transp. Co.,* 443 F.3d 122, 126 (1st Cir. 2006) (reaffirming that a plaintiff can tender an amended complaint after a motion for summary judgment has been filed if they show "that the proposed amendments were supported by substantial and convincing evidence").

But here the line seems easily drawn because there is no connection between Ms. Wadsworth's most unfortunate experience with her cheerleading coach and the allegations in the Amended Complaint, and Ms. Wadsworth has not moved to further amend her complaint to makes these new allegations while the motion has been pending. With no facts in the Amended Complaint to support this theory, Ms.

63

**A113**

Wadsworth may not raise it for the first time in opposition to the District's motion for summary judgment.

The Court thus focuses only on the District's response to Mr. Cavanaugh's alleged harassment, and specifically whether Ms. Pease and Ms. Philbrook had the requisite authority, knowledge, and indifference to support a Title IX claim.

### 1. Whether Assistant Principals Tamra Philbrook and Linda Pease Were "Appropriate Persons"

The inquiry begins with determining whether Ms. Pease and Ms. Philbrook, as assistant principals, were "appropriate persons" in the Title IX context. Section 1682 of title 20 provides for a notice requirement:

> Provided, however, that no such action shall be taken until the department or agency concerned has advised the appropriate person or persons of the failure to comply with the requirement and has determined that compliance cannot be secured by voluntary means.

20 U.S.C. § 1682. In *Gebser*, the United States Supreme Court addressed sexual harassment by a male high school teacher against a female student, which resulted in the teacher initiating sexual contact, leading to sexual intercourse. 524 U.S. at 277-78. Alida Star Gebser, the student, had not reported their relationship to school officials because "she was uncertain how to react and she wanted to continue having him as a teacher." *Id.* at 278. Their relationship was discovered when a police officer discovered Frank Waldrop, the teacher, engaged in sexual intercourse with Ms. Gebser, and arrested Mr. Waldrop. *Id.* Ms. Gebser and her mother sued the school district and Mr. Waldrop, raising claims under Title IX. *Id.* The school defended the

64

**A114**

Title IX claims on the ground that it did not have "actual or constructive notice that Waldrop was involved in a sexual relationship with a student." *Id.* at 279.

The *Gebser* Court reviewed the statutory and judicial history of Title IX. *Id.* at 280-88. Given this history, the Supreme Court wrote that "it would 'frustrate the purposes' of Title IX to permit a damages recovery against a school district for a teacher's sexual harassment of a student based on principals of *respondeat superior* or constructive notice, *i.e.*, without actual notice to a school district official." *Id.* at 285. The Court explained that "it does not appear that Congress contemplated unlimited recovery in damages against a funding recipient where the recipient is unaware of discrimination in its programs." *Id.* Noting that "Title IX focuses more on 'protecting' individuals from discriminatory practices carried out by recipients of federal funds," the Supreme Court summarized the purpose of the notice requirement:

> [A] central purpose of requiring notice of the violation "to the appropriate person" and an opportunity for voluntary compliance before administrative enforcement proceedings can commence . . . is to avoid diverting education funding from beneficial uses where a recipient was unaware of discrimination in its programs and is willing to institute prompt corrective measures.

*Id.* at 287, 289. The focus is on whether the district had "actual knowledge of the teacher's conduct" and "an opportunity to take action to end the harassment or to limit further harassment." *Id.* at 289.

With these concepts in mind, the Supreme Court turned to the question of notice to an "appropriate person":

**A115**

Because the express remedial scheme under Title IX is predicated upon notice to an "appropriate person" and an opportunity to rectify any violation, 20 U.S.C. § 1682, we conclude, in the absence of further direction from Congress, that the implied damages remedy should be fashioned along the same lines. An "appropriate person" under § 1682 is, at a minimum, an official of the recipient entity with authority to take corrective action to end the discrimination. Consequently, in cases like this one that do not involve official policy of the recipient entity, we hold that a damages remedy will not lie under Title IX unless an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf has actual knowledge of discrimination in the recipient's programs and fails adequately to respond.

*Id.* at 290.

In its motion and in oral argument, RSU 40 relies heavily on *Santiago*, where the First Circuit addressed the *Gebser* requirement of actual knowledge and wrote that "Title IX's 'actual knowledge' requirement demands that the official who is informed of the alleged harassment be a person who, at a minimum, has the authority to institute corrective measures." 655 F.3d at 74. The *Santiago* Court stated that "[a] school principal may, at least in some instances, be considered an appropriate person for the receipt of such notice." *Id.* But in rejecting a Title IX claim against sexual abuse by a bus driver who was employed by an independent contractor, the First Circuit noted that "the alleged harasser is not a person subject to the principal's customary disciplinary authority." *Id.*

The broader context of this inquiry is that a plaintiff may recover "only for harassment that is so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an educational opportunity" and the plaintiff must prove the school's "deliberate indifference to known acts of harassment in its programs or

activities." *Victim Rights Law Ctr. v. Cardona*, 552 F. Supp. 3d 104, 116 (D. Mass. 2021) (quoting *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 633 (1999)).  To meet this standard, a plaintiff must prove that she notified an "appropriate person" under 20 U.S.C. § 1682, which in *Gebser*, the United States Supreme Court defined as "at a minimum, an official of the recipient entity with authority to take corrective action to end the discrimination."  524 U.S. at 290.

RSU 40 makes the same argument here as in its motion to dismiss: that "neither Pease nor Philbrook had any supervisory responsibilities over Cavanaugh and thus neither are 'appropriate persons.'"[88] *Def.'s Mot.* at 9.  RSU 40's argument, however, runs counter to RSU 40's own policy as interpreted by its Superintendent.  As noted earlier, throughout the time Ms. Wadsworth was a student at MVHS, RSU 40 had policies in place prohibiting sexual harassment (the Policy) and setting forth a complaint procedure for reporting instances of sexual harassment (the Complaint Procedure).  DSMF ¶ 59; PRDSMF ¶ 59.  The Complaint Procedure directs "[a]ny individual who believes that a student has been discriminated against or harassed [to] report their concern promptly to the building principal and utilize this complaint procedure. . . .  Individuals who are unsure whether discrimination or harassment has occurred, or who need assistance in preparing a written [complaint,] are encouraged

---

[88]      This situation is unusual since the otherwise "appropriate person" is the harasser.  It would solve the notice and knowledge issue if the principal's knowledge of his own harassment were deemed notice to "an official of the recipient entity with authority to take corrective action to end the discrimination." *Gebser*, 524 U.S. at 290.  Taken literally, Mr. Cavanaugh was such an official: he had actual knowledge of the harassment because he was the harasser, he had the authority under RSU 40 policy to take corrective action, and he failed to do so.  However logical this approach, it is blocked by *Gebser*.  The *Gebser* Court wrote that "[w]here a school district's liability rests on actual notice principles . . ., the knowledge of the wrongdoer himself is not pertinent to the analysis." *Id.* at 291.

to discuss the situation with the Superintendent/designee." DSMF ¶ 66; PRDSMF ¶ 66.

The Policy mandates that "[t]he Superintendent/designee or the employee designated as the Title IX Coordinator will investigate complaints of harassment in accordance with the . . . Complaint Procedure." PSAMF ¶ 8; DRPSAMF ¶ 8; DSMF ¶ 63; PRDSMF ¶ 63. While the Policy does not define "designee," Superintendent Nolan testified that "it seems like it would be appropriate that it would be the principal or assistant principal." PSAMF ¶ 9; DRPSAMF ¶ 9. The Policy goes on to state that "any individual who believes that a student has been discriminated against or harassed should report their concern to the building principal . . .." PSAMF ¶ 10; DRPSAMF ¶ 10. Thus, by the express language of the Policy as interpreted by the Superintendent, an appropriate person to receive a complaint of sexual harassment would include Mr. Cavanaugh as Principal or Ms. Pease and Ms. Philbrook as Assistant Principals.

RSU 40 insists, however, that when the harasser is the Principal, deliberate indifference by the Assistant Principals would not implicate the District under *Gebser*, because the Assistant Principals would not have "authority to take corrective action" against their superior "to end the discrimination." 524 U.S. at 290.

First, the Policy nowhere says that the Assistant Principals would be without authority to act when the harasser is the Principal. To the contrary, as interpreted by both the Superintendent and the Assistant Principals, the Policy contemplates that the Principal and Assistant Principals are the Superintendent's designees for

68

**A118**

purposes of the Policy.  The Superintendent conceded that the Assistant Principals are properly his designees under this Policy.

Second, to remove the Assistant Principals from school officials whose knowledge of the harassment would be attributable to the school district would effectively leave the students with limited protection against harassment by a Principal since it would leave only the Superintendent, who is less frequently present in any specific school, as the single person within the RSU whose deliberate indifference would be attributable to the RSU.[89]

As the Supreme Court explained in *Davis v. Monroe County Board of Education*, 526 U.S. 629 (1999), liability arose in *Gebser* from "an official decision by the recipient not to remedy the violation."  *Id.* at 642 (quoting *Gebser*, 524 U.S. at 290).  The *Gebser* Court used two subtly different standards.  The first is whether the school official had "authority to take corrective action to end the discrimination" and the second, more general holding is the one the *Gebser* Court itself described:

> We conclude that damages may not be recovered in those circumstances unless an official of the school district who at a minimum has authority to institute corrective measures on the district's behalf has actual notice of, and is deliberately indifferent to, the teacher's misconduct.

*Id.* at 277, 290.  The emphasis here is a "school official" as opposed to a rank-and-file teacher.  Although one way of distinguishing between a "school official" and someone who is not, is to determine whether the school official could actually mete out

---

[89]     Under RSU 40's formulation, if the Superintendent were the harasser, there could be no action against the RSU because no one, absent the members of the Board, would be in a position to take corrective against the top administrative person in the school hierarchy.  Thus, if RSU 40's argument were accepted, the more administrative responsibility the less liability for a violation of Title IX.

discipline against the harasser, the broader point is to distinguish between school officials, where by virtue of their position, it is appropriate to hold the district accountable for their failure to act and others, where it is not. *See Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 257 (2009) ("[A] Title IX plaintiff can establish school district liability by showing that a single school administrator with authority to take corrective action responded to harassment with deliberate indifference"). *Gebser* infuses the concepts of actual notice, authority, corrective measures, and deliberate indifference in "an official of the school district." Thus, RSU 40's argument is compelling that the Assistant Principals did not fit all the components of the *Gebser* holding because neither had the authority to institute corrective action against their superior. RSU 40 may well be correct, but given the other language in *Gebser* and the policy implications of so narrowly limiting the range of appropriate persons when the harasser is a high administration official, the Court has arrived at a different conclusion.

Here, consistent with *Gebser* and with the Superintendent's description of the Assistant Principals' authority, the Court concludes that the position of Assistant Principal in RSU 40 is an "official of the school district" with sufficient authority to fit within the definition of "appropriate person" under Title IX, even though the Assistant Principals could not have imposed discipline against their superior. Had they acted, they were sufficiently high officials within RSU 40's administration to bring into effect the Policy that would have ensured "voluntary compliance." *Id.* at 289.

The Court therefore rejects RSU 40's attempt to insulate itself from the provisions of Title IX by unduly narrowing the definition of "appropriate person" in the rare instance where a superintendent or principal violates the law by sexually harassing a student.  The Court concludes that consistent with *Gebser* and the District's own Policy, Assistant Principals at RSU 40 fit within the definition of "appropriate person."

> **2.    Whether Assistant Principals Tamra Philbrook and Linda Pease Had Actual Notice of Sexual Harassment**

The actual knowledge prong is where Ms. Wadsworth's Title IX claim fails to pass muster.  The actual knowledge requirement imposes a higher standard for Title IX claims than for claims arising under § 1983, where deliberate indifference can follow actual or constructive knowledge.  *Doe v. Bradshaw*, 203 F. Supp. 3d 168, 185 (D. Mass. 2016); *see also Gebser*, 524 U.S. at 291 (complaints about inappropriate comments during class were "plainly insufficient" to establish actual knowledge); *Doe v. Flaherty*, 623 F.3d 577, 585 (8th Cir. 2010) (text messages that were not clearly sexual were insufficient for actual notice of harassment); *Escue v. N. OK Coll.*, 450 F.3d 1146, 1154 (10th Cir. 2006) (inappropriate name-calling and past dates with older non-traditional students insufficient for actual notice of harassment).  Courts have generally interpreted "actual knowledge" as requiring highly reliable and similar reports of inappropriate teacher behavior and, for example, "rumors, investigations, and student statements" have been held not to constitute "actual knowledge." *Bradshaw*, 203 F. Supp. 3d at 185.

In *Bradshaw,* the school received three initial sets of reports about a teacher's concerning behavior with a student, including a report that "everybody knows" the teacher was dating a student. *Id.* at 174. Nonetheless, the district court concluded at that point that "[w]hile the school perhaps ought to have known that [the teacher] was behaving inappropriately, given the quantity and consistency of rumors about him, even viewing the facts in the light most favorable to the plaintiff, it cannot be said that the school actually knew of his sexual harassment . . .." *Id.* at 185. Similarly, the Court of Appeals for the Eighth Circuit recently held that "[t]he actual notice standard is quite onerous, and favoritism towards the student; inordinate time spent with the student; unprofessional conduct towards the student; and vague complaints about the teacher's behavior toward the student (which do not *expressly* allege sexual abuse of that student) fall short of creating actual notice." *KD,* 1 F.4th at 598 (collecting cases finding that inappropriate and suggestive text messages or "conduct of spending too much time with [the student] causing [the student] to be absent from or tardy to classes" did not establish actual notice absent reports of actual or suspected sexual contact) (emphasis in *KD*).

The facts in this case—at least those known to school officials—are significantly less egregious than the facts in *Bradshaw* and *KD.* Focusing on the knowledge of Ms. Pease and Ms. Philbrook, the record reveals the following. Both Assistant Principals were aware that Mr. Cavanaugh had been pulling Ms. Wadsworth out of class to meet with him and that teachers had complained. PSAMF ¶¶ 106, 108; DRPSAMF ¶¶ 106, 108. Mr. Cavanaugh told them these meetings were

to help support her with a difficult family situation, DSMF ¶ 26; PRDSMF ¶ 26, and it is not uncommon for teachers to call students out of class for such meetings nor for teachers to complain about them, DSMF ¶¶ 30-31; PRDSMF ¶¶ 30-31, but Ms. Pease and Ms. Philbrook nonetheless spoke with Mr. Cavanaugh to ask him to stop pulling Ms. Wadsworth from class. PSAMF ¶ 109; DRPSAMF ¶ 109. Ms. Philbrook was present for at least part of a conversation where Mr. Cavanaugh asked Ms. Wadsworth who she was taking to prom and who had asked her to prom, called her "cupcake," asked about her prom dress, and advised her that she could take anyone she wanted to prom. PSAMF ¶ 36; DRPSAMF ¶ 36. Ms. Philbrook also briefly "popped in" to a meeting during which Ms. Wadsworth expressed at some point to Mr. Nguyen that she was embarrassed by Mr. Cavanaugh's nicknames for her. PSAMF ¶ 41; DRPSAMF ¶ 41.

Additionally, Ms. Philbrook was aware that Mr. Cavanaugh had asked Ms. Wadsworth if she was interested in moving in with him and his wife, PSAMF ¶ 99; DRPSAMF ¶ 99, and informed Officer Spear that she and Ms. Pease had tried to have professional conversations with Mr. Cavanaugh with regard to his behavior towards Ms. Wadsworth. PSAMF ¶ 100; DRPSAMF ¶ 100. Ms. Philbrook was aware that Mr. Cavanaugh and Ms. Wadsworth had communicated by text but did not learn of the content of some of the text messages between Mr. Cavanaugh and Ms. Wadsworth until Ms. Philbrook read them in the newspaper, and she did not know Mr. Cavanaugh messaged with Ms. Wadsworth outside of school. DSMF ¶ 49; PRDSMF ¶ 49. Ms. Philbrook also knew Ms. Wadsworth worked for Mr. Cavanaugh but, in

Ms. Philbrook's experience, it was normal for a student to do work for payment from a principal.  DSMF ¶ 55; PRDSMF ¶ 55.  Finally, Ms. Philbrook learned that Ms. Wadsworth was driving a car registered to and insured by Mr. Cavanaugh, DSMF ¶ 57; PRDSMF ¶ 57, but was told by Mr. Cavanaugh that Ms. Wadsworth would be buying the car from him.  DSMF ¶ 57; PRDSMF ¶ 57.

In sum, while there was some smoke regarding Mr. Cavanaugh's behavior, there is no evidence of the type of fire necessary to satisfy the "actual notice" standard.  Generally, Ms. Pease and/or Ms. Philbrook were aware that Mr. Cavanaugh was pulling Ms. Wadsworth out of class, had called her "cupcake" and had communicated with her by text message, had considered inviting her to move in with him and his wife, and that she was working with him and driving a car he owned—which he had explained she was working to buy from him.  While teachers and Officer Spear may have expressed concerns to Ms. Pease and Ms. Philbrook that Mr. Cavanaugh's relationship with Ms. Wadsworth may have been concerningly close or "that the perception was that she was receiving special treatment in the form of favoritism," PSAMF ¶ 102; DRPSAMF ¶ 102, there is no evidence in the record to suggest that either was aware of reports of any type of actual or suspected sexual contact or harassment.  Finally, while Ms. Philbrook appears to have been aware that Mr. Cavanaugh had been texting Ms. Wadsworth, there is no evidence suggesting that she was aware of the frequency or sexually explicit nature of his messages.

The "actual notice" standard is demanding, and Ms. Pease and Ms. Philbrook's knowledge falls short of meeting it.  The caselaw is clear that inappropriate

74

**A124**

comments, text messages that are not clearly sexual, and spending too much time with a student—even causing her to miss class—are insufficient.  *See Gebser*, 524 U.S. at 291; *Flaherty*, 623 F.3d at 585; *P.H. v. Sch. Dist. of Kansas City, Missouri*, 265 F.3d 653, 659 (8th Cir. 2001).  Instead, "actual knowledge" generally requires highly reliable and similar reports of inappropriate teacher behavior, meaning that "rumors, investigations, and student statements" do not qualify.  *Bradshaw*, 203 F. Supp. 3d at 185.  Ultimately, the Court concludes here, as did the *Bradshaw* Court, that "[w]hile the school perhaps ought to have known that [Mr. Cavanaugh] was behaving inappropriately, given the quantity and consistency of rumors about him, even viewing the facts in the light most favorable to the plaintiff, it cannot be said that the school actually knew of his sexual harassment . . .."  *Id.*  Because Ms. Wadsworth cannot demonstrate actual notice, she cannot prevail on her Title IX claim and the Court must grant the District's motion as to Count I and award RSU 40 judgment on Adrianna Wadsworth's Title IX claim.

## B.   Section 1983 Claim

Section 1983 provides that:

> [e]very person who, under color of [law], subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . ..

42 U.S.C. § 1983.  Section 1983 "is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred."  *Graham v. Connor*, 490 U.S. 386, 389-94 (1989).  The Section 1983 cause of action has two

elements. First, a plaintiff must show deprivation of a federally protected right, privilege, or immunity and a causal connection between the conduct complained of and the deprivation. *See Gutierrez-Rodriguez v. Cartagena*, 882 F.2d 553, 559 (1st Cir. 1989). Second, a plaintiff must establish that "the perpetrator of the violation was acting under color of law." *Cruz-Erazo v. Rivera-Montañez*, 212 F.3d 617, 621 (1st Cir. 2000).

### 1. Equal Protection Claim

The Fourteenth Amendment's Equal Protection Clause provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV, § 1. Ms. Wadsworth alleges that RSU 40 is liable for an equal protection violation under § 1983 on two grounds: (1) "its failure to follow, apply, or enforce laws preventing harassment and discrimination in schools" and (2) "its failure to adequately train or supervise employees about their obligation to properly investigate and address incidents of sexual harassment in public schools." *Am. Compl.* ¶ 177.

RSU 40 is a municipal department. Under *Monell* and its progeny, municipalities and their departments are liable only for constitutional violations arising from municipal policies. *See Connick v. Thompson*, 563 U.S. 51, 60 ("A municipality or other local government may be liable under [§ 1983] if the governmental body itself 'subjects' a person to a deprivation of rights or 'causes' a person 'to be subjected' to such deprivation.") (quoting *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 692 (1978)). "Official municipal policy includes the

decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick,* 563 U.S. at 61; *see also Doe v. Reg'l Sch. Unit No. 21*, No. 2:19-00341-NT, 2020 WL 2820197, at *4 (D. Me. May 29, 2020) (citing *Bordanaro v. McLeod*, 871 F.2d 1151, 1156 (1st Cir. 1989)).   In short, municipal liability can only arise from a municipal act.   *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986) ("*Monell* reasoned that recovery from a municipality is limited to acts that are, properly speaking, acts 'of the municipality' – that is, acts which the municipality has officially sanctioned or ordered").   Municipal liability cannot arise from vicarious liability.   *See id. at* 478 ("[A] municipality cannot be made liable by application of the doctrine of *respondeat superior*").   Rather, municipalities are responsible "only for their own unconstitutional acts"; there is no vicarious liability under § 1983 for the actions of a municipality's "non-policymaking employees."   *Haley*, 657 F.3d at 51.   The "first inquiry in any case alleging municipal liability under § 1983 is the question whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation."   *Canton*, 489 U.S. at 385.   The policy must be the "'moving force' behind the alleged violation of constitutional rights."   *Hayden*, 134 F.3d at 456 (quoting *Monell*, 436 U.S. at 694).

These principles provide the framework within which Ms. Wadsworth's § 1983 claim must fit to survive RSU 40's dispositive motion.   Her Amended Complaint advances two potential *Monell* claims.   The first is that the school district's sexual harassment reporting policy was itself the "moving force" behind the alleged equal

protection violation.  The second is a failure-to-train claim, alleging that the school district's failure to properly train its employees on issues of sexual harassment and proper reporting was itself a policy giving rise to deprivation of her rights under the Fourteenth Amendment.

Relying only on the well-pleaded facts in Ms. Wadsworth's Amended Complaint, the Court previously denied the District's motion to dismiss these claims, noting that it was "err[ing] on the side of caution" at the more liberal motion to dismiss stage because factual ambiguities remained about the District's sexual harassment policies and training procedures.  *Order on Mot. to Dismiss* at 42, 49 (stating that "[f]urther discovery may uncover the intended meaning of 'building principal,' allowing the Court or a jury to make a better-informed judgment at the summary judgment or trial stage" and that the Court "denies the motion to dismiss . . . in hopes that discovery will further develop the level of training MSAD 40/RSU 40 provided and which interpretation of the sexual harassment policy controls").  Now equipped with a summary judgment record that offers much greater detail about the District's policies and training, the Court finds that there is no unconstitutional deficiency in its sexual harassment policy and that no failure-to-train—if any— amounted to deliberate indifference or the moving force behind Ms. Wadsworth's injury.

### a.   Unconstitutional Policy Claim

The dispute around Ms. Wadsworth's unconstitutional policy claim centers on whether there was an infirmity in the District's sexual harassment policy where a

principal's sexual harassment could only be reported to the principal himself. *See id.* at 39-43. The parties agree that the District has a sexual harassment policy which instructs staff and students to report possible sexual harassment and discrimination to "the building principal" and instructs the building principal to notify the superintendent of the complaint but does not specify whether "building principal" includes assistant principals or only the head principal. *Id.* at 29. Resolving that ambiguity in Ms. Wadsworth's favor and assuming that "building principal" referred to only the head principal, the Court found at the motion to dismiss stage that the policy had a plausibly unconstitutional "glaring hole" where "the building principal can act with impunity because he or she stands between a school official reporting possible sexual harassment and the superintendent receiving the report." *Id.* at 41. The Court also noted, however, that "[f]urther discovery may uncover the intended meaning of 'building principal,' allowing the Court or a jury to make a better-informed judgment at the summary judgment or trial stage." *Id.* at 42.

The development of the summary judgment record has allayed the Court's concerns about a potential deficiency in the policy. Ms. Wadsworth maintains that the "policy's silence regarding whether 'building principal' included assistant principals, along with a strict adherence to that policy, created a never-ending loop whereby all instances of sexual harassment were being reported to the harasser, and then the harasser was not passing them along to the superintendent as the policy required." *Pl.'s Opp'n* at 31. The record, however, does not support this contention.

Superintendent Nolan testified that "building principal" means either the School Principal or the School Assistant Principals. PSAMF ¶ 13; DRPSAMF ¶ 13. He testified further that, under the policy, a staff person who had knowledge of a student being sexually harassed would ordinarily make a complaint to the principal, but if the principal was the perpetrator of the harassment, the staff person would be expected to make a report to the Superintendent. DSMF ¶ 70; PRDSMF ¶ 70.

Ms. Pease testified that if the Principal was the harasser, her understanding was that she was to report it to the Superintendent, PSAMF ¶ 23; DRPSAMF ¶ 23; DSMF ¶ 71; PRDSMF ¶ 71, and Ms. Philbrook testified that in that situation she was to report it to the Superintendent or to the police. PSAMF ¶ 24; DRPSAMF ¶ 24; DSMF ¶ 72; PRDSMF ¶ 72. They also both testified that, in general, any adult in the school would move a student up the chain of command, to the assistant principals, the principal, or to the Superintendent, if needed, for complaints to be made and an investigation to occur.[90] PSAMF ¶ 23, 25; DRPSAMF ¶ 23, 25.

The Court does not find any dead end in this chain of reporting. As the Court understands the Policy, in general, sexual harassment was to be reported either to Mr. Cavanaugh as the head principal or to Ms. Pease or Ms. Philbrook as the assistant principals—collectively, the building principals. In a case where the head

---

[90]     There is some irony in this conclusion because RSU 40 took the legal position in this litigation that the Assistant Principals were not "appropriate person[s]" under Title IX. But the standards of Title IX liability and § 1983 liability are not the same. *Bradshaw*, 203 F. Supp. 3d at 185 ("The actual knowledge requirement imposes a higher standard for Title IX claims than for claims arising under § 1983, where deliberate indifference can follow actual or constructive knowledge").

         Regardless of what RSU 40's lawyers have been arguing about the technical application of Title IX, the Assistant Principals themselves testified that they knew that under the Policy, they could report the Principal to the Superintendent.

principal was the perpetrator of the harassment, the policy does not prevent reporting; instead, students or staff could report harassment to an assistant principal.  The policy directs assistant principals, as building principals, to elevate reports of harassment to the Superintendent, and both Ms. Pease and Ms. Philbrook confirmed that this was their understanding of the policy.  The Superintendent then has the power to discipline the principal, as Superintendent Nolan did in this case. There is thus no break or dead end in the chain of reporting and a principal cannot act with impunity simply because there is no other person to whom harassment can be reported.

The Court recognizes that the definition of "building principal" and the chain for reporting a principal harassing a student are not spelled out in the District's written policy.  But Ms. Wadsworth offers no evidence suggesting that Mr. Nolan, Ms. Pease, and Ms. Philbrook's testimonies under oath about the policy and their understandings of it were incorrect or untruthful—beyond the assertion that Ms. Pease, Ms. Philbrook, and Mr. Nguyen speaking to Mr. Cavanaugh about their concerns implied that they felt his behavior amounted to harassment but that he was the only person to whom they could report it.  *Pl.'s Opp'n* at 3.  The Court does not find record support for this contention.

To the contrary, while Ms. Pease and Ms. Philbrook expressed concern regarding Mr. Cavanaugh's behavior, there is no indication in the record that they— or any other staff member or student—believed that Mr. Cavanaugh was sexually harassing Ms. Wadsworth.  Mr. Cavanaugh presumably violated the District's sexual

harassment policy through his constant and sexually explicit text messages to Ms. Wadsworth, but there is no suggestion that any staff member knew the content of those messages.  Even resolving all reasonable inferences in Ms. Wadsworth's favor, the record does not support Ms. Wadsworth's assertion that staff members viewed Mr. Cavanaugh's behavior as sexual harassment and sought to report it but were stymied by an unconstitutional sexual harassment policy that only permitted them to report sexual harassment to the perpetrator.

The Court finds no "hole" in the District's sexual harassment and reporting policies that could support a § 1983 claim, and even if the Court were to find a deficiency, the record does not support the conclusion that the infirmity could have been the "moving force" behind Ms. Wadsworth's injury, as § 1983 requires.  *Hayden*, 134 F.3d at 456 (quoting *Monell*, 436 U.S. at 694).  Accordingly, the Court grants the motion for summary judgment in favor of RSU 40 as to Ms. Wadsworth's § 1983 unconstitutional policy claim.

### b.    Failure to Train Claim

"There are limited circumstances in which an allegation of a 'failure to train' can be the basis for liability under § 1983." *Canton*, 489 U.S. at 387.  As the Supreme Court cautioned, "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train."  *Connick*, 563 U.S. at 61.  "[T]he inadequacy of . . . training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of the persons with whom the [officials] come into contact." *Canton*, 489 U.S. at 388.  "'[D]eliberate

indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Connick*, 563 U.S. at 61 (quoting *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown,* 520 U.S. 397, 410 (1997)); *see also Hayden*, 134 F. 3d at 456 ("The liability criteria for 'failure to train' claims are exceptionally stringent"). "Only where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality—a 'policy' as defined by [the Supreme Court's] previous cases—can a city [or school district] be liable for such a failure under § 1983." *Canton*, 489 U.S. at 390.

Deliberate indifference also requires showing that municipal policymakers had "actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights . . . ." *Connick*, 563 U.S. at 61. Ordinarily, this requires a plaintiff to demonstrate "[a] pattern of similar constitutional violations by untrained employees . . . ." *Id.* at 62 (citing *Brown*, 520 U.S. at 409); *see also Haley*, 657 F.3d at 52 ("Triggering municipal liability on a claim of failure to train requires a showing that municipal decisionmakers either knew or should have known that training was inadequate but nonetheless exhibited deliberate indifference to the unconstitutional effects of those inadequacies"). The United States Supreme Court in *Canton* left open the possibility that a consequence of failing to train might be so obvious that a pattern of similar violations might not be necessary to show deliberate indifference, but the Supreme Court since explained that this "hypothesized single-incident liability" applies to a "narrow range" of situations, such as training police officers on the constitutional limitation to the use

A133

of deadly force. *Id.* at 63-64 (citing *Brown*, 520 U.S. at 409). It does not, for example, apply to the failure of a prosecutor's office to adequately train attorneys in their *Brady*[91] obligations, particularly when the failure to train is on a "specific scenario related to the violation in [the] case," because "attorneys, unlike police officers, are equipped with the tools to find, interpret, and apply legal principles." *Id.* at 63-70.

"In resolving the issue of a city's liability, the focus must be on adequacy of the training program in relation to the tasks the particular officers must perform." *Canton*, 489 U.S. at 390. Inadequate training of a single official will not alone establish liability on the municipality. *Id.* at 390-91. "Moreover, for liability to attach in this circumstance the identified deficiency in a city's training program must be closely related to the ultimate injury." *Id.* at 391.

In denying the District's motion to dismiss, the Court noted that "because there is no evidence of other students in the school district bringing harassment or discrimination claims based on" the District's failure to train, Ms. Wadsworth's claim "must fit into the 'narrow range' of situations that qualify for the *Canton* Court's 'hypothesized single-incident liability.'" *Order on Mot. to Dismiss* at 46 (quoting *Connick*, 563 U.S. at 63-64).[92] The Court found that the District "had written policies and procedures detailing how to report possible sexual harassment, so there is an indication that there was some amount of training" but "[t]he question is how much and what." *Id.* at 48. With the assistance of the summary judgment record, the Court

---

[91]     *Brady v. Maryland*, 373 U.S. 83 (1963).
[92]     The Court's Order also outlined in detail the First Circuit's application of the single-incident standard. *See Order on Mot. to Dismiss* at 46-47.

now has a better understanding of "how much and what" training was provided and concludes that it was not so inadequate as to meet the stringent standard of "deliberate indifference."

Ms. Wadsworth contends that "[t]he record here is clear . . . that the School never provided training to any of its staff, which led to the multiple reporting failures regarding Mr. Cavanaugh's treatment of Ms. Wadsworth." *Pl.'s Opp'n* at 33. The Court disagrees. Ms. Wadsworth's contention is grounded in Mr. Cavanaugh's testimony that he did not provide training and was not qualified to do so. The record reveals, however, that each year during the relevant period, Mr. Cavanaugh provided a PowerPoint presentation to staff on the topic and Mr. Nguyen, Ms. Pease, and Ms. Philbrook each recalls attending these presentations and considered them to be trainings. *See Pease Dep.* at 19:23-20:19 (recounting Mr. Cavanaugh providing sexual harassment training "every year"); *Philbrook Dep.* at 18:17-19:18 (same); *Cavanaugh Dep.* at 173:12-22 (describing giving the presentation). The District is not able to produce copies of the PowerPoint because Mr. Cavanaugh removed his hard drive from his laptop after resigning.

The record thus shows that RSU 40's principal, who had received some training as an affirmative action officer, gave the staff at the beginning of each year a PowerPoint presentation on the school's sexual harassment policy, which staff members viewed as a training. Whether this annual training is a "best practice" for how a school should train its teachers to identify and report sexual harassment is not before the Court. But the standard for deliberate indifference in training is

exceptionally demanding. *See Canton*, 489 U.S. at 390 ("Only where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality—a 'policy' as defined by [the Supreme Court's] previous cases—can a city [or school district] be liable for such a failure under § 1983"); *Lucia v. City of Peabody*, 971 F. Supp. 2d 153, 167 (D. Mass. 2013) (court awarded summary judgment to defendant municipality where officer had not been trained on the policy and was only provided a copy in a department manual, stating "[s]uch a method of training, while perhaps not an ideal practice, does not constitute deliberate indifference to the constitutional rights of those [ultimately harmed]"); *Plamp v. Mitchell Sch. Dist. No. 17-2*, 565 F.3d 450, 462 (8th Cir. 2009) (regarding a school district that had sexual harassment policies and reporting procedures in place: "[w]hile [plaintiff] presented some evidence that personnel never received training specifically addressing teacher-on-student harassment, such testimony only raises concerns about the administration of the Board's policies . . . [t]his would, at most, raise a question about whether the program was negligently administered, but it is not alone a sufficient basis upon which to find liability for failure to train").

Finally, even if the Court had found that the District's training was so egregiously inadequate as to clear the "exceptionally stringent" bar for deliberate indifference, Ms. Wadsworth's claim would still fail because—as the Court has discussed—there is no indication that any staff member believed Ms. Wadsworth was being sexually harassed or that a staff member was confused about how to report sexual harassment, and thus any training deficiency was not the cause of her injuries.

86

**A136**

*See Canton*, 489 U.S. at 391 ("for liability to attach . . . the identified deficiency in a city's training program must be closely related to the ultimate injury"); *Office of the Pub. Guardian v. Elliot Hosp.*, No. 21-cv-705-LM, 2022 U.S. Dist. LEXIS 161799, at *24 (D.N.H. Sep. 8, 2022) ("the failure to train [must be] connected to the alleged deprivation of constitutional rights").  Finding no failure to train, causal connection between the District's sexual harassment training and Ms. Wadsworth's injuries, or deliberate indifference to her constitutional rights, the Court grants RSU 40's motion for summary judgment as to Ms. Wadsworth's § 1983 failure to train claim and grants judgment in favor of RSU 40 and against the Plaintiff on Count II of the Amended Complaint.

### C.    State Law Tort Claims

Ms. Wadsworth asserted three state law tort claims against the District: negligent hiring, training, and supervision (Count III); intentional infliction of emotional distress (Count IV); and negligent infliction of emotional distress (Count V).  The District contends that it is entitled to summary judgment on all three claims because it is immune from liability under the MTCA.  *Def.'s Mot.* at 19-20.  Ms. Wadsworth agrees, stating that she "agrees to dismiss her tort claims against MSAD 40 considering the Maine Tort Claims Act immunity conferred to the School."  *Pl.'s Opp'n* at 45.

The Court construes Ms. Wadsworth's agreement to dismiss her tort claims as a motion to dismiss Counts III, IV and V pursuant to Federal Rule of Civil Procedure 41(a)(2).  Under the Rule, a court may order a dismissal "on terms the court considers

proper." *Id.* Here, where the Plaintiff agreed to the dismissal of her state tort claims only after RSU 40 moved for summary judgment on those claims and in her response to RSU 40's dispositive motion, the Court determines that the dismissal should be with prejudice.

## VI.   CONCLUSION

The Court GRANTS Maine School Administrative District 40/Regional School Unit 40's Motion for Summary Judgment (ECF No. 100) as to Counts I and II as they pertain to the District.   In addition, pursuant to the Plaintiff's motion to dismiss the state tort claims, Court DISMISSES with prejudice Counts III-V of Adriana Wadsworth's Amended Complaint as against Maine School Administrative District 40/Regional School Unit 40.  The Court directs the Clerk to enter judgment in favor of Maine School Administrative District 40/Regional School Unit 40 and against Adrianna Wadsworth at the final conclusion of the case.

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 20th day of March, 2023

UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| ADRIANNA WADSWORTH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 2:19-cv-00577-JAW |
| | ) | |
| MAINE SCHOOL ADMINISTRATIVE | ) | |
| DISTRICT 40/REGIONAL SCHOOL | ) | |
| UNIT 40 et al., | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER ON CHUCK NGUYEN'S MOTION FOR SUMMARY JUDGMENT**

A former high school student brought a lawsuit against a school district, a school principal, and a school social worker asserting claims under 20 U.S.C. § 1681(a) (Title IX) and 42 U.S.C. § 1983, as well as state tort claims, stemming from sexual harassment she alleges the school principal committed against her. The social worker moves for summary judgment on the § 1983 and tort claims against him. The Court grants summary judgment on the § 1983 claim because there are no genuine issues of material fact that could support the plaintiff's contention that the social worker's actions shocked the conscience and, in any event, he is entitled to qualified immunity. The Court denies summary judgment on the tort claims because the plaintiff substantially complied with the notice requirements of the Maine Tort Claims Act and, as alleged, the social worker's actions fell well outside of his job authority. Finally, he is thus not entitled to discretionary function immunity.

## I.    PROCEDURAL HISTORY

On December 27, 2019, Adrianna Wadsworth[1] filed suit against Maine School Administrative District 40/Regional School Unit 40 (RSU 40 or the District),[2] Medomak Valley High School (MVHS), Andrew Cavanaugh, and Chuck Nguyen. *Compl.* (ECF No. 1).  She alleged a violation of Title IX and negligent hiring, training, and supervision against the District and MVHS, brought claims under 42 U.S.C. § 1983, brought common law tort and statutory claims of intentional infliction of emotional distress (IIED) and negligent infliction of emotional distress (NIED) against all the Defendants, and brought a negligence claim against Mr. Cavanaugh and Mr. Nguyen.  *Id.* ¶¶ 134-179.  On February 7, 2020, Mr. Cavanaugh answered the Complaint.  *Def., Andrew Cavanaugh's Answer to Pl.'s Compl. and Demand for Jury Trial* (ECF No. 11).  On March 11, 2020, the District and MVHS filed a motion to dismiss counts one and two of the Complaint.  *Def. MSAD 40/RSU 40's Mot. to Dismiss Counts I and II of Compl.* (ECF No. 12).  On the same day, Mr. Nguyen filed

---

[1]    Ms. Wadsworth brought this lawsuit in her own name rather than under a pseudonym such as Jane Doe.  Though a balancing of factors is required, a victim of sexual harassment or sexual assault—especially a minor at the time of the offense—often has a privacy interest sufficient to allow the victim to proceed under a pseudonym.  *See, e.g., Doe v. Reg'l Sch. Unit No. 21*, Docket No. 2:19-00341-NT, 2020 WL 2833248, at 1-4 (D. Me. May 29, 2020); *Doe v. Megless*, 654 F.3d 404, 408 (3d Cir. 2011).  However, as an adult, Ms. Wadsworth has an equal right to bring the action under her own name.

[2]    The filings in this case have variously referred to the District as MSAD 40/RSU 40, MSAD 40, or RSU 40.  According to the District, it was formerly known as MSAD 40 but is now known as RSU 40.  *Def. MSAD 40/RSU 40's Statement of Material Facts* ¶ 1 (ECF No. 101) ("Defendant Regional School Unit 40 ("RSU 40") . . . [was] formerly Maine School Administrative District 40").  The Court will refer to this party as RSU 40 or the District.

2

**A140**

an answer to the Complaint. *Answer and Affirmative Defenses to Compl. and Jury Trial Demand (Def. Chuck Nugyen)* (ECF No. 13).

On March 27, 2020, Ms. Wadsworth filed an amended complaint, dropping MVHS as a defendant. *Pl.'s Am. Compl. and Demand for Jury Trial* (ECF No. 15) (*Am. Compl.*). On April 10, 2020, Mr. Nguyen filed a motion to dismiss the Amended Complaint. *Def. Chuck Nguyen's Mot. to Dismiss Am. Compl.* (ECF No. 16). On April 14, 2020, Mr. Cavanaugh filed an answer to the Amended Complaint. *Def., Andrew Cavanaugh's Answer to Pl.'s Am. Compl. and Demand for Jury Trial* (ECF No. 17).

On May 8, 2020, the District filed a motion to dismiss counts one and two of the Amended Complaint, and on May 11, 2020, it withdrew its first motion to dismiss. *Def. MSAD 40/RSU 40's Mot. to Dismiss Counts I and II of First Am. Compl.* (ECF No. 21);[3] *Def. MSAD 40/RSU 40's Withdrawal of Mot. to Dismiss as Moot* (ECF No. 22). Ms. Wadsworth filed a response on June 8, 2020. *Opp'n of Pl., Adrianna Wadsworth, to Def. MSAD 40/RSU 40's Mot. to Dismiss for Failure to State a Claim* (ECF No. 31). On June 22, 2020, the District replied. *Def. MSAD 40/RSU 40's Reply in Supp. of Mot. to Dismiss* (ECF No. 32).

On October 2, 2020, the Court denied Mr. Nguyen's motion to dismiss, and on October 29, 2020, the Court denied the District's motion to dismiss. *Order on Def. Chuck Nguyen's Mot. to Dismiss* (ECF No. 36) (*Order on Mot. to Dismiss*); *Order on MSAD 40/RSU 40's Mot. to Dismiss* (ECF No. 39). The District filed its Answer to

---

[3]    The Plaintiff originally named Medomak Valley High School as a defendant, but when Ms. Wadsworth amended her complaint on March 27, 2020, she dropped MVHS as a named defendant. *See Am. Compl.* ¶¶ 1-5.

**A141**

the Amended Complaint on November 13, 2020 and Mr. Nguyen filed his Answer and affirmative defenses on February 4, 2021. *Def. MSAD 40/RSU 40's Answer to Pl.'s Am. Compl.* (ECF No. 45); *Answer and Affirmative Defense to Am. Compl. and Jury Trial Demand (Def. Chuck Nguyen)* (ECF No. 49).

On July 27, 2022, the District, Mr. Cavanaugh, and Mr. Nguyen each filed a motion for summary judgment accompanied by a statement of material facts. *Def. MSAD 40/RSU 40's Mot. for Summ. J.* (ECF No. 100); *Def. MSAD 40/RSU 40's Statement of Material Facts* (ECF No. 101); *Def. Andrew Cavanaugh's Mot. for Summ. J.* (ECF No. 103); *Def. Andrew Cavanaugh's Rule 56 Statement of Material Facts in Supp. of His Mot. for Summ. J.* (ECF No. 104); *Def. Chuck Nguyen's Mot. for Summ. J.* (ECF No. 105) (*Def.'s Mot.*); *Def. Chuck Nguyen's Statement of Material Facts in Supp. of Mot. for Summ. J.* (ECF No. 106) (DSMF).   On October 19, 2022, Ms. Wadsworth filed an omnibus response to the motions for summary judgment, her own statement of additional material facts, and separate responses to each defendant's statement of material facts. *Pl. Adrianna Wadsworth's Omnibus Opp'n to Defs.' Mots. for Summ. J.* (ECF No. 114) (*Pl.'s Resp.*); *Pl.'s Rule 56 Statement of Material Facts in Supp. of Her Omnibus Opp'n to Defs.' Mots. for Summ. J.* (ECF No. 115) (PSAMF); *Pl.'s Resps. to Def. MSAD 40's Statement of Material Facts in Supp. of its Mot. for Summ. J.* (ECF No. 116); *Pl.'s Resps. to Def. Andrew Cavanaugh's Statement of Material Facts in Supp. of His Mot. for Summ. J.* (ECF No. 117); *Pl.'s Resps. to Def. Chuck Nguyen's Statement of Material Facts in Supp. of His Mot. for Summ. J.* (ECF No. 118) (PRDSMF).

**A142**

On November 17, 2022, the District filed a reply in support of its motion for summary judgment and a reply to Ms. Wadsworth's statement of additional material facts. *MSAD 40/RSU 40's Reply in Supp. of Mot. for Summ. J.* (ECF No. 121); *Def. MSAD 40/RSU 40's Reply Statement of Material Facts* (ECF No. 122). The following day, Mr. Nguyen and Mr. Cavanaugh each filed their own replies and responses to Ms. Wadsworth's statement of additional material facts. *Def. Chuck Nguyen's Reply Mem. of Law in Supp. of Mot. for Summ. J.* (ECF No. 123) (*Def.'s Reply*); *Def. Chuck Nguyen's Resp. to Pl.'s Rule 56 Statement of Material Facts in Supp. of Her Omnibus Opp'n to Defs.' Mots. for Summ. J.* (ECF No. 124) (DRPSAMF); *Def. Andrew Cavanaugh's Reply in Supp. of Mot. for Summ. J.* (ECF No. 125); *Def. Andrew Cavanaugh's Resps. to Pl.'s Rule 56 Statement of Material Facts in Supp. of Her Omnibus Opp'n to Defs.' Mots. for Summ. J.* (ECF No. 126).

Finally, on December 19, 2022, Ms. Wadsworth moved to request oral argument on the defendants' motions. *Pl.'s Request for Hearing/Oral Argument on Defs.' Mot. for Summ. J.* (ECF No. 127). The Court granted that motion, *Order* (ECF No. 128), and heard oral arguments on March 14, 2023. *Min. Entry* (ECF No. 137).

## II.  FACTS[4],[5]

---

[4]  The Court states the facts "in the light most hospitable to [non-movants] consistent with record support . . .." *Mancini v. City of Providence ex rel. Lombardi*, 909 F.3d 32, 37 (1st Cir. 2018) (citing *Ahern v. Shinseki*, 629 F.3d 49, 51 (1st Cir. 2010); *Gillen v. Fallon Ambulance Serv., Inc.*, 283 F.3d 11, 17 (1st Cir. 2002)).

[5]  The Court notes at the outset that the parties have submitted between them 277 proposed facts for the record. *See* DSMF (120 facts); PSAMF (157 facts). The Court finds many of these facts to be largely or entirely immaterial to Ms. Wadsworth's claims against Mr. Nguyen and his motion for summary judgment.

Ms. Wadsworth, for example, has filed a single statement of additional facts to support her omnibus opposition to all three defendants' motions to dismiss. That statement of facts includes assertions that may be essential to her claims against Mr. Cavanaugh and/or the District but are largely irrelevant to her claim against Mr. Nguyen—e.g., detailed allegations relating to the District's sexual harassment policies and trainings, other District employees' knowledge of the harassment, and

5

### A.      The Parties

Adrianna Wadsworth, a woman now in her early twenties, attended MVHS, a school located within the District, between 2014 and 2018.   PSAMF ¶¶ 1-2; DRPSAMF ¶¶ 1-2.  At all pertinent times, Ms. Wadsworth was under the age of 18.[6] PSAMF ¶ 5; DRPSAMF ¶ 5.

As of October of 2021, Mr. Nguyen had worked for Defendant RSU 40 for 16 years.[7]  DSMF ¶ 1; PRDSMF ¶ 1.  Prior to the 2021-22 school year, Mr. Nguyen worked out of MVHS.  DSMF ¶ 2; PRDSMF ¶ 2.  Since 2007, Mr. Nguyen has been licensed with the State of Maine as a social worker.  DSMF ¶ 3; PRDSMF ¶ 3.

---

the content of text messages from Mr. Cavanaugh to Ms. Wadsworth, of which Mr. Nguyen is not alleged to have any knowledge.

Mr. Nguyen, for his part, asserts dozens of proposed facts relating to what other school officials and members of law enforcement knew or believed about Mr. Cavanaugh's behavior towards Ms. Wadsworth.  The focus of the motion before the Court is on Mr. Nguyen's knowledge and actions or inaction relating to Mr. Cavanaugh's harassment of Ms. Wadsworth.  Aside from occasionally providing narrative cohesion or context, the knowledge and beliefs of other actors are generally not relevant to the claims against Mr. Nguyen.

Accordingly, the Court will omit or abridge proposed facts irrelevant to Mr. Nguyen's motion for summary judgment.  *See CFTC v. JBW Capital, LLC*, 812 F.3d 98, 110 n.19 (1st Cir. 2016) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)) (at the summary judgment stage, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment" and thus "[f]actual disputes that are irrelevant or unnecessary will not be counted").  The Court included facts relating to Mr. Cavanaugh and his actions regarding Ms. Wadsworth to provide context for her claim against Mr. Nguyen, but it has attempted to differentiate for purposes of Mr. Nguyen's dispositive motion, evidence of Mr. Cavanaugh's actions that Mr. Nguyen was unaware of.

[6]      Mr. Nguyen objects to PSAMF ¶ 5, contending that it is vague and unsupported by the record. DRPSAMF ¶ 5.  Upon review of the record, the Court finds that Ms. Wadsworth cited the wrong deposition but that the cited lines on her second deposition support the fact asserted.  *See Joint R. Materials for Defs.' Mots. for Summ. J.* (ECF No. 91) (*Joint R. Materials)*, Attach. 16, *Deposition of Arianna Wadsworth Vol. II* at 74:2-6 (*Wadsworth Dep. Vol. II)* (stating her birth year and confirming that she was seventeen when the investigation into Mr. Cavanaugh began).  The Court overrules Mr. Nguyen's objection and admits PSAMF ¶ 5.

[7]      Ms. Wadsworth qualifies DSMF ¶ 1 to object that the record does not establish when Mr. Nguyen stopped working for the District.  PRDSMF ¶ 1.  The Court overrules this objection as beyond the scope of the fact asserted and admits DSMF ¶ 1.

6

**A144**

Andrew Cavanaugh was the Principal of MVHS from 2015 until he resigned in December of 2017, and during this time he was also designated as MVHS' Affirmative Action Coordinator.  PSAMF ¶¶ 3-4; DRPSAMF ¶¶ 3-4.

### B.   Andrew Cavanaugh's Alleged Harassment of Adrianna Wadsworth

During Ms. Wadsworth's junior and senior years of high school (starting in the fall of 2016), Mr. Cavanaugh repeatedly subjected her to conduct of a sexual nature, involving sexually charged and inappropriate comments, text messages, and gifts.[8] PSAMF ¶ 3; DRPSAMF ¶ 3.  While some RSU 40 employees, including Mr. Nguyen, witnessed instances of Mr. Cavanaugh's inappropriate conduct towards Ms. Wadsworth, RSU 40 did not investigate or discipline Mr. Cavanaugh until November 2017.[9]  PSAMF ¶ 6; DRPSAMF ¶ 6.

### 1.   Adrianna Wadsworth's Background and Initial Encounters with Andrew Cavanaugh and Chuck Nguyen

Ms. Wadsworth moved out of her parents' home during the fall of 2016, her junior year of high school.  DSMF ¶ 13; PRDSMF ¶ 13.  Ms. Wadsworth moved out of her parents' home for several reasons, including: her parents fought a lot; she wanted to finish high school at MVHS because she loved school; her desire for stability; and her desire to be active at school, contrary to the wishes of her mother.  DSMF ¶ 14; PRDSMF ¶ 14.  For most of the time from the fall of 2016 to the spring of 2018, Ms.

---

[8]       Mr. Nguyen objects to PSAMF ¶ 3, contending that its allegation that Mr. Cavanaugh "sexually harassed" Ms. Wadsworth is conclusory "should be stricken or disregarded as immaterial." DRPSAMF ¶ 3.  The Court modified PSAMF ¶ 3 to reflect factual assertions supported by the record.
[9]       Mr. Nguyen offers the same objection to PSAMF ¶ 6, again arguing that Ms. Wadsworth's proposed assertion should be stricken as conclusory.  DRPSAMF ¶ 6.  The Court modified PSAMF ¶ 6 to reflect factual assertions supported by the record.

Wadsworth lived with Theresa and Darren Kenniston, parents of one of her classmates, Ashley Kenniston.[10]  DSMF ¶ 15; PRDSMF ¶ 15.

Mr. Nguyen and Ms. Wadsworth first met in 2016, when Mr. Cavanaugh was principal of MVHS.  DSMF ¶¶ 4-5; PRDSMF ¶¶ 4-5.  Mr. Cavanaugh and Mr. Nguyen knew each other professionally based on their work at MVHS but did not socialize outside of work.[11]  DSMF ¶ 8; PRDSMF ¶ 8.  Mr. Cavanaugh referred Ms. Wadsworth to Mr. Nguyen because she was at risk of leaving home due to ongoing family stress and did not have a place to go.[12]   DSMF ¶ 6; PRDSMF ¶ 6.

During the summer of 2016, Ms. Wadsworth worked for Mr. Cavanaugh helping him fix up houses and watching his nephew, and she received payment for

---

[10]    Mr. Nguyen's proposed DSMF ¶ 16 asserts that "Ms. Wadsworth never asked Ms. Kenniston whether the things Mr. Cavanaugh was saying or doing were abnormal or inappropriate."  The Court finds the proposed assertion irrelevant for the reasons discussed in footnote 5—mainly, that Ms. Wadsworth's discussions with Ms. Kenniston are immaterial to the claims against Mr. Nguyen. Moreover, the Court finds the proposed addition contradicted by the record.  *See* PSAMF ¶ 16; *Wadsworth Dep. Vol. I* at 206:1-10 (even if Ms. Wadsworth did not use the exact words "abnormal or inappropriate," she testified that she "definitely asked [Ms. Kenniston] what [Ms. Kenniston] thought about Mr. Cavanaugh suggesting that [she] should be on birth control, and that's when [Ms. Kenniston] didn't understand why Mr. Cavanaugh was even suggesting that [she] should be on birth control").  Accordingly, the Court omits DSMF ¶ 16.

[11]    Ms. Wadsworth qualifies DSMF ¶ 8 to object that Mr. Nguyen and Mr. Cavanaugh were far closer than the proposed assertion conveys.  PRDSMF ¶ 8.  The Court overrules the objection as beyond the scope of the fact asserted and admits DSMF ¶ 8.

[12]    Mr. Nguyen's DSMF ¶ 7 reads:

> After his initial meeting with Ms. Wadsworth, Mr. Nguyen met with Ms. Wadsworth once before the end of the year and about once a month beginning in the late spring of 2017.

DSMF ¶ 7.  Mr. Nguyen supports this paragraph with appropriate citations to his own deposition.  *Id.* (citing *Nguyen Dep.* 43:2-7; 45:1-7).  Ms. Wadsworth denies DSMF ¶ 7, countering that she "met with Nguyen often throughout her junior and senior year of high school" and "[d]uring her senior year, Nguyen frequently pulled [her] out of study hall."  PRDSMF ¶ 7.  In support of her denial, she cites her own answers to interrogatories and the deposition testimony of a classmate, Brent Stewart.  Both citations support her denials and, as the Court is obligated to view contested facts in the light most favorable to Ms. Wadsworth, the Court omitted DSMF ¶ 7.  However, as Ms. Wadsworth did not include these facts in PSAMFs, the Court has not included them in its recitation of facts.

doing so.  DSMF ¶ 17; PRDSMF ¶ 17.  Neither Ms. Wadsworth's mother nor Ms. Kenniston was initially concerned about Ms. Wadsworth working for Mr. Cavanaugh and the fact they were exchanging phone numbers.[13]  DSMF ¶¶ 18-23; PRDSMF ¶¶ 18-23.

### 2.  Andrew Cavanaugh's Inappropriate Comments and Gifts

Between 2016 and 2017, Mr. Cavanaugh told Ms. Wadsworth she was pretty, looked nice, and made comments about what she was wearing nearly every day while Ms. Wadsworth was in school.  PSAMF ¶ 28; DRPSAMF ¶ 28.  Mr. Cavanaugh repeatedly used pet names to refer to Ms. Wadsworth such as "cupcake," "princess," and "ladytime."  PSAMF ¶ 29; DRPSAMF ¶ 29; DSMF ¶ 78; PRDSMF ¶ 78.  This was done repeatedly in person and via text message on an almost daily basis between 2016 and 2017.[14]  PSAMF ¶ 30; DRPSAMF ¶ 30.  Mr. Cavanaugh, in a meeting in his office, told Ms. Wadsworth that she was good looking and could take anyone she wanted to prom.[15]  PSAMF ¶ 31; DRPSAMF ¶ 31.

At a school basketball game, Mr. Nguyen witnessed Mr. Cavanaugh comment on Ms. Wadsworth's looks in the middle of the gym and in the presence of everyone

---

[13]    Mr. Nguyen's proposed DSMF ¶¶ 18-23 (primarily relating to the knowledge of Ms. Wadsworth's mother) are largely immaterial for the reasons discussed in footnote 5.  The Court admits a summary of the assertions and omits the remainder of DSMF ¶¶ 18-23.

[14]    Mr. Nguyen qualifies PSAMF ¶ 30, objecting only that "[t]he statement does not define 'this'; therefore, it is impossible to admit or deny the statement."  DRPSAMF ¶ 30.  The Court finds "this" to be obvious from the context and previous sentence as referring to Mr. Cavanaugh calling Ms. Wadsworth pet names, overrules the objection, and admits PSAMF ¶ 30.

[15]    Mr. Nguyen qualifies PSAMF ¶ 31, contending that "[t]he cited record material does not support the assertion that Mr. Cavanaugh told Ms. Wadsworth she was good looking."  DRPSAMF ¶ 31.  The Court agrees that the cited page does not allege that Mr. Cavanaugh called Ms. Wadsworth good looking.  However, in the same deposition, she states that "Mr. Cavanaugh said that I could take anybody in the school that I wanted [to prom] and said that I was a good looking girl."  *Wadsworth Dep. Vol. I* at 194:15-17.  The Court overrules the objection and admits PSAMF ¶ 31.

attending the game.[16],[17]  PSAMF ¶ 32; DRPSAMF ¶ 32; DSMF ¶¶ 70-71; PRDSMF ¶¶ 70-71.  Ms. Wadsworth is not sure when she first told Mr. Nguyen about the nicknames, but Mr. Nguyen was present and heard, at least once, when Mr. Cavanaugh called Ms. Wadsworth "ladytime," and, on multiple occasions, when Mr. Cavanaugh called Ms. Wadsworth "cupcake."[18]  PSAMF ¶ 33; DRPSAMF ¶ 33; DSMF ¶ 78; PRDSMF ¶ 78.

During this same period, Ms. Wadsworth met with Mr. Cavanaugh in his office, and on at least one occasion while Assistant Principal Tamra Philbrook was present, Mr. Cavanaugh asked Plaintiff whom she was taking to the prom, who had asked her to the prom, called her "cupcake," asked about her prom dress, and advised Ms. Wadsworth that she could take anyone she wanted to the prom.  PSAMF ¶ 36; DRPSAMF ¶ 36.  Mr. Nguyen was also present during this meeting and agreed with Mr. Cavanaugh's suggestions.[19]  PSAMF ¶ 37; DRPSAMF ¶ 37; DSMF ¶¶ 67-69; PRDSMF ¶¶ 67-69.

---

[16]    DSMF ¶ 70 is the first of many proposed assertions where Mr. Nguyen phrases the fact as "Ms. Wadsworth alleges . . ." even where he does not dispute—or outright admits—the truth of her testimony.  *See, e.g.*, DRPSAMF ¶ 32 (admitting that Mr. Nguyen witnessed the comments "alleged" in DSMF ¶ 70).  If the Court finds that a reasonable jury could believe Ms. Wadsworth's statements it will—as it must at this stage—adopt these statements as fact for the summary judgment record, discarding Mr. Nguyen's "Ms. Wadsworth alleges . . ." framings.

[17]    After admitting in DRPSAMF ¶ 32 that "Mr. Nguyen witnessed Mr. Cavanaugh comment on Ms. Wadsworth's looks" at the basketball game, Mr. Nguyen now asserts that he "does not recall hearing anything of the sort."  DSMF ¶ 72.  This is an awkward phrasing since people hear comments, they do not see them.  Nevertheless, the Court views this statement in the light most favorable to Ms. Wadsworth based on her deposition testimony and viewing it in the light most favorable to her, the Court interprets "witnessed" to mean "heard."  *See Wadsworth Dep. Vol. I* at 217:9-18:8 (recalling Mr. Cavanaugh making inappropriate comments while standing with Mr. Nguyen at the game).

The Court finds Mr. Nguyen's assertion contradicted by his own admission and by the record, and omits DSMF ¶ 72.  *See id.* at 216:1-10; 217:9-18:8.

[18]    Proposed PSAMF ¶¶ 34-35 and 38-39 assert Ms. Philbrook's knowledge of Mr. Cavanaugh's comments, and the Court omits them for the reasons discussed in footnote 5.

[19]    Mr. Nguyen qualifies PSAMF ¶ 37, objecting that the assertion is vague and unsupported by the record.  DRPSAMF ¶ 37.  The Court finds Ms. Wadsworth's testimony in support of the asserted

Ms. Wadsworth was embarrassed that Mr. Cavanaugh called her "cupcake," and after one of her friends found out about the nickname, Ms. Wadsworth went to Mr. Nguyen's office and advised him that Mr. Cavanaugh called her "cupcake" when they texted each other.  PSAMF ¶ 40; DRPSAMF ¶ 40; DSMF ¶ 24; PRDSMF ¶ 24. Prior to the time Mr. Cavanaugh came under investigation, Mr. Nguyen was aware that Mr. Cavanaugh texted Ms. Wadsworth with some regularity and that he called her "cupcake" in the messages but was not generally aware of the high frequency and sexually explicit content of the messages.[20]  DSMF ¶¶ 25-27; PRDSMF ¶¶ 25-27.  Ms. Philbrook came into the office during that meeting with Mr. Nguyen while Ms. Wadsworth was reporting her feelings, sat down, did not say anything, and then—after an undetermined amount of time—said "I'll leave you guys to it" and left Mr. Nguyen's office.  PSAMF ¶ 41; DRPSAMF ¶ 41.

In the text messages between Mr. Cavanaugh and Ms. Wadsworth, from the very limited period of April 20, 2017 through November 3, 2017, Mr. Cavanaugh called Ms. Wadsworth "cupcake" at least 60 times, "ladytime" at least 28 times, and "princess" at least 18 times.[21]  PSAMF ¶ 42; DRPSAMF ¶ 42.  Mr. Cavanaugh did not

---

fact sufficient to justify its inclusion and admits PSAMF ¶ 37.  *See Wadsworth Dep. Vol. I* at 195:18-196:3 ("Mr. Nguyen said, yes and that they've already heard several boys who want to take me to prom and made jokes about me turning them down or saying, yes, and so Mr. Nguyen just agreed with Mr. Cavanaugh").

[20]    Ms. Wadsworth objects to DSMF ¶¶ 25-27 that Mr. Nguyen's characterizations understate his knowledge of the text exchanges.  PRDSMF ¶¶ 25-27.  The Court finds each party's assertions to be factually supported by the record and largely compatible with the other's: Mr. Nguyen states fairly that he was not aware of the frequency or content of the texts; Ms. Wadsworth rejoins accurately that Mr. Nguyen knew they texted with some regularity and that Mr. Cavanaugh called her cupcake. DSMF ¶¶ 25-27; PRDSMF ¶¶ 25-27.  The Court admits a summary of DSMF ¶¶ 25-27 that reflects both parties' assertions and is supported by the record.

[21]    Mr. Nguyen qualifies PSAMF ¶ 42 to object that Ms. Wadsworth has not supplied specific citations for each time Mr. Cavanaugh used one of the referenced nicknames in a text message.

try to hide the fact that he was sending text messages to Ms. Wadsworth, and according to him, while he could not remember bringing up the exchanges, he may have told Ms. Philbrook, Mr. Nguyen, and Athletic Director Matt Lash, that he was exchanging text messages with Ms. Wadsworth.[22]   PSAMF ¶ 43; DRPSAMF ¶ 43.

Megan Wright, a classmate and friend of Ms. Wadsworth's, later testified that she thought Mr. Cavanaugh was creepy and that Mr. Cavanaugh commented on the length of Ms. Wadsworth's skirt when she walked into school in the morning.  PSAMF ¶ 155; DRPSAMF ¶ 155.  Ms. Wadsworth was borrowing Ms. Wright's skirt that day, and this comment made Ms. Wright so uncomfortable that she never wore it again.[23] PSAMF ¶ 155; DRPSAMF ¶ 155.  Ms. Wright testified that the relationship between Mr. Cavanaugh and Ms. Wadsworth was common knowledge throughout the school.[24]

---

PSAMF ¶ 42.  The Court finds the cited collections of text messages to be replete with Mr. Cavanaugh using the nicknames, rejects Mr. Nguyen's qualification, and admits PSAMF ¶ 42.

[22]     Mr. Nguyen qualifies PSAMF ¶ 43 to emphasize that the proposed assertions should be disregarded as conclusory and speculative.  DRPSAMF ¶ 43.  The Court does not find the assertions to be conclusory allegations or unsupported allegations because they accurately state Mr. Cavanaugh's own testimony and are not Ms. Wadsworth's mere conjecture.  *See Joint R. Materials,* Attach. 18, *Dep. of Andrew Cavanaugh* at 150:4-152:3 (*Cavanaugh Dep.*) (stating "I think [Mr. Nguyen] became aware" of the texts and that "I may have said [to Mr. Nguyen], you know, I'll send her a text or something. But like I said, I didn't make it a, you know, a secret or I didn't, you know, try to hide it. So I may have [had a conversation with him about the texting]").  The Court modified PSAMF ¶ 43 to add that Mr. Cavanaugh did not proactively "bring up" the exchanges but otherwise overrules the objection and admits PSAMF ¶ 43.

[23]     Ms. Wadsworth's proposed PSAMF ¶ 156 consists of Ms. Wright recounting additional inappropriate comments made by Mr. Cavanaugh to Ms. Wright.  There is no allegation that Mr. Nguyen had any knowledge of these comments, and the Court finds them redundant to Ms. Wright's already-admitted testimony and other facts in the record establishing that Mr. Cavanaugh often made inappropriate comments to Ms. Wadsworth in text and in person.  The Court omits PSAMF ¶ 156 for the reasons stated in footnote 5.

[24]     Mr. Nguyen objects to PSAMF ¶ 157 on the grounds that the assertion is conclusory and speculative.  DRPSAMF ¶ 157.  Given that the record is replete with evidence that Mr. Cavanaugh regularly pulled Ms. Wadsworth out of class, texted her constantly, and multiple teachers and administrators noticed and complained of their interactions, the Court does not strain to envision that their relationship—however it may be characterized—provided grist for the school's rumor mill.  Ms. Wright testified that her "group of friends" would "all find [the relationship] weird" and that she first heard about it through a mutual friend while living in Wisconsin.  *Joint R. Materials*, Attach. 23, *Dep.*

PSAMF ¶ 157; DRPSAMF ¶ 157.  Mr. Nguyen was present on one occasion when Mr. Cavanaugh gave her a gift of around $20.  DSMF ¶ 42; PRDSMF ¶ 42.  During a meeting[25] with Mr. Cavanaugh and Mr. Nguyen in which the prom was being discussed, Mr. Cavanaugh gave Ms. Wadsworth $20 as spare change.[26]  DSMF ¶ 43; PRDSMF ¶ 43.

Mr. Cavanaugh also made Ms. Wadsworth uncomfortable when he gave her gifts at school, including a box of feminine hygiene products and a winter coat.  PSAMF ¶ 53; DRPSAMF ¶ 53.  He often gave her gifts of money.  PSAMF ¶ 54; DRPSAMF ¶ 54.  Ms. Wadsworth informed Mr. Nguyen that the gifts Mr. Cavanaugh was giving her made her feel embarrassed.[27,28]  PSAMF ¶ 55; DRPSAMF ¶ 55; DSMF ¶ 39; PRDSMF ¶ 39.  Mr. Nguyen responded by stating that Mr. Cavanaugh was just

---

[25]     *of Megan Wright* at 31:9-32:1.  The Court finds support for Ms. Wright's assertion that the relationship was "common knowledge," overrules Mr. Nguyen's objection, and admits PSAMF ¶ 157.

[25]     The record is not clear whether this is the same meeting referenced in DSMF ¶ 42, but Mr. Nguyen asserted the meetings as separate facts and Ms. Wadsworth admitted both.

[26]     Ms. Wadsworth qualifies DSMF ¶ 43 to object that Mr. Cavanaugh asked her if she needed money "for a prom dress or to paint her nails, and handed her a $20 bill."  PRDSMF ¶ 43.  The Court rejects this qualification as beyond the scope of the fact asserted and admits DSMF ¶ 43.  *See Wadsworth Dep. Vol I* at 196:20-23 (testifying that Mr. Cavanaugh asked if "I needed spare change or how I was doing on money, and I said that I was fine and then he gave me I believe it was the $20 bill or so).

[27]     Mr. Nguyen qualifies PSAMF ¶ 55 to state that "[t]he cited record materials only refers to the alleged gift of 'hygiene products.'  Otherwise, denied as unsupported by the cited record materials."  DRPSAMF ¶ 55.  The Court finds that the cited testimony references "the hygiene products *and the box of gifts*," overrules the objection, and admits PSAMF ¶ 55.  *Wadsworth Dep. Vol. I* at 209:23-210:5 ("I do remember that I did discuss the hygiene products *and the box of gifts* that he gave me with Mr. Nguyen. I believe mentioning to [Mr. Nguyen] that I was kind of embarrassed because I don't know what people thought of that when they saw that, and once again [Mr. Nguyen] assured me that [Mr. Cavanaugh] was making sure that I had everything that I needed.") (emphasis added).

[28]     Mr. Nguyen's proposed DSMF ¶ 46 asserts that "Ms. Wadsworth did not report Mr. Cavanaugh's gifts to Mr. Nguyen or anyone else."  While there may be some minor disagreement as to whether Ms. Wadsworth telling Mr. Nguyen that the gifts made her feel embarrassed constitutes a "report," the Court omits DSMF ¶ 46 as contradicted by the record.  *See* DRPSAMF ¶ 40 (admitting that Ms. Wadsworth told Mr. Nguyen that the gift of hygiene products made her feel embarrassed).

making sure she had everything she needed.[29]  PSAMF ¶ 56; DRPSAMF ¶ 56.  He asked her if the gifts were things that she needed and could use and she replied that they were—in the sense that all girls could use these products.[30]  DSMF ¶¶ 40-41; PRDSMF ¶¶ 40-41.  Ms. Kenniston was aware of the box of hygiene products but did not consider it to be an inappropriate gift.  DSMF ¶¶ 47-49; PRDSMF ¶¶ 47-49.

Mr. Nguyen's general observations of Mr. Cavanaugh's interactions with students were that Mr. Cavanaugh was interested in helping students in need or who were struggling.  DSMF ¶ 9; PRDSMF ¶ 9.  Mr. Nguyen was aware that Mr. Cavanaugh had ensured that students who were struggling with basic needs would have gifts, clothing, and meals around the holidays.  DSMF ¶ 10; PRDSMF ¶ 10. Additionally, according to Ms. Philbrook, it was not uncommon for school employees to buy needy students clothing—including shoes, ties, and shirts.[31]  DSMF ¶ 11; PRDSMF ¶ 11.

### 3.    The Birth Control Appointment

During Ms. Wadsworth's junior year, while she was living with the Kennistons, Mr. Cavanaugh took Ms. Wadsworth to a physical examination with her doctor so she

---

[29]    Mr. Nguyen makes the same objection discussed in footnote 27 and the Court overrules it for the same reason.

[30]    Ms. Wadsworth qualifies DSMF ¶¶ 40-41 to clarify that when she responded that she "needed" and "would be able to use" the hygiene products, she meant in the sense that all girls could use tampons, pads, and razors.  PRDSMF ¶¶ 40-41.  The Court accepts Ms. Wadsworth's qualifications and admits DSMF ¶¶ 40-41 as modified by PRDSMF ¶¶ 40-41.  *See Wadsworth Dep. Vol I* at 212:13-215 ("When [Mr. Nguyen] said do you think that hygiene products are something that you need, and I said, well, yes, I would use tampons and pads and razors").

[31]    The Court omits DSMF ¶ 12 for the reasons stated in footnote 5.  No party alleges that Mr. Nguyen was aware Mr. Cavanaugh bought Ms. Wadsworth's prom ticket, and thus Ms. Philbrook's opinion on whether that purchase was improper is not relevant to Mr. Nguyen's motion.

could participate in cheerleading.[32]  PSAMF ¶ 44; DRPSAMF ¶ 44; DSMF ¶¶ 57-58;

PRDSMF ¶¶ 57-58.  At the time, Ms. Wadsworth was estranged from her parents and

they had not signed off on the physical or other permission slips she needed for

cheerleading.[33]  DSMF ¶ 59; PRDSMF ¶¶ 59.   While at the appointment, Mr.

Cavanaugh suggested Ms. Wadsworth get on birth control.[34]   PSAMF ¶ 45;

DRPSAMF ¶ 45.  Thereafter, Mr. Cavanaugh continually suggested Ms. Wadsworth

get on birth control, and ultimately scheduled a medical appointment for Ms.

Wadsworth so that she could obtain birth control.[35]  PSAMF ¶ 46; DRPSAMF ¶ 46.

Mr. Nguyen knew that Mr. Cavanaugh was attempting to schedule and take Ms.

Wadsworth to a birth control appointment, and he advised Mr. Cavanaugh that

---

[32]     Mr. Nguyen qualifies PSAMF ¶ 44, stating that "[t]he cited record material [only] supports the assertion that Mr. Cavanaugh took Ms. Wadsworth to a doctor's appointment." DRPSAMF ¶ 44. This objection is frivolous. Mr. Nguyen's own statement of material facts asserts that "Ms. Wadsworth testified that Mr. Cavanaugh helped her set up a doctor's appointment to get a physical *for cheerleading.*" DSMF ¶ 57 (emphasis added). Moreover, while the paragraph Ms. Wadsworth cited may not explicitly mention cheerleading being the reason, it is clear from the surrounding context that the physical was for cheerleading. *Wadsworth Dep. Vol. I* at 198:4-199:23 (stating that the appointment "occurred some time in my junior year before cheerleading started because I needed a physical in order to participate in cheerleading" and reiterating at least three times that the physical was for cheerleading). The Court overrules Mr. Nguyen's qualification and admits PSAMF ¶ 44.

[33]     Ms. Wadsworth qualifies DSMF ¶ 59 to clarify that she does not recall if she asked her parents to sign off on the form. PRDSMF ¶ 59. The Court has slightly reframed DSMF ¶ 59 to reflect her deposition testimony, but otherwise overrules her objection as beyond the scope of the fact asserted. *See Wadsworth Dep. Vol. I* at 198:11-15 ("I didn't have my parents to sign off on it or on my physical or any other permission slips that I needed for cheer").

[34]     Mr. Nguyen denies PSAMF ¶ 45, contending that Ms. Wadsworth's assertion that Mr. Cavanaugh suggested she get on birth control is unsupported by the record. DRPSAMF ¶ 45. The Court disagrees, overrules the objection as plainly supported by the record, and admits PSAMF ¶ 45. *See Wadsworth Dep. Vol. I* at 201:4-8 ("I remember [Mr. Cavanaugh] telling me while we were there that he would look into the topic of birth control for me and how we can get that").

[35]     Mr. Nguyen denies PSAMF ¶ 46, contending again that Ms. Wadsworth's assertions are unsupported by the record. Even if the Court were to accept Mr. Nguyen's contention that Ms. Kenniston's testimony is inadmissible hearsay, Mr. Cavanaugh testified that he offered to take Ms. Wadsworth to a birth control appointment but was dissuaded by Mr. Nguyen telling him "it wouldn't be a good idea; don't take her." *Cavanaugh Dep.* at 104:8-22, 107:22-108:20. The Court again overrules the objection and admits PSAMF ¶ 46.  *See Wadsworth Dep. Vol. I* at 203:15-20 (recalling Mr. Cavanaugh repeatedly reminder her that she should "be on [birth control]").

taking Ms. Wadsworth would be a bad idea.[36]  PSAMF ¶¶ 47-48; DRPSAMF ¶¶ 47-48.

In late 2016 or early 2017, Ms. Kenniston called Mr. Nguyen and complained about Mr. Cavanaugh setting up and intending to take Ms. Wadsworth to a doctor's appointment to obtain birth control, stating that—while she did not want to "make a mountain out of a molehill"—she believed such action was inappropriate.[37]  PSAMF ¶ 49; DRPSAMF ¶ 49; DSMF ¶¶ 64-65; PRDSMF ¶¶ 64-65.  The only thing Mr. Nguyen did with this information was to tell her the issue had been addressed, and he did not inform Superintendent Nolan of the call with Ms. Kenniston or otherwise initiate any investigation.[38]  PSAMF ¶¶ 51; DRPSAMF ¶¶ 51; DSMF ¶ 66; PRDSMF ¶ 66.  Instead, Mr. Nguyen spoke with Ms. Wadsworth about the birth control appointment and whether it was normal for Mr. Cavanaugh to be discussing birth

---

[36]    Mr. Nguyen argues that PSAMF ¶¶ 47-48 should be disregarded as unsupported by the record. DRPSAMF ¶¶ 47-48.  The Court overrules the objections for the reasons stated in footnote 35 and admits PSAMF ¶¶ 47-48.

[37]    Mr. Nguyen denies PSAMF ¶ 49 as unsupported by the record.  DRPSAMF ¶ 49.  The Court finds the assertion supported by the record, overrules the objection, and admits PSAMF ¶ 49.  *See Kenniston Dep.* at 49-1:50-4 (recounting call with Mr. Nguyen to discuss "the birth control issue because [she] was very disturbed about that").  Mr. Nguyen continues to offer blanket denials to Ms. Wadsworth's proposed assertions that are supported by deposition testimony.  As the Court is required to view disputed facts in the light most favorable to the nonmovant, where Ms. Wadsworth offers assertions supported by deposition testimony and Mr. Nguyen counters with only generic denials, the Court generally overrules the objections and admits the asserted facts.

[38]    Mr. Nguyen qualifies PSAMF ¶¶ 50-51 to make blanket denials, which the Court overrules for the reasons stated in footnote 37 and because the assertions are supported by the record.  DRPSAMF ¶¶ 50-51.  The Court also notes that Mr. Nguyen is denying Ms. Wadsworth's assertions that he *did not* do anything in response to the call but does not identify any actions that he *did* take.  The Court observes that Mr. Nguyen's blanket denials at times contradict his own asserted facts.  *Compare*, DSMF ¶ 66 ("During the alleged conversation between Ms. Kenniston and Mr. Nguyen, Ms. Kenniston alleges Mr. Nguyen asked how she became aware of the appointment and stated that the issue had been addressed") *with* DRPSAMF ¶ 50 (denying Ms. Wadsworth's assertion that "[t]he only thing Mr. Nguyen did with this information was to tell Ms. Kenniston the issue had been addressed" despite never suggesting he did anything else with the information).

The Court alters PSAMF ¶ 51 to remove the conclusory assertion that Mr. Nguyen "failed" to take corrective action but otherwise admits PSAMF ¶¶ 50-51.

control with her, with Mr. Nguyen informing her that Mr. Cavanaugh was like a father figure to her, and that Mr. Cavanaugh thought of her "as a daughter."[39] PSAMF ¶ 52; DRPSAMF ¶ 52; DSMF ¶¶ 60-62; PRDSMF ¶¶ 60-62.  During this conversation, Ms. Wadsworth first said that she "didn't know" if she was okay with Mr. Cavanaugh discussing birth control and asked Mr. Nguyen for his opinion, but after he affirmed Mr. Cavanaugh's behavior as a "father figure" Ms. Wadsworth then responded "yeah, you're right, I agree."[40, 41]  DSMF ¶ 63; PRDSMF ¶ 63.

### 4. Andrew Cavanaugh Asks Adrianna Wadsworth to Move in with Him

Over the course of several months, while Ms. Wadsworth was living with the Kennistons, Mr. Cavanaugh asked her to move into his home on a number of occasions.[42]   PSAMF ¶¶ 57-58; DRPSAMF ¶¶ 57-58.  During that period, Mr. Cavanaugh sent Ms. Wadsworth the following text messages:

> **April 28:** "You need to come here tomorrow.  I will get a room ready for you and you can rest and get better.  We will take care of you.  I think you are just too stressed."

> **April 29:** "Do you think staying with me isnt a good idea?"

---

[39]     Mr. Nguyen objects only to PSAMF ¶ 52's assertion that Ms. Wadsworth told Mr. Nguyen that her parents did not approve of her receiving birth control.  DRPSAMF ¶ 52.  The Court does not find support for Ms. Wadsworth's assertion about her parents in the cited deposition transcript, sustains the objection, and admits the remainder of PSAMF ¶ 52.

[40]     Ms. Wadsworth objects that DSMF ¶ 63 characterizing her response as "agree[ing] with Mr. Nguyen's comments" does not capture the dynamics of the conversation.  The Court agrees and admits DSMF ¶ 63 as supplemented to reflect more accurately Ms. Wadsworth's deposition testimony.

[41]     Ms. Wadsworth's proposed PSAMF ¶¶ 114-116 relate to a letter Mr. Cavanaugh wrote to her doctor and his understanding of her medical record.  The record has already established that Mr. Nguyen was aware that Mr. Cavanaugh intended to take Ms. Wadsworth to a birth control appointment.  Ms. Wadsworth does not allege that Mr. Nguyen was aware of the facts asserted in PSAMF ¶¶ 114-116 and the Court omits them for the reasons discussed in footnote 5.

[42]     Mr. Nguyen objects that PSAMF ¶¶ 57-58 are not supported by citations to specific text messages.  DRPSAMF ¶¶ 57-58.  Ms. Wadsworth, however, goes on to cite nearly a dozen such texts as her next proposed facts and Mr. Nguyen admits all of them.  *See* PSAMF ¶¶ 59-69.  The Court overrules his objections as frivolous and admits PSAMF ¶¶ 57-58.
.

**May 10:** "Would your parents freak if you lived with me?"

"What about staying here for a couple days just to try it?  You might like it.  At least no one would yell at you.  What about staying here tomorrow night?"

"If you decide you want to stay with me, just give a brutha a heads up."

"One of these days I will get you to live with me!"

**May 18:** "Move in here and we will teach you."

"You should live here for your senior year.  It would be a stable place and I dont care about child support."

"I have always said you were a class act.  I think if you talked with Debbie and I about it we could take care of a lot.  I would write a letter to the superintendent and all that."

**June 8:** "I have told you to live with me but you don't want to do that."

**June 22:** "I have a bit of bad news.  I spoke with work about you staying with me and i cant.  I feel terrible but thats what it is."

PSAMF ¶¶ 59-69; DRPSAMF ¶¶ 59-69.  While Mr. Cavanaugh was not more specific about whom at "work" he spoke with—he may have been referring to Mr. Nguyen, whom Mr. Cavanaugh asked if Ms. Wadsworth could move in with him (Mr. Nguyen responded that he did not think it was a good idea)—he informed someone at the school about his desire to have Ms. Wadsworth live with him, and no action was taken related to this request beyond seemingly denying it.[43]  PSAMF ¶¶ 70-71; DRPSAMF ¶¶ 70-71.

---

[43]     Mr. Nguyen objects that PSAMF ¶ 70—asserting that Mr. Cavanaugh asked someone at the school about Ms. Wadsworth moving in with him and that no action was taken—should be stricken as "conclusory and speculative," DRPSAMF ¶ 70, but then goes on to admit in DRPSAMF ¶ 71 that "Mr. Cavanaugh asked [Mr. Nguyen] if Ms. Wadsworth could move in with him."  The Court overrules Mr. Nguyen's objection for the reasons stated in footnote 37—that he has made a generic objection but

18

**A156**

### 5.      Andrew Cavanaugh's Inappropriate Text Messages

On a near daily basis, Mr. Cavanaugh would exchange text messages with Ms. Wadsworth, many of which were inappropriate.[44]  PSAMF ¶ 90; DRPSAMF ¶ 90.  In his text messages, Mr. Cavanaugh would ask Ms. Wadsworth to send him pictures of her in her swimsuit, ask her about her sexual relationships with boys, and even about whether she was having orgasms.  PSAMF ¶ 90; DRPSAMF ¶ 90.

On July 21, 2017, Mr. Cavanaugh texted her "You are like a daughter to me . . . Maybe a scandalous step daughter"[45] and "If you buy car insurance how would you afford those lacey shorts?"[46]  PSAMF ¶¶ 77-78; DRPSAMF ¶¶ 77-78.

---

then later admitted most of the substance of the assertion, without identifying any specific dispute— and admits PSAMF ¶¶ 70-71 as slightly altered to reflect the record.

[44]    Mr. Nguyen objects that PSAMF ¶ 90 should be disregarded as not supported by citations to specific text messages.  DRPSAMF ¶ 90.  The Court overrules this objection for the reasons discussed in footnotes 37 and 43 and admits PSAMF ¶ 90.

[45]    Mr. Nguyen qualifies PSAMF ¶ 77 to object that the assertion that "Mr. Cavanaugh abused Ms. Wadsworth's trust" is conclusory and speculative.  DRPSAMF ¶ 77.  The Court sustains the objection and has removed the conclusory portion of the assertion.  The Court admits the remainder of PSAMF ¶ 77.

[46]    In PSAMF ¶ 77, Ms. Wadsworth states:

> Mr. Cavanaugh abused Ms. Wadsworth's trust over the following weeks, sending her several sexually charged text messages: on July 21, 2017, "You are like a daughter to me . . . Maybe a scandalous step daughter."

Each of the PSAMF ¶¶ 78-82 quotes a text message from Mr. Cavanaugh to Ms. Wadsworth.

In response to Ms. Wadsworth's PSAMF ¶¶ 78-82, Mr. Nguyen admits for the most part that the "cited record material supports the quoted language," but he goes on to say that the "statements in this paragraph are both conclusory and speculative."  DRPSAMF ¶¶ 78-82.  As the Court understands Mr. Nguyen's response and objection, he is not objecting to the accuracy that Mr. Cavanaugh's texts contained the quoted language, but he is objecting to the characterization that these statements "abused Ms. Wadsworth's trust", which is not a fact, but a conclusion or opinion.  The Court eliminated the introductory phrase about abuse of trust and recited the quotations from Mr. Cavanaugh's texts to Ms. Wadsworth.

Mr. Nguyen also objects that PSAMF ¶¶ 78 and 82 are miscited.  DRPSAMF ¶¶ 78, 82.  Mr. Nguyen is correct, but the Court finds each of the disputed text messages on nearby pages and overrules the objections.  *See Joint R. Materials, Attach. 18, Text Messages Between Mr. Cavanaugh and Ms. Wadsworth (Text Messages)* at 12, 17.  With the exception of the introductory language, the Court admits PSAMF ¶¶ 78-82.

On July 27, 2017, he texted her "How casual is sex with your friends?  Like is it no big deal or what?"  PSAMF ¶ 79; DRPSAMF ¶ 79.  Three days later, Mr. Cavanaugh texted Ms. Wadsworth "Good you should be at the beach.  I would ask for pictures, but that might be a bit much . . . Can I see the photos or would that bother you? Only send the scandalous ones! Ha hah."  PSAMF ¶ 80; DRPSAMF ¶ 80.  Later that day, he texted her "Do you have any more [pictures] you could send?"  PSAMF ¶ 81; DRPSAMF ¶ 81.  On August 2, 2017, he texted her "Can you help me Friday or will you be taking more nude pictures of yourself?"  PSAMF ¶ 82; DRPSAMF ¶ 82.

On August 2, 2017, Ms. Wadsworth told Mr. Cavanaugh that she had been sexually assaulted by her cheerleading coach while swimming during an off-season cheerleading team trip earlier that summer.[47]  PSAMF ¶¶ 72-73; DRPSAMF ¶¶ 72-73.  Mr. Cavanaugh responded, in part:

> Even if he [took you swimming], it should have only been swimming, a few laughs and that's it.  I mean when I go to the beach (ve[r]y rare) and i see a student in a bikini, it can be awkward.  I mean the pictures you sent me, they are great shots and well taken, but there is no mistaking that you a pretty snappy number. So to be at the beach with you alone was not t[h]e best because he is seeing you with pret[t]y much not[h]ing on.[48]

---

[47]     PSAMF ¶¶ 72-76 and 83-88 concern allegations that Ms. Wadsworth was sexually assaulted by a cheerleading coach, told Mr. Cavanaugh about the assault, and Mr. Cavanaugh failed to report it or take any corrective action.  Mr. Nguyen acknowledges the content of the quoted text messages supporting Ms. Wadsworth's assertions but denies virtually every other facet of the assertions as speculative, conclusory, or unsupported by the record.  DRPSAMF ¶¶ 72-76, 83-88.

     Ms. Wadsworth does not allege that Mr. Nguyen had any knowledge of the alleged sexual assault, Mr. Cavanaugh's response, or the related text messages.  These messages are thus of limited relevance for the reasons discussed in footnote 5.  The Court admits portions of these assertions that provide basic context for Mr. Cavanaugh's later inappropriate text messages.  *See, e.g.,* PSAMF ¶ 88 (Mr. Cavanaugh contrasting his experiences seeing students in bikinis and calling Ms. Wadsworth "a pretty snappy number").  The Court omits PSAMF ¶¶ 74-76 and 83-87 and admits altered or partial versions of PSAMF ¶¶ 72-73 and 88 as relevant to establishing Mr. Cavanaugh's misconduct.

[48]     The Court admits an abridged PSAMF ¶¶ 88, as explained in footnote 47.

PSAMF ¶ 88; DRPSAMF ¶ 88.  This conversation continued until August 4, 2017, at which time Mr. Cavanaugh told Ms. Wadsworth to put on "her Mickey Mouse negligee" and go to bed, and then stated, "Im deleting our conversations, and the swimsuit pictures, as much as i hate to! Hah hah."[49]  PSAMF ¶ 89; DRPSAMF ¶ 89.

### 6.   Andrew  Cavanaugh Pulling Adrianna Wadsworth from Class

Mr. Cavanaugh would regularly pull Ms. Wadsworth out of class to have meetings with her in his office.[50]  PSAMF ¶ 106; DRPSAMF ¶ 106.  Mr. Cavanaugh would excuse Ms. Wadsworth's absences from class and school, despite not having the authority to do so.[51]  PSAMF ¶ 107; DRPSAMF ¶ 107.

On October 4, 2016, Ms. Wadsworth's English teacher sent an email to Mr. Cavanaugh, Assistant Principal Linda Pease, Ms. Philbrook, and Mr. Nguyen stating that she and another English teacher wanted to "voice [their] concern about Anna Wadsworth being pulled from [Writing Center and AP Language classes] at the

---

[49]      The Court omits PSAMF ¶ 91 as virtually identical to PSAMF ¶ 43.  *Compare* PSAMF ¶ 43 ("Shockingly, Mr. Cavanaugh did not try to hide the fact that he was sending text messages to Ms. Wadsworth, and according to him, he may have told Ms. Philbrook, Mr. Nguyen, and Athletic Director, Matt Lash, that he was exchanging text messages with Ms. Wadsworth") *with* PSAMF ¶ 91 ("Mr. Cavanaugh did not try to hide the fact that he was sending text messages to Ms. Wadsworth, and according to him, he may have told Ms. Philbrook, Mr. Nguyen, and Athletic Director, Matt Lash, that he was exchanging text messages with Ms. Wadsworth").

[50]      Mr. Nguyen qualifies PSAMF ¶ 106 to object "[t]he cited record material indicates that Ms. Wadsworth told a teacher that she was talking to Mr. Cavanaugh when she got 'called down' a lot" and "[o]therwise, the cited record material does not support the assertion in this paragraph." DRPSAMF ¶ 106.  The Court finds the cited deposition testimony to clearly read that a teacher asked Ms. Wadsworth who kept calling her from class and she responded that it was Mr. Cavanaugh calling her to come talk with him.  *See Wadsworth Dep. Vol. I* at 187:9-18.  The Court overrules the objection and admits PSAMF ¶ 106.

[51]      Mr. Nguyen qualifies DRPSAMF ¶ 107 to object that is conclusory and unsupported by the record.  DRPSAMF ¶ 107.  The assertion that "[d]uring these meetings, Mr. Cavanaugh continued his inappropriate and sexual conversations with Ms. Wadsworth" is not supported by the cited testimony and the Court omits that portion of PSAMF ¶ 107.  The Court admits the remainder of PSAMF ¶ 107 as supported by the record.  *See Nolan Dep.* at 105:5-11.

request of [Mr. Cavanaugh's] office."[52]  PSAMF ¶ 108; DRPSAMF ¶ 108; *Joint R. Materials*, Attach. 31, *Email Forward from Tamra Philbrook to Chuck Nguyen Dated November 17, 2020.*  Both School Assistant Principals, Ms. Pease and Ms. Philbrook, approached Mr. Cavanaugh and advised him not to "haul Anna out of a class or keep her from class."  PSAMF ¶ 109; DRPSAMF ¶ 109.

Mr. Cavanaugh replied to the teachers' email, stating:

> Anna has some issues outside of class that we are working to resolve.  I know she is extremely conscientious regarding her coursework and you are correct regarding her stress level.  I apologize for her being removed during these important classes and I will make sure it does not happen again.[53]

PSAMF ¶ 110; DRPSAMF ¶ 110.  Despite this assurance, Mr. Cavanaugh continued to pull Ms. Wadsworth from classes.[54]  PSAMF ¶ 111; DRPSAMF ¶ 111.  Mr. Nguyen

---

[52]    Mr. Nguyen objects that PSAMF ¶ 108 is hearsay, asserting that the emails are out of court statements offered for the truth of the matters asserted.  DRPSAMF ¶ 108.  This objection is unavailing.  First, this is a brief email string between a teacher to and from the principal of the school concerning a student and her attendance at classes.  The emails use school email addresses and copy the assistant principals and the school counselor.  As such, they fall well within the hearsay exception of Federal Rule of Evidence 803(6).

Moreover, in the specific context of this motion, PSAMF ¶ 108 is more relevant for its effect on Mr. Nguyen than for the truth of the matter asserted by the teacher—that Mr. Cavanaugh had been pulling Ms. Wadsworth from class.  There is no serious dispute as to the truth of the latter allegation.  *See* DRPSAMF ¶¶ 109-10 (Mr. Nguyen admitting that two assistant principals advised Mr. Cavanaugh not to "haul Anna out of a class or keep her from class" and that Mr. Cavanaugh responded to the teachers' email to say he would "make sure it does not happen again.").

Instead, the Court finds PSAMF ¶ 108 relevant to the claim against Mr. Nguyen because Mr. Nguyen was a recipient of the email, and it is thus evidence that he was aware that other teachers were concerned about Mr. Cavanaugh's behavior with Ms. Wadsworth.  Because the email is not offered for its truth it is not hearsay.  FED. R. EVID. 801(c)(2) ("'Hearsay' means a statement that . . . a party offers to prove the truth of the matter asserted in the statement").  Either way for purposes of this motion, the Court overrules the objection and admits PSAMF ¶ 108.

[53]    Mr. Nguyen qualifies PSAMF ¶ 110 to object to Ms. Wadsworth's paraphrasing of the email.  DRPSAMF ¶ 110.  The Court supplies the language of the email and overrules Mr. Nguyen's objection as moot.  *Email Forward from Tamra Philbrook to Chuck Nguyen Dated November 17, 2020.*

[54]    Mr. Nguyen denies PSAMF ¶ 111 as conclusory and unsupported by the record.  DRPSAMF ¶ 111.  The Court omits the assertion that Mr. Cavanaugh "lied" but admits the remainder of PSAMF ¶ 111 as supported by the record.  *See Joint R. Materials*, Attach. 29, *Email exchange with Penny Morrill, Tamra Philbrook and others dated December 4, 2017* (listing fifteen times Mr. Cavanaugh excused Ms. Wadsworth's absence or tardiness after his "I will make sure it does not happen again" email).

**A160**

was not aware of how frequently Mr. Cavanaugh was excusing Ms. Wadsworth from

School or that Mr. Cavanaugh had instructed the attendance secretary not to record

Ms. Wadsworth's absences.[55]  DSMF ¶¶ 79-80; PRDSMF ¶¶ 79-80.

### 7.    The Car and September 19, 2017 Traffic Stop[56]

Mr. Cavanaugh purchased a car, insured that car, and gave it to Ms.

Wadsworth for her personal use.  PSAMF ¶ 92; DRPSAMF ¶ 92.  Chris Spear, a

member of the Waldoboro Police Department and School staff, observed Ms.

Wadsworth driving a black Hyundai vehicle, ran the plate with dispatch, and the

vehicle came back as owned by Mr. Cavanaugh.  PSAMF ¶ 93; DRPSAMF ¶ 93.

Following the traffic stop, Officer Spear returned to the school, where he spoke

with Ms. Philbrook about the traffic stop and expressed his concern that Ms.

Wadsworth was driving a vehicle owned and insured by Mr. Cavanaugh.  PSAMF ¶

---

[55]    The Court omits PSAMF ¶¶ 112-19, which concern Mr. Cavanaugh pulling Ms. Wadsworth from class, for the reasons discussed in footnote 5. Ms. Wadsworth does not allege that Mr. Nguyen had any knowledge of these facts and the record has already established that Mr. Nguyen was aware that teachers were complaining about Mr. Cavanaugh regularly pulling Ms. Wadsworth from class.

[56]    Ms. Wadsworth proposed PSAMF ¶¶ 92-105 assert facts relating to Ms. Wadsworth being pulled over driving a car registered to Mr. Cavanaugh and subsequent conversations where staff members and a police officer expressed concern about Mr. Cavanaugh's behavior.  Mr. Nguyen however, had no knowledge of this incident or of Mr. Cavanaugh providing Ms. Wadsworth with a car. DSMF ¶ 45; PRDSMF ¶ 45.  The Court admits an abridged summary of these incidents that provides context relating to other staff members' concerns about Mr. Cavanaugh's behavior but omits the remainder of PSAMF ¶¶ 92-105 for the reasons discussed in footnote 5.

Additionally, proposed DSMF ¶¶ 50-56 consist of assertions relating to Ms. Kenniston's and Ms. Wadsworth's father's lack of concern about the car.  Because the record has established that Mr. Nguyen did not have any knowledge of the car—and, even if Mr. Nguyen had been aware of the car, these beliefs of non-parties would be at best marginally relevant—the Court omits DSMF ¶¶ 50-56 for the reasons stated in footnote 5.

Finally, proposed DSMF ¶¶ 73-76 also related to the circumstances where Ms. Kenniston did not raise concerns.  The record establishes that Ms. Kenniston eventually raised her concerns first to Mr. Nguyen and then reported them to law enforcement.  As she is not a party and is not alleged to have had any contact with Mr. Nguyen aside from the phone call about birth control, the Court does not find these assertions to be relevant and omits DSMF ¶¶ 73-76 for the reasons discussed in footnote 5.

23

**A161**

97; DRPSAMF ¶ 97.  Ms. Philbrook informed Officer Spear that she and Ms. Pease had tried to have professional conversations with Mr. Cavanaugh with regard to his behavior towards Ms. Wadsworth.  PSAMF ¶ 100; DRPSAMF ¶ 100.

Officer Spear later approached Mr. Cavanaugh, told him of the traffic stop, and advised him that staff and students had spoken about his relationship with Ms. Wadsworth, and that the perception was that she was receiving special treatment in the form of favoritism from Mr. Cavanaugh.  PSAMF ¶ 102; DRPSAMF ¶ 102.  Mr. Cavanaugh admitted to Officer Spear that he had heard the speculation but advised that he was not really concerned.  PSAMF ¶ 103; DRPSAMF ¶ 103.  Officer Spear then sent an email to the Waldoboro Police Chief titled "Pervert Principal" which described many of Mr. Cavanaugh's behaviors relating to Ms. Wadsworth.[57]  PSAMF ¶ 104; DRPSAMF ¶ 104.  After the September 19, 2017 traffic stop, conversations about Mr. Cavanaugh's behavior, and "pervert principal" email, no official action was taken relating to Mr. Cavanaugh's behavior with Ms. Wadsworth for over a month.[58]  PSAMF ¶ 105; DRPSAMF ¶ 105.

### 8.    The State of the Harassment Prior to the Investigation

The record includes a number of assertions regarding Ms. Wadsworth's views on and other persons' knowledge of the harassment that do not fit neatly into the timeline of specific incidents.

---

[57]    Mr. Nguyen objects to what it views as conclusory allegations in PSAMF ¶ 104.  DRPSAMF ¶ 104.  The Court sustains the objection in part, omitting the descriptions of Mr. Cavanaugh "perpetrating" behaviors that were "concerning" on Ms. Wadsworth and admitting the factual assertions.

[58]    Mr. Nguyen denies PSAMF ¶ 105 as conclusory and unsupported by the facts.  DRPSAMF ¶ 105.  The Court sustains the objection in part and has pared back PSAMF ¶ 105 to include only factual assertions supported by the record.

Despite being uncomfortable with Mr. Cavanaugh's behavior and feeling that "there are certain times where I should say that I don't want to talk about this or I should not engage in this and probably shouldn't be talking about this . . . it got a little too far," Ms. Wadsworth feared that if she told him "that would change our dynamics a lot and if I made it a big deal how is that going to affect school and feel awkward to go to school and how can you ignore the principal in the school and how is it going to make school awkward."[59]   DSMF ¶¶ 29-30; PRDSMF ¶¶ 29-30; *Wadsworth Dep. Vol. I* at 150:2-24.   After the allegations against Mr. Cavanaugh became public, Ms. Wadsworth told a classmate with whom she was living, Ashley Kenniston, not to say anything she knew about Ms. Wadsworth's interactions with Mr. Cavanaugh to Mr. Nguyen and also told Ashley Kenniston that she was vague when communicating with Mr. Nguyen.[60]   DSMF ¶¶ 31-32; PRDSMF ¶¶ 31-32.

Ms. Wadsworth was aware that there were comments going around the whole school about her interactions with Mr. Cavanaugh.[61]   DSMF ¶ 33; PRDSMF ¶ 33. Ms. Wadsworth questioned "all the time" whether Mr. Cavanaugh's behavior was appropriate, but worried that she was "overthinking . . . being dramatic . . . [and

---

[59]   Ms. Wadsworth contends that Mr. Nguyen's proposed assertions in DSMF ¶¶ 29-30 omit important context underlying her testimony.  PRDSMF ¶¶ 29-30.  The Court agrees and admits DSMF ¶¶ 29-30, modified to quote directly from Ms. Wadsworth's record testimony.

[60]   Ms. Wadsworth qualifies DSMF ¶¶ 31-32 to object that these conversations occurred "after the allegations had come out" and that Mr. Nguyen called another student into his office to ask the student about Ms. Wadsworth's relationship with Mr. Cavanaugh.  PRDSMF ¶¶ 31-32.  The Court adds the temporal clarification but rejects the qualification about the other student as beyond the scope of the facts asserted and admits DSMF ¶¶ 31-32.

[61]   Mr. Nguyen frames the assertion as "Ms. Wadsworth believes" while Ms. Wadsworth objects that her belief was supported by record evidence.  DSMF ¶ 33; PRDSMF ¶ 33.  The Court has already established that the relationship was "common knowledge," *see* PSAMF ¶ 157, and admits DSMF ¶ 33 slightly modified to reflect the factual basis for Ms. Wadsworth's belief.

risked] push[ing] away another person in [her] life by making something that it's not."[62]  DSMF ¶ 34; PRDSMF ¶ 34; *Wadsworth Dep. Vol. I* at 152:1-18.  She "was really confused as to whether or not I was having good [judgment] there or whether [she] could trust [her]self . . . [but] reminded [her]self that if it was really what [she] was worried of what it was, then there was a lot of people who knew about the situation and knew" about the relationship, specifically that she "discussed it with Mr. Nguyen and there was definitely comments made around the whole school basically." *Wadsworth Dep. Vol. I* at 152:5-13.  Because the teachers and staff were not "concerned enough to do anything" Ms. Wadsworth concluded that she was "definitely overthinking it and making this out to be something that it's not, and [she] felt guilty making it out to be something that it wasn't."  *Id.* at 152:13-18.

Ms. Wadsworth's relationship with Mr. Cavanaugh was never physical and he never made any physical contact with her that was inappropriate or sexual.  DSMF ¶¶ 106-07; PRDSMF ¶¶ 106-07.  Ms. Wadsworth does not recall using the term "sexual harassment" with anyone to describe Mr. Cavanaugh's conduct, but she did not know what sexual harassment was at that time.[63]  DSMF ¶ 108; PRDSMF ¶ 108.  Ms. Wadsworth also does not recall reporting to anyone that Mr. Cavanaugh's conduct constituted "discrimination."   DSMF ¶ 110; PRDSMF ¶ 110.  No one

---

[62]     Mr. Nguyen's proposed DSMF ¶ 34 asserts that "Ms. Wadsworth did not believe that MVHS teachers or staff were concerned about her interactions with Mr. Cavanaugh."  Ms. Wadsworth counters that she raised concerns about the relationship with Mr. Nguyen but then—believing that teachers and staff were aware but unconcerned—began to regularly distrust her own judgment of whether Mr. Cavanaugh's behavior was inappropriate.   PRDSMF ¶ 34.  Ms. Wadsworth's qualifications are relevant and supported by her deposition testimony.  *See Wadsworth Dep. Vol. I* at 152:1-18.  The Court expands on and alters DSMF ¶ 34 to reflect Ms. Wadsworth's testimony.

[63]     Ms. Wadsworth qualifies DSMF ¶ 108 to add that she did not know what sexual harassment was at that time.  PRDSMF ¶ 108.  The Court accepts her qualification as supported by the record.

suggested to Ms. Wadsworth that Mr. Cavanaugh's conduct constituted sexual harassment or discrimination. DSMF ¶¶ 109, 111; PRDSMF ¶¶ 109, 111. During Ms. Wadsworth's time as a student at MVHS, Ms. Wadsworth never stated to Mr. Nguyen that she believed Mr. Cavanaugh was "harassing" her or "discriminating" against her.[64],[65] DSMF ¶ 112; PRDSMF ¶ 112.

### C.   The Investigation Into Andrew Cavanaugh

Eventually, Ms. Kenniston reported her concerns to law enforcement and Superintendent Nolan began an investigation into Mr. Cavanaugh.[66],[67] PSAMF ¶ 120; DRPSAMF ¶ 120. In investigating the allegations, Mr. Nolan reviewed the school's harassment policy titled, "Harassment and Sexual Harassment of Students" and made the following notes: "Interfering, pulling out of class, late nights,

---

[64]     Ms. Wadsworth qualifies DSMF ¶ 112 to reiterate that she did not know what harassment was and to add that she went to Mr. Nguyen to ask whether Mr. Cavanaugh's behavior was appropriate. PRDSMF ¶ 112. The Court added quotation marks to "harassment" and "discriminating" to clarify that the assertion is only that Ms. Wadsworth did not use those specific terms.

[65]     Mr. Nguyen's proposed DSMF ¶¶ 113-14 assert that he "had no knowledge of whether Mr. Cavanaugh was harassing or discriminating against Ms. Wadsworth" and that he "was not aware Mr. Cavanaugh was engaging in any inappropriate behavior toward Ms. Wadsworth." The Court need not recount every record example of Mr. Nguyen witnessing Mr. Cavanaugh's misbehavior but concludes that, at the very least, this record could lead a reasonable juror to find that Mr. Nguyen was aware of Mr. Cavanaugh harassing, discriminating against, and/or behaving inappropriately toward Ms. Wadsworth. To the extent other record evidence contradicts Mr. Nguyen, the Court is required to view disputed evidence in the light most favorable to Ms. Wadsworth. The Court omits DSMF ¶¶ 113-14.

[66]     Mr. Nguyen objects that the first sentence of PSAMF ¶ 120 should be stricken because Ms. Wadsworth did not include a record citation. The Court overrules this objection as frivolous, given that Mr. Nguyen asserted essentially the same facts in his own statement of material facts. *See* DSMF ¶¶ 38, 45 (asserting that "Ms. Kenniston did not attempt to raise any concerns . . . with the RSU 40 superintendent until shortly before she reached out to law enforcement in November of 2017" and referencing "the investigation into Mr. Cavanaugh's conduct that began in November of 2017").

[67]     Mr. Nguyen's proposed DSMF ¶¶ 34-38 assert facts relating to Ms. Kenniston's initial lack of concern after becoming aware that Mr. Cavanaugh was texting Ms. Wadsworth. These assertions have no bearing on the claims against Mr. Nguyen and the Court omits DSMF ¶¶ 34-38 for the reasons discussed in footnote 5.

unwelcome, asks, shouldn't have asked."[68]  PSAMF ¶ 120; DRPSAMF ¶ 120.  The policy notes "sexual harassment includes but is not limited to . . . gestures, comments, or other physical, written, graphic, electronic or verbal conduct that is gender-based that interferes with a student's education."  PSAMF ¶ 121; DRPSAMF ¶ 121.  In investigating the complaints against Mr. Cavanaugh, Superintendent Nolan made these notes in an effort to figure out how the situation aligned with the school's policies.[69]  PSAMF ¶ 122; DRPSAMF ¶ 122.  Additionally, Mr. Nolan, testifying on behalf of the School, stated under oath that knowledge of: an administrator excusing a student from class would raise "red flags" regarding Mr. Cavanaugh's behavior; a school principal providing money to the attendance secretary to pay for Plaintiff's prom ticket or providing money to the attendance secretary money in an envelope to give to Plaintiff would raise "concerns"; a principal lending or giving a car to a student would be a "gray[] area"; and a school administrator making appointment for student to take birth control would be "highly unusual.[70]  PSAMF ¶ 123; DRPSAMF ¶ 123.

---

[68]     Mr. Nguyen contends that Superintendent Nolan's handwritten notes should be disregarded as inadmissible hearsay.  DRPSAMF ¶ 120.  The Court finds that it is not necessary to resolve this issue because Mr. Nolan adopted the content of the notes in his deposition testimony, and they are therefore not out of court statements subject to the hearsay rule.  *See Nolan Dep.* at 167:1-169:12.  The Court overrules the objection and admits the remainder of PSAMF ¶ 120.

[69]     Mr. Nguyen qualifies PSAMF ¶ 122, objecting the cited testimony does not support that Superintendent Nolan concluded the information was inconsistent with the school's policies.  DRPSAMF ¶ 122.  The Court agrees with Mr. Nguyen's interpretation of Superintendent Nolan's testimony, sustains the objection, and omits the contested portion of PSAMF ¶ 122.  *See Nolan Dep.* at 168:2-169:8 (explaining that he was "trying to figure out how a specific situation may align with one or more of our policies" but declining to state that Mr. Cavanaugh's behavior violated the policies).

[70]     Mr. Nguyen qualifies PSAMF ¶ 123 to contend that Superintendent Nolan did not specifically describe these behaviors as "raising red flags."  DRPSAMF ¶ 123.

         Mr. Nguyen first objects that "[t]he cited record material does not support the assertion that an administrator excusing a student from class (as opposed to excusing an absence from school) raised a red flag."  DRPSAMF ¶ 123.  The record, however, shows that Mr. Nolan specifically testified that excusing a student from *class* would raise a red flag.  *See Nolan Dep.* at 103:8-21 (responding "yes" when asked whether the fact that "Mr. Cavanaugh excused and/or exempted Ms. Wadsworth from being *in class*" would raise red flags) (emphasis added).

Mr. Nolan went on to testify that, individually, several of the facts asserted during the investigation would have potentially given him a reason to investigate Mr. Cavanaugh, including: the appointment about birth control, the fact that Mr. Cavanaugh had provided a car to a student, the fact that Mr. Cavanaugh called a student "cupcake," and the fact that Mr. Cavanaugh had seen nude photos of a student.[71]  PSAMF ¶ 124; DRPSAMF ¶ 124.

Around this time, Chris McLean, an attorney representing Mr. Cavanaugh with regard to the school board investigation, went "to the school and [waited] in the parking lot" to speak with Ms. Wadsworth.  PSAMF ¶ 129; DRPSAMF ¶ 129.  This encounter with the attorney occurred after Mr. Cavanaugh was instructed not to go to the school."[72]  PSAMF ¶ 130; DRPSAMF ¶ 130.  Ms. Wadsworth got into the attorney's car in the school parking lot and the attorney encouraged Ms. Wadsworth to sign an affidavit supporting Mr. Cavanaugh, repeatedly stating "Mr. Cavanaugh is a stand-up guy, wouldn't you agree?"[73]  PSAMF ¶¶ 131-32; DRPSAMF ¶¶ 131-32.

---

Regarding the other behaviors, Superintendent Nolan did not specifically characterize them as "red flags" but instead as raising "concerns," "highly unusual," or a "gray[] area."  The Court modified PSAMF ¶ 123 to reflect Mr. Nolan's testimony.

[71]    PSAMF ¶¶ 125-28 assert facts relating to Mr. Cavanaugh refusing to return his school-issued hard-drive or cellular phone after his resignation.  Mr. Nguyen is not alleged to have any knowledge of or role in these events.  The Court omits these proposed assertions for the reasons discussed in footnote 5.

[72]    Mr. Nguyen objects that the record is not clear whether this encounter occurred before or after Mr. Cavanaugh was instructed not to go to the school.  DRPSAMF ¶ 130.  Ms. Wadsworth's deposition references "around the time of September through November of 2017," *Wadsworth Dep. Vol. I* at 181:14-15, as a time frame.  Superintendent Nolan first called Mr. Cavanaugh about the allegations relating to Ms. Wadsworth on November 5 and informed him during that call "do not report to school," as a standing directive.  *Nolan Dep.* at 190:14-191:10.  Given that Mr. Cavanaugh was immediately banned from school upon learning of the investigation, there is no evidence in this record that he would have retained an attorney about this issue and had that attorney seek out Ms. Wadsworth *before* Superintendent Nolan issued this "standing directive."  The Court admits PSAMF ¶ 130 as supported by the record.

[73]    Mr. Nguyen qualifies PSAMF ¶ 131 to submit that the record only "indicates that Mr. McLean talked with Ms. Wadsworth about the potential of her signing an affidavit."  DRPSAMF ¶ 131.  The

Ms. Wadsworth never signed the proposed affidavit.  PSAMF ¶ 133; DRPSAMF ¶ 133.

Three law enforcement officials—Chief Labombarde, Officer Spear, and Detective Donald Murray—investigated the allegations and evidence against Mr. Cavanaugh and each concluded that Mr. Cavanaugh had not committed a crime.[74] DSMF ¶¶ 81-105; PRDSMF ¶¶ 81-105.  Detective Murray did not interview Mr. Nguyen as part of his investigation.  DSMF ¶ 84; PRDSMF ¶ 84.  When Detective Murray interviewed Ms. Wadsworth, she did not mention Mr. Nguyen during the interview.[75]  DSMF ¶ 87; PRDSMF ¶ 87.

### D.   Chuck Nguyen's Conduct During and After the Investigation

After the investigation began, Mr. Nguyen reached out to Mr. Cavanaugh a few times trying to be supportive and helpful, telling Mr. Cavanaugh that that he should not have texted Ms. Wadsworth so much, but that Mr. Nguyen knew he was a good guy and assured him that things would work out.[76]  PSAMF ¶¶ 134-35; DRPSAMF ¶¶ 134-35.  In November 2017, in reference to the investigation, the

---

Court has slightly altered PSAMF ¶ 131 to reflect Ms. Wadsworth's testimony.  *See Wadsworth Dep. Vol. I* at 181:13-182:15.

[74]     Mr. Nguyen's proposed DSMF ¶¶ 81-105 provide granular detail on each officer's investigation and conclusions.  But Mr. Nguyen's fundamental assertion, that Mr. Cavanaugh's behavior towards Ms. Wadsworth did not constitute a criminal offense, is undisputed.  Accordingly, the Court admits a summary of DSMF ¶¶ 81-105.  The Court omits the remainder of DSMF ¶¶ 81-105, except for DSMF ¶¶ 84 and 87—the only of these assertions to mention Mr. Nguyen—which it addresses in the following sentences.

[75]     Ms. Wadsworth admits the substance of DSMF ¶ 87 but qualifies it to assert that she was "very upset and caught off guard" by the interview.  PRDSMF ¶ 87.  The Court overrules the objection as beyond the scope of the fact asserted and admits DSMF ¶ 87.

[76]     Mr. Nguyen qualifies PSAMF ¶ 134 to object that it was only Mr. Cavanaugh's impression that Mr. Nguyen was "trying to be supportive and helpful" and that the record does not support his actual motivations.  DRPSAMF ¶ 134.  The Court overrules this objection as frivolous and admits PSAMF ¶ 134.  *See* DRPSAMF ¶ 135 (Mr. Nguyen admitting that he reached out to Mr. Cavanaugh to tell him that "he knew [Mr. Cavanaugh] was a good guy and assur[ing] him that things would work out").

30

**A168**

Waldoboro Police Chief advised Mr. Nolan that Mr. Nguyen thought the school should be more supportive of Mr. Cavanaugh, that Ms. Wadsworth was "bringing it on herself," and that Mr. Nguyen was trying to get her to talk about the situation with him.[77]   PSAMF ¶ 136; DRPSAMF ¶ 136.   Mr. Nolan expressed concern that Mr. Nguyen was "maybe . . . was, knowingly or unknowingly" interfering with the investigation into Mr. Cavanaugh.[78]   PSAMF ¶ 137; DRPSAMF ¶ 137.   As a result, Mr. Nolan instructed Mr. Nguyen not to have any contact with Mr. Cavanaugh regarding Ms. Wadsworth, and also instructed Mr. Nguyen not to have contact with Ms. Wadsworth.[79]   PSAMF ¶ 138; DRPSAMF ¶ 138.

Mr. Nguyen met with Ms. Wadsworth approximately five times after the allegations about Mr. Cavanaugh came out, although it is unclear from the record whether any or all of those meetings occurred after Mr. Nolan warned Mr. Nguyen

---

[77]   Mr. Nguyen qualifies PSAMF ¶ 136 to object that Chief Labombarde's comments are hearsay because they are out of court statements offered for their truth.  The Court disagrees.  Mr. Nolan's deposition testimony indicates that Chief Labombarde was merely relaying comments made to him by Mr. Nguyen. *Nolan Dep.* at 203:16-205:8.  Mr. Nguyen's comments are therefore admissible against him as statements of a party opponent. FED. R. EVID. 801(d)(2).

[78]   Mr. Nguyen qualifies PSAMF ¶ 137 to object that "the cited record material is nothing more than speculation" and the First Circuit has held that courts must ignore "unsupported speculation" on summary judgment.  DRPSAMF ¶ 137 (quoting *Chiang v. Verizon New England Inc.*, 595 F.3d 26, 30 (1st Cir. 2010).  The Court does not find Mr. Nolan's speculation to be unsupported; instead, the record has established that the police chief had recently expressed concern to him that, among other things, Mr. Nguyen was criticizing the investigation and "trying to get [Ms. Wadsworth] to talk about the situation with him." PSAMF ¶ 136.  The Court overrules Mr. Nguyen's objection and admits PSAMF ¶ 137, slightly modified to reflect Mr. Nolan's testimony. *See Nolan Dep.* at 207:1-5.

[79]   Mr. Nguyen qualifies PSAMF ¶ 138 to object that Mr. Nolan's testimony supporting the assertion is "inadmissible hearsay." DRPSAMF ¶ 138.  The Court is puzzled by Mr. Nguyen's objection.  The assertions in PSAMF ¶ 138 are supported by Mr. Nolan's testimony about his own statements to Mr. Nguyen—not, for example, statements Mr. Nolan relayed from a third party or statements of Mr. Nolan that Mr. Nguyen heard from someone other than Mr. Nolan.  The Court thus does not understand the basis of Mr. Nguyen's hearsay objection.  While deposition testimony may ordinarily be hearsay when offered at trial, Federal Rule of Civil Procedure 56 provides that for summary judgment a party can support an assertion by "citing to particular parts of materials in the record, *including depositions* . . .." FED. R. CIV. P. 56(c) (emphasis added).  The Court overrules the objection and admits PSAMF ¶ 138.

not to have contact with her.[80]   PSAMF ¶ 139; DRPSAMF ¶ 139.  During one of the first meetings after the allegations came out, Mr. Nguyen told Ms. Wadsworth that Mr. Cavanaugh did not do anything inappropriate or have any inappropriate conversations with her, going on to say Mr. Cavanaugh was a "stand-up guy," and that "it's not what they are making it out to be."  PSAMF ¶ 140; DRPSAMF ¶ 140.  Mr. Nguyen advised Ms. Wadsworth that if she wanted to help, she could sign an affidavit and "tell the truth."  PSAMF ¶ 141; DRPSAMF ¶ 141.

Ms. Wadsworth later went to Mr. Nguyen to tell him that Mr. Cavanaugh's family members had been sending her upsetting messages relating to Mr. Cavanaugh being investigated for his behavior with her, and as a result she no longer wanted to go to school.[81]   PSAMF ¶ 142; DRPSAMF ¶ 142.  Instead of reporting this further behavior to anyone at the school, Mr. Nguyen told Ms. Wadsworth that Mr. Cavanaugh's family had a right to be angry and advised Ms. Wadsworth to apologize to Mr. Cavanaugh's wife and niece, who was another student at the school.[82]   PSAMF ¶ 143; DRPSAMF ¶ 143.

---

[80]     Mr. Nguyen qualifies PSAMF ¶ 139 to object to the assertion that the meetings occurred after Mr. Nolan's warnings.  DRPSAMF ¶ 139.  The record is unclear when the meetings occurred in relation to Mr. Nolan's warnings, *see Wadsworth Dep. Vol. II* at 36:12-23, and the Court has altered PSAMF ¶ 139 to address Mr. Nguyen's concern and reflect the temporal uncertainty.

[81]     Mr. Nguyen qualifies PSAMF ¶ 142 to clarify that Ms. Wadsworth went to Mr. Nguyen to have this discussion and to object that characterizing Mr. Cavanaugh's behavior as "harassment" improperly asserts a legal conclusion.  DRPSAMF ¶ 142.  The Court altered PSAMF ¶ 142 slightly to address Mr. Nguyen's concerns and reflect Ms. Wadsworth's testimony.

[82]     Mr. Nguyen qualifies PSAMF ¶ 143 to object that the cited testimony does not support the assertion that Mr. Cavanaugh's niece was another student at the school.  DRPSAMF ¶ 143.  The Court agrees that this assertion is not referenced in the cited testimony but finds support for the assertion elsewhere in Ms. Wadsworth's deposition and admits PSAMF ¶ 143 in its entirety.  *See Wadsworth Dep. Vol. II* at 121:1-5 (Ms. Wadsworth had a dispute "with a girl in class . . . who's Mr. Cavanaugh's niece").

In another meeting with Ms. Wadsworth in his office, Mr. Nguyen stood up, closed the door to his office, and informed Ms. Wadsworth that Mr. Cavanaugh had a drinking problem and that he lost sight of his boundaries; he went on to tell Ms. Wadsworth to picture a day in the future, in college, having coffee with Mr. Cavanaugh, when "all of this would be gone and over with."[83]  PSAMF ¶ 144; DRPSAMF ¶ 144.  On January 12, 2018, at 7:26 p.m., Ms. Wadsworth reached out to Mr. Nguyen via Facebook messenger and complained that Mr. Cavanaugh's wife had messaged her.  PSAMF ¶ 145; DRPSAMF ¶ 145.  Mr. Nguyen responded that Mr. Cavanaugh's wife was mad that Ms. Wadsworth had not signed the affidavit, advised her that Mr. Cavanaugh's wife had a right to be mad, and offered to reach out to Mr. Cavanaugh on Ms. Wadsworth's behalf.  PSAMF ¶ 145; DRPSAMF ¶ 145.

According to Mr. Nolan, had he been aware that Mr. Nguyen continued to meet with Ms. Wadsworth after he was instructed not to, he would have called for an investigation to potentially discipline Mr. Nguyen.[84]  PSAMF ¶ 146; DRPSAMF ¶ 146.  After Mr. Nguyen was instructed not to have contact with Ms. Wadsworth, Mr. Spear observed Ms. Wadsworth crying in the hallway, and observed Mr. Nguyen chase her down the hallway.[85]  PSAMF ¶ 147; DRPSAMF ¶ 147.  In or around

---

[83]    Mr. Nguyen qualifies PSAMF ¶ 144 to object to the characterization of the meeting as "yet another inappropriate meeting."  DRPSAMF ¶ 144.  The Courts sustains the objection, omits that characterization, and admits the remainder of PSAMF ¶ 144.

[84]    Mr. Nguyen qualifies PSAMF ¶ 146 to object that Mr. Nolan did not specifically say that he would have disciplined Mr. Nguyen.  DRPSAMF ¶ 146.  The Court modified PSAMF ¶ 146 slightly to address this concern and reflect Mr. Nolan's testimony.

[85]    Mr. Nguyen makes several objections that the Court views as bordering on frivolous.  Ms. Wadsworth asserts that Officer Spear saw her "crying in the hallway" and then Mr. Nguyen "chase her down the hallway."  PSAMF ¶ 147.  Mr. Nguyen counters instead that instead of "chas[ing]" her while she was "crying," he walked after her in a "hurriedly manner" when she was "visibly upset."  DRPSAMF ¶ 147.  Officer Spear, however, testified that he observed Mr. Nguyen "*chasing* [Ms.

33

**A171**

November 2017, Police Chief Labombarde met with Mr. Nguyen in his office to discuss concerns that Mr. Nguyen was defending Mr. Cavanaugh's behavior.[86] PSAMF ¶ 148; DRPSAMF ¶ 148. During this conversation, Mr. Nguyen defended Mr. Cavanaugh's actions and again stated that Mr. Cavanaugh was just trying to be a father figure to Ms. Wadsworth.[87] PSAMF ¶ 149; DRPSAMF ¶ 149. Mr. Nguyen then stated to Mr. Labombarde: "You know, this could happen to you or I or anybody dealing with kids on a regular basis; somebody can make an allegation." PSAMF ¶ 150; DRPSAMF ¶ 150. Mr. Labombarde was shocked by this statement. PSAMF ¶ 150; DRPSAMF ¶ 150.

### E.   Adrianna Wadsworth's Mental Health

Ms. Wadsworth has experienced anxiety and depression, which she relates in part to the actions of Mr. Cavanaugh and Mr. Nguyen.[88] PSAMF ¶ 151; DRPSAMF

---

Wadsworth] in the hallway when "she was visibly upset" and her "eyes were welled up." *Spear Dep.* at 48:12-22 (emphasis added). The record supports Ms. Wadsworth's assertions. The Court overrules Mr. Nguyen's objections and admits PSAMF ¶ 147.

[86]   Mr. Nguyen qualifies PSAMF ¶ 148 to object that the assertion that Chief Labombarde "heard that Mr. Nguyen was defending Mr. Cavanaugh's behavior" is inadmissible hearsay. DRPSAMF ¶ 148. Even if what Chief Labombarde heard about Mr. Nguyen's behavior is hearsay, he testified at length and from his own personal knowledge about meeting with Mr. Nguyen to discuss concerns relating to Mr. Nguyen defending Mr. Cavanaugh. *See Labombarde Dep.* at 31:22-33:16. The Court admits PSAMF ¶ 148, modified slightly to reflect Chief Labombarde's personal knowledge.

[87]   Mr. Nguyen qualifies PSAMF ¶ 149 to object that the assertion that Mr. Nguyen defended Mr. Cavanaugh should be regarded as conclusory. DRPSAMF ¶ 149. The record clearly supports the assertion, and the Court admits PSAMF ¶ 149. *See Labombarde Dep.* at 33:1-12 (stating that "to hear [Mr. Nguyen] say that he thought [Mr. Cavanaugh's behavior] was – there was nothing really inappropriate about it and that Mr. Cavanaugh was just trying to be a father to her or act like a father to her, it kind of sent me off" and that when Mr. Nguyen "validated that [behavior] by saying, well, you know, it could happen to you, too, and I'm like, whatever, you know, and then I left").

[88]   Mr. Nguyen qualifies PSAMF ¶ 151 to object that the cited testimony does not support the assertion that her depression and anxiety are related to "Mr. Cavanaugh and Mr. Nguyen's actions." DRPSAMF ¶ 151. The Court disagrees. Even though the cited testimony refers to depression and anxiety she experienced at college three years later, Ms. Wadsworth immediately clarified that she spoke to the college counselor in part due to "Mr. Cavanaugh and Mr. Nguyen and this situation." *See Wadsworth Dep. Vol. II* at 23:20-24-13.

¶ 151.  In high school, Ms. Wadsworth's depression and anxiety affected her at school because she did not want to go to class anymore, and she would cry in the morning on the way to school and on her way home from school.[89]  PSAMF ¶ 152; DRPSAMF ¶ 152.  Ms. Wadsworth began going to counseling in April 2018.  PSAMF ¶ 153; DRPSAMF ¶ 153.  Ms. Wadsworth continues to suffer from anxiety and has trouble in school when dealing with male professors.[90]  PSAMF ¶ 154; DRPSAMF ¶ 154.

## F.    The District's Policies and Trainings[91]

RSU 40's Sexual Harassment Policy (The Policy) defines sexual harassment as: "Sexual harassment includes but is not limited to unwelcome sexual advances, requests for sexual favors or pressure to engage in sexual activity, physical contact of

---

Mr. Nguyen also objects that Ms. Wadsworth is not qualified to offer opinion testimony on her medical conditions or their causation.  DRPSAMF ¶ 151.  The Court notes that Ms. Wadsworth's diagnoses of anxiety and depression are not merely her own speculation, as she testified that she spoke with a doctor about her symptoms and the doctor suggested anxiety and depression medication.  *See Wadsworth Dep. Vol. II* at 54:16-55-8.  The Court admits PSAMF ¶ 151, modified to reflect that it is Ms. Wadsworth's opinion that her conditions result from Mr. Cavanaugh and Mr. Nguyen's actions.

[89]    Mr. Nguyen again objects that Ms. Wadsworth cannot offer opinion testimony as to medical causation for the conditions she is alleging.  DRPSAMF ¶ 152.  The Court interprets PSAMF ¶ 152 not to opine on what caused Ms. Wadsworth's depression and anxiety, but instead to suggest that her depression and anxiety affected her at school by causing her to not want to attend and to cry on her way there and back.  This assertion is reasonably supported by the record—particularly where a doctor later diagnosed those conditions—and the Court admits PSAMF ¶ 152.

[90]    Mr. Nguyen qualifies PSAMF ¶ 154 to object that the cited testimony does not support the assertion that Ms. Wadsworth "has trouble in school" when dealing with male professors.  DRPSAMF ¶ 154.  However, when asked whether her anxiety has "improved as [she has] gone on in [her] college career in terms of having a comfort level dealing with all of [her] professors," Ms. Wadsworth responded "[d]efinitely not."  *Wadsworth Dep. Vol. II* at 12:13-16.  Mr. Nguyen also again objects that Ms. Wadsworth is not qualified to testify as to her medical conditions and the Court overrules the objection for the reasons discussed in footnotes 88 and 89.  The Court admits PSAMF ¶ 154.

[91]    The adequacy (or inadequacy) of the District's sexual harassment policies and trainings was central to Ms. Wadsworth's claims against RSU 40 but is largely irrelevant to her claims against Mr. Nguyen.  Mr. Nguyen does not assert as a defense either that he did not report Mr. Cavanaugh's harassment because he was inadequately trained, or that he recognized and sought to report the harassment but was stymied by flaws in the District's reporting policy.  Instead, he maintains that he simply did not believe that Mr. Cavanaugh was sexually harassing Ms. Wadsworth.  For those reasons and the reasons discussed in footnote 5, the Court will omit the majority of PSAMF ¶¶ 7-20, admitting only assertions that relate to the claims against Mr. Nguyen.

a sexual nature, gestures, comments, or other physical, written, graphic, electronic or verbal conduct that is gender-based that interferes with a student's education." PSAMF ¶ 7; DRPSAMF ¶ 7. The Policy goes on to state that "[s]chool staff shall report possible incidents of discrimination or harassment of students to [the] building principal." PSAMF ¶ 11; DRPSAMF ¶ 11. While the term "building principal" is undefined in the policy, Superintendent Nolan testified that "building principal" means either the School Principal (Mr. Cavanaugh) or the School Assistant Principals (Ms. Philbrook and Ms. Pease). PSAMF ¶ 13; DRPSAMF ¶ 13. Mr. Nguyen testified that his understanding of the sexual harassment policy was that the reports of sexual harassment were to go to a district-level affirmative action officer in the Superintendent's office. PSAMF ¶ 26; DRPSAMF ¶ 26. He also testified that he could report harassment to the Maine Human Rights Commission. *Nguyen Dep.* at 32:17-20.

## G. Adrianna Wadsworth's Notice to Chuck Nguyen

Ms. Wadsworth did not serve Mr. Nguyen with a notice of claim pursuant to the Maine Tort Claims Act (MTCA).[92] DSMF ¶ 115; PRDSMF ¶ 115. The only notice of claim Ms. Wadsworth filed with RSU 40 related to her claims in this case did not refer to Mr. Nguyen as an "involved" governmental employee or as part of her statement of the basis of the claim. DSMF ¶ 116-17; PRDSMF ¶ 116-17. Mr. Nguyen is not mentioned anywhere in the only notice of claim Ms. Wadsworth filed with RSU

---

[92]   Ms. Wadsworth qualifies each of Mr. Nguyen's MTCA assertions to offer her explanation for not initially serving him with notice. *See* DSMF ¶¶ 115-18; PRDSMF ¶¶ 115-18. The Court includes her explanation at the end of the paragraph and otherwise admits DSMF ¶¶ 115-18 as supported by the record.

40 related to her claims in this case. DSMF ¶ 118; PRDSMF ¶ 118. At the time, Ms. Wadsworth did not know the extent of Mr. Nguyen's involvement and therefore did not put him on notice directly. PRDSMF ¶¶ 115-18. She did provide notice to the District, where Mr. Nguyen was an employee. PRDSMF ¶¶ 115-18.

Ms. Wadsworth also did not serve Mr. Nguyen with a notice of claim pursuant to the Maine Health Security Act (MHSA) and her claims have not been submitted to the prelitigation screening process the MHSA requires for certain claims.[93] DSMF ¶¶ 119-20; PRDSMF ¶¶ 119-20.

## III.    THE PARTIES' POSITIONS

### A.    Chuck Nguyen's Motion for Summary Judgment

Pursuant to Federal Rules of Civil Procedure 12 and 56, Mr. Nguyen asks this Court to dismiss for lack of subject matter jurisdiction or grant summary judgment in his favor and against Adrianna Wadsworth on all counts pleaded against him in the Amended Complaint: the § 1983 (Count II) and state law tort (IV-VI) claims. *Def.'s Mot.* at 1-2. Mr. Nguyen contends that Ms. Wadsworth's claims should be dismissed for failing to comply with the MHSA. *Id.* at 1. He argues further that she has failed to state a cognizable constitutional claim, that he is protected by qualified immunity, and that her tort claims failed to comply with the MTCA's notice requirements and are also barred by the MTCA's personal immunity provisions. *Id.* at 2.

---

[93]    Ms. Wadsworth qualifies DSMF ¶¶ 119-20 to object that the MHSA's requirements are inapplicable because she is not bringing a medical malpractice claim. PRDSMF ¶¶ 119-20. The Court overrules her objections as beyond the scope of the facts asserted and admits DSMF ¶¶ 119-20.

**A175**

### 1.    The MHSA Defense

Mr. Nguyen first submits that "Ms. Wadsworth has not complied with the requirements of Section 2903 of the MHSA" and thus "the Court lacks subject matter jurisdiction to entertain Ms. Wadsworth's claims against Mr. Nguyen and the claims must be dismissed." *Id.* at 4.  The MHSA provides that no "action for professional negligence" may be commenced until the plaintiff has complied with certain notice and prelitigation screening requirements.[94]  *Id.* at 2 (citing 24 M.R.S. § 2903(1)).  Mr. Nguyen adds that the MHSA defines an "action for professional negligence" as: "[A]ny action for damages for injury or death against any health care provider, its agents or employees, or health care practitioner, his agents or employees, whether based upon tort or breach of contract or otherwise, arising out of the provision or failure to provide health care services." *Id.* at 3 (quoting 24 M.R.S. § 2502(6)).  He states further that "[t]he MHSA's provisions are broad and intended to apply to '*all* actions for professional negligence against a health care provider or practitioner.'" *Id.* (quoting *Saunders v. Tisher*, 2006 ME 94, ¶ 13, 902 A.2d 830) (emphasis in *Saunders*).

Mr. Nguyen contends that Ms. Wadsworth's claims against Mr. Nguyen are subject to the MHSA's prelitigation requirements because they "are premised on his position as a social worker and appear to allege either the failure to provide care or the provision of inappropriate care" and thus all "appear to arise 'out of the provision

---

[94]    Neither party suggests that Ms. Wadsworth may have complied with some of the MHSA's three pre-suit requirements but not others; instead, she agrees that she did not comply with any but contends that her claims were not subject to the MHSA or any of its requirements. *See* DSMF ¶¶ 119-20; PRDSMF ¶¶ 119-20.  For simplicity, the Court will refer to the MHSA's three pre-suit requirements collectively as the prelitigation requirements.

38

**A176**

or failure to provide health care services.'" *Id.* at 3-4 (quoting 24 M.R.S. § 2502(6)). Because, in Mr. Nguyen's view, "Ms. Wadsworth has not complied with the requirements of Section 2903 of the MHSA," he argues that the Court lacks subject matter jurisdiction and must dismiss all of her claims. *Id.* at 4.

### 2.    The Section 1983 Claim

The bulk of Mr. Nguyen's motion argues that the Court should grant summary judgment in his favor on Ms. Wadsworth's constitutional claim. *Id.* at 4-21. He begins by submitting that four purportedly undisputed facts are critical to the Court's analysis: (1) that Mr. Nguyen did not engage in harassing or discriminatory acts; (2) Ms. Wadsworth did not complain to Mr. Nguyen that she believed Mr. Cavanaugh was harassing or discriminating against her; (3) she concedes that Mr. Cavanaugh's alleged harassment did not involve any physical or sexual contact; and (4) Mr. Nguyen was not aware of the frequency or the content of Mr. Cavanaugh's text messages to Ms. Wadsworth. *Id.* at 5. Mr. Nguyen argues that, given these facts, "the summary judgment record does not support a substantive due process claim against Mr. Nguyen as a matter of law," because Ms. Wadsworth has not established a protected interested necessary to support a substantive due process claim, she cannot establish required elements for a "state-created danger" theory, and Mr. Nguyen is protected by qualified immunity. *Id.* at 4-21.

### a.    Protected Interest

Mr. Nguyen first contends that Ms. Wadsworth "has not established a protected interest necessary to support a substantive due process claim." *Id.* at 5. He

notes that "[t]he Amended Complaint does not identify the protected interest of which Ms. Wadsworth claims she was deprived" but acknowledges that "Ms. Wadsworth has indicated in briefing that the protected interest is her bodily integrity, and the Court has accepted that assertion." *Id.*

Mr. Nguyen submits that "[w]hile this Court has held that 'students have a fundamental right to bodily integrity that includes the right to be free from sexual abuse,'" *id.* at 5-6 (quoting *Doe v. Sch. Admin. Dist. No. 19*, 66 F. Supp. 2d 57, 65 (D. Me. 1999)), "it appears that right applies only to *physical* intrusions upon a person's body." *Id.* at 6 (collecting cases) (emphasis in *Def.'s Mot.*). He adds that "the alleged harassment by Mr. Cavanaugh was never physical or sexual" and thus Ms. Wadsworth's "suggestion that she was deprived of her right to bodily integrity is unsupported." *Id.* Moreover, Mr. Nguyen contends that "since verbal abuse is normally not a constitutional violation, Mr. Cavanaugh's comments, text messages, and overtures that did not involve physical contact (such as alleged gift-giving and alleged doctor's appointment arrangements) are not actionable." *Id.* He concludes that "[i]t necessarily follows that Mr. Nguyen's alleged failure to protect her from Mr. Cavanaugh's alleged actions could not have deprived Ms. Wadsworth of a constitutionally-protected interest" and the Court should grant summary judgment in his favor on Ms. Wadsworth's constitutional claim. *Id.*

### b.   State-Created Danger Theory

Next, Mr. Nguyen submits that Ms. Wadsworth fails to establish the required elements of a state-created danger claim. He begins by noting that "[a]s a general

matter . . . a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *Id.* at 7 (quoting *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 197 (1989). Ms. Wadsworth instead "seeks to hold Mr. Nguyen liable for Mr. Cavanaugh's alleged conduct under the 'state-created danger' doctrine that some circuit courts of appeal—including, most recently, the First Circuit—have adopted based on dicta that appears in *DeShaney*." *Id.* (citing *Irish v. Fowler*, 979 F.3d 65, 67 (1st Cir. 2020)). Mr. Nguyen adds that, under *Irish*, to establish a state-created danger claim a plaintiff must demonstrate: "(1) that a state actor or state actors affirmatively acted to create or enhance a danger to the plaintiff; (2) that the act or acts created or enhanced a danger specific to the plaintiff and distinct from the danger to the general public; (3) that the act or acts caused the plaintiff's harm; and (4) that the state actor's conduct, when viewed in total, shocks the conscience." *Id.* (quoting *Irish*, 979 F.3d at 75). He contends that, "at minimum, the summary judgment record does not support the first and fourth elements" of this standard. *Id.*

### i.    Affirmative Act

Mr. Nguyen submits that "Ms. Wadsworth's constitutional claim against Mr. Nguyen is premised on the assertion that he failed to protect her when she complained about sexual harassment and discrimination by Mr. Cavanaugh." *Id.* He reiterates that "the premise of her claim does not exist" but adds that even if the record supported her allegations "circuit courts of appeal have held that failure to protect or ensure the safety of a plaintiff—even when a state actor has affirmatively

promised such protection and safety—is insufficient to create a constitutional duty to protect." *Id.* at 7-8.

Mr. Nguyen quotes heavily from *Rivera v. Rhode Island*, 402 F.3d 27 (1st Cir. 2005). *Id.* at 8. In that case a fifteen-year-old witness agreed to testify at a murder trial because of assurances made by police that she would be safe, but was then shot and killed the day before she was scheduled to testify. *Id.* (citing *Rivera,* 402 F.3d at 31-32). The First Circuit affirmed the dismissal of Rivera's state-created danger suit, holding that the government's assurances that she would be protected "do not amount to the type of state creation of risk contemplated by the doctrine . . . [in that they] are not the kind of affirmative acts by the state that would give rise to a constitutional duty to protect." *Id.* (quoting *Rivera,* 402 F.3d at 36-37) (internal quotations omitted). Mr. Nguyen adds that the Third, Fourth, and Sixth Circuit Courts of Appeals have adopted the same reasoning at the Rivera Court. *Id.* at 9-11 (collecting cases).

Citing this authority, Mr. Nguyen concludes that "Ms. Wadsworth has not established affirmative conduct by Mr. Nguyen that could support a state-created danger claim." *Id.* at 12. He asserts that "Mr. Nguyen's alleged failure to report Mr. Cavanaugh's alleged conduct plainly is not an affirmative act – it is, self-evidently, a failure to take action . . . [that] could not, if true, support a state-created danger claim." *Id.* (citing *Cohen v. City of Portland*, No. 2:21-cv-00267-NT, 2022 U.S. Dist. LEXIS 80588, at *15 (D. Me. May 4, 2022). Mr. Nguyen adds that, moreover, "even if Mr. Nguyen's comments could be construed as assurances of protection or safety— which they plainly are not—or 'normalization' of Mr. Cavanaugh's conduct, they

42

**A180**

would not give rise to an affirmative duty to protect as a matter of law." *Id.* (citations omitted).   Finally, he contends that "even if Ms. Wadsworth maintains that she continued her interactions with Mr. Cavanaugh based on Mr. Nguyen's alleged comments, state-created danger liability cannot be predicated on such facts" because "Mr. Nguyen did nothing to deprive Ms. Wadsworth of the liberty to act on her own behalf, nor did he force her, against her will, to become dependent on him." *Id.* at 13 (citations omitted).   Because—in his view—Ms. Wadsworth has failed to establish affirmative conduct, Mr. Nguyen argues that her constitutional claim fails as a matter of law. *Id.*

### ii.   Conduct that "Shocks the Conscience"

Next, Mr. Nguyen contends that, even if the record supports all of Ms. Wadsworth's allegations, "Mr. Nguyen's alleged conduct does not shock the conscience as a matter of law." *Id.* at 15-16.   He submits that "[t]he First Circuit has emphasized that only conduct that is 'truly outrageous, uncivilized, and intolerable' shocks the conscience" and that Mr. Nguyen's alleged conduct does not meet any of these standards. *Id.* at 13, 16 (quoting *Hasenfus v. LaJeunesse*, 175 F.3d 68, 72 (1st Cir. 1999)).

First, Mr. Nguyen submits that "the alleged 'abuse' by Mr. Cavanaugh was verbal and not physical or sexual" and thus "[i]f the underlying conduct does not rise to the level of conscience-shocking behavior, it necessarily follows that failure to report the conduct or 'normalizing' the conduct is not conscience-shocking." *Id.* at 16. Second, he contends that "the information Ms. Wadsworth claims Mr. Nguyen knew

is not indicative of a substantial risk of serious harm" and "[g]iven Ms. Wadsworth's circumstances and her lack of complaints of harassment, Mr. Nguyen's alleged conduct does not reflect a disregard of a known serious risk that constitutes a brutal and inhumane abuse of official power." *Id.* at 16-17. Mr. Nguyen also asserts that "numerous individuals . . . who had substantially more information about Ms. Wadsworth's relationship with Mr. Cavanaugh, did not perceive that a substantial risk of serious harm existed" and thus his "alleged actions do not shock the conscience." *Id.* at 17.

### c.     Qualified Immunity

Mr. Nguyen argues next that "[i]n any event, [he] is protected from Ms. Wadsworth's civil rights claims by qualified immunity." *Id.* at 18. Mr. Nguyen offers that, to defeat his qualified immunity, Ms. Wadsworth must "show that the law was clearly established such that a reasonable public official would be on notice that his or her actions violate the plaintiff's constitutional rights." *Id.* (citing *Mitchell v. Miller*, 790 F.3d 73, 78 (1st Cir. 2015)). Yet, in his view, "Ms. Wadsworth has not met her heavy burden of showing that the right allegedly violated was clearly established at the time of Mr. Nguyen's alleged conduct." *Id.* at 19. He suggests that Ms. Wadsworth is required to demonstrate that "the lack of a report by Mr. Nguyen and his comments to her in the face of the information he allegedly had violated her right to bodily integrity by creating a danger that did not exist prior to her discussions with him and under circumstances that shocked the conscience." *Id.* Instead, however, he contends that any illegality was not clearly established because it is not clear that

44

**A182**

verbal harassment can support a substantive due process claim and because his conduct did not constitute an affirmative act. *Id.* Mr. Nguyen again adds that his conclusion is "further supported by the reactions of other persons who are mandated reporters under Maine's child abuse statute" but did not report Mr. Cavanaugh at the time. *Id.* at 20. Mr. Nguyen concludes that "a reasonable official in Mr. Nguyen's position . . . could reasonably believe that the actions he allegedly took would not violate Ms. Wadsworth's clearly established rights" and thus he "is protected by qualified immunity." *Id.* at 20-21.

### 3.    The State Law Tort Claims

Mr. Nguyen contends that Ms. Wadsworth' state law tort claims "are barred by her failure to provide timely notice under the [MTCA]" and, alternatively, that they are barred by absolute discretionary function immunity. *Id.* at 21-25.

Mr. Nguyen begins by noting that "[a]s a prerequisite to filing a claim under the MTCA against a political subdivision or an employee of that subdivision, a person is required to serve notice of that claim on the political subdivision consistent with the Maine Rules of Civil Procedure." *Id.* at 21 (citing 14 M.R.S. § 8107(3)(B)). He adds that the notice must also state, among other things, "[t]he name and address of any governmental employee involved, if known," *id.* (quoting 14 M.R.S. § 8107(1)(C)), and that "[f]ailure to provide timely notice of claim bars that claim." *Id.* (citations omitted). Mr. Nguyen asserts that Ms. Wadsworth "did not comply with Section 8107 insofar as she asserts claims against Mr. Nguyen" because "[w]hile [Ms. Wadsworth] apparently served the RSU 40 superintendent with a notice of claim, it does not

identify Mr. Nguyen as a municipal employee involved in the claims for which she is providing notice, nor does the notice mention Mr. Nguyen in the statement of the basis for the claim." *Id.* at 22. Mr. Nguyen submits that, for this reason, Ms. Wadsworth's tort claims are barred. *Id.* at 22.

Next, Mr. Nguyen contends that "[t]he MTCA confers upon governmental employees absolute discretionary function immunity," *id.* (citing 14 M.R.S. § 8111(1)(C)), which applies here "unless Mr. Nguyen's conduct clearly exceeded, as a matter of law, the scope of any discretion he could have possessed in his official capacity as a school social worker." *Id.* (citing *Lyons v. City of Lewiston*, 666 A.2d 95, 101 (Me. 1995)). He adds that "[c]ourts have emphasized that a governmental employee is protected by discretionary function immunity even if the conduct at issue could be characterized as intentional misconduct." *Id.* at 23.

Mr. Nguyen submits that he "is protected from Ms. Wadsworth's tort claims by discretionary function immunity" because he "unquestionably had the lawful authority to provide services to students at a public high school" which "necessarily involves the exercise of judgment by guidance counselors and social workers, including the discretionary assessment of whether a student is at risk or may need assistance." *Id.* at 25. Additionally, even if Mr. Nguyen abused his discretion, "it was nonetheless within the scope of his duties to assess the situation, respond to Ms. Wadsworth's queries, and refrain from making a report." *Id.* Mr. Nguyen concludes that he is "protected by immunity" and the tort claims are barred. *Id.*

## B.   Adrianna Wadsworth's Opposition

**A184**

Ms. Wadsworth submitted an omnibus opposition memorandum responding to all three defendants' motions to dismiss. The Court recounts here only the arguments relating to the Mr. Nguyen's motion. Ms. Wadsworth rejoins that she has established the required elements to support a state-created danger theory, Mr. Nguyen is not entitled to qualified immunity on the constitutional claim, her notice of claim complied with the MTCA, and Mr. Nguyen is not entitled to discretionary function immunity on the tort claims. *Pl.'s Opp'n* at 41-52.

### 1.    The Section 1983 Claim

### a.    State-Created Danger Theory

Ms. Wadsworth submits that "[w]hile much of Mr. Nguyen's involvement in this matter is characterized by inaction, Mr. Nguyen certainly took affirmative actions to enhance the danger to Ms. Wadsworth." *Id.* at 41. In her view, Mr. Nguyen "routinely normalized and justified Mr. Cavanaugh's sexual harassment by informing Ms. Wadsworth that Mr. Cavanaugh was merely trying to act like a father figure and make sure she had everything she needed" and "he furthered the sexual harassment by echoing and validating Mr. Cavanaugh's statements that Ms. Wadsworth looked good in her dress and could take any boy she wanted to prom." *Id.* Ms. Wadsworth also highlights what she perceives to be similar "manipulative, gaslighting behavior" by Mr. Nguyen during the birth control incident and when she told him she was embarrassed by Mr. Cavanaugh's gifts. *Id.* at 41-42.

Ms. Wadsworth adds that "[e]ven after all of Mr. Cavanaugh's misdeeds were exposed, Mr. Nguyen still took actions to create or enhance danger to Ms.

Wadsworth," including—after being warned by the Superintendent not to contact Mr. Cavanaugh or Ms. Wadsworth during the investigation—"reach[ing] out and [speaking] to both of them," telling Ms. Wadsworth that Mr. Cavanaugh was a "stand up guy" who had not done anything inappropriate, and asking Ms. Wadsworth to sign an affidavit supporting Mr. Cavanaugh. *Id.* at 42-43. Mr. Nguyen, she asserts, also told Ms. Wadsworth to "apologize to Mr. Cavanaugh's wife and niece" and "offered to act as a liaison between Mr. Cavanaugh and Ms. Wadsworth." *Id.* at 43. Ms. Wadsworth argues that these actions are evidence that "Mr. Nguyen habitually and intentionally manipulated a child into not reporting sexual harassment by his superior, thereby causing her additional emotional harm." *Id.*

Ms. Wadsworth concludes that "[a]ll of these actions, which occurred over the course of two school years, shock the conscience and plainly enhanced the danger to Ms. Wadsworth, causing further damage to her and only her." *Id.* She contends that because "Mr. Nguyen had ample time to consider his actions, Ms. Wadsworth need only show that Mr. Nguyen's actions were deliberately indifferent." *Id.* That standard is, in her view, easily met by the behavior described. *Id.* at 43-44.

### b.   Qualified Immunity

Ms. Wadsworth recounts many of the same facts highlighted in her state-created danger argument to support her position that Mr. Nguyen is not entitled to qualified immunity. *Id.* at 44-45. She submits that "a reasonable adult in Mr. Nguyen's position" or a "reasonable social worker" would "of course" know that Mr. Cavanaugh's harassing behavior violated Ms. Wadsworth's constitutional rights, that

**A186**

normalizing the harassment was inappropriate, and that—after findings had been made that Mr. Wadsworth harassed Ms. Wadsworth—he should not reach out to encourage her to apologize to Mr. Cavanaugh's family or sign a statement supporting him. *Id.* "Despite Mr. Nguyen's assertions to the contrary," she concludes that "there are numerous and substantial disputed material facts surrounding Mr. Nguyen's claim for qualified immunity, and summary judgment must not be granted." *Id.* at 45.

### 2.     The State Law Tort Claims

Next, Ms. Wadsworth counters that "there are significant disputed issues of material fact, but the evidence is clear that Mr. Nguyen . . . should not be afforded immunity under either the intentional act or discretionary function provisions of the MTCA." *Id.* at 45. She also rejects as baseless Mr. Nguyen's arguments that her claims are procedurally barred for defective notice. *Id.* at 47-48.

Regarding the notice requirement, Ms. Wadsworth acknowledges that "[t]he statute is clear that municipal employees should be named in the notice, if the employee's involvement is known at the time the notice is provided." *Id.* at 48 (citing 14 M.R.S. § 8107(1)(C)). However, she contends that the purpose of the MTCA "is to enable the governmental entity to investigate and evaluate claims for the purposes of defense or settlement and to allow governmental entities to avoid needless expense and litigation by providing an opportunity for amicable resolution of disputes prior to formal litigation." *Id.* (quoting *Perry v. Dean*, 2015 WL 9794538, at *22 (Me. Super. Dec. 3, 2015) (internal citation and quotations omitted). Ms. Wadsworth also submits

that Mr. Nguyen's notice argument relies on *Dean*, but the *Dean* Court also specifically noted that "Plaintiffs who *seek to hold a governmental unit and employee liable must first meet a procedural requirement of notifying the unit* of the intention to bring a claim." *Id.* (quoting *Dean,* 2015 WL 9794538, at *21) (emphasis in *Pl.'s Opp'n*). Ms. Wadsworth concludes that she "submitted a timely notice of claim to the governmental unit, in this case the School, and provided ample notice of the nature of her claims" and thus "[g]iven the facts alleged in this case, the School clearly knew or should have known that the claim involved [Mr.] Nguyen, and was therefore not prejudiced in its investigation and evaluation of the claims prior to suit." *Id.* at 48-49.

Regarding discretionary function immunity, Ms. Wadsworth argues that Mr. Nguyen is not entitled to any immunity because "the evidence is clear that Mr. Nguyen was not, at least as it pertained to Ms. Wadsworth, acting within any discretionary job functions." *Id.* at 49. Instead, she claims "the evidence clearly indicates that Mr. Nguyen was acting with loyalty to Mr. Cavanaugh, and an apparent fear of allegations of sexual harassment." *Id.* Ms. Wadsworth contends that Mr. Nguyen's actions satisfy each factor of *Darling's* four-part test:[95]

---

[95]    To determine whether an act is discretionary, courts consider four questions:

(1) Does the challenged act, omission, or decision necessarily involve a basic governmental policy, program or objective? (2) Is the questioned act, omission, or decision essential to the realization or accomplishment of that policy, program, or objective as opposed to one which would not change the course or direction of the policy, program, or objective? (3) Does the act, omission, or decision require the exercise of basic policy evaluation, judgment, and expertise on the part of the governmental agency involved? (4) Does the governmental agency involved possess the requisite constitutional, statutory, or lawful authority and duty to do or make the challenged act, omission, or decision?

**A188**

(1) Nguyen's statements to Plaintiff that Cavanaugh was "being nice", acting as a "father figure", that he was trying to make sure she had everything she needed, and that his behavior was "normal" did not involve a basic governmental policy, program or objective. Similarly, meeting with Ms. Wadsworth after being instructed not to, encouraging her to apologize to her harasser's family, advising her to sign an affidavit in support of her harasser, and telling her that her harasser's family had a right to be upset with her clearly did not involve a basic governmental policy, program or objective; (2) Nguyen's statements were not essential to realization of any policy, program, or objective; (3) Nguyen's statements did not require the exercise of basic policy evaluation, judgment, and expertise; and (4) Nguyen did not possess the requisite constitutional, statutory, or lawful authority and duty to do or make the statements to Plaintiff.

*Id.* at 51. Ms. Wadsworth asserts further that "even if this Court were to find that some of Mr. Nguyen's actions were protected by discretionary function immunity, he would not be afforded immunity for his intentional acts after the allegations came to light as he was specifically instructed not to meet with Ms. Wadsworth." *Id.* Ms. Wadsworth concludes that because Mr. Nguyen's "actions were outside the scope of his job duties . . . he is not entitled to immunity under the MTCA." *Id.* at 52.

### C.    Chuck Nguyen's Reply

In reply, Mr. Nguyen argues that the Court should disregard a number of Ms. Wadsworth's assertions as unsupported by fact or law. *Def.'s Reply* at 1-5. He contends that "Ms. Wadsworth's response is replete with instances in which facts are introduced that do not appear in her statement of additional facts" or "are not supported by the record references." *Id.* at 1-2. Furthermore, Mr. Nguyen asserts that "[t]he Court should reject arguments Ms. Wadsworth made in her opposition

---

*Darling v. Augusta Mental Health Inst.,* 535 A.2d 421, 426 (Me. 1987) (quoting *Trianon Park Condo. Ass'n v. City of Hialeah,* 468 So. 2d 912, 918 (Fla. 1985)).

**A189**

that are unsupported by any legal authority." *Id.* at 4.  He also claims that, through her perceived failure to respond, Ms. Wadsworth has waived any objection she might have to his MSHA noncompliance defense and his argument that she has not established a protected constitutional interest.  *Id.* at 2-3.

Mr. Nguyen also submits that Ms. Wadsworth has not effectively rebutted his MTCA notice defense and that the Court should disregard her "attempts to ground her claims on Mr. Nguyen's alleged conduct after investigations began into Mr. Cavanaugh." *Id.* at 5.  Finally, Mr. Nguyen contends that "Ms. Wadsworth's objection to Mr. Nguyen's assertion of discretionary function immunity under the MTCA is misguided" because she is speculating as to his motives, she has not identified an instance where he "clearly exceeded" his discretion, and "refusal to recognize immunity for officials with such responsibilities [as Mr. Nguyen's] would seriously compromise the independence of action necessary for the effective discharge of their duties." *Id.* at 6-8 (internal quotations and emphasis omitted).

## IV.  LEGAL STANDARD

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  "Genuine issues of fact are those that a factfinder could resolve in favor of the nonmovant, while material facts are those whose 'existence or nonexistence has the potential to change the outcome of the suit.'" *Green Mountain Realty Corp. v. Leonard*, 750 F.3d 30, 38 (1st Cir. 2014) (quoting *Tropigas de P.R., Inc. v. Certain Underwriters at Lloyd's of London*, 637 F.3d 53, 56 (1st Cir. 2011)).

When the movant "has made a preliminary showing that there is no genuine issue of material fact, the nonmovant must 'produce specific facts, in suitable evidentiary form, to . . . establish the presence of a trialworthy issue.'" *McCarthy v. City of Newburyport*, 252 F. App'x 328, 332 (1st Cir. 2007) (alteration in original) (quoting *Triangle Trading Co. v. Robroy Indus., Inc.*, 200 F.3d 1, 2 (1st Cir. 1999)). The nonmoving party must provide "'enough competent evidence' to enable a factfinder to decide in its favor on the disputed claims." *Carroll v. Xerox Corp.*, 294 F.3d 231, 237 (1st Cir. 2002) (quoting *Goldman v. First Nat'l Bank of Bos.*, 985 F.2d 1113, 1116 (1st Cir. 1993)). Then, a "court views the facts and draws all reasonable inferences in favor of the nonmoving party," *Ophthalmic Surgeons, Ltd. v. Paychex, Inc.*, 632 F.3d 31, 35 (1st Cir. 2011), but disregards "[c]onclusory allegations, improbable inferences, acrimonious invective, or rank speculation." *Mancini v. City of Providence ex rel. Lombardi*, 909 F.3d 32, 38 (1st Cir. 2018) (quoting *Ahern v. Shinseki*, 629 F.3d 49, 54 (1st Cir. 2010)). "[T]he plain language of Rule 56(c) mandates entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## V.   DISCUSSION

### A.   MHSA Noncompliance Defense

The Court begins with Mr. Nguyen's MHSA defense, which he argues strips this Court of jurisdiction over all Ms. Wadsworth's claims. *Def.'s Mot.* at 1.  The Court

does not find this to be a close call: the MHSA offers Mr. Nguyen no protection from Ms. Wadsworth's claims, which do not sound in medical malpractice.

The MHSA imposes certain prelitigation requirements for suits based on an "action for professional negligence," defined as "any action for damages for injury or death against any health care provider, its agents or employees, or health care practitioner, his agents or employees, whether based upon tort or breach of contract or otherwise, arising out of the provision or failure to provide health care services." 24 M.R.S. § 2502(6).  Maine law also defines "social work" as "engaging in psychosocial evaluation and intervention, including therapy, to the extent permitted by the licensure provisions of this chapter, to effect a change in the feelings, attitudes and behavior of a client, whether an individual, group or community . . .." 32 M.R.S. § 7001-A(11).  Mr. Nguyen's claim is straightforward: as a licensed social worker he "qualifies as a health care practitioner under the MHSA" and because Ms. Wadsworth's claims "are premised on his position as a social worker and appear to allege either the failure to provide care or the provision of inappropriate care," they are subject to the MHSA and its prelitigation requirements. *Def.'s Mot.* at 3-4.  This theory does not hold water.

First, Mr. Nguyen contends that all Ms. Wadsworth's claims, including her § 1983 claim, are subject to the MHSA.  *Id.* at 4 ("Ms. Wadsworth's claims—whether sounding in civil rights, intentional tort, negligence, or malpractice—are subject to the requirements of the MHSA").  The law is well established, however, that "[t]he MHSA's procedural requirements do not apply to suits for constitutional violations

54

**A192**

brought under 42 U.S.C. § 1983, even where the suit in question proceeds against a health care provider and involves the provision of health care services." *Stewart v. Mason*, No. 1:21-cv-00321-LEW, 2022 U.S. Dist. LEXIS 100151, at *6 n.1 (D. Me. June 6, 2022); *see also Ferris v. Cty. of Kennebec*, 44 F. Supp. 2d 62, 66 (D. Me. 1999) (dismissing state law negligence claim, but not § 1983 claim, for failure to comply with MHSA). Even if Mr. Nguyen were correct that Ms. Wadsworth's claims fell with the MHSA's subject matter, her § 1983 claims would not be subject to its prelitigation requirements.

Second, the more fundamental problem with Mr. Nguyen's theory is that, viewed in the light most favorable to Ms. Wadsworth, her claims do not fall under the ambit of the MHSA. In the 1970s, the Maine Legislature was faced with "an alleged national crisis in the availability and cost of medical malpractice insurance" and, in response, enacted the MHSA as "comprehensive tort reform within the health care industry designed to stem rising malpractice insurance costs and ensure the continued availability of malpractice insurance to Maine health care providers and practitioners." *Butler v. Killoran*, 1998 ME 147, ¶ 9, 714 A.2d 129. While worded broadly, "the statutory definition of 'an action for professional negligence' contains several clear and distinct elements" including "that the claim must 'aris[e] out of the provision or failure to provide health care services.'"[96] *Salerno v. Spectrum Med. Grp.,*

---

[96]     During oral argument, Mr. Nguyen pointed to *Saunders v. Tisher*, 2006 ME 94, 902 A.2d 830, a case cited in his motion. *Def.'s Mot.* at 3. In *Saunders*, the Maine Supreme Judicial Court wrote that the MHSA provisions are broad and apply to "*all* actions for professional negligence against a health care provider or practitioner." *Id.* ¶ 12 (emphasis in original). But the Law Court also emphasized that to fit within the MHSA, the practitioner's actions must "*aris[e] out of the provision or failure to provide health care services.*" *Id.* (emphasis in original). Thus, the citation begs the question before the Court.

**A193**

*P.A.*, 2019 ME 139, ¶ 18, 215 A.3d 804, 811 (quoting 24 M.R.S. § 2502(6)). In *Salerno*, for example, the Law Court held that a woman's claim for injuries she suffered at a healthcare provider's facility after receiving treatment was not subject to the MHSA because she sustained her injuries slipping in the shower, "a circumstance unrelated to the provision of health care." *Id.* at ¶ 18. The statute and precedent are both clear that the MHSA only applies to claims "arising out of the provision or failure to provide health care services." 24 M.R.S. § 2502(6). Mr. Nguyen contends that Ms. Wadsworth's claims fit this definition because they "are premised on his position as a social worker and appear to allege either the failure to provide care or the provision of inappropriate care." *Def.'s Mot.* at 3-4. Based on the record, the Court is unconvinced.

The Court accepts for the sake of argument Mr. Nguyen's assertion that as a licensed social worker he could qualify as a "health care practitioner" under the MHSA and would thus be protected for any actions "arising out of the provision or failure to provide health care services." 24 M.R.S. § 2502(6). Even so, the record

---

In *Saunders*, a former patient sued Dr. Tisher, a psychiatrist, for signing a document involuntarily committing him on an emergency basis to Acadia Hospital, a psychiatric hospital. *Id.* ¶ 10. The Law Court easily concluded that "the actions of a psychiatrist in determining whether a person should be involuntarily committed . . . constitute the treatment of the mentally ill, and therefore, the provision of health care services." *Id.* ¶ 14. The facts in *Saunders* are distinct from the facts, viewed in the light most favorable to Ms. Wadsworth, concerning her encounters with Mr. Nguyen.

In his motion, Mr. Nguyen also argued that "[t]he Law Court has therefore held that civil rights claims and IIED claims are subject to the MHSA if they arise out of the provision or failure to provide health care services." *Def.'s Mot.* at 3 (citing *Saunders*, 2006 ME 94, ¶¶ 5 & 15). However, the Maine Supreme Judicial Court did not address claims under 42 U.S.C. § 1983 because Mr. Saunders did not pursue his § 1983 action on appeal. *Saunders*, 2006 ME 94, ¶ 5 n.1 ("At oral argument, Saunders indicated that he is not asserting any State action in connection with his claims and, thus, no longer pursues any claim for violation of 42 U.S.C. § 1983"). Here, Ms. Wadsworth is not pursuing a claim under the Maine Human Rights Act so *Saunders* does not stand for the proposition that her civil rights claim under § 1983 is subject to the MHSA.

reflects that a vast majority—if not the entirety—of Ms. Wadsworth's claims involve Mr. Nguyen's actions or inactions "unrelated to the provision of healthcare." *Salerno*, 2019 ME 139, ¶ 18, 215 A.3d at 811.

For this analysis, Ms. Wadsworth's allegations against Mr. Nguyen can be sorted into two buckets: Mr. Nguyen's behavior in private meetings with Ms. Wadsworth; and the rest of the allegations. The former category comes closer to conduct contemplated by the MHSA, in this case a licensed social worker privately giving a student advice in what could be characterized as a therapy or quasi-therapy setting. *See, e.g.*, PSAMF ¶ 40; DRPSAMF ¶ 41 (Ms. Wadsworth went to Mr. Nguyen's office and advised him that Mr. Cavanaugh called her "cupcake" when they texted each other). However, even for these private meetings, there exist—at the very least—disputed issues of material fact as to whether Mr. Nguyen was "provid[ing] health care services." 24 M.R.S. § 2502(6). The record is silent as to whether these were impromptu meetings or appointments, or whether Mr. Nguyen employed recognized medical techniques, took clinical notes, made diagnoses, or had similar meetings with other students. It does not appear that these meetings were private. *See* PSAMF ¶ 41; DRPSAMF ¶ 41 (Ms. Philbrook came into the office during that meeting with Mr. Nguyen while Ms. Wadsworth was reporting her feelings, sat down, did not say anything, and then—after an undetermined amount of time—said "I'll leave you guys to it" and left Mr. Nguyen's office). Thus, even if some services school social workers offer could constitute "provid[ing] healthcare services", the record here is far from clear as to whether these were anything more than informal

**A195**

conversations and, to the extent there is a factual dispute, the Court is required to view those facts in the light most favorable to Ms. Wadsworth.

The remainder of Ms. Wadsworth's allegations against Mr. Nguyen—a sizeable majority—involve conduct that could not reasonably be characterized as the provision of (or failure to provide) a healthcare service. Examples include telling Ms. Kenniston the issue of Mr. Cavanaugh trying to get Ms. Wadsworth birth control had been addressed and not reporting the birth control issue, his knowledge of the cupcake comments, the texting, Mr. Cavanaugh's desire for Ms. Wadsworth to move in with him, or her expressing that she was embarrassed by his behavior. Perhaps most egregious—or at least the farthest afield from healthcare—is Mr. Nguyen's conduct during and after the investigation, including telling Ms. Wadsworth that Mr. Cavanaugh's family had a right to be angry at her and that she should apologize to them, downplay or recant the harassment, and sign an affidavit supporting Mr. Cavanaugh. The list is not exhaustive, but it is overwhelming. During these encounters, viewing contested facts in the light most favorable to Ms. Wadsworth, Mr. Nguyen was acting as Mr. Cavanaugh's colleague or supporter, not Ms. Wadsworth's counselor. Even Mr. Nguyen's conduct during his meetings with Ms. Wadsworth at school presents unresolved factual issues as to whether he was providing healthcare, leaving genuine issues of material fact to be resolved by a jury.

In sum, viewed in the light most favorable to her, Ms. Wadsworth's claims against Mr. Nguyen do not sound in malpractice, nor do they arise from the provision or failure to provide healthcare services. For summary judgment purposes, her

**A196**

claims are thus not subject to the MHSA's prelitigation requirements and are not waived by failing to abide by those requirements.

### B.    Section 1983 Claim

Section 1983 provides that:

> [e]very person who, under color of [law], subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . ..

42 U.S.C. § 1983.  Section 1983 "is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred."  *Graham v. Connor*, 490 U.S. 386, 389-94 (1989).  The § 1983 cause of action has two elements.  First, a plaintiff must show deprivation of a federally protected right, privilege, or immunity and a causal connection between the conduct complained of and the deprivation.  *See Gutierrez-Rodriguez v. Cartagena*, 882 F.2d 553, 559 (1st Cir. 1989).  Second, a plaintiff must establish that "the perpetrator of the violation was acting under color of law."  *Cruz-Erazo v. Rivera-Montañez*, 212 F.3d 617, 621 (1st Cir. 2000).

### 1.    Deprivation of a Federally Protected Right

Ms. Wadsworth identifies a federal right: the right to be free from intrusions into her bodily integrity.  *Pl.'s Opp'n* at 35; *see Doe v. Sch. Admin. Dist. No. 19*, 66 F. Supp. 2d 57, 65 (D. Me. 1999) ("It is well recognized that students have a fundamental right to bodily integrity that includes the right to be free from sexual abuse").  She also asserts a deprivation of that right: Mr. Cavanaugh's "repeated, demanding sexual harassment . . .."  *Order on Mot. to Dismiss* at 26; *Pl.'s Opp'n* at 35-36.  Mr.

Nguyen disagrees, acknowledging a fundamental right to bodily integrity but submitting that "it appears that right applies only to *physical* intrusions upon a person's body." *Def.'s Mot.* at 5-6 (collecting cases) (emphasis in *Def.'s Mot.*). Because Ms. Wadsworth does not allege that Mr. Cavanaugh physically abused her, Mr. Nguyen contends that "since verbal abuse is normally not a constitutional violation, Mr. Cavanaugh's comments, text messages, and overtures that did not involve physical contact . . . are not actionable" and thus, absent an underlying constitutional violation, Mr. Nguyen cannot be held liable under § 1983 for any role facilitating Mr. Cavanaugh's harassment. *Id.* at 5.

The Court addresses Mr. Cavanaugh's conduct in a separately issued order on his motion for summary judgment; however, focusing on Mr. Nguyen's actions in facilitating Mr. Cavanaugh's harassment of Ms. Wadsworth, Mr. Nguyen is a step removed from Mr. Cavanaugh, and the record supports the conclusion that he was actually aware of only some of Mr. Cavanaugh's harassment.

To set out a substantive due process claim, a plaintiff challenging specific acts of state officials must "show *both* that the acts were so egregious as to shock the conscience *and* that they deprived him of a protected interest in life, liberty, or property." *Pagan v. Calderon*, 448 F.3d 16, 32 (1st Cir. 2006) (emphasis in *Pagan*); *see also Rivera*, 402 F.3d at 33–34 (1st Cir. 2005) ("In order to establish a substantive due process claim, the plaintiff must first show a deprivation of a protected interest in life, liberty, or property.  It is not enough to claim the governmental action shocked the conscience" because "[t]he implication of a fundamental right is a threshold

requirement for establishing a due process violation") (citations omitted). While "the cases in which [the First Circuit has] found governmental conduct to shock the conscience have often involved state action that was highly physically intrusive," it has "pointedly left open the possibility that verbal or other less physical harassment . . . might rise to a conscience-shocking level." *Cruz-Erazo*, 212 F.3d at 622.

"It is well recognized that students have a fundamental right to bodily integrity that includes the right to be free from sexual abuse." *Doe,* 66 F. Supp. 2d at 65. As Mr. Nguyen observes, however, cases of sexual harassment amounting to a constitutional deprivation have uniformly involved at least some form of physical sexual contact. *See Def.'s Mot.* at 5-6 (collecting cases). Ms. Wadsworth responds only that the Fourteenth Amendment right to bodily integrity "protects a student's right to be free from sexual abuse <u>and harassment</u> by teachers at a public school." *Pl.'s Mot.* at 35 (citing *B.W. v. Career Technology Center of Lackawanna County*, 422 F. Supp. 3d 859, 888-89 (M.D. Pa. 2019) and *Doe v. Boyertown Area Sch. Dist.*, 10 F. Supp. 3d 637, 650 (E.D. Pa. 2014) (emphasis in *Pl.'s Mot.*)). But, unlike Ms. Wadsworth, the plaintiffs in those cases alleged physical abuse. *See B.W.,* 422 F. Supp. 3d at 872-873 (students were "sexually assaulted and abused by a teacher" who "constantly engaged in inappropriate and unwanted physical contact with his students"); *Boyertown,* 10 F. Supp. 3d 637, 650 (E.D. Pa. 2014) (plaintiff's allegation of having suffered a sexual assault is sufficient to constitute a violation of her Fourteenth Amendment rights).

The Court has not identified any authority supporting the proposition that non-physical harassment alone can violate the right to bodily integrity or shock the conscience.[97]  Neither party disputes that under First Circuit caselaw physical sexual abuse will generally violate the right to bodily integrity in a manner that shocks the conscience.  *See, e.g., Doe,* 66 F. Supp. 2d at 65.  First Circuit caselaw examining non-physical harassment, however, has primarily focused on verbal abuse or other misconduct by police or prosecutors that was manipulative or threatening and found the conduct was not conscience shocking.  *See Cruz-Erazo,* 212 F.3d at 622-23 (discussing cases); *Spencer v. Doran,* No. 18-CV-1191-LM, 2020 LEXIS 150728, at *18-19 (D.N.H. Aug. 20, 2020) (same).

Out-of-circuit caselaw focusing on non-physical abuse in a school setting has generally considered inappropriate and extraordinarily cruel verbal abuse by teachers that did not shock the conscience or deprive the student of a protected constitutional right.  *See, e.g., Abeyta By & Through Martinez v. Chama Valley Ind. Sch. Dist., No. 19,* 77 F.3d 1253, 1255–57 (10th Cir. 1996) (teacher repeatedly calling sixth-grade student a "prostitute" in front of her class did not rise to a substantive due process violation and the Court noted that "[w]e have found no case in a school context that held conduct falling shy of sexual molestation or assault constitutes constitutionally actionable sexual harassment"); *Doe v. Gooden,* 214 F.3d 952, 955

---

[97]     During oral argument, the Court challenged Ms. Wadsworth's counsel to cite one case where a court has found that a § 1983 action based on sexual harassment was viable if there was no allegation of physical contact.  Consistent with the Court's research and the parties' submissions, Ms. Wadsworth's attorney was unable to cite one case as authority for the proposition that a § 1983 sexual harassment claim may proceed without some physical contact.

(8th Cir. 2000) (dismissing verbal-abuse substantive due process claim against elementary school teacher "accused of yelling and screaming at students, using foul language, . . . calling students 'stupid,' and referring to students as 'bimbos,' 'fatso,' and 'welfare bunch'"); *Costello v. Mitchell Pub. Sch. Dist. 79*, 266 F.3d 916, 921 (8th Cir. 2001) (teacher calling student "retarded," "stupid," and "dumb," in front of her classmates on a daily basis did not amount to a constitutional violation).

As the Court discusses in its Cavanaugh order, Mr. Cavanaugh's pattern of sexual harassment of Ms. Wadsworth does not line up neatly with any of the cases from the First Circuit or elsewhere, and if Ms. Wadsworth's § 1983 claim against Mr. Cavanaugh faces a jurisprudential roadblock, her facilitating claim against Mr. Nguyen is even more attenuated.

The second prong of Ms. Wadsworth's § 1983 claim is Mr. Nguyen's interference with the school and police investigations of Mr. Cavanaugh. Here, the record reveals some unusually ill-considered actions by Mr. Nguyen: (1) sympathizing with Mr. Cavanaugh, (2) blaming the victim (Ms. Wadsworth was "bringing it on herself"), (3) repeatedly acting in defiance of a direct order from the superintendent not to contact either Mr. Cavanaugh or Ms. Wadsworth, (4) vouching for Mr. Cavanaugh's character to Ms. Wadsworth, (5) urging her to sign an affidavit drafted by Mr. Cavanaugh's attorney, (6) justifying the Cavanaugh family's anger at Ms. Wadsworth, (7) telling Ms. Wadsworth that she should apologize to Mr. Cavanaugh's wife and niece, (8) excusing Mr. Cavanaugh's actions to Ms. Wadsworth on the ground that Mr. Cavanaugh had a drinking problem and had lost sight of his boundaries, (9)

minimizing the impact of Mr. Cavanaugh's actions by hypothesizing a future friendly meeting over coffee between Mr. Cavanaugh and Ms. Wadsworth, (10) chasing a crying Ms. Wadsworth down the high school corridors, and (11) strongly implying to the police that Ms. Wadsworth was making false allegations against an innocent teacher.   None of these allegations, if proven, speaks well for Mr. Nguyen, but in the Court's view, they do not come close to the shock the conscience standard for a viable § 1983 claim.

### 2.   State-Created Danger

The Fourteenth Amendment's Due Process Clause provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law . . .." U.S. CONST. amend. XIV, § 1.  As a general matter, "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *Irish*, 979 F.3d at 73 (quoting *DeShaney*, 489 U.S. at 197).  This principle is not absolute: "[I]n situations in which there is a 'special relationship,' an affirmative, constitutional duty to protect may arise when the state 'so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs.'" *Rivera*, 402 F.3d at 34 (quoting *DeShaney*, 489 U.S. at 200).  "The Supreme Court also suggested, but never expressly recognized, the possibility that when the state creates the danger to an individual, an affirmative duty to protect might arise . . .." *Id.* at 34-35.

In *Irish v. Fowler*, the First Circuit set forth the elements of a state-created danger claim:

In order to make out a state-created danger claim in the First Circuit, the plaintiff must establish:

> (1) that a state actor or state actors affirmatively acted to create or enhance a danger to the plaintiff;
>
> (2) that the act or acts created or enhanced a danger specific to the plaintiff and distinct from the danger to the general public;
>
> (3) that the act or acts caused the plaintiff's harm; and
>
> (4) that the state actor's conduct, when viewed in total, shocks the conscience.
>
>> (i) Where officials have the opportunity to make unhurried judgments, deliberate indifference may shock the conscience, particularly where the state official performs multiple acts of indifference to a rising risk of acute and severe danger. To show deliberate indifference, the plaintiff must, at a bare minimum, demonstrate that the defendant actually knew of a substantial risk of serious harm and disregarded that risk.
>
>> (ii) Where state actors must act in a matter of seconds or minutes, a higher level of culpability is required.

979 F.3d at 75. In short, to fit within the state-created danger doctrine in the First Circuit, the plaintiff must show an affirmative act on the part of a government employee that creates or increases the danger to the plaintiff and that shocks the conscience of the Court.

### a.   Affirmative Act

The first prong, an affirmative act, is not highly developed in the First Circuit. *See id.* (the requirement is that a state actor "affirmatively acted to create or enhance a danger to the plaintiff"). In *Irish*, after "actions and inactions by the defendant officers," Anthony Lord murdered Brittany Irish's boyfriend, shot her mother, and

then kidnapped and raped her. *Id.* at 67. Ms. Irish alleged that "Lord's rampage was triggered by a voicemail left on Lord's cellphone by defendant . . . officers investigating Irish's criminal complaint that Lord had abducted, threatened, and raped her two days earlier." *Id.* at 67-68. The *Irish* Court held that Ms. Irish had plausibly established affirmative acts that created and/or enhanced a danger to her and shocked the conscience where a reasonable jury could conclude that the defendants "even in the face of Irish's expressed fear that Lord would react violently, contacted him in a manner that a reasonable jury could find notified him that Irish had reported him to the police" and then withdrew police protection without telling her, "thereby allowing the plaintiffs to believe more protection was available than was actually true." *Id.* at 79.

While the First Circuit has not expressly stated whether inaction alone can constitute an affirmative act, other circuits that have adopted the state-created danger theory require either an affirmative act or "a degree and pattern of inaction that rises to the level of an affirmative act." *Irish v. Fowler*, 436 F. Supp. 3d 362, 417 (2020) (collecting cases). The Court is unaware of a First Circuit case that adopts the rule that a pattern of inaction alone can rise to the level of an affirmative act in this context or examines the type of conduct that would qualify as a "pattern." *See Welch v. City of Biddeford Police Dep't*, 12 F.4th 70, 75-75 (1st Cir. 2021) (affirming that defendant officer "took no affirmative act that enhanced the danger to the plaintiffs" in failing to investigate or protect them and that "[t]he plaintiffs also do not explain how any of [the officer's] actions, on their own, could give rise to a state-created

66

**A204**

danger claim [because o]fficers are not liable under § 1983 for the actions of other officers."). The Second Circuit has held that "repeated, sustained inaction by government officials, in the face of potential acts of violence," might "ris[e] to the level of an affirmative condoning of private violence, even if there is no explicit approval or encouragement." *Okin v. Village of Cornwall-on-Hudson Police Dep't*, 577 F.3d 415, 428 (2d Cir. 2009) (quoting *Pena v. DePrisco*, 432 F.3d 98, 111 (2d Cir. 2005)).

The Court's analysis of this prong is largely unchanged from the motion to dismiss stage. The Court, assuming that the First Circuit would recognize the state-created danger theory, found then that Ms. Wadsworth presented two bases for a state-created danger claim against Mr. Nguyen—Mr. Nguyen's "failure to report" Mr. Cavanaugh's sexual harassment and his "perpetual and frequent normalization" of such behavior—and that, when viewed in combination, Ms. Wadsworth had alleged sufficient facts to survive the motion to dismiss. *Mot. to Dismiss* at 34. The Court concluded that Mr. Nguyen's failure to report the harassment for over a year "may be enough to show a pattern of inaction that rises to the level of an affirmative act," *id.* at 35 (citing *Fowler*, 436 F. Supp. 3d at 417), but also that "if this case were only about a failure to act, however, the Court would be constrained by *Hasenfus* and *Abdisamad [v. City of Lewiston*, 960 F.3d 56 (1st Cir. 2020)], which counsel against holding a school official liable for a failure to act except in the most immediate and egregious circumstances." *Id.*

Instead, the Court found that Mr. Nguyen's normalization of Mr. Cavanaugh's sexual harassment provided "a clearer argument for an affirmative act by Mr.

Nguyen" because "Ms. Wadsworth has sufficiently alleged that Mr. Nguyen's active choice to make comments that diminished the seriousness of Mr. Cavanaugh's inappropriate behavior encouraged her not to report Mr. Cavanaugh to someone else and to continue her relationship with him . . . and thus exposed her to additional improper conduct over the course of a year." *Id.*; *see also Doe*, 2020 WL 2820197, at *3 (finding that the allegations supported a claim under a state-created danger theory "particularly where the Defendants' actions—permitting [the teacher] unsupervised access to the Plaintiff after the March investigation—may have exposed Doe to additional abuse"). Based on the allegations in Ms. Wadsworth's Amended Complaint, Mr. Nguyen's affirmative and omissive actions, viewed together, "plausibly increased Mr. Cavanaugh's access to Ms. Wadsworth to continue sexually harassing her for over a year by preventing an investigation and encouraging her to keep making herself available to him." *Id.* at 36.

Now armed with an expanded record and further briefing from the parties, the Court's analysis of this prong is essentially the same—particularly its focus on Mr. Nguyen's normalization of Mr. Cavanaugh's behavior as the basis for an "affirmative act." All Mr. Nguyen's conduct alleged by Ms. Wadsworth that the Court characterized as normalizing or perpetuating Mr. Cavanaugh's harassment is supported by the record. On multiple occasions, Ms. Wadsworth came to Mr. Nguyen to express that she was embarrassed or otherwise concerned about Mr. Cavanaugh's behavior (for example, giving her feminine hygiene products or encouraging her to get on birth control) and wondered whether it was appropriate or normal. Each time

68

**A206**

Mr. Nguyen, an adult she trusted, assured her that Mr. Cavanaugh was like a "father figure" who thought of her as a daughter and was just looking out for her. These reassurances allayed Ms. Wadsworth's fears and normalized Mr. Cavanaugh's inappropriate behavior in her eyes, and a jury could reasonably conclude that they "plausibly increased Mr. Cavanaugh's access to Ms. Wadsworth to continue sexually harassing her." *Order on Mot. to Dismiss* at 36.

Additionally, the summary judgment record also provides new instances of Mr. Nguyen's affirmative conduct that plausibly enabled the harassment and exacerbated Ms. Wadsworth's injuries. Theresa Kenniston is not mentioned in the Amended Complaint and thus was not considered by the Court in its Order on Mr. Nguyen's motion to dismiss. In the summary judgment record, however, Ms. Kenniston emerges as apparently the first third party to express concern about Mr. Cavanaugh's behavior and ultimately the person to end the harassment by reporting him to law enforcement. When she discovered that Mr. Cavanaugh was attempting to set up and drive Ms. Wadsworth to a birth control appointment, Ms. Kenniston was "disturbed" and called Mr. Nguyen to express her concern about a behavior she viewed to be inappropriate. *See Kenniston Dep.* at 49-1:50-4 (recounting calling Mr. Nguyen to discuss "the birth control issue because [she] was very disturbed about that"). Mr. Nguyen's response was to assure Ms. Kenniston the issue had been addressed and then initiate the conversation with Ms. Wadsworth where he described Mr. Cavanaugh as a father figure. Mr. Nguyen's assurances appear to have allayed Ms. Kenniston's concerns about the relationship and she did not report Mr.

Cavanaugh to law enforcement until the following school year.   A reasonable factfinder could conclude that Mr. Nguyen's seemingly empty assurances prolonged the harassment by delaying Ms. Kenniston's report.

The record also includes new details about Mr. Nguyen's affirmative conduct during and after the investigation, including encouraging Ms. Wadsworth to apologize to Mr. Cavanaugh's family—who, he explained, had a right to be upset with Ms. Wadsworth—and sign an affidavit supporting him.   *See, e.g.*, PSAMF ¶ 140; DRPSAMF ¶ 140 (Mr. Nguyen told Ms. Wadsworth that Mr. Cavanaugh did not do anything inappropriate or have any inappropriate conversations with her; going on to say Mr. Cavanaugh was a "stand-up guy," and that "it's not what they are making it out to be").   While this conduct did not directly enable additional harassment by Mr. Cavanaugh, a reasonable juror could find that it contributed to Ms. Wadsworth's injuries by gaslighting her and making her feel that the harassment was her fault or was not harassment at all, and she was ruining Mr. Cavanaugh's life over nothing.

Mr. Nguyen responds that his actions do not qualify as the type of affirmative acts required to sustain Ms. Wadsworth's state-created danger theory.   His argument relies on *Rivera* and other out-of-circuit cases holding that assurances by law enforcement that they would protect a person do not qualify as "affirmative acts," even if those assurances ultimately prove hollow and render the person vulnerable to harm.   *Def.'s Mot.* at 8-12 (collecting cases).   Mr. Nguyen concludes that "circuit courts of appeal have held that failure to protect or ensure the safety of a plaintiff—even

when a state actor has affirmatively promised such protection and safety—is insufficient to create a constitutional duty to protect." *Id.* at 7-8.

While that may be a fair summary of the caselaw, the Court does not find it fits these facts.  The Court does not view Mr. Nguyen's behavior to be "affirmatively promis[ing] such protection and safety" as in the cases he has cited.  Those cases are more akin to a situation where if, when Ms. Wadsworth came to him with concerns about Mr. Cavanaugh's behavior, Mr. Nguyen instead responded that the behavior was inappropriate and sexually harassing and that he would ensure that Mr. Cavanaugh stopped perpetrating them—but then ultimately failed to stop Mr. Cavanaugh.  That situation would have been more analogous to *Rivera's* holding that such promises may not be constitutionally binding.

That is not, however, the situation before the Court.  Instead of offering assurances to protect Ms. Wadsworth from harm, Mr. Nguyen assured her—from a position of trust and authority—that her harm was no harm at all, and Ms. Wadsworth relied on those assurances to continue subjecting herself to the sexual harassment for another year.  In *Doe ex rel. B.G. v. Bos. v. Bos. Pub. Schs.*, No. 17-cv-11653-ADB, 2019 U.S. Dist. LEXIS 32705 (D. Mass. Mar. 1, 2019), the district court held that the plaintiff's state-created danger theory survived summary judgment, reasoning that "because school staff knew that [the perpetrator] committed sexual assaults on fellow school children before he harmed [other students] and [the principal] discouraged them from filing [sexual harassment reports] in connection with those incidents, the [later] assaults . . . were a foreseeable and direct result of

[the principal's] actions." *Id.* at *13-14. The Court finds Mr. Nguyen's actions in assuaging Ms. Wadsworth and Ms. Kenniston about Mr. Cavanaugh's behavior more analogous to the suppression of reporting in *B.G.* than the false promise of protection in *Rivera*. A reasonable juror could conclude that by normalizing Mr. Cavanaugh's behavior Mr. Nguyen "plausibly increased Mr. Cavanaugh's access to Ms. Wadsworth to continue sexually harassing her," *Order on Mot. to Dismiss* at 36, and she has successfully established the affirmative action prong of her state-created danger theory.

### b.    Conduct that Shocks the Conscience

Ms. Wadsworth's constitutional claim must fail because it cannot clear the high bar of establishing that Mr. Nguyen's behavior "shocked the conscience." To establish a due process violation a plaintiff must normally "allege facts 'so extreme and egregious as to shock the contemporary conscience.'" *Abdisamad*, 960 F.3d at 59-60 (quoting *DePoutot v. Raffaelly*, 424 F.3d 112, 118 (1st Cir. 2005)). The First Circuit provides that "[w]here officials have the opportunity to make unhurried judgments, deliberate indifference may shock the conscience, particularly where the state official performs multiple acts of indifference to a rising risk of acute and severe danger" and "[t]o show deliberate indifference, the plaintiff must, at a bare minimum, demonstrate that the defendant actually knew of a substantial risk of serious harm and disregarded that risk." *Irish*, 979 F.3d at 75.

At the motion to dismiss stage, the Court applied the deliberate indifference standard, and concluded that, based on the allegations alone, there was a basis for

finding that Mr. Nguyen's behavior was deliberately indifferent. *Order on Mot. to Dismiss* at 36. The Court noted, however, that it did "not know what exactly Mr. Nguyen knew of Mr. Cavanaugh's harassment, the circumstances of Ms. Wadsworth's reports to Mr. Nguyen, [and] why her reports did not trigger a more serious response from Mr. Nguyen," and that "discovery may reveal there is less than meets the eye in this situation and that Mr. Nguyen simply misjudged it." *Id.* at 37-38.

That is essentially what the Court concludes now: that Mr. Nguyen exhibited extremely poor judgment in his assessment of and response to the situation, but that this record would not allow a reasonable juror to conclude that he had the requisite knowledge for his behavior to shock the conscience. To show deliberate indifference, the plaintiff "must, at a bare minimum, demonstrate that [the defendant] actually knew of a substantial risk of serious harm . . . and disregarded that risk." *Irish*, 979 F.3d at 74 (quoting *Coyne v. Cronin*, 386 F.3d 280, 288 (1st Cir. 2004)). The First Circuit has held that, in the foster care context, "state officials must have been at least aware of known or likely injuries or abuse and have chosen to ignore the danger to the child." *J.R. v. Gloria*, 593 F.3d 73, 80-81 (1st Cir. 2010) (concluding that, even where workers' failure to conduct background checks may have violated state law, "there is no evidence that defendants made a reasoned decision to deliberately ignore the risk of harm").

Mr. Nguyen knew that Mr. Cavanaugh called Ms. Wadsworth cupcake, had told her she could take any boy she wanted to prom, had given her money and gifts that included hygiene products, had taken her to a physical and encouraged her to

get on birth control, and had invited her to move in with him and his wife. He knew that Ms. Wadsworth was embarrassed by the cupcake nickname and on one occasion by the gift of feminine products and had questioned whether Mr. Cavanaugh advising her to get birth control was appropriate. But, aside from apparently being aware that Mr. Cavanaugh and Ms. Wadsworth had exchanged some text messages and that he called her cupcake, there is no allegation that Mr. Nguyen had knowledge of the frequency or sexually explicit content of the text messages—by far the most important piece for understanding the severity of the harassment. Even without the text messages, Mr. Cavanaugh's behavior should still have raised red flags, but there is far less evidence of imminent or ongoing "serious harm." There is no indication from Mr. Nguyen's behavior that he considered Ms. Wadsworth to face a "substantial risk of serious harm" from Mr. Cavanaugh. The record is clear that Mr. Nguyen misjudged the situation and—based on his inexplicable, continuing defense of Mr. Cavanaugh as "a stand-up guy"—may continue to misjudge it to this day and that this poor exercise of judgment contributed to Ms. Wadsworth's injuries. But there is also no evidence to suggest that Mr. Nguyen was "at least aware of known or likely injuries or abuse" to Ms. Wadsworth and "made a reasoned decision to deliberately ignore the risk of harm." *J.R.*, 593 F.3d at 80-81. For this reason, the Court must grant judgment in Mr. Nguyen's favor on Ms. Wadsworth's § 1983 claim.

### 3. Qualified Immunity

Even if the Court had found that Mr. Cavanaugh's conduct deprived Ms. Wadsworth of her constitutional right to bodily integrity and also that she had

established the disputed elements—affirmative act and conduct that shocks the conscience—of her state-created danger claim against Mr. Nguyen, Ms. Wadsworth's claim would still fail nonetheless because Mr. Nguyen would be entitled to qualified immunity on her § 1983 claim.

"[T]he qualified immunity inquiry is a two-part test. A court must decide: (1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right; and (2) if so, whether the right was 'clearly established' at the time of the defendant's alleged violation." *Maldonado v. Fontanes*, 568 F.3d 263, 268-69 (1st Cir. 2009) (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). "[T]he second, 'clearly established' step of the qualified immunity analysis . . ., in turn, has two aspects." *Id.* at 269. First, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right," *id.* (alteration in original) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)); second, the Court must ask "whether a reasonable defendant would have understood that his conduct violated the plaintiff['s] constitutional rights." *Id.* The Supreme Court has instructed that "this inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled on other grounds by Pearson*, 555 U.S. 223).

The Court finds the first part of the test to be insurmountable for Ms. Wadsworth. Even assuming the Court had held that Mr. Cavanaugh's conduct violated her right to bodily integrity in a manner that shocked the conscience, at the

75

**A213**

time the events of this case occurred, no court—at least that this Court or Ms. Wadsworth has been able to identify—had held that any form of non-physical sexual harassment alone was sufficient to sustain a substantive due process violation, much less harassment that resembled Mr. Cavanaugh's.  The "contours of that right"—at least as it pertains to non-physical harassment—could not be considered "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Maldonado*, 568 F.3d at 268-69.

Finally, even if the Court had also found the contours of the right to be well established and defeated Mr. Cavanaugh's qualified immunity, the claim against Mr. Nguyen would nonetheless again fail at second step of the qualified immunity analysis.  The Court focuses particularly on "whether a reasonable defendant would have understood that his conduct violated the plaintiff['s] constitutional rights." *Maldonado*, 568 F.3d at 268-69.

"[T]he salient question is whether the state of the law at the time of the alleged violation gave the defendant fair warning that his particular conduct was unconstitutional." *Id.* at 269 (citing *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)).  The question is whether Mr. Nguyen had fair notice that his particular conduct was unconstitutional, and the Court concludes that he did not.

As the Court explained in its shocks-the-conscience analysis, Mr. Cavanaugh's persistent and sexually explicit text messages were an order of magnitude more harassing and harmful than any of his other individual behaviors.  With the text messages removed from consideration, however, the other behaviors remain

76

**A214**

inappropriate and potentially harassing, but they are not nearly as egregious. Because Mr. Nguyen was not aware of the text messages, he did not possess all the pieces to the puzzle—indeed, he was missing the biggest and most important piece. He exhibited poor personal and professional judgment and a bizarrely unshakeable trust in Mr. Cavanaugh, but given his knowledge at the time a reasonable factfinder could not conclude that Mr. Nguyen—or a reasonable defendant in his position—had "fair warning" that telling Ms. Wadsworth not to worry and that Mr. Cavanaugh had her best interests in mind would "violate[] the plaintiff['s] constitutional rights." *Id.* at 268-69.

Even if Ms. Wadsworth had been able to establish all the required elements for her state-created danger theory, Mr. Nguyen would be entitled to qualified immunity on her § 1983 claim. Accordingly, the Court grants the motion for summary judgment in favor of Mr. Nguyen as to Ms. Wadsworth's § 1983 substantive due process claim.

## C.   State Law Tort Claims

Ms. Wadsworth has asserted three state law tort claims against Mr. Nguyen: intentional infliction of emotional distress (Count IV); negligent infliction of emotional distress (Count V); and negligence (Count VI). *Am. Compl.* ¶¶ 189-208. Mr. Nguyen contends that her tort claims are barred both by her purported failure to provide timely notice as required by the MTCA and by his absolute discretionary function immunity as a government employee. *Def.'s Mot.* at 21-25. Neither defense is availing, and the Court denies summary judgment on Ms. Wadsworth's tort claims.

### 1.   MTCA Notice Defense

The MTCA requires that a claimant against a governmental entity file a written notice of claim within 180 days after the cause of action accrues.  14 M.R.S. § 8107(1).   The general purpose of the notice requirement is to "enable the governmental entity to investigate and evaluate claims for purposes of defense or settlement."  *Pepperman v. Barrett*, 661 A.2d 1124, 1126 (Me. 1995).  Notice of claims "against any political subdivision or an employee thereof" must be addressed to "one of the persons upon whom a summons and complaint could be served under the Maine Rules of Civil Procedure, Rule 4."  14 M.R.S. § 8107(3).  This notice must include:

> A. The name and address of the claimant, and the name and address of the claimant's attorney or other representative, if any;
> B. A concise statement of the basis of the claim, including the date, time, place and circumstances of the act, omission or occurrence complained of;
> C. The name and address of any governmental employee involved, if known;
> D. A concise statement of the nature and extent of the injury claimed to have been suffered; and
> E. A statement of the amount of monetary damages claimed.

14 M.R.S. § 8107(1).  A claim that does not "substantially compl[y]" with this notice requirement is barred, but claims "shall not be held invalid or insufficient by reason of an inaccuracy in stating the time, place, nature or cause of the claim, or otherwise, unless it is shown that the governmental entity was in fact prejudiced thereby."  14 M.R.S. § 8107(4).  Mr. Nguyen asserts that Ms. Wadsworth "did not comply with Section 8107 insofar as she asserts claims against Mr. Nguyen" because "[w]hile [Ms. Wadsworth] apparently served the RSU 40 superintendent with a notice of claim, it

78

**A216**

does not identify Mr. Nguyen as a municipal employee involved in the claims for which she is providing notice, nor does the notice mention Mr. Nguyen in the statement of the basis for the claim." *Def.'s Mot.* at 22.

Mr. Nguyen does not appear to dispute that Ms. Wadsworth served proper and timely notice on RSU 40. Instead, he submits that the MTCA requires that notice include "[t]he name and address of any governmental employee involved, if known," *id.* at 21 (quoting 14 M.R.S. § 8107(1)(C)), and Ms. Wadsworth's notice did not mention Mr. Nguyen—despite her being aware of his involvement. Ms. Wadsworth counters that she "submitted a timely notice of claim to the governmental unit, in this case the School, and provided ample notice of the nature of her claims" and thus "[g]iven the facts alleged in this case, the School clearly knew or should have known that the claim involved [Mr.] Nguyen, and was therefore not prejudiced in its investigation and evaluation of the claims prior to suit." *Pl.'s Opp'n* at 48-49.

Ms. Wadsworth's notice to RSU 40 and Mr. Cavanaugh is dated June 13, 2018. *Pl.'s Resps. to Def. Chuck Nguyen's Req. for Production*, Attach. 1, *Me. Tort Claims Act Notice of Cl. to Gov'tal Entity Pursuant to 14 M.R.S. § 8107* at 3-4. Ms. Wadsworth gave notice to Eileen Dondlinger, Waldoboro Town Clerk, Steve Nolan, Superintendent of Schools, RSU 40, Stacey Parra, Union Town Clerk, and Andrew Cavanaugh. *Id.* at 1. The Notice reads in relevant part:

> Notice is hereby given under the Maine Tort Claims Act, 14 M.R.S. § 8107 of the following claim against MSAD 40; RSU 40; Medomak Valley High School; and Andrew Cavanaugh:
>
> A. Name and Address of Claimant and Claimant's Attorney:

Claimant:      Adrianna Wadsworth

                  Washington, ME 94574


Attorney:      Rachel J. Deschuytner, Esq.
                  Robinson, Kriger & McCallum
                  12 Portland Pier
                  Portland, ME 04101

B. Concise Statement of the Basis of the Claim:

From April 20, 2017 through November 3, 2017, Mr. Andrew Cavanaugh, the principal of Medomak Valley High School, MSAD 40, pursued and engaged in an in appropriate relationship with Ms. Adrianna Wadsworth, a minor student. Mr. Cavanaugh sent thousands of text messages to Ms. Wadsworth, a minor student. Mr. Cavanaugh sent thousands of text messages to Ms. Wadsworth, provided her gifts, and made sexually explicit and inappropriate remarks to her. As a result of the relationship, Ms. Wadsworth suffered emotional damages and damage to her reputation.

C. Name and Address of Municipal Employee(s) Involved:

Andrew Cavanaugh

Rockland, ME 04856

D. Concise Statement of the Nature and Extent of the Injuries Claimed to Have Been Suffered:

As a result of the above-referenced incident, Ms. Wadsworth suffered extreme emotional damages and damages to her reputation. She is currently receiving counseling services.

*Id.* at 1-2.

The Court finds instructive the Law Court's decision in *Kakitis v. Perry*, 659 A.2d 852 (Me. 1995). In that case, the plaintiff first sued the City of Westbrook and served notice stating in relevant part that his claim arose "from the negligent conduct of various employees of the City," without naming any individual employees. *Id.* at

853.  Kakitis then later filed tort claims against individual employees.  The Superior Court awarded summary judgment in the employees' favor, reasoning that the plaintiff's claim "was barred because he failed to notify the governmental entity that a claim against its employees would be made."   *Id.*  The Law Court vacated that decision, stating:

> Contrary to the ruling of the Superior Court, the [MTCA] contains no requirement that a plaintiff's notice of claim specify whether he intends to bring an action against the employees rather than against the governmental entity itself . . . [w]e reject the Superior Court's reasoning that in the absence of specific reference in the notice of claim that a plaintiff intends to file a claim against employees, the governmental entity is somehow prejudiced in regard to its right or obligation to defend and indemnify its employees. The governmental entity in this case received a timely notice, and has been deprived of neither an opportunity to investigate nor an opportunity to seek to achieve a settlement on its own behalf or on behalf of its employees.  The contents of plaintiff's notice complies with the requirements of the Act.

*Id.* at 854.  The facts of *Kakitis* are not identical to the facts here, as in that case the plaintiff did not know the names or addresses of the employees at the time he served his initial notice.  *Id.* at 854 n.1.

At oral argument, Mr. Nguyen's attorney pointed to *Parker v. Dall-Leighton*, No. 2:17-CV-216-GZS, 2018 U.S. Dist. LEXIS 108867 (D. Me. June 29, 2018), a case not cited in his filings, as support for the proposition that a plaintiff must name the employees to comply with the notice provisions of 14 M.R.S. § 8107(1).  In *Parker*, a female inmate of the Maine Department of Corrections was sexually assaulted on multiple occasions by a male corrections officer.  *Id.* at *1-2.  The inmate alleged that she repeatedly informed a female corrections officer about the sexual encounters with the male officer.  *Id.* at *2.  The inmate sent timely notices of claims, naming the

male corrections officer but describing the female officer only as Jane Doe. *Id.* The inmate did not tell the Department of Corrections the name of the female officer until after the inmate was released from custody, and she never amended her notice to include the female's name. *Id.* at *3-4.

In *Parker*, the district court noted that the plaintiff did not name the female corrections officer "even though Plaintiff knew her identity," and that the plaintiff "did not adequately provide notice that Plaintiff was bringing any claim against a corrections officer for negligently failing to stop [the male corrections officer's] sexual assaults." *Id.* at *7-8. The district court granted summary judgment in favor of the female corrections officer for failure to comply with the notice provisions of the MTCA. *Id.* at *9. Based on the record before it, the Court finds Ms. Wadsworth's failure to name Mr. Nguyen in her January 13, 2018 notice of claim is more like *Kakitis* than *Parker*. It is true that Ms. Wadsworth had direct contact with Mr. Nguyen and was aware of his interactions with her, and Mr. Nguyen's dealings with her could have placed her on notice of a potential claim against him. It was also true Mr. Nguyen was aware that Mr. Cavanaugh referred to Ms. Wadsworth as cupcake, that Mr. Cavanaugh was texting Ms. Wadsworth but not the high frequency and sexually explicit nature of the texting, that Mr. Cavanaugh gave Ms. Wadsworth $20 on one occasion in Mr. Nguyen's presence, and that Mr. Cavanaugh gave Ms. Wadsworth other gifts, such feminine hygiene products, that embarrassed Ms. Wadsworth. In addition, Ms. Wadsworth was also aware that Mr. Nguyen minimized and justified some of Mr. Cavanaugh's conduct, even after the allegations against Mr. Cavanaugh

came to light.  From what Ms. Wadsworth knew, Mr. Nguyen's responses were quizzical at best, perhaps misplaced loyalty to a colleague and superior.  Ms. Wadsworth's unformed view of Mr. Nguyen's actions is confirmed by the fact she did not mention Mr. Nguyen when Detective Murray first interviewed her.

What makes Mr. Nguyen's conduct highly unusual and tips the balance toward potential legal liability is his conduct after the police and school initiated the investigation.  Even after the police had opened an investigation of Mr. Cavanaugh, Mr. Nguyen told the Waldoboro Police Chief Labombarde that he thought the school should be more supportive of Mr. Cavanaugh, that Ms. Wadsworth was "bringing it on herself," and that he was trying to get Ms. Wadsworth to talk about the situation.  These comments led the Police Chief to inform Superintendent Nolan that Mr. Nguyen was either knowingly or unknowingly trying to interfere with the police investigation and in turn caused Superintendent Nolan to instruct Mr. Nguyen not to contact either Mr. Cavanaugh or Ms. Wadsworth.

But Mr. Nguyen apparently defied Superintendent Nolan's order.[98]   He continued to contact Ms. Wadsworth and to defend Mr. Cavanaugh's behavior to Ms. Wadsworth and to the police after the law enforcement and school investigations had commenced and after being instructed not to continue his involvement.  Mr. Nguyen

---

[98]      As noted earlier, the timing of Mr. Nolan's no-contact directive and Mr. Nguyen's meetings with Ms. Wadsworth is not entirely clear, but the Court has viewed this ambiguity in the light most favorable to Ms. Wadsworth.  Furthermore, during Superintendent Nolan's deposition, some of counsel's questions to Superintendent Nolan were premised on Mr. Nguyen contacting Ms. Wadsworth after Superintendent Nolan directed him not to contact Ms. Wadsworth and Mr. Cavanaugh.  *Nolan Dep.* at 148:20-150:14.  In fact, Superintendent Nolan said that if he had been aware of the post-directive contact, he would have opened up an investigation and it would have been a cause for discipline against Mr. Nguyen.  *Id.* at 150:10-14.

even told Chief Labombarde that anyone who deals with children could be subject to similar allegations, shocking the Chief by his comment. There is no evidence in this record that Ms. Wadsworth was aware that when Mr. Nguyen was contacting her after early November 2017, he was violating a direct order from the superintendent and was justifying Mr. Cavanaugh's conduct to the police. There is no evidence in this record that Ms. Wadsworth was aware of this additional information when she filed the notice of claim on January 13, 2018.

From the Court's perspective, these additional facts place Mr. Nguyen's other actions in a different context and make a potential claim against him more apparent. This additional unknown information reveals evidence that Mr. Nguyen's actions were not merely based on misguided loyalty to Mr. Cavanaugh, but on an unwarranted skepticism of Ms. Wadsworth's truthfulness based on her gender and age. Excusing Mr. Cavanaugh and attempting to influence Ms. Wadsworth on Mr. Cavanaugh's behalf based on these stereotypes places into a different perspective the potential viability of Title IX and § 1983 claims and strengthens the bases for the Maine tort claims, revealing the depth and potential impropriety of his intentionality and the scope of his negligence.

The Court's analysis of the record leads to the conclusion that, even though Ms. Wadsworth knew who Mr. Nguyen was and what he had done in his direct dealings with her, there is no evidence that she had sufficient information about the scope of Mr. Nguyen's potential liability when she filed the notice of claim on January

**A222**

13, 2018.[99]  Ms. Wadsworth's claim is not barred under section 8107 on another basis. Section 8107(4) contains a "substantial notice compliance" requirement.  14 M.R.S. § 8107(4).  The statute provides that a claim "filed under this section shall not be held invalid or insufficient by reason of an inaccuracy in stating the time, place, nature or cause of the claim, or otherwise, unless it is shown that the governmental entity was in fact prejudiced thereby."  *Id.*  The Maine Supreme Judicial Court has observed that the purpose of the notice requirement is to "enable the governmental entity to investigate and evaluate claims for purposes of defense or settlement."  *Pepperman*, 661 A.2d at 1126; *see also* 14 M.R.S. § 8107(4) (claims "shall not be held invalid or insufficient by reason of an inaccuracy in stating the time, place, nature or cause of the claim, or otherwise, unless it is shown that the *governmental entity was in fact prejudiced thereby*") (emphasis added); *Deschenes v. City of Sanford*, 2016 ME 56, ¶ 12, 137 A.3d 198) (citations omitted) ("failure to comply with the notice provision bars the claim, unless (1) the errors in a plaintiff's notice constitute mere inaccuracies, and (2) the governmental entity is unable to show prejudice").

Here, RSU 40 "received a timely notice, and has been deprived of neither an opportunity to investigate nor an opportunity to seek to achieve a settlement on its own behalf or on behalf of its employees" and thus "[t]he contents of plaintiff's notice complies with the requirements of the Act."  *Kakitis*, 659 A.2d at 854.  The purpose

---

[99]  Section 8107 requires that the notice be filed within the statute of limitations provided by section 8110.  14 M.R.S. § 8107(1) ("or at a later time within the limits of section 8110").  Section 8110 establishes a two-year statute of limitations, except that "if the claimant is a minor when the cause of action accrues, the action may be brought within 2 years of the minor's attaining 18 years of age."  *Id.* Here, as Ms. Wadsworth was nineteen years old when she filed the complaint on December 27, 2019, and, therefore, Mr. Nguyen received notice within the time provided by section 8107.

of the requirement is to protect the government entity, not the employee, but Mr. Nguyen does not identify any prejudice that either the District or he has suffered. *See Def.'s Mot.* at 21-22; *Def.'s Opp'n* at 5. The record confirms that the District was aware of the nature of the allegations against Mr. Cavanaugh as early as November 2017 and, in fact, Mr. Cavanaugh resigned in early November 2017 and the record reflects an active law enforcement investigation, including interviews of Mr. Nguyen. If the District or Mr. Nguyen suffered some prejudice due to the lack of listing Mr. Nguyen in the notice of claim, Mr. Nguyen has not identified it. Consequently, at worst, Ms. Wadsworth substantially complied with notice provisions of the statute and there has been no showing of prejudice against Mr. Nguyen. Her tort claims are not barred for deficient notice.

### 2.  Discretionary Function Immunity

Finally, Mr. Nguyen argues that he is entitled to "absolute discretionary function immunity" from the state tort claims pursuant to the Maine Tort Claims Act. *Def.'s Mot.* at 22-25. Ms. Wadsworth responds that the Court should deny Mr. Nguyen's claim of immunity because "the evidence is clear that Mr. Nguyen was not, at least as it pertained to Ms. Wadsworth, acting within any discretionary job functions" and "[i]nstead, the evidence clearly indicates that Mr. Nguyen was acting with loyalty to Mr. Cavanaugh, and an apparent fear of allegations of sexual harassment." *Pl.'s Opp'n* at 49.

The Maine Tort Claims Act "applies a policy of broad liability to governmental employees, subject to the" enumerated exceptions. *Carroll v. City of Portland*, 1999

ME 131, ¶ 6, 736 A.2d 279.  One exception provides absolute immunity to employees of governmental entities "[p]erforming or failing to perform any discretionary function or duty, whether or not the discretion is abused . . .." 14 M.R.S. § 8111(1)(C). The immunity applies to discretionary acts that are "reasonably encompassed by the duties of the governmental employee in action . . .." *Carroll*, 1999 ME 131, ¶ 6 (quoting 14 M.R.S. § 8111(1)).  In other words, the immunity applies only to conduct "within the scope of [the government employee's] employment . . .." *Darling*, 535 A.2d at 425.  "[T]ort liability should not be imposed for conduct of a type for which the imposition of liability would substantially impair the effective performance of a discretionary function." *Carroll*, 1999 ME 131, ¶ 6 n.4 (alteration in original) (quoting *Grossman v. Richards*, 1999 ME 9, ¶ 6, 722 A.2d 371, 373).  Moreover, there is no exception to immunity under § 8111(1)(C) for "acts or omissions characterized by animus." *Buchanan ex rel. Estate of Buchanan v. Maine*, 417 F. Supp. 2d 24, 44 (D. Me. 2006), *aff'd*, 469 F.3d 158 (1st Cir. 2006) (*Buchanan*).

To determine whether an act is discretionary, courts consider four questions:

(1) Does the challenged act, omission, or decision necessarily involve a basic governmental policy, program or objective?  (2) Is the questioned act, omission, or decision essential to the realization or accomplishment of that policy, program, or objective as opposed to one which would not change the course or direction of the policy, program, or objective?  (3) Does the act, omission, or decision require the exercise of basic policy evaluation, judgment, and expertise on the part of the governmental agency involved?  (4) Does the governmental agency involved possess the requisite constitutional, statutory, or lawful authority and duty to do or make the challenged act, omission, or decision?

*Darling*, 535 A.2d at 426 (quoting *Trianon Park Condo. Ass'n v. City of Hialeah*, 468 So. 2d 912, 918 (Fla. 1985)).  "[I]n cases where the questioned conduct has little or no

purely governmental content but instead resembles decisions or activities carried on by people generally, there is an objective standard for judgment by the courts and the doctrine of discretionary immunity does not bar the action." *Rodriguez v. Town of Moose River*, 2007 ME 68, ¶ 22, 922 A.2d 484 (quoting *Adriance v. Town of Standish*, 687 A.2d 238, 241 (Me. 1996)).

At the motion to dismiss stage, the Court found that Ms. Wadsworth's tort claims survived discretionary immunity because "[o]ne way of looking at Mr. Nguyen's actions shows a social worker hearing a complaint, evaluating it, and giving advice" while "[a]nother way is to view Mr. Nguyen as someone enabling an administrator in his pursuit of a student" and ultimately "[w]hether discretionary function immunity protects Mr. Nguyen's actions depends on which view the Court takes" as more facts are revealed. *Order on Mot. to Dismiss* at 48. The Court also noted:

> If Mr. Nguyen's actions were consistent with the practice of his profession and in accordance with school policy, then, although they were professional misjudgments, they necessarily involve a basic governmental policy, program, or objective—the counseling of students in accordance with Maine law. On the other hand, if Mr. Nguyen's actions were attempts to normalize Mr. Cavanaugh's abnormal behavior because Mr. Nguyen and Mr. Cavanaugh were friends, Mr. Nguyen instinctively supports authority figures over students, or some other facts not yet known, then his actions fall outside of what he was hired to do as the school social worker.

*Id.* at 49. If anything, the development of the summary judgment record has revealed even more clearly that Mr. Nguyen's actions "fall outside of what he was hired to do as the school social worker." *Id.* While the Court's analysis of Mr. Nguyen's MHSA defense involved a different legal question, the Court finds that his behavior can

**A226**

similarly be sorted into two buckets to evaluate his discretionary function immunity claim: behavior that could fall within the professional duties of a school social worker; and behavior that could not possibly be within that discretion or advancing a governmental objective.

Behavior within the first category presents a closer call, but the Court finds that there remain disputed issues of material fact that would allow a jury to conclude that Mr. Nguyen's actions were not professional judgments but were attempts to protect Mr. Cavanaugh out of personal loyalty or affinity in a manner that did not "involve a basic governmental policy, program or objective." *Darling*, 535 A.2d at 426 (citation omitted). Several examples would include reassuring Ms. Wadsworth that Mr. Cavanaugh was a "father figure" who thought of her as a daughter, assuring Ms. Kenniston that the birth control issue had been taken care of, and not either reporting or counseling Mr. Cavanaugh to stop behaviors that were clearly inappropriate. Under the right light, each of these examples might be characterized as professional misjudgments made while exercising Mr. Nguyen's lawful authority to provide services to students. However, given the record in this case—and particularly Mr. Nguyen's inexplicably unshakeable loyalty to Mr. Cavanaugh, even after the investigation—a reasonable juror could conclude that these were not mistakes made within Mr. Nguyen's professional discretion but instead efforts to protect Mr. Cavanaugh because of Mr. Nguyen's personal affinity for him.

The second category of behaviors—primarily Mr. Nguyen's conduct during and after the investigation—eviscerates his immunity defense. The timeline is

89

**A227**

occasionally unclear, but during and/or after the investigation Mr. Nguyen' told Ms.
Wadsworth that Mr. Cavanaugh's family had a right to be angry at her and that she
should apologize to them, downplay or recant her harassment allegations, and sign
an affidavit supporting Mr. Cavanaugh. Mr. Nguyen told Ms. Wadsworth that Mr.
Cavanaugh did not do anything inappropriate or have any inappropriate
conversations with her; characterizing Mr. Cavanaugh as a "stand-up guy," and
saying that "it's not what they are making it out to be." PSAMF ¶ 140; DRPSAMF ¶
140. He also went on to tell Ms. Wadsworth to picture a day in the future, in college,
having coffee with Mr. Cavanaugh, when "all of this would be gone and over with."
PSAMF ¶ 144; DRPSAMF ¶ 144.

Multiple members of law enforcement were shocked by Mr. Nguyen's conduct
and Superintendent Nolan expressed concern that he "maybe . . . was, knowingly or
unknowingly" interfering with the investigation into Mr. Cavanaugh. PSAMF ¶ 137;
DRPSAMF ¶ 137. Mr. Nolan instructed Mr. Nguyen not to have any contact with
Mr. Cavanaugh regarding Ms. Wadsworth and instructed Mr. Nguyen not to have
contact with Ms. Wadsworth. PSAMF ¶ 138; DRPSAMF ¶ 138. Because the record
is unclear when Mr. Nguyen's many interactions with Ms. Wadsworth relating to the
investigation occurred in relation to this directive, there is at the very least a disputed
issue of material fact as to whether Mr. Nguyen complied with Mr. Nolan's order.
*See, e.g.*, PSAMF ¶ 147; DRPSAMF ¶ 147 (after Mr. Nguyen was instructed not to
have contact with Ms. Wadsworth, Mr. Spear observed Ms. Wadsworth crying in the
hallway, and observed Mr. Nguyen chase her down the hallway).

A228

Mr. Nguyen telling an underage victim of sexual harassment that her harasser's family had a right to be mad at her and repeatedly encouraging her to recant her allegations and sign an affidavit supporting the harasser cannot be possibly construed as within his discretion as a social worker or advancing any governmental objective. That conclusion is plain on its face but is made even more obvious in this case where RSU 40's superintendent—Mr. Nguyen's superior and the highest ranking official in the District—explicitly ordered Mr. Nguyen to cease this behavior and Mr. Nguyen appears to have defied that directive. Viewing disputed facts in the light most favorable to Ms. Wadsworth, Mr. Nguyen's actions fall well outside of what he was hired to do as the school social worker, and he is thus not entitled to discretionary function immunity.

## VI.   CONCLUSION

The Court GRANTS Chuck Nguyen's Motion for Summary Judgment (ECF No. 105) as to Count II of Adrianna Wadsworth's Amended Complaint as it pertains to him. The Court DENIES the motion as to Counts IV-VI.

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 30th day of March, 2023

UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| ADRIANNA WADSWORTH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 2:19-cv-00577-JAW |
| | ) | |
| MAINE SCHOOL ADMINISTRATIVE | ) | |
| DISTRICT 40/REGIONAL SCHOOL | ) | |
| UNIT 40 et al., | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER ON ANDREW CAVANAUGH'S MOTION FOR
SUMMARY JUDGMENT**

A former high school student brought a lawsuit against a school principal asserting claims under 42 U.S.C. § 1983, as well as state tort claims, stemming from sexual harassment she alleges the school principal committed against her. The principal moves for summary judgment on all claims. The Court grants summary judgment on the § 1983 substantive due process claim because there are no genuine issues of material fact that could support the plaintiff's contention that the alleged harassment amounted to a violation of the student's rights to substantive due process and, in any event, the principal is entitled to qualified immunity. The Court grants summary judgment on the § 1983 equal protection claim because the principal is entitled to qualified immunity. The Court denies summary judgment on the tort claims because the plaintiff established the essential elements of each claim, and the principal is not entitled to intentional act immunity under the Maine Tort Claims Act.

## I.   PROCEDURAL HISTORY

On December 27, 2019, Adrianna Wadsworth[1] filed suit against Maine School Administrative District 40/Regional School Unit 40 (RSU 40 or the District),[2] Medomak Valley High School (MVHS), Andrew Cavanaugh, and Chuck Nguyen, a school social worker.  *Compl.* (ECF No. 1).  She alleged a violation of Title IX and negligent hiring, training, and supervision against the District and MVHS, brought claims under 42 U.S.C. § 1983, brought common law tort and statutory claims of intentional infliction of emotional distress (IIED) and negligent infliction of emotional distress (NIED) against all the Defendants, and brought a negligence claim against Mr. Cavanaugh and Mr. Nguyen.  *Id.* ¶¶ 134-179.  On February 7, 2020, Mr. Cavanaugh answered the Complaint.  *Def., Andrew Cavanaugh's Answer to Pl.'s Compl. and Demand for Jury Trial* (ECF No. 11).  On March 11, 2020, the District and MVHS filed a motion to dismiss counts one and two of the Complaint.  *Def. MSAD 40/RSU 40's Mot. to Dismiss Counts I and II of Compl.* (ECF No. 12).  On the same day, Mr. Nguyen filed an answer to the Complaint.  *Answer and Affirmative Defenses to Compl. and Jury Trial Demand (Def. Chuck Nugyen)* (ECF No. 13).

---

[1]   Ms. Wadsworth brought this lawsuit in her own name rather than under a pseudonym such as Jane Doe.  Though a balancing of factors is required, a victim of sexual harassment or sexual assault—especially a minor at the time of the offense—often has a privacy interest sufficient to allow the victim to proceed under a pseudonym.  *See, e.g., Doe v. Reg'l Sch. Unit No. 21*, Docket No. 2:19-00341-NT, 2020 WL 2833248, at 1-4 (D. Me. May 29, 2020); *Doe v. Megless*, 654 F.3d 404, 408 (3d Cir. 2011).  However, as an adult, Ms. Wadsworth has an equal right to bring the action under her own name.

[2]   The filings in this case have variously referred to the District as MSAD 40/RSU 40, MSAD 40, or RSU 40.  According to the District, it was formerly known as MSAD 40 but is now known as RSU 40.  *Def. MSAD 40/RSU 40's Statement of Material Facts* ¶ 1 (ECF No. 101) ("Defendant Regional School Unit 40 ("RSU 40") . . . [was] formerly Maine School Administrative District 40").  The Court will refer to this party as RSU 40 or the District.

2

**A231**

On March 27, 2020, Ms. Wadsworth filed an amended complaint, dropping MVHS as a defendant. *Pl.'s Am. Compl. and Demand for Jury Trial* (ECF No. 15) (*Am. Compl.*). On April 10, 2020, Mr. Nguyen filed a motion to dismiss the Amended Complaint. *Def. Chuck Nguyen's Mot. to Dismiss Am. Compl.* (ECF No. 16). On April 14, 2020, Mr. Cavanaugh filed an answer to the Amended Complaint. *Def., Andrew Cavanaugh's Answer to Pl.'s Am. Compl. and Demand for Jury Trial* (ECF No. 17).

On May 8, 2020, the District filed a motion to dismiss counts one and two of the Amended Complaint, and on May 11, 2020, it withdrew its first motion to dismiss. *Def. MSAD 40/RSU 40's Mot. to Dismiss Counts I and II of First Am. Compl.* (ECF No. 21); *Def. MSAD 40/RSU 40's Withdrawal of Mot. to Dismiss as Moot* (ECF No. 22). Ms. Wadsworth filed a response on June 8, 2020. *Opp'n of Pl., Adrianna Wadsworth, to Def. MSAD 40/RSU 40's Mot. to Dismiss for Failure to State a Claim* (ECF No. 31). On June 22, 2020, the District replied. *Def. MSAD 40/RSU 40's Reply in Supp. of Mot. to Dismiss* (ECF No. 32).

On October 2, 2020, the Court denied Mr. Nguyen's motion to dismiss, and on October 29, 2020, the Court denied the District's motion to dismiss. *Order on Def. Chuck Nguyen's Mot. to Dismiss* (ECF No. 36) (*Order on Nguyen Mot. to Dismiss*); *Order on MSAD 40/RSU 40's Mot. to Dismiss* (ECF No. 39). The District filed its Answer to the Amended Complaint on November 13, 2020 and Mr. Nguyen filed his Answer and affirmative defenses on February 4, 2021. *Def. MSAD 40/RSU 40's Answer to Pl.'s Am. Compl.* (ECF No. 45); *Answer and Affirmative Defense to Am. Compl. and Jury Trial Demand (Def. Chuck Nguyen)* (ECF No. 49).

On July 27, 2022, the District, Mr. Cavanaugh, and Mr. Nguyen each filed a motion for summary judgment accompanied by a statement of material facts. *Def. MSAD 40/RSU 40's Mot. for Summ. J.* (ECF No. 100); *Def. MSAD 40/RSU 40's Statement of Material Facts* (ECF No. 101); *Def. Andrew Cavanaugh's Mot. for Summ. J.* (ECF No. 103) (*Def.'s Mot.*); *Def. Andrew Cavanaugh's Rule 56 Statement of Material Facts in Supp. of His Mot. for Summ. J.* (ECF No. 104) (DSMF); *Def. Chuck Nguyen's Mot. for Summ. J.* (ECF No. 105); *Def. Chuck Nguyen's Statement of Material Facts in Supp. of Mot. for Summ. J.* (ECF No. 106). On October 19, 2022, Ms. Wadsworth filed an omnibus response to the motions for summary judgment, her own statement of additional material facts, and separate responses to each defendant's statement of material facts. *Pl. Adrianna Wadsworth's Omnibus Opp'n to Defs.' Mots. for Summ. J.* (ECF No. 114) (*Pl.'s Opp'n*); *Pl.'s Rule 56 Statement of Material Facts in Supp. of Her Omnibus Opp'n to Defs.' Mots. for Summ. J.* (ECF No. 115) (PSAMF); *Pl.'s Resps. to Def. MSAD 40's Statement of Material Facts in Supp. of its Mot. for Summ. J.* (ECF No. 116); *Pl.'s Resps. to Def. Andrew Cavanaugh's Statement of Material Facts in Supp. of His Mot. for Summ. J.* (ECF No. 117) (PRDSMF); *Pl.'s Resps. to Def. Chuck Nguyen's Statement of Material Facts in Supp. of His Mot. for Summ. J.* (ECF No. 118).

On November 17, 2022, the District filed a reply in support of its motion for summary judgment and a reply to Ms. Wadsworth's statement of additional material facts. *MSAD 40/RSU 40's Reply in Supp. of Mot. for Summ. J.* (ECF No. 121); *Def. MSAD 40/RSU 40's Reply Statement of Material Facts* (ECF No. 122) (RSU 40's

4

DRPSAMF).  The following day, Mr. Nguyen and Mr. Cavanaugh each filed their own replies and responses to Ms. Wadsworth's statement of additional material facts.  *Def. Chuck Nguyen's Reply Mem. of Law in Supp. of Mot. for Summ. J.* (ECF No. 123); *Def. Chuck Nguyen's Resp. to Pl.'s Rule 56 Statement of Material Facts in Supp. of Her Omnibus Opp'n to Defs.' Mots. for Summ. J.* (ECF No. 124); *Def. Andrew Cavanaugh's Reply in Supp. of Mot. for Summ. J.* (ECF No. 125) (*Def.'s Reply*); *Def. Andrew Cavanaugh's Resps. to Pl.'s Rule 56 Statement of Material Facts in Supp. of Her Omnibus Opp'n to Defs.' Mots. for Summ. J.* (ECF No. 126) (DRPSAMF).

Finally, on December 19, 2022, Ms. Wadsworth moved to request oral argument on the defendants' motions.  *Pl.'s Request for Hearing/Oral Argument on Defs.' Mot. for Summ. J.* (ECF No. 127).  The Court granted that motion, *Order* (ECF No. 128), and heard oral arguments on March 14, 2023.  *Min. Entry* (ECF No. 137).

## II.   FACTS[3],[4]

---

[3]     The Court states the facts "in the light most hospitable to [non-movants] consistent with record support . . . ."  *Mancini v. City of Providence ex rel. Lombardi*, 909 F.3d 32, 37 (1st Cir. 2018) (citing *Ahern v. Shinseki*, 629 F.3d 49, 51 (1st Cir. 2010); *Gillen v. Fallon Ambulance Serv., Inc.*, 283 F.3d 11, 17 (1st Cir. 2002)).

[4]     The Court notes at the outset that the parties have submitted between them 321 proposed facts for the record.  *See* DSMF (164 facts); PSAMF (157 facts).  The Court finds many of these facts to be largely or entirely immaterial to Ms. Wadsworth's claims against Mr. Cavanaugh and his motion for summary judgment.

For example, Ms. Wadsworth has filed a single statement of additional facts to support her omnibus opposition to all three defendants' motions to dismiss.  That statement of facts includes assertions that may be essential to her claims against Mr. Nguyen and/or the District but are largely irrelevant to her claim against Mr. Cavanaugh—e.g., detailed allegations relating to the District's sexual harassment policies and trainings and other District employees' knowledge of the harassment.

The focus of the motion before the Court is on Mr. Cavanaugh's alleged harassment of Ms. Wadsworth.  Aside from occasionally providing narrative cohesion or context, the knowledge and beliefs of other actors is generally not relevant to these claims.  Accordingly, the Court will omit or abridge proposed facts it finds irrelevant to Mr. Cavanaugh's motion for summary judgment.  *See CFTC v. JBW Capital, LLC*, 812 F.3d 98, 110 n.19 (1st Cir. 2016) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)) (at the summary judgment stage, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment" and thus "[f]actual disputes that are irrelevant or unnecessary will not be counted").

5

**A234**

### A.   The Parties

Adrianna Wadsworth, a woman now in her early twenties, attended MVHS, a school located within the District, between 2014 and 2018. PSAMF ¶¶ 1-2; DRPSAMF ¶¶ 1-2; DSMF ¶ 1; PRDSMF ¶ 1. At all pertinent times, Ms. Wadsworth was under the age of 18. PSAMF ¶ 5; DRPSAMF ¶ 5.

Andrew Cavanaugh began his career with RSU 40 in 2001, was promoted to Assistant Principal of MVHS in 2006 and to Principal in 2014.[5] DSMF ¶¶ 2-4; PRDSMF ¶¶ 2-4. He served as Principal until he was placed on a leave of absence on November 5, 2017, and then later resigned prior to a School Board meeting addressing the results of RSU 40's investigation. PSAMF ¶¶ 120, 125, 130; DRPSAMF ¶¶ 120, 125, 130.

Chuong "Chuck" Nguyen was at all relevant times the social worker at MVHS. DSMF ¶ 5; PRDSMF ¶ 5. RSU 40 is a school district consisting of the following Maine towns: Friendship, Union, Waldoboro, Warren, and Washington. DSMF ¶ 6; PRDSMF ¶ 6. At all relevant times, Stephen Nolan was the Superintendent of the District and Linda Pease and Tamra Philbrook were Assistant Principals at MVHS. DSMF ¶¶ 8-10; PRDSMF ¶¶ 8-10.

### B.   Andrew Cavanaugh's Alleged Harassment of Adrianna Wadsworth

---

[5]      Ms. Wadsworth qualifies DSMF ¶ 4 to note that Mr. Cavanaugh was unclear in his deposition testimony whether he was promoted to Principal in 2014 or 2015. PRDSMF ¶ 4. The Court rejects that qualification as irrelevant because neither party disputes that Mr. Cavanaugh was Principal at all relevant times, and it appears that the events Ms. Wadsworth alleges did not begin until 2016.

During Ms. Wadsworth's junior and senior years of high school (starting in the fall of 2016), Mr. Cavanaugh repeatedly subjected her to conduct of a sexual nature, involving sexually charged and inappropriate comments, text messages, and gifts.[6] PSAMF ¶ 3; DRPSAMF ¶ 3.  While some RSU 40 employees, including Mr. Nguyen, witnessed instances of Mr. Cavanaugh's inappropriate conduct towards Ms. Wadsworth, RSU 40 did not investigate or discipline him until November 2017.[7] PSAMF ¶ 6; DRPSAMF ¶ 6.

### 1.  Adrianna Wadsworth's Background and Initial Encounters with Andrew Cavanaugh

Ms. Wadsworth's home life was very challenging.  DSMF ¶ 12; PRDSMF ¶ 12. Her parents separated and got back together multiple times throughout her childhood, including at least two occasions—once when Ms. Wadsworth was two years old and again when she was twelve years old—where she and her mother moved to temporary accommodations while her parents separated for several months.  DSMF ¶¶ 13-15; PRDSMF ¶¶ 13-15.  There were domestic violence incidents between Ms. Wadsworth's parents, resulting in police and child protective services involvement. DSMF ¶¶ 12, 16; PRDSMF ¶¶ 12-16.  In one instance, Ms. Wadsworth's mother struck her in the face, causing a bloodied lip, and Ms. Wadsworth moved out of the family home when she was sixteen.[8]  DSMF ¶ 17; PRDSMF ¶ 17.  Ms. Wadsworth

---

[6]      Mr. Cavanaugh objects to PSAMF ¶ 3, contending that the allegation that Mr. Cavanaugh "sexually harassed" Ms. Wadsworth should be stricken as conclusory.  DRPSAMF ¶ 3.  The Court has modified PSAMF ¶ 3 to reflect factual assertions supported by the record.

[7]      Mr. Cavanaugh offers the same objection to PSAMF ¶ 6, again arguing that Ms. Wadsworth's proposed assertion should be stricken as conclusory.  DRPSAMF ¶ 6.  The Court has modified PSAMF ¶ 6 to reflect factual assertions supported by the record.

[8]      Ms. Wadsworth qualifies DSMF ¶ 17 to—as the Court understands the qualification—object that she did not testify that the incident in question was "part of the reason she moved out of her

also reported that her mother had deep religious beliefs that tended to conflict with the normal life of a teenager and Ms. Wadsworth experienced numerous issues with her mother that caused her to rethink her living arrangements.  DSMF ¶¶ 18-19; PRDSMF ¶¶ 18-19.

Ms. Wadsworth first informed Mr. Cavanaugh of these issues during her sophomore year, when she met with him after being caught drinking at a party, and she told Mr. Cavanaugh and MVHS athletic director Matthew Lash that if her parents found out about this infraction, they would take extreme measures, including sending her away to a religious school in Arizona.  DSMF ¶¶ 20-21; PRDSMF ¶¶ 20-21.  Ms. Wadsworth also explained to Mr. Cavanaugh that her mother was very mean to her, excluded her from family activities, and refused to permit her to participate in other activities.[9]  DSMF ¶ 22; PRDSMF ¶ 22.

After this initial meeting with Ms. Wadsworth during her sophomore year, Mr. Cavanaugh asked Ms. Wadsworth to work for him, gave her his cell phone number,

---

family home."  PRDSMF ¶ 17.  The Court interprets Ms. Wadsworth's testimony to state that "these physical incidents" were part of the reason she moved out, but not necessarily this incident in particular.  *See Joint R. Materials for Defs.' Mots. for Summ. J.* (ECF No. 91) (*Joint R. Materials),* Attach. 16, *Dep. of Adrianna Wadsworth Vol. I* at 48:20-49:2 (*Wadsworth Dep. Vol. I*).  The Court does not view this issue of which specific instance(s) of physical abuse motivated Ms. Wadsworth to leave home to be relevant to her claims against Mr. Cavanaugh but has pared back DSMF ¶ 17 to reflect her testimony.

[9]      Ms. Wadsworth denies DSMF ¶ 22, contending that her mother did not call her names or use drugs.  PRDSMF ¶ 22.  The Court omits those assertions, finding that in addition to being factually disputed they are irrelevant for the reasons discussed in footnote 4, and admits the remainder of DSMF ¶ 22.

and told her to text him.[10],[11]  DSMF ¶ 23; PRDSMF ¶ 23.  Mr. Cavanaugh also spoke with Mr. Nguyen and informed him that Ms. Wadsworth needed his professional assistance.[12]  DSMF ¶ 26; PRDSMF ¶ 26.  She was formally referred to Mr. Nguyen due to her risk of leaving her home and consulted him a few times during her sophomore year to discuss some of her family issues.[13]  DSMF ¶¶ 27-28; PRDSMF ¶¶ 27-28.  Mr. Cavanaugh also continued to meet a few times a week with Ms. Wadsworth towards the end of her sophomore year.  DSMF ¶ 29; PRDSMF ¶ 29.

In the summer of 2016, Ms. Wadsworth started working for Mr. Cavanaugh at the houses that he fixed up, babysat his nephew, and also worked as a hostess at the waterfront in Camden and for two women at a catering company.  DSMF ¶ 30; PRDSMF ¶ 30.  She described how she came to work for Mr. Cavanaugh:

> It first came about when they found out about the situation between me and my parents, and Mr. Cavanaugh asked if there was some way that he could help me escape from the house, try to get away from the house, and he said that he had a few jobs that he had for me that would get me away from the house, and so then he asked my mom if I could work for him occasionally, and that's when we exchanged numbers.

---

[10]    Ms. Wadsworth qualifies DSMF ¶ 23 to assert that "[Mr.] Cavanaugh provided [her] his cell phone number when he asked her to work for him, and told her that she should text him."  PRDSMF ¶ 23 (quoting PSAMF, Attach. 2, *Decl. of Adrianna Wadsworth* ¶ 3 (*Wadsworth Decl.*)).  Because the Court finds that a reasonable jury could believe Ms. Wadsworth's statements, it—as it must at this stage—adopts those statements as fact for the summary judgment record and admits DSMF ¶ 23 as modified by her qualification.

[11]    Ms. Wadsworth denies DSMF ¶¶ 24-25, citing her sworn statement that Mr. Cavanaugh did not call her until after she started working for him.  PRDSMF ¶¶ 24-25.  The Court sustains the objections for the reasons discussed in the previous footnote and omits DSMF ¶¶ 24-25.

[12]    Ms. Wadsworth qualifies DSMF ¶ 26 only to deny the assertion to the extent that it refers to DSMF ¶¶ 24-25.  PRDSMF ¶ 26.  Because the Court has omitted those assertions, it rejects Ms. Wadsworth's qualification as moot.

[13]    Ms. Wadsworth admits DSMF ¶ 27, but DSMF ¶ 27 and Mr. Nguyen's corroborating testimony are phrased in the passive, not the active voice, so the Court cannot be certain who made the referral.  *See Joint R. Materials,* Attach. 2, *Dep. of Chuck Nguyen* at 36:14-17 (*Nguyen Dep.*).

9

**A238**

DSMF ¶ 30; PRDSMF ¶ 30.  Ms. Wadsworth would go with Mr. Cavanaugh to rental houses he fixed up, and she would help him with either spray painting things, disposing wood piles, or general cleaning.  DSMF ¶ 31; PRDSMF ¶ 31.  On occasion, she would watch his nephew.  DSMF ¶ 31; PRDSMF ¶ 31.  Ms. Wadsworth's mother approved of this arrangement and was aware that they had exchanged cell phone numbers.  DSMF ¶ 32; PRDSMF ¶ 32.

Ms. Wadsworth was alone with Defendant Cavanaugh at times during these workdays and formed a relationship that she described as an adult she could trust but one in which it was "like talking to a teenage friend."[14]  DSMF ¶ 33; PRDSMF ¶ 33.  Mr. Cavanaugh repeatedly asked Ms. Wadsworth to call him "Andy" and assured her she could trust him, which made her think of the relationship as a friendship rather than a formal relationship between principal and student.  DSMF ¶ 33; PRDSMF ¶ 33.  Their conversations included adult and sex-based topics, but Ms. Wadsworth was often uncomfortable with sex-based topics and did not initiate conversations about them with Mr. Cavanaugh.  DSMF ¶ 33; PRDSMF ¶ 33.  Ms. Wadsworth thought of Mr. Cavanaugh as a "father figure," but only because Mr. Nguyen used that term to describe Mr. Cavanaugh to her.  DSMF ¶ 33; PRDSMF ¶ 33.

In fall 2016, Ms. Wadsworth moved in with her friend Ashley Kenniston and the Kenniston family and lived there until after Mr. Cavanaugh's resignation, except

---

[14]   Ms. Wadsworth qualifies DSMF ¶ 33 to offer different characterizations of and caveats to Mr. Cavanaugh's assertions.  PRDSMF ¶ 33; *Wadsworth Decl.* ¶ 5.  For the reasons discussed in footnote 10, the Court accepts Ms. Wadsworth's qualifications and admits an altered DSMF ¶ 33.

for a brief period when she lived with her sister.[15,16]  DSMF ¶ 35; PRDSMF ¶ 35.  She

decided to move out of her home because her parents frequently fought, her father

was in and out of the home, they had to leave the home a few times, and her mother

kept talking about how they would be leaving again.  DSMF ¶ 36; PRDSMF ¶ 36.  Ms.

Wadsworth loved school and felt she was building a life for herself at school.  DSMF

¶ 36; PRDSMF ¶ 36.  She wanted to focus on school and make that her priority, so

she felt that she needed to leave her family home, which was an unstable

environment.  DSMF ¶ 36; PRDSMF ¶ 36.  After Ms. Wadsworth moved out, she

fought and lost frequent touch with two of her siblings, but maintained a good

relationship with her third sibling.[17]  DSMF ¶ 37; PRDSMF ¶ 37.

Ms. Wadsworth recalls that her decision to move out made her sad, stating:

It was sad sometimes because I felt like my family that I disappointment
my family and that our relationship wouldn't be the same again and that
I wasn't as close with them and there were a lot of arguments about the
choices and decisions that I was making when I moved out, and that was
hard.

I was sad and conflicted being in high school and not having my family
to turn to and not really being able to communicate with my family as
much because they didn't agree with my decision to leave, and I didn't
really feel that I had anybody at the time to talk to when I couldn't talk
to my family as much, and also was conflicted because I didn't know if I
was making the right choice to stay away and leave home or if I should

---

[15]  Ms. Wadsworth qualifies DSMF ¶ 35 to assert that she also lived with her sister and then her
father during her junior and senior years.  PRDSMF ¶ 35.  The Court accepts the qualification as to
her sister but rejects it as to her father, because she did not move in with him until 2018—well after
Mr. Cavanaugh's resignation.  *See Wadsworth Dep. Vol.* I at 16:11-20.

[16]  Ms. Wadsworth qualifies DSMF ¶ 42, which asserts that the Kennistons acted as her foster
parents, to state that "[t]here was no formal or informal arrangement or agreement for the Kenniston's
to act as Plaintiff Wadsworth's foster parents."  PRDSMF ¶ 42.  The Court omits DSMF ¶ 42 as
unsupported by the record.

[17]  Ms. Wadsworth qualifies DSMF ¶ 37 to add that she only testified to losing "frequent touch"
with two of the siblings and that she maintained a good relationship with the third sibling.  PRDSMF
¶ 37.  The Court accepts these qualifications.

go back home with my family, and I wasn't sure if I was making a big mistake or if I was doing what was best for me.

DSMF ¶ 38; PRDSMF ¶ 38.  Ms. Wadsworth's parents divorced during her stay with the Kenniston family.  DSMF ¶ 39; PRDSMF ¶ 39.  Ms. Wadsworth reported the move to Mr. Nguyen, and he and Mr. Cavanaugh then met with the Kennistons to ensure Ms. Wadsworth was living in a healthy environment.  DSMF ¶¶ 40-41; PRDSMF ¶¶ 40-41.

### 2.    Andrew Cavanaugh's Inappropriate Comments and Gifts

Between 2016 and 2017, Mr. Cavanaugh told Ms. Wadsworth she was pretty, looked nice, and made comments about what she was wearing nearly every day while Ms. Wadsworth was in school.[18]  PSAMF ¶ 28; DRPSAMF ¶ 28.  Mr. Cavanaugh repeatedly used pet names to refer to Ms. Wadsworth such as "cupcake," "princess," "ladytime," "Sports Illustrated swimsuit model," and handsome.[19]  PSAMF ¶ 29; DRPSAMF ¶ 29; DSMF ¶ 110; PRDSMF ¶ 110.  This was done repeatedly in person

---

[18]    Mr. Cavanaugh denies PSAMF ¶ 28, objecting that it should be stricken as conclusory, violating the rule that statements of fact must be separate, short, and concise, and inadmissible at trial.  DRPSAMF ¶ 28.  None of these objections is availing.

These assertions of fact are not conclusory, argumentative, or overly lengthy.  To the extent that Mr. Cavanaugh argues that the comments she describes are inadmissible hearsay, the Court rejects that argument for two reasons.  First, because the comments are not offered for their truth (whether Ms. Wadsworth actually was pretty) but rather for their harassing impact on her, they are not hearsay.  FED. R. EVID. 801(c)(2) ("'Hearsay' means a statement that . . . a party offers to prove the truth of the matter asserted in the statement").  Second, even if the comments were offered for their truth they would be admissible against Mr. Cavanaugh as statements of a party opponent.  FED. R. EVID. 801(d)(2).  The Court overrules the objections and admits PSAMF ¶ 28.

[19]    Mr. Cavanaugh qualifies PSAMF ¶ 29 to object that the assertions contain inadmissible characterizations and conclusions, and that they do not fully capture the context of their relationship at the time Mr. Cavanaugh made these statements.  DRPSAMF ¶ 29.  The Court admits PSAMF ¶ 29, rejecting the former objection because these are factual assertions and rejecting the latter objection as beyond the scope of the fact asserted.

and via text message on an almost daily basis between 2016 and 2017.[20]  PSAMF ¶ 30; DRPSAMF ¶ 30.  Ms. Kenniston and some of Ms. Wadsworth's friends were aware of the "cupcake" nickname.  DSMF ¶¶ 111-12; PRDSMF ¶¶ 111-12.  Her friends teased her about it, but Ms. Kenniston was concerned about the nickname because she was not sure of the nature of the relationship.[21]  *Id.*

Mr. Cavanaugh, in a meeting in his office, told Ms. Wadsworth that she was good looking and could take anyone she wanted to prom.[22]  PSAMF ¶ 31; DRPSAMF ¶ 31.  At a school basketball game, Mr. Nguyen witnessed Mr. Cavanaugh comment on Ms. Wadsworth's looks in the middle of the gym and in the presence of everyone attending the game.  PSAMF ¶ 32; DRPSAMF ¶ 32.  In the spring of 2017, around the time of Ms. Wadsworth's junior prom, Mr. Cavanaugh handed her an envelope of money in the office and called her "cupcake" during the exchange.[23]  PSAMF ¶ 35; DRPSAMF ¶ 35.

---

[20]    Mr. Cavanaugh offers the same qualifications as in DRPSAMF ¶ 29 and the Court rejects them for the same reasons.  Mr. Cavanaugh incorporates these same context objections into DRPSAMF ¶¶ 30-38, 40, 42-43, 51, 53-54, 105, 120, 122-24, 151.  To the degree that those objections offer only that Ms. Wadsworth's factual proposed assertion does not fully capture the context of the relationship, without any further explanation or support, the Court rejects the objections as beyond the scope of the fact(s) asserted.

[21]    DSMF ¶ 112 states: "The Plaintiff, [Ms.] Kenniston and the Plaintiff's friends joked about the nickname."  Ms. Wadsworth qualifies DSMF ¶ 112 to submit that "Ms. Kenniston was concerned about the nickname because she was not sure of the nature of the relationship."  PRDSMF ¶ 112.  The Court accepts this qualification as supported by the record.  *See Kenniston Dep.* at 38:6-12 (expressing "concern" because she "wasn't sure about the nature of the relationship").

[22]    Mr. Cavanaugh denies PSAMF ¶ 31 as unsupported by Ms. Wadsworth's record citation.  DRPSAMF ¶ 31.  The Court agrees that the cited page does not allege that Mr. Cavanaugh called Ms. Wadsworth good looking.  However, in the same deposition, she states that "Mr. Cavanaugh said that I could take anybody in the school that I wanted [to prom] and said that I was a good looking girl."  *Wadsworth Dep. Vol. I* at 194:15-17.  The Court overrules the objection and admits PSAMF ¶ 31.

[23]    Ms. Wadsworth's proposed PSAMF ¶¶ 34-41 assert facts relating to Mr. Nguyen's and Ms. Philbrook's awareness of Mr. Cavanaugh's behavior.  As the Court explained in footnote 4, Ms. Wadsworth submitted an omnibus statement of alternative material facts to also support her claims against Mr. Nguyen and RSU 40.  Assertions relating to the knowledge of those officials may be relevant to those other claims, but they are generally not relevant to the claims against Mr. Cavanaugh

Ms. Wadsworth was embarrassed that Mr. Cavanaugh called her "cupcake," and after one of her friends found out about the nickname, Ms. Wadsworth went to Mr. Nguyen's office and advised him that Mr. Cavanaugh called her "cupcake" when they texted each other.  PSAMF ¶ 40; DRPSAMF ¶ 40.

In the text messages between Mr. Cavanaugh and Ms. Wadsworth, from the limited period of April 20, 2017 through November 3, 2017, Mr. Cavanaugh called Ms. Wadsworth "cupcake" at least 60 times, "ladytime" at least 28 times, and "princess" at least 18 times.[24]  PSAMF ¶ 42; DRPSAMF ¶ 42.

Megan Wright, a classmate and friend of Ms. Wadsworth's, later testified that she thought Mr. Cavanaugh was creepy and that Mr. Cavanaugh commented on the length of Ms. Wadsworth's skirt when she walked into school in the morning.[25]  PSAMF ¶ 155; DRPSAMF ¶ 155.  Ms. Wadsworth was borrowing Ms. Wright's skirt that day, and this comment made Ms. Wright so uncomfortable that she never wore it again.  *Id.*  Ms. Wright testified that the relationship between Mr. Cavanaugh and

---

except where they describe his behavior or its effect on Ms. Wadsworth.  The Court admits the assertions or portions of assertions relating to Mr. Cavanaugh's behavior, but omits asserted facts that address the potential liability of other actors.  *See, e.g.,* PSAMF ¶ 35 (Ms. Wadsworth asserts that "Ms. Philbrook was present when Mr. Cavanaugh handed Plaintiff an envelope of money . . ." but the Court admits "Mr. Cavanaugh handed [Ms. Wadsworth] an envelope of money . . .").

[24]   Ms. Wadsworth's proposed PSAMF ¶ 43 asserts only other school officials' awareness of the text messages and the Court omits it for the reasons described in footnote 23.

[25]   Mr. Cavanaugh offers virtually identical objections to PSAMF ¶¶ 155-56 (and similar objections to ¶ 157), objecting that the assertions are unsupported by the record, irrelevant, hearsay, impermissible character evidence, and inadmissible at trial for unspecified reasons.  DRPSAMF ¶¶ 155-57.  While some objections may be reasonable as to certain assertions, many are wholly inapplicable.  The Court concludes that PSAMF ¶ 155 is clearly supported by Ms. Wright's deposition testimony, not impermissible hearsay because the comment is admissible either as a statement of a party opponent or for its impact on the declarant, relevant to Ms. Wadsworth's claims that Mr. Cavanaugh sexually harassed her, and not impermissible character evidence because it describes an incident of him sexually harassing Ms. Wadsworth.  *See Joint R. Materials*, Attach. 23, *Dep. of Megan Wright* at 25:20-27:4.  The Court overrules all objections and admits PSAMF ¶ 155.

Ms. Wadsworth was common knowledge throughout the school.[26]  PSAMF ¶ 157;

DRPSAMF ¶ 157.  Mr. Cavanaugh commented on one of Ms. Wright's mother's

Facebook posts—a picture of Ms. Wright and Ms. Wadsworth dressed up in Harry

Potter costumes—stating that he felt slighted because he was not in the photo.[27]

---

[26]      Mr. Cavanaugh objects to PSAMF ¶ 157 on the grounds that it is unsupported, conclusory, and otherwise inadmissible.  DRPSAMF ¶ 157.  The Court views these objections as plausible only as they relate to the foundation of Ms. Wadsworth's statement.

      Given that the record is replete with evidence that Mr. Cavanaugh regularly pulled Ms. Wadsworth out of class, texted her constantly, and multiple teachers and administrators noticed and complained of their interactions, the Court does not strain to infer that their relationship—however it may be characterized—provided grist for the school's rumor mill.  Ms. Wright testified that her "group of friends" would "all find [the relationship] weird" and that she first heard about it through a mutual friend while living in Wisconsin.  *Wright Dep.* at 31:9-32:1.  The Court finds support for Ms. Wright's assertion that the relationship was "common knowledge," overrules Mr. Cavanaugh's objections, and admits PSAMF ¶ 157.

[27]      PSAMF ¶ 156 states:

> Defendant Cavanaugh made comments to Plaintiff in the main office, saying she looked sexy in her glasses.  Defendant Cavanaugh also commented on one of Ms. Wright's mom's Facebook posts, a picture of Ms. Wright and Plaintiff dressed up in Harry Potter costumes, stating that he felt slighted because he wasn't in the photo. This was the same costume that Plaintiff was wearing when Defendant Cavanaugh told her she looked like a playboy bunny.

PSAMF ¶ 156.  In support of these statements, Ms. Wadsworth cites the deposition testimony of Megan Wright.  *Id.* (quoting *Wright Dep.* at 26:1-5, 28:5-21, 27:12-16).  In the first statement about the glasses, Ms. Wright says that she was not present when Mr. Cavanaugh made the comment, but that Ms. Wadsworth told Ms. Wright about the comment which took place in the main office at the beginning of their senior year.  *Id.* at 25:18-26:17.

      In the second comment about the Facebook posting, Ms. Wright explained that there was a school dress-up day and Ms. Wadsworth, another female, and she dressed up as Harry Potter.  *Id.* at 27:12-28:23.  As it turned out, Mr. Cavanaugh dressed up as Harry Potter too.  *Id.* at 28:15-17.  There were two photographs: one with the three females and the other with the three females and Mr. Cavanaugh.  *Id.* at 28:11-21.  Ms. Wright's mother posted only the one of the three females on Facebook and did not post the one with the three females and Mr. Cavanaugh.  *Id.* at 27:23-28:21.  Mr. Cavanaugh commented that he felt slighted because Ms. Wright's mother had not posted the photograph in which he appeared.  *Id.* at 28:9-21.  Ms. Wright testified that Mr. Cavanaugh's comment made her feel "super uncomfortable."  *Id.* at 28:22-23.  The deposition does not clarify whether Mr. Cavanaugh made this comment directly to Ms. Wright or to Ms. Wadsworth who conveyed it to Ms. Wright.  Based on Ms. Wright's comment that Mr. Cavanaugh's comment made her feel "super uncomfortable," the Court infers that the comment was made to Ms. Wright.

      The third comment involved the same photograph of the three females wearing Harry Potter costumes on dress-up day.  *Id.* at 27:8-21.  Ms. Wadsworth told Ms. Wright that Mr. Cavanaugh commented that the way she held up her tie made her look like a Playboy bunny.  *Id.*  Ms. Wright did not hear Mr. Cavanaugh make this comment.  *Id.*

PSAMF ¶ 156; DRPSAMF ¶ 156.  Mr. Cavanaugh also told Ms. Wadsworth that she looked sexy in glasses, a comment that Ms. Wadsworth repeated to Ms. Wright.  *Id.*  Finally, Ms. Wadsworth told Ms. Wright that Mr. Cavanaugh told her that she looked like a Playboy bunny when wearing the Harry Potter costume.  *Id.*

Mr. Cavanaugh also made Ms. Wadsworth uncomfortable when he gave her gifts at school, including a box of feminine hygiene products and toiletries, as well as a winter coat.[28]  PSAMF ¶ 53; DRPSAMF ¶ 53; DSMF ¶¶ 74, 77; PRDSMF ¶¶ 74, 77.  He gave her gifts of money "a lot of times" to pay for school lunches and essentials, as well as non-essentials like clothing and trips.[29]  PSAMF ¶ 54; DRPSAMF ¶ 54; DSMF ¶ 73; PRDSMF ¶ 73.  Mr. Cavanaugh paid for Ms. Wadsworth's school photos because her parents had never purchased them for her and offered to pay for her to take the SAT.  DSMF ¶¶ 75-76; PRDSMF ¶¶ 75-76.

Ms. Wadsworth informed Mr. Nguyen that the gifts Mr. Cavanaugh was giving her made her feel embarrassed, and Mr. Nguyen responded by stating that Mr.

---

Mr. Cavanaugh offers the same slew of objections he made to PSAMF ¶ 155.  DRPSAMF ¶ 156.  The Court rejects all but the hearsay objections for the reasons stated in footnote 25 and addresses the hearsay objections below.

First, none of the testimony is offered for its truth and is not hearsay—for example, the Playboy bunny comment is obviously not being offered to prove that Ms. Wadsworth actually looked like a Playboy bunny.  FED. R. EVID. 801(c)(2) ("'Hearsay' means a statement that . . . a party offers in evidence to prove the truth of the matter asserted in the statement").  Furthermore, it seems unlikely that Ms. Wright created these comments out of whole cloth.  If Ms. Wadsworth were to testify consistently with Ms. Wright, Ms. Wadsworth's testimony about what Mr. Cavanaugh said to her would be admissible as an admission of a party opponent.  FED. R. EVID. 801(d)(2).  Finally, Ms. Wright's testimony would be admissible to rebut an express or implied charge of recent fabrication.  FED. R. EVID. 801(d)(1)(B)(i).  The Court overrules the objections and admits PSAMF ¶ 156.

[28]   Mr. Cavanaugh qualifies PSAMF ¶ 53 to assert that Ms. Wadsworth testified that she was "kind of embarrassed" by the gifts.  DRPSAMF ¶ 53.  The Court does not find this phrasing materially different than "uncomfortable" and rejects the qualification.

[29]   Mr. Cavanaugh objects to Ms. Wadsworth's use of "often" as a conclusory term.  DRPSAMF ¶ 54.  The Court substituted the exact language from her deposition testimony.  *See Wadsworth Dep. Vol. I* at 135:17-136:16.

Cavanaugh was just making sure she had everything she needed.  PSAMF ¶¶ 55-56; DRPSAMF ¶¶ 55-56.  Ms. Wadsworth's family was aware of some of Mr. Cavanaugh's assistance and would comment on it, with her father asking her to "ask Mr. Cavanaugh if he could do this or that" and her mother sarcastically saying "if you need help why don't you go ask Mr. Cavanaugh."[30]  DSMF ¶¶ 78-79; PRDSMF ¶¶ 78-79.  Neither of Ms. Wadsworth's parents complained to the District of any wrongdoing by Mr. Cavanaugh, regarding the financial assistance or any other issues.  DSMF ¶ 80; PRDSMF ¶ 80.

Other teachers and administrators have financially assisted students in need, and Ms. Philbrook testified:

> We buy sneakers for kids; we give them scholarships and help them pay for driver's ed.  If a student – I've bought ties for students and shirts for students [for the prom].  Our students are needy.  That in itself would not cause any sort of concern . . ..  I'm not going to speculate what she was in need of, and if Mr. Cavanaugh knew she was in need of something, he would give the shirt off his back for somebody.

DSMF ¶ 80; PRDSMF ¶ 80.  Mr. Cavanaugh assisted other students who were in need or struggling, particularly around the holidays, and ensured that families had gifts; had previously bought another student a coat after the passing of her father; and had given cash and gifts to other students and paid for students' prom dresses.[31] DSMF ¶¶ 82-84; PRDSMF ¶¶ 82-84.  Ms. Philbrook testified that the staff and

---

[30]    Ms. Wadsworth qualifies DSMF ¶ 78 to note that her parents were only aware of certain instances of Mr. Cavanaugh supporting her.  PRDSMF ¶ 78.  The Court modified DSMF ¶ 78 to clarify that they were aware of some of the assistance.

[31]    Ms. Wadsworth qualifies DSMF ¶ 84 to note that "[i]t was [her] understanding during the relationship that [Mr.] Cavanaugh did not provide cash and gifts to other students."  PRDSMF ¶ 84. Even if the Court accepted the assumption that this information was within her knowledge, the fact asserts that Mr. Cavanagh had given gifts in the past—a period not limited to their relationship.  The Court rejects the qualification as beyond the scope of the fact asserted.

administrators go out of their way to help kids in need and that such instances of assistance are not inherently concerning.  DSMF ¶ 85; PRDSMF ¶ 85.

### 3.    The Birth Control Appointment

During Ms. Wadsworth's junior year, while she was living with the Kennistons, Mr. Cavanaugh took Ms. Wadsworth to a physical examination with her doctor so she could participate in cheerleading.  PSAMF ¶ 44; DRPSAMF ¶ 44; DSMF ¶ 43; PRDSMF ¶ 43.  At the time, Ms. Wadsworth was estranged from her parents and they had not signed off on the physical or signed other permission slips she needed for cheerleading.[32]  DSMF ¶¶ 43-44; PRDSMF ¶¶ 43-44.  Mr. Cavanaugh offered to bring Ms. Wadsworth but she replied that Ms. Kenniston could take her.[33]  DSMF ¶ 45; PRDSMF ¶ 45.   Mr. Cavanaugh insisted and ultimately took her to the appointment.  DSMF ¶¶ 45-46, 50; PRDSMF ¶¶ 45-46, 50.

While at the appointment, Mr. Cavanaugh suggested Ms. Wadsworth get on birth control.[34]  PSAMF ¶ 45; DRPSAMF ¶ 45; DSMF ¶ 47; PRDSMF ¶ 47.  While she saw him approach the person sitting at the front desk, she was not present for

[32]    Ms. Wadsworth qualifies DSMF ¶¶ 43-45 to clarify that she does not recall if she asked her parents to sign off on the form or take her to the examination.  PRDSMF ¶¶ 43-45.  The Court has slightly reframed the assertions to reflect her deposition testimony, but otherwise overrules her objections as beyond the scope of the fact asserted.  *See Wadsworth Dep. Vol. I* at 198:11-15 ("I didn't have my parents to sign off on it or on my physical or any other permission slips that I needed for cheer").

[33]    Ms. Wadsworth qualifies DSMF ¶ 45 to add that she advised Mr. Cavanaugh that Ms. Kenniston could take her, but Mr. Cavanaugh insisted on taking her himself.  PRDSMF ¶ 45.  The Court admits this qualification as supported by the record.  *See Joint R. Materials*, Attach. 20, *Pl. Adrianna Wadsworth's Answer to Def. Chuck Nguyen's Interrogs.* at 4 (*Wadsworth Interrogs.*).

[34]    Mr. Cavanaugh denies PSAMF ¶ 45, contending that Ms. Wadsworth's assertion that Mr. Cavanaugh suggested she get on birth control is unsupported by the record.  DRPSAMF ¶ 45.  The Court disagrees, overrules the objection, and admits PSAMF ¶ 45.  *See Wadsworth Dep. Vol. I* at 201:4-8 ("I remember [Mr. Cavanaugh] telling me while we were there that he would look into the topic of birth control for me and how we can get that").

18

any conversation that may have taken place. DSMF ¶ 51; PRDSMF ¶ 51. Ms. Wadsworth does not recall having any conversation with the healthcare provider about birth control, nor was she prescribed birth control as a result of this visit, but Mr. Cavanaugh wrote a letter to the doctor's office advising the doctor of issues he perceived she had with her menstruation.[35] DSMF ¶¶ 51-52; PRDSMF ¶¶ 51-52.

That letter advised that Mr. Cavanaugh had concerns about Ms. Wadsworth's health that included depression, attention deficit, irregular menstrual cycle, and lack of vaccinations due to religious concerns. PSAMF ¶ 114; DRPSAMF ¶ 114. Mr. Cavanaugh noted in the letter that Ms. Wadsworth's medical records should be kept confidential and not shared with her parents, but later admitted that he did not have the authority to prevent Ms. Wadsworth's parents from seeing her medical records, as they remained her legal guardians. PSAMF ¶¶ 115-16; DRPSAMF PSAMF ¶¶ 115-16.

Ms. Wadsworth did not do any research on her own or consult the female school nurse regarding birth control to address her menstruation issues, as she "felt like Mr. Cavanaugh gave [her] all the knowledge [she] needed," but she did speak to Ms. Kenniston, who advised her that they could make a decision together without Mr. Cavanaugh's involvement.[36] DSMF ¶¶ 53-54, 59; PRDSMF ¶¶ 53-54, 59.

---

[35]    Ms. Wadsworth qualifies DSMF ¶ 51 to add that Mr. Cavanaugh wrote a letter to the doctor's office about issues he perceived her to have with menstruation. PRDSMF ¶ 51. The Court accepts this qualification. *See Joint R. Materials*, Attach. 36, *Letter from Andrew Cavanaugh to Pl.'s Doctor* at 2 (*Cavanaugh Letter*).

[36]    Ms. Wadsworth qualifies DSMF ¶ 53 to add her discussion with Ms. Kenniston. The Court accepts that qualification as supported by the record.

After the physical, Mr. Cavanaugh continually suggested Ms. Wadsworth get on birth control and ultimately scheduled a medical appointment for Ms. Wadsworth so that she could obtain birth control.[37]   PSAMF ¶ 46; DRPSAMF ¶ 46.   Mr. Cavanaugh made these suggestions after speaking with Ms. Wadsworth about her menstruation issues and about intercourse with other persons her age.[38]   DSMF ¶¶ 48-49; PRDSMF ¶¶ 48-49.

Mr. Nguyen knew that Mr. Cavanaugh was attempting to schedule and take Ms. Wadsworth to a birth control appointment, and he advised Mr. Cavanaugh that taking Ms. Wadsworth "wouldn't be a good idea; don't take her."[39]   PSAMF ¶¶ 47-48; DRPSAMF ¶¶ 47-48.   Mr. Nguyen spoke with Ms. Wadsworth about the birth control appointment and whether it was normal for Mr. Cavanaugh to be discussing birth control with her, with Mr. Nguyen informing her that Mr. Cavanaugh was like a father figure to her, and that Mr. Cavanaugh thought of her "as a daughter."[40]   PSAMF ¶ 52; DRPSAMF ¶ 52; DSMF ¶ 57; PRDSMF ¶ 57.   During this conversation, Ms. Wadsworth first said that she "didn't know" if she was okay with Mr. Cavanaugh

---

[37]   Mr. Cavanaugh denies PSAMF ¶ 46, contending again that Ms. Wadsworth's assertions are unsupported by the record.  The Court again overrules the objection and admits PSAMF ¶ 46.  *See Wadsworth Dep. Vol. I* at 203:15-20 (recalling Mr. Cavanaugh repeatedly reminded her that she should "be on [birth control]").

[38]   Mr. Cavanaugh submits that he suggested birth control as a potential solution for Ms. Wadsworth's menstruation issues.  DSMF ¶¶ 48-49.  She counters that they had also discussed her being sexually active and she primarily associated birth control with intercourse.  PRDSMF ¶¶ 48-49.  The Court views Mr. Cavanaugh's motive to be a disputed issue of fact and—as it must at this stage—draws the inference in Ms. Wadsworth's favor, modifying DSMF ¶ 48 and omitting ¶ 49.

[39]   Mr. Cavanaugh qualifies PSAMF ¶ 48 to assert that instead of saying it was a bad idea, Mr. Nguyen said it was not a good idea.  DRPSAMF ¶ 48.  The Court accepts the qualification and modified PSAMF ¶ 48 to reflect Mr. Cavanaugh's testimony.

[40]   The Court omits PSAMF ¶¶ 49-51 and DSMF ¶¶ 55-56 for the reasons stated in footnote 4, as irrelevant to the claims against Mr. Cavanaugh, but admits Mr. Nguyen's comments in PSAMF ¶ 52 and DSMF ¶¶ 57-58 as relevant to Ms. Wadsworth's feelings about Mr. Cavanaugh's behavior.

discussing birth control and asked Mr. Nguyen for his opinion, but after he affirmed Mr. Cavanaugh's behavior as a "father figure," Ms. Wadsworth then responded "yeah, you're right, I agree."[41]   DSMF ¶ 58; PRDSMF ¶ 58.

Ms. Wadsworth "relied on" Defendant Cavanaugh and Defendant Nguyen for "all of her private issues" because she thought she could trust them and had been reassured by Mr. Nguyen that Mr. Cavanaugh's behavior was not inappropriate.[42] DSMF ¶ 61; PRDSMF ¶ 61.   Mr. Nguyen testified that it was not abnormal for administrators at the high school to ask him about birth control for students but that an administrator asking about taking a student to get birth control would "raise alarm bells" as a "violation of professional and personal boundaries."[43,44]   DSMF ¶ 62; PRDSMF ¶ 62.

### 4. Andrew Cavanaugh Asks Adrianna Wadsworth to Move in with Him

Over the course of several months, while Ms. Wadsworth was living with the Kennistons, Mr. Cavanaugh asked her to move into his home on a number of

---

[41]   Ms. Wadsworth objects that DSMF ¶ 58, characterizing her response as agreeing with Mr. Nguyen's comments, does not capture the dynamics of the conversation.  The Court agrees and admits DSMF ¶ 58 as supplemented to reflect more accurately Ms. Wadsworth's deposition testimony.  *See Wadsworth Dep. Vol. I* at 208:17-209:8.

[42]   The Court accepts Ms. Wadsworth's qualification to supplement DSMF ¶ 61 to add why she relied on Mr. Cavanaugh and Mr. Nguyen.

[43]   Ms. Wadsworth qualifies DSMF ¶ 62 to object that the proposed assertion omitted key parts of Mr. Nguyen's testimony on this issue.  PRDSMF ¶ 62.  The Court supplemented DSMF ¶ 62 to fairly represent Mr. Nguyen's testimony.  *See Nguyen Dep.* at 102:16-103:9.

[44]   The Court omits DSMF ¶ 60, asserting that Mr. Cavanaugh played no role in Ms. Wadsworth ultimately obtaining birth control, as contradicted by the record.  *See Kenniston Dep.* at 39:5-6 ("[Mr.] Cavanaugh made an appointment for [Ms. Wadsworth] to go on birth control").

occasions.[45]   PSAMF ¶¶ 57-58; DRPSAMF ¶¶ 57-58.   During that period, Mr.

Cavanaugh sent Ms. Wadsworth the following text messages:

> **April 28:** "You need to come here tomorrow.  I will get a room ready for you and you can rest and get better.  We will take care of you.  I think you are just too stressed."

> **April 29:** "Do you think staying with me isnt a good idea?"

> **May 10:** "Would your parents freak if you lived with me?"

> "What about staying here for a couple days just to try it?  You might like it.  At least no one would yell at you.  What about staying here tomorrow night?"

> "If you decide you want to stay with me, just give a brutha a heads up."

> "One of these days I will get you to live with me!"

> **May 18:** "Move in here and we will teach you."

> "You should live here for your senior year.  It would be a stable place and I dont care about child support."

> "I have always said you were a class act.  I think if you talked with Debbie and I about it we could take care of a lot.  I would write a letter to the superintendent and all that."

> **June 8:** "I have told you to live with me but you don't want to do that."

> **June 22:** "I have a bit of bad news.  I spoke with work about you staying with me and i cant.  I feel terrible but thats what it is."

---

[45]    Mr. Cavanaugh objects that "[o]ver the course of several months" should be stricken as conclusory.   DRPSAMF ¶ 57.   The Court overrules this objection as frivolous, given that Mr. Cavanaugh goes on to admit the veracity of nearly a dozen such text messages over a two-month period.  DRPSAMF ¶¶ 58-69.
       Mr. Cavanaugh also qualifies PSAMF ¶ 57 to object that the assertion "again ignores the context of the communications and their relationship."  DRPSAMF ¶ 57.  He offers this same objection to PSAMF ¶¶ 58-71.  The Court overrules each context objection as beyond the scope of the fact(s) asserted.

PSAMF ¶¶ 59-69; DRPSAMF ¶¶ 59-69.  While Mr. Cavanaugh was not more specific about whom at "work" he spoke with—he may have been referring to Mr. Nguyen, whom Mr. Cavanaugh asked if Ms. Wadsworth could move in with him (Mr. Nguyen responded that he did not think it was a good idea)—he informed someone at the school about his desire to have Ms. Wadsworth live with him, and no action was taken related to this request beyond seemingly denying it.[46]  PSAMF ¶¶ 70-71; DRPSAMF ¶¶ 70-71.

### 5.   Andrew Cavanaugh's Inappropriate Text Messages

On a near daily basis, Mr. Cavanaugh would exchange text messages with Ms. Wadsworth; many   inappropriate.[47]   PSAMF ¶ 90; DRPSAMF ¶ 90.  In his text messages, Mr. Cavanaugh would ask Ms. Wadsworth to send him pictures of her in her swimsuit, ask her about her sexual relationships with boys, and even about whether she was having orgasms.  PSAMF ¶ 90; DRPSAMF ¶ 90.

On July 21, 2017, Mr. Cavanaugh texted her "You are like a daughter to me . . . Maybe a scandalous step daughter"[48] and "If you buy car insurance how would you afford those lacey shorts?"  PSAMF ¶¶ 77-78; DRPSAMF ¶¶ 77-78.

---

[46]      Mr. Cavanaugh objects that PSAMF ¶ 70 should be stricken because it "would be inadmissible at the time of trial," without elaborating on his reasoning.  DRPSAMF ¶ 70.  Mr. Cavanaugh, however, admitted the substance of the underlying text message in DRPSAMF ¶ 69.  To the extent that he is now arguing that the assertion that he told someone at school is hearsay, the Court overrules the objection because the text message is admissible against him as a statement of a party opponent.  *See* FED. R. EVID. 801(d)(2).

[47]      As with the text messages about moving in, Mr. Cavangh does not deny the veracity of the text messages cited in this section, but instead qualifies each to state that "Plaintiff is again ignoring the context of the communications and their relationship."  DRPSAMF ¶ 77.  The Court again overrules each context objection as beyond the scope of the fact(s) asserted.  *See* DRPSAMF ¶¶ 77-91.

[48]      PSAMF ¶ 77 begins by saying, "Mr. Cavanaugh abused Ms. Wadsworth's trust".  The Court sua sponte strikes this introductory phrase as a legal conclusion.  The Court admits the remainder of PSAMF ¶ 77.

On July 27, 2017, he texted her "How casual is sex with your friends?  Like is it no big deal or what?"  PSAMF ¶ 79; DRPSAMF ¶ 79.  Three days later, Mr. Cavanaugh texted Ms. Wadsworth, "Good you should be at the beach.  I would ask for pictures, but that might be a bit much . . . Can I see the photos or would that bother you?  Only send the scandalous ones!  Ha hah."  PSAMF ¶ 80; DRPSAMF ¶ 80.  Later that day, he texted her "Do you have any more [pictures] you could send?"  PSAMF ¶ 81; DRPSAMF ¶ 81.  On August 2, 2017, he texted her "Can you help me Friday or will you be taking more nude pictures of yourself?"[49]  PSAMF ¶ 82; DRPSAMF ¶ 82.

On August 2, 2017, Ms. Wadsworth told Mr. Cavanaugh that she had been sexually assaulted by her cheerleading coach while swimming during an off-season cheerleading team trip earlier that summer.[50]  PSAMF ¶¶ 72-73; DRPSAMF ¶¶ 72-

---

[49]    During oral argument, Mr. Cavanaugh's counsel vigorously objected when the Court referenced nude photographs, denying that Mr. Cavanaugh ever asked Ms. Wadsworth for nude photographs or that she ever sent any nude photographs to him.  Be this as it may, the record reflects that Mr. Cavanaugh, the principal of the high school, was texting Ms. Wadsworth, a female high school student, about nude photographs of herself.  Furthermore, Mr. Cavanaugh's text message about whether Ms. Wadsworth would be taking more photographs of herself followed a rather extended and detailed text discussion in which Mr. Cavanaugh quizzed Ms. Wadsworth about whether she had ever sent nude pictures of herself to anyone.  *See Joint R. Materials,* Attach. 18, *Text Messages Between Mr. Cavanaugh and Ms. Wadsworth* at 15-16.

[50]    PSAMF ¶¶ 72-76 and 83-88 concern allegations that Ms. Wadsworth was sexually assaulted by a cheerleading coach, told Mr. Cavanaugh about the assault, and Mr. Cavanaugh failed to report it or take any corrective action.  Mr. Cavanaugh objects to each assertion that "to the extent that Plaintiff is attempting to raise a new theory of liability against Defendant Cavanaugh in her opposition to his motion for summary judgment is improper."  DRPSAMF ¶ 72 (citing *Miranda-Rivera v. Toledo-Davila,* 813 F.3d 64, 76 (1st Cir. 2016)) (citation and internal quotations omitted).

The Court agrees that Ms. Wadsworth cannot use these assertions to raise a new theory of liability at this point.  However, Ms. Wadsworth's telling Mr. Cavanaugh about this assault corroborates the trust she placed in Mr. Cavanaugh.  The Court admits these assertions as relevant to Ms. Wadsworth's existing claims.

Additionally, Mr. Cavanaugh objects that Ms. Wadsworth "communicated with Defendant Cavanaugh privately and in confidence about being inappropriately touched by one of her cheerleading coaches at the beach, not during school hours . . . [t]he communication was not made to him in his capacity as School principal, and specifically asked him not to tell anyone about the incident."

24

73; DSMF ¶ 87; PRDSMF ¶ 87.  Following the incident, on July 11, 2017, Ms. Wadsworth advised Mr. Cavanaugh—as the second person she told, after a friend— that something had happened but that she did not want to talk about it.  PSAMF ¶ 75; DRPSAMF ¶ 75; DSMF ¶¶ 88-89; PRDSMF ¶¶ 88-89.  She described Mr. Cavanaugh as the only person she could trust at the time.[51,52]  DSMF ¶ 90; PRDSMF ¶ 90.  Mr. Cavanaugh responded, "Ok, You will want [t]o talk with someone about what happened. If you talk with me it will go no further and i will give you some constructive options."  PSAMF ¶ 75; DRPSAMF ¶ 75.  Several days later, Mr. Cavanaugh texted Ms. Wadsworth, "I dont like that someone took advantage of you. I have my suspicions."  PSAMF ¶ 76; DRPSAMF ¶ 76.

On August 2, 2017, Mr. Cavanaugh told Ms. Wadsworth that he wanted to know more about what happened the day Ms. Wadsworth called him crying.  PSAMF ¶ 83; DRPSAMF ¶ 83.  Ms. Wadsworth responded that her school cheerleading coach

---

DRPSAMF ¶ 72.  The Court is not convinced that these assertions are inadmissible if they were conveyed to Mr. Cavanaugh in his personal capacity, but even if that were true there is at the very least a dispute of material fact as to whether she reported the allegation to him in his capacity as principal—especially where she was reporting an assault by a coach presumably under his direct authority as principal.

Finally, Mr. Cavanaugh objects that Ms. Wadsworth "also claims herein that Defendant Cavanaugh 'discovered' the incident and questioned her about it . . . [but h]er deposition testimony reflects the opposite."  *Id.*  Despite his employment of quotation marks, the terms "discover" or "discovered" do not appear in Ms. Wadsworth's statement of additional material facts.  Instead, she asserts that "[f]ollowing the incident, on July 11, 2017, *Ms. Wadsworth advised Mr. Cavanaugh* that something had happened . . .," PSAMF ¶ 74 (emphasis added), and that "Mr. Cavanaugh told Ms. Wadsworth that he wanted to know more about what happened the day *Ms. Wadsworth called him* crying."  PSAMF ¶ 83 (emphasis added).  The Court overrules this objection as contradicted by the record and admits PSAMF ¶¶ 72-76 and 83-88.

[51]   Mr. Cavanaugh qualifies DSMF ¶ 90, offering more context about her feelings at the time but ultimately acknowledging the assertion that "[s]he felt, at the time, that she could only trust Defendant Cavanaugh."  PRDSMF ¶ 90.  The Court rejects Ms. Wadsworth's qualifications as beyond the scope of the fact asserted and admits DSMF ¶ 90.

[52]   The Court omits DSMF ¶ 108 as redundant to DSMF ¶ 90.  *See* DSMF ¶ 108 ("She described him during this timeframe of her life as the one person she could trust").

"tried something in the water." PSAMF ¶ 84; DRPSAMF ¶ 84. Mr. Cavanaugh replied, "Like put his hands in your suit? ... I assume this was your bikini bottoms. What he say or did he just make the move?" PSAMF ¶ 85; DRPSAMF ¶ 85. Ms. Wadsworth responded:

> It just sucked he always stretches me in cheering and has to touch me all the time and right after we went swimming I had practice but I had been crying and didn't want anyone to notice so I was late to cheer and of course it was in the middle of warm ups when we all had to have partners and everyone already had partners so just my luck coach told me to be partners with him. And my hands started shaking and he could see my eyes were red and he just kept silently reminding me not to say anything. He kept giving me special treatment at first and telling me he could make sure I had all of those special positions in cheering and then I told him I didn't want it and that he was my coach and that's all and then he immediately turned cold. And he always comes back for winter season and it's all just ruined.

PSAMF ¶ 86; DRPSAMF ¶ 86.

Over the ensuing days and weeks, Mr. Cavanaugh and Ms. Wadsworth continued texting about the sexual assault and ultimately Ms. Wadsworth stated that she believed that what happened was her fault. PSAMF ¶ 87; DRPSAMF ¶ 87. To that point, Mr. Cavanaugh responded:

> I can understand why you feel that way, but at the same time he is your coach an[d] that is precisely why its not allowed. Its complicated but he should not have taken you swimming. Even if he did, it should have only been swimming, a few laughs and that's it. I mean when I go to the beach (ve[r]y rare) and i see a student in a bikini, it can be awkward. I mean the pictures you sent me, they are great shots and well taken, but there is no mistaking that you a pretty snappy number. So to be at the beach with you alone was not t[h]e best because he is seeing you with pret[t]y much not[h]ing on. Still if he is stretching you at practice, that can be pretty revealing, so i would think he would be used to it and be able to think a bit more clearly.

PSAMF ¶ 88; DRPSAMF ¶ 88.  Ms. Wadsworth specifically asked him not to tell anyone about the incident.  DSMF ¶ 91; PRDSMF ¶ 91.  This conversation continued until August 4, 2017, at which time Mr. Cavanaugh told Ms. Wadsworth to put on "her Mickey Mouse negligee" and go to bed, and then stated, "Im deleting our conversations, and the swimsuit pictures, as much as i hate to! Hah hah."[53]  PSAMF ¶ 89; DRPSAMF ¶ 89.

### 6.   Andrew Cavanaugh Pulling Adrianna Wadsworth from Class

Mr. Cavanaugh would regularly pull Ms. Wadsworth out of class to have meetings with her in his office.[54]  PSAMF ¶ 106; DRPSAMF ¶ 106.  Mr. Cavanaugh would excuse Ms. Wadsworth's absences from class and school, despite not having the authority to do so.[55]  PSAMF ¶ 107; DRPSAMF ¶ 107.

---

[53]     The Court omits PSAMF ¶ 91 as virtually identical to PSAMF ¶ 43.  *Compare* PSAMF ¶ 43 ("Shockingly, Mr. Cavanaugh did not try to hide the fact that he was sending text messages to Ms. Wadsworth, and according to him, he may have told Ms. Philbrook, Mr. Nguyen, and Athletic Director, Matt Lash, that he was exchanging text messages with Ms. Wadsworth") *with* PSAMF ¶ 91 ("Mr. Cavanaugh did not try to hide the fact that he was sending text messages to Ms. Wadsworth, and according to him, he may have told Ms. Philbrook, Mr. Nguyen, and Athletic Director, Matt Lash, that he was exchanging text messages with Ms. Wadsworth").

[54]     Mr. Cavanaugh denies PSAMF ¶ 106, objecting that the assertion is not supported by the record and that the cited conversation is hearsay.  DRPSAMF ¶ 106.  The Court finds the cited deposition testimony to clearly read that a teacher asked Ms. Wadsworth who kept calling her from class and she responded that it was Mr. Cavanaugh calling her to come talk with him.  *See Wadsworth Dep. Vol. I* at 187:9-18.  Even if the teacher's questions were inadmissible hearsay, Ms. Wadsworth's statement that Mr. Cavanaugh was calling her out of class is admissible.  Furthermore, this factual assertion is not seriously in dispute.  *See* DRPSAMF ¶ 110 (Mr. Cavanaugh admitting that he sent her concerned teachers an email stating that "I apologize for [Ms. Wadsworth] being removed during these important classes and I will make sure it does not happen again").  The Court overrules the objections and admits PSAMF ¶ 106.

[55]     Mr. Cavanaugh denies PSAMF ¶ 107, objecting that the cited testimony quotes Mr. Nolan saying "there are reasons in law for why students can be absent" but this "testimony has nothing to do with nor does it factually support the statement in this paragraph and should be stricken pursuant to Local Rule 56(e)."  DRPSAMF ¶ 107.  The Court disagrees.  In the cited excerpt, Mr. Nolan goes on to say "there are reasons in law for why students can be absent . . . and I don't believe they include having a school administrator excuse them for – for the student."  *Nolan Dep.* at 105:5-11.  A reasonable juror could find that this testimony supports the assertion that Mr. Cavanaugh did not have the authority to excuse Ms. Wadsworth's absences.

On October 4, 2016, Ms. Wadsworth's English teacher sent an email to Mr. Cavanaugh, Assistant Principal Linda Pease, Ms. Philbrook, and Mr. Nguyen stating that she and another English teacher wanted to "voice [their] concern about Anna Wadsworth being pulled from [Writing Center and AP Language classes] at the request of [Mr. Cavanaugh's] office."[56]   PSAMF ¶ 108; DRPSAMF ¶ 108; *Joint R. Materials*, Attach. 31, *Email Forward from Tamra Philbrook to Chuck Nguyen Dated November 17, 2020*.   Both School Assistant Principals, Ms. Pease and Ms. Philbrook, approached Mr. Cavanaugh and advised him not to "haul Anna out of a class or keep her from class."[57]   PSAMF ¶ 109; DRPSAMF ¶ 109.

---

Mr. Cavanaugh also contends that the assertion is conclusory, which the Court interprets to refer to the portion stating that "[d]uring these meetings, Mr. Cavanaugh continued his inappropriate and sexual conversations with Ms. Wadsworth." PSAMF ¶ 107. The Court omits this language as conclusory and admits the remainder of PSAMF ¶ 107 as supported by the record.

[56]   Mr. Cavanaugh objects that PSAMF ¶ 108 is hearsay, asserting that the emails are out of court statements offered for the truth of the matters asserted. DRPSAMF ¶ 108. This objection is unavailing. First, this is a brief email string between a teacher to and from the principal of the school concerning a student and her attendance at classes. The emails use school email addresses and copy the assistant principals and the school counselor. As such, they fall well within the hearsay exception of Federal Rule of Evidence 803(6).

Moreover, in the specific context of this motion, PSAMF ¶ 108 is more relevant for its effect on Mr. Cavanaugh than for the truth of the matter asserted by the teacher—that Mr. Cavanaugh had been pulling Ms. Wadsworth from class. There is no serious dispute as to the truth of the latter allegation. *See* DRPSAMF ¶ 110 (Mr. Cavanaugh admitting that he sent her concerned teachers an email stating that "I apologize for [Ms. Wadsworth] being removed during these important classes and I will make sure it does not happen again").

Instead, the Court finds PSAMF ¶ 108 relevant to the claim against Mr. Cavanaugh as evidence that he was aware that other teachers were concerned about his behavior with Ms. Wadsworth. Because the email is not offered for its truth it is not hearsay. FED. R. EVID. 801(c)(2) ("'Hearsay' means a statement that . . . a party offers to prove the truth of the matter asserted in the statement"). Either way for purposes of this motion, the Court overrules the objection and admits PSAMF ¶ 108.

[57]   Mr. Cavanaugh qualifies PSAMF ¶ 109 to object that the assertion is "unreliable hearsay." DRPSAMF ¶ 108. The assertions in PSAMF ¶ 109 are supported by Ms. Philbrook's testimony about his own statements to Mr. Cavanaugh. *See Philbrook Dep.* at 130:20-23 (she and Ms. Pease "went into [Mr. Cavanaugh's office] and said, you know, don't haul Anna [Wadsworth] out of a class or keep her from her class"). The Court thus does not understand the basis of Mr. Cavanaugh's hearsay objection. While deposition testimony may (or may not) be hearsay when offered at trial, Federal Rule of Civil Procedure 56 clearly provides that for summary judgment a party can support an assertion by "citing to particular parts of materials in the record, *including depositions* . . . ." FED. R. CIV. P. 56(c) (emphasis added). The Court overrules the objection and admits PSAMF ¶ 109.

Mr. Cavanaugh replied to the teachers' email, stating:

Anna has some issues outside of class that we are working to resolve. I know she is extremely conscientious regarding her coursework and you are correct regarding her stress level. I apologize for her being removed during these important classes and I will make sure it does not happen again.[58]

PSAMF ¶ 110; DRPSAMF ¶ 110. Despite this assurance, Mr. Cavanaugh continued to pull Ms. Wadsworth from classes.[59] PSAMF ¶ 111; DRPSAMF ¶ 111.

### 7. The Car and September 19, 2017 Traffic Stop

At some point, not long after moving in with the Kenniston family, Ms. Wadsworth's mother ceased letting her use her vehicle. DSMF ¶ 63; PRDSMF ¶ 63. Ms. Wadsworth raised the issue with her father and with Mr. Cavanaugh, telling both that she needed a car and telling her father that she had raised the issue with Mr. Cavanaugh and that Mr. Cavanaugh had offered to assist her. DSMF ¶¶ 63-66; PRDSMF ¶¶ 63-66. At the time Ms. Wadsworth was still working for Mr. Cavanaugh babysitting and fixing properties, and he sought to assist her with a vehicle so she could drive to her jobs. DSMF ¶ 67; PRDSMF ¶ 67. Mr. Cavanaugh purchased a vehicle from his sister, who operated a car dealership, and advised Ms. Wadsworth

---

[58]   Mr. Cavanaugh admits sending an email but denies the remainder of PSAMF ¶ 110. DRPSAMF ¶ 110. The Court supplies the language of the email and overrules Mr. Cavanaugh's objection. *Email Forward from Tamra Philbrook to Chuck Nguyen Dated November 17, 2020.*

[59]   Mr. Cavanaugh denies PSAMF ¶ 111 as unreliable hearsay and unsupported by the record. DRPSAMF ¶ 111. The Court omits the assertion that Mr. Cavanaugh "lied" but admits the remainder of PSAMF ¶ 111 as supported by the record. *See Joint R. Materials*, Attach. 29, *Email exchange with Penny Morrill, Tamra Philbrook and others dated December 4, 2017* (listing fifteen times Mr. Cavanaugh excused Ms. Wadsworth's absence or tardiness after his "I will make sure it does not happen again" email). Even if the email was prepared for the investigation of Mr. Cavanaugh, the attendance records fall well within the hearsay exception of Federal Rule of Evidence 803(6). *See Philbrook Dep.* at 102:10-12 (stating that the school attendance secretary "has to run a state report regarding attendance every quarter").

that he would pay for half the car and that she could work for him to pay for the other half of the cost of the vehicle.[60]   DSMF ¶¶ 68-69; PRDSMF ¶¶ 68-69; PSAMF ¶ 92; DRPSAMF ¶ 92.  Mr. Cavanaugh specifically made Ms. Wadsworth's father aware of the plan and obtained his permission before proceeding with the purchase.  DSMF ¶¶ 70-71; PRDSMF ¶¶ 70-71.  Ms. Wadsworth's father was aware that Mr. Cavanaugh was assisting her with a number of items while she was at school, beyond just the vehicle.[61]  DSMF ¶ 72; PRDSMF ¶ 72.

On September 19, 2017, School Resource Officer, Chris Spear, a member of the Waldoboro Police Department and School staff, observed Ms. Wadsworth driving a black Hyundai vehicle, ran the plate with dispatch, and the vehicle came back as owned by Mr. Cavanaugh.  PSAMF ¶ 93; DRPSAMF ¶ 93; DSMF ¶ 11; PRDSMF ¶ 11.  Later that day, Officer Spear conducted a traffic stop on Ms. Wadsworth when he observed her speeding after school.  PSAMF ¶ 94; DRPSAMF ¶ 94; DSMF ¶ 115; PRDSMF ¶ 115.  Upon reviewing the registration information, Officer Spear asked Ms. Wadsworth why the registration showed that the vehicle was owned by Mr. Cavanaugh.  PSAMF ¶ 95; DRPSAMF ¶ 95; DSMF ¶¶ 116-17; PRDSMF ¶¶ 116-17.  Ms. Wadsworth responded that Mr. Cavanaugh was helping her out while she waited to potentially move in with her father.  PSAMF ¶ 96; DRPSAMF ¶ 96.

---

[60]    Ms. Wadsworth qualifies DSMF ¶ 69 to add that Mr. Cavanaugh only asked her to work to pay off half of the sale price.  PRDSMF ¶ 69.  The Court accepts this qualification as supported by the record.

[61]    Ms. Wadsworth qualifies DSMF ¶ 72 to—as the Court understands the qualification—note that she did not testify that the assistance was specifically financial.  PRDSMF ¶ 72.  The Court does not view this distinction to be particularly significant but accepts the clarification and omits "financially."  *See Wadsworth Dep. Vol. I* at 139:18-20 ("my dad knew that Mr. Cavanaugh was helping me while I was at school").

Following the traffic stop, Officer Spear returned to the school, where he spoke with Ms. Philbrook about the traffic stop and expressed his concern that Ms. Wadsworth was driving a vehicle owned and insured by Mr. Cavanaugh.[62] PSAMF ¶ 97; DRPSAMF ¶ 97. Mr. Cavanaugh had informed Ms. Philbrook that Ms. Wadsworth was purchasing the car from him. DSMF ¶ 121; PRDSMF ¶ 121. Ms. Philbrook responded that both she and Ms. Pease had received complaints that Mr. Cavanaugh was spending too much time with Ms. Wadsworth and complaints surrounding his excusing her from class too often. PSAMF ¶ 98; DRPSAMF ¶ 98. Ms. Philbrook also advised Officer Spear that Mr. Cavanaugh had asked Ms. Wadsworth if she was interested in moving in with him.[63] PSAMF ¶ 99; DRPSAMF ¶ 99. Ms. Philbrook informed Officer Spear that she and Ms. Pease had tried to have professional conversations with Mr. Cavanaugh with regard to his behavior towards Ms. Wadsworth.[64] PSAMF ¶ 100; DRPSAMF ¶ 100; DSMF ¶ 120; PRDSMF ¶ 120.

[62]     Ms. Wadsworth qualifies DSMF ¶ 35 to propose adding that Ms. Philbrook also told Officer Spear that she and Ms. Pease had received complaints about Mr. Cavanaugh spending too much time with Ms. Wadsworth. PRDSMF ¶ 35. The Court admits those exact proposed additions as part of PSAMF ¶ 98 in the following sentences, and thus overrules Ms. Wadsworth's qualification as moot.

[63]     Mr. Cavanaugh incorporates the District's response to PSAMF ¶ 99, which qualified the assertion to clarify that Officer Spear did not include this information in an email he sent the police chief following his conversation with Ms. Philbrook. DRPSAMF ¶ 99; RSU 40's DRPSAMF ¶ 99. Officer Spear testified that he had learned during "the conversation with Tamra Philbrook . . . that Principal Cavanaugh had asked [Ms. Wadsworth] if she was interested in moving in." *Joint R. Materials,* Attach. 12, *Dep. of Christopher P. Spear* at 33:20-24 (*Spear Dep.*). The Court finds the qualification beyond the scope of the asserted fact and admits PSAMF ¶ 99.

[64]     Mr. Cavanaugh denies PSAMF ¶ 100, objecting that the assertion is inadmissible hearsay. DRPSAMF ¶ 100. The Court disagrees. The Court views the assertion as relevant primarily for its effect on Mr. Spear—and as context for his later "Pervert Principal" email, *see* PSAMF ¶ 104—and, if offered for that reason, it would not be hearsay. To the extent that it is offered for the truth of the underlying assertion, that Ms. Philbrook and Ms. Pease had expressed their concerns to Mr. Cavanaugh about his behavior with Ms. Wadsworth, the Court has already found that assertion supported by the record for the reasons explained in footnote 57. *See Philbrook Dep.* at 130:20-23 (Ms. Philbrook and Ms. Pease "went into [Mr. Cavanaugh's office] and said, you know, don't haul Anna [Wadsworth] out of a class or keep her from her class"). Regardless of how PSAMF ¶ 100 is characterized, it is not inadmissible hearsay and the Court overrules Mr. Cavanaugh's objection.

31

**A260**

As a result of the traffic stop, Ms. Philbrook asked Officer Spear to have a conversation with Mr. Cavanaugh.  PSAMF ¶ 101; DRPSAMF ¶ 101.  On September 19, 2017, at 3:30 p.m., Officer Spear approached Mr. Cavanaugh, told him of the traffic stop, and advised him that staff and students had spoken about his relationship with Ms. Wadsworth, and that the perception was that she was receiving special treatment in the form of favoritism from Mr. Cavanaugh.  PSAMF ¶ 102; DRPSAMF ¶ 102; DSMF ¶ 118; PRDSMF ¶ 118.  Mr. Cavanaugh admitted to Officer Spear that he had heard the speculation but advised that he was not really concerned and that he was helping Ms. Wadsworth out with a vehicle.[65]  PSAMF ¶ 103; DRPSAMF ¶ 103; DSMF ¶ 119; PRDSMF ¶ 119.  Officer Spear wrote up a summary of the stop and his conversations with Ms. Philbrook and Mr. Cavanaugh and sent an email to the Waldoboro Police Chief titled "Pervert Principal" which described many of Mr. Cavanaugh's behaviors relating to Ms. Wadsworth.[66]  PSAMF ¶ 104; DRPSAMF ¶ 104.

Ms. Wadsworth's father communicated directly with Mr. Cavanaugh and asked to meet with him about purchasing the car after she had been pulled over by Officer Spear.  DSMF ¶ 122; PRDSMF ¶ 122.  Ms. Philbrook did not view the

---

[65]    Ms. Wadsworth qualifies DSMF ¶ 119 to propose adding additional detail about the arrangement with the car.  PRDSMF ¶ 119.  That information has been admitted elsewhere and the Court rejects the qualification as beyond the scope of the fact asserted.

[66]    Mr. Cavanaugh objects to what he views as conclusory allegations in PSAMF ¶ 104. DRPSAMF ¶ 104.  The Court sustains the objection in part, omitting the descriptions of Mr. Cavanaugh "perpetrating" behaviors that were "concerning" on Ms. Wadsworth and admitting the factual assertions.  Mr. Cavanaugh also objects that "[t]he statement contained in this paragraph is unreliable hearsay."  DRPSAMF ¶ 104.  The Court disagrees, noting that even if the email itself is hearsay, Mr. Spear verified its authenticity in his deposition testimony.  *See Spear Dep.* at 22:8-12.

arrangement with the car as inappropriate and did not investigate this incident any further.[67]  DSMF ¶ 123; PRDSMF ¶ 123.

After the September 19, 2017 traffic stop, conversations about Mr. Cavanaugh's behavior, and the "pervert principal" email, no official action was taken relating to Mr. Cavanaugh's behavior with Ms. Wadsworth for over a month.[68] PSAMF ¶ 105; DRPSAMF ¶ 105.

### 8.   The State of the Harassment Prior to the Investigation

The record includes a number of assertions regarding Ms. Wadsworth's views on and other persons' knowledge of the harassment that do not fit neatly into the timeline of specific incidents.

During this time, Mr. Cavanaugh made Ms. Wadsworth feel like he was someone that she could tell anything to and that she should never feel uncomfortable with him.[69]  DSMF ¶ 86; PRDSMF ¶ 86.  Ms. Wadsworth felt at the time that Mr. Cavanaugh was one of the only people she could trust, and their communications often involved joking and adult themed humor.  DSMF ¶ 92; PRDSMF ¶ 92.  She expressed discomfort with some of these conversations "several times personally in

---

[67]     Ms. Wadsworth qualifies DSMF ¶ 123 to submit that Ms. Philbrook had expressed concern regarding some of Mr. Cavanaugh's other behaviors with Ms. Wadsworth.  PRDSMF ¶ 123.  The Court alters DSMF ¶ 123 slightly to reflect that by "this situation" Ms. Philbrook was referring to the arrangement with the car but otherwise rejects the qualification as beyond the scope of the fact asserted.

[68]     Mr. Cavanaugh denies PSAMF ¶ 105 as conclusory, hearsay, and unsupported by the facts. DRPSAMF ¶ 105.  The Court sustains the objection to the extent that the assertions that Ms. Philbrook and the police chief had "clear knowledge" of Mr. Cavanaugh's "harassment" are conclusory and has pared back PSAMF ¶ 105 to include only factual assertions supported by the record.

[69]     Ms. Wadsworth qualifies DSMF ¶ 86 to submit that she testified that Mr. Cavanaugh "**made me feel**" that way.  PRDSMF ¶ 86 (emphasis in PRDSMF ¶ 86).  The Court accepts the qualification and modified DSMF ¶ 86 to reflect her testimony.

33

**A262**

person and [she did not] know if [she] was super blatant about it because [she] would mostly manifest itself by getting silent or getting nervous and changing the topic . . ."[70]   DSMF ¶ 103; PRDSMF ¶ 103.  They regularly joked together, including one instance where Ms. Wadsworth offered to bake cookies for Mr. Cavanaugh if he would cancel school (which he did not have the authority to do).  DSMF ¶¶ 97-100; PRDSMF ¶¶ 97-100.

In the beginning of her senior year, Ms. Wadsworth started hearing more and more rumors in school about her relationship with Mr. Cavanaugh and, at this point in time, she described feeling anxious, confused, and mad at herself for letting the rumors affect her because she believed at the time that Mr. Cavanaugh had nothing but genuine intentions.  DSMF ¶ 93; PRDSMF ¶ 93.  Although Ms. Wadsworth was at times initially uncomfortable with some of the topics of conversation between them, she specifically did not want to change the dynamic of her relationship[71] with Mr. Cavanaugh, explaining:

> [A]t the time he was one of the only people that I felt that I could rely on and I didn't want to mess that up by saying that I'm uncomfortable [talking about certain topics].  I remember thinking through my head that there are certain times where I should say that I don't want to talk about this or I should not engage in this and probably shouldn't be talking about this, and felt that it got a little too far and then I was thinking about several options and that if I told him that it made me

---

[70]    Mr. Cavanaugh's proposed DSMF ¶ 105 asserts that Ms. Wadsworth "does not recall ever saying she was uncomfortable with any particular topic."  He appears to be relying on her testimony that she was not "super blatant" about expressing discomfort, but she also describes that she "definitely" expressed discomfort with sexual topics several times and "he would be asking me whether or not I was uncomfortable, and a lot of the times I would say that I don't want to talk about this kind of stuff and I'm not used to talking about this kind of stuff" before Mr. Cavanaugh would convince her to continue.  *Wadsworth Dep. Vol. I* at 149:9-16.  The Court omits DSMF ¶ 105 as contradicted by the record.

[71]    Mr. Cavanaugh's proposed DSMF ¶ 106 asserts only "[n]or did [Ms. Wadsworth] wish to change the dynamic of their relationship."  The Court omits DSMF ¶ 106 as redundant to DSMF ¶ 96.

feel uncomfortable, that would change our dynamics a lot and if I made it a big deal how is that going to affect school and feel awkward to go to school and how can you ignore the principal in the school and how is it going to make school awkward.  So, instead of telling him that he was making me feel uncomfortable, I would just find other ways to do it and just not answer and say that I was at practice or doing homework or I was busy and just home that the conversation would change from there or sometimes I would engage because it felt like a joke and he made me feel like it was a joke, and that it was okay to talk about it.

DSMF ¶ 96; PRDSMF ¶ 96.  Their joking relationship continued even as rumors spread amongst staff members or students about their relationship, with Ms. Wadsworth describing:

A lot of jokes.  We joked about particularly when rumors started to spread about when other teachers had made comments about and circulating around the school with other staff members or students about the effects that I have on Mr. Cavanaugh and our relationship, and I remember that we talked about privacy and if I felt that we had that kind of relationship and he assured me several times and that people say these things but that I know that he sees me like a daughter and not every other man sees it that way, but he's one of them and then we turned it into a joke and that, oh, everyone was saying that I get everything that I want, and I just started owning it that, yep, I get everything.

A lot of things turned into jokes that didn't start off as jokes.  We would talk about my sexual activities with other boys or orgasms and other sexual things with boys or sex in general, and it started off as talking about it and a lot of times I would get off of that conversation in order to make light of it that it would turn into a joke to the point where I started to feel more comfortable talking about it because it was more like a joke to me and it seemed very normal when I didn't have a positive home and someone turning it into something that could be talked about, and when I feel uncomfortable he would start to turn it into a joke and I felt like it was just joking, but it was like a teenage friend that I was talking to.

Yes, he had characterized it as playful banter and when I worked for him at his office and there were certain topics that were brought up that at first were not jokes and he was educating me on things, and he said that my parents sheltered me too much and that I should know these things and that it would hurt me in the future to not know these things,

and so he wanted to educate me on all of this stuff and I definitely got closed off of those conversations a lot because I wasn't used to talking about sex so openly especially with an adult.  I never really talked about sex with an adult, and so I referred to other things by not their name, and so I didn't say sex, I said it or I didn't even call my period my period, I called it another name for it, and so he told me don't call it, refer to it as sex or intercourse or he would turn it into a joke the things that I would call like instead of saying my period, I would say my lady friend, and it was just less uncomfortable. I don't know why it was less uncomfortable but a lot of things to do with my body and he would turn that into a nickname and called me lady friend.  So, a lot of the conversations started out not as jokes and then if I would be uncomfortable that they were turned into a joke so that I would feel comfortable.[72]

DSMF ¶ 107; PRDSMF ¶ 107.

Ms. Wadsworth and Mr. Cavanaugh continued to communicate regularly during her senior year, until the time he was placed on leave with the school.  DSMF ¶ 108; PRDSMF ¶ 108.  At no point prior to the investigation did Ms. Wadsworth report to Mr. Cavanaugh that she explicitly felt "abused" or "harassed" by his behavior.[73]  DSMF ¶ 114; PRDSMF ¶ 114.

---

[72]   Ms. Wadsworth qualifies DSMF ¶ 107 to clarify that she was initially uncomfortable discussing these topics until Mr. Cavanaugh turned it into a joke.  PRDSMF ¶ 107.  The Court rejects this qualification as redundant.  *See* DSMF ¶ 107 (including her testimony that "a lot of times I would get off of that conversation" because she was uncomfortable but "when I [felt] uncomfortable he would start to turn it into a joke").

Admitting this lengthy excerpt also resolves similar disputes over DSMF ¶¶ 92, 94-95, 97, 101, 104, 113, and 145, where both parties offer competing characterizations of Ms. Wadsworth's testimony describing their relationship.  *See* DSMF ¶¶ 92, 94-95, 97, 101, 104, 113, 145; PRDSMF ¶¶ 92, 94-95, 97, 101, 104, 113, 145.  The testimony underlying those assertions is largely, if not entirely, included in DSMF ¶ 107.  *Compare, e.g.*, DSMF ¶ 102 (Ms. Wadsworth "would talk about these topics to Cavanaugh, testifying in her deposition that there was no adult in her life that had spoken to her about these things to educate her or make her feel comfortable talking about such matters") *with* DSMF ¶ 107 (explaining how she had "never really talked about sex with an adult").

The Court finds redundant the parties' competing characterizations, attempting to spin Ms. Wadsworth's testimony in their favor, where the underlying testimony is already admitted and—except where otherwise noted—omits DSMF ¶¶ 92, 94-95, 97, 101, 104, 113, and 145.

[73]   Ms. Wadsworth qualifies DSMF ¶ 114 to assert that, while she never used the specific terms "abuse" or "harassment," she often informed Mr. Cavanaugh that his continued discussion of sexual topics made her uncomfortable.  PRDSMF ¶ 114.  The record reveals a disputed issue of fact as to

36

**A265**

Ms. Wadsworth never had a physical relationship with Mr. Cavanaugh, and he never touched her inappropriately or sexually in any way.  DSMF ¶¶ 158-59; PRDSMF ¶¶ 158-59.  The fact that Mr. Cavanaugh never touched her inappropriately or sexually, or that they never had any physical relationship despite having worked alone together or in private scenarios deepened Ms. Wadsworth's confusion about the relationship.[74]  DSMF ¶ 160; PRDSMF ¶ 160.  At the time, she questioned her relationship with Mr. Cavanaugh and knew there were things he said that made her feel uncomfortable, but he told her that he just thought of her as a daughter—an assertion reiterated by Mr. Nguyen—and made it seem like the it was normal to have the conversations that made her uncomfortable.  *Id.*  Because Ms. Wadsworth believed many teachers and administrators at the school knew about the relationship and were not concerned, she felt like she was overthinking things and felt guilty for making it out to be something that it was not.  *Id.*  Regarding Mr. Cavanaugh not attempting to touch her inappropriately, she stated:

> [T]hat's exactly why I thought that I was overthinking it and that this is something other than genuine, like maybe it was progressive or something and was like, no, he wouldn't do that, I can trust him, and it just went on and he made a lot of comments about my physical appearance and always talking about, but never any physical manifestation of it and was like, okay, this is something that I'm overthinking, we've been alone together and I can trust him and I know that I can trust him and that's how I felt.

*Id.*

---

whether those statements could be considered reporting feeling harassed, and the Court modified DSMF ¶ 114 to reflect only that Ms. Wadsworth did not use the terms "harassment" or "abuse."

[74]   Ms. Wadsworth qualifies DSMF ¶ 160 to clarify that the confusion Mr. Cavanaugh references involved far more than just Mr. Cavanaugh not attempting to touch her sexually.  PRDSMF ¶ 160. The Court accepts these qualifications as relevant and supported by the record.

**A266**

Ms. Wadsworth's opinion on the propriety of Mr. Cavanaugh's behavior has changed since 2018, and she only now fully "understands" the nature of his behavior and "[has] looked at it for what it is."[75]  DSMF ¶ 157; PRDSMF ¶ 157.  Ms. Wadsworth did not experience distress while communicating with Mr. Cavanaugh or as an immediate result of their communications as they were occurring and stated that after the investigation had commenced:

> [People were] telling me that the relations was something that I believed it was otherwise and I had to reread [the texts] to see if I could understand what they were talking about, and then that's when I became embarrassed and uncomfortable and reread them and figured out that maybe they are right and that this is not what I thought it was, and I felt really stupid and angry and how do you not notice when you look at those, and I was embarrassed when I looked at them.[76]

DSMF ¶ 155; PRDSMF ¶ 155.

### C.   The Investigation Into Andrew Cavanaugh

#### 1.   Ms. Kenniston's Report and the Law Enforcement Investigation

At some point while Mr. Cavanaugh was still an Assistant Principal—thus, in 2015, at the latest—he learned from a male student, that another student (not Ms. Wadsworth) had sent nude photos to a fellow student and that the photos were potentially published to an internet website that collected such photos of nude Maine high school girls.[77]   DSMF ¶ 124; PRDSMF ¶ 124.   At that time, Mr. Cavanaugh

---

[75]    Ms. Wadsworth offers qualifications similar to those the Court admitted in the previous paragraph.  PRDSMF ¶ 160.  The Court rejects them as moot.

[76]    Ms. Wadsworth qualifies DSMF ¶ 155 to clarify that she was often uncomfortable.  PRDSMF ¶ 155.  The Court rejects this qualification because it is already well-established in the record and, regardless, is beyond the scope of the fact asserted.

[77]    Mr. Cavanaugh asserts that this incident occurred in 2017, but Ms. Wadsworth objects that he testified that he became aware of the website when he was still an Assistant Principal.  PRDSMF ¶ 124.  The record supports Ms. Wadsworth's qualified response,  and the Court alters DSMF ¶ 124 to

reported the internet website to Waldoboro Police Chief William Labombarde.[78] DSMF ¶ 127; PRDSMF ¶ 127. Several years later, in 2017, Mr. Cavanaugh asked Ms. Wadsworth if she had sent nude photos to anyone, expressing concern that if she had taken nude photos, they could be published, and he did not want her to be involved in those matters.[79] DSMF ¶¶ 125-26; PRDSMF ¶¶ 125-26.

After learning that Mr. Cavanaugh had asked Ms. Wadsworth if she had ever sent nude photos to other students, Ms. Kenniston called the police.[80] DSMF ¶ 128; PRDSMF ¶ 128; PSAMF ¶ 120; DRPSAMF ¶ 120. The police came to the Kenniston home and Ms. Kenniston, who paid for the phone, took it from Ms. Wadsworth and submitted it to the police. DSMF ¶ 129; PRDSMF ¶ 129. Ms. Wadsworth was mad that Ms. Kenniston submitted her phone to the police. *Id.* The entirety of Ms. Wadsworth's communications with Mr. Cavanaugh occurred prior to November 3, 2017, including all text messages in the record. DSMF ¶ 130; PRDSMF ¶ 130.

On November 5, 2017, Ms. Kenniston submitted a statement to Detective Donald Murray of the Knox County Sheriff's Office following a meeting with him during which she expressed her concerns regarding the relationship between Ms.

---

reflect that the incident took place before Mr. Cavanaugh became Principal. *See Joint R. Materials,* Attach. 10, *Dep. of Andrew Cavanaugh* at 138:9-22 ("at the time I talked to the principal about it . . . [a]t the time I think I was the assistant").

[78]    Mr. Cavanaugh's proposed facts blur the timeline and suggest that he discovered the website and reported it to police around the same time as he mentioned it to Ms. Wadsworth—eliding a time gap of multiple years. The Court modified DSMF ¶ 127 to clarify that Mr. Cavanaugh reported the website to police around the time he first discovered it.

[79]    Ms. Wadsworth qualifies DSMF ¶ 126 to assert additional facts about the conversation. DSMF ¶ 126. The Court finds the characterization that Mr. Cavanaugh expressed concern—it is for the factfinder to determine whether that concern is genuine—is fair and rejects the qualifications as beyond the scope of the facts asserted.

[80]    Ms. Wadsworth qualifies DSMF ¶ 129 to assert additional facts about the conversation. DSMF ¶ 129. The Court rejects this qualification as beyond the scope of the facts asserted.

Wadsworth and Mr. Cavanaugh.  DSMF ¶ 132; PRDSMF ¶ 132.  Law enforcement officials investigated Mr. Cavanaugh's behavior but confirmed that they did not find probable cause to charge Mr. Cavanaugh for any crime relating to his conduct with Ms. Wadsworth.[81]  DSMF ¶¶ 161-64; PRDSMF ¶¶ 161-64.

### 2.   RSU 40's Investigation

On November 2, 2017, Superintendent Nolan received a call from the police regarding concerns about the messages exchanged by the Ms. Wadsworth and Mr. Cavanaugh.  DSMF ¶ 131; PRDSMF ¶ 131.  He then met with Mr. Cavanaugh, who stated he was simply trying to assist Ms. Wadsworth in dealing with her difficult home life.  DSMF ¶¶ 133-34; PRDSMF ¶¶ 133-34.  In investigating the allegations, Mr. Nolan reviewed the school's harassment policy titled, "Harassment and Sexual Harassment of Students" and made the following notes: "Interfering, pulling out of class, late nights, unwelcome, asks, shouldn't have asked."  PSAMF ¶ 120; DRPSAMF ¶ 120.  The policy notes "sexual harassment includes but is not limited to . . . gestures, comments, or other physical, written, graphic, electronic or verbal conduct that is gender-based that interferes with a student's education."[82]   PSAMF ¶¶ 7, 121;

---

[81]     Ms. Wadsworth qualifies DSMF ¶¶ 161-64 to offer objections relating to Mr. Cavanaugh's unrelated criminal charges and the adequacy of the investigation.  PRDSMF ¶¶ 161-64.  She does not, however, contest the underlying assertion—that law enforcement investigated the allegations but ultimately did not charge Mr. Cavanaugh—and the Court rejects her qualifications as beyond the scope of the facts asserted.

[82]     The adequacy (or inadequacy) of the District's sexual harassment policies and trainings was central to Ms. Wadsworth's claims against RSU 40 but is largely irrelevant to her claims against Mr. Cavanaugh.  Mr. Cavanaugh does not assert as a defense that he either harassed Ms. Wadsworth or failed to report his own harassment because he was inadequately trained or because the District's reporting policy was flawed.  Instead, he maintains that he simply did not believe that he was sexually harassing Ms. Wadsworth.  For those reasons and the reasons discussed in footnote 4, the Court will omit the majority of PSAMF ¶¶ 7-20, admitting only assertions that relate to the claims against Mr. Cavanaugh.

DRPSAMF ¶¶ 7, 121; DSMF ¶ 7; PRDSMF ¶ 7.  In investigating the complaints against Mr. Cavanaugh, Superintendent Nolan made these notes in an effort to figure out how the situation aligned with the school's policies.[83]  PSAMF ¶ 122; DRPSAMF ¶ 122.  Additionally, Mr. Nolan, testifying on behalf of the School, stated under oath that knowledge of: an administrator excusing a student from class would raise "red flags" regarding Mr. Cavanaugh's behavior; a school principal providing money to the attendance secretary to pay for Plaintiff's prom ticket or providing money to the attendance secretary money in an envelope to give to Plaintiff would raise "concerns"; a principal lending or giving a car to a student would be a "gray[] area"; and a school administrator making an appointment for a student to take birth control would be "highly unusual.[84]  PSAMF ¶ 123; DRPSAMF ¶ 123.

Mr. Nolan went on to testify that individually, several of the facts asserted during the investigation would have potentially given him a reason to investigate Mr. Cavanaugh, including: the appointment about birth control, the fact that Mr. Cavanaugh had provided a car to a student, the fact that Mr. Cavanaugh called a student "cupcake," and the fact that Mr. Cavanaugh had seen nude photos of a student.[85]  PSAMF ¶ 124; DRPSAMF ¶ 124.

---

[83]     Mr. Cavanaugh qualifies PSAMF ¶ 122, objecting that "[t]o the extent that the statement of this paragraph infers Defendant Cavanaugh engaged in sexual harassment, the same is denied." DRPSAMF ¶ 122.  The summary judgment record consists of factual assertions, not inferences.  Where a factual assertion is relevant and supported by the record and Mr. Cavanaugh's only objection is to what that fact may infer, the Court overrules the objection and admits the fact.  *See* DRPSAMF ¶ 122-24.

[84]     The Court modified PSAMF ¶ 123 slightly to reflect Mr. Nolan's deposition testimony.

[85]     Mr. Cavanaugh incorporates ¶ 122 of RSU 40's DRPSAMF to object to PSAMF ¶ 124. DRPSAMF ¶ 124.  The incorporated paragraph responds to a different assertion, but the Court assumes that Mr. Cavanaugh meant RSU 40's DRPSAMF ¶ 124, which qualifies PSAMF ¶ 124 to note that Mr. Nolan was answering a question about whether these reasons would *potentially* give rise to

41

**A270**

After resigning from his position as a result of the investigation into his behavior (and in lieu of being fired), Mr. Cavanaugh returned his school-issued MacBook, but it was missing the hard-drive.[86]  PSAMF ¶ 125; DRPSAMF ¶ 125; DSMF ¶ 142; PRDSMF ¶ 142.  In order to remove the hard-drive, a special tool is required.[87]  PSAMF ¶ 126; DRPSAMF ¶ 126.  As a result, Mr. Cavanaugh was charged with theft by unauthorized taking and transfer for removing the hard-drive.[88]  PSAMF ¶ 127; DRPSAMF ¶ 127.  Mr. Cavanaugh also purchased a new phone in December 2017 and returned his previous phone to Walmart the following summer.[89]  PSAMF ¶ 128; DRPSAMF ¶ 128.

---

the need to investigate Mr. Cavanaugh.  The Court slightly altered PSAMF ¶ 124 to include that addition.

[86]    Mr. Cavanaugh qualifies PSAMF ¶ 125 to object that it contains inadmissible evidence—for reasons unexplained—and that it is not relevant to the theory pleaded.  DRPSAMF ¶ 125.  To the extent that the Court views the former objection as a hearsay objection, it concludes that Chief Labombarde charged Mr. Cavanaugh with theft for removing the hard-drive.  *See* PSAMF ¶ 127; DRPSAMF ¶ 127.  The record does not specify the evidence supporting that charge or whether Mr. Cavanaugh was convicted, but the Court finds there to be at least a question of fact as to whether Chief Labombarde's testimony was sufficiently supported by his own personal knowledge as to be admissible and overrules the hearsay objection.

To the extent that Mr. Cavanaugh contends that the assertion he refused to return the hard-drive is irrelevant, the Court disagrees.  A reasonable juror could find—given the thousands of digital communications he exchanged with Ms. Wadsworth and his admission that he had visited a website containing photos of nude high school students—that Mr. Cavanaugh removed his hard-drive to destroy potentially incriminating evidence.  The Court overrules the objection and admits PSAMF ¶ 125.

[87]    Mr. Cavanaugh qualifies PSAMF ¶ 126 to raise the same objections as in DRPSAMF ¶ 125, adding also that there is no evidence Chief Labombarde is competent to testify to technical knowledge relating to computers.  DRPSAMF ¶ 126.  Again reserving judgment on the foundation of Chief Labombarde's testimony in the absence of information about the criminal investigation, the Court overrules the objections for the reasons discussed in the previous footnote and admits PSAMF ¶ 126.

[88]    Mr. Cavanaugh offers the same objections as to the other assertions about the hard-drive and the Court overrules them for the same reasons.

[89]    Mr. Cavanaugh qualifies PSAMF ¶ 128 to contend that the record does not support Ms. Wadsworth's assertion that "Mr. Cavanaugh destroyed or turned in his cellular phone so it could not be used against him."  DRPSAMF ¶ 128.  The Court accepts the qualification and modified PSAMF ¶ 128 to reflect his deposition testimony.

During the investigation into Mr. Cavanaugh, Chris MacLean,[90] an attorney representing him with regard to the school board investigation, went on school property to speak with Ms. Wadsworth while the investigation was pending.[91] PSAMF ¶ 129; DRPSAMF ¶ 129. This encounter with the attorney occurred after Mr. Cavanaugh was instructed not to go to the school."[92] PSAMF ¶ 130; DRPSAMF ¶ 130. Ms. Wadsworth got into the attorney's car in the school parking lot and the attorney encouraged Ms. Wadsworth to sign an affidavit supporting Mr. Cavanaugh, repeatedly stating "Mr. Cavanaugh is a stand-up guy, wouldn't you agree?"[93] PSAMF

---

[90]    PSAMF ¶ 129 and DRPSAMF ¶ 129 misspell Christopher MacLean's name as McLean. The Court sua sponte corrected the spelling. *See Sparks v. Mills*, 2:20-cv-00190-LEW, 2022 U.S. Dist. LEXIS 151730, at *1 (D. Me. Aug. 24, 2022).

[91]    Mr. Cavanaugh qualifies PSAMF ¶ 129 to admit the factual assertions but contends it contains conclusory statements. DRPSAMF ¶ 129. The Court omits the reference to "the fallout of" the investigation and admits the remainder of PSAMF ¶ 129.

[92]    Mr. Cavanaugh objects that the assertion is unsupported by the evidence, irrelevant, and "is inadmissible pursuant to Fed. R. Civ. P. 609." DRPSAMF ¶ 130. To the extent he objects that the record is not clear whether this encounter occurred before or after Mr. Cavanaugh was instructed not to go to the school, the Court disagrees. Ms. Wadsworth's deposition references "around the time of September through November of 2017," *Wadsworth Dep. Vol. I* at 181:14-15, as a time frame. Superintendent Nolan first called Mr. Cavanaugh about the allegations relating to Ms. Wadsworth on November 5 and informed him during that call "do not report to school," as a standing directive. *Nolan Dep.* at 190:14-191:10. Given that Mr. Cavanaugh was immediately banned from school upon learning of the investigation, there is no evidence in this record that he would have retained an attorney about this issue and had that attorney seek out Ms. Wadsworth before Superintendent Nolan issued this "standing directive."

Additionally, to the extent Mr. Cavanaugh argues the assertion is irrelevant, this assertion would allow a factfinder to conclude that even after being banned from school, Mr. Cavanaugh employed an attorney to convince Ms. Wadsworth into recanting and/or supporting him, which could have increased her emotional damages. Finally, Mr. Cavanaugh contends that the assertion "is inadmissible pursuant to Fed. R. Civ. P. 609." DRPSAMF ¶ 130. The Court assumes that he meant to refer to Federal Rule of Evidence 609, but, regardless, the objection is irrelevant because that rule pertains to impeachment by a criminal conviction. The Court admits PSAMF ¶ 130 as supported by the record.

[93]    Mr. Cavanaugh denies PSAMF ¶ 131, objecting that Ms. Wadsworth intended to sign the affidavit but could not because she was a minor. DRPSAMF ¶ 131. The Court overrules the objection as beyond the scope of the fact asserted.

Mr. Cavanaugh also denies PSAMF ¶ 132, objecting that it is irrelevant and inadmissible hearsay. The Court overrules the relevance objection for the reasons stated in the previous footnote. The Court also overrules the hearsay objection because the attorney's repeated statements to Ms. Wadsworth that Mr. Cavanaugh is "a stand-up guy" are not offered for the truth of the matter asserted (Ms. Wadsworth is plainly not offering this evidence as proof that Mr. Cavanaugh is a stand-up guy)

¶¶ 131-32; DRPSAMF ¶¶ 131-32.   Ms. Wadsworth never signed the proposed affidavit.[94]   PSAMF ¶ 133; DRPSAMF ¶ 133.

A day or two after the police came to the Kenniston home, Ms. Wadsworth and Mr. Nguyen met to follow up regarding the allegations against Mr. Cavanaugh.[95],[96] DSMF ¶ 135; PRDSMF ¶ 135.   Ms. Wadsworth stated that nothing physical happened between her and Mr. Cavanaugh, that he had never asked for inappropriate photos, and that he had never came on to her.[97]   DSMF ¶ 136; PRDSMF ¶ 136.   Ms. Wadsworth was confused and did not know if the relationship was genuine, but at the time—relying on Mr. Nguyen's and Mr. Cavanaugh's assurances—Ms. Wadsworth believed her relationship with Defendant Cavanaugh was genuine and she trusted him.[98]   DSMF ¶ 138; PRDSMF ¶ 138.

---

but for their impact on her.   FED. R. EVID. 801(c)(2) ("'Hearsay' means a statement that . . . a party offers to prove the truth of the matter asserted in the statement").   The Court admits PSAMF ¶¶ 131-32.

[94]   Mr. Cavanaugh offers the same objection as in DRPSAMF ¶ 131 and the Court overrules it for the same reasons.

[95]   Ms. Wadsworth admits the substance of DSMF ¶ 135 but qualifies it to assert numerous details about the conversation.   PRDSMF ¶ 135.   The Court finds DSMF ¶ 135 to fairly characterize the record and rejects the qualifications as beyond the scope of the fact asserted.

[96]   Ms. Wadsworth's proposed PSAMF ¶¶ 134-50 relate almost entirely to Mr. Nguyen's purported misconduct during the investigation.   As the Court explained in footnote 4, these assertions may be relevant to Ms. Wadsworth's claims against Mr. Nguyen but—as she has not alleged that Mr. Cavanaugh in any way controlled or directed Mr. Nguyen's actions—they are generally not relevant to her claims against Mr. Cavanaugh.   The Court views Mr. Nguyen's conduct as relevant where the pressure he put on Ms. Wadsworth explains her actions during the investigation but otherwise omits PSAMF ¶¶ 134-50 for the reasons explained in footnote 4.

[97]   Mr. Cavanaugh's proposed DSMF ¶ 137 asserts that Ms. Wadsworth had never reported any sexual harassment or abuse.   The Court finds that Ms. Wadsworth's complaints to Mr. Nguyen about Mr. Cavanaugh buying her feminine hygiene products and calling her cupcake create a dispute of material fact about whether she reported harassment and omits DSMF ¶ 137 as contradicted by the record.

[98]   Ms. Wadsworth qualifies DSMF ¶ 138 to add context about why she trusted Mr. Cavanaugh at the time.   PRDSMF ¶ 138.   The Court accepts these qualifications as relevant and supported by the record.

During a meeting with Ms. Philbrook, Mr. Nolan and Ms. Pease, Ms. Wadsworth defended Mr. Cavanaugh.  DSMF ¶ 139; PRDSMF ¶ 139.  Mr. Nguyen suggested that Ms. Wadsworth write a letter or sign an affidavit to help Mr. Cavanaugh and defend him.[99]  DSMF ¶ 140; PRDSMF ¶ 140.  At the time, under repeated urging from Mr. Nguyen, Ms. Wadsworth stated that she was confused about whether Mr. Cavanaugh had done anything wrong, and then stated that she was willing to sign an affidavit defending him but could not because she was a minor.[100]  DSMF ¶ 141; PRDSMF ¶ 141; PSAMF ¶¶ 140-41; DRPSAMF ¶¶ 140-41.  Ms. Wadsworth then indicated to Mr. Nguyen that she still wanted to defend Mr. Cavanaugh but she was afraid to stand up to her parents.[101]  DSMF ¶ 142; PRDSMF ¶ 142.  Again in response to Mr. Nguyen's urging, Ms. Wadsworth agreed with his statement that Mr. Cavanaugh viewed her as a daughter, and she believed Mr. Cavanaugh was helping her.[102]  DSMF ¶ 143; PRDSMF ¶ 143.  After Mr. Cavanaugh's common law wife, Deborah Ecker McFarland berated Ms. Wadsworth and blamed her for Mr. Cavanaugh being investigated, Ms. Wadsworth responded by

---

[99] Ms. Wadsworth admits the substance of DSMF ¶ 140 but qualifies it to assert additional details about the conversation and the wording of the proposed affidavit.  PRDSMF ¶ 140.  The Court finds DSMF ¶ 140 to fairly characterize the record and rejects the qualifications as beyond the scope of the fact asserted.  *See* PSAMF ¶ 131 (Ms. Wadsworth's description of the affidavit, which the Court has admitted in full).

[100] Ms. Wadsworth qualifies DSMF ¶ 141 to add that she expressed confusion but eventually agreed after urging from Mr. Nguyen.  PRDSMF ¶ 141.  The Court accepts these qualifications as relevant and supported by the record.

[101] Ms. Wadsworth offers the same qualifications as in PRDSMF ¶ 141.  The Court rejects them as moot after having included them in the previous sentence.

[102] Ms. Wadsworth again offers similar qualifications asserting that her statements came in response to Mr. Nguyen's urging.  PRDSMF ¶ 143.  The Court views the context of this conversation as already well-established but slightly modified DSMF ¶ 143 to reiterate that Mr. Nguyen was urging her to support Mr. Cavanaugh.

apologizing and accepting blame.[103]   DSMF ¶ 144; PRDSMF ¶ 144; PSAMF ¶ 142; DRPSAMF ¶ 142.

### D.   Adrianna Wadsworth's Mental Health

Ms. Wadsworth has experienced anxiety and depression, which she relates in part to the actions of Mr. Cavanaugh.[104]   PSAMF ¶ 151; DRPSAMF ¶ 151.   In high school, Ms. Wadsworth's depression and anxiety affected her at school because she did not want to go to class anymore, and she would cry in the morning on the way to school and on her way home from school.   PSAMF ¶ 152; DRPSAMF ¶ 152.   Ms. Wadsworth began going to counseling in April 2018.   PSAMF ¶ 153; DRPSAMF ¶ 153; DSMF ¶ 156; DRPSAMF ¶ 156.   Ms. Wadsworth continues to suffer from anxiety and has trouble in school when dealing with male professors.[105]   PSAMF ¶ 154; DRPSAMF ¶ 154.

### E.   Adrianna Wadsworth's Later Achievements

[103]   Ms. Wadsworth qualifies DSMF ¶ 143 to add nearly a full page of explanation about how her statements came in response to Ms. McFarland's pressure.   PRDSMF ¶ 143.   The Court accepts these qualifications as relevant and supported by the record and modified DSMF ¶ 143 to reflect the context of Ms. Wadsworth's statements.

[104]   Mr. Cavanaugh qualifies PSAMF ¶ 151 to object that Ms. Wadsworth's view of Mr. Cavanaugh's behavior has changed over time and that she did not seek any mental health treatment until April 2018.   DRPSAMF ¶ 151.   The Court overrules both objections as beyond the scope of the facts asserted and notes that Ms. Wadsworth asserts in her own statement of material facts that she first sought counseling in April 2018.   PSAMF ¶ 153; DRPSAMF ¶ 153.   Mr. Cavanaugh offers these same objections to PSAMF ¶¶ 151-54 and each time the Court overrules them for the same reasons.

[105]   Mr. Cavanaugh incorporates RSU 40's qualification to PSAMF ¶ 154, which objected that the cited testimony does not support the assertion that Ms. Wadsworth "continues to suffer from anxiety." DRPSAMF ¶ 154 (incorporating RSU 40's DRPSAMF ¶ 154).   However, when asked whether her anxiety has "improved as [she has] gone on in [her] college career in terms of having a comfort level dealing with all of [her] professors," Ms. Wadsworth responded "[d]efinitely not." *Wadsworth Dep. Vol. II* at 12:13-16.   The record reveals support for the assertion, and the Court overrules the objection and admits PSAMF ¶ 154.

Ms. Wadsworth completed her senior year of high school, graduated salutatorian as second in her class, and is proud of that accomplishment. DSMF ¶¶ 174, 153; DRPSAMF ¶¶ 147, 153. Over her junior and senior years of high school she: participated in soccer, cheerleading, softball, and track; received an all-conference and a GPA award in cheerleading; was on the student council and in the National Honor Society and participated in PAWS, math team, and the debate team; and went to parties and socialized regularly at school and sporting events, spending time with her friends and with the Kennistons. DSMF ¶¶ 148-152; DRPSAMF ¶¶ 148-152. She went on to complete her undergraduate studies and is currently attending law school. DSMF ¶ 154; DRPSAMF ¶ 154.

## III.   THE PARTIES' POSITIONS

### A.   Andrew Cavanaugh's Motion for Summary Judgment

Pursuant to Federal Rules of Civil Procedure 56, Mr. Cavanaugh asks this Court to grant summary judgment in his favor and against Adrianna Wadsworth on all counts pleaded against him in the Amended Complaint: the § 1983 (Count II) and state law tort (IV-VI) claims. *Def.'s Mot.* at 1-2. Mr. Cavanaugh contends that Ms. Wadsworth has failed to state a cognizable constitutional claim on either substantive due process or equal protection grounds, that he is protected by qualified immunity and intentional act immunity, and that her tort claims fail on the merits because she has not established the required elements. *Id.* at 2-19.

#### 1.   The Section 1983 Claims

The bulk of Mr. Cavanaugh's motion argues that the Court should grant summary judgment in his favor on Ms. Wadsworth's constitutional claims. *Id.* at 2-14. He notes at the outset that "to state a claim under § 1983, a plaintiff must allege (1) the violation of a right protected by the Constitution or laws of the United States and (2) that the perpetrator of the violation was acting under color of law." *Id.* at 2 (citations omitted). Mr. Cavanaugh submits that Ms. Wadsworth's "equal protection and bodily integrity claims are both deficient and must be dismissed as a matter of law." *Id.* at 3.

### a.    The Equal Protection Claim

Mr. Cavanaugh notes that "[t]his Court found at the motion to dismiss stage that Plaintiff's equal protection claim against Defendant Nguyen fell far below the requirement that the plaintiff show specific comparable and specific instances of disparate treatment" and offers that "Plaintiff's equal protection claim against Defendant Cavanaugh is similarly deficient." *Id.* He argues that "to state a claim under Section 1983 for an alleged equal protection violation, a plaintiff 'must allege facts indicating that, compared with others similarly situated, [she] was selectively treated based on an impermissible consideration'" *id.* at 4 (quoting *Alston v. Spiegel*, 988 F.3d 564, 574-75 (1st Cir. 2021)), but that Ms. Wadsworth "does not mention any other students Defendant Cavanaugh interacted with or treated differently, nor did she engage in any such discovery." *Id.* at 3. Mr. Cavanaugh adds that Ms. Wadsworth "must also show that the defendant acted with discriminatory purpose" or intent. *Id.* at 4 (citations omitted).

48

A277

In sum, Mr. Cavanaugh contends that Ms. Wadsworth's "equal protection claim fails as she has not and cannot show any deprivation of her rights under the equal protection clause" because "[t]here is no indication that [she] was treated differently than similarly situated persons or due to 'impermissible considerations,' such as an intent to injure her or punish the exercise of her constitutional rights." *Id.* He characterizes their relationship as "a friendship" and submits that "[t]here is no indication or evidence that such a relationship constituted a discriminatory purpose" or "impacted her schooling." *Id.* at 5-6. Mr. Cavanaugh concludes that "as [Ms. Wadsworth's] equal protection claim against Defendant Nguyen fell far below the requirements of such a claim, so too does her equal protection claim against Defendant Cavanaugh." *Id.* at 7.

### b.   The Substantive Due Process Claim

Mr. Cavanaugh states that Ms. Wadsworth alleges an infringement of her right to bodily integrity and acknowledges that such a right is constitutionally protected but contends "a student's due process rights can be violated as pertaining to physical abuse, not verbal harassment." *Id.* (citations omitted). He submits that "[t]here is no body of law upon which it would be clear to a reasonable official that one could violate a constitutional right to bodily integrity without engaging in any physical acts which actually violate a person's bodily integrity." *Id.* at 8. Thus, in his view, because Ms. Wadsworth has "admitted there was no physically inappropriate contact or sexual relations of any kind between herself and Defendant Cavanaugh"

her "claim of a constitutional violation based upon a violation of her bodily integrity must be dismissed." *Id.*

### c.    Qualified Immunity

Next, Mr. Cavanaugh submits that—even if the Court denies summary judgment on the merits of the constitutional claim—he is nonetheless "qualifiedly immune from liability under 42 U.S.C. § 1983," which "protects government officials from liability for civil damages for actions taken under color of state law." *Id.* at 9 (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  An official is entitled to qualified immunity if a court determines that either: (1) "the facts alleged or shown by the plaintiff" do not "make out a violation of a constitutional right"; or (2) "the right" the plaintiff's suit is based on was not "'clearly established' at the time of the defendant's violation." *Id.* (quoting *Pollack v. Regional Sch. Unit 75*, 12 F. Supp. 3d 173, 194-95 (D. Me. 2014)).

Mr. Cavanaugh cites several cases holding that physical sexual abuse constituted a conscience-shocking constitutional violation, as well as several cases holding that verbal abuse alone did not rise to the level of a constitutional deprivation. *Id.* at 10-11 (collecting cases).  He argues that this case falls in the latter category because Ms. Wadsworth "never accused Defendant Cavanaugh of sexual harassment, physical or otherwise." *Id.* at 11.  Mr. Cavanaugh contends that "it cannot be stated that the contours of the right in question were sufficiently clear, as to establish that Defendant Cavanaugh knew he was engaging in a violation of the Plaintiff's rights under the equal protection clause or [right] to bodily integrity under

50

**A279**

the Fourteenth Amendment." *Id.* Additionally, he submits that, to the extent Ms. Wadsworth claims Mr. Cavanaugh denied her the benefits of an education, that contention is wholly unsupported by the evidence. *Id.* at 12.

Mr. Cavanaugh concludes that, even if "the contours of the right are found to be sufficiently clear, a reasonable defendant in his position would not be aware he was violating the Plaintiff's rights," and therefore he "is entitled to qualified immunity from the Plaintiff's § 1983 claim." *Id.*

### d.   Acting Under the Color of Law

Mr. Cavanaugh next submits that Ms. Wadsworth's "Section 1983 claims fail because the actions she complains of as against Defendant Cavanaugh were not performed under color of law." *Id.* at 14. He asserts that "[a] teacher who meets a student at school, but who does not commit an act of sexual abuse or misconduct during a period when the teacher is actively engaged in teaching that student, does not act under color of state law." *Id.* at 13-14 (collecting cases). In his interpretation of Ms. Wadsworth's allegations, the comments Mr. Cavanaugh made and the nicknames he called her in school do not rise to the level of a constitutional violation, and the remainder of her allegations "occurred in private or over text message, not in the context of her schooling" and were therefore not performed under the color of law, defeating her § 1983 claims. *Id.* at 14.

### 2.   The State Law Tort Claims

### a.   Intentional Infliction of Emotional Distress

51

**A280**

Mr. Cavanaugh first argues that he is immune from liability on Ms. Wadsworth's intentional infliction of emotional distress (IIED) claim. *Id.* at 15. He submits that "[s]uch a claim is barred by the Maine Tort Claims Act," which provides that "employees of governmental entities shall be absolutely immune from personal civil liability for . . . [a]ny intentional act or omission within the course and scope of employment; provided that such immunity does not exist in any case in which an employee's actions are found to have been in bad faith." *Id.* (quoting 14 M.R.S. §§ 8111). Mr. Cavanaugh contends that he did not act in bad faith and thus is immune from liability. *Id.*

Alternatively, Mr. Cavanaugh asserts that Ms. Wadsworth's IIED claim fails on the merits. He contends that:[106] (1) he did not act to intentionally inflict emotional distress; (2) it is unlikely a jury could find that the Defendant's behavior was "conduct so extreme and outrageous as to exceed all possible bounds of decency and must be regarded as atrocious, utterly intolerable in a civilized community"; (3) Ms. Wadsworth's emotional distress was instead caused by other persons; and (4) her testimony "is clearly at odds with her claim to have suffered severe emotional distress that no reasonable person should be expected to endure." *Id.* at 16-17.

---

[106]     In Maine, the four elements required to establish an IIED claim are:

> (1) the defendant intentionally or recklessly inflicted severe emotional distress or was certain or substantially certain that such distress would result from her conduct; (2) the conduct was so "extreme and outrageous as to exceed all possible bounds of decency and must be regarded as atrocious, utterly intolerable in a civilized community"; (3) the actions of the defendant caused the plaintiff's emotional distress; and (4) the emotional distress suffered by the plaintiff was "so severe that no reasonable [person] could be expected to endure it."

*Curtis v. Porter*, 784 A.2d 18, 20 (Me. 2001).

### b.    Negligent Infliction of Emotional Distress

Next, Mr. Cavanaugh asserts that he is entitled to summary judgment on Ms. Wadsworth's claim for negligent infliction of emotional distress (NIED).  He notes that "[t]he Supreme Judicial Court has recognized very limited circumstances in which a negligent infliction claim may be brought," including "circumstances in which a special relationship exists between the actor and the person emotionally harmed . . . [or] when the wrong-doer has committed another tort."  *Id.* at 18 (citing *Curtis*, 784 A.2d at 25).  Mr. Cavanaugh submits that he has not committed another underlying tort and that no special relationship existed, and therefore Ms. Wadsworth cannot sustain a NIED claim against him.

### c.    Negligence

Finally, Mr. Cavanaugh contends that he is entitled to summary judgment on the negligence claim.  As he interprets the Amended Complaint, Ms. Wadsworth's "claim against Defendant Cavanaugh for negligence does not appear to implicate him at all; it is Defendant Nguyen who is cited as allegedly breaching his duty, leading to the cause of alleged damages in negligence."  *Id.* at 19.  Mr. Cavanaugh suggests that Ms. Wadsworth instead alleges that he acted intentionally and that there are no facts supporting "a viable claim of negligence against Defendant Cavanaugh."  *Id.*

### B.    Adrianna Wadsworth's Opposition

Ms. Wadsworth submitted an omnibus opposition memorandum responding to all three defendants' motions to dismiss.  The Court recounts here only the arguments relating to the Mr. Cavanaugh's motion.  Ms. Wadsworth responds that she has

sufficiently established substantive due process and equal protection violations, Mr. Cavanaugh is not entitled to qualified immunity or intentional act immunity, and there are at least disputed issues of material facts on all necessary elements of her tort claims. *Pl.'s Opp'n* at 34-41, 52-58.

> **1.   The Section 1983 Claims**

> **a.   Equal Protection Claim**

Ms. Wadsworth begins by noting that to state a claim for an equal protection violation, a plaintiff must "allege facts indicating that, 'compared with others similarly situated, the plaintiff was selectively treated . . . based on impermissible considerations such as . . . intent to inhibit or punish the exercise of constitutional rights.'" *Id.* at 34 (quoting *Barrington Cove Ltd. P'ship v. R.I. Hous, & Mort. Fin. Corp.*, 246 F.3d 1, 7 (1st Cir. 2001)).  She submits that "under the Fourteenth Amendment, individuals have a right to bodily integrity" which "protects a student's right to be free from sexual abuse <u>and harassment</u> by teachers at a public school." *Id.* at 35 (citations omitted) (emphasis in *Pl.'s Opp'n*).

She first responds that Mr. Cavanaugh's contention that he was not acting under the color of law is "specious" because he was acting "under the guise of [his] authority as School principal." *Id.* at 35-36.  Next, Ms. Wadsworth asserts that "[t]his Court has already found, in its Motion to Dismiss rulings, that sexual harassment can implicate the substantive due process rights as an infringement of bodily integrity of a student when the sexual harassment is perpetrated by a teacher" and thus "the Court is left to determine whether there was any discriminatory intent on

the part of Mr. Cavanaugh, and then determine whether qualified immunity applies. *Id.* at 36-37 (citation omitted).  She contends that "[t]here is certainly a factual question surrounding whether Mr. Cavanaugh treated Ms. Wadsworth differently because of her gender" and concludes that "ample disputed facts exist to create a triable issue as to Ms. Wadsworth's equal protection claims." *Id.* at 37-38.

### b.   Substantive Due Process Claim

Ms. Wadsworth frames her substantive due process claim against Mr. Cavanaugh as a state-created danger claim.[107]  *Id.* at 38.  She asserts that he "took various affirmative actions with respect to Ms. Wadsworth that created danger to Ms. Wadsworth, who was a minor child under his protection and authority by right of his role as the School principal."  *Id.*  Because "these acts were directed at and affected only Ms. Wadsworth . . . prongs two and three"—that the acts enhanced a danger

---

[107]   Ms. Wadsworth's state-created danger claim may technically fit within the First Circuit's description of what a plaintiff must prove to make out a state-created danger claim.  *Compare Pl.'s Opp'n* at 38-40 *with Irish*, 979 F.3d at 75.  However, the state-created danger doctrine is generally employed to attach liability to a government actor who enabled a violation by a third-party; not against the government actor who caused the harm directly.  *See Irish*, 979 F.3d at 74 (quoting *Coyne v. Cronin*, 386 F.3d 280, 287 (1st Cir. 2004)) ("This court has stated that in order to be liable under the state-created danger doctrine, the defendant must 'affirmatively act[] to increase the threat to an individual of third-party private harm'").  A state-created danger claim requires an underlying substantive due process violation but also imposes additional elements that a plaintiff must establish.  *See id.* at 75.  If the state law enforcement officers in *Irish* had directly caused harm by their own actions (which they did not), Ms. Irish would not have had to resort to a state-created danger theory to make out a direct claim against them.

Ms. Wadsworth's state-created danger theory fits her § 1983 claim against Mr. Nguyen, because she alleges that he enabled Mr. Cavanaugh without perpetrating the harassment himself.  The Court, however, interprets Ms. Wadsworth's Amended Complaint to allege against Mr. Cavanaugh a direct substantive due process violation that does not require the additional elements of a state-created danger.  *Am. Compl.* ¶ 175; *see also Def.'s Mot.* at 7-8 (arguing that Ms. Wadsworth's substantive due process claim must fail, without mentioning the state-created danger theory).  Regardless, whether Ms. Wadsworth's claim against Mr. Cavanaugh is framed as a direct substantive due process violation or as a state-created danger does not ultimately affect the Court's decision because she cannot establish the underlying substantive due process violation essential to either claim.

specific to the plaintiff and caused the plaintiff's harm[108]—"are also met." *Id.* at 39. Finally, she concludes "that a jury can certainly find that Mr. Cavanaugh's actions shock the conscience," given that she "need only show that there are material facts in dispute as to whether or not Mr. Cavanaugh acted with deliberate indifference." *Id.* In her view, he "groomed Ms. Wadsworth, a minor, for sexual harassment; continuously engaged in sexualized and otherwise inappropriate speech and conduct that made her uncomfortable, and when confronted with his wrongdoing, took affirmative steps to isolate Ms. Wadsworth from her support network (her parents) and to cover up his own abhorrent and illegal behavior." *Id.* Ms. Wadsworth submits that "[i]f that is not conscience shocking, nothing is; but at the very least, the actions were deliberately indifferent" and asserts that because "Mr. Cavanaugh's decisions caused Ms. Wadsworth to continue undergoing harassment," he is not entitled to summary judgment on her substantive due process claim. *Id.* at 39-40.

## c.  Qualified Immunity

Ms. Wadsworth next contends that, assuming she suffered a constitutional violation, Mr. Cavanaugh is not entitled to qualified immunity. In her view, the "only question is whether a reasonable defendant would have known that Mr. Cavanaugh

---

[108]    To make out a state-created danger claim in the First Circuit, the plaintiff must establish:

(1) that a state actor or state actors affirmatively acted to create or enhance a danger to the plaintiff;
(2) that the act or acts created or enhanced a danger specific to the plaintiff and distinct from the danger to the general public;
(3) that the act or acts caused the plaintiff's harm; and
(4) that the state actor's conduct, when viewed in total, shocks the conscience.

*Irish*, 979 F.3d at 75.

was violating Ms. Wadsworth's rights by sexually harassing her, and that a reasonable defendant would understand Mr. Cavanaugh's conduct violated Ms. Wadsworth's rights." *Id.* at 40.  She states that Mr. Cavanaugh "was the School's affirmative action coordinator" and presumably knew that "the School's sexual harassment policy included in its definition of sexual harassment actions such as comments or gestures that could make a person feel uncomfortable. *Id.* She submits that, even with that knowledge, "he was having explicit sexual conversations with a 16 year old student at his school" despite "constantly being asked to reign in his relationship with Ms. Wadsworth" and that these facts ultimately "create large enough issues of material fact to preclude the entry of summary judgment." *Id.* at 40-41.

### 2.   The State Law Tort Claims

### a.   Maine Tort Claims Act Immunity

First, Ms. Wadsworth argues that Mr. Cavanaugh's position that he is entitled to immunity because he was acting under his authority as principal is "an absurd proposition given the evidence produced in discovery." *Id.* at 52.  She counters that "Mr. Cavanaugh's actions toward Ms. Wadsworth could not possibly be considered authorized by his employment, and as noted above, governmental employees are not entitled to immunity for intentional actions undertaken in 'bad faith.'" *Id.* at 52-53. Ms. Wadsworth asserts that while Mr. Cavanaugh "alleges that he was simply trying to help Ms. Wadsworth in the course of his employment as the School principal, there is no plausible, non-sexually related explanation as to why he would try to convince

**A286**

her to be on birth control, ask her about sexual experiences, and ask her to send scandalous photos to him." *Id.* at 53-54.  She concludes that "[c]learly, any conduct that sexualizes a minor student would be outside the scope of a principal's employment duties, and for personal gain only" and "[a]t a minimum, there are substantial issues of material fact that preclude summary judgment on this issue." *Id.* at 54.

### b.     Intentional Infliction of Emotional Distress

Next, Ms. Wadsworth counters that she "has a valid claim against Mr. Cavanaugh for intentional infliction of emotional distress, and summary judgment is inappropriate because there are substantial disputed issues of material fact." *Id.* Recounting the four required elements as stated in *Curtis*,[109] Ms. Wadsworth submits that: (1) it would be absurd for Mr. Cavanaugh to suggest that he did not know his actions would cause Ms. Wadsworth emotional distress; (2) Mr. Cavanaugh's conduct was outrageous and exceeded all bounds of decency; (3) the record shows that Ms. Wadsworth suffered depression, anxiety, and panic attacks as a result of his harassment; and (4) her distress was so severe that no one should have to endure it. *Id.* at 55-56.  Because—in Ms. Wadsworth's view—she "has alleged sufficient facts to support her claim for intentional infliction of emotional distress . . . summary judgment is inappropriate." *Id.* at 56.

### c.     Negligence and Negligent Infliction of Emotional Distress

---

[109]     *See* footnote 106.

Finally, Ms. Wadsworth asserts that, contrary to Mr. Cavanaugh' contentions, "it is clear that [he] owed a duty of care to [her]." *Id.* at 57. She focuses on the fact that "[a]s part of [his] position, Mr. Cavanaugh was responsible for reporting to the superintendent and investigating complaints of harassment." *Id.* Ms. Wadsworth contends that "[t]hroughout Ms. Wadsworth's junior and senior years of high school, she reported to Mr. Cavanaugh that she was uncomfortable with him speaking about sex-based topics with her" and that "Ms. Wadsworth's complaints of discomfort should have immediately prompted Mr. Cavanaugh to begin an investigation into his own actions, or report them to the superintendent." *Id.* at 58. She concludes that "Mr. Cavanaugh had a duty to Ms. Wadsworth to investigate her complaints [but] failed to do so, and instead continued to sexually harass her on a daily basis," and therefore "there are significant issues of material fact as to Ms. Wadsworth's damages and Mr. Cavanaugh's breach of duty, which preclude summary judgment." *Id.*

## C.   Andrew Cavanaugh's Reply

In reply, Mr. Cavanaugh argues that Ms. Wadsworth has not established a substantive due process violation because she admits that her bodily integrity was not violated. *Def.'s Reply* at 1. He adds further that he is entitled to qualified immunity because "[t]here is no body of law upon which it would be clear to a reasonable official that one could violate a constitutional right to bodily integrity without engaging in any physical acts which actually violate a person's bodily integrity." *Id.* at 2. Next, Mr. Cavanaugh argues that the state-created danger theory in inapplicable because Ms. Wadsworth "alleges that Defendant Cavanaugh was *the*

person that caused her alleged injury, not a state actor who engaged in an affirmative act that create or enhanced the danger of private violence." *Id.* at 3 (emphasis in *Def.'s Reply*).

Regarding Ms. Wadsworth's tort claims, Mr. Cavanaugh contends that she has not effectively countered his immunity claim because she "has not elicited any facts showing that Defendant Cavanaugh acted in bad faith." *Id.* at 5-6.

## IV.   LEGAL STANDARD

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "Genuine issues of fact are those that a factfinder could resolve in favor of the nonmovant, while material facts are those whose 'existence or nonexistence has the potential to change the outcome of the suit.'" *Green Mountain Realty Corp. v. Leonard*, 750 F.3d 30, 38 (1st Cir. 2014) (quoting *Tropigas de P.R., Inc. v. Certain Underwriters at Lloyd's of London*, 637 F.3d 53, 56 (1st Cir. 2011)).

When the movant "has made a preliminary showing that there is no genuine issue of material fact, the nonmovant must 'produce specific facts, in suitable evidentiary form, to . . . establish the presence of a trialworthy issue.'" *McCarthy v. City of Newburyport*, 252 F. App'x 328, 332 (1st Cir. 2007) (alteration in original) (quoting *Triangle Trading Co. v. Robroy Indus., Inc.*, 200 F.3d 1, 2 (1st Cir. 1999)). The nonmoving party must provide "'enough competent evidence' to enable a factfinder to decide in its favor on the disputed claims." *Carroll v. Xerox Corp.*, 294 F.3d 231, 237 (1st Cir. 2002) (quoting *Goldman v. First Nat'l Bank of Bos.*, 985 F.2d

1113, 1116 (1st Cir. 1993)).  Then, a "court views the facts and draws all reasonable

inferences in favor of the nonmoving party," *Ophthalmic Surgeons, Ltd. v. Paychex,*

*Inc.*, 632 F.3d 31, 35 (1st Cir. 2011), but disregards "[c]onclusory allegations,

improbable inferences, acrimonious invective, or rank speculation." *Mancini v. City*

*of Providence ex rel. Lombardi*, 909 F.3d 32, 38 (1st Cir. 2018) (quoting *Ahern v.*

*Shinseki*, 629 F.3d 49, 54 (1st Cir. 2010)).  "[T]he plain language of Rule 56(c)

mandates entry of summary judgment . . . against a party who fails to make a showing

sufficient to establish the existence of an element essential to that party's case, and

on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*,

477 U.S. 317, 322 (1986).

## V.    DISCUSSION

### A.    Section 1983 Claims

Section 1983 provides that:

> [e]very person who, under color of [law], subjects, or causes to be
> subjected, any citizen of the United States or other person within the
> jurisdiction thereof to the deprivation of any rights, privileges, or
> immunities secured by the Constitution and laws, shall be liable to the
> party injured in an action at law, suit in equity, or other proper
> proceeding for redress . . ..

42 U.S.C. § 1983.  Section 1983 "is not itself a source of substantive rights, but merely

provides a method for vindicating federal rights elsewhere conferred."  *Graham v.*

*Connor*, 490 U.S. 386, 389-94 (1989).  A § 1983 cause of action has two elements.

First, a plaintiff must show deprivation of a federally protected right, privilege, or

immunity and a causal connection between the conduct complained of and the

deprivation.  *See Gutierrez-Rodriguez v. Cartagena*, 882 F.2d 553, 559 (1st Cir. 1989).

Second, a plaintiff must establish that "the perpetrator of the violation was acting under color of law." *Cruz-Erazo v. Rivera-Montañez*, 212 F.3d 617, 621 (1st Cir. 2000).

### 1. Substantive Due Process Violation

Ms. Wadsworth identifies a federal right: the right to be free from intrusions into her bodily integrity. *Pl.'s Opp'n* at 35; *see Doe v. Sch. Admin. Dist. No. 19*, 66 F. Supp. 2d 57, 65 (D. Me. 1999) ("It is well recognized that students have a fundamental right to bodily integrity that includes the right to be free from sexual abuse"). She also asserts a deprivation of that right: Mr. Cavanaugh's "repeated, demanding sexual harassment . . .." *Order on Mot. to Dismiss* at 26; *Pl.'s Opp'n* at 35-36. Mr. Cavanaugh disagrees, countering that "a student's due process rights can be violated as pertaining to physical abuse, [but] not verbal harassment," "[a]ll such [§ 1983] cases involve a state actor committing physical acts of abuse," and "[t]here is no body of law upon which it would be clear to a reasonable official that one could violate a constitutional right to bodily integrity without engaging in any physical acts which actually violate a person's bodily integrity." *Def.'s Mot.* at 7-8.

Based on the existing law within the First Circuit, the Court cannot conclude that a reasonable factfinder would be able to find that Mr. Cavanaugh's non-physical harassment violated Ms. Wadsworth constitutional right to bodily integrity in a manner sufficiently conscience-shocking to sustain a § 1983 claim.[110]

---

[110]    The Court is duty-sworn to apply the law of the United States Supreme Court and the First Circuit to the facts in this case. *Carson v. Makin*, 142 S. Ct. 1987, 1995 (2022) ("Applying Circuit precedent . . . , the District Court rejected petitioners' constitutional claims and granted judgment to the commissioner"); *Eulitt v. Me. Dep't of Educ.*, 386 F.3d 344, (1st Cir. 2004) ("Until a court of appeals revokes a binding precedent, a district court within the circuit is hard put to ignore that precedent unless it has unmistakably been cast into disrepute by supervening authority").

To set out a substantive due process claim, a plaintiff challenging specific acts of state officials must "show *both* that the acts were so egregious as to shock the conscience *and* that they deprived him of a protected interest in life, liberty, or property." *Pagan v. Calderon*, 448 F.3d 16, 32 (1st Cir. 2006) (emphasis in *Pagan*); *see also Rivera*, 402 F.3d at 33–34 (1st Cir. 2005) ("In order to establish a substantive due process claim, the plaintiff must first show a deprivation of a protected interest in life, liberty, or property.  It is not enough to claim the governmental action shocked the conscience" because "[t]he implication of a fundamental right is a threshold requirement for establishing a due process violation") (citations omitted).  While "the cases in which [the First Circuit has] found governmental conduct to shock the conscience have often involved state action that was highly physically intrusive," it has "pointedly left open the possibility that verbal or other less physical harassment . . . might rise to a conscience-shocking level." *Cruz-Erazo*, 212 F.3d at 622.

---

This area of law may be ripe for reexamination as to whether pervasive, non-physical sexual harassment may be as harmful to the victim's constitutional right to bodily integrity as some forms of physical abuse.  In the tort area, the law was slow to acknowledge that purely psychological injuries should be treated like physical injuries, subject to the same standards of proof.  In Maine, for example, the Law Court held in 1880 that "mental suffering alone, unattended by any injury to the person, caused by simple actionable negligence" was not compensable. *Wyman v. Leavitt*, 71 Me. 227, 230 (1880).  The doctrine developed to permit recovery for "objectively manifested" emotional suffering without discernible trauma caused by negligence, then to adopt the theory of negligent infliction of emotional distress when manifested as a physical impact, and finally to drop the physical injury requirement and permit recovery for emotional suffering alone. *Gammon v. Osteopathic Hosp. of Maine, Inc.*, 534 A.2d 1282, 1284 (Me. 1987) (describing the law's development on "mental suffering alone" torts in Maine from 1880 onward).

Here, a high school principal engaged in prolonged, pervasive, and persistent sexual harassment of a teenage girl under his authority, who was struggling with a difficult family situation, and his actions were bound to cause confusion, emotional distress, worry, and other significant psychological harms.  If Mr. Cavanaugh had even momentary sexual contact with Ms. Wadsworth, the Court could apply an entirely different analysis to the case.  Without diminishing the impact of physical sexual contact, it strikes the Court that the current state of the law artificially diminishes the impact of psychological sexual harassment.

"It is well recognized that students have a fundamental right to bodily integrity that includes the right to be free from sexual abuse." *Doe,* 66 F. Supp. 2d at 65. As Mr. Cavanaugh observes, however, cases of sexual harassment amounting to a constitutional deprivation have <u>uniformly</u> involved at least some form of physical sexual contact. *See Def.'s Mot.* at 8. Ms. Wadsworth responds only that the Fourteenth Amendment right to bodily integrity "protects a student's right to be free from sexual abuse <u>and harassment</u> by teachers at a public school." *Pl.'s Mot.* at 35 (citing *B.W. v. Career Technology Center of Lackawanna County*, 422 F. Supp. 3d 859, 888-89 (M.D. Pa. 2019) and *Doe v. Boyertown Area Sch. Dist.*, 10 F. Supp. 3d 637, 650 (E.D. Pa. 2014)) (emphasis in *Pl.'s Mot.*). But, unlike Ms. Wadsworth, the plaintiffs in those cases alleged <u>physical</u> abuse. *See B.W.,* 422 F. Supp. 3d at 872-873 (students were "sexually assaulted and abused by a teacher" who "constantly engaged in inappropriate and unwanted physical contact with his students"); *Boyertown,* 10 F. Supp. 3d at 650 (plaintiff's allegation of having suffered a sexual assault was sufficient to constitute a violation of her Fourteenth Amendment rights).

The Court has not identified any authority supporting the proposition that non-physical harassment alone can violate the right to bodily integrity or shock the conscience.[111] Neither party disputes that under First Circuit caselaw physical sexual abuse will generally violate the right to bodily integrity in a manner that

---

[111]   During oral argument, the Court challenged Ms. Wadsworth's counsel to cite one case where a court has found that a § 1983 action based on sexual harassment was viable if there was no allegation of physical contact. Consistent with the Court's research and the parties' submissions, Ms. Wadsworth's attorney was unable to cite one case as authority for the proposition that a § 1983 sexual harassment claim may proceed without some physical contact.

64

**A293**

shocks the conscience. *See, e.g., Doe,* 66 F. Supp. 2d at 65. First Circuit caselaw examining non-physical harassment, however, has primarily focused on verbal abuse or other misconduct by police or prosecutors that was manipulative or threatening and found the conduct not to be conscience-shocking. *See Cruz-Erazo*, 212 F.3d at 622-23 (discussing cases); *Spencer v. Doran*, No. 18-CV-1191-LM, 2020 LEXIS 150728, at *18-19 (D.N.H. Aug. 20, 2020) (same).

Out-of-circuit caselaw focusing on non-physical abuse in a school setting has generally considered verbal abuse by teachers that was inappropriate and often extraordinarily cruel yet did not shock the conscience or deprive the student of a protected constitutional right. *See, e.g., Abeyta By & Through Martinez v. Chama Valley Ind. Sch. Dist., No. 19*, 77 F.3d 1253, 1255–57 (10th Cir. 1996) (teacher repeatedly calling sixth-grade student a "prostitute" in front of her class did not rise to a substantive due process violation and the Court noted that "[w]e have found no case in a school context that held conduct falling shy of sexual molestation or assault constitutes constitutionally actionable sexual harassment"); *Doe v. Gooden*, 214 F.3d 952, 955 (8th Cir. 2000) (dismissing verbal-abuse substantive due process claim against elementary school teacher "accused of yelling and screaming at students, using foul language, . . . calling students 'stupid,' and referring to students as 'bimbos,' 'fatso,' and 'welfare bunch'"); *Costello v. Mitchell Pub. Sch. Dist. 79*, 266 F.3d 916, 921 (8th Cir. 2001) (teacher calling student "retarded," "stupid," and "dumb," in front of her classmates on a daily basis did not amount to a constitutional violation).

Mr. Cavanaugh's pattern of sexual harassment of Ms. Wadsworth does not line up neatly with any of these cases. To sustain her § 1983 claim, Ms. Wadsworth must "show *both* that the acts were so egregious as to shock the conscience *and* that they deprived [her] of a protected interest in life, liberty, or property." *Pagan*, 448 F.3d at 32 (emphasis in *Pagan*). While it may be axiomatic that sexual abuse so harmful that it deprives the victim of her constitutional right to bodily integrity is inherently conscience-shocking, the Court has not identified any authority—in this Circuit or any other—suggesting either that non-physical harassment like the type in this case violates a plaintiff's right to bodily integrity or that such abuse shocks the judicial conscience. The Court must apply the law as it finds it exists today, and thus concludes that it would be a bridge too far to hold for the first time, absent any supporting authority, both that Mr. Cavanaugh's non-physical harassment violates Ms. Wadsworth's right to bodily integrity and also that it shocks the conscience.

For this reason, the Court must find that no reasonable jury could conclude that Mr. Cavanaugh's conduct deprived Ms. Wadsworth of her constitutional right to bodily integrity and the Court is compelled to reject Ms. Wadsworth's § 1983 substantive due process claim.

### 2. Qualified Immunity

Even if the Court had found that Mr. Cavanaugh's conduct deprived Ms. Wadsworth of her constitutional right to bodily integrity, Ms. Wadsworth's claim would still fail because Mr. Cavanaugh would be entitled to qualified immunity on her § 1983 claim.

"[T]he qualified immunity inquiry is a two-part test.  A court must decide: (1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right; and (2) if so, whether the right was 'clearly established' at the time of the defendant's alleged violation." *Maldonado v. Fontanes*, 568 F.3d 263, 268-69 (1st Cir. 2009) (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)).  "[T]he second, 'clearly established' step of the qualified immunity analysis . . ., in turn, has two aspects." *Id.* at 269.  "The first sub-part requires the plaintiff to identify either 'controlling authority' or a 'consensus of cases of persuasive authority' sufficient to send a clear signal to a reasonable official that certain conduct falls short of the constitutional norm." *Alfano v. Lynch*, 847 F.3d 71, 75 (1st Cir. 2017) (quoting *Wilson v. Layne*, 526 U.S. 603, 617, 119 S. Ct. 1692, 143 L. Ed. 2d 818 (1999)).  For the second, the Court must ask "whether a reasonable defendant would have understood that his conduct violated the plaintiff['s] constitutional rights." *Id.*  The Supreme Court has instructed that "this inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled on other grounds by Pearson*, 555 U.S. 223).

The Court finds the first part of the test to be insurmountable for Ms. Wadsworth.  Even assuming the Court had held that Mr. Cavanaugh's conduct violated her right to bodily integrity in a manner that shocked the conscience, at the time the events of this case occurred, no court—at least that this Court or Ms. Wadsworth has been able to identify—had held that any form of non-physical sexual

67

**A296**

harassment alone was sufficient to sustain a substantive due process violation, much less harassment that resembled Mr. Cavanaugh's. The "contours of that right"—at least as it pertains to non-physical harassment—could not be considered "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Maldonado*, 568 F.3d at 268-69.

Even if Ms. Wadsworth had been able to establish a substantive due process violation, Mr. Cavanaugh would be entitled to qualified immunity on her § 1983 claim. Accordingly, the Court grants the motion for summary judgment in favor of Mr. Cavanaugh as to Ms. Wadsworth's § 1983 substantive due process claim.

### B.   Equal Protection Claim

#### 1.   Equal Protection Violation

"[Section] 1983 equal protection claims may be brought against individuals as well as municipalities . . . ." *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 257 (2009) (citing *West v. Atkins*, 487 U.S. 42, 48-51 (1988)). "To state an equal protection claim, the plaintiff must 'show that the parties with whom he seeks to be compared have engaged in the same activity vis-à-vis the government entity without such distinguishing or mitigating circumstances as would render the comparison inutile.'" *Raymond v. Me. Sch. Admin. Dist. 6*, No. 2:18-cv-00379-JAW, 2019 U.S. Dist. LEXIS 80868, at *21 (D. Me. May 14, 2019) (quoting *Cordi-Allen v. Conlon,* 494 F.3d 245, 251 (1st Cir. 2007)). "[A] plaintiff needs to allege facts showing that (1) the person, compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such

as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Davis v. Coakley*, 802 F.3d 128, 132-33 (1st Cir. 2015) (quoting *Rubinovitz v. Rogato*, 60 F.3d 906, 910 (1st Cir. 1995)). The plaintiff must "identify and relate *specific instances*" of the defendant treating similarly situated persons differently, "instances which have the capacity to demonstrate that [plaintiffs] were singled . . . out for unlawful oppression." *Buchanan v. Maine*, 469 F.3d 158, 178 (1st Cir. 2006) (alterations and emphasis in original) (quoting *Rubinovitz*, 60 F.3d at 910). The plaintiff must also show that the defendant acted with a discriminatory intent. *Lipsett v. Univ. of Puerto Rico*, 864 F.2d 881, 896.

In the Court's Order on Mr. Nguyen's motion to dismiss—cited here by both parties—the Court found that Ms. Wadsworth had not adequately pleaded an Equal Protection claim against Mr. Nguyen. *Order on Nguyen Mot. to Dismiss* at 38-41. The Court noted that a District of Maine court recently dismissed an equal protection claim against a school department in a Title IX case because "[t]he complaint d[id] not allege either that [the student] was treated differently than other similarly situated students with disabilities, or that the School Department's actions were based on the types of impermissible considerations described" in *Davis*. *Id.* at 39 (quoting *McCann, on behalf of J.M. v. York School Department*, 365 F. Supp. 3d 132, 147 (D. Me. 2019)). The Court found that, as in *McCann*, "Ms. Wadsworth's Amended Complaint does not allege that Mr. Nguyen treated Ms. Wadsworth differently than any other students" and did "not mention any other students Mr. Nguyen interacted with, so it falls far below the requirement that the plaintiff show specific instances of

disparate treatment." *Id.* at 40. The Court also found Ms. Wadsworth's claim deficient because "she attempts to hold Mr. Nguyen liable for the alleged actions of Mr. Cavanaugh" yet "no facts establish that Mr. Nguyen had any control over Mr. Cavanaugh, the principal." *Id.*

The analysis differs greatly for the claims against Mr. Cavanaugh. Again, Ms. Wadsworth must "allege facts showing that (1) the person, compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Davis*, 802 F.3d at 132-33 (quoting *Rubinovitz*, 60 F.3d at 910). While Ms. Wadsworth faced the barrier of showing that Mr. Nguyen controlled the actions of Mr. Cavanaugh, the harasser, that obstacle is removed for the claims directly against Mr. Cavanaugh. She must show that she was (1) selectively treated compared with others similarly situated and (2) that such treatment was based on impermissible considerations.

### a.   Selective Treatment

An individual is "similarly situated" to others for equal protection purposes when "a prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated." *Id.* at 133 (quoting *Barrington Cove Ltd. P'ship v. Rhode Island Hous. & Mortgage Fin. Corp.*, 246 F.3d 1, 8 (1st Cir. 2001)). The First Circuit has explained that "[e]xact correlation is

70

**A299**

neither likely nor necessary, but the cases must be fair congeners.  In other words, apples should be compared to apples." *Id.*

This hurdle has often proven insurmountable for student victims of sexual harassment attempting to hold liable school officials or entities for failing to prevent or report the harm.  Ms. Wadsworth's unsuccessful Equal Protection claim against Mr. Nguyen provides a representative example of the challenges such plaintiffs face. There, the gravamen of her claim against Mr. Nguyen was that he failed to prevent or report Mr. Cavanaugh's harassment.  Assuming that Mr. Nguyen handled her complaints poorly, for an Equal Protection claim to lie against him, the Court would need some evidence that Mr. Nguyen handled differently the complaints of a student similarly situated to Ms. Wadsworth—thereby raising the question of whether that differential treatment was due to an impermissible consideration, like the student's gender.

In these cases against officials for failing to prevent harassment, however, the similarly situated student(s) will generally only be other students who have also reported similar harassment to the same defendant—a narrow and often nonexistent cohort.  If Ms. Wadsworth had asserted that Mr. Nguyen had promptly reported a male student's complaints of harassment by Mr. Cavanaugh, the Court could then inquire whether this differential treatment was motivated by the impermissible consideration of gender.  If, however, the record reveals no evidence that Mr. Nguyen handled any other similar complaints, the Court has no benchmark against which to judge whether he inadequately responded to Ms. Wadsworth's complaints, and thus

71

**A300**

cannot determine whether his response to her was motivated by an impermissible consideration. Ultimately, Ms. Wadsworth's claim against Mr. Nguyen failed because she did "not mention any other students Mr. Nguyen interacted with" and thus "[did] not allege that Mr. Nguyen treated Ms. Wadsworth differently than any other students." *Order on Nguyen Mot. to Dismiss* at 40.

In the First Circuit, this high bar has regularly stymied plaintiffs attempting to hold school officials or entities liable for failing to prevent harassment by another teacher or student. *See, e.g.*, *McCann*, 365 F. Supp. 3d at 147 ("[t]he complaint d[id] not allege either that [the student] was treated differently than other similarly situated students with disabilities, or that the School Department's actions were based on . . . impermissible considerations"); *Harrington v. City of Attleboro*, 172 F. Supp. 3d 337, 346 (D. Mass. 2016) ("Plaintiffs, however, fail to allege any facts or argue in their opposition that [defendants] treated the harassment of [the victim] by her peers differently than that of any other student, let alone that such treatment was because of her membership in a protected class"); *Thomas v. Town of Chelmsford*, 267 F. Supp. 3d 279, 303 (D. Mass. 2017) (concluding that "[t]he plaintiffs do not show any similarly situated comparator" because "[t]he plaintiffs' equal protection claim is based entirely on how school officials might have treated a hypothetical, similarly situated female rape victim" and "[s]uch conjecture does not suffice to state an equal protection claim"); *Doe v. Town of Stoughton*, No. CIV.A. 12-10467-PBS, 2013 U.S. Dist. LEXIS 173030, at *13 (D. Mass. Dec. 10, 2013) ("[t]o the extent Plaintiff asserts that [the defendant] is a mandated reporter who failed to report [the perpetrator's]

felonious actions . . . Plaintiff does not allege that in other circumstances similarly situated students were treated differently than her); *Pollard v. Georgetown Sch. Dist.*, 132 F. Supp. 3d 208, 223 (D. Mass. 2015) (although [plaintiff] alleges that the District afforded [the victim] a lower level of protection compared to 'other students,' she never alleges any facts to establish that these students are similarly situated"). The caselaw is much less established, however, for claims where the student-victim sues the teacher-harasser directly, rather than the person(s) who failed to prevent the harassment.

It strikes the Court that the "similarly situated" analysis must be framed differently for such cases. "It is axiomatic that the liability of persons sued in their individual capacities under section 1983 must be gauged in terms of their own actions." *Rogan v. Menino*, 175 F.3d 75, 77 (1st Cir. 1999). When the allegation is that the defendant failed to report or prevent the victim's harassment due to an impermissible consideration, the plaintiff must show that he treated another similarly situated complainant differently to establish a benchmark. For a defendant like Mr. Nguyen, there is no way to assess whether he treated other complainants differently without evidence that he was aware of another complaint. Yet when the claim is brought against the alleged perpetrator directly, the question is not whether he treated *this* victim differently from another victim of harassment; instead, it is whether he harassed the victim due to an impermissible consideration.

In other words, a non-harassing defendant is gauged in terms of whether he handled this complaint differently than others, and so the Court generally needs

73

**A302**

another complaint to compare.  By contrast, a perpetrator-defendant is gauged on why he harassed the plaintiff (but presumably not every other student), and it would take a bizarre interpretation of the Equal Protection Clause to require a plaintiff to provide two victims of the perpetrator's harassment for the Court to weigh whether and why he harassed one more severely than the other. The similarly situated benchmark is thus a student the perpetrator did not harass.

The Court finds Ms. Wadsworth to have met that burden at the summary judgment stage.  She alleges that Mr. Cavanaugh sexually harassed her and treated her differently because of her gender.  *Pl.'s Opp'n* at 37.  In the Court's view, her similarly situated comparators would thus be male students at MVHS, also under Mr. Cavanaugh's authority as principal.

There is no bright line for exactly what level of specificity is required, but "[e]xact correlation is neither likely nor necessary" and instead the standard is whether "a prudent person" would "think them roughly equivalent and the protagonists similarly situated."  *Davis*, 802 F.3d at 133 (quoting *Barrington*, 246 F.3d at 8).  MVHS is a coeducational school with numerous male and female students under Mr. Cavanaugh's authority as principal.  In the Court's view, any male classmate of Ms. Wadsworth would qualify as a "fair cogener[]" and it would be unnecessarily formalistic to require her to identify a specific male classmate and establish that he was not harassed by Mr. Cavanaugh.

Nevertheless, even if the Court were to apply that demanding level of specificity, it appears that such a classmate has been identified.  The record includes

74

**A303**

the deposition testimony of Brent Stewart, a MVHS classmate and friend of Ms. Wadsworth's. *See Joint R. Materials*, Attach. 24, *Dep. of Brent Stewart*. As with Ms. Wadsworth, Mr. Cavanaugh had the authority to spontaneously "pull" Mr. Stewart "into his office in the middle of the day" for a meeting, but only did so on one occasion—to "ask like how [Ms. Wadsworth] was doing." *Id.* at 22:14-23:12. There is no suggestion that Mr. Cavanaugh ever harassed Mr. Stewart, a male classmate "similarly situated" to Ms. Wadsworth.[112] Ms. Wadsworth has thus sufficiently established similarly situated comparators in Mr. Stewart and the rest of her male MVHS classmates.

### b.      Impermissible Considerations

The next step of the analysis is to assess whether Mr. Cavanaugh treated Ms. Wadsworth differently from her comparators "based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Davis*, 802 F.3d at 132-33 (quoting *Rubinovitz*, 60 F.3d at 910). Discrimination on the basis of sex violates the equal protection clause if such discrimination does not "serve important governmental objectives" and is not "substantially related to achievement of those objectives." *Lipsett*, 864 F.2d at 896 (quoting *Davis*, 442 U.S. at 234-35).

In *Forrest v. Brinker International Payroll Company, LP*, 511 F.3d 225 (1st Cir. 2007), the First Circuit considered a defendant's contention that the alleged

---

[112]      There are likewise no allegations that Mr. Cavanaugh harassed any other student. The teachers' email complaining about him pulling her out of class, Officer Spear's "pervert principal" email, and the school and law enforcement investigations all related to his behavior with Ms. Wadsworth, not with any other student(s).

harassment of the perpetrator's former romantic partner "could not have been motivated by the victim's sex because it was instead motivated by a romantic relationship gone sour." *Id.* at 229. The panel flatly rejected this argument as a "false dichotomy," reasoning that:

> Presumably the prior relationship would never have occurred if the victim were not a member of the sex preferred by the harasser, and thus the victim's sex is inextricably linked to the harasser's decision to harass. To interpret sexual harassment perpetrated by a jilted lover in all cases not as gender discrimination, but rather as discrimination on the basis of the failed interpersonal relationship . . . is as flawed a proposition under Title VII as the corollary that ordinary sexual harassment does not violate Title VII when the [ ] asserted purpose is the establishment of a new interpersonal relationship. Whether a harasser picks his or her targets because of a prior intimate relationship, desire for a future intimate relationship, or any other factor that draws the harasser's attention should not be the focus of the Title VII analysis. Instead, improper gender bias can be inferred from conduct; if the harassing conduct is gender-based, Title VII's requirement that the harassment be based upon sex is satisfied.

*Id.* at 229 (citations and internal quotation marks omitted); *see also Charette v. St. John Valley Soil & Water Conservation Dist.*, No. 1:17-cv-35-GZS, 2017 U.S. Dist. LEXIS 94433, at *39 (D. Me. June 20, 2017) (analytical framework for discriminatory intent is the same in the Title VII and Equal Protection contexts). To the degree that—as the Court has discussed—a factfinder could reasonably construe Mr. Cavanaugh's behavior as harassment in the sexual infatuation with Ms. Wadsworth, that factfinder could infer that presumably it "would never have occurred if the victim were not a member of the sex preferred by the harasser, and thus the victim's sex is inextricably linked to the harasser's decision to harass." *Id.*

Additionally, many of Mr. Cavanaugh's actions appear to be gender-based.  He persistently called Ms. Wadsworth "princess," "Sports Illustrated swimsuit model," "ladytime," (a reference to her menstruation as her "ladytime"), and "cupcake."  He gave her a gift of tampons and repeatedly suggested—and made an appointment— for her to get birth control.  He also asked her about her sexual relationships with boys, whether she was having orgasms, her lacey shorts, and to send him "scandalous" photos of her in a bikini at the beach.  Viewed in combination, the Court finds that a reasonable juror could conclude on this record that Mr. Cavanaugh's harassment was motivated by the impermissible consideration of Ms. Wadsworth's gender.

### c.    Acting Under Color of Law

Mr. Cavanaugh also argues that Ms. Wadsworth's § 1983 claims must fail because he was not acting under the color of law.  *Def.'s Mot.* at 13-14.  The Court finds this defense unavailing.

To sustain a § 1983 claim, plaintiffs generally need to show not only a violation of a constitutional right, but also that the deprivation was committed by a person acting under the color of state law.  *Doe v. Sch. Admin. Dist. No. 19*, 66 F. Supp. 2d at 66 (citing *West v. Atkins*, 487 U.S. 42, 48, (1988)).  Mr. Cavanaugh relies on *Doe* and two out-of-circuit cases it cited where a teacher's (or former teacher's) conduct has not been considered to be acting under the color of law.  *Def.'s Mot.* at 13-14.  All are easily distinguishable.

In *Doe*, the misconduct "occurred off school grounds on a Saturday night, when school was not in session" and "because Doe did not have [the perpetrator] as a teacher prior to December 7, 1996 and had not really had any opportunity to interact with her at the school, it cannot be said that [the perpetrator] befriended Doe while acting in a teaching capacity." 66 F. Supp. 2d at 67. Here, however, some of the complained of conduct—including Mr. Cavanaugh regularly pulling Ms. Wadsworth out of class to meet in his office—clearly occurred while school was in session, and the record does not make clear which text messages were exchanged in school versus out of school. Additionally, the factfinder could easily conclude that, unlike the perpetrator in *Doe*, Mr. Cavanaugh befriended Ms. Wadsworth in his capacity as principal.

The other two cases, *D.T. v. Independent School District*, 894 F.2d 1176 (10th Cir. 1990) and *Becerra v. Asher,* 105 F.3d 1042 (5th Cir. 1997) are similarly inapposite. In *D.T.*, the abuse occurred during fundraising efforts for a private basketball camp and there was "absolutely nothing in the record demonstrating that the School District had any control over [the teacher] during the summer months" when the abuse occurred. *D.T.,* 894 F.2d 1177. As discussed in the previous paragraph, there are at the very least disputed issues of material act regarding whether key elements of Mr. Cavanaugh's misconduct occurred during the school year. In *Becerra*, the teacher had molested a student in his home after the student was no longer enrolled in the school. 105 F.3d at 1044. Ms. Wadsworth, by contrast, was at all relevant times enrolled at MVHS with Mr. Cavanaugh as her principal.

78

**A307**

The Court concludes that a reasonable juror could find that Mr. Cavanaugh was acting under color of law in his harassment of Ms. Wadsworth.

### 2.    Qualified Immunity

The most challenging question of the equal protection analysis is whether, even if he violated Ms. Wadsworth's Equal Protection rights, Mr. Cavanaugh is nonetheless entitled to qualified immunity.  The Court concludes that he is.

Even if Ms. Wadsworth has shown a violation of her Equal Protection rights, she cannot show that this right was "clearly established" with sufficient specificity required by the second prong of the qualified immunity analysis.  The first sub-part of this prong "requires the plaintiff to identify either 'controlling authority' or a 'consensus of cases of persuasive authority' sufficient to send a clear signal to a reasonable official that certain conduct falls short of the constitutional norm." *Alfano*, 847 F.3d at 75 (quoting *Wilson*, 526 U.S. at 617).

The Supreme Court instructs that "clearly established law should not be defined at a high level of generality" and "the clearly established law must be particularized to the facts of the case."  *White v. Pauly*, 580 U.S. 73, 79 (2017) (citations and internal quotations omitted).  While qualified immunity does not require "a case directly on point" for law to be clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate" and thus, "[p]ut simply, qualified immunity protects all but the plainly incompetent or those who knowingly violate the law." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (citations and internal quotations omitted).

"[W]hen a defendant invokes qualified immunity, the burden is on the plaintiff to show the inapplicability of the defense." *Rivera-Corraliza v. Morales*, 794 F.3d 208, 215 (1st Cir. 2015) (citing *Quintero de Quintero v. Aponte-Roque*, 974 F.2d 226, 228 (1st Cir. 1992)). Mr. Cavanaugh has invoked qualified immunity, but Ms. Wadsworth has not met her burden. She submits that "[p]rovided this Court agrees that a Constitutional violation occurred . . . the only question is whether a reasonable defendant would have known that Mr. Cavanaugh was violating Ms. Wadsworth's rights by sexually harassing her, and that a reasonable defendant would understand Mr. Cavanaugh's conduct violated Ms. Wadsworth's rights." *Pl.'s Opp'n* at 40. But that contention skips entirely over the critical second prong of the qualified immunity analysis—assessing whether that right was "clearly established" at the time. Ms. Wadsworth offers no First Circuit caselaw—and the Court has not identified any—holding that a teacher's non-physical sexual harassment of a student violates her Equal Protection rights, where the conduct does not involve hostility or direct sexual advances. While "officials can still be on notice that their conduct violates established law even in novel factual circumstances," *Hope v. Pelzer*, 536 U.S. 730, Ms. Wadsworth has not met her burden "to identify either 'controlling authority' or a 'consensus of cases of persuasive authority' sufficient to send a clear signal to a reasonable official that certain conduct falls short of the constitutional norm." *Alfano*, 847 F.3d at 75 (quoting *Wilson*, 526 U.S. at 617). Mr. Cavanaugh is entitled to qualified immunity and the Court must award summary judgment in his favor on Adrianna Wadsworth's Equal Protection claim.

A309

### C.     State Law Tort Claims

Ms. Wadsworth has asserted three state law tort claims against Mr. Cavanaugh: intentional infliction of emotional distress (Count IV); negligent infliction of emotional distress (Count V); and negligence (Count VI). *Am. Compl.* ¶¶ 189-208.

#### 1.     Intentional Infliction of Emotional Distress

##### a.     Maine Tort Claims Act Immunity

First, Mr. Cavanaugh argues that he is entitled to immunity for the IIED claim pursuant to the Maine Tort Claims Act (MTCA). *Def.'s Mot.* at 15. Although the MTCA provides for several types of absolute immunity, in this motion, Mr. Cavanaugh asserted his immunity from suit under only so-called intentional act immunity.[113] *Morgan v. Kooistra*, 2008 ME 26, ¶ 20, 941 A.2d 447. Claims of absolute immunity are affirmative defenses under § 8111(1). *See Miller v. Szelenyi*, 546 A.2d 1013, 1020 (Me. 1988) ("Immunity under section 8111(1)(C) is an affirmative defense"). This is not a close call. To meet the requirements for intentional act immunity, Mr. Cavanaugh must demonstrate that his actions "were intentional, they

---

[113]     Intentional act immunity under 14 M.R.S. § 8111(1)(E) is distinct from discretionary act immunity under 14 M.R.S. § 8111(1)(C). *Morgan v. Kooistra*, 2008 ME 26, ¶ 20, 941 A.2d 447. In proceeding with his motion for summary judgment, Mr. Cavanaugh has not asserted discretionary act immunity under § 8111(1)(C).

In his answer to the amended complaint, Mr. Cavanaugh raised § 8111(1)(C), discretionary function immunity, as his eighth affirmative defense. *Def., Andrew Cavanaugh's Answer to Pl.'s Am. Compl.* at 16 (ECF No. 17) ("The Defendant is immune from liability by operation of 14 M.R.S.A. § 8111(1)(C)"). Shifting subsections in his motion for summary judgment, Mr. Cavanaugh is demanding summary judgment based on the application of § 8111(1)(E), not § 8111(1)(C). *Def.'s Mot.* at 15 (quoting § 8111(1)(E)). Ms. Wadsworth has not claimed that Mr. Cavanaugh waived intentional act immunity by failing to raise it in his amended answer. As the Plaintiff has not raised the issue, the Court will not address it sua sponte.

were within the scope of [his] employment," and that they were not undertaken "in bad faith." *Day's Auto Body, Inc. v. Town of Medway*, 2016 ME 121, ¶ 21, 145 A.3d 1030. Here, there is no claim that Mr. Cavanaugh acted unintentionally.

Regarding the "scope of employment" requirement, "[c]onduct that is within the scope of employment is the type of conduct the employee was hired to perform; occurs within the time and space of the employment; and is undertaken, at least partially, to serve the employee's master." *Morgan*, 2008 ME 26, ¶ 20 (citations omitted). "Actions that are not work-related do not fall within this category" and "[a]n employee who acts in bad faith loses this immunity." *Id.* The Court cannot seriously credit Mr. Cavanaugh's assertion that some of his actions—including texting an underage student, presumably off campus, to send him "only . . . the scandalous" photos of her in her bikini or to put on "her Mickey Mouse negligee," PSAMF ¶¶ 80, 89; DRPSAMF ¶¶ 80, 89—could possibly be considered "the type of conduct the employee was hired to perform" or "undertaken to serve the employee's master," RSU 40. *Morgan*, 2008 ME 26, ¶ 20.

Mr. Cavanaugh's last argument is that he was not acting in bad faith. *Def.'s Mot.* at 15. *See Lyons v. City of Lewiston*, 666 A.2d 95, 101-02 (Me. 1995) (affirming a summary judgment in favor of a government-employee defendant where the record revealed no genuine dispute as to whether the defendant acted in bad faith). Here, there is a palpable genuine issue of material fact as to whether a reasonable factfinder could conclude that Mr. Cavanaugh's actions toward Ms. Wadsworth were in bad faith. Therefore, Mr. Cavanaugh has not sustained his burden to demonstrate that

82

**A311**

there is no genuine issue of material fact as to whether he is entitled to intentional acts immunity under 14 M.R.S. § 8111(1)(E).  The Court denies his motion for summary judgment on MTCA immunity grounds.

### b.    The Merits of the Claim

Mr. Cavanaugh also argues that he is entitled to summary judgment on Ms. Wadsworth's IIED claim because she has not established any of the required elements. *Def.'s Mot.* at 15-17.  The Court disagrees.

In Maine, the four elements required to establish an IIED claim are:

(1) the defendant intentionally or recklessly inflicted severe emotional distress or was certain or substantially certain that such distress would result from her conduct; (2) the conduct was so "extreme and outrageous as to exceed all possible bounds of decency and must be regarded as atrocious, utterly intolerable in a civilized community"; (3) the actions of the defendant caused the plaintiff's emotional distress; and (4) the emotional distress suffered by the plaintiff was "so severe that no reasonable [person] could be expected to endure it."

*Curtis*, 784 A.2d at 20.  Beginning with the first element, Mr. Cavanaugh submits that he "did not act to intentionally or recklessly inflict emotional distress" and instead Ms. Wadsworth's "life at home was troubled, abusive and [he] tried to assist her." *Def.'s Mot.* at 16.

In its analysis of Ms. Wadsworth's substantive due process claim, the Court has discussed its views of—and how a reasonable juror could view—Mr. Cavanaugh's conduct.  The Court does not find it necessary to repeat that analysis in full but reiterates its conclusion that a reasonable factfinder could conclude that this prolonged, pervasive, and persistent sexual harassment of a teenage girl struggling with a difficult family situation by an older, trusted male authority figure was bound

to cause confusion, emotional distress, worry, and other significant psychological harms deeply damaging to Ms. Wadsworth. The record reveals that she was forced to endure false rumors that she "was only second in [her] class because of the sexual relations that [she] was having with the principal" and that she had sexually transmitted diseases. *Wadsworth Dep. Vol. I* at 120:20-24. She began to cry in the morning on the way to school and on her way home from school, was diagnosed with depression and anxiety, and even now continues to suffer from anxiety and has trouble in school when dealing with male professors. PSAMF ¶¶ 152-54; DRPSAMF ¶¶ 152-54. A reasonable juror could conclude from this record that Mr. Cavanaugh "recklessly inflicted severe emotional distress" upon Ms. Wadsworth. *Curtis*, 784 A.2d at 20.

The analysis is similar for the next element. Mr. Cavanaugh contends that his conduct was not "conduct so extreme and outrageous as to exceed all possible bounds of decency and must be regarded as atrocious, utterly intolerable in a civilized community." *Def.'s Mot.* at 16 (quoting *Curtis*, 784 A.2d at 20). He adds that one district court has found that "in *most* cases where courts have found a teacher's gender-motivated conduct toward a student sufficiently extreme and outrageous to support such a claim, it included physical abuse." *Id.* (quoting *Brodeur v. Claremont Sch. Dist.*, 626 F. Supp. 2d 195, 225 (D.N.H. 2009) (emphasis added)). The Court does not read *Broduer*—a case where the complained-of conduct consisted entirely of "several remarks about [the plaintiff's] buttocks"—to suggest that non-physical harassment can never support an IIED claim; indeed, the district court clarified that

"[t]his is not to say that a student cannot prevail on such a claim as a matter of law if it arises from a teacher's words rather than his actions."  626 F. Supp. 2d at 199, 225.  For the reasons the Court explained in its discussions of the substantive due process claim and the prior IIED element, it concludes that a reasonable juror could find from this record that Mr. Cavanaugh's conduct was sufficiently extreme to support an IIED claim.

For the third element, Mr. Cavanaugh submits that Ms. Wadsworth's emotional distress is attributable not to his conduct but to other traumatic events in her life.  *Def.'s Mot.* at 16-17.  The record at the very least supports a plausible connection between his conduct and Ms. Wadsworth's distress.  Its ultimate attribution is a question for the jury to decide that is not properly disposed of on summary judgment.

Finally, Mr. Cavanaugh contends that Ms. Wadsworth has not "suffered severe emotional distress that no reasonable person should be expected to endure."  *Id.* at 17 (quoting *Curtis*, 784 A.2d at 20).  The Court reiterates its views about the reprehensibility of Mr. Cavanaugh's conduct and the depth of the trauma it was inevitable to inflict on Ms. Wadsworth, concluding that a reasonable juror could find that she has established this element.  The Court denies Mr. Cavanaugh's request for summary judgment as to Ms. Wadsworth's IIED claim.

## 2.   Negligent Infliction of Emotional Distress

Under Maine law, proof of negligent infliction of emotional distress requires plaintiffs to show that (1) the defendant was negligent; (2) the plaintiff suffered

**A314**

emotional distress that was a reasonably foreseeable result of the defendant's negligent conduct; (3) and the plaintiff suffered severe emotional distress as a result of the defendant's negligence. *Veilleux v. Nat'l Broad. Co.*, 206 F.3d 92, 129 (1st Cir. 2000) (citations omitted). Mr. Cavanaugh notes that the Law Court "has recognized very limited circumstances in which a negligent infliction claim may be brought," including "in circumstances in which a special relationship exists between the actor and the person emotionally harmed" or where "the wrong-doer has committed another tort." *Def.'s Mot.* at 18 (citing *Curtis*, 784 A.2d at 25). Mr. Cavanaugh submits that neither circumstance applies because he has not committed a tort and no special relationship existed between him and Ms. Wadsworth. *Id.* The Court disagrees on both counts.

The Court finds instructive *Hinkley v. Baker*, 122 F. Supp. 2d 48 (D. Me. 2000). In that decision, Judge Singal noted that, because he had not dismissed the plaintiff's IIED count, the plaintiff "ha[d] also alleged an independent tort . . . which could stand as [an] underlying tort[] in support of her NIED claim." *Id.* at 57. The Court has denied Mr. Cavanaugh's request for summary judgment on Ms. Wadsworth's IIED claim. It can thus "stand as [an] underlying tort[] in support of her NIED claim," and Mr. Cavanaugh's argument for summary judgment on her NIED claim fails for that reason alone.

Moreover, Mr. Cavanaugh's argument that no special relationship existed also does not hold water. Judge Singal in *Hinkley* also found that "a student and her teacher share a unique relationship," *id.* at 56 (collecting cases), and that "[b]ecause

of the teacher-student relationship between Plaintiff and Defendant, Plaintiff need not allege or prove a separate, underlying tort to maintain her NIED claim." *Id.; see also New Jersey v. T.L.O.*, 469 U.S. 325, 349-50 (1985) (recognizing a "special relationship between teacher and student", in which the "attitude of the typical teacher is one of personal responsibility for the student's welfare as well as for his education.") (Powell, J., concurring); *Bridges v. MacLean–Stevens Studios, Inc.*, 201 F.3d 6, 11 (1st Cir. 2000) ("Unquestionably, the schools and the students enjoy a special relationship of trust"); *C.B. v. Me. Sch. Admin. Dist. No. 40*, No. 08-57-P-H, 2008 U.S. Dist. LEXIS 58236, at *21 (D. Me. July 29, 2008) (upholding a NIED claim against a teacher and stating that "in [*Hinkley*], the question was specifically whether there is a unique relationship between a teacher and a student that will provide the basis for a tort claim under Maine law, and this court answered that question in the affirmative"). While Mr. Cavanaugh may have been Ms. Wadsworth's principal rather than her teacher, the record reveals that he exercised even more authority over her then a teacher ordinarily would, especially considering that he willingly took on a "father figure" role in her life. The Court denies his request for summary judgment on Ms. Wadsworth's NIED claim because of the independent tort and because of the existence of a special relationship.

### 3.    Negligence

Finally, Mr. Cavanaugh submits that Ms. Wadsworth's "claim against Defendant Cavanaugh for negligence does not appear to implicate him at all . . . it is Defendant Nguyen who is cited as allegedly breaching his duty" and that "[r]ather,

[Ms. Wadsworth] claims that [Mr.] Cavanaugh acted intentionally" and she has "otherwise failed to offer evidence from which a reasonable jury could conclude that [he] had a duty to [her] in negligence, breached that duty, and caused damages as result of negligent acts." *Def.'s* Mot. at 19. Ms. Wadsworth counters that Mr. Cavanaugh owed her a duty as her principal and affirmative action coordinator designated to investigate and report complaint of sexual harassment and asserts that, if a duty exists, "the question of whether there was a breach of the standard of care would ordinarily be a question for a fact-finder, not susceptible on this record to summary judgment." *Pl.'s Opp'n* at 56 (quoting *Alexander v. Mitchell*, 2007 ME 108, ¶ 12, 930 A.2d 1016, 1020). The Court concludes that a reasonable jury could find negligence from these facts.

To establish negligence, a plaintiff must demonstrate: (1) a duty owed to plaintiff by defendant, (2) a breach of that duty, and (3) that the plaintiff was injured as a result of that breach. *Canning v. Broan-Nutone*, LLC, 480 F. Supp. 2d 392, 410 (D. Me. 2007) (citing *Parker v. Harriman*, 516 A.2d 549, 550 (Me. 1986)). The Court has already established that Mr. Cavanagh owed Ms. Wadsworth a duty sufficient to sustain her NIED claim and—because the bar is lower for general negligence— affirms that finding for her negligence claim. *See Curtis*, 784 A.2d at 25 (plaintiffs claiming [NIED rather than general negligence], however, face a significant hurdle in establishing the requisite duty, in great part because the determination of duty in these circumstances is not generated by traditional concepts of foreseeability").

The primary question here is whether Mr. Cavanaugh negligently breached that duty.   On this record, a reasonable factfinder could conclude that Mr. Cavanaugh's harassing behavior was intentional misconduct—sending an underage girl sexually explicit text messages despite knowing it was wrong.   However, the factfinder could, alternatively, reasonably credit Mr. Cavanaugh's assertions that he truly had Ms. Wadsworth's best interests at heart and the distress he inflicted through his text messages and other actions was primarily accidental or otherwise negligent.

As Ms. Wadsworth has noted, "the question of whether there was a breach of the standard of care would ordinarily be a question for a fact-finder, not susceptible on this record to summary judgment." *Alexander*, 2007 ME 108, ¶ 12, 930 A.2d 1020. On this record, a reasonable juror could conclude that Mr. Cavanaugh breached his duty to Ms. Wadsworth through intentional and/or negligent conduct and that she was harmed as a result.   Because the Court does not know how the factfinder will characterize Mr. Cavanaugh's behavior, it does not find it proper to award summary judgment on Ms. Wadsworth's negligence claim.

## VI.   CONCLUSION

The Court GRANTS Andrew Cavanaugh's Motion for Summary Judgment (ECF No. 103) as to Count II of Adrianna Wadsworth's Amended Complaint as it pertains to him.   The Court DENIES the motion as to Counts IV-VI.

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 30th day of March, 2023

UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| ADRIANNA WADSWORTH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 2:19-cv-00577-JAW |
| | ) | |
| MAINE SCHOOL ADMINISTRATIVE | ) | |
| DISTRICT 40/REGIONAL SCHOOL | ) | |
| UNIT 40 et al., | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER ON MOTION FOR JUDGMENT AND STAY**

Applying First Circuit law to the provisions of Federal Rule of Civil Procedure 54(b), the court grants a motion for partial judgment to allow for the appeal of certain dispositive motions and a motion to stay the remaining claims until resolution of the appeals.

**I.    BACKGROUND**

On December 27, 2019, Adrianna Wadsworth filed a civil action in this court against Maine School Administrative District 40/Regional School Unit 40 (RSU 40 or the District), Andrew Cavanaugh, and Chuck Nguyen on various legal theories, alleging that Mr. Cavanaugh, the high school principal, sexually harassed her when she was a student and that the other Defendants were complicit in his harassment. *Compl.* (ECF No. 1); *Pl.'s Am. Compl.* (ECF No. 15).  Ms. Wadsworth's civil action has been the subject of intensive and exhaustive pretrial motion practice.  *See Order on Def. Chuck Nguyen's Mot. to Dismiss* (ECF No. 36); *Order on MSAD 40/RSU 40's Mot. to Dismiss* (ECF No. 39); *Am. Order on MSAD 40/RSU 40's Mot. for Summ. J.*

**A320**

(ECF No. 139) (*RSU 40 Order*); *Order on Chuck Nguyen's Mot. for Summ. J.* (ECF No. 140) (*Nguyen Order*); *Order on Andrew Cavanaugh's Mot. for Summ. J.* (ECF No. 141) (*Cavanaugh Order*).

On April 19, 2023, the Court duly scheduled the case for final pretrial conference with an anticipated trial date of October 2023. *Order Granting Mot. To Continue* (ECF No. 144). However, on April 20, 2023, Ms. Wadsworth moved for entry of partial final judgment as to all federal claims and to stay all state claims. *Pl.'s Mot. for Entry of Partial Final J. as to all Fed. Cls. and Mot. to Stay all State Cls.* (ECF No. 146) (*Pl.'s Mot.*). None of the parties responded to Ms. Wadsworth's motion.

Meanwhile, on April 27, 2023, Mr. Nguyen filed a notice of appeal of the Court's denial of his dispositive motion on the state law claims. *Def Chuck Nguyen's Notice of Appeal* (ECF No. 147). Mr. Nguyen states that his appeal is being taken "of right pursuant to an exception to the final judgment rule." *Id.* at 1. In support, he cites *Polly v. Atwell*, 581 A.2d 410, 412-13 (Me. 1990), *Smith v. School Administrative District 58*, 582 A.2d 247, 249 (Me. 1990), *Darling v. Augusta Mental Health Institute*, 535 A.2d 421, 430 (Me. 1987), and *Faucher v. City of Auburn*, 465 A.2d 1120, 1123 (Me. 1983).

## II.   PLAINTIFF'S POSITION

In her motion, Ms. Wadsworth contends that it is preferable to allow her to proceed with an appeal of those claims the Court has dismissed or on which the Court has granted summary judgment. *Pl.'s Mot.* at 1. She says that an appeal will allow the parties to proceed with full knowledge of which parties are properly before the

court and which claims are viable. *Id.* at 2. She contends that the appeal will also clarify which court has jurisdiction, thereby avoiding the possibility of trials in both state and federal court. *Id.* Ms. Wadsworth observes that as Mr. Nguyen is proceeding with an appeal as a matter of right, her appeal of the Court's dispositive rulings will not delay the resolution of the case. *Id.*

## III.   LEGAL STANDARDS

In *Amyndas Pharmaceuticals, S.A. v. Zeeland Pharma A/S*, 48 F.4th 18 (1st Cir. 2022), the First Circuit addressed the propriety of a trial court's issuance of a partial judgment to allow for immediate appellate review. By statute, federal appellate courts have jurisdiction of appeals only from "'final decisions' of the district court." *Id.* at 27 (quoting 28 U.S.C. § 1291). "This finality principle typically requires a final disposition of all claims in an action that have been brought by or against all of the parties." *Id.* Nevertheless, Federal Rule of Civil Procedure 54(b) "carves out an exception: it permits a district court to issue a partial final judgment that is immediately appealable as to particular claims or parties when those claims or parties can be sufficiently separated from other claims or parties in the case." *Id.* at 28.

Rule 54(b) provides:

> **(b) Judgment on Multiple Claims or Involving Multiple Parties.** When an action presents more than one claim for relief— whether as a claim, counterclaim, crossclaim, or third-party claim—or when multiple parties are involved, the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay. Otherwise, any order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer

> than all the parties does not end the action as to any of the claims or
> parties and may be revised at any time before the entry of a judgment
> adjudicating all the claims and all the parties' rights and liabilities.

FED. R. CIV. P. 54(b).   The First Circuit has cautioned that the district court's authority under Rule 54(b) is "narrowly circumscribed." *Amyndas*, 28 F.4th at 28. "Only if the court supportably determines both that its decision regarding a claim or party is sufficiently final and that 'there is no just reason for delay[ing]' an immediate appeal may it enter a partial final judgment under Rule 54(b)." *Id.* (quoting *Curtiss-Wright Corp. v. Gen. Elec. Co.*, 446 U.S. 1, 8 (1980)).   The *Amyndas* Court explained that Rule 54(b) "is designed to balance the need for the timely adjudication of important issues that arise early in a case with the 'long-settled and prudential policy against the scattershot disposition of litigation.'" *Id.* (quoting *Spiegel v. Trs. of Tufts Coll.*, 843 F.2d 38, 42 (1st Cir. 1988)).   The First Circuit wrote that "[t]he entry of '[j]udgments under Rule 54(b) must be reserved for the unusual case in which the costs and risks of multiplying the number of proceedings and of overcrowding the appellate docket are outbalanced by pressing needs of the litigants for an early and separate judgment as to some claims of parties.'" *Id.* (quoting *Spiegel*, 843 F.2d at 42 (quoting *Morrison-Knudsen Co. v. Archer*, 655 F.2d 962, 965 (9th Cir. 1981))).

The district court must first "assess the finality of the disputed ruling." *Spiegel*, 843 F.2d at 42.   The United States Supreme Court has written that "the District Court *cannot*, in the exercise of its discretion, treat as 'final' that which is not 'final' within the meaning of [28 U.S.C.] § 1291." *Sears, Roebuck & Co. v. Mackey*, 351 U.S. 427, 437 (1956)) (emphasis in original).   The district court must be satisfied that its ruling "at a bare minimum, disposes fully 'of at least a single substantive

4

**A323**

claim.'"  *Spiegel*, 843 F.2d at 43 (quoting *Acha v. Beame*, 570 F.2d 57, 62 (2d Cir. 1978)).

If the district court determines that the ruling is final, the trial court must turn to whether "there is no just reason for delay."  *Id.* (quoting FED. R. CIV. P. 54(b)).  In making this assessment, the district court "acts as a 'dispatcher,' determining which final decisions should await appeal in the ordinary course and which should be permitted to go forward immediately."  *Amyndas*, 28 F.4th at 28 (citing *Curtiss-Wright*. 446 U.S. at 8).  In *Spiegel*, the First Circuit referred to *Allis-Chalmers Corporation v. Philadelphia Electric Company*, 521 F.2d 360 (2d Cir. 1975) as listing appropriate factors to consider.  843 F.2d at 43, n.3.  In *Allis-Chalmers*, the Third Circuit identified:

> (1) the relationship between the adjudicated and unadjudicated claims; (2) the possibility that the need for review might or might not be mooted by future developments in the district court; (3) the possibility that the reviewing court might be obliged to consider the same issue a second time; (4) the presence or absence of a claim or counterclaim which could result in set-off against the judgment sought to be made final; (5) miscellaneous factors such as delay, economic and solvency considerations, shortening the time of trial, frivolity of competing claims, expense, and the like.

521 F.2d at 364.

## IV.  DISCUSSION

### A.  Finality

Turning to the first factor, the Court easily determines that the Court issued a final order on the claims being appealed to the First Circuit.  As regards RSU 40, the Court granted summary judgment in its entirely to all Ms. Wadsworth's claims against the school union; this order satisfies the finality requirement because all

claims against the school union have been resolved.  *Amyndas*, 48 F.4th at 28 ("[T]he dismissal of Amyndas's claims against the Zealand defendants satisfies [the finality requirement]"); *Fed. Home Loan Bank of Boston v. Moody's Corp.*, 821 F.3d 102, 107 n.3 (1st Cir. 2016) ("The ruling dismissing all claims against Moody's for lack of personal jurisdiction clearly 'dispose[s] of all the rights and liabilities of at least one party as to at least one claim' and so satisfies Rule 54(b)'s finality requirement") (quoting *State St. Bank & Tr. Co. v. Brockrim, Inc.*, 87 F.3d 1487, 1489 (1st Cir. 1996)).  In the orders on the Cavanaugh and Nguyen claims, the Court fully disposed of all federal claims under 42 U.S.C. § 1983, and therefore as to the federal claims, there is finality.

### B.    Just Reason for Delay

The Court turns to whether there is "just reason for delay."  FED. R. CIV. P. 54(b).  If RSU 40 were the only Defendant, Ms. Wadsworth's claim against it would be subject to immediate appeal and therefore the assessment of this factor depends upon the remaining two Defendants.  In its summary judgment orders against Mr. Cavanaugh and Mr. Nguyen, the Court granted judgment against the federal claims and retained the state tort claims.  *Cavanaugh Order* at 89; *Nguyen Order* at 91.  In *Federal Home Loan Bank*, the First Circuit focused on whether the judgment "rests on purely legal grounds distinct from the factual questions of liability being litigated by the remaining parties," and whether there is a "problematic 'imbrication between the dismissed [parties] and the surviving [parties]."  821 F.3d at 107, n.3 (quoting *Spiegel*, 843 F.2d at 45).  Here, the Court based its ruling on the state claims against

both Mr. Cavanaugh and Mr. Nguyen on legal principles distinct from Ms. Wadsworth's civil actions under 42 U.S.C. § 1983.

Turning to the second *Allis-Chalmers* factor, because the Court is staying the portions of the case unrelated to the matters on appeal, it is unlikely that this Court's disposition of those matters would moot the issues on immediate appeal.

The third *Allis-Chalmers* factor is whether the appellate court will be required to review the same issues a second time. If the First Circuit reaches the merits of this Court's dispositive orders, it would be unlikely that the appellate court would have to revisit them a second time, having clarified the law the first time.

The fourth *Allis-Chalmers* factor – counterclaims or set offs – is not applicable here.

The Court turns to the fifth *Allis-Chalmers* factor, miscellaneous issues. A premise of Ms. Wadsworth's motion for partial judgment and stay is that as Mr. Nguyen is appealing the Court's decisions on discretionary function immunity and the notice provisions of the Maine Tort Claims Act, her appellate challenge of the Court's dispositive rulings will cause no delay since the First Circuit will be addressing the Nguyen appeal. Although the appealability of an interlocutory order is mainly an issue for the appellate courts, this Court reviewed the current state of Maine law and agrees with Ms. Wadsworth that the Court of Appeals for the First Circuit may well accept Mr. Nguyen's interlocutory appeal in this case. As recently as October 13, 2020, the Maine Supreme Judicial Court reiterated its view that a summary judgment order denying the availability of discretionary function immunity

7

**A326**

is immediately appealable. *McDonald v. City of Portland*, 2020 ME 119, ¶ 8, 239 A.3d 662 ("[T]he denial of a motion for summary judgment based on a claim of immunity is immediately reviewable pursuant to an exception to the final judgment rule"). Moreover, whether the First Circuit reaches the merits of Mr. Nguyen's interlocutory appeal or decides it on procedural grounds, the case against Mr. Nguyen will be delayed pending its appellate disposition.

It is true that the Court could proceed with Ms. Wadsworth's remaining state claims against Mr. Cavanaugh, but if Mr. Nguyen is unsuccessful in his appeal, this would result in two trials: one against Mr. Cavanaugh and the other against Mr. Nguyen.  Furthermore, if the Court erred in granting summary judgment on the federal claims against Mr. Cavanaugh, the approach could even result in two trials against Mr. Cavanaugh.  Also, with the granting of summary judgment in its entirety in favor of RSU 40, a final judgment of Ms. Wadsworth's claims against RSU 40 awaits only the resolution of the claims against Mr. Nguyen and Mr. Cavanaugh.

In sum, the Court concludes that because it would be preferable to hold one jury trial disposing of all viable claims, this case falls into one of those rare categories where a partial judgment should issue, and the remaining matters should be stayed pending resolution of the appeals to the First Circuit.  To avoid losing track of this case, however, the Court orders the parties to file status reports with this Court every 120 days.

## V.    CONCLUSION

The Court GRANTS Plaintiff Adrianna Wadsworth's Motion for Entry of Partial Final Judgment as to all Federal Claims and Motion to Stay all State Claims (ECF No. 146).   The Court directs the Clerk to enter final judgment pursuant to Federal Rule of Civil Procedure 54(b):

1) *Adrianna Wadsworth v. Maine School Administrative District 40/Regional School Unit 40*: judgment in favor of Maine School Administrative District 40/Regional School Unit 40 and against Adrianna Wadsworth on all counts of Adrianna Wadsworth's Amended Complaint;

2) *Adrianna Wadsworth v. Andrew Cavanaugh*: judgment in favor of Andrew Cavanaugh and against Adrianna Wadsworth on Count II of Adrianna Wadsworth's Amended Complaint; and

3) *Adrianna Wadsworth v. Chuck Nguyen*: judgment in favor of Chuck Nguyen and against Adrianna Wadsworth on Count II of Adrianna Wadsworth's Amended Complaint.

The Court further STAYS all remaining claims pending resolution of the appeals, and the Court ORDERS the parties to file status reports every 120 days from the date of this order until resolution of the appeals.

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 16th day of May, 2023

9

**A328**

UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| ADRIANNA WADSWORTH, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | CIVIL NO. 2:19-cv-00577-JAW |
| | ) | |
| MSAD 40/RSU40, | ) | |
| ANDREW CAVANUAGH, | ) | |
| CHUCK NGUYEN, | ) | |
| | ) | |
| Defendants | ) | |

<u>PARTIAL FINAL JUDGMENT</u>

In accordance with the Order on Motion for Judgment and Stay, issued

by U.S. District Judge John A. Woodcock, Jr.  on May 16, 2023;

JUDGMENT is hereby entered for Defendant MSAD 40/RSU 40, and

against Plaintiff Adrianna Wadsworth, on all counts of the Amended Complaint;

JUDGMENT is hereby entered for Defendants Andrew Cavanaugh and

Chuck Nguyen, and against Plaintiff Adrianna Wadsworth, on Count II of the

Amended Complaint.

CHRISTA K. BERRY
CLERK

By:   /s/ Joanne Deering
Deputy Clerk

Dated: May17, 2023

**A329**