# United States Court of Appeals
# for the First Circuit

---

ADRIANNA WADSWORTH,
Plaintiff - Appellee/Cross - Appellant,

v.

CHUCK NGUYEN,
Defendant - Appellant/Cross-Appellee,

MSAD 40/RSU 40; ANDREW CAVANAUGH,
Defendants/Cross-Appellees,

MEDOMAK VALLEY HIGH SCHOOL,
Defendant.

---

On Appeal From The United States District Court
For The District Of Massachusetts

---

## BRIEF OF DEFENDANT/CROSS-APPELLEE
## ANDREW CAVANAUGH

---

Douglas I. Louison (Bar #57265)
dlouison@lccplaw.com
Joseph A. Padolsky (Bar #1153317)
jpadolsky@lccplaw.com
Louison, Costello, Condon & Pfaff, LLP
10 Post Office Square, Suite 1330
Boston, MA 02109
(617) 439-0305

Dated: January 22, 2024

BATEMAN & SLADE, INC.                                    STONEHAM, MASSACHUSETTS

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................... ii

STATEMENT OF THE ISSUES.................................................................1

STATEMENT OF FACTS ........................................................................1

SUMMARY OF ARGUMENT ...............................................................20

ARGUMENT .........................................................................................21

    A.    The District Court Correctly Determined That Ms.
Wadsworth's Fourteenth Amendment Claim Failed Where She
Admitted That She Was Free From Intrusions To Her Bodily
Integrity. .............................................................................21

    B.    The District Court Correctly Determined That Ms.
Wadsworth's Would Have Alternatively Failed Because Mr.
Cavanaugh Would Be Entitled To Qualified Immunity. ...................30

    C.    The State Created Danger Doctrine Is Completely Applicable
To Ms. Wadsworth's Claims Against Mr. Cavanaugh. ......................35

    D.    The District Court's Order Allowing Mr. Cavanaugh's Motion
For Summary Judgment On Ms. Wadsworth's Equal Protection
Claims Should Be Affirmed. ................................................38

CONCLUSION ......................................................................................40

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT.................42

CERTIFICATE OF SERVICE ................................................................43

# TABLE OF AUTHORITIES

CASES:

Abeyta v. Chama Valley Indep. Sch. Dist., No. 19,
    77 F.3d 1253 (10th Cir. 1996)...................................................................... 24, 29, 33

Albright v. Oliver,
    510 U.S. 266, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994)........................................ 21

Ashcroft v. al-Kidd,
    131 S. Ct. 2074, 179 L. Ed. 2d 1149 (2011) ........................................................ 31

Ashcroft v. Iqbal,
    556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)................................... 22

Banco Bilbao Vizcaya Argentaria v. Wiscovitch-Rentas (In re Net-Velazquez),
    625 F.3d 34 (1st Cir. 2010) .................................................................................... 30

Bergeron v. Cabral,
    560 F.3d 1 (1st Cir. 2009) ...................................................................................... 31

Boldthen v. Indep. Sch. Dist. No.,
    865 F. Supp. 1330 (D. Minn. 1994)....................................................................... 33

Bridges v. Scranton Sch. Dist.,
    644 Fed. Appx. 172 (3rd Cir. 2015)....................................................................... 29

Brown v. Hot, Sexy, & Safer Prods. Inc.,
    68 F.3d 525 (1st Cir. 1995) ............................................................................. 26, 27

Cruz-Erazo v. Rivera-Montanez,
    212 F.3d 617 (1st Cir. 2000) ........................................................................... 26, 28

DeShaney v. Winnebago Cnty. Dep't. of Soc. Servs.,
    489 U.S. 189 (1989)......................................................................................... 35, 36

District of Columbia v. Wesby,
    583 U.S. 48 (2018).................................................................................................. 32

Doe v. Beaumont I.S.D.,
  8 F. Supp. 2d 596 (E.D. Tex. 1998) ............................................... 33, 34

Doe v. Fournier,
  851 F. Supp. 2d 207 (D. Mass. 2012) ................................................ 23

Doe v. Georgetown County Sch. Dist.,
  2015 U.S. Dist. LEXIS 137934 (D.S.C. Oct. 9, 2015) ........................................ 29

Doe v. Reg'l Sch. Unit, No. 21,
  2020 U.S. Dist. LEXIS 94295 (D. Me. May 29, 2020) ........................................ 23

Doe v. School Admin. Dist. No. 19,
  66 F. Supp. 2d 57 (D. Me. 1999) ........................................ 23

Doe v. Taylor Indep. Sch. Dist.,
  15 F.3d 443 (5th Cir. 1994) ............................................ 23

Doe v. Town of Stoughton,
  No. CIV.A. 12-10467-PBS, 2013 U.S. Dist. LEXIS 173030
  (D. Mass. Dec. 10, 2013) .................................. 39

Frazier v. Fairhaven Sch. Comm.,
  276 F.3d 52 (1st Cir. 2002) ............................................ 22

Haley v. City of Boston,
  657 F.3d 39 (1st Cir. 2011) ............................................ 31

Harlow v. Fitzgerald,
  457 U.S. 800 (1982) ............................................ 30

Harrington v. Almy,
  977 F.2d 37 (1st Cir. 1992) ............................................ 29, 30

Harrington v. City of Attleboro,
  172 F. Supp. 3d 337 (D. Mass. 2016) .................................. 39

Hinkley v. Baker,
  122 F. Supp. 2d 48 (D. Me. 2000) ........................................ 33

Irish v. Fowler,
    979 F.3d 65 (1st Cir. 2020) ...................................................... 35, 36, 38

Irish v. Maine,
    849 F.3d 521 (1st Cir. 2017) ............................................................ 37

Lipsett v. University of Puerto Rico,
    864 F.2d 881 (1st Cir. 1988) ............................................................ 40

Maldonado v. Fontanes,
    568 F.3d 263 (1st Cir. 2009) ....................................................... 31, 32

McCann on Behalf of J.M. v. York School Dept.,
    365 F. Supp. 3d 132 (D. Me. 2019) .................................................. 38

Miranda-Rivera v. Toledo-Davila,
    813 F.3d 64 (1st Cir. 2016) .............................................................. 37

Mosher v. Nelson,
    589 F.3d 488 (2009) ........................................................................ 31

Mullenix v. Luna,
    577 U.S. 7, 136 S. Ct. 305 (2015) ................................................... 31

Nace v. Pennridge Sch. Dist.,
    185 F. Supp. 3d 564 (E.D. Pa. 2016) .............................................. 24

Ouellette v. Beaupre,
    977 F.3d 127 (1st Cir. 2020) ........................................................... 23

Pagan v. Calderon,
    448 F.3d 16 (1st Cir. 2006) ............................................................. 22

Parratt v. Taylor,
    451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981) ..................... 22

Pearson v. Callahan,
    555 U.S. 223, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009) ................... 31

Pittsley v. Warish,
   927 F.2d 3 (1st Cir. 1991) .......................................................... 22, 26, 28

Pollack v. Regional Sch. Unit 75,
   12 F. Supp. 3d 173 (D. Me. 2014) ................................................. 31, 32

Pollard v. Georgetown Sch. Dist.,
   132 F. Supp. 3d 208 (D. Mass. 2015) ................................................. 39

Rivera v. Rhode Island,
   402 F.3d 27 (1st Cir. 2005) .................................................................. 22

Souza v. Pina,
   53 F.3d 423 (1st Cir. 1995) ........................................................... 26, 27

Thomas v. Town of Chelmsford,
   267 F. Supp. 3d 279 (D. Mass. 2017) ................................................. 39

United States v. Bulger,
   816 F.3d 137 (1st Cir. 2016) ................................................................ 38

Welch v. City of Biddeford Police Department,
   12 F.4th 70 (1st Cir. 2021) .................................................................. 22

Wilson v. Layne,
   526 U.S. 603 (1999) ............................................................................. 32

**STATUTES:**

42 U.S.C. § 1983 ................................................................................ *passim*

U.S. Const. amend. XIV ..................................................................... *passim*

# STATEMENT OF THE ISSUES

Whether the District Court correctly decided Ms. Wadsworth's 42 U.S.C. § 1983 Fourteenth Amendment bodily integrity claim against Cavanaugh where she admitted she never had a physical relationship with him and that he never touched her inappropriately or sexually in any way.

# STATEMENT OF FACTS

Ms. Wadsworth's appeal challenges an order of the district court granting Defendant Andrew Cavanaugh's motion for summary judgment on Plaintiff's 42 U.S.C. § 1983 claim through which she alleged a violation of her Fourteenth Amendment right to be free from intrusions to her bodily integrity. (Add. 291).

Ms. Wadsworth admitted that she never had a physical relationship with Mr. Cavanaugh, and he never touched her inappropriately or sexually in any way.[1] (RA 226).

---

[1] Indeed, Ms. Wadsworth testified that she was alone with Mr. Cavanaugh in scenarios where he could have made physical advances upon her if he intended on doing so but he did not. (RA 226-227). Ms. Wadsworth confirmed that they never had a physical relationship and Mr. Cavanaugh never touched her inappropriately or sexually in any way. (Id.). Ms. Wadsworth also testified, and admitted in the lower court summary judgment record, that nothing physical ever happened between them, and that Mr. Cavanaugh never asked for inappropriate photos and never came on to her. (RA 219). The *Brief of Public Justice as Amicus Curiae in support of Plaintiff-Appellee/Cross-Appellant* nevertheless starts its brief by claiming that Mr. Cavanaugh was "grooming," "asked if she took naked pictures of herself," and "asked for pictures of her in a bikini." Public Justice proceeds to cite articles relating to sexual grooming in its facts sections as a way of stating that as a

Ms. Wadsworth argued that Mr. Cavanaugh's verbal harassment was sufficient to sustain a § 1983 claim. (Add. 291). The district court found otherwise. (Add. 293). Existing law shows that bodily integrity cases involving allegations of sexual harassment amounting to a constitutional deprivation have uniformly involved at least some form of physical sexual contact. (Id.). Here, there was none.

By way of background, Ms. Wadsworth's home life was very challenging. (RA 187). The details of which are discussed in the district court's *Order on Andrew Cavanaugh's Motion for Summary Judgment*. (Add. 236-237). Ms. Wadsworth first informed Mr. Cavanaugh of her home life issues during her sophomore year, when she met with him after being caught drinking at a party, and she told him and MVHS athletic director Matthew Lash that if her parents found out about the infraction, they would take extreme measures, including sending her away to a religious school in Arizona. (Add. 237; RA 189). Ms. Wadsworth also explained to Mr. Cavanaugh that her mother was very mean to her, excluded her from family activities, and refused to permit her to participate in other activities. (See Add. 237; RA 189). In one instance, Ms. Wadsworth's mother struck her in

---

matter of fact. Indeed, Public Justice takes similar liberties with the factual record throughout its brief.

the face, causing a bloodied lip, and Ms. Wadsworth moved out of the family home when she was sixteen. (See Add. 237; RA 188).

After this initial meeting with Ms. Wadsworth during her sophomore year, Mr. Cavanaugh asked Ms. Wadsworth to work for him, gave her his cell phone number, and told her to text him. (See Add. 237-238; RA 189-190). Ms. Wadsworth's mother approved of this arrangement and was aware that they had exchanged cell phone numbers. (RA 191-192).

Mr. Cavanaugh also spoke with the school social worker Chuong "Chuck" Nguyen and informed him that Ms. Wadsworth needed his professional assistance. (See Add. 238; RA 190-191). She was formally referred to Mr. Nguyen due to her risk of leaving her home and consulted him a few times during her sophomore year to discuss some of her family issues. (Id.). Mr. Cavanaugh also continued to meet a few times a week with Ms. Wadsworth towards the end of her sophomore year. (Id.).

In the summer of 2016, Ms. Wadsworth started working for Mr. Cavanaugh at the houses that he fixed up, babysat his nephew, and also worked as a hostess at the waterfront in Camden and for two women at a catering company. (RA 191). She described how she came to work for him:

> It first came about when they found out about the situation between me and my parents, and Mr. Cavanaugh asked if there was some way that he could help me escape from the house, try to get away from the house, and he said that he had a few jobs that he had for me that would get me away from the

> house, and so then he asked my mom if I could work for him occasionally,
> and that's when we exchanged numbers.

(RA 191).

Ms. Wadsworth was alone with Mr. Cavanaugh at times during these

workdays and formed a relationship that she described as an adult she could trust

but one in which it was "like talking to a teenage friend." (Add. 239; RA 192).  Mr.

Cavanaugh repeatedly asked Ms. Wadsworth to call him "Andy" and assured her

she could trust him, which made her think of the relationship as a friendship rather

than a formal relationship between principal and student. (Id.).  Their

conversations included adult and sex-based topics.  (Id.).  Ms. Wadsworth testified

at her deposition that she was often uncomfortable with sex-based topics and did

not initiate conversations about them with Mr. Cavanaugh.  (Id.).   She thought of

Mr. Cavanaugh as a "father figure," but qualified her litigation response to say that

she did so only because Mr. Nguyen used that term to describe Mr. Cavanaugh to

her. (Id.).  The record at summary judgment showed that Ms. Wadsworth and Mr.

Cavanaugh had a platonic relationship outside of a principal-student relationship of

which Ms. Wadsworth's mother was aware and approved.

In the fall 2016, Ms. Wadsworth moved in with her friend Ashley Kenniston

and the Kenniston family and lived there until after Mr. Cavanaugh's resignation,

except for a brief period when she lived with her sister. (Add. 239-240; RA 193).

Additional details regarding the reasons Ms. Wadsworth moved out of her home

are in the district court's *Order on Andrew Cavanaugh's Motion for Summary Judgment*. Ms. Wadsworth reported the move to Mr. Nguyen, and he and Mr. Cavanaugh then met with the Kennistons to ensure Ms. Wadsworth was living in a healthy environment. (RA 194).

Mr. Cavanaugh would regularly pull Ms. Wadsworth out of class to have meetings with her in his office over this timeframe. (Add. 256; RA 390). On October 4, 2016, Ms. Wadsworth's English teacher sent an email to Mr. Cavanaugh, Assistant Principal Linda Pease, Ms. Philbrook, and Mr. Nguyen stating that she and another English teacher wanted to "voice [their] concern about Anna Wadsworth being pulled from [Writing Center and AP Language classes] at the request of [Mr. Cavanaugh's] office." (Add. 257; RA 391; see also District Court Dkt # 91-31). Both School Assistant Principals, Ms. Pease and Ms. Philbrook, approached Mr. Cavanaugh and advised him not to "haul Anna out of a class or keep her from class." (Add. 257; RA 391).

Mr. Cavanaugh replied to the teachers' email, stating:

> Anna has some issues outside of class that we are working to resolve. I know she is extremely conscientious regarding her coursework and you are correct regarding her stress level. I apologize for her being removed during these important classes and I will make sure it does not happen again.

(Add. 258; RA 391). Despite this assurance, Mr. Cavanaugh continued to pull Ms. Wadsworth from classes. (Id.). Ms. Wadsworth's complaint points to being pulled out of class as an impropriety but she makes no substantive complaints regarding

their communications within the meetings. (*See Brief of Plaintiff-Appellee/Cross-Appellant Adrianna Wadsworth, et seq.*).

Between 2016 and 2017, Ms. Wadsworth and Mr. Cavanaugh communicated regularly. (RA 212). She described Mr. Cavanaugh as the one person she felt she could trust. (Id.). Due to the nature of their relationship, over this timeframe, Mr. Cavanaugh told Ms. Wadsworth she was pretty, looked nice, and made comments about what she was wearing nearly every day while Ms. Wadsworth was in school. (Add. 241-242; RA 191, RA 212). Mr. Cavanaugh repeatedly used pet names to refer to Ms. Wadsworth such as "cupcake," "princess," "ladytime," "Sports Illustrated swimsuit model," and handsome. (RA 212). This was done repeatedly in person and via text message on an almost daily basis between 2016 and 2017 the details of which are contained in the district court's *Order on Andrew Cavanaugh's Motion for Summary Judgment*. (Add. 242-243). Ms. Kenniston and some of Ms. Wadsworth's friends were aware of the "cupcake" nickname. (Add. 242, RA 213). Her friends teased her about it, but Ms. Kenniston was concerned about the nickname because she was not sure of the nature of the relationship. (Id.). Indeed, Ms. Wadsworth believed the whole school knew about the relationship she had with Mr. Cavanaugh and that no one was concerned about it. (RA 220).

Mr. Cavanaugh gave Ms. Wadsworth gifts at school, including a box of feminine hygiene products and toiletries, as well as a winter coat. (Add. 245; RA 202-203, 377-378). He gave her gifts of money "a lot of times" to pay for school lunches and essentials, as well as non-essentials like clothing and trips. (Add. 245; RA 202, 378). Mr. Cavanaugh paid for Ms. Wadsworth's school photos because her parents had never purchased them for her and offered to pay for her to take the SAT. (RA 203). Ms. Wadsworth informed Mr. Nguyen that the gifts Mr. Cavanaugh was giving her made her feel embarrassed, and Mr. Nguyen responded by stating that Mr. Cavanaugh was just making sure she had everything she needed. (Add. 245-246; RA 378). Ms. Wadsworth's family was aware of some of Mr. Cavanaugh's assistance and would comment on it, with her father asking her to "ask Mr. Cavanaugh if he could do this or that" and her mother sarcastically saying "if you need help why don't you go ask Mr. Cavanaugh." (Add. 245-246; RA 203-204). Neither of Ms. Wadsworth's parents complained to the school district of any wrongdoing by Mr. Cavanaugh, regarding the financial assistance or any other issues. (Id.).

Other teachers and administrators have similarly assisted students in need, the details of which are contained in the district court's *Order on Andrew Cavanaugh's Motion for Summary Judgment*. (Add. 246; RA 204). Mr. Cavanaugh assisted other students who were in need or struggling, particularly

around the holidays, and ensured that families had gifts; had previously bought another student a coat after the passing of her father; and had given cash and gifts to other students and paid for students' prom dresses.  (Add. 246-247; RA 204). Ms. Philbrook, assistant principal, testified that the staff and administrators go out of their way to help kids in need and that such instances of assistance are not inherently concerning. (Add. 247; RA 205).

During Ms. Wadsworth's junior year, while she was living with the Kennistons, Mr. Cavanaugh took Ms. Wadsworth to a physical examination with her doctor so she could participate in cheerleading.  (Add. 247; RA 375).  While at the appointment, Mr. Cavanaugh suggested Ms. Wadsworth go on birth control. (Add. 247-248; RA 196, 375).  He did so because at some point prior to the appointment Ms. Wadsworth told him about menstruation issues she was experiencing and had spoken about her intercourse and other things with persons her age.  (RA 196).  Mr. Cavanaugh also wrote a letter to the doctor's office advising the doctor of issues Ms. Wadsworth spoke of regarding her menstruation. (Add. 248; RA 197).  Ms. Wadsworth did not do any research on her own or consult the female school nurse regarding birth control to address her menstruation issues, as she "felt like Mr. Cavanaugh gave [her] all the knowledge [she] needed," but she did speak to Ms. Kenniston, who advised her that they could make a decision together without Mr. Cavanaugh's involvement. (Add. 248; RA 197-198,

377-379).  Despite this conversation, Ms. Wadsworth testified that she "relied on" Mr. Cavanaugh and Mr. Nguyen for "all of her private issues" because she thought she could trust them and had been reassured by Mr. Nguyen that Mr. Cavanaugh's behavior was not inappropriate.  (Add. 250; RA 200).  The district court's complete findings on this issue is contained in its *Order on Andrew Cavanaugh's Motion for Summary Judgment.*  (Add. 247-250).

Over the course of several months, while Ms. Wadsworth was living with the Kennistons, Mr. Cavanaugh asked her to move into his home with he and his wife on a number of occasions between April and June, 2017. (Add. 250-251; RA 378-379). Mr. Cavanaugh informed someone at the school about this, and no action was taken related to this request beyond seemingly denying it. (Id.).

At some point, not long after moving in with the Kenniston family, Ms. Wadsworth's mother ceased letting her use her vehicle.  (Add. 258; RA 200). Ms. Wadsworth raised the issue with her father and with Mr. Cavanaugh, telling both that she needed a car and telling her father that she had raised the issue with Mr. Cavanaugh and that Mr. Cavanaugh had offered to assist her. (Add. 258; RA 200-201).  At the time Ms. Wadsworth was still working for Mr. Cavanaugh babysitting and fixing properties, and he sought to assist her with a vehicle so she could drive to her jobs. (Id.).  Mr. Cavanaugh purchased a vehicle from his sister, who operated a car dealership, and advised Ms. Wadsworth that he would pay for

half the car and that she could work for him to pay for the other half of the cost of the vehicle. (Add. 258; RA 200-201, 387). Mr. Cavanaugh specifically made Ms. Wadsworth's father aware of the plan and obtained his permission before proceeding with the purchase. (Add. 258; RA 201-202, 387). Ms. Wadsworth's father was also aware that Mr. Cavanaugh was assisting her with a number of items while she was at school, beyond just the vehicle. (Add. 258; RA 202).

On a near daily basis over this same timeframe, Ms. Wadsworth and Mr. Cavanaugh exchanged text messages. (Add. 252; RA 531-572). The district court found that many of the texts were inappropriate, the details of which are discussed in the district court's *Order on Andrew Cavanaugh's Motion for Summary Judgment*. (Add. 252-256).[2] The texts are in the Record Appendix at RA 531-572 and at District Court Docket # 91-11.

---

[2] For the purpose of *Defendant Cavanaugh's Motion for Summary Judgment* and this Court's review of the district court's order on summary judgment, Defendant Cavanaugh does not dispute that the text messages, particularly if viewed in insolation, can be viewed as inappropriate. Defendant Cavanaugh admitted as much in his deposition. However, much of the context of their communications was overlooked, despite it being undisputed. For example, in one text message during the discussions they were having regarding the cheerleading coach (below), Mr. Cavanaugh tells Ms. Wadsworth she is "extremely attractive" and that she is a "snappy number." (District Court Dkt # 91-11 at pg. 2). Review of the full discussion shows that Ms. Wadsworth was confiding in Mr. Cavanaugh and blaming herself for the incident and that he was telling her she was not to blame, explaining how situations like that can arise, how they are not right, how she should be "able to tell guys to fuck off," etcetera. The district court excerpted a "mickey mouse neglige" and "I'm deleting our conversations, and the swimsuit

On August 2, 2017, Ms. Wadsworth told Mr. Cavanaugh that she had been sexually assaulted by her cheerleading coach while swimming during an off-season cheerleading team trip earlier that summer.  (Add. 253-254; RA 205, 381-382). Mr. Cavanaugh was the second person she told.  (Id.).  She described Mr. Cavanaugh as the only person she could trust at the time.  (Id.).  The two texted and spoke about the incident over the next several days and weeks, the details of which are discussed in the district court's *Order on Andrew Cavanaugh's Motion for Summary Judgment*.  (Add. 252-256).  Mr. Cavanaugh suggested she talk with someone about what happened and told Ms. Wadsworth she could talk with him about it as well.  (Add. 254; RA 382).  Ms. Wadsworth continued to speak with Mr. Cavanaugh about the incident and seeing the cheerleading coach in practice after the incident, ultimately specifically asking him not to tell anyone about what she had confided in him about. (Add. 256; RA 206).

Ms. Wadsworth felt at the time that Mr. Cavanaugh was one of the only people she could trust, and their communications often involved joking and adult themed humor.  (Add. 262; RA 206-207).  They regularly joked together, including one instance where Ms. Wadsworth offered to bake cookies for Mr. Cavanaugh if

---

pictures, as much as i hate to! Hah hah" texts from the rest of the conversation and Ms. Wadsworth's testimony regarding the joking nature of their relationship. (Add. 255-256).

he would cancel school (which he did not have the authority to do).  (Add. 263; RA 208-209).

In the beginning of her senior year, Ms. Wadsworth started hearing more and more rumors in school about her relationship with Mr. Cavanaugh and, at this point in time, she described feeling anxious, confused, and mad at herself for letting the rumors affect her because she believed at the time that Mr. Cavanaugh had nothing but genuine intentions.  (Add. 263; RA 207). Although Ms. Wadsworth was at times initially uncomfortable with some of the topics of conversation between them, she specifically did not want to change the dynamic of her relationship with Mr. Cavanaugh, explaining:

> [A]t the time he was one of the only people that I felt that I could rely on and I didn't want to mess that up by saying that I'm uncomfortable [talking about certain topics]. I remember thinking through my head that there are certain times where I should say that I don't want to talk about this or I should not engage in this and probably shouldn't be talking about this, and felt that it got a little too far and then I was thinking about several options and that if I told him that it made me feel uncomfortable, that would change our dynamics a lot and if I made it a big deal how is that going to affect school and feel awkward to go to school and how can you ignore the principal in the school and how is it going to make school awkward. So, instead of telling him that he was making me feel uncomfortable, I would just find other ways to do it and just not answer and say that I was at practice or doing homework or I was busy and just home [sic] that the conversation would change from there or sometimes I would engage because it felt like a joke and he made me feel like it was a joke, and that it was okay to talk about it.

(Add. 263-264; RA 208). Their joking relationship continued even as rumors

spread amongst staff members or students about their relationship, with Ms.

Wadsworth describing:

> A lot of jokes. We joked about particularly when rumors started to spread about when other teachers had made comments about and circulating around the school with other staff members or students about the effects that I have on Mr. Cavanaugh and our relationship, and I remember that we talked about privacy and if I felt that we had that kind of relationship and he assured me several times and that people say these things but that I know that he sees me like a daughter and not every other man sees it that way, but he's one of them and then we turned it into a joke and that, oh, everyone was saying that I get everything that I want, and I just started owning it that, yep, I get everything.

> A lot of things turned into jokes that didn't start off as jokes. We would talk about my sexual activities with other boys or orgasms and other sexual things with boys or sex in general, and it started off as talking about it and a lot of times I would get off of that conversation in order to make light of it that it would turn into a joke to the point where I started to feel more comfortable talking about it because it was more like a joke to me and it seemed very normal when I didn't have a positive home and someone turning it into something that could be talked about, and when I feel uncomfortable he would start to turn it into a joke and I felt like it was just joking, but it was like a teenage friend that I was talking to.

> Yes, he had characterized it as playful banter and when I worked for him at his office and there were certain topics that were brought up that at first were not jokes and he was educating me on things, and he said that my parents sheltered me too much and that I should know these things and that it would hurt me in the future to not know these things, and so he wanted to educate me on all of this stuff and I definitely got closed off of those conversations a lot because I wasn't used to talking about sex so openly especially with an adult. I never really talked about sex with an adult, and so I referred to other things by not their name, and so I didn't say sex, I said it or I didn't even call my period my period, I called it another name for it, and so he told me don't call it, refer to it as sex or intercourse or he would turn it into a joke the

things that I would call like instead of saying my period, I would say my lady friend, and it was just less uncomfortable. I don't know why it was less uncomfortable but a lot of things to do with my body and he would turn that into a nickname and called me lady friend. So, a lot of the conversations started out not as jokes and then if I would be uncomfortable that they were turned into a joke so that I would feel comfortable.

(Add. 264-265; RA 211-212).

Ms. Wadsworth and Mr. Cavanaugh continued to communicate regularly during her senior year, and in the same manner, until the time he was placed on leave with the school (discussed below). (Add. 265; RA 212). At no point prior to the investigation did Ms. Wadsworth report to Mr. Cavanaugh that she explicitly felt "abused" or "harassed" by his behavior. (Add. 265; RA 213-214). Even as the school and the local police department were investigating allegations of misconduct Ms. Wadsworth believed her relationship was genuine and she trusted him. (Add. 273; RA 220).

On September 19, 2017, School Resource Officer, Chris Spear, a member of the Waldoboro Police Department and School staff, observed Ms. Wadsworth driving a black Hyundai vehicle, ran the plate with dispatch, and the vehicle came back as owned by Mr. Cavanaugh. (Add. 259; RA 187, 387). Later that day, Officer Spear conducted a traffic stop on Ms. Wadsworth when he observed her speeding after school. (Add. 259; RA 214, 387). Upon reviewing the registration information, Officer Spear asked Ms. Wadsworth why the registration showed that

the vehicle was owned by Mr. Cavanaugh.  (Add. 259; RA 214, 387).  Ms. Wadsworth responded that Mr. Cavanaugh was helping her out while she waited to potentially move in with her father.  (Add. 259; RA 387).

Following the traffic stop, Officer Spear returned to the school, where he spoke with Assistant Principal Tamra Philbrook about the traffic stop and expressed his concern that Ms. Wadsworth was driving a vehicle owned and insured by Mr. Cavanaugh.  (Add. 260; RA 387).  Mr. Cavanaugh had informed Ms. Philbrook that Ms. Wadsworth was purchasing the car from him. (Add. 260; RA 215).  Ms. Philbrook responded that both she and Assistant Principal Linda Pease had received complaints that Mr. Cavanaugh was spending too much time with Ms. Wadsworth and complaints surrounding his excusing her from class too often.  (Add. 260; RA 388).  Ms. Philbrook also advised Officer Spear that Mr. Cavanaugh had asked Ms. Wadsworth if she was interested in moving in with him. (Add. 260; RA 388).  Ms. Philbrook informed Officer Spear that she and Ms. Pease had tried to have professional conversations with Mr. Cavanaugh with regard to his behavior towards Ms. Wadsworth.  (Add. 260; RA 215, 388).

As a result of the traffic stop, Ms. Philbrook asked Officer Spear to have a conversation with Mr. Cavanaugh.  (Add. 261; RA 388).  On September 19, 2017, at 3:30 p.m., Officer Spear approached Mr. Cavanaugh, told him of the traffic stop, and advised him that staff and students had spoken about his relationship with Ms.

Wadsworth, and that the perception was that she was receiving special treatment in the form of favoritism from Mr. Cavanaugh. (Add. 261; RA 214, 388). Mr. Cavanaugh admitted to Officer Spear that he had heard the speculation but advised that he was not really concerned and that he was helping Ms. Wadsworth out with a vehicle.[3] (Add. 261; RA 214-215, 389). Officer Spear wrote up a summary of the stop and his conversations with Ms. Philbrook and Mr. Cavanaugh and sent an email to the Waldoboro Police Chief titled "Pervert Principal." (Add. 261; RA 389). After the September 19, 2017 traffic stop, conversations about Mr. Cavanaugh's behavior, and the "pervert principal" email, no official action was taken relating to Mr. Cavanaugh's behavior with Ms. Wadsworth for over a month. (Add. 262; RA 389-390).

At some point while Mr. Cavanaugh was still an Assistant Principal—which the district court found would have been in 2015, at the latest—he learned from a male student, that another student (not Ms. Wadsworth) had sent nude photos to a fellow student and that the photos were potentially published to an internet website that collected such photos of nude Maine high school girls. (Add. 267; RA 216). At that time, Mr. Cavanaugh reported the internet website to Waldoboro Police

---

[3] Ms. Wadsworth's father communicated directly with Mr. Cavanaugh and asked to meet with him about purchasing the car after she had been pulled over by Officer Spear. (Add. 261-262; RA 215). Ms. Philbrook did not view the arrangement with the car as inappropriate and did not investigate this incident any further. (Id.).

Chief William Labombarde. (Add. 267-268; RA 217). Several years later, in 2017, Mr. Cavanaugh asked Ms. Wadsworth if she had sent nude photos to anyone, expressing concern that if she had taken nude photos, they could be published, and he did not want her to be involved in those matters. (Add. 268; RA 216-217).

After learning that Mr. Cavanaugh had asked Ms. Wadsworth if she had ever sent nude photos to other students, Ms. Kenniston called the police. (Add. 268; RA 217, 393). The police came to the Kenniston home and Ms. Kenniston, who paid for the phone, took it from Ms. Wadsworth and submitted it to the police. (Add. 268; RA 217). Ms. Wadsworth was mad that Ms. Kenniston submitted her phone to the police. (Id.). The texts on Ms. Wadsworth's phone were reviewed in the subsequent police investigation. (RA 217-218, 228). The entirety of Ms. Wadsworth's communications with Mr. Cavanaugh occurred prior to November 3, 2017, including all text messages in the record. (Add. 268; RA 218).

On November 5, 2017, Ms. Kenniston submitted a statement to Detective Donald Murray of the Knox County Sheriff's Office following a meeting with him during which she expressed her concerns regarding the relationship between Ms. Wadsworth and Mr. Cavanaugh. (Add. 268-269; RA 218). Law enforcement officials investigated Mr. Cavanaugh's behavior and confirmed that they did not find probable cause to charge Mr. Cavanaugh for any crime relating to his conduct with Ms. Wadsworth. (Add. 269; RA 227-228).

Ms. Wadsworth spoke with Detective Murray. (RA 228). She also met with Mr. Nugyen and told him that nothing physical happened between her and Mr. Cavanaugh, that he had never asked for inappropriate photos, and that he had never come on to her. (Add. 273; RA 219). She also met with Superintendent Nolan, and assistant principals Philbrook and Pease and defended Mr. Cavanaugh. (Add. 274; RA 220). At the same time, Mr. Nguyen and Mr. Cavanaugh's attorney Chris MacLean suggested that Ms. Wadsworth write a letter or sign an affidavit to help Mr. Cavanaugh and defend him and she indicated that she wished to do so but could not because she was a minor. (Add. 272, 274; RA 221-222).

Mr. Cavanaugh resigned from his position as a result of the investigation in lieu of being fired. (Add. 271; RA 395).

Thereafter, on December 13, 2017, Mr. Cavanaugh's common law wife, Deborah Ecker McFarland and Ms. Wadsworth had the following text exchange:

DEM: Do you know that not only is mr Cavanaugh going to lose his job but the school will say horrible things about him in the paper. [Redacted] will have to read that and be devastated by it. Do you remember how [redacted] spent hours helping you in that science project. Are you ok with that?

(RA 222-223). Plaintiff responded that she did not want anyone to have to read that and agreed to write something on Defendant Cavanaugh's behalf. (Id.).

Ms. Wadsworth completed her senior year of high school, graduated salutatorian as second in her class, and is proud of that accomplishment.

(Add. 276; RA 224-225). Over her junior and senior years of high school she: participated in soccer, cheerleading, softball, and track; received an all-conference and a GPA award in cheerleading; was on the student council and in the National Honor Society and participated in PAWS, math team, and the debate team; and went to parties and socialized regularly at school and sporting events, spending time with her friends and with the Kennistons. (Add. 276; RA 224-225). She went on to complete her undergraduate studies and is currently attending law school. (Add. 276; RA 225).

Ms. Wadsworth never had a physical relationship with Mr. Cavanaugh, and he never touched her inappropriately or sexually in any way. (RA 226).

Law enforcement officials investigated Mr. Cavanaugh's behavior and confirmed that they did not find probable cause to charge him for any crime relating to his conduct with Ms. Wadsworth. (Add. 269; RA 227-228).

Neither Ms. Wadsworth nor her parents complained to the School District of any wrongdoing by Mr. Cavanaugh, regarding the financial assistance he provided to her or otherwise. (Add. 246, 273; RA 204, 219-220). Ms. Wadsworth confirmed in her deposition that she never complained about her text communications with Mr. Cavanaugh with the school, law enforcement or with her family or friends. (RA 448-449). At no point did Ms. Wadsworth report that she

explicitly felt "abused" or "harassed" by Mr. Cavanaugh's behavior. (Add. 265; RA 213-214).

Ms. Wadsworth also testified that although she questioned it at times, she believed that Mr. Cavanaugh had nothing but genuine intentions. (RA 438, 443-444).

Ms. Wadsworth did not experience distress while communicating with Mr. Cavanaugh or as an immediate result of their communications as they were occurring and stated that after the investigation had commenced:

> [People were] telling me that the relations was something that I believed it was otherwise and I had to reread [the texts] to see if I could understand what they were talking about, and then that's when I became embarrassed and uncomfortable and reread them and figured out that maybe they are right and that this is not what I thought it was, and I felt really stupid and angry and how do you not notice when you look at those, and I was embarrassed when I looked at them.

(Add. 267; RA 225).

Ms. Wadsworth's opinion on the propriety of Mr. Cavanaugh's behavior has changed since 2018, and she only now fully "understands" the nature of his behavior and "[has] looked at it for what it is." (Add. 267; RA 226).

## SUMMARY OF ARGUMENT

The District Court correctly determined that Ms. Wadsworth's Fourteenth Amendment claim failed where she admitted that she was free from intrusions into her bodily integrity. There is no body of law upon which it would be clear to a

20

reasonable official that one could violate a constitutional right to bodily integrity without engaging in any physical acts which actually violate a person's bodily integrity. Alternatively, the District Court correctly determined that Mr. Cavanaugh would have otherwise been entitled to qualified immunity.

The state created danger doctrine is completely inapplicable to Ms. Wadsworth's claims against Mr. Cavanaugh.

Lastly, the District Court's order allowing Mr. Cavanaugh's motion for summary judgment on Ms. Wadsworth's Equal Protection claim should be affirmed as Ms. Wadsworth has failed to develop and has waived her arguments in this regard, and because the District Court correctly found that there is no caselaw holding that a teacher sexually harassing a student could result in an equal protection violation against the individual.

## ARGUMENT

### A. The District Court Correctly Determined That Ms. Wadsworth's Fourteenth Amendment Claim Failed Where She Admitted That She Was Free From Intrusions To Her Bodily Integrity.

It is well established that § 1983 creates no independent substantive rights but rather provides a cause of action by which individuals may seek money damages for governmental violations of rights protected by federal law. See, e.g., Albright v. Oliver, 510 U.S. 266, 271, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994). Therefore, to state a claim under § 1983, a plaintiff must allege (1) the violation of

a right protected by the Constitution or laws of the United States and (2) that the perpetrator of the violation was acting under color of law. See, e.g., Pittsley v. Warish, 927 F.2d 3, 6 (1st Cir. 1991), citing Parratt v. Taylor, 451 U.S. 527, 535, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981); see also Frazier v. Fairhaven Sch. Comm., 276 F.3d 52, 57-58 (1st Cir. 2002). In § 1983 cases, the plaintiff must show that "each Government-official defendant, through the official's own individual actions, has violated the Constitution." Welch v. City of Biddeford Police Department, 12 F.4th 70 (1st Cir. 2021) citing Ashcroft v. Iqbal, 556 U.S. 662, 676, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009).

To set out a substantive due process claim, a plaintiff challenging specific acts of state officials must "show *both* that the acts were so egregious as to shock the conscience and that they deprived him of a protected interest in life, liberty, or property." Pagan v. Calderon, 448 F.3d 16, 32 (1st Cir. 2006) (emphasis in Pagan); see also Rivera v. Rhode Island, 402 F.3d 27, 33–34 (1st Cir. 2005) ("In order to establish a substantive due process claim, the plaintiff must first show a deprivation of a protected interest in life, liberty, or property. It is not enough to claim the governmental action shocked the conscience" because "[t]he implication of a fundamental right is a threshold requirement for establishing a due process violation") (citations omitted).

"It is well recognized that students have a fundamental right to bodily integrity that includes the right to be free from sexual abuse." Doe v. School Admin. Dist. No. 19, 66 F. Supp. 2d 57, 65 (D. Me. 1999). For example, in Doe v. Fornier, a minor, male student was sexually abused by a female adult teacher. She purchased alcohol for him and had sexual relations with him on December 7, 1996. The Court determined that the Plaintiff's bodily integrity was clearly violated in that case because of the teacher's sexual relations with the student. See Doe v. Fournier, 851 F. Supp. 2d 207, 219 (D. Mass. 2012), quoting Doe v. Taylor Indep. Sch. Dist., 15 F.3d 443, 451-52 (5th Cir. 1994) ("It is beyond question that the Fourteenth Amendment protects the right to bodily integrity and that right 'is necessarily violated when a state actor sexually abuses a schoolchild[.]'" (emphasis added). See also Doe v. Reg'l Sch. Unit No. 21, 2020 U.S. Dist. LEXIS 94295, at *2, *5 (D. Me. May 29, 2020) ("Defendants concede that Doe had a constitutionally protected substantive due process right to bodily integrity, which covers freedom from sexual abuse by a public school teacher" who "allegedly began to sexually abuse Doe in her classroom closet, in her car, and at her home") (emphasis added). See Ouellette v. Beaupre, 977 F.3d 127, 133 n.4 (1st Cir. 2020)(finding "deprivation of [Plaintiff's] constitutional right to be free from violations of bodily integrity at the hands of a state actor" is "appropriately characterized … as a Fourteenth Amendment substantive due process claim").

The same rule applies in other circuits – a student's due process rights can be violated as pertaining to physical abuse, not verbal harassment.  See Nace v. Pennridge Sch. Dist., 185 F. Supp. 3d 564, 575 (E.D. Pa. 2016) ("the Third Circuit did not intend to extend its holding to verbal harassment or abuse"); Abeyta v. Chama Valley Indep. Sch. Dist., No. 19, 77 F.3d 1253, 1255-56 (10th Cir. 1996) (holding that verbal sexual harassment does not support a §1983 claim).

There is no body of law upon which it would be clear to a reasonable official that one could violate a constitutional right to bodily integrity without engaging in any physical acts which actually violate a person's bodily integrity.  The cases cited all indicate that physical abuse must occur to constitute a Title IX violation under § 1983. All such cases involve a state actor committing physical acts of abuse: the Doe cases involve sexual abuse of male or female students by teachers; Ouellette involved a minor male plaintiff who was sexually abused and raped by a police officer of the Biddeford Police Department.

Here, discovery made clear that Ms. Wadsworth's bodily integrity was never compromised.  She admitted she was never physically contacted by Defendant Cavanaugh in an inappropriate or sexual manner.  According to Ms. Wadsworth's testimony, because of their working relationship, she and Mr. Cavanaugh were alone with one another in settings that were conducive to such advances and no such conduct occurred.  Indeed, Ms. Wadsworth explained in her deposition that

24

she trusted Mr. Cavanaugh, specifically denoting that part of the reason she trusted him was because he never made any physical advances towards her. She explained, the two had a joking relationship where she looked at him as a friend and "progressive" father figure, even as rumors spread about the two potentially having an inappropriate relationship. She described that the two of them would discuss adult topics and had adult themed jokes that they would say to one another. Ms. Wadsworth indicated that she was initially uncomfortable about these subjects but that her discomfort did not last and she genuinely believed that Mr. Cavanaugh was an adult who she could confide in like she would a friend and who was someone who was helping her in the time after she left her family home. She specifically testified that she did not want the dynamic of their relationship to change. She did not complain to Mr. Cavanaugh, to the school, to law enforcement or to her friends or family about Mr. Cavanaugh or her communications with him. Ms. Wadsworth also testified, and the district court found, that she did not experience distress while communicating with Mr. Cavanaugh or as an immediate result of their communications as they were occurring. Indeed, she testified in her deposition that it was not until years later when she changed her opinion on the propriety of Mr. Cavanaugh's behavior.

Having admitted there was no physically inappropriate contact or sexual relations of any kind between herself and Mr. Cavanaugh, the district court was

correct to conclude that Ms. Wadsworth's Fourteenth Amendment bodily integrity claim failed on the merits of the claim.

Ms. Wadsworth argues on appeal that the district court committed error because caselaw shows that this Circuit has not foreclosed the possibility that verbal harassment could shock-the-conscience. *See Brief of Plaintiff-Appellee/Cross-Appellant Adrianna Wadsworth* at pp. 59-63. In making this argument she points to dicta in <u>Brown v. Hot, Sexy, & Safer Prods. Inc.</u>, 68 F.3d 525, 532 (1st Cir. 1995) ("Although we have not foreclosed the possibility that … verbal harassment may constitute 'conscious shocking' behavior in violation of substantive due process rights ... our review of the caselaw indicates that the threshold for alleging such claims is high and that the facts here do not rise to that level,"); <u>Souza v. Pina</u>, 53 F.3d 423, 427 (1st Cir. 1995) ("While we do not foreclose the possibility that [an official's] statements ... or other forms of psychological harm, may [violate] a citizen's substantive due process rights, we find that the facts alleged here do not rise to that level,") (internal citations omitted); <u>Pittsley v. Warish</u>, 927 F.2d 3, 7 & n.3 (1st Cir. 1991) ("As despicable and wrongful as it may have been, the single threat … is not sufficient to 'shock the conscience'... This does not mean that under no circumstances will [verbal harassment] rise to the level of a constitutional violation."). Ms. Wadsworth also points to <u>Cruz-Erazo v. Rivera-Montanez</u>, 212 F.3d 617 (1st Cir. 2000).

The rights at issue in <u>Brown</u> were the Free Exercise Clause, the right to privacy and an alleged right to be free from offensive speech. The Court concluded that the plaintiffs in <u>Brown</u> failed to identify protected rights through their claim that their minor children's rights were violated through a school program showing sexually explicit content. <u>Brown</u>, <u>supra</u>. The statement from the <u>Brown</u> opinion that Ms. Wadsworth seeks to utilize in this case as authoritative support for her bodily integrity claim was in dicta and was not essential to the holdings of the case.

<u>Souza</u>, <u>supra</u>, is not a Title IX case. Nor does it involve a claim of violation to the plaintiff's bodily integrity. <u>Souza</u> involved statements made by a district attorney encouraging the media to connect an individual to recent murders, which the plaintiff, the administrator of the individual's estate, alleged was the reason the individual subsequently committed suicide. The right identified by the plaintiff in that case was the right not to be deprived of life without due process of law. The Court in <u>Souza</u> found that the plaintiff failed to identify any authority supporting their claim and dismissed the claim.[4]

---

[4] <u>Souza</u> was dismissed on qualified immunity grounds in an interlocutory appeal of the district court's denial of a defense motion to dismiss. However, the grounds on which the claims were dismissed was the lack of *any* authority to support the plaintiff's constitutional theory.

Pittsley, supra, is not a Title IX case. Nor does it involve a claim of violation to the plaintiff's bodily integrity. Pittsley involves a substantive due process claim against police officers for threats made by the officers to young children. The Court stated "[w]hile we certainly do not condone the acts of the police in this instance, the conduct complained of simply is not cognizable under § 1983" because "[t]he plaintiffs [] have not established a violation of any constitutionally recognized right."

Cruz-Erazo, supra, is also not a Title IX case, nor is it a case which involves a claim of violation of the plaintiff's bodily integrity. Cruz-Erazo involved a claim against the police for a pattern of threats and harassment that took place after the plaintiff tried to file a complaint against a fellow police officer. Contrary to what has been argued, the facts of Cruz-Erazo involved multiple threats, abuse of police authority, abuse of legal process, an alleged burglarizing of the plaintiff's home *and* allegations of physical violence. Further, the Court concluded that our precedent steer required the conclusion that appellants have failed to articulate a claim under the Fourteenth Amendment. Indeed, the Court in Cruz-Erazo applied Pittsley as authoritative precedent requiring dismissal of the plaintiff's claims.

None of these cases support Ms. Wadsworth's claims. Acknowledging that there is no supporting authority for her claim, Ms. Wadsworth asks the Court to reexamine the law, reverse the district court's summary judgment order, and permit

her to present her bodily integrity claim to a jury on a theory of constitutional jurisprudence which would be applied in the first instance in this case.

Ms. Wadsworth also points to out-of-circuit decisions which she argues are supportive of her position when they are not. *See Brief of Plaintiff-Appellee/Cross-Appellant Adrianna Wadsworth* at pp. 61-62. Contrary to Ms. Wadsworth's argument, in <u>Abeyta by & Through Martinez v. Chama Valley Indep. Sch. Dist. No. 19</u>, the Tenth Circuit refused to expand the right of bodily integrity to flagrant and repeated verbal abuse. 77 F.3d 1253, 1258 (10th Cir. 1996). The Third Circuit rejected the same request to expand the theory. <u>Bridges v. Scranton Sch. Dist.</u>, 644 Fed. Appx. 172 (3rd Cir. 2015). The South Carolina District Court came to the same conclusion. <u>Doe v. Georgetown County Sch. Dist.</u>, 2015 U.S. Dist. LEXIS 137934, *13 (D.S.C. Oct. 9, 2015).

Ms. Wadsworth also argues that <u>Harrington v. Almy</u> supports her position because the Court found that the plaintiff's continued employment was conditioned on an unwanted and mandatory medical procedure. 977 F.2d 37, 38-39 & 44 (1st Cir. 1992). In comparison, she argues that she too went through an intrusive medical treatment without her parents' consent. Except, Ms. Wadsworth contorts the facts of her case and makes an argument that she has not made at any point prior in this case in order to attempt the comparison between her case and the facts

of Harrington.[5]  Mr. Cavanaugh did not make Ms. Wadsworth go through any

medical treatment.  Ms. Wadsworth needed a physical to participate in

cheerleading, which she was intending to get regardless of whether Mr. Cavanaugh

or Mrs. Kenniston drove her to the doctor's office.  Mr. Cavanaugh did not force

Ms. Wadsworth to undergo any medical treatment, nor did he condition Ms.

Wadsworth's rights under Title IX in any way upon a medical procedure or an

intrusion of her bodily integrity of any kind.

**B.      The District Court Correctly Determined That Ms. Wadsworth's Claim
          Would Have Alternatively Failed Because Mr. Cavanaugh Would Be
          Entitled To Qualified Immunity.**

As the Court knows, qualified immunity protects government officials from

liability for civil damages for actions taken under color of state law.  See Harlow v.

Fitzgerald, 457 U.S. 800, 818 (1982). Where a plaintiff brings a § 1983 claim

against an individual public official, qualified immunity may shield the official

---

[5] During oral argument, the district court challenged Ms. Wadsworth's
counsel to cite one case where a court has found that a § 1983 action based on
sexual harassment was viable if there was no allegation of physical contact.
Consistent with the district court's research and the parties' submissions, Ms.
Wadsworth's attorney was unable to cite one case as authority for the proposition
that a § 1983 sexual harassment claim may proceed without some physical contact.
(Add. 293). Nor did Ms. Wadsworth cite to Harrington nor make this argument in
any way in *Plaintiff Adrianna Wadsworth's Omnibus Opposition to Defendants'
Motion for Summary Judgment*.  (District Court Dkt # 114). Theories not raised
squarely in the lower court cannot be broached for the first time on appeal.  Banco
Bilbao Vizcaya Argentaria v. Wiscovitch-Rentas (In re Net-Velazquez), 625 F.3d
34, 36 (1st Cir. 2010).

from both liability and litigation.  Bergeron v. Cabral, 560 F.3d 1, 5 (1st Cir.

2009). Qualified immunity protects officials who "make reasonable but mistaken

judgments about open legal questions," Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2085,

179 L. Ed. 2d 1149 (2011), but not those who "should have known their conduct

was unlawful." Haley v. City of Boston, 657 F.3d 39, 47 (1st Cir. 2011).

An official is entitled to qualified immunity if a court determines that either:

(1) "the facts alleged or shown by the plaintiff" do not "make out a violation of a

constitutional right"; or (2) "the right the plaintiff's suit is based on was not

'clearly established' at the time of the defendant's violation."  Pollack v. Regional

Sch. Unit 75, 12 F. Supp. 3d 173, 194-195 (D. Me. 2014), quoting Maldonado v.

Fontanes, 568 F.3d 263, 269 (1st Cir. 2009); see also Pearson v. Callahan, 555

U.S. 223, 236, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009).  "Put simply, qualified

immunity protects 'all but the plainly incompetent or those who knowingly violate

the law.'" Mullenix v. Luna, 577 U.S. 7, 12, 136 S. Ct. 305, 308 (2015).

In order to determine whether a right was "clearly established," a court first

asks "whether 'the contours of the right were sufficiently clear that a reasonable

official would understand that what he is doing violates that right.'" Pollack, 12 F.

Supp. at 195, quoting Mosher v. Nelson, 589 F.3d 488, 493 (2009) (internal

citations omitted).  "This inquiry 'focuses on the clarity of the law at the time of

the alleged civil rights violation.'" Pollack, 12 F. Supp. at 195, quoting

Maldonado, 568 F.3d at 269. Next, a court inquires "whether in the specific context of the case, 'a reasonable defendant would have understood that his conduct violated the plaintiffs' constitutional rights.'" Pollack, 12 F. Supp. at 195, citing Mosher, 589 F.3d at 493 (internal citations omitted). "This inquiry 'focuses more concretely on the facts of the particular case and whether a reasonable defendant would have understood that his conduct violated the plaintiffs' constitutional rights.'" Pollack, 12 F. Supp. at 195, citing Maldonado, 568 F.3d at 269.

Contrary to how it is argued in the *Brief of Public Justice as Amicus Curiae in support of Plaintiff-Appellee-Cross-Appellant*, for the rule to be considered settled law it must be dictated by controlling authority or a robust consensus of cases of persuasive authority. District of Columbia v. Wesby, 583 U.S. 48, 63 (2018). It is not enough that the rule is suggested by then-existing precedent. Id. Further, in the absence of controlling authority, a split among the Federal Circuits on the constitutional question at issue means that the law is not clearly established. Wilson v. Layne, 526 U.S. 603, 617 (1999).

On the first issue involving an analysis of the clarity of the law, Mr. Cavanaugh repeats and incorporates herein his discussion in Section A. above.

On the second issue – whether in the specific context of the case a reasonable defendant would have understood that his conduct violated the

plaintiff's constitutional rights – Mr. Cavanaugh asserts that the facts and the comparative law show that a reasonable official in his position would not have believed he was violating Ms. Wadsworth's constitutional rights.

Only a few cases have examined whether the defendant's alleged conduct was sufficient to shock the conscience. Hinkley v. Baker, 122 F. Supp. 2d 48, 52 (D. Me. 2000). In Abeyta, the Tenth Circuit held that it did not amount to sexual abuse actionable under Section 1983 when a teacher repeatedly called a twelve-year old girl a "prostitute" in front of the class for a period of several weeks. See Abeyta by & Through Martinez v. Chama Valley Indep. Sch. Dist. No. 19, 77 F.3d 1253, 1259-1260 (10th Cir. 1996). In arriving at this conclusion, the court found it significant that there had been no allegations of "sexual assault, molestation, or touching of any sort." Id. at 1255. In Boldthen v. Indep. Sch. Dist. No. 2397, 865 F. Supp. 1330 (D. Minn. 1994), the court held that a twelve-year old plaintiff had no Section 1983 claim against a school principal for patting her on the back or on the hand, even though the principal knew that the student feared her. See id. at 1334, 1337. Although the plaintiff in that case cited several cases of sexual abuse supporting her Section 1983 claim, the plaintiff did not allege that this patting was at all sexual in nature. See id. at 1337.

On the other hand, in Doe v. Beaumont I.S.D., 8 F. Supp. 2d 596 (E.D. Tex. 1998), the court found that a teacher's alleged touching of the plaintiffs' breasts

could constitute sexual abuse that shocked the conscience. See id. at 606-07. In Beaumont, two eleven-year-old fourth grade girls complained that one of the schoolteachers would drape his arm over their shoulders, with his hand touching their chest areas. See id. at 602-03. The defendant argued that this type of touching did not rise to the level of sexual abuse that shocked the conscience. See id. at 605. After analyzing the relevant case law, the court stated that it felt uncomfortable "gauging social norms" of whether touching a girl's breasts was shocking. See id. at 607. Denying summary judgment, the court held that it would hear all of the evidence before deciding whether the alleged conduct could or could not rise to a level that shocks the conscience. See id.

Notably, Ms. Wadsworth never accused Mr. Cavanaugh of sexual harassment. Rather, as discussed above, she spoke with him about matters such as her menstruation cycle and about issues she was experiencing. She spoke to him about intercourse with other people her age. It was in this context that Mr. Cavanaugh spoke about birth control as a potential solution to her menstruation issues. In fact, even at of the time of her deposition, she testified that she relied upon Mr. Cavanaugh and Mr. Nugyen for "all of her private issues." Indeed, when Plaintiff was inappropriately touched by her cheerleading coach, she called a friend and the next person she called to confide in was Mr. Cavanaugh. Ms. Wadsworth also testified that she was educated by her conversations with Mr. Cavanaugh.

Though she was initially uncomfortable with some of the conversations, it got to a point where she would rely upon Mr. Cavanaugh and joke with him about these matters, even as rumors spread about them having an allegedly inappropriate relationship. This was the context of Ms. Wadsworth and Mr. Cavanaugh's relationship in which she now claims that her constitutional rights were violated because of some of the text comments or conversations that were exchanged. Most importantly, Mr. Cavanaugh never made any physical advance upon Ms. Wadsworth, never touching her inappropriately or sexually in any way. Therefore, it cannot be stated that Mr. Cavanaugh knew he was engaging in a violation of Ms. Wadsworth's constitutional rights to bodily integrity under the Fourteenth Amendment in the context of this case.

C.     **The State Created Danger Doctrine Is Completely Inapplicable To Ms. Wadsworth's Claims Against Mr. Cavanaugh.**

The state created danger doctrine is inapplicable to Ms. Wadsworth's claims against Mr. Cavanaugh. The state created danger doctrine was not formally recognized as a viable substantive due process theory in this Circuit until November 5, 2020. Irish v. Fowler, 979 F.3d 65, 75 (1st Cir. 2020). It is a theory in which a state actor may be held liable for a violation of the substantive due process clause of the Fourteenth Amendment for an injury caused by private violence. It arises as an exception to DeShaney v. Winnebago Cnty. Dep't. of Soc. Servs., 489 U.S. 189, 197 (1989), wherein the Supreme Court stated as a general

matter, "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." Id. at 197. That is not Ms. Wadsworth's theory against Mr. Cavanaugh. Ms. Wadsworth alleges that Mr. Cavanaugh was *the* person that caused her alleged injury, not a state actor who engaged in an affirmative act that created or enhanced the danger of private violence. As to Mr. Cavanaugh, the state-created danger doctrine is completely inapplicable.

Further, to the extent that Ms. Wadsworth is attempting to apply the state-created danger doctrine to Defendant Cavanaugh, he is entitled to qualified immunity.

Irish II was not decided until November, 2020, three years after the latest allegation against Defendant Cavanaugh. Irish I, an earlier interlocutory appeal to the First Circuit arising out of the same case, was decided in March, 2017. In Irish I, the First Circuit made the following statement about the existence of the state-created danger theory in the circuit:

> The Fourteenth Amendment's Due Process Clause provides that "[n]o State shall ... deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. As a general matter, "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *DeShaney*, 489 U.S. at 197. But some circuit courts have recognized the "state-created danger" exception to this rule based on language in *DeShaney* that "suggested, but never expressly recognized, the possibility that when the state creates the danger to an individual, an affirmative duty to protect might arise." *Rivera*, 402 F.3d at

36

34-35 (*citing DeShaney*, 489 U.S. at 201).3 At least eight sister circuits have recognized the existence of the state-created danger theory. *See Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1061 n.1 (9th Cir. 2006) (collecting cases). **While this circuit has discussed the possible existence of the state-created danger theory, we have never found it applicable to any specific set of facts.**

Irish v. Maine, 849 F.3d 521, 525-526 (1st Cir. 2017)(emphasis added).

As of 2017, the state-created danger theory was not explicitly recognized in the First Circuit and had never been applied to any specific set of facts. This is highly relevant to the qualified immunity analysis. Not only had the First Circuit not adopted the theory, but in the cases in which it was discussed, the Court specifically declared that the theory *did not* apply to the fact pattern of each of what are now described by the First Circuit as the "contours" cases. The theory was not adopted by the First Circuit as a viable source of substantive due process rights until 2020.

Ms. Wadsworth's Amended Complaint alleges that Mr. Cavanaugh violated § 1983 by engaging in harassment and discrimination. (RA 60). Conversely, she alleged that Mr. Nguyen violated her rights by failing to protect her from Defendant Cavanaugh. (RA 61).

Ms. Wadsworth's attempt to raise a new theory of liability against Mr. Cavanaugh in her opposition to his motion for summary judgment was improper. See Miranda-Rivera v. Toledo-Davila, 813 F.3d 64, 76 (1st Cir. 2016) ("Plaintiffs may not raise new and unadvertised theories of liability for the first time in

opposition to a motion for summary judgment."). Although the district court reasoned that it could potentially analyze Ms. Wadsworth's claims under the state-created danger test announced in Irish II, the court ultimately concluded that Ms. Wadsworth could not prove the underlying substantive due process violation essential to either her bodily integrity or her state-created danger claim. The result was correct and should be affirmed.

## D.    The District Court's Order Allowing Mr. Cavanaugh's Motion For Summary Judgment On Ms. Wadsworth's Equal Protection Claims Should Be Affirmed.

Ms. Wadsworth argues that it was clearly established that Mr. Cavanaugh's conduct violated Ms. Wadsworth's right to equal protection without developing any argument on the issue. The failure to develop an argument waives it. United States v. Bulger, 816 F.3d 137, 140 (1st Cir. 2016).

The district court's finding Ms. Wadsworth met that burden at the summary judgment stage on her equal protection claim was also flawed as the court used "all male students at MVHS" as her similarly situated comparator. This Court has made clear that the similarly situated analysis requires comparison to a factually similar comparator, not all male students attending the same school that Ms. Wadsworth attended. See, e.g., McCann, 365 F. Supp. 3d at 147 ("[t]he complaint d[id] not allege either that [the student] was treated differently than other similarly situated students with disabilities, or that the School Department's actions were

based on ... impermissible considerations"); <u>Harrington v. City of Attleboro</u>, 172 F. Supp. 3d 337, 346 (D. Mass. 2016) ("Plaintiffs, however, fail to allege any facts or argue in their opposition that [defendants] treated the harassment of [the victim] by her peers differently than that of any other student, let alone that such treatment was because of her membership in a protected class"); <u>Thomas v. Town of Chelmsford</u>, 267 F. Supp. 3d 279, 303 (D. Mass. 2017) (concluding that "[t]he plaintiffs do not show any similarly situated comparator" because "[t]he plaintiffs' equal protection claim is based entirely on how school officials might have treated a hypothetical, similarly situated female rape victim" and "[s]uch conjecture does not suffice to state an equal protection claim"); <u>Doe v. Town of Stoughton</u>, No. CIV.A. 12-10467-PBS, 2013 U.S. Dist. LEXIS 173030, at *13 (D. Mass. Dec. 10, 2013) ("[t]o the extent Plaintiff asserts that [the defendant] is a mandated reporter who failed to report [the perpetrator's] felonious actions ... Plaintiff does not allege that in other circumstances similarly situated students were treated differently than her); <u>Pollard v. Georgetown Sch. Dist.</u>, 132 F. Supp. 3d 208, 223 (D. Mass. 2015) (although [plaintiff] alleges that the District afforded [the victim] a lower level of protection compared to 'other students,' she never alleges any facts to establish that these students are similarly situated"). The district court's discussion of Brent Stewart bears no relation to Ms. Wadsworth's rights under the equal protection clause. This is also not a case involving allegations of quid pro quo harassment or

retaliatory discipline. <u>Contra. Lipsett v. University of Puerto Rico</u>, 864 F.2d 881, 884 (1st Cir. 1988). To the extent the Court were inclined to disturb the district court's order allowing summary judgment on Ms. Wadsworth's equal protection claim, applying the similarly situated analysis with "all male students" as a comparator was an error of law.

In Ms. Wadsworth's limited equal protection discussion, she admits that there is no caselaw holding that a teacher sexually harassing a student could result in an equal protection violation. This is accurate and is precisely why the Court allowed Mr. Cavanaugh's request for qualified immunity on this claim. As is the case in her arguments before this Court, Ms. Wadsworth offered no First Circuit caselaw holding that a teacher's non-physical sexual harassment of a student violates her Equal Protection rights, where the conduct does not involve hostility or direct sexual advances. This being the case, the district court's application of qualified immunity must be affirmed.

## CONCLUSION

For the foregoing reasons, Defendant/Cross-Appellee, Andrew Cavanaugh, respectfully asks the Court to affirm the District Court's *Order on Andrew Cavanaugh's Motion for Summary Judgment.*

Respectfully submitted,

DEFENDANT/CROSS-APPELLEE,
ANDREW CAVANAUGH

By their attorney:

*/s/ Joseph A. Padolsky*
Douglas I. Louison, Bar #57265
dlouison@lccplaw.com
Joseph A. Padolsky, Bar #1153317
jpadolsky@lccplaw.com
Louison, Costello, Condon & Pfaff, LLP
10 Post Office Square, Suite 1330
Boston, MA  02109
(617) 439-0305

Dated:  January 22, 2024

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT**

     1. This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) excluding the parts of the document exempted by Fed. R. App. P. 32(f) because this document contains 10,391 words.

     2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-face requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in proportionally spaced typeface using Microsoft Word 2016 in Times New Roman text at a 14-point font size.

<u>January 22, 2024</u>               <u>*/s/ Joseph A. Padolsky*</u>
Date                            Joseph A. Padolsky, Esq.

**CERTIFICATE OF SERVICE**

I hereby certify that on this January 22, 2024, I electronically filed the foregoing document with the United States Court of Appeals for the First Circuit by using the CM/ECF system.  I certify that the following parties or their counsel of record are registered as ECF Filers and that they will be served by the CM/ECF system:

| | |
|---|---|
| Eric R. LeBlanc | John J. Wall, III |
| Bennett & Belfort, P.C. | Monaghan Leahy, LLP |
| 24 Thorndike Street, Suite 300 | 95 Exchange Street |
| Cambridge, MA 02141 | P.O. Box 7046 |
| | Portland, ME 04112 |
| | |
| Rachel D. Okun | Melissa A. Hewey |
| Okun Law PLLC | Drummond Woodsum |
| 251 US-1, Suite W18 | 84 Marginal Way, Suite 600 |
| Falmouth, ME 04105 | Portland, ME 04101 |

Sean Ouellette
Mollie Berkowitz
Adele P. Kimmel
PUBLIC JUSTICE
1620 L Street NW, Suite 630
Washington, DC 20036

January 22, 2024                              */s/ Joseph A. Padolsky*
Date                                                Joseph A. Padolsky, Esq.